IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHAMPION ENTERPRISES, INC., et al., [1] | ) | Case No. 09-14019 (___) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

## DECLARATION OF PHYLLIS KNIGHT, CHIEF FINANCIAL OFFICER OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS

I, Phyllis Knight, hereby declare that the following is true to the best of my knowledge, information and belief:

1.     I am the Chief Financial Officer of Champion Enterprises, Inc. and an officer of its domestic subsidiaries including each of the above-captioned debtors in these Chapter 11 cases (the "Debtors"). I joined Champion Enterprises, Inc. as Chief Financial Officer in October 2002.

2.     I began my career in public accounting with KPMG Peat Marwick where I spent nine years with significant focus on banking and financial services transaction support (mergers, acquisitions and capital markets support services). Prior to joining Champion, I served as president of the Mortgage Services Division of Conseco Finance Corporation. Beginning in 1994, I held a variety of executive positions, including senior vice president and treasurer of Conseco Finance leading the company's extensive capital markets efforts.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642). The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

3. I am familiar with the Debtors' day-to-day operations, business affairs and books and records. Except as otherwise indicated, all statements set forth in this declaration are based upon: (i) my personal knowledge, including my knowledge of the homebuilding industry, (ii) information supplied to me by other members of the Debtors' management, workforce or professionals in the ordinary course of business, (iii) my review of relevant documents, or (iv) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon to testify, I would and could testify competently to the facts set forth herein.

4. On the date hereof (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). To minimize the adverse effects of filing for Chapter 11 protection and to enhance the Debtors' prospects of the success of the Chapter 11 cases, the Debtors have filed a number of motions requesting various types of relief from the Court (each, a "First Day Motion" and collectively, the "First Day Motions"). The First Day Motions seek relief aimed at, among other things preserving supplier confidence and employee morale, assuring customers of the stability of the Debtors, and minimizing disruption to the Debtors' business operations. Each of the First Day Motions is crucial to the Debtors' efforts to reorganize and maximize creditors' recoveries in an orderly manner. All capitalized terms not defined herein shall have the meanings given to them in the applicable First Day Motion.

5. In accordance with the local bankruptcy rules, the Debtors have also requested that the Court schedule an emergency hearing at its earliest convenience to consider the First Day Motions.

2

6.     Part I of this declaration describes the Debtors' businesses, their capital structure, and the circumstances surrounding the commencement of these Chapter 11 cases. Part II sets forth the relevant facts in support of each First Day Motion.

## PART I

## OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

### A. Summary of the Debtors' History and Business

7.     Champion Enterprises, Inc. and its Debtor and non-debtor subsidiaries (referred to variously herein as "Champion" or the "Company") are international manufacturers of factory-built homes and modular buildings, with operations in the United States, Canada, and the United Kingdom. Buildings constructed by the Company consist of both single and multi-module units designed for either commercial or residential purposes. Champion products range from single-module HUD-Code Homes (as defined below) to sophisticated commercial structures such as hotels.

8.     Champion's North American manufacturing operations consist of 22 homebuilding facilities in 13 states and three provinces in western Canada. Champion homes are sold through more than 1,400 independent sales centers, builders and developers across the U.S. and western Canada and also through a retail segment that operates 14 sales offices in California.

9.     The Debtors' manufacturing facilities and corporate headquarters employ approximately 1,994 Employees. The majority of the Debtors' Employees, approximately 1,327 in all, perform critical core manufacturing functions in the Debtors' U.S. manufacturing facilities. An additional 667 of the Debtors' Employees provide administrative support,

3

including engineering, purchasing, human resources, financing and accounting services to the manufacturing facilities.

10.     Champion reported a loss before income taxes for the year ended January 3, 2009 of $52.0 million versus income of $3.9 million in 2007. Compared to 2007, Champion's 2008 manufacturing segment income declined $27.1 million or 67% on a 23% decline in sales. In their most recently reported quarterly results for the second quarter of 2009, Champion reported a loss before income taxes of $13.3 million compared to pretax income of $3.6 million in the same period of 2008. Revenues for the quarter decreased 55.2% to $129.5 million compared to $289.2 million for the second quarter of 2008.

**B.     Company History**

11.     Champion was founded in 1953, in Dryden, Michigan, by Walter W. Clark and Henry E. George. During that first year of operations, each home was built by hand at a pace of two per week. Today, Champion has the capacity to build over 1,000 homes per month and continues to transform the factory-built housing industry by expanding its product offerings and developing creative solutions for affordable, quality housing. Throughout the past half century, Champion has built travel trailers, RVs, trailer homes, campers, commercial buses, and mobile homes. Today, Champion focuses primarily on building innovative manufactured and modular homes, as well as modular buildings for government and commercial applications. As the Company has grown throughout the years, it has acquired some of the most well-known and respected brand names in the industry, including Carolina Building Solutions, Commander, Dutch, Fortune, Highland Manufacturing, Homes of Merit, Moduline, New Era, New Image, North American, Redman, Silvercrest, SRI, Summit Crest and Titan. Since Champion was founded in 1953, the Company has built and sold more than 1.7 million homes.

4

12. In its early years, Champion was an innovator and market leader in the manufactured and mobile home industry. In the late 1950's, Champion entered the recreational vehicle market with the production of campers and camp trailers. In the 1960's, Champion introduced its first "double-wide" mobile home product, conducted an initial public offering of shares of its common stock, and began production of motor home recreational vehicles. During the 1970's and 1980's, Champion actively worked to grow its business by expanding into businesses to produce medium duty buses and commercial vehicles, develop manufactured housing communities, open retail sales centers, and provide retail financing for the purchase of manufactured homes. By the early 1990's, Champion closed or sold most of these non-core businesses and focused upon manufacturing.

13. From 1994 to 1999, Champion significantly expanded its manufactured housing production operations through acquisitions, internal growth and, in 1996, its merger with Redman Industries, Inc. ("Redman"). During the period, Champion acquired eight manufactured housing companies that operated 18 manufactured housing facilities at the time of acquisition. Among the companies acquired were Dutch Housing, Inc. in Michigan and Indiana; Chandeleur Homes, Inc. and Homes of Legend, Inc. in Alabama; and Homes of Merit, Inc. in Florida. In addition, from 1996 through 1999 the Company opened 17 new production facilities. As a result of this growth, Champion's manufacturing revenues increased from $310 million in 1993 (excluding Redman sales) to $1.98 billion in 1999.

14. Throughout its history, Champion has attempted to diversify and vertically integrate by expanding into a number of operations to support its core manufacturing operations. Reminiscent of its early attempts to expand in the 1970's and 1980's, Champion pursued a broad strategy to expand and vertically integrate during the late 1990's and early 2000's. This effort

5

toward vertical integration proved difficult from the start and, as a result, was short-lived. Ultimately Champion decided to refocus upon its manufacturing operations. These attempts at diversification over the period 1998 to 2002 include the following:

a.  During 1998 and 1999, Champion significantly expanded its retail operations by completing the acquisitions of 15 retail organizations which operated 178 sales centers throughout the U.S. Among those acquired were Southern Showcase Housing, Inc. headquartered in North Carolina; Advantage Homes, Inc. in California; Iseman Homes, Inc. in South Dakota; A-1 Homes in Texas; and Trading Post Mobile Homes, Inc. in Kentucky. At the beginning of 2000, the Company had 308 retail locations in 28 states. In 2003, Champion began a program to reduce the number of its retail sales centers in response to industry conditions and to eliminate unprofitable locations. By the end of 2005, Champion had closed most of its traditional retail sales centers and reduced its retail operations to 20 Advantage Homes sales offices in California. Champion's remaining retail operations now consist of 14 Advantage Homes sales offices that specialize in replacing older homes within local manufactured housing communities with new manufactured homes.

b.  In 1999, Champion formed Champion Development Corp. to make minority interest investments in manufactured housing community developments. During 2002 and 2003, market conditions led Champion to divest a number of its interests in communities and close its management and development administrative offices.

c.  In 2002, Champion acquired the manufactured housing consumer loan origination business of CIT Group/Sales Financing, Inc. Through this business, operated as HomePride Finance Corp., Champion originated and funded loans to consumers who purchased Champion manufactured homes from both Company-owned and independent retailers. However, Champion's inability to obtain satisfactory financing for this business caused it to exit the consumer finance business in the third quarter of 2003.

15.  Since 2005, Champion has acquired a number of companies as part of a strategy to grow and diversify their revenue base while remaining focused on its core competency of manufacturing structures in factories. Champion sought to increase its modular homebuilding presence in the U.S. and to find factory-built construction opportunities outside of the U.S. The acquisitions included the following:

6

a. On August 8, 2005, Champion acquired the assets and business of New Era Building Systems, Inc. and its affiliates, Castle Housing of Pennsylvania, Ltd. and Carolina Building Solutions, L.L.C. These companies are primarily manufacturers of modular housing located in Pennsylvania and North Carolina;

b. On March 31, 2006, Champion acquired 100% of the membership interests of Highland Manufacturing Company, LLC, a manufacturer of modular and HUD-code homes that operates one plant in Minnesota;

c. In April 2006, the Company acquired Calsafe Group (Holdings) Limited and its operating subsidiary Caledonian Building Systems Limited ("Caledonian"), a leading modular manufacturer in the U.K. Caledonian operates four manufacturing facilities in Newark, Nottinghamshire. Caledonian is a leading modular manufacturer in the U.K. that constructs steel-framed modular buildings for uses such as prisons, military accommodations, hotels and residential units, among other things. Caledonian competes in the U.K. custom modular industry, which also competes with traditional commercial builders in the construction of permanent, multi-story buildings. Caledonian is the only UK modular builder that focuses solely on the custom market;

d. On July 31, 2006, Champion acquired certain of the assets and the business of North American Housing Corp. and an affiliate. North American is a modular homebuilder that operates manufacturing facilities in Virginia;

e. On December 21, 2007, the Company acquired substantially all of the assets and the business of western Canada-based SRI Homes Inc., which operates three manufacturing plants in the provinces of Alberta, British Columbia and Saskatchewan; and

f. On February 29, 2008, the Company acquired 100% of the capital stock of United Kingdom based ModularUK Building Systems Limited ("ModularUK"), a producer of steel-framed modular buildings serving the healthcare, education and commercial sectors.

16. As a result of these acquisitions, and the divestitures of many of its previous businesses, Champion Enterprises, Inc. currently controls eighteen operating affiliates in the U.S., three operating affiliates in Canada and two operating affiliates in the U.K. A copy of the Debtors' organizational chart is attached hereto as **Exhibit A**.

## C.   Summary of Operations

17.   In 2008, Champion's North American manufacturing segment sold 11,406 homes. Approximately 56.1% of the homes Champion produced in 2008 were constructed to building standards in accordance with the National Manufactured Home Construction and Safety Standards promulgated by the U.S. Department of Housing and Urban Development ("HUD-Code Homes" or "Manufactured Homes"). The HUD Code regulates Manufactured Home design and construction, strength and durability, fire resistance and energy efficiency. Other than the HUD-Code Homes, the remaining homes and units Champion produced in 2008 consisted of (a) modular homes and units designed and built to meet local building codes, (b) homes sold and primarily manufactured in Canada and (c) park models.[2]

18.   Champion produces a broad range of homes under various trade names and brand names and in a variety of floor plans and price ranges. While most of the homes Champion builds are single-family, multi-section, ranch-style homes, Champion also builds two-story, single-section, and Cape Cod style homes as well as multi-family units such as town homes, apartments, duplexes and triplexes. The single-family homes that Champion manufactures generally range in size from 400 to 4,000 square feet and typically include two to four bedrooms, a living room and/or family room, a dining room, a kitchen and two full bathrooms.

19.   Champion constructs homes in indoor facilities using an assembly-line process employing generally 100 to 200 production employees at each facility. Manufactured Homes are constructed in one or more sections (also known as floors) on a permanently affixed steel support frame that allows the section(s) to be moved through the assembly line and transported upon

---

[2] Park models are temporary quarters built on a frame which are generally used in resort or vacation locations. They are built in accordance with recreational vehicle construction codes. Although they are small (less than 400 square feet), they can be fully appointed inside.

8

sale. The sections of many of the modular homes Champion produces are built on wooden floor systems and transported on carriers that are removed upon placement of the home at the home site. The efficiency of the assembly-line process, protection from the weather, and favorable pricing of materials enables Champion to produce homes more quickly and often at a lower cost than a conventional site-built home of similar quality.

20.     Champion's factory-built homes are distributed through over 1,400 independent retailers, builders and developers, and Champion's California-based retail segment.

21.     Champion offers its products and services through five distinct operating segments. These five segments are summarized below.

22.     **U.S. Manufacturing**. Based on 2008 industry data, Champion is the largest producer of modular housing and the third largest producer of HUD-code homes in the United States. Factory-built homes manufactured by Champion range from single-section HUD-code homes to multi-section modular homes that are nearly indistinguishable from site-built properties. Champion currently operates 17 homebuilding facilities throughout the U.S. Factory-built homes are sold through independent sales centers, builders, and developers, as well as through Champion's retail segment. During 2008, Champion had a 7.8 percent and 11.7 percent market share of the U.S. HUD-code and modular housing markets, respectively.

23.     **Canada Manufacturing**.[3] Champion is the leading producer of factory-built housing in western Canada. The Canadian operation is an autonomous segment of the Company that manufactures factory-built homes for a diverse set of customers, including homebuyers in rural areas not traditionally served by site-built construction and regions driven by energy-related growth. Champion currently operates five plants in three provinces in western Canada.

---

[3] There were no bankruptcy or other proceedings filed for the companies in the Canada Manufacturing segment, and the intent is that such operations will not be impacted by the United States filings.

9

Canadian operations have historically averaged a 60 percent share of the western Canada factory-built housing market.

24. **Star Fleet**. Debtor Star Fleet, Inc. ("Star Fleet") is a wholly-owned subsidiary of Champion, specializing in the transportation of manufactured housing, recreational vehicles, semi trailers, flat beds, tankers, boats, conversion vans, cargo trailers, and horse trailers from manufacturing facilities to retailers. Star Fleet operates as an autonomous segment of the Company and provides services to Champion's U.S. and Canadian manufacturing segments as it would any other third-party customer. Star Fleet works with independent owner-operators who provide and drive the equipment used to transport products for Star Fleet. Star Fleet qualifies and supports each of these owner operators to ensure that they are able to provide the highest level service to the Star Fleet customer base. Star Fleet currently has over 500 customers, including several Champion plants, which accounted for 12.6 percent of Star Fleet's total net sales of $67 million during 2008.

25. **Retail**. The Company's retail segment is comprised of 14 sales offices that sell manufactured houses to consumers throughout California. These sales offices specialize in replacing older homes within manufactured housing communities with new Manufactured Homes. Champion sales agents locate vacant spaces and available spaces to be renovated in local communities and order a home from a manufacturer, which is typically a Champion plant. Homes can be placed in communities without a current customer, as a customer trade-in, or as a customer order for an approved buyer. The homes are placed on the leased sites and independent contractors are engaged to prepare the home and arrange site and home improvements such as decks, porches, landscaping and air conditioning. Of the total new homes sold by the Debtors' retail segment in 2008, 88.5% were Champion- produced.

10

26. **International**.[4] Champion's international segment ("International") is comprised of Caledonian, which was acquired in April 2006, and Caledonian's subsidiary ModularUK, which was acquired in February 2008. As described above, Caledonian is a leading modular manufacturer in the U.K. that constructs steel-framed modular buildings for use as prisons, military accommodations, hotels, large-scale residential units, and various other commercial and institutional applications. Depending on the size and nature of a project, International will operate as either the general contractor or as a sub-contractor. For projects in which International is the general contractor, the Company will manage the entire construction process and outsource work to sub-contractors. Typical Caledonian projects range between £5-6 million in revenue. Caledonian has key framework agreements in place with its major customers, including Her Majesty's Prison Service and, through a third-party prime contractor, the U.K. Ministry of Defence ("MoD").

D. **Capital Structure**

27. Champion finances its operations with secured debt, unsecured notes, and equity as described in detail below.

**Secured Debt**

28. Champion has a senior secured credit agreement, as amended, (the "Prepetition Credit Agreement") with various financial institutions including Credit Suisse ("CS") as agent. The Prepetition Credit Agreement is comprised of the following: (a) a secured U.S. term loan (the "Term Loan") of approximately $45.4 million as of the Petition Date; (b) a secured Sterling denominated term loan (the "Sterling Term Loan") of approximately $59.9 million as of the

---

[4] There were no bankruptcy or other proceedings filed for the companies in the International segment, and the intent is that such operations will not be impacted by the United States filings.

Petition Date; (c) a revolving line of credit (the "Revolver") in the amount of $40.0 million, of which approximately $26.6 million is drawn as of the Petition Date; and (d) a letter of credit facility (the "Synthetic LC Facility") in the amount of $43.1 million (inclusive of interest and fees) which supports certain letters of credit and is an undrawn facility but is referred to as "synthetic" because it is supported by cash funded to a CS account, plus certain interest and fees, as applicable.

29. The Prepetition Credit Agreement is secured by a first security interest in substantially all of the assets of the domestic operating subsidiaries of the Champion. As of the Petition Date, letters of credit issued under the Revolver totaled $12.9 million, while an additional $42.1 million are issued pursuant to the Synthetic LC Facility. The maturity date for the Revolver is October 31, 2010. The maturity date for the Term Loan, the Sterling Term Loan and the Synthetic LC Facility is October 31, 2012. Each of the Debtors is a guarantor under the Prepetition Credit Agreement. Each of the Company's primary debt instruments contains cross default provisions whereby a default under one instrument that results in the debt being accelerated or declared due and payable, if not cured or waived by the lenders, could cause an acceleration or default under its other debt instruments.

30. The Prepetition Credit Agreement contains affirmative and negative covenants requiring certain maximum senior leverage, minimum interest coverage and minimum fixed charge coverage, all as defined in the Prepetition Credit Agreement. During October 2008, an amendment to the Prepetition Credit Agreement (the "Amendment") was completed. The Amendment covers the period from September 27, 2008 through January 2, 2010 (the Company's 2009 fiscal year end) and, among other things, eliminated the maximum senior leverage ratio, minimum interest coverage ratio and minimum fixed charge ratio covenants in

12

exchange for new covenants requiring minimum liquidity and minimum twelve-month adjusted EBITDA measured quarterly and as defined in the Prepetition Credit Agreement. The Amendment also required that the Company prepay $10.0 million of the Revolver, $10.4 million of the U.S. Term Loan and $13.1 million of the Sterling Term Loan in addition to reducing the Synthetic LC Facility by $17.5 million, for a total reduction of $40.0 million. Further, the Amendment requires quarterly principal payments for the Term Loan and the Sterling Term Loan totaling $5.0 million during 2009. Thereafter the Prepetition Credit Agreement requires quarterly principal payments for the Term Loan and the Sterling Term Loan totaling approximately $1.0 million annually.

31.     As a result of deteriorating operating results throughout 2009, the Company was not in compliance with its amended minimum liquidity and minimum twelve-month adjusted EBITDA covenants for the quarter ended July 4, 2009. In addition, the Company did not make certain interest and principal payments due at or around the end of its third fiscal quarter. The Company has obtained a waiver of certain covenants and a forbearance agreement with respect to the missed payments under the Prepetition Credit Agreement (as amended) through November 13, 2009. Absent this waiver or upon its expiration, if not extended, a majority of the Company's senior lenders could cause an acceleration of the outstanding indebtedness under the Prepetition Credit Agreement. During the period of the waiver, the Prepetition Credit Agreement debt is subject to an additional 2% per annum of interest, payable in kind. The waiver also requires the Company to engage a financial advisor, and to provide certain enhanced weekly and monthly financial and operating information.

**Convertible and Unsecured Notes**

32.     In the fourth quarter of 2007, Champion issued $180 million of 2.75% Convertible Notes (the "Convertible Notes") that provided $174.1 million of net proceeds.

13

Interest on the Convertible Notes is payable semi-annually on May 1 and November 1 of each year. The Convertible Notes are convertible into approximately 47.7 shares of Champion common stock per $1,000 of principal. The conversion rate can exceed 47.7 shares per $1,000 of principal when the closing price of Champion's common stock exceeds approximately $20.97 per share for one or more days in the 20 consecutive trading day period beginning on the second trading day after the conversion date. Holders of the Convertible Notes have the right to require Champion to repurchase all or a portion of their Notes on November 1 of 2012, 2017, 2022, 2027 and 2032. Champion has the right to redeem the Convertible Notes, in whole or in part, for cash at any time after October 31, 2012. The use of proceeds from this note issuance was to facilitate the tender offer for the Company's 2009 Senior Notes, certain reductions of the Pre-Petition Credit Agreement and general corporate purposes.

**Common Stock Holdings**

33.     Champion Enterprises, Inc.'s common stock is listed on the New York Stock Exchange as ChampEnt and the Chicago Stock Exchange as Champ Enterprises and has a ticker symbol of "CHB" for both Exchanges. As of the Petition Date, Champion Enterprises, Inc. had issued approximately 77.8 million shares of common stock to approximately 3,590 shareholders of record and approximately 11,517 beneficial holders. Champion Enterprises, Inc. also has potentially dilutive securities consisting of convertible debt, outstanding stock options, restricted stock awards and performance share awards.

34.     On December 17, 2008, Champion received notice from the New York Stock Exchange ("NYSE") that it was below the criteria relating to minimum share price of $1.00 for securities listed on the exchange (the "Average Price Rule"). Under rules of the exchange, the NYSE may start delisting proceedings for companies whose 30-day average price falls below $1.00. On February 26, 2009 NYSE suspended the Average Price Rule through June 30, 2009

14

and on July 7, 2009 NYSE announced the suspension of Average Price Rule would only be extended through July 31, 2009. Champion's cure period is set to expire on or about November 18, 2009.[5]

## Additional Liabilities

35. As of the Petition Date, the Company was contingently obligated for approximately $55.1 million under letters of credit, primarily comprised of $34.4 million to support insurance reserves and $12.6 million to support long-term debt. Champion was also contingently obligated for approximately $6.1 million under surety bonds, generally to support license and service bonding and other performance requirements, and an additional $2.0 million to support repurchase obligations.

36. In addition, as of October 3, 2009, Champion Enterprises, Inc. and its affiliated Debtors owe approximately $60.5 million in accrued expenses (excluding accrued interest of approximately $2.1 million) and approximately $12.7 million in accounts payable. Further, as of November 13, 2009, Champion Enterprises, Inc. and its affiliated Debtors owe approximately $40.0 million in repurchase obligations as further discussed in paragraph 42 below, approximately $9.3 million in dealer volume discount obligations, and approximately $610,000 in warranty obligations for warranty services that have been provided as of the Petition Date in addition to approximately $2.3 million in general warranty obligations.

## E.    Events Leading to Bankruptcy

37. Each Champion operating segment serves a unique end market and is influenced by different risk factors. The severity and breadth of the global economic downturn has

---

[5] The NYSE ruled that Champion could not extend its cure period by proposing a reverse split at its annual meeting in May 2010.

significantly impacted each respective end market, resulting in reduced operating performance across all Champion business units. The market for factory-built housing is affected by a number of factors, including the availability, cost and credit underwriting standards of consumer financing, consumer confidence, employment levels, general housing market and other economic conditions and the overall affordability of factory-built housing versus other forms of housing. As discussed below, these factors have each contributed to Champion's decision to file for protection under the Bankruptcy Code

## Reduced Demand for Housing

38.     During 2007 and 2008, the broader U.S. housing market declined considerably, with 2008 registering a 41% decline in new single-family housing starts and a 38% decline in new home sales versus 2007 levels. In addition, average selling prices in many U.S. markets saw significant declines, and inventories of unsold homes continued to increase. Industry shipments of modular homes, which are more directly impacted by conditions in the traditional housing market, totaled an estimated 21,500 homes in 2008, a decrease of 33% versus 2007. Champion's sales of modular homes in 2008 were 32% lower than its sales of modular homes in 2007 and 23% lower than its modular sales in 2004.

39.     Declining home prices, an oversupply of existing homes, and financial struggles for key demographics served by the U.S. manufacturing segment have continued to result in a steep decline in U.S. factory-built housing shipments over the past year. As a result of the difficult housing environment, the U.S. manufacturing segment operated at a cash loss over the past year. Management reacted quickly to correct the negative cash flow by idling certain plants to reduce capacity and by instituting a number of cash conservation initiatives designed to maximize labor efficiency and limit excess spending on inventory. Since mid-2006, Champion has closed, idled, sold, or consolidated 15 manufacturing facilities, eliminating under-performing

16

operations and rationalizing its operations and capacity for industry conditions. The Company has reduced the total number of Employees from approximately 6,500 at the end of 2006 to 2,026 as of the Petition Date.

40. Management's efforts substantially reduced the cash burn and as a result the U.S. manufacturing assets were cash flow breakeven from operations in the months of July and August. At current volumes, the Company anticipates that the U.S. manufacturing segment will continue to operate at breakeven profitability until the overall housing market recovers.

**Tightening Credit Markets**

41. Independent retailers of factory-built homes generally finance their inventory purchases from manufacturers using floor plan financing[6] provided by third party lending institutions and secured by a lien on the homes. The availability and cost of floor plan financing can affect the amount of retailer new home inventory, the number of retail sales centers and related wholesale demand. During the past five years, there has been consolidation among the major national floor plan lenders resulting in a reduction of the number of national lenders available to finance inventory purchases.

42. During 2008, approximately 42% of the Company's sales to independent retailers were financed by retailers under floor plan agreements with national lenders, while the remaining 58% were financed under various arrangements with local or regional banks or paid in cash. In accordance with trade practice, the Company has entered into repurchase agreements with each of the national lenders and with a small number of local and regional banks providing floor plan

---

[6] Champion's floor plan facilities are provided by third-party lending institutions that are given a lien on a retailer's housing inventory as security for the loan. The availability and cost of floor plan financing can have a significant effect upon the amount of inventory carried by retailers and the number of retail sales centers. During the past five years, there has been consolidation among the major national floor plan lenders. As a result of the credit crisis during the fourth quarter of 2008, national floor plan lenders substantially curtailed their lending to the Company's independent retailer network. As a result, Champion's independent retailers have been forced to proactively seek financing from local and regional banks as a replacement source of inventory financing.

17

financing.[7] As a result of the credit crisis, during the fourth quarter of 2008 each of the national floor plan lenders substantially curtailed their lending activities, and one announced its intention to exit the business in 2009. The limitation of lending has had a negative impact on the manufactured home industry.

43.     The number of factory-built homes that are sold to consumers and related wholesale demand are significantly affected by the availability, credit underwriting standards, loan terms and cost of consumer financing. During 2008, as the credit crisis deepened, credit terms and pricing for traditional mortgages were tightened substantially resulting in a more challenging lending environment for most home buyers. Buyers of the Company's homes generally need to finance the purchase. For the past several years consumer financing has been harder to obtain and has been more expensive than traditional mortgage lending.

44.     Although the housing crisis in Canada has been far less severe than in the U.S., Canadian manufacturing has also experienced a decline in performance due to general economic conditions and lack of adequate financing for retailers, in addition to declining commodity prices that have slowed development in western Canada. During the first half of 2009, the Debtors conducted extensive marketing of their Canadian operations. Despite difficulties in the Canadian end markets, Canada manufacturing has been the most consistently profitable segment of the Company over the past year and has generated positive cash flows that have been used to offset the cash losses attributable to U.S. manufacturing operations. Following due diligence and

---

[7] In connection with a floor plan arrangement for Champion's manufacturing shipments to independent retailers, the financial institution that provides the retailer financing customarily requires Champion to enter into a separate repurchase agreement with the financial institution. Under this separate agreement, generally for a period up to 18 months from the date of our sale to the retailer, upon default by the retailer and repossession of the home by the financial institution, Champion is generally obligated to repurchase the home from the lender at a price equal to the unpaid principal amount of the loan, plus certain administrative and handling expenses, reduced by the cost of any damage to the home and any missing parts or accessories. Champion's estimated aggregate contingent repurchase obligation at November 13, 2009 was approximately $40 million and included significant contingent repurchase obligations relating to its largest independent retail customers.

18

negotiations with several prospective purchasers, the final offers were deemed inadequate to justify a divestiture of the Canadian manufacturing operations.

45.     The general lack of construction financing available in the U.K. has limited the number of new projects available to the International segment. After the completion of a number of large custodial and prison projects during the first half of 2008, net sales have fallen off significantly from the prior year. International generally operates with negative working capital and as sales have dropped in 2009, that negative working capital position has narrowed, requiring a significant outflow of capital. As of the end of October 2009, year-to-date International working capital changes have resulted in a cash loss of $24.1 million. The majority of the loss has been attributed to a reduction in payables, as sub-contractors from completed projects have been paid and new project activity has slowed. This trend is expected to reverse over the next several months, indicating that International has nearly reached a trough in project activity. Based on the current backlog and estimated government spending in connection with existing framework agreements, International expects that net sales have indeed reached a trough and only modest additional cash losses from working capital changes may occur before improvements begin to be seen. As the credit markets normalize and project financing becomes more readily available, International will be able to generate cash from its negative working capital position as the business grows again.

46.     The cash losses attributed to the U.S. manufacturing operations, the unwinding of the negative working capital position at International, and reduced earnings from Canadian operations have combined with the Company's significant cash interest burden to consume Champion's liquidity, leading to the decision to file for protection under the Bankruptcy Code. As a result of these conditions, and to help ensure that day-to-day operations can continue and

that an orderly process can be put in place to create an ongoing path for the Debtors, the Debtors determined that it was in the best interest of the Debtors, their estates, and their creditors to commence the Chapter 11 cases.

47.     During the difficult times leading up to the commencement of the Chapter 11 cases, the Debtors looked at several strategic options. One of these options was to sell the Company. Tightness in the credit markets, current economic conditions, and the current condition of the Company made finding a buyer difficult. As of the date hereof, the Debtors have not found a suitable purchaser for their assets but intend to continue their efforts to sell the Company after filing these cases.

48.     In preparation for filing these Chapter 11 cases, the Debtors and their advisors surveyed the various sources of prospective postpetition financing. In considering their options, the Debtors recognized that the obligations owed to their prepetition lenders are secured by substantially all of the Debtors' property and that such liens would either have to be primed to obtain postpetition financing or the Debtors would need to locate a lender willing to extend credit that would be junior to the liens of the prepetition lenders. Borrowing from another postpetition lender or lending group that requires security senior to that of the of the prepetition lenders likely could only be accomplished through an extended, contested hearing on whether the requirements for obtaining credit under the Bankruptcy Code had been satisfied. In light of the risk involved, the fees and expenses that would be incurred, and economics offered by the prepetition lenders, the Debtors determined that the entry into a debtor in possession financing credit agreement with their prepetition lenders is the best financing option available under the circumstances.

20

49.     Prior to this date, the Debtors, lenders and each of their respective professionals engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the proposed DIP credit agreement. The DIP credit agreement permits the Debtors to draw immediately on a sizable source of financing that should enable the Debtors to meet all of their administrative obligations during the initial stages of these Chapter 11 Cases. Further, the Debtors have provided a budget to their lenders setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis through and including that date that is four months after the Petition Date.

50.     Initially, during their Chapter 11 Cases, the Debtors intend to continue marketing their assets and/or businesses, in whole or in part, for sale. Morgan Joseph was employed prepetition and will continue during the Chapter 11 Cases in assisting the Debtors in assessing and pursuing opportunities for such a transaction. At the same time, the Debtors intend to continue to operate their business in the ordinary course and work to maximize the value of their assets for the benefit of their creditors.

## PART II

## FIRST DAY MOTIONS

51.     In order to minimize the adverse effects associated with commencing these chapter 11 cases, the Debtors have requested various forms of relief in the First Day Motions filed concurrently with this Declaration. For each such motion, the facts stated herein are true and correct to the best of my knowledge, information and belief, and provide the justification for the following two conclusions: the relief sought therein is an immediate necessity (1) in order to limit the disruption associated with the Debtors' entry into bankruptcy and (2) is essential if the Debtors are to maximize the value of their estates.

21

**A.**     **Motion of the Debtors for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases**

52.     The nineteen Debtors in these cases are affiliated entities. The Debtors are under common ownership and management, and it is my belief that they share many creditors and other parties in interest. I am informed that the Debtors' consolidated creditor matrices set forth more than 30,000 potential creditors and parties in interest. I am informed by counsel that the joint administration of the chapter 11 cases will permit the Clerk of the Court to utilize a single general docket for these cases and combine notices to creditors of the Debtors' respective estates and other parties in interest, which will result in significant savings to the estates. Accordingly, I believe that the relief requested in the joint administration motion is in the best interests of the Debtors' estates.

**B.**     **Application of Debtors for Order Under 28 U.S.C. § 156(C) Authorizing and Approving the Retention of and Appointing Epiq Bankruptcy Solutions, LLC as Noticing, Claims and Balloting Agent**

53.     The Debtors seek entry of an order authorizing and approving the retention of and appointing Epiq Bankruptcy Solutions LLC ("Epiq"), effective as of the Petition Date, as claims, noticing and balloting agent (the "Claims and Noticing Agent") for the Debtors and, as applicable, the Clerk to, among other things: (i) serve as the Court's notice agent to mail certain notices to the estates' creditors and parties-in-interest, (ii) provide computerized claims, claims objections and balloting database services, and (iii) provide expertise, consultation and assistance with claim and ballot processing and with other administrative information related to the Debtors' bankruptcy cases. With the large number of creditors that the Debtors have identified, the Debtors believe it is in the best interests of their estates and their creditors to appoint Epiq as agent for the Clerk.

22

54.     I understand that Epiq is one of the country's leading chapter 11 administrators with experience in noticing, claims processing, assisting with claims reconciliation and distribution. I believe Epiq is well qualified to provide the Debtors with experienced noticing, claims and balloting services in connection with theses cases and has substantial experience in the matters upon which it is to be engaged.

55.     Accordingly, I believe it is in the best interest of the Debtors' estates to seek the entry of an order retaining and appointing Epiq as the agent for the Clerk and as custodian of official court records and to perform such other services as may be required by the Debtors as described below. Additionally, the Debtors seek authorization to compensate Epiq for services rendered and to reimburse Epiq for expenses incurred without further order of this Court upon the Debtors' receipt of reasonably detailed statements of fees and expenses.

**C.     Motion of Debtors for Entry of Order Under 11 U.S.C. §§ 105, 345, 363, 503, 1107, and 1108 Authorizing (I) Maintenance of Certain Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System, (IV) Continued Performance of Intercompany Transactions and Exercise of Intercompany Setoff Rights, (V) Grant of Postpetition Administrative Priority to Intercompany Claims, and (VI) Limited Waiver of Section 345(b) Deposit and Investment Requirements**

56.     The Debtors' cash management system (the "Cash Management System") is a network of bank accounts that facilitates the timely and efficient collection, management, and disbursement of funds used in the Debtors' business. Because of the nature of the Debtors' business and the disruption to the business that would result if they were forced to close the Accounts, I believe it is critical that the Cash Management System remain in place.

57.     The Cash Management System consists of an integrated network of bank accounts maintained at Comerica Bank, Wells Fargo, Bank of America, Bank of the West, Branch Banking & Trust, Fremont Bank, First Niagara, First Bank, PNC Bank and Bank First

23

(collectively, the "Primary Banks"). The Cash Management System consists of approximately 56 domestic bank accounts. The Debtors use the bank accounts to manage their cash receipts, transfers and disbursements for the Debtors' entire domestic corporate enterprise.

58. The Debtors derive substantially all of their revenue from sales to their customers. Revenues generated by the Debtors' sales are deposited into accounts that are then swept daily into the Debtors' master depository account at Comerica (the "Master Depository Account"). Certain payments from floorplan lenders and other miscellaneous wire transfers are deposited directly into the Master Depository Account.

59. Intercompany loan payments from the Debtors' foreign subsidiaries and certain other miscellaneous wires are deposited directly into an operating account at Comerica (the "Concentration Account"), the proceeds of which are generally used for operations and are not swept into the Master Depository Account. In addition, certain small cash balances are maintained at separate accounts for petty cash and local operations expenses.

60. Prepetition, excess cash would be deposited periodically into an investment account at Comerica (the "Investment Account") and invested in the Dreyfus Institutional Preferred Plus Money Market Fund (the "Dreyfus Fund"). The Dreyfus Fund invests in a diversified portfolio of dollar-denominated short-term debt securities. Normally, the fund invests at least 25% of its net assets in domestic or dollar-denominated foreign bank obligations. As of the Petition Date, there are no funds on deposit in the Investment Account. However, I believe that Debtors currently intend to keep the Investment Account open postpetition to the extent that they elect to deposit funds therein for investment in the Dreyfus Fund.

61. Under the existing Cash Management System, the Debtors' main operating accounts are the Master Depository Account and the Concentration Account, both at Comerica.

The balances of these accounts fluctuate and, as of the Petition Date, were approximately $1.0 million in the aggregate. The Debtors use the Master Depository Account and the Concentration Account to fund (a) corporate expenses such as bank interest payments, payroll, insurance, sales and use taxes and other taxes, employee health insurance and 401k benefits, and (b) operating expenses such as product and inventory purchases through general checking accounts that draw from the Master Depository Account. Draws on the Debtors' revolving credit facility or intercompany loans are used to cover any deficiency in the amounts required to be disbursed.

62.     As reflected in the DIP Motion, if approved by the Court, it is contemplated that the proposed DIP Financing will fund (i) a reserve account ("Reserve Account") which shall be used to fund, on a monthly basis, an operating account ("Operating Account") which in turn shall be used to fund, through the Debtors' existing Cash Management System and direct payments to third parties, the operating expenses and capital expenditures of the Debtors, certain expenses of Credit Suisse (the agent for the Debtors' prepetition and proposed postpetition lenders), professional fees and expenses incurred by the Debtors and their estates and similar costs, all pursuant to budgets approved by the DIP Financing lenders, (ii) an interest reserve account ("Interest Reserve Account") to periodically fund postpetition interest and letter of credit fees due to the DIP Financing lenders, and (iii) a carve out account ("Carve Out Account") to fund budgeted professional fees and expenses pursuant to the approved budget. The Reserve Account, Interest Reserve Account, Operating Account and Carve Out Account (collectively, the "DIP Accounts") shall be managed accounts held at a financial institution to be selected by Credit Suisse from the list of approved financial institutions published by the United States Trustee for Delaware. Each DIP Account shall be subject to the control of the Collateral Agent

13814-001\DOCS_DE:152951.20

as cash collateral and as a cash reserve (and governed by appropriate blocked account and control agreements).

63.     In particular, the Debtors' DIP Financing budget assumes that there will be a free flow of funds between the U.S., Canada and the Company's UK operations (in some cases, via CHB International) to cover expenses as they arise across the enterprise. Specifically, the DIP Financing budget projects that the U.S. is the net beneficiary of $3.0 million from Canada through March 2010, after assuming the maintenance of minimum cash balances of $2,000,000 by the Canadian operations. Additionally, there will be cash flowing out from the Debtors to Canada and the UK in the short term, of which a portion is expected to be repatriated later in 2010. Short term outflows to the UK are expected to peak at $7.9 million in short term funding during November 2009 and total outflows to the UK are projected to aggregate up to $2.6 million, as contemplated by the DIP budget. I believe it is critical that the flow of funds between the entities continue without interruption. If the Debtors' UK operations are not funded, the Debtors' UK affiliate will not be able to continue operations, which would result in a diminished enterprise value for the Debtors and would impede their efforts to sell their assets for the benefit of their creditors. Given that the Debtors' domestic operations rely upon the income generated by the UK and Canadian operations, I believe a disruption in those foreign operations would redound to the detriment of the Debtors.

64.     The Debtors seek a waiver of the United States Trustee's requirement that the Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in these cases, I believe the United States Trustee's requirement would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under Chapter 11. Maintenance of the Accounts will greatly facilitate

26

the Debtors' operations in Chapter 11. If the Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures with customers and vendors, which would completely disrupt the flow of the Debtors' receipt of sales revenues and the Debtors' payment of debts incurred after the Petition Date. In addition, closing the Accounts would require the Debtors to cancel and reinstitute wire transfer instructions for various entities, all of which would be difficult to modify under these exigent circumstances. I believe these disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business.

65. The Debtors seek authority to continue to use the Cash Management System, as such system may be modified pursuant to the requirements of any DIP Financing and/or Court-approved cash collateral usage, and related orders of this Court. The Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The use of the Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from sales revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. I believe preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be associated with a substantial disruption of the Cash Management System will facilitate and enhance the Debtors' efforts to continue to operate postpetition.

66. I believe the Debtors should also be granted the authority to (i) continue to use all correspondence and business forms (including, but not limited to letterhead, purchase orders,

27

invoices, etc.) until such time as the Debtors can effectuate the necessary changes to such forms in order to add the "debtor in possession" label, and (ii) continue using their existing check stock without reference to the "debtor in possession" status until such time as the Debtors can effectuate the necessary changes to such forms in order to add the "debtor in possession" label (all such correspondence, check stock, books and records and other business forms collectively referred to herein as "Business Forms"). I believe that it would take approximately one to two weeks to make the aforementioned changes to the Business Forms.

67. Prior to the Petition Date, the Debtors, amongst themselves, engaged in intercompany financial transactions in the ordinary course of their businesses (collectively, the "Intercompany Arrangements"). Intercompany transactions are recorded on the applicable Debtor's general ledgers as an intercompany payable, receivable or loan. In the ordinary course of business as part of the consolidated Cash Management System, certain intercompany transactions are made between and among certain Debtors, and in some cases, the transactions are made between and among, on the one hand, the Debtors and, on the other hand, the Debtors' (i) international affiliates operating in the UK, or (ii) international affiliates operating in Canada, or (iii) Dutch affiliate CHB International B.V. ("CHB International"), which owns the Debtors' international affiliates operating in the UK and Canada. I believe that the Debtors should be granted authority to continue to operate the Cash Management System to enable the Intercompany Arrangements to continue postpetition in the ordinary course of business. It is critical to preserve the Debtors' ability to engage in intercompany transactions while they reorganize. Given that the Debtors' domestic operations rely upon the income generated by the UK and Canadian operations, I believe a disruption in those foreign operations would redound to the detriment of the Debtors.

28

68.     I believe that the Debtors should also be granted an interim waiver of the requirements of the Bankruptcy Code to permit the Debtors to maintain the Accounts without posting a bond or other security, as would otherwise be required. The balances in the Debtors' operating accounts fluctuate based on sales receipts and expenses. From and after the Petition Date, I believe that substantially all excess cash will be concentrated in the Master Depository Account, the Concentration Account, and the Investment Account, and that there will also be cash balances in the DIP Accounts to be used pursuant to an agreed budget. Most accounts in which balances are maintained will not exceed FDIC coverage. However, to the extent that Accounts exceed the FDIC limit, the Debtors will seek to obtain collateralization agreements executed by Comerica and/or other banks where such deposits are maintained.

**D.      Motion of the Debtors for Entry of an Order: (I) Authorizing the Debtors to (A) Pay Wages, Salaries, and Other Compensation, (B) Maintain Employee Medical and Similar Benefits, and (C) Pay Reimbursable Employee Expenses; and (II) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made By the Debtors Relating to the Foregoing.**

69.     The Debtors currently employ 1,994 full and part-time U.S. employees in hourly, salaried, supervisory, management, sales, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (collectively, the "Employees"). The majority of the Debtors' Employees, approximately 1,327 in all, perform critical core manufacturing functions in the Debtors' U.S. manufacturing facilities. An additional 667 of the Debtors' Employees provide administrative support, including engineering, purchasing, human resources, financing and accounting services to the manufacturing facilities. In addition to their Employees, the Debtors also utilize the services of independent contractors who perform essential duties such as delivery and retail sales (the "Independent Contractors") and temporary employees, who are hired through temporary employment agencies, to perform

29

essential services in the Debtors' manufacturing facilities (the "Temporary Employees"). None of the Debtors' Employees or Temporary Employees are associated with a national union.

70.     The Debtors' aggregate monthly payroll for October, 2009, including wages, salaries, bonuses and commissions, was approximately $9.1 million, $7,900 of which was paid to temporary employment agencies for the services of the Temporary Employees. Hourly Employees are paid in arrears, on a bi-weekly basis, with direct deposits or checks issued on the 6th or 7th day after the close of each pay period. Salaried employees are paid bi-weekly with direct deposits or checks being issued on the last day of the pay period. On November 12, 2009, the Debtors delivered to Automated Data Processing, Inc., its outside payroll administrator, funds for paychecks distributed on November 13, 2009 (the "Last Employees' Pay Date"). The pre-petition payroll funding for the Last Employees' Pay Date included payment for Hourly Employee wages and salaries earned between October 24, 2009 and November 6, 2009 and Salaried Employee salaries between October 31, 2009 and November 13, 2009. Thus, as of the Petition Date, Hourly Employees are owed Unpaid Wages earned between November 7, 2009 and the Petition Date and Salaried Employees are owed Unpaid Wages earned between November 14, 2009 and the Petition Date.

71.     As of the Petition Date, the Debtors owe an estimated $1,620,000 for the gross amount of earned but Unpaid Wages, including approximately $260,000 in Unpaid Wages to be paid to temporary employment agencies for the services of the Temporary Employees. No single Employee is owed more than $10,950 in Unpaid Wages. In addition to the Unpaid Wages, the Debtors estimate that as of the Petition Date, approximately $100,000 of the Debtors' contributions to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages (the "Employer Tax Obligations"). I believe the Debtors should be authorized to

30

pay all Unpaid Wages and Employer Tax Obligations that exist as of the Petition Date, and be provided the authority to continue to pay such obligations as they arise in the ordinary course during these cases.

72.     The Debtors use a payroll service company, Automated Data Processing ("ADP") to process their payroll. ADP draws funds from the Debtors' account approximately two days in advance of each payday and are responsible for paying all applicable withholdings and payroll taxes with respect to the Employees. In the ordinary course of business, the Debtors provide applicable schedules in advance of the payroll payment period, and ADP issues payroll checks. The Debtor pays approximately $15,000 per month to ADP on account of payroll processing services. The Debtors estimate that they may owe ADP approximately $14,900 on account of prepetition services. I believe the Debtors should be provided the authority to pay ADP all amounts outstanding as of the Petition Date, and continue to pay ADP any amounts that come due after the Petition Date in the ordinary course.

73.     I believe the Debtors should also be provided the authority to pay Temporary Employees that provide services to the Debtors in the same manner as Employees. The Debtors retain the services of Temporary Employees provided through various service vendors (the "Staffing Providers"). The Debtors typically remit compensation for the Temporary Employees' services directly to the applicable Staffing Provider that refers such Temporary Employees through their accounts payable system. The Staffing Providers in turn pay the Temporary Employees. I believe that, if they are not permitted to pay the Staffing Providers for the services of the Temporary Employees, the Staffing Providers will withdraw the Temporary Employees or refuse to provide the Debtors with replacement workers. Although I believe that the Debtors could replace the Temporary Employees over a period of time, the abrupt departure of the

31

Temporary Employees could potentially cause significant disruption to the Debtors' operations. Because the Debtors' prepetition obligation to the Temporary Employees is minimal when compared to the total cost of the Unpaid Wages, I do not believe that the risk of such disruption is worth any potential benefit to the estate in withholding the Unpaid Wages of the Temporary Employees.

74.     The Debtors use a number of Independent Contractors in the course of their business. Most are used for transporting goods by road and on-site setup. All of the drivers who provide their services to Star Fleet, Inc. ("Star Fleet") are independent contractors. Each of the drivers are compensated based on the number of miles driven. A software program generates data as to the number of miles driven and the respective dollar amount to be paid to each driver. The data is then forwarded to a company called Comdata. The Debtors pay Comdata and Comdata subsequently credits a debit card issued to each driver in the amount he/she has earned based on the number of miles driven. Therefore, the drivers receive a credit on their Comdata card as payment for their services within two days of when the services are provided. The Debtors pay Comdata approximately $160,000 per day for the 531 drivers used by Star Fleet. As of the Petition Date, I estimate that no more than three days' worth of Unpaid Wages are due. I believe the Debtors should be provided the authority to pay the Comdata drivers all amounts outstanding as of the Petition Date, and continue to pay the drivers any amounts that come due after the Petition Date in the ordinary course.

75.     I believe that, if the Debtors are not permitted to pay the Comdata drivers for the services provide prior to the Petition Date, the drivers may refuse to provide further services to Star Fleet until such payments are made in full. Transportation of manufactured and modular homes is unique skill that requires a high degree of expertise and familiarity with numerous

32

regulations and traffic laws. I am informed that in many states, drivers much hold a special commercial drivers license to transport these wide loads. Drivers with such skills and qualifications are often in short supply and of great value to the operations of Star Fleet. Although I believe that the Debtors could replace the Independent Contractors over a period of time, the abrupt departure of the Independent Contractors could potentially cause significant disruption to the Debtors' operations. Indeed, without these Independent Contractors, Star Fleet would be forced to suspend deliveries until suitable replacement drivers could be located.

76. San Jose Advantage Homes, Inc., the Debtors' retail entity ("Advantage Homes"), utilizes real estate sales agents and sales managers that are Independent Contractors in retail locations in California. The sales agents work strictly on commission. Commissions to the sales agents are paid from Advantage Homes based on a fixed commission schedule. Depending on the property sold, commissions are based on either a flat rate or a percentage of the profit earned by Advantage Homes from the sale of the home. Sales managers are paid both in commission (for homes sold individually) and a monthly salary for their management role. For the year 2009 up through August 17, 2009, the amount of commissions paid by San Jose Advantage Homes, Inc. to 55 independent contractors totaled $1.3 million. As of the Petition Date, to the best of my belief, no sales agents or sales managers are due Unpaid Wages in an amount in excess of $10,950 for sales of homes that closed prior to the Petition Date. I believe the Debtors should be provided the authority to pay Advantage Homes sales agents and sales managers all amounts outstanding as of the Petition Date, and continue to pay Advantage Homes sales agents and sales managers any amounts that come due after the Petition Date in the ordinary course.

77. The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically

33

include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations"). Such General Reimbursement Obligations also include amounts billed by Employees to corporate charge cards for the purchase supplies, inventory, and equipment on behalf of the Debtors and in support of the Debtors' businesses. I believe the Debtors should be authorized to pay the General Reimbursement Obligations that exist at the time of the filing of these cases.

78. The Debtors provide several health and related benefit plans to their Employees, including a medical/dental plan and vision (collectively, the "Health Plans"), health care reimbursement accounts, life insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Benefit Plans"). All full-time Employees who work more than 32 hours per week are eligible to participate in the Health Plans commencing on the first day of the month following the Employee's completion of three months of continuous full-time employment with the Debtors. I believe that the Debtors should be granted the authority to honor any obligations under the Health Plans and Benefit Plans as of the Petition Date, and continue to offer their Employees the benefits provided by the Health Plans and Benefit Plans after the Petition Date in the ordinary course.

79. As a general matter, for most of the Health Plans, Employees make payroll contributions and the Debtors deduct the Employees' portion of the Health Plan costs owing under the Health Plans from the Employees' Wages every pay period. As required by law, the Debtors also offer the Health Plans to their former employees who have elected COBRA coverage. I believe the Debtors shall be authorized to pay prepetition claims payments relating to COBRA coverage (which are partially funded for via premium payments by the former

employees) and to continue to make such payments in the ordinary course of business for all their Health Plans.

80. The Champion Home Builders Self-Insured Plan (the "Medical Plan") is the Debtors' primary self-insured medical, dental and prescription drug plan. Approximately 1,729 active and former employees participate in the Medical Plan with a range of options and varying benefits depending upon the Employee's status.

81. The Debtors provide their Medical Plan through the Debtors' third-party administrator, Blue Cross Blue Shield ("BCBS"). When claims are submitted to BCBS for care provided to Employees or their dependents, BCBS invoices the Debtors each Tuesday for the claims payable by the Plan and the Employee is billed directly by the provider for their remaining share of the deductible, copays and coinsurance. The Debtors make payments to BCBS each Thursday for claims received by BCBS in the previous week. The last such payment for $248,946.19 prior to the Petition Date was sent to BCBS on November 9, 2009. However, such payment does not include any claims for care provided to Employees or their dependents provided prior to the Petition Date and not yet submitted to BCBS. Typically, there is a delay of approximately 2 to 3 months between the time that Employees receive services and when some care providers submit their claims to BCBS for payment.

82. In October 2009, the Debtors paid $1,691,633.73 on account of claims obligations under the Health Plan, which amount includes $43,066.90 in COBRA premium payments, which, as discussed above, are reimbursed to the Debtors in full. In 2009, I expect the Debtors to make payments of approximately $18 million for their claim obligations under the Medical Plan. On average, the Debtors pay approximately $1.4 million per month for claims, although this amount can vary widely and can be somewhat unpredictable based on the Debtors inability to

35

predict the number or amount of claims that may be submitted by Employees in any give month. To limit their total exposure to medical claims, the Debtors maintain stop-loss insurance coverage through the BCBS with respect to claims under the Medical Plans exceeding $150,000. The Debtors pay a monthly premium of approximately $53,500 for this stop-loss coverage. As of the Petition Date, the Debtors had no costs for services rendered to Employees received by BCBS and invoiced to the Debtors prior to the Petition Date and estimate they owe an additional $3,500,000 for claims for services rendered to Employees but not yet submitted to BCBS on account of the Medical Plans (the "Medical Plan Obligations"). I believe the Debtors should be provided the authority to pay all Medical Plan Obligations outstanding as of the Petition Date, and continue to honor any Medical Plan Obligations that come due after the Petition Date in the ordinary course.

83.     In addition to the BCBS administered Medical Plan, the Debtors also provide medical insurance to seven of their Employees through a fully-insured plan through Kaiser Permanente (the "Kaiser Permanente Medical Plan"). The Kaiser Permanente Medical Plan is a fully insured holdover plan from a company previously acquired by the Debtors prior to the Petition Date, and I believe the Debtors should be provided the authority to continue to honor its obligations under the Kaiser Permanente Medical Plan for the convenience of participating Employees. As of the Petition Date, I do not believe that any costs relating to this program were outstanding and payable to Kaiser Permanente by the Debtors.

84.     The Debtors also provide their eligible Employees with voluntary employee paid vision insurance through VSP (the "Vision Plan"). As of the Petition Date, the Debtors owe to VSP, $12,784.65 for the November 2009 invoice. This coverage is paid 100% by the employees through pre-tax payroll deductions.

36

85. The Debtors also offer their Employees access to a flexible spending account ("FSA") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. As of the Petition Date, there are accrued but unremitted FSA contribution amounts that will be due for remittance on account of requests received during the period after the Debtors' last payroll was funded but before the Petition Date, which amounts are included in the Unpaid Wages described above. In addition, there may be additional accrued but unremitted FSA contributions from earlier pay periods that will be due for remittance, which amounts are also included in the Unpaid Wages.

86. Activa receives claims for benefits, requests funds from Debtor via ACH wire and disburses payments on such claims, and the Debtors pay Activa a monthly fee based upon the number of participants and certain associated expenses. I estimate that the Debtors pay $1,200 per month to Activa on average. As of the Petition Date, I believe the Debtors owes $1,190.25 to Activa for the November invoice. I believe the Debtors should be provided the authority to pay Activa all amounts outstanding as of the Petition Date, and continue to pay Activa any amounts that come due after the Petition Date in the ordinary course.

87. The Debtors provide their Employees with life insurance, short-term and long-term disability insurance, and accidental death and dismemberment insurance, each as more fully described below. The Debtors' premium contributions and administrative fees related to the Life Insurance, AD&D Insurance, and Disability Insurance total, in the aggregate, approximately $62,000 per month. All premiums are fully paid by the company with the exception of the Voluntary Life Insurance Programs (as defined below) which are voluntary plans fully paid for by the Employees. As of the Petition Date, I believe that there is approximately $62,000 owing on account of the pre-petition period for these programs, which includes amounts due for

37

Voluntary Life Insurance Program premiums that have been collected from Employees. I believe the Debtors should be authorized to pay all amounts outstanding as of the Petition Date for their Life Insurance, AD&D Insurance, and Disability Insurance programs, and continue to pay any amounts that come due after the Petition Date for these programs in the ordinary course.

88.     The Debtors are required to maintain workers' compensation insurance to provide their Employees with coverage for claims arising from or related to their employment with the Debtors. The Debtors currently maintain an annual workers' compensation policy (the "Workers' Compensation Policy") with Travelers Insurance Company ("Travelers") pursuant to which Travelers provides workers' compensation insurance coverage up to the statutory limits and up to $1 million per occurrence for employer liability. The Debtors pay a deductible of $500,000 per occurrence. The Debtors' overall claims paid associated with their Workers' Compensation Programs were approximately $5.7 million in 2008. I expect the costs for 2009 to be approximately the same as 2008. As of the Petition Date, approximately $10,019,565 in claims in reserve under the Workers' Compensation Policy were outstanding. I believe the Debtors should be provided the authority to pay all obligations outstanding as of the Petition Date related to their Workers' Compensation Policy, and continue to pay any amounts that come due after the Petition Date in the ordinary course.

89.     The Debtors provide vacation time to their employees as a paid time-off benefit. Vacation benefits vary based on the Employee's location and position. Vacation time is accrued based on time worked. Full-time salaried and hourly paid Employees are eligible for paid vacation days after one year of service. Although the amount of vacation earned by Employees is different for each of the Debtors' locations, the number of weeks that most Employees are eligible for are based on the number of years of service an Employee has completed as of

38

December 31 of the previous year. I believe the Debtors should be authorized to honor all vacation time obligations to the Employees that exist as of the Petition Date, and continue to honor its vacation time obligations to Employees after the Petition Date in the ordinary course.

90.     The Debtors maintain a 401(k) plan for the benefit of their Employees (the "401(k) Plan"). The 401(k) Plan provides for automatic pre-tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code. Approximately 1,000 Employees participate in the 401(k) Plan, and the approximate monthly amount collectively withheld from Employees' paychecks is $325,000. The Debtors do not currently pay matching contributions to the 401(k) plan. As of the Petition Date, there are no accrued but unfunded matching contributions with respect to the 401(k) Plan. The Debtors utilize Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") as the Plan Trustee and Recordkeeper. All fees associated with the 401(k) Plan are paid from plan assets and not by the Debtors directly. I believe the Debtors should be provided the authority, in their discretion, to continue the existing 401(k) Plan and pay any 401(k) fees in the ordinary course of the Debtors' business from the plan assets.

91.     In the ordinary course of business, the Debtors maintain various incentive plans to encourage their Employees to maximize the value of the Debtors' enterprise (collectively, the "Incentive Plans"). These Incentive Plans are an important component of employee compensation and provide substantial value to the Debtors' estates because they encourage Employees to achieve important financial performance and quality goals.

92.     The Debtors created certain Incentive Plans that are earned by Employees as a direct result of the performance of the operating facilities (the "Salary Incentives") to provide a market-appropriate salary to their production-oriented plant managers that includes both (a) a

39

modest base wage to provide these Employees with a guarantee of an appropriate living wage not dependent upon the cyclical nature of the Debtors' business and (b) a quarterly payment based on actual plant earnings to incentivize the managers to meet performance goals necessary for the success of the Debtors' overall business. The amount of the Salary Incentives is tightly controlled by the Debtors to provide the appropriate motivation for the Employees to meet or exceed the performance goals. The Employees paid through the Salary Incentives (the "Eligible Employees") agree to a lower base salary (relative to market rates in the communities in which they reside) in return for a chance to earn a higher final salary due to their efforts in support of company-wide goals. I believe that these Employees view the Salary Incentives not as a "bonus" paid over and above an annual salary commensurate with the Employees' experience and position, but as a significant and integral part of their total compensation package.

93.     Approximately 65 Eligible Employees at the Debtors' manufacturing facilities are paid Salary Incentives as a portion of their compensation. The Eligible Employees include plant managers, production managers, sales managers, service managers, controllers and other production supervisors at each of the Debtors 16 operating manufacturing facilities. The Eligible Employees are not officers of the Debtors and, although they have a great impact on the performance of the manufacturing facility where they work, the Eligible Employees are not "in control" of the Debtors and make no strategic operating decisions that impact the company as a whole. As set forth in detail below, I believe that the Eligible Employees only receive the Salary Incentives if their plant meets objective performance standards based on earnings before interest, taxes and amortization as calculated by the chief financial officer of each plant.

94.     If the Eligible Employees meet their goals, then each of the Eligible Employees will be entitled to divide an aggregate incentive payment equal to a percentage of the adjusted

40

earnings for their manufacturing facility. Salary Incentives are calculated based upon the quarterly performance of the facilities, but are typically paid at least one month in arrears to permit senior management and the Debtors' financial advisors to determine an accurate calculation for the earnings of each of the Debtors' manufacturing facilities. On November 6, 2009, the Debtors paid the Salary Incentive payments due to Eligible Employees (less the Incentive Holdback, as defined below) for the calendar quarter ending September 30, 2009.

95.     In addition, the Debtors retain 15% of the quarterly payments to be made as Salary Incentives (the "Incentive Holdback") as a hedge against potential unforeseen reduction in future Salary Incentive payments throughout the remainder of the calendar year. These Incentive Holdbacks are paid to Eligible Employees at the end of the calendar year with the fourth quarter Salary Incentive payments. As of the Petition Date, the Debtors owe approximately $112,867 to approximately 45 of the Eligible Employees for Incentive Holdbacks collected from Eligible Employees during the first three quarters of 2009. I believe that the Debtors should be authorized to pay all Incentive Holdbacks earned prior to the Petition Date and to continue to provide the Salary Incentives to the Eligible Employees postpetition in the ordinary course of the Debtors' businesses.

**E.      Motion of the Debtors for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Prepetition Fees and (B) Authorizing and Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests**

96.     In the ordinary course of their business, the Debtors pay taxes, including, but not limited to, sales, use and franchise taxes and other taxes necessary to operate their businesses (collectively, the "Taxes") and certain regulatory fees for licenses, permits, and other similar assessments (the "Fees"). The Debtors also collect such Taxes and Fees from their customers for payment on behalf of the Debtors and, in some instances, the customers. In both cases, the proceeds collected by the Debtors are remitted to various governmental bodies (the "Taxing

41

Authorities") in accordance with the requirements of such Authorities. The Debtors incur approximately $312,000.00 per month, comprised of an average of $245,000 in monthly sales and use taxes and approximately $67,000 in franchise taxes.

97.     I estimate these Taxes and Fees will not exceed $562,000, which is the sum of the budgeted $312,000 for Taxes and Fees incurred and billed in the preceding month, an $156,000 pro-rated contingency for associated taxes incurred during the instant month as of the Petition Date, and an additional $94,000 for prepetition taxes, business license and regulatory fees that have been incurred but not yet billed. This estimate does not include additional prepetition tax liability that may later come due as a result of certain audits that are ongoing or may be commenced and remain unresolved as of the Petition Date.

98.     I am informed and believe that any failure to make the requested payments could cause: (a) the Taxing Authorities to initiate audits of the Debtors that would unnecessarily divert their attention away from the reorganization process; (b) the Taxing Authorities to file liens, and pursue other remedies that will harm the Debtors' estates; and (c) certain of the Debtors' directors and officers to face personal liability – even if failure to pay such Prepetition Taxes was not a result of malfeasance on their part – that would undoubtedly distract those key employees from their duties related to the Debtors' restructuring.

99.     Additionally, I believe that any failure to obtain or maintain the requisite permits, licenses, and alike could cause the Debtors' entire manufacturing operation to grind to a halt if the state and local authorities that issue them attempt to shut down the Debtors' operations for a failure to stay current on these obligations. In this highly competitive industry, any disruption of the supply chain, and thus the supply of homes to dealers and final homeowners would put the

Debtors' reorganization efforts in substantial jeopardy. Accordingly, I believe that the Debtors should have authority, but not obligation, to pay Taxes and Fees as requested in the motion.

**F.      Motion of the Debtors and Debtors in Possession for an Order Authorizing Payment in the Ordinary Course of (I) Section 503(b)(9) Claims and (II) Certain Obligations for the Postpetition Delivery of Goods and Services**

100.    The Debtors received numerous goods in the ordinary course business during the twenty-day period immediately preceding the Petition Date.  The Debtors believe that certain of the vendors and suppliers who delivered goods to the Debtors during the twenty-day period prior to the Petition Date but have not received payment for such goods (the "503(b)(9) Claimants") likely will seek the allowance and payment of those claims (the "503(b)(9) Claims") through individual motions to this Court.  The 503(b)(9) Claimants, Debtors and other parties in interest will likely divert resources in these cases toward drafting, filing, prosecuting and defending such individual motions and related responses.

101.    Under these circumstances, I believe relief is necessary to permit the Debtors to pay any vendor that delivered goods in the ordinary course of business within twenty days of the Petition Date.  In order to maintain their relationship with their vendors and to minimize any potential consequences of delaying payment of the 503(b)(9) Claims, I believe that the Debtors should be authorized, but not directed, to pay the 503(b)(9) Claims immediately to the extent the Debtors determine that it is necessary to ensure the uninterrupted supply of materials to the Debtors.  I estimate that the amount owing to 503(b)(9) Claimants for goods delivered in the twenty days prior to the Petition Date is approximately $6,616,000.

102.    Also in the ordinary course of the Debtors' business, numerous suppliers and service providers provide the Debtors with goods and services that are integral to the Debtors' business operations. As of the Petition Date, the Debtors had outstanding prepetition purchase orders (collectively, the "Purchase Orders") with certain suppliers (collectively, the "Suppliers")

for such goods and services. The delivery of goods and services by the Suppliers is critical to the continued operation of the Debtors' businesses.

103. As a result of the commencement of these chapter 11 cases, I believe Suppliers may perceive a risk that they will be treated as prepetition general unsecured creditors for the cost of any shipments made or services provided pursuant to the Purchase Orders. As a result, the Suppliers may refuse to ship such goods to the Debtors or provide such services to the Debtors unless the Debtors issue substitute postpetition purchase orders or provide other assurances of payment. The revised postpetition purchase orders may include oppressive trade terms much more onerous on the Debtors than the terms in existing Purchase Orders. Most troubling, I believe some Suppliers may refuse to do business with the Debtors after the Petition Date due to the failure to honor the existing Purchase Orders, thereby forcing the Debtors to find alternate suppliers with only minimal resources.

104. I believe issuing substitute purchase orders on a postpetition basis would be administratively burdensome, time-consuming, and counterproductive to the Debtors' reorganization. Such a requirement imposed by the Suppliers – or other requests for assurance of payment – inevitably will lead to delays in the Debtors' receipt of goods and services, ultimately resulting in the disruption of the Debtors' businesses and hindering the Debtors' ability to continue with operations. I believe any such disruption of the Debtors' operations would have a negative impact on the value of the Debtors' estates as a whole. Under these circumstances, I believe relief is needed to permit the Debtors to pay for the timely delivery of goods and uninterrupted provision of services from the Suppliers pursuant to the Purchase Orders.

105. I also believe that, prior to providing payment for 503(b)(9) Claims or Purchase Orders, the Debtors should be granted the authority to require each 503(b)(9) Claimant and/or

44

Supplier to agree to (a) continue to supply goods and services to the Debtors post petition on trade terms substantially similar or better than those provided to the Debtors prior to the Petition Date, (b) execute a written acknowledgement that provides that any future purchase orders will be subject to the agreed trade terms, (c) remove any mechanics' liens, possessory liens, or similar state law trade liens obtained from the 503(b)(9) Claims and/or Purchase Orders, (d) submit to the Court's jurisdiction in resolving all disputes arising under or related to the payment of the 503(b)(9) Claim or Purchase Order, and (e) certain other provisions as agreed between the Debtors and each 503(b)(9) Claimant or Supplier. Further, if, following receipt of payment of its 503(b)(9) Claim and/or Purchase Order, a 503(b)(9) Claimant or Supplier refuses to supply goods and services in accordance with the agreed trade terms, I believe the Debtors should be granted the authority to demand the repayment of the 503(b)(9) Claim and/or Purchase Order.

**G.      Debtors' Motion for an Order Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Shippers and Granting Related Relief (the "Shippers Motion")**

106.     The Debtors produce manufactured housing that is sold via a nationwide network of dealers. Due to the highly localized nature of the Debtors' associated shipping needs, the process is managed on a plant-by-plant basis.

107.     I am informed and believe that when a shipment is ready, plant management teams select a shipper based on that prospective Shipper's skill, availability, and track record. As explained in the Shippers Motion many aspects of the shipping process are within the control of the chosen Shippers, and given the size of the product, the Shippers must deal with significant logistical challenges in making these deliveries. The Shippers are responsible for the mechanics associated with moving the Debtors' products from place to place, including seeing to it that the shipping process complies with the various intrastate, interstate and international regulations that are applicable.

45

108.    Based on these practical difficulties, the value of the cargo, and the time-sensitive nature of the process, it is my belief that the Debtors cannot simply hire any cargo transportation service to move their goods.  Instead, the Debtors depend on a specialized group of established Shippers that they know are capable of timely delivering the Debtors' products to their dealers and customers.  I do not believe that these Shippers will continue accepting shipments if they are still owed prepetition amounts.

109.    If these Shippers turn the Debtors away, the Debtors will be left without access to carriers that, through experience, have proven themselves able to meet the challenging objectives entailed in the delivery of the Debtors' products.  I believe that this disruption would severely damage the Debtors' prospects in this highly competitive industry.  Dealers typically offer homes produced by a number of manufacturers, meaning that they can (and, in my opinion would) shift buyers to other products, rather than waiting to find out if the Debtors' products arrive in time or at all.

110.    The damage associated with this disruption will be compounded if, Shippers assert possessory liens on account of the unpaid Shipping Obligations and thus refuse to deliver the homes in their possession to the Debtors' dealers and customers.  Even more than the disruptions described above, I believe that this would alienate consumers and dealers, which in turn would jeopardize the Debtors' prospects for reorganization.

111.    I believe that the Debtors currently owe approximately $500,150 in accrued delivery expenses, which are those expenses incurred prepetition but not yet paid, plus another $200,000 in amounts currently due to dealers that have fronted shipping costs because some Shippers seek compensation from the dealers upon delivery.  Based on the foregoing, I believe

46

that the Debtors should be authorized, but not directed to pay $700,000 and this relief is in the best interest of the Debtors and their estates.

**H.  Debtors Motion for Entry of an Order Authorizing Debtors to (1) Honor Prepetition Obligations Pursuant to Their Customer Programs and (2) to Continue the Same in the Ordinary Course of Business (the "Warranty Motion")**

112.    The Debtors offer a year-long Warranty on all their manufactured, modular and park homes that their authorized dealers sell. The Warranty coverage commences when the homebuyer makes their purchase, and covers defects in workmanship including any factory-introduced failure of the structural, mechanical, electrical, plumbing, or weather-resistance systems – it does not cover any consequential or incidental damages related to the same. If coverage is triggered, the Debtors a) handle the repair in-house; b) hire the dealer to make the repair; c) hire a third party contractor to perform the work; or d) permit the homeowner to make the repairs and reimburse them for the same. The Warranty Motion describes the Debtors' warranty programs.

113.    As set forth in the Warranty Motion, third party contractors are selected on the basis of cost and quality of work; service managers have a number of relationships with their third party contractors. Some are explicitly on contract, and the vast majority routinely perform work for the Debtors. Accordingly, the Debtors' third party contractors have developed the experience necessary to quickly and correctly repair most of the problems that arise under the Warranties. Whenever the Debtors do not use their in-house staff to make the repair, the process is as follows: The Debtors pre-approve the repair, then the repair is made, and only then is the party performing the repair compensated. Since service is a precursor to payment, the Debtors believe that there are currently third party contractors holding claims for at least $610,000 for work performed prepetition under the Warranties for which they have not been compensated.

47

114. As set forth in the Warranty Motion Debtors calculate Warranty costs using a formula based on units, which yields an accrual of $3,100,000. I anticipate the Debtors will actually incur an additional $2,300,000 in Warranty costs through year-end.

115. I believe that any failure to make these third party providers whole with respect to prepetition amounts owed to them would be to the significant detriment of the Debtors' ongoing operations. First, to the extent that dealers have already made these repairs, any failure to reimburse them for the same will put a significant amount of unnecessary pressure on a critical relationship with its dealers, which for the reasons stated below, is already quite fragile. Second, the failure to pay prepetition repair claims with respect to the Warranties will harm the Debtors' relationship with the tradesmen that they routinely use, or with their customer base if customers are denied their promised reimbursement for repairs. The Debtors' relations with their dealers or customers may be further strained if third party vendors demand payment from the homeowners or dealers for repairs normally paid for by the Debtor, or if tradesmen attempt to place liens on the homes for the work that they performed.

116. Any failure to meet prepetition Warranty obligations will create a public impression that the Debtors will not honor Warranty obligations postpetition. Given the particularly competitive nature of this market, the Debtors submit that such a negative impression will significantly harm their efforts to maintain customer and dealer good will, and therefore negatively impact their sales. Therefore, either a failure to honor prepetition warranty obligations, including payment of outstanding bills to the Debtors' third party contractors, or to continue to offer the coverage associated with these industry-standard Warranties will substantially impair the Debtors' efforts to preserve the value of their estates.

48

117.    As set forth in the Warranty Motion, the Debtors also give purchasers the chance to opt for varying types of extended coverage (the "Extended Warranties") provided by a third party insurer.

118.    Because this coverage is provided by a third party, the home purchaser makes a single lump sum payment (ranging from approximately $75.00 to $300.00) to the Debtors. The Debtors remit the payment to the third party provider in exchange for Extended Warranty coverage. As of the Petition Date, the Debtors hold approximately $50,000.00 in payments that are due to third party insurers.

119.    I believe that the continuing opportunity to purchase extended coverage is a necessity if the Debtors are to remain competitive. Further I believe that, any failure of the Debtors to pass along such prepetition payments made for the same would alienate their customers and dealers as described above in conjunction with its traditional Warranty programs.

120.    As explained in the Warranty Motion, the Debtors offer rebate and discount programs to the dealers who sell their products (each, an "Incentive") designed to keep their products competitive in the eyes of the dealers that market them.

121.    I estimated that the Debtors owe their dealers approximately $9,300,000 in rebate Incentive payments based on prepetition sales for which rebates have not yet issued, and expect to accrue an additional $1,900,000 in such rebate Incentive payments between the Petition Date and year-end 2009, the majority of which will become payable in early 2010.

122.    I believe that any failure to honor these Incentives would seriously jeopardize the Debtors' reorganization efforts. The market for manufactured homes is extremely competitive. Dealers are not typically "captive" in that they only sell one manufacturer's homes. Rather, the dealers typically offer products supplied by a number of manufacturers. This means that dealers

49

are freely able to migrate toward the products offering the best return in salability and profitability terms. Accordingly, to keep dealers selling the Debtors' homes, it is imperative that the Debtors offer profitable, salable products to their existing dealer network. An important aspect of such profitability to dealers is honoring Incentives due to them.

123. Because these dealers are facing financial strains of their own, they are particularly interested in maximizing profits per sale, and I believe that Incentives will play a major role in determining which products dealers sell. Therefore I believe that, the continuation of the Incentive programs is essential to retain the support of the Debtors' dealers and to preserve the value of the estates.

124. In addition and as explained in the Warranty Motion, the Debtors also hold $3,000,000 in customer deposits made on homes that are in the process of being built (the "Customer Deposits"). I believe that Customer Deposits are integral to ensuring that the Debtors are not left with customized units that cannot be resold absent costly modification, and thus believe that continuing to accept Customer Deposits (and honor prepetition Customer Deposits) is in the best interests of the estates.

125. Any failure to honor their existing Customer Deposits, in my opinion, will not only impair their reputation in the marketplace, but will also harm their relationship with their dealers, who will be deprived of significant profits, and who will likely shift their loyalty and marketing efforts to other brands. Such a wholesale failure to honor Customer Deposits will drive end-user customers away in droves, which may render the Debtors' units unsalable.

50

**I.** **Motion of the Debtors for Entry of Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment**

126. In the normal course of business, the Debtors have relationships with various utility companies and other providers (each a "Utility Provider" and, collectively, the "Utility Providers") for the provision of telephone, gas, electricity and related services (the "Utility Services"). The Utility Providers include, without limitation, the entities set forth on the list attached as Exhibit A to that motion. The Debtors estimate that their average monthly payments to the Utility Providers aggregate approximately $480,000.

127. I believe the Debtors cannot continue to operate without continued Utility Services. If any of the Utility Providers alter, refuse or discontinue service, even for a brief period, I believe the Debtors' business operations would be severely disrupted. In contrast, the Utility Providers will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges. It is therefore critical that Utility Services continue uninterrupted and I believe that the relief requested in the motion is in the best interest of the Debtors' estates.

**J.** **Debtors' Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of Common Stock**

128. In connection with the operation of their business, the Debtors have incurred, and continue to incur, significant net operating and capital losses ("NOLs"). As of December 31, 2008, the Debtors had NOL carryforwards of approximately $346 million, and foreign tax credit, minimum tax credit and general business tax credit carry forwards of approximately $6,807. The Debtors seek authorization to protect and preserve these valuable tax attributes, (collectively, the NOL carryforwards and tax credit carry forwards are "Tax Attributes").

51

129.    The Tax Attributes are of significant value to the Debtors and their estates because the Debtors are permitted to carry forward their NOLs for federal income tax purposes to offset their future taxable income for up to 20 tax years, and can carry forward their Tax Credits for varying periods of time, to directly offset their federal tax liability, thereby reducing their future aggregate tax obligations. Among other things, the Tax Attributes may also be utilized by the Debtors to offset any taxable income or federal tax obligation generated by transactions completed during the Chapter 11 Cases. Accordingly, the Debtors' Tax Attributes could result in significant future U.S. federal income tax savings. In addition, I believe that the Debtors have significant Tax Attributes for U.S. state income tax purposes that the Debtors seek to protect and preserve.

130.    I believe the procedures set up by this motion to protect the Tax Attributes are appropriate and necessary to maximize the value of the Debtors' estates. The Debtors' Tax Attributes are valuable assets of their estates that will inure to the benefit of their stakeholders and facilitate the Debtors' reorganization. Unrestricted trading in the Common Stock with no advance warning of such trades jeopardizes these assets and impairs their value for the Debtors' stakeholders at large. The requested relief imposes a minimal burden to achieve a substantial benefit for the Debtors and their creditors and other interested parties. Accordingly I believe that the requested relief in this motion should be granted, including all of the procedures governing the trading of Common Stock.

52

**K.** **Motion of the Debtors for Entry of an Order Under 11 U.S.C. Sections 105(a), 361, 362, 363, and 364 and Fed. R. Bankr. P. 6004(A) For an Order Authorizing: Payment of Prepetition Obligations Incurred In the Ordinary Course of Business in Connection with the Workers' Compensation, Liability, Property, and Other Insurance Programs, Including Payment of Policy Premiums, and Brokers' Fees; and (II) Continuation of Insurance Premium Financing Programs (the "Insurance Motion")**

131. In connection with the operation of their businesses, the Debtors maintain workers' compensation, directors and officers liability, employment practices liability, fiduciary liability, crime, kidnap & ransom, inland cargo liability, foreign coverage, umbrella & excess liability and various other liability, property, and automobile insurance programs (collectively, the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers") under insurance contracts listed on an exhibit to the Insurance Motion.

132. I am informed that, the Debtors are required to maintain workers' compensation policies and programs to provide their employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "Workers' Compensation Program"). The current Workers' Compensation Program insures losses arising during the period October 1, 2009 through October 1, 2010. The Workers' Compensation Program includes a $500,000 per occurrence deductible, and the annual premium payable for such coverage is approximately $908,191 (the "Workers' Compensation Premium"). This workers' compensation coverage premium is subject to audit and annual retroactive adjustments until all claims under the policy are closed. The Worker's Compensation Program coverage is underwritten by Travelers Insurance ("Travelers"). Under the Travelers program, the Debtors continue to be billed daily for all reimbursable charges and claim handling fees up to the $500,000 per occurrence deductible until all claims are closed. Total losses billed in 2008 by Travelers were $5,732,162.

53

133. The Debtors maintain insurance coverage for all of their directors and officers that covers, among other things, defense costs, settlements, court awards and pre- and post judgment interest arising from claims brought by third parties alleging an insured is liable for an error, misstatement, misleading statement, improper act, omission, neglect or breach of duty (the "D&O Programs"). The aggregate limit of liability for these policies (primary and excess) is $50 million and the per occurrence deductible/self insured retentions, where applicable, are $0 for non-indemnifiable claims, $1,000,000 for SEC claims and $500,000 for all other claims. The aggregate annual premium is $1,249,500. The current policy period is April 4, 2009 to April 4, 2010.

134. The Debtors maintain general liability insurance that insures premises liability, products/completed operations liability, personal injury and certain excess employee benefits liability (the "Liability Insurance Programs"). The coverage provided by the Liability Insurance Programs is $250,000 per occurrence with aggregate annual limits of $3.5 million for product liability and $2.5 million for general liability. The per occurrence self insured retention under the general liability policy is $1,750,000. The aggregate annual premium for the general liability coverage is $67,646, and the current policy expires October 1, 2010.

135. The Debtors maintain automobile insurance that insures automobile liability, medical payments, uninsured and underinsured motorists and physical damage to hired vehicles (the "Automobile Insurance Programs"). The total amount of coverage provided by the Automobile Insurance Programs is $2,000,000 with a deductible of $500,000. The total aggregate annual deposit premium paid by Debtors for automobile insurance coverage is $231,680 and the current policy expires October 1, 2010.

54

136. The Debtors maintain property insurance that insures the Debtors' property for perils such as, but not limited to, fire, theft and earthquake (the "Property Insurance Programs"). The total amount of coverage provided by the Property Insurance Programs is $60,000,000 with a deductible of $1,000,000 per occurrence. The aggregate annual premiums for the Property Insurance Programs coverage is approximately $970,256 and the current policy expires May 1, 2010.

137. The Debtors maintain inland cargo insurance that insures direct physical loss or damage to property hauled for others in transit by Debtors. The total amount of coverage provided by these insurance programs is $100,000 with a deductible of $100,000 per occurrence. The aggregate annual deposit premium for the Inland Cargo Insurance Program coverage is $11,600 and the current policy expires August 1, 2010.

138. San Jose Advantage Homes maintains four policies separate from the Champion insurance program. Those policies relate to auto liability, general liability, workers compensation and real estate errors & omissions.

139. The Debtors maintain several other insurance policies that insure excess liability, engineers professional liability, foreign liability, fiduciary liability, employment practices liability, first party crime losses, and kidnap and ransom liability, ("Miscellaneous Policies"). The aggregate annual premium for the Miscellaneous Policies coverage is approximately $1,257,610.

140. The Debtors pay all insurance obligations through their Insurance Programs. The Debtors pay the premiums for certain of their coverage in full when due, and for certain of the Insurance Programs the Debtors finance payment over the course of the coverage year.

55

141.     Debtors employ an insurance broker, Aon Risk Services Central Inc. ("Aon"), to assist with the procurement and negotiation of the policies under the Insurance Programs. Aon provides services to and receives compensation from, the Debtors (the "Brokers' Fees") in connection with these services. To date in 2009, Aon was paid approximately $375,000 for the placement of the Property Program, Primary and Excess Liability Insurance Programs, Automobile Insurance Program, Workers' Compensation Program, Foreign Liability Insurance Program, and Kidnap/Ransom Liability Program, which became effective the year starting October 1, 2008. Aon also received approximately $556,588 in commission for the placement of the D&O Program, Fiduciary Liability, Commercial Crime coverage, Employment Practices Liability and miscellaneous bonds placed since October 1, 2008. I believe that as of the Petition Date, Aon is not owed any Brokers' Fees for services rendered relating to the period prior to the Petition Date.

142.     As part of their existing cash management system and financing arrangements, the Debtors have entered into two separate premium financing agreements covering certain of the policies under their Insurance Programs.

143.     I believe that the Debtors should be authorized, in their business judgment, to continue the Insurance Programs on an uninterrupted basis in accordance with the same practices and procedures as in effect prior the Petition Date, and to pay all premiums, claims, deductibles, excess payments, retrospective adjustments, settlement costs , insurance broker fees, and all other obligations arising under or in connection with the Insurance Programs (collectively, the "Insurance Obligations") including, in their sole discretion and business judgment, those Insurance Obligations that were due and payable or related to the period prior to the commencement of these Chapter 11 Cases.

56

144.    In addition, I believe the Debtors should be granted the authority to continue, in the ordinary course of business, their insurance premium financing arrangements and, to the extent necessary, to pay prepetition insurance premium financing obligations owed by the Debtors on account of such arrangements.

## L.    Motion of Debtors for Authorization, But Not Directing, To Pay Certain Prepetition Claims of Critical Vendors

145.    The Debtors use a variety of products in their manufacturing and construction process including lumber, plywood, drywall, steel, floor coverings, insulation, exterior siding, doors, windows, roofing materials, plumbing and electrical fixtures and hardware, finishing materials, and other specialty components as well as certain services (collectively, the "Building Materials"). The Debtors' business model enables them to produce a lower cost product because all aspects of the manufacturing process are tightly controlled. For example, the construction occurs on an "assembly line" and is not affected by adverse weather that can cause delays or damage Building Materials. This controlled environment enables the Debtors to use the Building Materials in a more efficiently manner resulting in a higher production rate and less Building Material waste. Theses production levels also permit the Debtors to purchase Building Materials on a larger scale and at a reduced cost.

146.    To maintain these efficiencies, the Debtors' manufacturing process, like that of conventional-on-site builders, is dependent upon a steady supply of Building Materials from vendors and other service providers. The business relationship that the Debtors have developed with these vendors and service providers has enabled them to negotiate competitive rates and a level of certainty that the Building Materials will be delivered in accordance with the various deadlines of the Debtors' projects. If the Debtors' supply of Building Materials is interrupted or if the Debtors are forced to purchase Building Materials at higher costs, assuming they can be

57

efficiently obtained in the necessary geographic locations, I believe it will likely slow or even stop their operations and hinder their ability to produce a lower cost and affordable product and meet scheduled delivery deadlines.

147. As of the Petition Date, some of the Debtors' vendors and service providers hold claims for payment due on account of Building Materials supplied to the Debtors. I believe that the payment of a portion or all of certain prepetition claims (the "Critical Vendor Claims") arising from the prepetition purchase of Building Materials is necessary to help prevent certain vendors and other service providers (the "Critical Vendors") from discontinuing the sale of Building Materials to the Debtors on the same favorable terms that were received prepetition.

148. I believe that the Debtors' entry into chapter 11 combined with the general economic climate and financial conditions of their vendors makes the payment of the Critical Vendor Claims vital to the Debtors' continuing business operations. I believe that the failure to pay the Critical Vendor Claims would result in (i) the Debtors' inability to obtain necessary Building Materials for their manufacturing operations, (ii) severe negative effects on the Debtors' customers, and (iii) temporary closure of the manufacturing facilities operated by the Debtors. Any temporary closures would likely prevent the Debtors from satisfying customer orders and the Debtors would risk that their customers would look to the Debtors' competitors to fulfill their order.

149. The Debtors have undertaken a thorough review of their accounts payable and ongoing operations to identify the Critical Vendors and the amount of Critical Vendor Claims. As of the Petition Date, I estimate that the Critical Vendor Claims aggregate approximately $4,553,000, which represents 33.8% of the total amount of vendor claims against the Debtors.

58

150.     Among the various projects of the Debtors, one of the Debtors, Western Homes, Inc. ("Western Homes"), has been engaged as a subcontractor among a hierarchy of contract-counterparties under a prime contract with the Department of the Navy (the "Camp Pendleton Contract"). Under the Camp Pendleton Contract, the Western Homes Debtor has agreed to build and deliver an initial approximately 47 buildings for the Camp Pendleton military base, with an additional 41 buildings possible. I estimate that the revenues under this contract and the additional phases will be approximately $25 million, which represents approximately 250% of the projected revenues for this Debtor during 2009. I estimate that the prepetition claims (the "Western Home Vendor Claims") of vendors and service providers that supplied goods and services relating to the Camp Pendleton Contract is in the aggregate approximately $812,000. I believe that it is essential that the commencement of Western Home's chapter 11 case does not interfere with its operation or cause any delays with the various production deadlines and liquidated damages that the Western Homes Debtor is subject to under the Camp Pendleton Contract.

151.     I submit that the payment of the Camp Pendleton Claims will help preserve and enhance the value of these estates and benefit the economic stakeholders in these cases. Present estimates indicate that this project will generate significant earnings and, therefore, it is in the best interest of the estate to perform this project in a timely and professional manner. The payment of the Camp Pendleton Claims, will, therefore, not harm but benefit the Debtors' estates.

152.     The Western Homes Debtors is subject to certain risks if it does not pay its vendors on a timely basis. For example, the government counterparty under the prime contract may invoke certain federal regulations that permit it to reduce or suspend payments to the

59

Western Homes Debtor until the Camp Pendleton Vendors are paid. More importantly, failing to pay suppliers and subcontractors could cause manufacturing to cease all together – jeopardizing the schedule of deadlines and harming the entire project. Thus, the payment of the Camp Pendleton Claims ensures that the Debtor will continue to receive the full amount of each installment payment due under the Camp Pendleton Contract.

**L.** **Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 365: (1) Authorizing Debtors to (A) Obtain Post-Petition Financing, and (B) Grant Senior Liens, Junior Liens and Superpriority Administrative Expense Status; (II) Approving Use of Cash Collateral; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief**

153. In connection with the commencement of their chapter 11 cases, the Debtors filed their Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 365: (1) Authorizing Debtors to (A) Obtain Post-Petition Financing, and (B) Grant Senior Liens, Junior Liens and Superpriority Administrative Expense Status; (II) Approving Use of Cash Collateral; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief (the "DIP Financing Motion").

154. Under the DIP Financing Motion, the Debtors seek authorization to incur (i) up to $2 million in a synthetic letter of credit facility ("DIP LCs") upon entry of an interim order, (ii) up to $38 million in principal amount of new money loans (the "New Money Loan"), of which up to $30,335,052 in principal amount will be advanced upon entry of an interim order and the closing date and the remaining balance will be made available upon entry of a final order, and (iii) a dollar-for-dollar roll-up of up to $40 million in principal amount of outstanding prepetition loans and other credit extensions of the lenders under the Debtors' prepetition credit agreement (the "Prepetition Credit Agreement") (and/or their affiliates) who fund the New Money Loans and DIP LCs, plus an additional principal amount equal to any amount of interest on the Roll-Up

60

Loans that is paid in kind (the "Roll-Up Loan" and, together with the New Money Loan and the DIP LCs, the "DIP Loan").

155.    As noted above, the Debtors' estimated liabilities under the Prepetition Credit Agreement aggregate approximately $187 million, comprising approximately $26.6 million in principal obligations (excluding letters of credit) outstanding under a revolving loan, $12.9 million in revolving letters of credit, $45.4 outstanding under the U.S. term loan, and the pound sterling equivalent of approximately $59.9 million outstanding under the sterling term loan. Furthermore, the synthetic letter of credit outstandings are approximately $42.1 million, plus, in each case, certain interest and fees.

156.    In addition to these financial obligations, and as I explained in greater detail above, the market for factory-built housing has been affected by a number of factors, including the availability, cost and credit underwriting standards of consumer financing, consumer confidence, employment levels, general housing market and other economic conditions and the overall affordability of factory-built housing versus other forms of housing. These factors have led to a reduced demand for housing and the Debtors' U.S. manufacturing operations has suffered cash losses, the unwinding of the negative working capital position at the international segment, and reduced earnings from the Canadian operations. I believe these factors have combined with the Debtors' significant cash interest burden to consume their liquidity, leading to the decision to file for protection under the Bankruptcy Code and seek the relief in the DIP Financing Motion.

157.    In preparation for these cases, the Debtors and their advisors surveyed various sources of prospective postpetition financing, including financing from the lenders (the

61

"Prepetition Lenders") under the Prepetition Credit Agreement and certain unrelated third parties.

158.    The Debtors' efforts to obtain credit except as provided under the DIP Loan was impacted by the fact that all or substantially all of the Debtors' assets are encumbered. The financing proposals from unrelated third-parties would have entailed the "priming" of the Prepetition Lenders' pre-petition "blanket" liens. During the negotiations between the Debtors and the lenders under the DIP Loan, the Prepetition Lenders declined to entertain certain proposals for alternative financing except on the terms and conditions offered under the DIP Loan. After considering all of their alternatives, and in consultation with my advisors, I concluded that the financing to be provided by the DIP Loans represents the best financing presently available to the Debtors.

159.    I am informed and believe that if the Debtors were to borrow the amounts under the DIP Loan from an unrelated third-party lender that required security senior to that of the of the Prepetition Lenders, the Debtors could only obtain such loan after an extended, contested hearing on whether the affected parties are adequately protected under the applicable provisions under the Bankruptcy Code. In light of the risk involved, the fees and expenses that would be incurred, and economics offered by the DIP Loan, I believe that the DIP Loan is the best financing available under the circumstances that such loan was negotiated among the parties at arms' length and in accordance with their sound business judgment.

160.    The DIP Credit Agreement permits the Debtors to draw immediately $32,335,052 from the New Money Loan, $2 million of which is DIP LCs, after interim authorization by the Court. With the assistance of the Debtors' financial advisors, I developed a budget setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis

through and including the date that is four and one-half months (20 weeks) after the Petition Date (as amended from time to time, the "Approved DIP Budget"), a copy of which is annexed to the DIP Financing Motion as Exhibit C. In this regard, I believe that the Approved DIP Budget is achievable and the commitment under the DIP Loan will enable the Debtors to meet all of their administrative obligations during the initial stages of these chapter 11 cases will enable them to operate their business without the accrual of unpaid administrative expenses.

161. In addition to other covenants and conditions, the Debtors' borrowings under the DIP Loan are also subject to the following timelines for the proposed sale process. The Debtors will have (i) filed a motion, in form and substance acceptable to the Administrative Agent, to sell substantially all of their assets (on terms and other documentation in form and substance acceptable to the Administrative Agent and the Required Lenders), by no later than thirty-seven (37) days from the Petition Date, (as defined above, the "Sale Motion Milestone"), (ii) by no later than sixty-one (61) days from the Petition Date, obtained entry of an order of the Bankruptcy Court, in form and substance acceptable to the Administrative Agent (as defined above, the "Bidding Procedures Order"), approving bidding procedures with respect to such sale, (iii) by no later than ninety (90) days from the Petition Date, conducted an auction pursuant to the Bidding Procedures Order, (iv) by no later than one hundred (100) days from the Petition Date, obtained entry of an order approving a sale of substantially all of the Debtors' assets, in form and substance acceptable to the Administrative Agent (as defined above, the "Sale Order"), and (v) by no later than one hundred and ten (110) days from the Petition Date, consummated the sale approved by the Sale Order.

162. The Debtors' available cash collateral is insufficient to fund their necessary expenditures without the borrowing under the DIP Loan. I believe that if these expenditures are

63

not made, the Debtors will be forced to cease operations, which would cause substantial harm to their business, destroy going concern value, and prevent the Debtors the opportunity to reorganize and maximize value.

163.    To avoid these results, the Prepetition Lenders have consented to the Debtors' use of cash collateral in the ordinary course of business in accordance with the Approved DIP Budget, subject to the approval and entry of an order approving the DIP Loans and the adequate protection liens and payments discussed in greater detail in the DIP Financing Motion.

164.    I believe that with the use of cash collateral that the other terms and conditions of the DIP Loan are the best possible under the circumstances of these cases, and were negotiated in good faith and at arm's-length with all parties represented by experienced counsel. Thus, the approval of the DIP Financing Motion and use of cash collateral will enable the Debtors to achieve the milestones described above and provide the Debtors with immediate and ongoing liquidity to satisfy their various operating expenditures, including postpetition wages and salaries and utility and vendor costs, as discussed in more detail above. In this regard, the availability under the DIP Loan will provide confidence to the Debtors' vendors and will be viewed favorably by the Debtors' employees, thereby aiding in the administration of these cases and enabling them to achieve the milestones in these cases and effect a successful sale.

**M.      Joint Motion Pursuant to Section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018 for Authorization to File Under Seal Certain DIP Letters Related to the Proposed Senior Secured Super Priority Priming Debtor-in-Possession Credit and Guaranty Agreement**

165.    In connection with the commencement of their chapter 11 cases, the Debtors filed their *Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 365: (1) Authorizing Debtors to (A) Obtain Post-Petition Financing, and (B) Grant Senior Liens, Junior Liens and Superpriority Administrative Expense Status; (II) Approving Use of Cash*

*Collateral; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV)*

*Scheduling a Final Hearing; and (V) Granting Related Relief* (the "DIP Financing Motion").

The DIP Financing Motion requests approval of the terms and conditions of the DIP Credit

Agreement (the "DIP Loan"), for the purpose of financing the ongoing operations of the

Debtors' business during these chapter 11 cases.

166.    It is my understanding that the DIP Lenders believe that publication of the terms

of the DIP Letters would be inappropriate and materially harmful to the DIP Lenders in other

matters.  I further understand that the Debtors agreed to seek such relief jointly because all other

fees in connection with the DIP Facility have been disclosed in the DIP Financing Motion and

the DIP Lenders are permitting disclosure of the DIP Letters to certain key constituencies in

these cases, as described in that motion.

I declare under the penalty of perjury that the forgoing is true and accurate to the

best of my knowledge.

November 15, 2009

Phyllis A. Knight
Chief Financial Officer

65