IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHAMPION ENTERPRISES, INC., et al., [1] | ) | Case No. 09-14019 (___) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**MOTION OF DEBTORS FOR ENTRY OF ORDER UNDER 11 U.S.C. §§ 105, 345, 363, 503, 1107, AND 1108 AUTHORIZING (I) MAINTENANCE OF CERTAIN EXISTING BANK ACCOUNTS, (II) CONTINUED USE OF EXISTING BUSINESS FORMS, (III) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (IV) CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS AND EXERCISE OF INTERCOMPANY SETOFF RIGHTS, (V) GRANT OF POSTPETITION ADMINISTRATIVE PRIORITY TO INTERCOMPANY CLAIMS, AND (VI) LIMITED WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move the

Court for entry of order under 11 U.S.C. §§ 105, 345, 363, 1107, and 1108 authorizing (i) the

maintenance of certain existing bank accounts including the authority to pay routine prepetition

banking fees owed to financial institutions, (ii) the continued use of existing business forms,

(iii) the continued use of their existing cash management system, (iv) the continued performance

of intercompany transactions and exercise of intercompany setoff rights, (v) grant of postpetition

administrative priority to intercompany claims, and (vi) a limited waiver of the 11 U.S.C. §

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642). The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

In support of the Motion, the Debtors respectfully represent as follows:

## Jurisdiction

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are section 105(a), 345, 363, 503(b)(1), 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4. The Debtors and their non-debtor affiliates are leading producers of manufactured and modular housing, as well as modular buildings for government and commercial applications. The Debtors distribute these products through independent retailers, builders and developers. In addition to their manufacturing operations, the Debtors also sell manufactured homes directly to certain manufactured home parks in California and transport manufactured homes, recreational vehicles and a variety of other products including semi

trailers, flat beds, tankers, boats, conversion vans, cargo trailers and horse trailers from manufacturing factories to retailers.

5. The Debtors' principal prepetition financing was provided by a revolving credit line under the *Amended and Restated Credit Agreement*, dated as of April 7, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement") pursuant to which Champion Home Builders Co. is borrower and Credit Suisse, Cayman Islands Branch ("Credit Suisse") is agent. Concurrently with the filing of this Motion, the Debtors have filed their *Motion to Approve Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 365 and 507: (1) Approving Senior Secured Superpriority, Postpetition Financing; (2) Authorizing Use of Cash Collateral; (3) Granting Liens and Providing Superpriority Administrative Expense Status; (4) Granting Adequate Protection; (5) Modifying the Automatic Stay; and (6) Scheduling a Final Hearing* (the "DIP Motion") seeking authorization to enter into that certain *Debtor-in-Possession Credit Agreement* (the "DIP Financing").

6. The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Phyllis Knight, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Knight Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

## Relief Requested

7. By this Motion, the Debtors seek authorization (a) to maintain their existing bank accounts as described on Exhibit A hereto (the "Accounts") and to pay any prepetition routine banking fees imposed by the financial institutions of the Accounts, (b) to

continue to use their existing check stock and business forms until existing check stocks are

exhausted and until business forms can be modified, (c) to continue to use their existing cash

management system, (d) to continue to perform intercompany transactions and exercise

intercompany setoff rights in accordance with existing business practices, (e) to grant

postpetition administrative priority to intercompany claims, and (f) for a limited waiver of the

deposit and investment guidelines imposed under section 345(b) of the Bankruptcy Code.

## The Cash Management System

8.    The Debtors' cash management system (the "Cash Management

System") is a network of bank accounts that facilitates the timely and efficient collection,

management, and disbursement of funds used in the Debtors' business. Because of the nature

of the Debtors' business and the disruption to the business that would result if they were

forced to close the Accounts, it is critical that the Cash Management System remain in place.

9.    The Cash Management System consists of an integrated network of bank

accounts maintained at Comerica Bank, Wells Fargo, Bank of America, Bank of the West,

Branch Banking & Trust, Fremont Bank, First Niagara, First Bank, PNC Bank and Bank First

(collectively, the "Primary Banks"). The Cash Management System consists of the

approximately 56 domestic bank accounts shown on Exhibit A. A diagram summarizing the

role of each of the Accounts in the Cash Management System is attached hereto as Exhibit B.

The Debtors use the Bank Accounts to manage their cash receipts, transfers and disbursements

for the Debtors' entire domestic corporate enterprise.[2]

---

[2] If approved, the DIP Financing will require the establishment of additional bank accounts on a
postpetition basis, as described below.

## Collection and Deposits

10.     The Debtors derive substantially all of their revenue from sales to their customers. Revenues generated by the Debtors' sales are deposited into accounts that are then swept regularly into the Debtors' master depository account at Comerica (the "Master Depository Account"). Certain payments from floorplan lenders[3] and other miscellaneous wire transfers are deposited directly into the Master Depository Account.

11.     Intercompany loan payments from the Debtors' foreign subsidiaries and certain other miscellaneous wires are deposited directly into an operating account at Comerica (the "Concentration Account"), the proceeds of which are generally used for operations and are not swept into the Master Depository Account. In addition, certain small cash balances are maintained in separate accounts for petty cash and local operations expenses.

12.     Prepetition, excess cash would be deposited periodically into an investment account at Comerica (the "Investment Account") and invested in the Dreyfus Institutional Preferred Plus Money Market Fund (the "Dreyfus Fund"). The Dreyfus Fund invests in a diversified portfolio of dollar-denominated short-term debt securities. Normally, the fund invests at least 25% of its net assets in domestic or dollar-denominated foreign bank obligations. As of the Petition Date, there are no funds on deposit in the Investment Account. However, the Debtors currently intend to keep the Investment Account open postpetition to the extent that they elect to deposit funds therein for investment in the Dreyfus Fund.

---

[3] The purchase of the Debtors' products is financed, in part, by loans made to the customers by third party "floorplan lenders" who make payments for product directly to the Debtors on the customers' behalf.

## The Operating and Disbursement Accounts

13.     Under the existing Cash Management System, the Debtors' main operating accounts are the Master Depository Account and the Concentration Account, both at Comerica. The balances of these accounts fluctuate and, as of the Petition Date, were approximately $1.0 million in the aggregate. The Debtors use the Master Depository Account and the Concentration Account to fund (a) corporate expenses such as bank interest payments, payroll, insurance, sales and use taxes and other taxes, employee health insurance and 401k benefits, and (b) operating expenses such as product and inventory purchases through general checking accounts that draw from the Master Depository Account as reflected on Exhibit B. Draws on the Debtors' revolving credit facility or intercompany loans are used to cover any deficiency in the amounts required to be disbursed.

14.     As reflected in the DIP Motion, if approved by the Court, it is contemplated that the proposed DIP Financing will fund (i) a reserve account ("Reserve Account") which shall be used to fund, on a monthly basis, an operating account ("Operating Account") which in turn shall be used to fund, through the Debtors' existing Cash Management System and direct payments to third parties, the operating expenses and capital expenditures of the Debtors, certain expenses of Credit Suisse (the agent for the Debtors' prepetition and proposed postpetition lenders), professional fees and expenses incurred by the Debtors and their estates and similar costs, all pursuant to budgets approved by the DIP Financing lenders, (ii) an interest reserve account ("Interest Reserve Account") to periodically fund postpetition interest and letter of credit fees due to the DIP Financing lenders, and (iii) a carve out account ("Carve Out Account") to fund budgeted professional fees and expenses

pursuant to the approved budget. The Reserve Account, Interest Reserve Account, Operating Account and Carve Out Account (collectively, the "DIP Accounts") shall be managed accounts held at a financial institution to be selected by Credit Suisse from the list of approved financial institutions published by the United States Trustee for Delaware. Each DIP Account shall be subject to the control of the Collateral Agent as cash collateral and as a cash reserve (and governed by appropriate blocked account and control agreements).

### The Court Should Authorize the Debtors to Maintain the Accounts

15. The United States Trustee for the District of Delaware has established certain operating guidelines for debtors in possession. One such provision requires a Chapter 11 debtor in possession to open new bank accounts and close all existing accounts. The United States Trustee Guidelines also require that the new bank accounts only be opened in certain financial institutions designated as authorized depositories by the United States Trustee. This requirement, designed to provide a clear line of demarcation between prepetition and postpetition claims and payments, helps to protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

16. The Debtors seek a waiver of the United States Trustee's requirement that the Accounts be closed and new postpetition bank accounts be opened at depositories authorized by the United States Trustee. If strictly enforced in these cases, the United States Trustee's requirement would cause a severe disruption in the Debtors' activities and would impair the Debtors' ability to operate under Chapter 11. Additionally, the Debtors presently

intend to expeditiously pursue a sale of assets for the benefit of creditors. Therefore, this relief may only be required for a relatively short time with respect to certain of the Accounts.

17. Maintenance of the Accounts will greatly facilitate the Debtors' operations in Chapter 11. As noted on Exhibit B hereto, there is not one single account into which principally all payments from the Debtors' customers are deposited. Rather, customer payments are deposited into several different Accounts. Similarly, vendor and similar payments are made from a number of the Accounts. If the Accounts were closed, the Debtors would have to open new accounts and then attempt to arrange alternative electronic and manual payment procedures with customers and vendors, which would completely disrupt the flow of the Debtors' receipt of sales revenues and the Debtors' payment of debts incurred after the Petition Date. In addition, closing the Accounts would require the Debtors to cancel and reinstitute wire transfer instructions for various entities, all of which would be difficult to modify under these exigent circumstances. These disruptions would severely impact and could irreparably harm the Debtors' ability to operate their business.

18. To avoid disruptions and delays in the operation of the Debtors' business, the Debtors should be permitted to continue to maintain the Accounts and, if necessary, to open new accounts or close unnecessary existing accounts. The Debtors will promptly advise the United States Trustee of any Accounts that are closed or new accounts that are opened.

19. To guard against improper transfers resulting from the honoring after the Petition Date of checks issued before the Petition Date, the Debtors propose that the Banks will be instructed that they may not honor checks drawn on the Accounts before the Petition

Date, except upon limited, Court-approved exceptions. Subject to a prohibition against honoring checks or offsets arising prior to the Petition Date without specific authorization from this Court, the Debtors request that they be authorized to maintain and continue the use of the Accounts in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period.

20.     If the relief requested herein is granted, the Debtors will not pay, and each of the Banks where the Accounts are maintained will be instructed not to pay, any debts incurred before the Petition Date, other than as specifically authorized by this Court.

### The Court Should Authorize the Debtors to Continue their Existing Cash Management System

21.     The Debtors hereby seek authority to continue to use the Cash Management System, as such system may be modified pursuant to the requirements of any DIP Financing and/or Court-approved cash collateral usage, and related orders of this Court.

22.     For the reasons set forth above, the Cash Management System constitutes an essential business practice and was created and implemented by the management of the Debtors in the exercise of their business judgment. The use of the Cash Management System, moreover, is attributable to the numerous benefits it provides, including the ability to (a) process and timely pay expenses; (b) allow a mechanism for deposits from sales revenues; (c) ensure cash availability; (d) control and monitor corporate funds; and (e) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information. In addition, preserving a "business as usual" atmosphere and avoiding the unnecessary distractions that would inevitably be

associated with a substantial disruption of the Cash Management System will facilitate and

enhance the Debtors' efforts to continue to operate postpetition. Moreover, the Debtors

submit that the relief requested is consistent with the relief provided to debtors in numerous

other cases pending in this District.

### The Court Should Grant the Debtors Authority to Use
### Existing Business Forms and Checks to the Limited Extent Requested Below

23.     To minimize expense to their estate, the Debtors also request authority

to (i) continue to use all correspondence and business forms (including, but not limited to

letterhead, purchase orders, invoices, etc.) until such time as the Debtors can effectuate the

necessary changes to such forms in order to add the "debtor in possession" label, and

(ii) continue using their existing check stock without reference to the "debtor in possession"

status until such time as the Debtors can effectuate the necessary changes to such forms in

order to add the "debtor in possession" label (all such correspondence, check stock, books and

records and other business forms collectively referred to herein as "Business Forms"). For

example, while the Debtors' accounting system prints all checks as necessary for the Debtors'

operating account, some of the Debtors' accounts have preprinted check stock and other

business forms, such as correspondence, purchase orders and invoices. As such, the Debtors

estimate that it may take some time to insure that new forms are properly generated with the

"debtor in possession" label. The Debtors will require approximately one week to make the

changes to most checks and other Business Forms, and the Debtors will require approximately

two weeks to replace all hard-copy checks, correspondence, purchase orders and invoices.

## Payment of Outstanding Routine Prepetition Expenses
## Relating to the Operation of the Cash Management System

24.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtors incur routine bank charges and fees relating to the administration of the Cash Management System. The Debtors do not believe that their unpaid prepetition banking fees are in excess of $50,000. The Debtors therefore seek authority, in their sole discretion, to pay any such routine prepetition banking fees owed to the Banks.

## The Debtors Should Be Authorized to Continue Their
## Intercompany Arrangements; Intercompany
## Claims Should Be Afforded Administrative Expense Status

25.     Prior to the Petition Date, the Debtors, amongst themselves, engaged in intercompany financial transactions in the ordinary course of their businesses (collectively, the "Intercompany Arrangements"). Intercompany transactions are recorded on the applicable Debtor's general ledgers as an intercompany payable, receivable or loan. In the ordinary course of business as part of their consolidated Cash Management System, certain intercompany transactions are made between and among certain Debtors, and in some cases, the transactions are made between and among, on the one hand, the Debtors and, on the other hand, the Debtors' (i) international affiliates operating in the UK, or (ii) international affiliates operating in Canada, or (iii) Dutch affiliate CHB International B.V. ("CHB International"), which owns the Debtors' international affiliates operating in the UK and Canada.

## Intercompany Transactions With Non-Debtor Affiliates

26.     At any given time, there may be balances due and owing from one Debtor to another Debtor or, in the case of international intercompany accounts, from a Debtor to a non-Debtor affiliate. These balances represent extensions of intercompany credit

made in the ordinary course of business. The Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Arrangements. The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

27.     It is critical to preserve the Debtors' ability to engage in intercompany transactions while they reorganize. In particular, the Debtors' DIP Financing budget assumes that there will be a free flow of funds between the U.S., Canada and UK operations (in some cases, via CHB International) to cover expenses as they arise across the enterprise. Specifically, the DIP Financing budget projects that the U.S. is the net beneficiary of $3.0 million from Canada through March 2010, after assuming the maintenance of minimum cash balances of $2,000,000 by the Canadian operations. Additionally, there will be cash flowing out from the Debtors, to Canada and the UK in the short term, of which a portion is expected to be repatriated later in 2010. Short term outflows to the UK are expected to peak at $7.9 million in short term funding during November 2009 and total outflows to the UK are projected to aggregate up to $2.6 million, as contemplated by the DIP budget. It is critical that the flow of funds between the entities continue without interruption. If the Debtors' U.K. operations are not funded, the Debtors' UK affiliate will not be able to continue operations, which would result in a diminished enterprise value for the Debtors and would impede their efforts to sell their assets for the benefit of their creditors. Given that the Debtors' domestic operations rely upon the income generated by the UK and Canadian operations, a disruption in those foreign operations would redound to the detriment of the Debtors.

## Intercompany Claims Between Affiliated Debtors

28.     The Debtors hereby request authority to continue to operate the Cash Management System to enable the Intercompany Arrangements to continue postpetition in the ordinary course of business.  To ensure each individual entity will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims between and among affiliated Debtors arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status.  If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

## The Court Should Grant a Limited Waiver of 11 U.S.C. § 345(b) on an Interim Basis

29.     The Debtors seek an interim waiver of section 11 U.S.C. § 345(b) of the Bankruptcy Code subject to final approval.  The waiver would permit the Debtors to maintain the Accounts without posting a bond or other security, as would otherwise be required under section 345(b) whenever the funds on deposit exceed the amount permitted under section 345(b).  As explained above, balances in the Debtors' operating accounts fluctuate based on sales receipts and expenses.  From and after the Petition Date, the Debtors contemplate that substantially all excess cash will be concentrated in the Master Depository Account, the Concentration Account, and the Investment Acount, and that there will also be cash balances in the DIP Accounts to be used pursuant to an agreed budget.

30.     Most accounts in which balances are maintained will not exceed FDIC

coverage. For instance, it is anticipated that the Master Depository Account and the

Concentration Account will exceed FDIC coverage (the average balance is estimated to be

approximately $6.5 million). In addition, if approved, the DIP Accounts will have large

balances. However, to the extent that Accounts exceed the FDIC limit, the Debtors will seek

to obtain collateralization agreements executed by Comerica and/or other banks where such

deposits are maintained.

## Authority for the Requested Relief

**A.    The Continued Use of the Debtors' Routine Cash Management
System, Bank Accounts, and Business Forms is Essential to the
Debtors' Operations, and Approval to Maintain the Status Quo
Is Routinely Granted Under the Bankruptcy Code Sections 363 and 105**

31.     Bankruptcy courts routinely grant Chapter 11 debtors authority to

continue utilizing existing cash management systems and treat requests for such authority as a

relatively "simple matter." *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio

1987). This is particularly true where, as here, the Chapter 11 case involves entities with

complex financial affairs. In *In re Charter Co.*, 778 F.2d 617 (11th Cir. 1985), for example,

the bankruptcy court entered an order authorizing the debtor and forty-three (43) of its

subsidiaries "to continue to consolidate the management of its cash as has been usual and

customary in the past, and to transfer monies from affiliated entity to entity, including

operating entities that are not debtors." *Id.* at 620. The Eleventh Circuit Court of Appeals

then affirmed a subsequent district court decision denying a creditor's motion for leave to

appeal the bankruptcy court's cash management order, holding that authorizing the debtor to

utilize its prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code. *Id*. at 621.

32. Likewise, in another context, the bankruptcy court in the *Columbia Gas* Chapter 11 case explained that a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticabilities of maintaining separate cash accounts for the many different purposes that require cash." *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1993), *aff'd in part* and *rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 114 S. Ct. 1050 (1994). The Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient." *Columbia Gas*, 997 F.2d at 1061. *See also In re Southmark Corp.*, 49 F.3d 111, 114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets"); *In re UNR Indus., Inc.*, 46 B.R. 25, 27 (Bankr. N.D. Ill. 1984).

33. Section 363(c)(1) of the Bankruptcy Code authorizes a debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). The purpose of section 363(c)(1) of the Bankruptcy Code is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without undue oversight by creditors or the court. *In re Lavigne*, 114 F.3d 379, 384 (2nd Cir. 1997). Included within the purview of section 363(c) is a debtor's ability to continue the "routine transactions" necessitated by a debtor's cash management system. *In re Amdura Corp.*, 75 F.3d 1447, 1453 (10th Cir. 1996).

Accordingly, the Debtors seek authority under section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and disbursement of cash pursuant to the Cash Management System as described above.

34. Additionally, the Court may exercise its equitable powers to grant the relief requested herein. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Continuing the Debtors' Cash Management System without interruption is vital to the success of the Chapter 11 Cases. The Cash Management System is an important mechanism whereby the Debtors are able to transfer their revenues—collected through various channels—toward the payment of their obligations, without which the Debtors' reorganization would fail.

35. In other cases in this District, this Court has granted relief similar to that requested in this Motion. *See, e.g.*, *In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re Monaco Coach Corporation, et al.*, Case No. 09-10750 (KJC) (Bankr. D. Del. March 10, 2009); *In re eToys Direct 1, LLC, et al.*, Case No. 08-13412 (BLS) (Bankr. D. Del. Dec. 30, 2008); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western Nonwovens, Inc., et al.*, Case No. 08-11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc., et al.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008); *In re Aegis Mortgage Corp.*, Case No 07-11119 (BLS) (Bank. D. Del. Aug. 16, 2007); *In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (PJW) (Bank. D. Del. Feb. 5, 2007); *In re Global Home Products, LLC et al.*, Case No. 06-10340 (Bankr. D. Del. April 11, 2006); *In re Maxide*

*Acquisition, Inc.*, Case No. 05-10429 (Bankr. D. Del. Feb. 15, 2005); *In re Cable and Wireless USA, Inc., et al.*, Case No. 03-13711 (Bankr. D. Del. Dec. 10, 2003); *In re Redback Networks Inc.*, Case No. 03-13359 (Bankr. D. Del. Nov. 5, 2003); *In re Chi-Chi's, Inc.*, Case No. 03-13063 (Bankr. D. Del. Oct. 9, 2003).

36.     It is well within the Court's equitable powers under section 105(a) to approve the continued use of the Cash Management System and to authorize the Debtors' continued use of their existing business forms, including, but not limited to, purchase orders, letterhead, envelopes, promotional materials, checks and business forms, without reference to the Debtors' debtor-in-possession status, substantially in the forms existing immediately before the Petition Date.

37.     As noted above, as part of the Cash Management System, the Debtors maintain their Bank Accounts and utilize numerous preprinted business forms in the ordinary course of their businesses. For example, while the Debtors' accounting system prints all checks as necessary for the Debtors' operating account, as noted above, some of the Debtors' accounts have preprinted check stock and other Business Forms. The Debtors shall use reasonable efforts to mark "Debtor-in-Possession" on their Business Forms as soon as reasonably practicable following the Petition Date.

**B.      An Interim Waiver of Section 345(b) to Allow the Debtors to
Continue to Use Their Accounts Without the Need for Posting
a Bond or Providing Other Security Is Appropriate in This Case**

38.     The Debtors seek an interim waiver of the requirements of Bankruptcy Code section 345, subject to final approval by this Court. Bankruptcy Code section 345(a) authorizes deposits or investments of money "as will yield the maximum reasonable net return

on such money, taking into account the safety of such deposit or investment." Section 345(b)

provides:

> Except with respect to a deposit or investment that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States, the trustee shall require from an entity with which such money is deposited or invested --
>
> 1) a bond –
>
> A. in favor of the United States;
>
> B. secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and
>
> C. conditioned on --
>
> i) a proper accounting of all money so deposited or invested and for any return on such money;
>
> ii) prompt repayment of such money and return; and
>
> iii) faithful performance of duties as a depository; or
>
> 2) the deposit of securities of the kind specified in section 9303 of title 31 unless the court for cause orders otherwise.

39. The Court's ability to excuse strict performance of the deposit and

investment requirements of section 345(b) "for cause" arises from the 1994 amendments to the

Bankruptcy Code. The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates. The purposes (sic) is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of smaller Debtor with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated Debtors. This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling *In re Columbia Gas Systems, Inc.*, 33 F.3d 294 (3d Cir. 1994).

*In re Service Merchandise Company, Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).

      40.    In determining whether the "for cause" standard has been met, the Court should consider a "totality of the circumstances," utilizing the following factors:

      a.    The sophistication of the debtor's business;

      b.    The size of the debtor's business operations;

      c.    The amount of the investments involved;

      d.    The bank ratings (Moody's and Standard and Poor) of the financial institutions where the debtor in possession funds are held;

      e.    The complexity of the case;

      f.    The safeguards in place within the debtor's own business of insuring the safety of the funds;

      g.    The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

      h.    The benefit to the debtor;

      i.    The harm, if any, to the estate; and

      j.    The reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*Id.*

      41.    Because of the nature of their operating business, the Debtors may, at certain times, have funds accumulated in the Accounts that exceed the limits provided in

section 345, and therefore necessitate a waiver of section 345(b). Unless the Debtors are granted a waiver from Bankruptcy Code section 345(b), the Debtors' business and their ability to effectuate the sale of their assets will be prejudiced for the reasons discussed above. The Debtors will also present a form of collateralization agreement to Comerica, to the extent one has not already been executed, and to such other of the Banks where deposits may exceed federally insured amounts. The Debtors submit that their funds will not be sufficiently at risk to necessitate strict adherence to the requirements of section 345(b) of the Bankruptcy Code. Additionally, the Debtors request that the relief granted at the first day hearing under section 354(b) be on an interim basis only and subject to final approval.

42.    In other Chapter 11 cases, courts have liberally construed the requirement of section 345(b) that a debtor in possession obtain a bond from any entity with which its money is deposited or invested. In those instances, courts, including many within this district, have waived the requirements of section 345(b) and replaced them with alternative procedures. *See e.g., In re Filene's Basement, Inc., et al.*, Case No. 09-11525 (MFW) (Bankr. D. Del. May 5, 2009); *In re Monaco Coach Corporation, et al.*, Case No. 09-10750 (KJC) (Bankr. D. Del. March 10, 2009); *In re eToys Direct 1, LLC, et al.*, Case No. 08-13412(BLS) (Bankr. D. Del. Dec. 30, 2008); *In re Global Motorsport Group, et al.* Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 1, 2008); *In re Aegis Mortgage Corp.*, Case No 07-11119 (BLS) (Bankr. D. Del. Aug. 16, 2007); *In re Mortgage Lenders Network, USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Feb. 5, 2007); *In re Breuners Home Furnishings Corp.*, Case No. 04-12030(PJW) (Bankr. D. Del. July 16, 2004); *In re Redback Networks, Inc.*, Case No. 03-13359 (CGC) (Bankr. D. Del. Nov. 5, 2003); *In re Focal Communications*

*Corporation*, Case No. 02-13709 (KJC) (Bankr. D. Del. Dec. 20, 2002); *In re Integrated Health Services, Inc.*, Case No. 00-389 (MFW) (Bankr. D. Del. Feb. 2, 2000).

43.     For the foregoing reasons, it is critical that the Debtors utilize the Cash Management System and continue to use their existing business forms as set forth herein, without disruption. Accordingly, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code and case law for the Court to approve the Debtors' centralized Cash Management System and grant a waiver of the requirements of section 345(b) of the Bankruptcy Code on an interim basis pending a final hearing.

**C.     The Debtors Should Be Permitted to Continue**
**Intercompany Arrangements**

44.     Throughout the reorganization process, it will be critically important that the Debtors are allowed to maintain their intercompany practices. As noted above, continuation of the Intercompany Arrangements is not only important to the successful restructuring of the Debtors' entities, but is integral to ensure the Debtors' ability to operate their businesses as debtors-in-possession. Without the ability to move funds between the U.S., UK and Canadian operations as needed, all aspects of the enterprise would suffer, as would the Debtors' ability to work toward a successful restructuring.

45.     Thus, while the Debtors are not seeking to assume the Intercompany Arrangements as executory contracts at this time (to the extent they could constitute executory contracts), they respectfully request the authority to continue performing under the Intercompany Arrangements in the ordinary course of business without need for further Court order. The Debtors engage in the Intercompany Arrangements on a regular basis, and such

transactions are common among similar enterprises. Therefore, the Debtors believe the Intercompany Arrangements are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, to avoid needless disputes in the future, the Debtors are seeking express authority to engage in such transactions on a postpetition basis. Courts have routinely granted such authority in other complex, multi-debtor chapter 11 cases for similar reasons. *See, e.g., In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. July 17, 2009); *In re Source Interlink Companies, Inc.*, Case No. 09-11424 (KG) (Bankr. D. Del. April 30, 2009); *In re Nobex Corporation*, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); *In re FLYi, Inc.*, Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 8, 2005); *In re W. R. Grace & Co.*, Case No. 01-01139 (Bankr. D. Del. Apr. 2, 2001); *In re Montgomery Ward Holding Corp.*, Case No. 97-01409 (PJW) (Bankr. D. Del. July 8, 1997); *In re Mid-Valley. Inc.*, Case No. 03-35592 (JKF) (Bankr. W.D. Pa. June 8, 2004) (interim order authorizing debtors to continue to engage in intercompany agreements in the ordinary course of business).

## D. **Intercompany Setoff Rights Should Be Preserved**

46. The Debtors also seek authorization to preserve and exercise intercompany setoff rights that arise through the operation of the Cash Management System. Section 553(a) of the Bankruptcy Code provides that:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . .

11 U.S.C. § 553(a).

47.     A creditor need only establish two elements before a setoff may be asserted: mutuality and timing. *See Official Comm. of Unsecured Creditors v. Mfrs. & Traders Trust Co. (In re The Bennett Funding Group, Inc.)*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997); *see also In re Verco Indus.*, 704 F.2d 1134, 1139 (9th Cir. 1983); *In re Lundell Farms*, 86 B.R. 582, 584 (Bankr. W.D. Wis. 1988). Although courts have not uniformly defined the elements of mutuality, most courts require that the debts are (a) owed between the same parties and (b) in the same right or capacity. *See* 5 Collier On Bankruptcy 553.03[3][a] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); *Lubman v. Sovran Bank, N.A. (In re A & B Homes, Ltd.)*, 98 B.R. 243, 248 (Bankr. E.D. Va. 1989). Timing requires that both claims arise prepetition. *See Packaging Indus. Group, Inc. v. Dennison Mfg. Co. (In re Sentinel Prods. Corp.)*, 192 B.R. 41, 45 (N.D.N.Y. 1996) ("[T]he offset debts must be mutual, prepetition debts."); *Scherling v. Hellman Elec. Corp. (In re Westchester Structures)*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995) ("Courts have interpreted debts in the same right to mean that a "pre-petition debt cannot offset a post-petition debt.'"). In other words, a creditor may not set off a claim that arose prepetition against a postpetition debt the creditor owes the debtor. In addition, courts have allowed parties to offset claims postpetition in the same manner as a prepetition setoff, as long as the mutuality requirements are met. *See, e.g.*, *United States v. Gordon Sel-Way, Inc. (In re Gordon Sel-Way, Inc.)*, 239 B.R. 741, 751 (E.D. Mich. 1999), aff'd, 270 F.3d 280 (6th Cir. 2001); *In re Mohawk Indus., Inc.*, 82 B.R. 174, 179 (Bankr. D. Mass. 1987).

48. As described above, intercompany receivables and payables are normally netted. The Cash Management System and related controls allow the Debtors to track all obligations owing between related entities and thereby ensure that any setoff of intercompany receivables and payables through the netting process will meet both the mutuality and timing requirements of section 553 of the Bankruptcy Code.

49. Accordingly, the Debtors respectfully request that they and their non-debtor affiliates be expressly authorized to set off mutual prepetition obligations relating to intercompany receivables and payables through the netting process. Further, because the netting process provides numerous benefits to the Debtors, the Debtors also respectfully request that the Debtors and their non-debtor affiliates be expressly authorized, in the Debtors' discretion, to set off mutual postpetition obligations relating to intercompany receivables and payables through the Cash Management System by means of the netting process.

## Waiver of Bankruptcy Rules 6003 and 6004

50. Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above, and as supported by the Knight Declaration, and to the extent that the relief requested herein implicates Rule 6003(b), the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

51. Finally, to implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

## Notice

52. Notice of this Motion has been given to (i) the Office of the United States Trustee and (ii) the Debtors' prepetition and postpetition secured lenders or, in lieu thereof, to their counsel, if known, and within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

53. No prior request for the relief sought in this Motion has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an Order, substantially in the form attached hereto, (i) authorizing the Debtors to maintain the Accounts, subject to the Debtors' ability, in their discretion, to close any unnecessary Accounts throughout these Chapter 11 Cases; (ii) authorizing the Debtors to continue to use their existing business forms and checks without reference to the debtor-in-possession status, as provided herein; (iii) authorizing the Debtors to continue to employ the Cash Management System; (iv) authorizing the continued performance of intercompany transactions and exercise of intercompany setoff rights; (v) granting postpetition administrative priority to intercompany

claims; (vi) granting a limited waiver of the investment and deposit guidelines set forth in

Bankruptcy Code Section 345(b) on an interim basis pending a final hearing; and (vii) granting

such other and further relief is proper.

Dated: November 15, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
Mark M. Billion (Bar No. 5263)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: 302/652-4100
Facsimile: 302/652-4400
Email: ljones@pszjlaw.com
    dbertenthal@pszjlaw.com
    tcairns@pszjlaw.com
    mbillion@pszjlaw.com

[Proposed] Counsel for the Debtors and
Debtors in Possession