IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHAMPION ENTERPRISES, INC., et al.,[1] | ) | Case No. 09-14019 (___) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**MOTION OF DEBTORS FOR AUTHORIZATION, BUT NOT DIRECTING, TO PAY CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS**

Champion Enterprises, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), file this motion (the "Motion") for authorization, but not requiring, to pay, in the Debtors' sole discretion and to the extent necessary, prepetition claims of (i) certain critical vendors that supply critical goods and services to the Debtors and (ii) those vendors that supply goods and services to the Debtors with respect to a certain government contract. In support of the Motion, the Debtors respectfully represent as follows:

**Jurisdiction**

1. This Court has jurisdiction to consider and determine this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642). The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

1

2. The statutory bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003(b) and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or committee has been appointed in the Debtors' chapter 11 cases.

4. The Debtors and their non-debtor affiliates are leading producers of manufactured and modular housing, as well as modular buildings for government and commercial applications. The Debtors distribute these products through independent retailers, builders and developers. In addition to their manufacturing and other sale operations, Debtors also sell manufactured homes directly to certain manufactured home parks in California and transport their products from the factories to retailers.

5. The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Phyllis Knight, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Knight Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

## Relief Requested

6. By this motion, the Debtors request authorization, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003(b) and 6004, to pay, in their sole discretion and to the extent determined by the Debtors to be necessary, (i) the Critical Vendor

2

Claims (as defined below) in an aggregate amount not to exceed $4,553,000 and (ii) the Camp Pendleton Claims (as defined below) of vendors and service providers relating to goods and services purchased in connection with the Camp Pendleton Contract (as defined below) in an aggregate amount not to exceed $812,000.[2]

### The Critical Vendor Creditors

7. The Debtors use a variety of products in their manufacturing and construction process including lumber, plywood, drywall, steel, floor coverings, insulation, exterior siding, doors, windows, roofing materials, plumbing and electrical fixtures and hardware, finishing materials, and other specialty components as well as certain services (collectively, the "Building Materials"). The Debtors' business model enables them to produce a lower cost product because all aspects of the manufacturing process are tightly controlled. For example, the construction occurs on an "assembly line" and is not affected by adverse weather that can cause delays or damage Building Materials. This controlled environment enables the Debtors to use the Building Materials in a more efficiently manner resulting in a higher production rate and less Building Material waste. Theses production levels also permit the Debtors to purchase Building Materials on a larger scale and at a reduced cost.

8. To maintain these efficiencies, the Debtors' manufacturing process, like that of conventional-on-site builders, is dependent upon a steady supply of Building Materials from vendors and other service providers. The business relationship that the Debtors have developed with these vendors and service providers has enabled them to negotiate competitive rates and a level of certainty that the Building Materials will be delivered in accordance with the various

---

[2] The Debtors filed a motion contemporaneously herewith for authority to pay claims arising under 11 U.S.C. § 503(b)(9) (the "503(b)(9) Motion"). As a result, the relief sought in this Motion overlaps with the relief sought in the 503(b)(9) Motion and that approximately 56.2% of the Critical Vendor Claims and 80.3% of the Camp Pendleton Claims are subject to payment to the extent the Court grants the 503(b)(9) Motion.

deadlines of the Debtors' projects. If the Debtors' supply of Building Materials is interrupted or if the Debtors are forced to purchase Building Materials at higher costs, assuming they can be efficiently obtained in the necessary geographic locations, it will likely slow or even stop their operations and hinder their ability to produce a lower cost and affordable product and meet scheduled delivery deadlines.

9. As of the Petition Date, some of the Debtors' vendors and service providers hold claims for payment due on account of Building Materials supplied to the Debtors. The Debtors and their advisors have determined that the payment of a portion or all of certain prepetition claims (the "Critical Vendor Claims") arising from the prepetition purchase of Building Materials is necessary to help prevent certain vendors and other service providers (the "Critical Vendors") from discontinuing the sale of Building Materials to the Debtors on the same favorable terms that were received prepetition.

10. Notwithstanding the legal rights that the Debtors may have under certain prepetition supplier contracts, if any of the Critical Vendors decide to unilaterally terminate or cease providing Building Materials to the Debtors because of an unpaid prepetition debt, or are forced to do so as a result of their own financial difficulties arising from such nonpayment, the Debtors' ability to produce and deliver finished goods to customers would be severely compromised. Therefore, preservation of the Debtors' business relationships with its Critical Vendors is crucial to the Debtors' ability to successfully operate in chapter 11 and, notwithstanding the legal rights the Debtors may have against a party with a supply contract, in the exceptional circumstances described herein, the Debtors request the authority described in this Motion with respect to the entities identified as Critical Vendors, including those with existing supply contracts.

11.     The Debtors have determined that, now that they are operating in chapter 11 combined with the general economic climate and financial conditions of their vendors, the payment of the Critical Vendor Claims is vital to the Debtors' continuing business operations as described in the Knight Declaration and herein. In this regard, the Debtors used the following criteria to identify potential Critical Vendors: (i) whether certain Building Materials may be only purchased from certain "sole source" vendors, (ii) whether quality control or Building Material specifications contained in the applicable building codes or Debtors' contracts with their customers prevent the Debtors from obtaining the materials from reasonably available alternative sources, (iii) whether the Debtors receive advantageous pricing and other terms that they risk losing if they delay the payment of prepetition claims and as a result are forced to change vendors, and (iv) whether the vendors' business operation could be jeopardized if their prepetition claims are not timely paid.

12.     The Debtors believe that the failure to pay the Critical Vendor Claims would result in (i) the Debtors' inability to obtain necessary Building Materials for their manufacturing operations, (ii) severe negative effects on the Debtors' customers, and (iii) temporary closure of the manufacturing facilities operated by the Debtors. Any temporary closures would likely prevent the Debtors from satisfying customer orders and the Debtors would risk that their customers would look to the Debtors' competitors to fulfill their order.

13.     The Debtors have undertaken a thorough review of their accounts payable and ongoing operations to identify the Critical Vendors and the amount of Critical Vendor Claims. As of the Petition Date, the Debtors estimate that the Critical Vendor Claims aggregate approximately $4,553,000, which represents 33.8% of the total amount of vendor claims against

5

the Debtors.[3] As discussed in more detail below, in connection with the relief requested herein, the Debtors have developed certain procedures that, when implemented, will aid the Debtors in maintaining their current supply of Building Materials and on the same or better credit terms they currently receive from their Critical Vendors.

### The Proposed Critical Vendor Program

14. The Debtors propose to send each Critical Vendor (a) a letter substantially in the form of the letter annexed hereto as Exhibit A (the "Critical Vendor Agreement") that sets forth the terms and conditions (the "Required Trade Terms") on which the provisional payment of the Critical Vendor Claim will be made and (b) any order entered by the Court approving this Motion. In addition, any checks used to pay Critical Vendor Claims will contain a legend substantially as follows:

> Acceptance of this check is subject to the Order
> Authorizing Payment of Prepetition Critical
> Vendor Claims, dated _____, 2009,
> Case No. _____ (Jointly Administered)

15. As set forth in detail in the proposed Critical Vendor Agreement, prior to receiving payment of its Critical Vendor Claim, each Critical Vendor must agree to (i) supply Building Materials in accordance with the applicable required trade terms set forth in the Critical Vendor Agreement, (ii) the amount of its prepetition claim, (iii) certain credit terms, (iv) accept payment of all administrative expense claims in the ordinary course of business after confirmation of a chapter 11 plan and not require a lump sum payment of such administrative expense claims upon confirmation of a chapter 11 plan, (v) submit to the Court's jurisdiction in

---

[3] Prior to the payment of any Critical Vendor Claim, the Debtors will assess each Critical Vendor Claim on a claim-by-claim basis and endeavor to pay less than the full amount of the total Critical Vendor Claim but reserve the right to pay the entire amount to the extent the Debtors determine it is necessary.

resolving all disputes arising under or related to the Critical Vendor Agreement, and (vi) certain other provisions as applicable to each Critical Vendor.

16. In addition to the foregoing, certain Critical Vendors may have obtained mechanics' liens, possessory liens, or similar state law trade liens (collectively, the "Trade Liens") on certain assets of the Debtors. As a further condition of receiving payment of a Critical Vendor Claim, the Debtors propose that the Critical Vendors must agree to take whatever action is necessary to remove the Trade Lien at the expense of the applicable Critical Vendor. In addition, the Critical Vendor must agree not to contest the assumption of any purchase order issued by the Debtors to such Critical Vendor on the basis that it is an executory contract or for any other reason.

17. If, following receipt of payment of its Critical Vendor Claim, a Critical Vendor breaches the Critical Vendor Agreement or otherwise refuses to supply Building Materials in accordance with the required trade terms set forth in the applicable Critical Vendor Agreement, the Debtors may in their sole discretion (a) declare without further order of the Court that (i) the provisional payments made to the applicable Critical Vendor on account of the Critical Vendor Claims be deemed to have been in payment of outstanding postpetition claims of such supplier and (ii) demand the repayment of the Critical Vendor Claim to the extent that the aggregate amount of such payment exceeds the post-petition obligations then outstanding without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or otherwise, or (b) seek an order of the Court on notice to the applicable Critical Vendor requiring the disgorgement of all funds used to pay the Critical Vendor Claims.

18. If necessary, the Debtors propose that they be authorized to reserve their right to require certain Critical Vendors to execute a written acknowledgement (each, an "Critical

7

Vendor Acknowledgement") by the Critical Vendor that provides that any all purchase orders will be subject to the required trade terms set forth in the applicable Critical Vendor Agreement. A copy of the Critical Vendor Acknowledgement is annexed hereto as Exhibit B. If the Debtors request such an acknowledgment, they may rely upon a confirming memorandum setting forth the Required Trade Terms, whether received by facsimile, electronic mail, express mail, or by other customary modes of delivery.

19. In all cases, the Debtors reserve all rights, claims, defenses, and objections to contest any claim or invoice of any Critical Vendor under the Bankruptcy Code and applicable non-bankruptcy law.

**The Proposed Camp Pendleton Vendor Program**

20. Among the various projects of the Debtors, one of the Debtors, Western Homes, Inc. ("Western Homes"), has been engaged as a subcontractor among a hierarchy of contract-counterparties under a prime contract with the Department of the Navy (the "Camp Pendleton Contract"). Under the Camp Pendleton Contract, the Western Homes Debtor has agreed to build and deliver an initial approximately 47 buildings for the Camp Pendleton military base, with an additional 41 buildings possible. The Western Homes Debtor estimates that the revenues under this contract and the additional phases will be approximately $25 million, which represents approximately 250% of the projected revenues for this Debtor during 2009. The Western Homes Debtor estimates that the prepetition claims (the "Western Home Vendor Claims") of vendors and service providers that supplied goods and services relating to the Camp Pendleton Contract is in the aggregate approximately $812,000.

21. The Debtors propose to pay all the prepetition claims of vendors and service providers (the "Camp Pendleton Vendors") relating to goods and services purchased by the

13814-001\DOCS_DE:154621.2

Western Homes Debtor in connection with the Camp Pendleton Contract (the "Camp Pendleton Claims"). It is essential that the commencement of Western Home's chapter 11 case does not interfere with its operation or cause any delays with the various production deadlines that the Western Homes Debtor is subject to under the Camp Pendleton Contract.

22. The Debtors submit that the payment of the Camp Pendleton Claims will help preserve and enhance the value of these estates and benefit the economic stakeholders in these cases. Present estimates indicate that this project will generate significant earnings and, therefore, it is in the best interest of the estate to perform this project in a timely and professional manner. The payment of the Camp Pendleton Claims, will, therefore, not harm but benefit the Debtors' estates.

23. The Western Homes Debtor is subject to certain risks if it does not pay its vendors on a timely basis. For example, the government counterparty under the prime contract may invoke certain federal regulations that permit it to reduce or suspend payments to the Western Homes Debtor until the Camp Pendleton Vendors are paid. More importantly, failing to pay suppliers and subcontractors could cause manufacturing to cease all together –jeopardizing the schedule of deadlines and harming the entire project. Thus, the payment of the Camp Pendleton Claims ensures that the Debtor will continue to receive the full amount of each installment payment due under the Camp Pendleton Contract.

24. The Debtors believe that for many of the same reasons supporting the payment of Critical Vendor Claims that the payment of the Camp Pendleton Claims will help avoid any delays caused by vendors no longer willing to conduct business with the Western Homes Debtor. The payment of the Camp Pendleton Claims will help ensure that the Western Homes Debtor continues to receive its Building Materials on a timely basis and on the same or better

terms, not to mention that the actual amount of the Camp Pendleton Claims is *de minimis* relative to the revenues under the contract. Thus, the payment of the Camp Pendleton Claims is essential to preservation of the Western Homes Debtor's business operations and will ultimately inure to the benefit of all parties in interest in these chapter 11 cases.[4]

25. Moreover, the Camp Pendleton Contract is the first phase of several construction projects at this military base and the Debtors believe that their performance under the Camp Pendleton Contract will play a material part in determining whether their are engaged to provide services for these phases in the future.

26. In all cases, the Debtors reserve all rights, claims, defenses, and objections to contest any claim or invoice of any of the Camp Pendleton Claims under the Bankruptcy Code and applicable non-bankruptcy law.

## Basis For Relief Requested

27. This Court has authorized the payment (or other special treatment) of prepetition obligations in appropriate circumstances.[5] In authorizing such payments, courts generally rely on the statutory authority provided by and the case law based upon sections 105(a) and 363(b) of the Bankruptcy Code.

---

[4] The payment of all Camp Pendleton Claims will be subject to the same and terms and conditions as the payment of the Critical Vendor Claims including the entry into an agreement or acknowledgement that is substantially similar to the Critical Vendor Agreement and Critical Vendor Acknowledgement annexed hereto as Exhibit A and Exhibit, respectively.

[5] *See, e.g., In re Pierre Foods, Inc.*, No. 08-11480 (KG) (Bankr. D. Del. Aug. 13, 2008); *In re Tropicana Entm't, LLC*, No. 08-10856 (KJC) (Bankr. D. Del. May 30, 2008); *In re Leiner Health Prods. Inc.*, No. 08-10446 (KJC) (Bankr. D. Del. Mar. 12, 2008); *In re Wickes Holdings, LLC*, No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008); *In re Tweeter Home Entm't Group, Inc.*, No. 07-10787 (PJW) (Bankr. D. Del. June 13, 2007); *In re Pope & Talbot, Inc.*, No. 07-11738 (CSS) (Bankr. D. Del. Nov. 21, 2007); *In re Hancock Fabrics, Inc.*, No. 07-10353 (BLS) (Bankr. D. Del. Mar 22, 2007); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Nov. 20, 2006); *In re J.L. French Auto. Castings, Inc.*, No. 06-10119 (MFW) (Bankr. D. Del. Mar. 6, 2006); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-26 (Bankr. D. Del. 1999).

28. Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "(t)he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Under this section, a court may authorize a debtor to pay certain prepetition claims. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing payment of pre petition wages pursuant to section 363(b) of the Bankruptcy Code); *In re UAL Corp.*, Case No. 02-48191, (ERW) (Bankr. N.D. Ill. Dec. 9, 2002) (authorizing payment of pre petition claims under section 363 of the Bankruptcy Code as an out-of-ordinary-course transaction). In support of such relief "the debtor must articulate some business justification, other than mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175.

29. As discussed more fully herein, the Debtors' request to pay Critical Vendor Claims and Camp Pendleton Claims satisfies this standard because any discontinuation of the steady supply of Building Materials or a change in the favorable trade terms the Debtors receive will have an immediate and material adverse impact on the day-to-day operations of the Debtors' businesses. In certain instances, any delay in the payment of prepetition claims to Critical Vendors will endanger the operations of certain Critical Vendors that the Debtors depend upon to operate their business. *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks."); *Armstrong World Indus., Inc. v. James A. Philips, Inc.*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (authorizing debtor, pursuant to section 363, to pay prepetition supplier claims to free up funds owed by third parties to debtor).

11

30. Section 105(a) of the Bankruptcy Code authorizes the Court to enforce the Bankruptcy Code's provisions either under the specific statutory language of the Bankruptcy Code or under equitable common law doctrines. *See* 11 U.S.C § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title"); *In re Just For Feet, Inc.*, 242 B.R. 821, 824 (Bankr. D. Del. 1999) (acknowledging that "[c]ertain pre-petition claims . . . may need to be paid to facilitate a successful reorganization" and that "[s]ection 105(a) of the [Bankruptcy] Code provides a statutory basis for the payment of pre-petition claims"); *Ionosphere Clubs*, 98 B.R. at 175 ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept").

31. The "doctrine of necessity" further supports the relief requested in this Motion. In a long line of well-established cases, federal courts have invoked the doctrine of necessity when authorizing the post-petition payment of prepetition obligations when necessary for the continued operation of the debtor or to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g., Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286, 311 (1882) (articulating the legal theory later termed "doctrine of necessity" and holding that payment of pre-receivership claim prior to reorganization permitted to prevent stoppage of crucial business relations); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that the doctrine of necessity supports the payment of prepetition claims if essential to the continued operation of the business during reorganization); *In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing a court's power to authorize trustees to pay claims for goods and services that are indispensably necessary to debtors' continued operation); *S. Ry. Co. v. Flournoy*, 301 F.2d 847, 852 (4th Cir. 1962) ("The principle of necessity of payment has

12

13814-001\DOCS_DE:154621.2

since been carried into different factual surroundings as the basis for granting superiority to business-operating accounts."); *Just For Feet*, 242 B.R. at 824 (authorizing payment of prepetition claims of certain trade vendors that were critical to debtors' reorganization); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that debtors may pay prepetition claims that are essential to continued operation of business); *Ionosphere Clubs*, 98 B.R. at 176 ("necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of the debtor").

33. The doctrine of necessity is frequently invoked early in reorganization cases when preservation of the estate is most critical and often extremely difficult. For that reason, bankruptcy courts routinely use their power to authorize a debtor to pay certain critical prepetition claims under the doctrine of necessity when failure to make such payments threatens to disrupt a debtor's efforts to reorganize. *See In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that "to justify payment of a pre-petition unsecured creditor, a debtor must show that the payment is necessary to avert a serious threat to the [c]hapter 11 process"). Indeed, the Third Circuit stated that "the sine qua non for the application of the 'necessity of payment' doctrine is the possibility that the creditor will employ an immediate economic sanction, failing such payment." *Lehigh & New Eng. Ry. Co.*, 657 F.2d at 581.

33. Courts in this district and others have authorized the payment of prepetition trade claims where the payment of such claims is essential to the debtor's continued operations. *See In re Hayes Lemmerz Int'l, Inc.*, Case No. 09-11655 (MFW) (Bankr. D. Del. May 13, 2009) (authorizing debtors to pay up to $2.5 million, on an interim basis, in prepetition claims of

13

critical vendors); *In re Tousa, Inc.*, Case No. 08-10928 (JKO) (Bankr. S.D. Fla. Jan. 31, 2008); *In re SemCrude, L.P.*, Case No. 08-11525 (BLS) (Bankr. D. Del. July 23, 2008) (authorizing debtors to pay up to $50 million in prepetition claims of critical providers, suppliers, and transporters of products and services); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (KJC) (Bankr. D. Del. Nov. 20, 2006) (authorizing debtors to pay up to $29 million in prepetition claims of critical vendors); *In re Dana Corp.*, Case No. 06-10354 (BRL) (Bank. S.D.N.Y Mar. 3, 2006) (authorizing debtors to pay $52. 1 million in prepetition claims of critical vendors); *In re J.L. French Auto. Castings, Inc.*, Case No. 06-10119 (MFW) (Bank. D. Del. Mar. 6, 2006) (authorizing debtors to pay up to $10.6 million in prepetition claims of critical trade creditors); *In re Pliant Corp.*, Case No. 06-10001 (MFW) (Ban. D. Del. Jan. 4, 2006) (authorizing debtors to $18.2 million in prepetition critical vendor claims); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y, Oct. 13, 2005) (authorizing debtors to continue vendor rescue program and payment of $90 million in prepetition claims of financially distressed sole source suppliers and vendors without contracts); *In re Tower Auto., Inc.*, Case No. 05-10578 (ALG) (Bank. S.D.N.Y. Mar. 14, 2005) (authorizing debtors to pay $40 million in prepetition claims of essential suppliers).

34. The Debtors respectfully submit that similar relief is warranted in these chapter 11 cases. If the Critical Vendors or Camp Pendleton Vendors discontinue their supply of Building Materials or impose less favorable credit terms upon the Debtors, the Debtors will be forced to (a) spend significant time and resources locating alternative vendors, (b) incur additional costs as a result of the higher priced Building Materials charged by new vendors, and (c) cease operations resulting from the delays associated with these efforts and risk losing business with

current and prospective customers, including some of the Debtors' current business that is related to modular buildings supplied to the federal government.

35. In response to these concerns, the Debtors have reviewed the market to determine whether they can reasonably obtain Building Materials from sources other than their current Critical Vendors and Camp Pendleton Vendors without risking material price increases, change in product quality, or delays in receiving the Building Materials prior to the deadlines of their various building contracts. In many cases, they have found no other Building Material source due to the specialize nature of the material. In other situations the Debtors believe that other vendors would charge substantially more for these Building Materials than their current vendors currently charge, or that the delay caused by locating a new vendor will unnecessarily increase the cost of these materials that would otherwise be avoidable if the Debtors were able to maintain their current vendor relationships.

36. In addition to the foregoing, the Debtors have also identified certain other vendors that rely on the Debtors' continued business and regular payment of invoices to maintain their businesses. In these instances, these vendors cannot continue to supply the Debtors with Building Materials without the Debtors' payment of their prepetition claims. If certain vendors are not able to maintain their business due to the Debtors' delayed payments, the Debtors might be forced to obtain Building Materials from vendors on less favorable terms and the delay associated with this change will likely affect their ability to meet deadlines, which will in turn adversely affect their ability to maintain and preserve the value of these estates for the benefit of all economic stakeholders in these cases.

37. The payment of the Critical Vendor Claims and Camp Pendleton Claims is vital to the uninterrupted operation of the Debtors' business and the administration of these chapter

11 cases as it will contribute to the efficient administration of these cases and help support the Debtors' ability to reorganize their operations for the benefit of all economic stakeholders. The Debtors believe it is imperative to pay the Critical Vendor Claims and Camp Pendleton Claims in instances where the Critical Vendor or Camp Pendleton Vendor, as applicable, is refusing to continue to supply Building Materials or continue to engage in business on the same favorable terms that existed prior to the Petition Date. For the reasons discussed herein and the Knight Declaration, the Debtors submit that this Court should authorize the Debtors to pay, in their sole discretion, the Critical Vendor Claims and the Camp Pendleton Claims.

38. Pursuant to Bankruptcy Rule 6003(b), "a motion to pay all or part of a claim that arose before the filing of the petition: shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." FED. R. BANKR. P. 6003(b). For the reasons described herein and as supported by the Knight Declaration, the Debtors submit that the requirements of Bankruptcy Rule 6003(b) have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

39. Further, to implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

40. Nothing in this Motion should be construed as, or be deemed to be, an assumption or rejection of an executory contract or unexpired lease between the Debtors and any credit, including, but not limited to, the Critical Vendors. The Debtors expressly reserve the right to contest the amount claimed by any of the Critical Vendors in accordance with the applicable

bankruptcy and non-bankruptcy law. If this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the validity of any claim of a Critical Vendor or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

41. Notice of this Motion has been given to (i) the Office of the United States Trustee and (ii) the Debtors' prepetition and postpetition secured lenders or, in lieu thereof, to their counsel, if known. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. L.R. 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

42. No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other further relief as the Court deems appropriate.

Dated: November 15, 2009

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ Laura Davis Jones*

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
Mark M. Billion (Bar No. 5263)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
tcairns@pszjlaw.com
mbillion@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession