IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHAMPION ENTERPRISES, INC., et al.,[1] | ) | Case No. 09-14019 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF ORDER AUTHORIZING DEBTORS TO (1) HONOR PREPETITION OBLIGATIONS PURSUANT TO THEIR CUSTOMER PROGRAMS AND (2) TO CONTINUE THE SAME IN THE ORDINARY COURSE OF BUSINESS**

Champion Enterprises, Inc. and its affiliated debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors"), hereby file this Motion (the "Motion") for entry of an order under sections 105(a), 363, 1107 and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") authorizing but not directing the Debtors to (i) honor their prepetition Programs (defined below) and (ii) continue the same in the ordinary course of the Debtors' businesses. In support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction and Venue**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642). The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

DOCS_DE:153188.12

2. The statutory predicates for the relief requested herein are sections 105(a), 363, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

**Background**

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4. The Debtors and their non-debtor affiliates are leading producers of manufactured and modular housing, as well as modular buildings for government and commercial applications. The Debtors distribute these products through independent retailers, builders and developers. In addition to their manufacturing and other sale operations, the Debtors also sell manufactured homes directly to certain manufactured home parks in California and transport their products from the factories to retailers.

5. The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Phyllis Knight, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Knight Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

## Summary Of the Debtors' Programs

6. Prior to the Petition Date and in the ordinary course of their businesses, the Debtors engaged in certain practices to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. The Programs (defined below) offered by the Debtors are commonplace among homebuilders similar to the Debtors and form the cornerstone of the Debtors' businesses. The Debtors must continue to offer these Programs if they are preserve the value of their assets in anticipation of an eventual sale.

### A. Debtors' HUD Obligations

7. The Debtors' warranty obligations must be examined within the context of HUD regulations under which it operates. When a traditional contractor builds a home, it builds to code dictated by state and local regulations. This approach is not feasible for producers of manufactured homes because a single model is often shipped nationwide, frustrating any attempt to build to state or local codes. In response to the problems associated with this regime, the Department of Housing and Urban Development ("HUD") promulgated a uniform set of regulations applicable to manufactured housing producers nationwide. See 24 C.F.R. §3280 et seq.

8. Part of HUD's regulatory scheme, 24 C.F.R. §3282 Subpart I ("Subpart I"), operates as a quasi-warranty requiring producers of manufactured housing to correct defects associated with their products. Meeting the requirements of Subpart I (the "HUD Obligations") can be as simple as a repair in some instances, or as involved as a full-blown recall of the model

3

in others. Further, the HUD Obligations remain regardless of how long ago a home was built and cannot be limited by contract.

9. Any failure to meet these obligations could cause HUD to attempt to shut down the Debtors' U.S. manufacturing operations if the Debtors fail to honor their HUD Obligations. Regardless of whether such an approach is ultimately deemed permissible under the Bankruptcy Code, the disruption alone would cause significant harm to the Debtors and their operations, thereby reducing the going concern value of these entities and thus reducing the creditors' potential recovery.

## The Debtors' Warranty Programs

10. The Debtors also have obligations under more traditional warranty programs (collectively, the "Warranties" and each a "Warranty") that provide coverage above and beyond that provided by the HUD Obligations.

11. First, the Debtors offer a one year limited Warranty on all their manufactured, modular and park homes that their authorized dealers sell. The Warranty coverage commences when the home arrives on site, and covers defects in workmanship including any factory-introduced failure of the structural, mechanical, electrical, plumbing, or weather-resistance systems – it does not cover any consequential or incidental damages related to the same. If coverage is triggered, the Debtors a) handle the repair in-house; b) hire the dealer to make the repair;[2] c) hire a third party contractor to perform the work; or d) permit the homeowner to make the repairs and reimburse them for the same.

---

[2] In some limited instances, the Debtors contract with their dealers at the outset to make all repairs called for under this Warranty in exchange for a flat fee. However, this practice is not the routine and, as a result, the Debtors

4

12. The warranty repair process commences when either a) the customer contacts a dealer, who then contacts one of the Debtors' local plants, or b) the customer contacts the Debtors' local plant directly. These calls are handled by each plant's service division, initially by a service clerk and, if necessary, then by the plant's service manager. Typically, the decision as to whether any alleged defect merits repair pursuant to the warranty is made during this initial phone consultation. In certain cases, the plant's service department sends a team out to the home before authorizing the repair.

13. Once a given repair is authorized pursuant to the warranty, the local plant's service manager determines how the repair should be made. To the extent that the homeowner indicates that he or she is willing to perform the repairs and the manager believes that this is feasible, the homeowner is supplied with the parts necessary to perform the repair and paid a nominal amount, typically between $50 and $100, for their labor.

14. Often, the homeowner is not interested or able to perform their own repairs. In these situations, the plant's service managers choose between deploying their own service teams, the dealer's service teams, or an independent contractor. A dealer's service team is generally used if the dealer asks to be placed in charge of the warranty fulfillment process and can offer the repairs in a cost-effective manner.

15. If the dealers do not wish to perform the repairs or cannot make them at a reasonable cost, the Debtors are left to choose between in-house and independent contractors to make the repairs. This decision is also made by the plant manager on the basis of anticipated

---

remain directly liable for most repairs incurred under the year-long Warranty.

repair costs, which costs are primarily a function of the home's distance from the local plant. To the extent that the plant is too far away from the home, or other factors make using the local plant's service team cost prohibitive, the service manager at a given plant will use outside contractors to perform the work.

16. Third party contractors are selected on the basis of cost and quality of work; service managers have a number of relationships with their third party contractors. Some are explicitly on contract, and the vast majority routinely perform work for the Debtors. Accordingly, the Debtors' third party contractors have developed the experience necessary to quickly and correctly repair most of the problems that arise under the Warranties. Whenever the Debtors do not use their in-house staff to make the repair, the process is as follows: The Debtors pre-approve the repair, then the repair is made, *and only then is the party performing the repair compensated.* Since service is a precursor to payment, the Debtors believe that there are currently third party contractors holding claims for at least $610,000 for work performed prepetition under the Warranties for which they have not been compensated.

17. In connection with determining their going-forward warranty obligations, the Debtors calculate warranty costs using a formula that:

    a. multiplies the number of floors on their retailers' lots that – since they are not sold – are still owed a full year of coverage by

    b. the average repair costs per floor over the previous year, and

6

DOCS_DE:153188.12

c. adds an additional 33% of the previous years warranty cash costs to cover the future warranty expenses related to floors that are retail sold but the warranty period has not yet expired.

Based on this formula, the Debtors anticipate an additional $3,100,000 in Warranty costs through year-end that have accrued as of the Petition Date. Based on historical data, the Debtors expect they will actually pay $2,300,000 in warranty cash costs through year end 2009.

18. The Debtors submit that any failure to make these third party providers whole with respect to prepetition amounts owed to them would be to the significant detriment of the Debtors' ongoing operations. First, to the extent that dealers have already made these repairs, any failure to reimburse them for the same will put a significant amount of unnecessary pressure on a critical relationship with its dealers, which for the reasons stated below, is already quite fragile. Second, the failure to pay prepetition repair claims with respect to the Warranties will harm the Debtors' relationship with the tradesmen that they routinely use, or with their customer base if customers are denied their promised reimbursement for repairs. The Debtors' relations with their dealers or customers may be further strained if third party vendors demand payment from the homeowners or dealers for repairs normally paid for by the Debtor, or if tradesmen attempt to place liens on the homes for the work that they performed.

19. Any failure to meet prepetition Warranty obligations will create a public impression that the Debtors will not honor Warranty obligations postpetition. Given the particularly competitive nature of this market, the Debtors submit that such a negative impression will significantly harm their efforts to maintain customer and dealer good will, and

7

therefore negatively impact their sales. Therefore, either a failure to honor prepetition warranty obligations, including payment of outstanding bills to the Debtors' third party contractors, or to continue to offer the coverage associated with these industry-standard Warranties will substantially impair the Debtors' efforts to preserve the value of their estates. For these reasons, the Debtors submit that they should be permitted to honor outstanding Warranty obligations, including repair reimbursement payments that are currently due and owing, and to continue to provide coverage pursuant to these Warranties on a going forward basis in keeping with the Debtors' ordinary course practices, subject to a maximum cap of $2,300,000.

### The Debtors' Extended Warranty Programs

20.     In addition to meeting their HUD Obligations and offering year-long Warranties to every customer, the Debtors also give purchasers the chance to opt for varying types of extended coverage (the "Extended Warranties") provided by a third party insurer. Some Extended Warranties offer consumers the option to purchase comprehensive coverage akin to the auto industry's "bumper to bumper" warranties. Some offer only minimal coverage. The duration of the Extended Warranties varies from seven to ten years.

21.     Because this coverage is provided by a third party, the home purchaser makes a single lump sum payment (ranging from approximately $75.00 to $300.00) to the Debtors. The Debtors remit the payment to the third party provider in exchange for Extended Warranty coverage. As of the Petition Date, the Debtors hold approximately $50,000.00 in payments that are due to third party insurers.

8

22. The continuing opportunity to purchase extended coverage is a necessity if the Debtors are to remain competitive. Further, any failure of the Debtors to pass along such prepetition payments made for the same would alienate their customers and dealers as described above in conjunction with its traditional Warranty programs. Accordingly, the Debtors are requesting authority to remit all such payments made to the Debtors prepetition, up to a maximum amount of $50,000.00, and to continue to remit all such Extended Warranty payments going forward in the ordinary course of business.

### Debtors' Sales Incentive Programs

23. The Debtors offer rebate and discount programs to the dealers who sell their products (each, an "Incentive") designed to keep their products competitive in the eyes of the dealers that market them. The rebate program offers dealers cash rebates of up to 12% of a home's invoice price, or some smaller percentage based on a sliding scale predicated on the dealers' sales volume. These "Volume Incentive Programs," as they are called, are accrued continuously by the Debtors and are paid to the dealers periodically depending on the specifics of the arrangement with the particular dealer.

24. These incentives are negotiated at the outset of a dealer's relationship with the Debtors, normally between the dealer's management and the relevant plant manager of the Debtors. The magnitude of the discount or rebate is a function of the volume of the dealer's anticipated sales, coupled with the practices that are typical of that locality. In other words, a dealer capable of selling a significant number of units in an area known for highly competitive rebate regimes is most likely to qualify for the full 12% rebate. By comparison, a dealer with a

very limited volume, hailing from a region where discounts rather than rebates are the prevalent form of incentive, will more than likely receive a rebate of far less than the 12% maximum. Once an Incentive is in place, it is typically not renegotiated and generally governs the Debtors' relationship with the particular dealer for a number of years to come.

25. The Debtors estimate that they owe their dealers approximately $9,300,000 in rebate Incentive payments based on prepetition sales for which rebates have not yet issued, and expect to accrue an additional $1,900,000 in such rebate Incentive payments between the Petition Date and year-end 2009, the majority of which will become payable in early 2010.

26. Any failure to honor these Incentives would seriously jeopardize the Debtors' reorganization efforts. The market for manufactured homes is extremely competitive. Dealers are not typically "captive" in that they only sell one manufacturer's homes. Rather, the dealers typically offer products supplied by a number of manufacturers. This means that dealers are freely able to migrate toward the products offering the best return in salability and profitability terms. Accordingly, to keep dealers selling the Debtors' homes, it is imperative that the Debtors offer profitable, salable products to their existing dealer network. An important aspect of such profitability to dealers is honoring Incentives due to them.

27. Because these dealers are facing financial strains of their own, they are particularly interested in maximizing profits per sale, and Incentives will play a major role in determining which products dealers sell. As a consequence, if the Debtors wish to maintain their leading role in the market – and preserve the corresponding enterprise value – they must keep the

profits associated with their products competitive from the dealers' perspective. If it is more profitable for a dealer to sell the Debtors' competitors' models, they will, and the Debtors' current business and future prospects will suffer accordingly. Therefore, the continuation of the Incentive programs is essential to retain the support of the Debtors' dealers and to preserve the value of the estates.

28. Therefore, the Debtors request authority to pay up to $9,300,000 in rebate Incentive payments based on prepetition sales for which rebates have not yet issued, and an additional $1,900,000 in rebate Incentive payments they expect to incur between the Petition Date and year-end 2009.

## Customer Deposits

29. In addition, the Debtors also hold $3,000,000 in customer deposits made on homes that are in the process of being built (the "Customer Deposits"). These deposits are typically made by dealers (who often require a similar deposit from their customers), and are a prerequisite to placing an order for a home. Deposits range from 10% for a typical manufactured home to approximately 30% for a modular home, as the latter is customized to the lot and region where it will be located. On receipt of the deposit, the order is officially considered placed and work on the unit begins. The deposits are held in a segregated account until the unit is delivered to the dealer and final payment is received from the customer. The Debtors believe that Customer Deposits are integral to ensuring that they are not left with customized units that cannot be resold absent costly modification, and thus believe that continuing to accept Customer Deposits (and honor prepetition Customer Deposits) is in the best interests of the estates.

30. The Debtors believe that the only way to ensure that Customer Deposits continue to be made by potential customers is to ensure that the Deposits they currently hold are honored appropriately. The Debtors submit that any failure to honor their existing Customer Deposits will not only impair their reputation in the marketplace, but will also harm their relationship with their dealers, who will be deprived of significant profits, and who will likely shift their loyalty and marketing efforts to other brands. The Debtors believe such a wholesale failure to honor Customer Deposits will drive end-user customers away in droves, which may render the Debtors' units unsalable

31. Therefore, the Debtors request authority to honor, in the ordinary course of business, the Customer Deposits, up to the amount of $3,000,000.

32. For the reasons stated above, each of these programs – the HUD Obligations, Warranties, Extended Warranties, Incentives, and Customer Deposits (collectively, the "Programs") – are necessary to preserve going concern value of the Debtors' business operations and therefore, to maximize the value of their estates. As a consequence, the Debtors submit that authorization to continue these programs is necessary to the reorganization effort.

### Basis for Relief

33. If the Debtors are prohibited from continuing these Programs consistent with their past business practices, both existing dealers and potential customers will likely lose confidence in the Debtors, and the Debtors' sales will likely significantly deteriorate and may also result in efforts by HUD-shutdown or otherwise limit the Debtors' operations. As stated above, the failure to maintain sales volume will substantially impair the going-concern value of

the Debtors' business, meaning that the damage from refusing to honor these obligations or continue these programs far exceeds the savings associated with their suspension.

### Sections 363(c), 1107(a) and 1108 of the Bankruptcy Code

34. The Debtors submit that continuing the Programs postpetition is entirely permissible under Sections 1107(a) and 1108 of the Bankruptcy Code, which permit debtors in possession to operate their businesses, and Section 363(c) of the Bankruptcy Code, which authorizes a debtor to use property of the estate in the ordinary course of business without notice or a hearing. The Debtors respectfully submit that their continuing, renewing, replacing, initiating and terminating these Programs is in the ordinary course of their business and is permitted by sections 363(c), 1107(a) and 1108 of the Bankruptcy Code, without further application to the Court. However out of an abundance of caution, the Debtors seek permission to continue these programs postpetition.

35. In addition to the foregoing, though the Debtors believe that expenses associated with the Programs constitute ordinary course expenditures, the Debtors submit that relief is permissible even if this Court takes a different view. Section 363(b)(1) of the Bankruptcy Code permits the debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate" on court order, so long as the decision to do so is grounded in the sound business judgment of the Debtor. 11 U.S.C. § 363(b)(1); see also, Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996), citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); In re Delaware &

13

Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991). See In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him a good business reason to grant such application). See also In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (same); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that standard for determining a section 363(b) motion is "good business reason").

36. The Debtors exercise permissible business judgment whenever their decision is made on an "informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). In a bankruptcy case, the decision must be "reasonable in light of the circumstances surrounding the Debtors' bankruptcy." In re Montgomery Ward Holding Corp., 242 B.R. 147, 155 (D. Del. 1999). In fact "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

37. As was previously stated, these Programs are critical to the Debtors' business because they allow the Debtors to remain competitive in the manufactured housing industry. The Debtors believe that their continuation (including modifying existing programs and introducing new programs that are similar in scope and expense to existing programs) is necessary to maximize the enterprise value of the Debtors and their businesses. Given that these

well-grounded considerations form the basis of their decision, the Debtors submit that their deliberations satisfy the business judgment test.

### Section 105(a) of the Bankruptcy Code

38. With respect to the prepetition claims due by way of these Programs, as well as the continuation of the same, Section 105(a) of the Bankruptcy Code permits the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a). A bankruptcy court's use of equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). Under 11 U.S.C. §105, a court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing Ionosphere Clubs, Inc., 98 B.R. at 177).

39. Paying or otherwise honoring the Debtors' prepetition obligations pursuant to these Programs, and continuing the Programs postpetition, is imperative to the Debtors' going concern prospects, and thus to their successful reorganization. As was laid out above, any failure to do so will alienate the Debtors' integral dealer network, and more than likely, their customer base. The highly competitive nature of this industry will lead to severe repercussions with respect to their sale efforts should the Debtors fail to meet their obligations under these Programs, and given that such repercussions would frustrate the primary objectives of the Bankruptcy Code, the Debtors submit that the order sought by this Motion is necessary and appropriate, and thus is permissible. See Ionosphere Clubs, Inc., 98 B.R. at 176.

## Necessity of Payment Doctrine

40. The "necessity of payment" doctrine further supports the relief requested herein. This doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." Id.; see also In re Lehigh & New England Railway Co., 657 F.2d 570, 581 (3rd Cir. 1981) (stating the "necessity of payment" doctrine "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus."); In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987). The rationale for the necessity of payment rule is consistent with the paramount goal of chapter 11, "facilitating the continued operation and rehabilitation of the debtor." Ionosphere Clubs, Inc., 98 B.R. at 176; see also Dudley v. Mealey, 147 F.2d 268, 271 (2nd Cir.), cert. denied, 325 U.S. 813 (1945) ("let [the Debtor] once shut down, and it will lose much of its value . . . Some priority to [the Debtor's prepetition suppliers] may be essential to preservation of the business").

41. Where failing to grant the requested relief would substantially harm the ongoing operations of a debtor, as it would here, courts in this and other districts have granted relief similar to that requested here. See, e.g., In re WCI Communities, Inc., et al., Case No. 08-11643 (KJC) (D. Del. August 4, 2008); J.L. French Automotive Castings, Inc., et al., Case No. 06-10119 (MFW) (D. Del. March 3, 2006); Nellson Nutraceutical, Inc., et al., Case No. 06-10072 (PJW) (D. Del. March 31, 2006); In re Breuners Home Furnishings Corp., et al., Case No. 04-12030 (PJW); In re Exide Technologies, et al., Case No. 02-11125 (KJC) (Bankr. D. Del.

April 18, 2002); In re Federal Mogul Global, Inc. et al., Case No. 01-10578 (SLR); In re Homelife Corporation, et al., Case No. 01-2412 (JJF).

**Section 541(d)**

42. Finally, to the extent that the Debtors are holding funds that were intended be remitted to third party Extended Warranty providers or that secure homes in progress via Customer Deposits, they submit that permitting them to remit the same is entirely permissible insomuch as these funds are held by the Debtors in trust for the benefit of those third parties to whom payment is owed, or on behalf of whom such payment is being made. Section 541(d) of the Bankruptcy Code excludes "property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest." 11 U.S.C. § 541(d); see City of Farrell v. Sharon Steel Corp. (In re Sharon Steel Corp.), 41 F.3d 92, 98-103 (3d Cir. 1994) (finding that funds withheld from employees' paychecks may be subject to a trust, and thus were not property of a debtor's estate, even where such funds were commingled with the debtor's other property). Because these payments are the property of third parties, these funds do not constitute property of the Debtors' estates, and these amounts will not otherwise be available for distribution to the Debtors' creditors. Thus, the payment of these funds will not adversely affect the Debtors' estates and is permissible under the Bankruptcy Code.

43. Accordingly, the Debtors request that they be authorized, in their business judgment and at their discretion, to (a) perform and honor their prepetition obligations under the Programs as they deem appropriate so long as payments made based on prepetition obligations under these Programs do not exceed $2,300,000 in Warranty payments, $50,000 in Extended

Warranty pass throughs, $9,300,000 in Incentives, and $3,000,000 in Customer Deposits; and (b) continue, renew, replace, implement, and terminate such of the Programs as they deem appropriate, in the ordinary course of business, without further application to the Court. Any delay in the relief sought herein, even to the extent of being forced to advise customers that further judicial relief is necessary, could result in the Debtors' losing a substantial portion of their customer base, diminish the value of their assets, and severely harm their prospects for a successful reorganization.

### Waiver of 6003(b)

44. Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described herein, and as supported by the Knight Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and should be granted without delay. To implement the foregoing successfully, the Debtors also seek a waiver of the requirements under Bankruptcy Rule 6004, including the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

### No Waiver of Rights

45. Nothing herein is intended or should be construed as an admission as to the validity of any claim against any of the Debtors, or a waiver of any of the Debtors' rights to

18

dispute any claim related to the Programs. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim, or a waiver of any of the Debtors' rights to subsequently dispute such claim and recover such payments.

## Notice

46. Notice of this Motion has been given to (i) the Office of the United States Trustee and (ii) the Debtors' prepetition and postpetition secured lenders or, in lieu thereof, to their counsel, if known. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectively request that the Court (i) enter an order in the form attached hereto and (ii) grant such other and further relief as this Court may deem just and proper.

Dated: November 15, 2009

PACHULSKI STANG ZIEHL & JONES LLP

/s/ Laura Davis Jones
Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
Mark M. Billion (Bar No. 5263)
919 N. Market Street, 17th Floor
Wilmington, DE 19801
Telephone: 302/652-4100
Facsimile: 302/652-4400
Email: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
tcairns@pszjlaw.com
mbillion@pszjlaw.com

[Proposed] Counsel for the Debtors and Debtors in Possession