IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHAMPION ENTERPRISES, INC., et al., [1] | ) | Case No. 09-14019 (___) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER:
(I) AUTHORIZING THE DEBTORS TO (A) PAY WAGES,
SALARIES, AND OTHER COMPENSATION, (B) MAINTAIN EMPLOYEE MEDICAL
AND SIMILAR BENEFITS, AND (C) PAY REIMBURSABLE EMPLOYEE EXPENSES;
AND (II) AUTHORIZING AND DIRECTING BANKS AND OTHER FINANCIAL
INSTITUTIONS TO PAY ALL CHECKS AND ELECTRONIC PAYMENT
REQUESTS MADE BY THE DEBTORS RELATING TO THE FOREGOING**

Champion Enterprises, Inc. and its affiliated chapter 11 debtors, debtors and

debtors in possession (collectively, the "Debtors"), (the "Motion") move the Court for entry of

an order: (a) authorizing, but not requiring the Debtors to (i) pay and/or honor prepetition wages,

commissions, salaries, and other compensation, (ii) maintain employee medical and similar

benefits and (iii) pay reimbursable employee expenses; and (b) authorizing banks and other

financial institutions to receive, process, honor, and pay all checks presented for payment and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642). The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

electronic payment requests relating to the foregoing. In support of this Motion, the Debtors respectfully state as follows:

## Jurisdiction

1.    This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are sections 105(a), 363(b), 507(a)(4) and 507(a)(5) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## Background

3.    On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4.    The Debtors and their non-debtor affiliates are leading producers of manufactured and modular housing, as well as modular buildings for government and commercial applications. The Debtors distribute these products through independent retailers, builders and developers. In addition to their manufacturing and other sale operations, Debtors

2

also sell manufactured homes directly to certain manufactured home parks in California and transport their products from the factories to retailers.

5.      The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Phyllis Knight, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Knight Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

6.      The Debtors currently employ 1,994 full and part-time U.S. employees in hourly, salaried, supervisory, management, sales, and administrative positions to perform the functions necessary to effectively and efficiently operate the Debtors' business (collectively, the "Employees"). The Debtors employ both salaried and hourly Employees. 1,573 Employees are paid hourly and 421 Employees are salaried. 1,966 Employees are employed full-time and 28 Employees work part time.

7.      To minimize the personal hardships that the Employees will suffer if their prepetition employee-related obligations are not paid, to maintain the morale of the Employees during this critical time, and to minimize disruptions to the Debtors' ongoing business operations to facilitate a quick emergence from these chapter 11 cases, the Debtors, by this Motion, seek authority, in their sole discretion, to: (i) pay unpaid prepetition claims for wages, commissions and salaries to the Employees, including payments made to their temporary employees (the "Unpaid Wages"); (ii) remit applicable withholding obligations to the proper third parties; (iii) honor and maintain certain benefits (as more fully set forth below) offered by the Debtors (the

3

"Benefits"); (iv) reimburse certain unpaid business expenses incurred prepetition by the Employees; and (v) pay all costs incident to the foregoing as set forth in detail below.

## The Debtors' Compensation and Benefits Programs

### A.     The Debtors' Workforce

8.     The Debtors' manufacturing facilities and corporate headquarters employ approximately 1,994 Employees. The majority of the Debtors' Employees, approximately 1,327 in all, perform critical core manufacturing functions in the Debtors' U.S. manufacturing facilities. An additional 667 of the Debtors' Employees provide administrative support, including engineering, purchasing, human resources, financing and accounting services to the manufacturing facilities. In addition to their Employees, the Debtors also utilize the services of independent contractors who perform essential duties such as delivery and retail sales (the "Independent Contractors") and temporary employees, who are hired through temporary employment agencies, to perform essential services in the Debtors' manufacturing facilities (the "Temporary Employees"). None of the Debtors' Employees or Temporary Employees are associated with a national union.

### B.     The Debtors' Compensation Procedures

9.     The Debtors' aggregate monthly payroll for October, 2009, including wages, salaries, bonuses and commissions, was approximately $9.1 million, $7,900 of which was paid to temporary employment agencies for the services of the Temporary Employees. Hourly Employees are paid in arrears, on a bi-weekly basis, with direct deposits or checks issued on the 6th or 7th day after the close of each pay period. Salaried employees are paid bi-weekly with

4

direct deposits or checks being issued on the last day of the pay period. On November 12, 2009, the Debtors delivered to Automated Data Processing, Inc., its outside payroll administrator, funds for paychecks distributed on November 13, 2009 (the "Last Employees' Pay Date"). The pre-petition payroll funding for the Last Employees' Pay Date included payment for Hourly Employee wages and salaries earned between October 24, 2009 and November 6, 2009 and Salaried Employee salaries between October 31, 2009 and November 13, 2009. Thus, as of the Petition Date, Hourly Employees are owed Unpaid Wages earned between November 7, 2009 and the Petition Date and Salaried Employees are owed Unpaid Wages earned between November 14, 2009 and the Petition Date.

10. As of the Petition Date, the Debtors owe an estimated $1,620,000 for the gross amount of earned but Unpaid Wages, including approximately $260,000 in Unpaid Wages to be paid to temporary employment agencies for the services of the Temporary Employees. No single Employee is owed more than $10,950 in Unpaid Wages. The Debtors therefore seek authority to pay the Unpaid Wages up to a total and aggregate amount of $2 million. In addition to the Unpaid Wages, the Debtors estimate that as of the Petition Date, approximately $100,000 of the Debtors' contributions to tax and insurance withholdings were incurred and unpaid in connection with the Unpaid Wages (the "Employer Tax Obligations"). The Debtors also request authority to pay the Employer Tax Obligations, up to $200,000 in connection with the payment of the Unpaid Wages, plus any amounts subsequently deemed to be due and owing pursuant to any audit of the Employer Tax Obligations which occurs after the Petition Date.

5

11.     The Debtors use a payroll service company, Automated Data Processing ("ADP") to process their payroll. ADP draws funds from the Debtors' account approximately two days in advance of each payday and are responsible for paying all applicable withholdings and payroll taxes with respect to the Employees. In the ordinary course of business, the Debtors provide applicable schedules in advance of the payroll payment period, and ADP issues payroll checks. The Debtor pays approximately $15,000 per month to ADP on account of payroll processing services. The Debtors estimate that they may owe ADP approximately $14,900 on account of prepetition services. By this Motion, the Debtors request authority to continue to use ADP's payroll processing services to pay any prepetition amounts that may be due to ADP up to a total and aggregate amount of $25,000.

12.     The Debtors seek to pay Temporary Employees that provide services to the Debtors in the same manner as Employees. All limits regarding the amounts of Unpaid Wages proposed to pay herein include the Debtors' proposed payments to Temporary Employees for their prepetition services as described below:

**Temporary Workers**

13.     As noted above, the Debtors retain the services of Temporary Employees provided through various service vendors (the "Staffing Providers"). The Debtors typically remit compensation for the Temporary Employees' services directly to the applicable Staffing Provider that refers such Temporary Employees through their accounts payable system. The Staffing Providers in turn pay the Temporary Employees. The Debtors believe that, if they are not permitted to pay the Staffing Providers for the services of the Temporary Employees, the

6

Staffing Providers will withdraw the Temporary Employees or refuse to provide the Debtors

with replacement workers. Although the Debtors could replace the Temporary Employees over a

period of time, the abrupt departure of the Temporary Employees could potentially cause

significant disruption to the Debtors' operations. Because the Debtors' prepetition obligation to

the Temporary Employees is minimal when compared to the total cost of the Unpaid Wages, the

risk of such disruption is not worth any potential benefit to the estate in withholding the Unpaid

Wages of the Temporary Employees.

**C.     Payment of Independent Contractors**

14.     The Debtors' retail entity, San Jose Advantage Homes, Inc., employs

approximately 66 Independent Contractors, and the Debtors' shipping entity, Star Fleet, Inc.,

also employs approximately 531 Independent Contractors. The Debtors seek to pay Independent

Contractors for all services rendered prior to the Petition Date pursuant to the agreements with

such Independent Contractors as described below:

**Star Fleet, Inc. Drivers**

15.     The Debtors use a number of Independent Contractors in the course of

their business. Most are used for transporting goods by road and on-site setup. All of the drivers

who provide their services to Star Fleet, Inc. ("Star Fleet") are independent contractors. Each of

the drivers are compensated based on the number of miles driven. A software program generates

data as to the number of miles driven and the respective dollar amount to be paid to each driver.

The data is then forwarded to a company called Comdata. The Debtors pay Comdata and

Comdata subsequently credits a debit card issued to each driver in the amount he/she has earned

7

based on the number of miles driven. Therefore, the drivers receive a credit on their Comdata card as payment for their services within two days of when the services are provided. The Debtors pay Comdata approximately $160,000 per day for the 531 drivers used by Star Fleet. As of the Petition Date, the Debtors estimate that no more than three days' worth of Unpaid Wages are due. By this Motion, the Debtors request authority to continue to pay Comdata for the independent contractors providing service to Star Fleet, Inc. and to pay any prepetition amounts that may be due to these independent contractors. As of the Petition Date, no individual Comdata driver is owed more than $10,950 for Unpaid Wages.

16.     The Debtors believe that, if they are not permitted to pay the Comdata drivers for the services provide prior to the Petition Date, the drivers may refuse to provide further services to Star Fleet until such payments are made in full. Transportation of manufactured and modular homes is unique skill that requires a high degree of expertise and familiarity with numerous regulations and traffic laws. In many states, drivers much hold a special commercial drivers license to transport these wide loads. Drivers with such skills and qualifications are often in short supply and of great value to the operations of Star Fleet. Although the Debtors could replace the Independent Contractors over a period of time, the abrupt departure of the Independent Contractors could potentially cause significant disruption to the Debtors' operations. Indeed, without these Independent Contractors, Star Fleet would be forced to suspend deliveries until suitable replacement drivers could be located.

8

**San Jose Advantage Homes Brokers**

17.     San Jose Advantage Homes, Inc., the Debtors' retail entity ("Advantage Homes"), utilizes real estate sales agents and sales managers that are Independent Contractors in retail locations in California. The sales agents work strictly on commission. Commissions to the sales agents are paid from Advantage Homes based on a fixed commission schedule. Depending on the property sold, commissions are based on either a flat rate or a percentage of the profit earned by Advantage Homes from the sale of the home. Sales managers are paid both in commission (for homes sold individually) and a monthly salary for their management role. For the year 2009 up through August 17, 2009, the amount of commissions paid by San Jose Advantage Homes, Inc. to 55 independent contractors totaled $1.3 million. As of the Petition Date, to the best of the Debtors' belief, no sales agents or sales managers are due Unpaid Wages in an amount in excess of $10,950 for sales of homes that closed prior to the Petition Date. By this Motion, the Debtors request authority to continue to pay the independent contractors commissions for sales of homes for Advantage Homes that close prior to the Petition Date in the ordinary course.

**D.      Business Expense Reimbursements**

18.     The Debtors customarily reimburse Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtors. Such expenses typically include, but are not limited to, business-related travel expenses, including air travel, auto travel and car rental, lodging, meal charges, business lunches, telephone charges, and miscellaneous other allowed travel expenses (the "General Reimbursement Obligations"). Such

9

General Reimbursement Obligations also include amounts billed by Employees to corporate charge cards for the purchase supplies, inventory, and equipment on behalf of the Debtors and in support of the Debtors' businesses.

19.     It is difficult for the Debtors to determine the exact amounts of General Reimbursement Obligations that are due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtors throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, when the Debtors had a much higher number of Employees, the average monthly amount of General Reimbursement Obligations for all Employees was approximately $311,000.

20.     By this Motion, the Debtors seek authority to pay any prepetition General Reimbursement Obligations (including any such amounts due to former employees) up to a total amount of $389,000 and to continue to honor General Reimbursement Obligations incurred postpetition in the ordinary course of the Debtors' business.

**E.     The Debtors' Employee Benefits and Employee Programs**

21.     The Debtors provide employees, in the ordinary course of business, with a number of employee Benefits, including, but not limited to (a) medical, dental and vision insurance, (b) stop loss coverage, (c) workers' compensation, (d) vacation time, (e) sick leave, (f) stock and savings plans and (g) other miscellaneous employee benefits, all as described below.

10

## The Debtors' Employee Health Plans

22.     The Debtors provide several health and related benefit plans to their Employees, including a medical/dental plan and vision (collectively, the "Health Plans"), health care reimbursement accounts, life insurance, accidental death and disability insurance, and short and long-term disability insurance (collectively, the "Benefit Plans"), as described in more detail below. All full-time Employees who work more than 32 hours per week are eligible to participate in the Health Plans commencing on the first day of the month following the Employee's completion of three months of continuous full-time employment with the Debtors.

23.     As a general matter, for most of the Health Plans, Employees make payroll contributions and the Debtors deduct the Employees' portion of the Health Plan costs owing under the Health Plans from the Employees' Wages every pay period. As required by law, the Debtors also offer the Health Plans to their former employees who have elected COBRA coverage. In the case of the former employees who have elected COBRA coverage, the Debtors charge an actuarial premium to these former employees. Such former employees pay the full amount of the premiums due (plus a small per party administrative fee) to a third party COBRA administrator, Activa Benefits Services ("Activa"). A number of these former employees electing coverage through COBRA are currently participating in the COBRA Subsidy Program through the American Recovery and Reinvestment Act and only pay 35% of the required premium to Activa. The remaining 65% government subsidy is refunded to the Debtors each quarter through a reduction in the Debtors' obligation to pay federal withholding tax for their Employees. Although the Debtors advance the amounts for these former employees when the

11

Debtors pay their weekly invoices to the Health Plans, these amounts paid by the Debtors are reimbursed to the Debtors by the Federal Government or Activa, who collects the premium amounts owing directly from the former employees and remits them to the Debtors. As part of the relief requested hereunder, the Debtors request authority to pay prepetition claims payments relating to COBRA coverage (which are partially funded for via premium payments by the former employees) and to continue to make such payments in the ordinary course of business for all their Health Plans. The Debtor paid Activa approximately $3,638.88 in fees for October and currently owes $3,710.69 for November.

**The Medical Plan**

24.     The Champion Home Builders Self-Insured Plan (the "Medical Plan") is the Debtors' primary self-insured medical, dental and prescription drug plan. Approximately 1729 active and former employees participate in the Medical Plan with a range of options and varying benefits depending upon the Employee's status.

25.     The Debtors provide their Medical Plan through the Debtors' third-party administrator, Blue Cross Blue Shield ("BCBS"). Employees can select either a Preferred Provider Option ("PPO") or an Exclusive Provider Option ("EPO") level of coverage under the Medical Plan. Under both the PPO and EPO plan levels, Employees receive the most benefits when selecting a provider participating in the benefit program (a preferred provider"). However, under the EPO option, Employees may only use in-network providers. Under the PPO option, employees may use either in-network or out-of network providers, but are subject to higher co-pays, deductibles and out of pocket maximums for the out-of-network services.

12

26. With both the PPO and EPO plans, the Debtors pay the net claims amount due after the Employees' deductible, co-pays and coinsurance for qualified health services. When claims are submitted to BCBS for care provided to Employees or their dependents, BCBS invoices the Debtors each Tuesday for the claims payable by the Plan and the Employee is billed directly by the provider for their remaining share of the deductible, copays and coinsurance. The Debtors make payments to BCBS each Thursday for claims received by BCBS in the previous week. The last such payment for $248,946.19 prior to the Petition Date was sent to BCBS on November 9, 2009. However, such payment does not include any claims for care provided to Employees or their dependents provided prior to the Petition Date and not yet submitted to BCBS. Typically, there is a delay of approximately 2 to 3 months between the time that Employees receive services and when some care providers submit their claims to BCBS for payment.

27. The two levels of coverage offered to the Employees from the Debtors under the Medical Plan differ only in the allocation of the total deductible that is paid by the Debtors and Employees and the out of pocket maximum to the Employees for all services provided under the Medical Plan. Under the PPO plan level, Employees are responsible to pay a $900 deductible for in-network services for each covered family and yearly out -of- pocket maximums for in-network services are limited to $3,700 for a family. For out-of-network service provided under the PPO plan level, the family deductible is $1,100 and the yearly out-of-pocket maximums are limited to $5,600 per family. Under the EPO plan level, which provides

13

13814-001\DOCS_DE:153169.12

no out-of-network coverage, Employees are responsible to pay a $600 deductible for each covered family and yearly out -of- pocket maximums are limited to $3,600 for a family.

28.     The Medical Plan also includes two levels of dental plans administered by BCBS for Employees and their eligible dependents (the "Dental Plan"). The basic Dental Plan pays 70% of the costs of all provided services after satisfaction of a $100 per employee/$200 per family deductible paid by the Employee, and pays a maximum of $1,000 per year for each covered individual. The enhanced Dental Plan, which has a higher employee contribution, pays 100% of the costs of all preventive services and, after satisfaction of a $50 per employee/$100 per family deductible, 70% of the costs of all basic services and major services (e.g., crowns, dentures). Under the Enhanced Dental Plan, the per family member maximum benefit payment is also increased to $1,500.

29.     In October 2009, the Debtors paid $1,691,633.73 on account of claims obligations under the Health Plan, which amount includes $43,066.90 in COBRA premium payments, which, as discussed above, are reimbursed to the Debtors in full. In 2009, the Debtors anticipate making payments of approximately $18 million for their claim obligations under the Medical Plan. On average, the Debtors pay approximately $1.4 million per month for claims, although this amount can vary widely and can be somewhat unpredictable based on the Debtors inability to predict the number or amount of claims that may be submitted by Employees in any give month. To limit their total exposure to medical claims, the Debtors maintain stop-loss insurance coverage through the BCBS with respect to claims under the Medical Plans exceeding $150,000. The Debtors pay a monthly premium of approximately $53,500 for this stop-loss

14

coverage. As of the Petition Date, the Debtors no costs for services rendered to Employees received by BCBS and invoiced to the Debtors prior to the Petition Date and estimate they owe an additional $3,500,000 for claims for services rendered to Employees but not yet submitted to BCBS on account of the Medical Plans (the "Medical Plan Obligations").

30.     The Debtors' monthly contribution to claims and fees due under the Medical Plan is approximately 77% of the cost of the Medical Plan, or approximately $1.1 million, including approximately $69,100 in administrative fees paid to BCBS. Each pay period, the Debtors deduct from the Employees' Wages, the Employees' portion of the Medical Plan contribution, which amount depends upon the plan they select according to the chart below:

| | **Employee** | **Employee & Spouse** | **Employee & Child** | **Employee & Children** | **Employee & Family** |
|---|---|---|---|---|---|
| **PPO/EPO Plan w/ Basic Dental** | 40.96 | 86.10 | 86.10 | 86.10 | 123.90 |
| **PPO/EPO Plan w/ Enhanced Dental** | 43.06 | 91.36 | 91.36 | 91.36 | 132.30 |

On average, the Employees contribute approximately 23% of the cost of the Medical Plan.

31.     As of the Petition Date, no costs relating to this program were outstanding and payable to BCBS by the Debtors. In an abundance of caution, and due to both the difficulty estimating the claims that may have been submitted by the Employees in prior to the filing and the time lag between the time that services are rendered and such claims are submitted to BCBS,

15

the Debtors seek authority to pay up to three month's of invoices to BCBS not to exceed $4,200,000 on account of pre-petition periods in the event that amounts may be owing to BCBS on their Medical Plan for which the Debtors are not yet aware. The Debtors seek authority to continue to offer their Medical Plan postpetition in the ordinary case of business in their discretion.

32. In addition to the BCBS administered Medical Plan, the Debtors also provide medical insurance to seven of their Employees through a fully-insured plan through Kaiser Permanente (the "Kaiser Permanente Medical Plan"). The Kaiser Permanente Medical Plan is a fully insured holdover plan from a company previously acquired by the Debtors prior to the Petition Date, and the Debtors seek to continue to honor its obligations under the Kaiser Permanente Medical Plan for the convenience of participating Employees. The Kaiser Permanente Medical Plan coverage costs approximately $3,250 per month in premiums, of which 73% is funded directly by the Debtor and participating Employees fund the remaining 27% by submitting payment through pre-tax payroll deductions. The Debtors prepay the premiums for the upcoming month in full, and the last such payment prior to the Petition Date was made on October 23, 2009. As of the Petition Date, no costs relating to this program were outstanding and payable to Kaiser Permanente by the Debtors. The Debtors seek authority to continue to offer their Kaiser Permanente Medical Plan postpetition in the ordinary case of business in their discretion.

16

## Vision Services Plan.

33.    The Debtors also provide their eligible Employees with voluntary employee paid vision insurance through VSP (the "Vision Plan"). As of the Petition Date, the Debtors owe to VSP, $12,784.65 for the November 2009 invoice. This coverage is paid 100% by the employees through pre-tax payroll deductions.

34.    The Debtors seek authority to continue to offer the Vision Plan postpetition in the ordinary course of business in their discretion and to remit any pre-petition amounts owing on account of the Vision Plan in an aggregate amount not to exceed $30,000 in an abundance of caution.

## Stop Loss Coverage.

35.    The Debtors purchase stop loss coverage (the "Stop Loss Coverage") through BCBS for the self-insured plan described above to cap the Debtors' exposure for individuals at $150,000 per calendar year per claim. The Stop Loss Coverage costs the Debtors approximately $53,500 per month. The Debtors believe that as of Petition Date, no costs relating to this program were outstanding and payable to BCBS. The Debtors seek authority to continue to pay for their Stop Loss Coverage postpetition in the ordinary case of business in their discretion.

## Flexible Spending Accounts

36.    The Debtors also offer their Employees access to a flexible spending account ("FSA") to set aside pre-tax dollars to pay for eligible medical and dependent care costs. Approximately 175 of the Debtors' employees contribute a portion of their pre-tax wages into a

17

flexible spending account. An Employee's FSA deduction is taken out of his or her paycheck each pay period and put in an account to be used for eligible expenses throughout the year. Claims are submitted to a third party administrator, Activa Benefits Services. Activa then sends a request for funds to the Debtor who wires money from the employees' accounts to Activa to fund the claims. As of the Petition Date, there are accrued but unremitted FSA contribution amounts that will be due for remittance on account of requests received during the period after the Debtors' last payroll was funded but before the Petition Date, which amounts are included in the Unpaid Wages described above. In addition, there may be additional accrued but unremitted FSA contributions from earlier pay periods that will be due for remittance, which amounts are also included in the Unpaid Wages.

37.     Activa receives claims for benefits, requests funds from Debtor via ACH wire and disburses payments on such claims, and the Debtors pay Activa a monthly fee based upon the number of participants and certain associated expenses. The Debtors estimate that they pay $1,200 per month to Activa on average. As of the Petition Date, the Debtors owe to Activa $1,190.25 for the November invoice. However, in an abundance of caution, the Debtors seek authority to pay Activa up to $2,000 on account of pre-petition periods for which amounts may be owing that they are not yet aware.

38.     The Debtors seek authority to honor the FSA contributions in connection with satisfaction of the Unpaid Wages and to continue to provide the FSA program postpetition in the ordinary course of the Debtors' businesses.

18

**Life and Disability Insurance**

39.     The Debtors provide their Employees with life insurance, short-term and long-term disability insurance, and accidental death and dismemberment insurance, each as more fully described below. The Debtors seek authority to continue to offer the Life Insurance, AD&D Insurance, and Disability Insurance postpetition in the ordinary course of business in their discretion. The Debtors' premium contributions and administrative fees related to the Life Insurance, AD&D Insurance, and Disability Insurance total, in the aggregate, approximately $62,000 per month. All premiums are fully paid by the company with the exception of the Voluntary Life Insurance Programs (as defined below) which are voluntary plans fully paid for by the Employees. As of the Petition Date, the Debtors believe that there is approximately $62,000 owing on account of the pre-petition period for these programs, which includes amounts due for Voluntary Life Insurance Program premiums that have been collected from Employees. The Debtors seek authority to pay up to $70,000 for all of these insurance programs on account of any pre-petition amounts that may be owing for which they are not yet aware.

40.     Disability Insurance. The Debtors provide certain Employees with short-term and long-term disability benefits (the "Disability Insurance"). The Debtors fully fund their short-term disability program, which is self-insured. The Hartford provides administrative services to certify claimant eligibility for benefits. Salaried Employees are eligible for short-term disability benefits the first of the month after they have worked with the Debtors for 90 days  Hourly Employees are eligible the first of the month after working for the Debtors for 180 days. As of the Petition Date, there are seven employees receiving short-term disability benefits

19

receiving approximately $10,000 per month in Disability benefits. As of the Petition Date, approximately $4,800 in administrative fees associated with the short-term disability program were outstanding and payable and $2,900 are due to Employees receiving benefits under the short-term disability program. The Debtors also provide their employees with long-term disability benefits through a fully insured program with The Hartford, paying all applicable premiums (approximately $12,700 per month). Salaried employees are eligible for long-term disability benefits the first of the month after 90 days and are eligible to receive long-term disability benefits on the 91st day of the disability. As of the Petition Date, approximately $12,700 in premiums associated with the long-term disability program were outstanding and payable to The Hartford.

41.     Life Insurance. The Debtors provide primary life insurance coverage (the "Life Insurance") for certain of their Employees through The Hartford Life and Accident Insurance Company ("The Hartford"). Approximately 1,860 Employees receive such coverage, which costs the Debtors approximately $13,600 per month. As of Petition Date, approximately $28,000 in costs associated with the primary life insurance program were outstanding and payable to The Hartford.

42.     The Debtors also provide their Employees with an option to elect (at their cost) supplemental and/or dependent life insurance, which provide coverage above what the Debtors offer ("Voluntary Life Insurance Programs"). Under these Voluntary Life Insurance Programs, the Debtors deduct from the Employees' Wages the applicable premiums and remit those to the applicable third party insurance carriers. Such amounts are included in the

20

Withholding Obligations discussed above. The Debtors seek authority to continue to offer the

Voluntary Life Insurance Programs postpetition in their ordinary course of business.

**Workers' Compensation**

43.     Under the laws of the various states where the Debtors conduct their

businesses, the Debtors are required to maintain workers' compensation insurance to provide

their Employees with coverage for claims arising from or related to their employment with the

Debtors. The Debtors currently maintain an annual workers' compensation policy (the

"Workers' Compensation Policy") with Travelers Insurance Company ("Travelers") pursuant to

which Travelers provides workers' compensation insurance coverage up to the statutory limits

and up to $1 million per occurrence for employer liability. The Debtors pay a deductible of

$500,000 per occurrence.

44.     The Debtors' overall claims paid associated with their Workers'

Compensation Programs were approximately $5.7 million in 2008. The Debtors expect the costs

for 2009 to be approximately the same as 2008. As of the Petition Date, approximately

$10,019,565 million in claims in reserve under the Workers' Compensation Policy were

outstanding.

45.     As of the Petition Date, the Debtors were contingently obligated through

letters of credit (the "LCs") for approximately $35.5 million to support insurance reserves

including the reserves under their Workers' Compensation Policy. The Debtors' contingent

obligations under these LCs were secured by all of the Debtors' assets pursuant to their credit

agreement with their prepetition secured lenders. Pursuant to the rights granted to the

21

beneficiaries of these LCs, any failure of the Debtors to meet their obligations under the

Workers' Compensation Policy may result in an immediate draw upon the LCs by the

beneficiary, and a maturing of the Debtors' contingent obligation under the LCs into a secured

obligation on behalf of the banks that issued the LCs. The Debtors seek to continue to meet its

current and future obligations under the Workers' Compensation Policy to avoid the potential

secured obligation that may develop if these obligations are not met.

         46.     The current term of the Workers' Compensation Policy runs through

October 1, 2010, and costs $908,191 on an annual basis, subject to final audit. The Debtors

submit that the continuance of their Workers' Compensation Policy is appropriate in the ordinary

course of business, but out of an abundance of caution, seek authority to maintain their workers'

compensation insurance in accordance with applicable law postpetition and to pay all premium

installments as they come due in the ordinary course of business for going forward coverage.

**Vacation and Sick Pay.**

         47.     The Debtors provide vacation time to their employees as a paid time-off

benefit. Vacation benefits vary based on the Employee's location and position. Vacation time is

accrued based on time worked. Full-time salaried and hourly paid Employees are eligible for

paid vacation days after one year of service. Although the amount of vacation earned by

Employees is different for each of the Debtors' locations, the number of weeks that most

Employees are eligible for are based on the number of years of service an Employee has

completed as of December 31 of the previous year. The most common schedule of vacation

22

benefits earned by Employees follows:

| Years of Service | Weeks of Vacation |
|:---:|:---:|
| 1 | 2 |
| 6 | 3 |
| 15 | 4 |

In addition, during the year Employees celebrate their 6th or 15th anniversary, they are eligible to take an extra week of vacation the week after the anniversary.

48.    Hourly employees may receive a vacation payout on the anniversary date of their employment for accrued vacation time. If salaried employees fail to take their yearly vacation time, it is deemed forfeited as of their anniversary date. In additional to short term disability covered earlier in this document, the Debtors also provide sick pay for employees that is unique to policies implemented independently at each of the Debtors' facilities. For example, in addition to the accrued vacation time described above, hourly administrative Employees at the Debtors' headquarters receive up to 5 days per year for paid time off due to illness. Any unused sick time from the previous year is deemed forfeited on the Employee's yearly anniversary date.

49.    The Debtors request authority in their discretion to honor existing vacation and sick time obligations accrued in the previous year by their Employees and develop any similar policies regarding time away from work and holidays on a post-petition basis and in the ordinary course of the Debtors' business.

23

**401(k) Savings Plans**

        50.     The Debtors maintain a 401(k) plan for the benefit of their Employees (the "401(k) Plan"). The 401(k) Plan provides for automatic pre-tax salary deductions of eligible compensation up to certain limits set by the Internal Revenue Code. Approximately 1,000 Employees participate in the 401(k) Plan, and the approximate monthly amount collectively withheld from Employees' paychecks is $325,000. The Debtors do not currently pay matching contributions to the 401(k) plan. As of the Petition Date, there are no accrued but unfunded matching contributions with respect to the 401(k) Plan. The Debtors utilize Fidelity Investments Institutional Operations Company, Inc. ("Fidelity") as the Plan Trustee and Recordkeeper. All fees associated with the 401(k) Plan are paid from plan assets and not by the Debtors directly. The Debtors request authority, in their discretion, to continue their existing 401(k) Plan and pay any 401(k) fees in the ordinary course of the Debtors' business from the plan assets.

**Incentive and Bonus Plans**

        51.     In the ordinary course of business, the Debtors maintain various incentive plans to encourage their Employees to maximize the value of the Debtors' enterprise (collectively, the "Incentive Plans"). These Incentive Plans are an important component of employee compensation and provide substantial value to the Debtors' estates because they encourage Employees to achieve important financial performance and quality goals. The Debtors are not seeking authority herein to honor obligations under all of their Incentive Plans at

this time,[2] but do seek approval of certain of the Incentive Plans that are earned by Employees as a direct result of the performance of the operating facilities (the "Salary Incentives").

52.     The Debtors created the Salary Incentives to provide a market-appropriate salary to their production-oriented plant managers that includes both (a) a modest base wage to provide these Employees with a guarantee of an appropriate living wage not dependent upon the cyclical nature of the Debtors' business and (b) a quarterly payment based on actual plant earnings to incentivize the managers to meet performance goals necessary for the success of the Debtors' overall business. The amount of the Salary Incentives is tightly controlled by the Debtors to provide the appropriate motivation for the Employees to meet or exceed the performance goals. The Employees paid through the Salary Incentives (the "Eligible Employees") agree to a lower base salary (relative to market rates in the communities in which they reside) in return for a chance to earn a higher final salary due to their efforts in support of company-wide goals. These Employees view the Salary Incentives not as a "bonus" paid over and above an annual salary commensurate with the Employees' experience and position, but as a significant and integral part of their total compensation package.

53.     Approximately 65 Eligible Employees at the Debtors' manufacturing facilities are paid Salary Incentives as a portion of their compensation. The Eligible Employees include plant managers, production managers, sales managers, service managers, controllers and other production supervisors at each of the Debtors 16 operating manufacturing facilities. None

---

[2] The Debtors will seek further relief from the Court, as appropriate, before making any payment to any Employee on account of the Incentive Plans not fully described herein.

of the Eligible Employees is an "insider" of the Debtors as that term is defined by the

Bankruptcy Code. *See* 11 U.S.C. § 101(31)(B). The Eligible Employees are not officers of the

Debtors and, although they have a great impact on the performance of the manufacturing facility

where they work, the Eligible Employees are not "in control" of the Debtors and make no

strategic operating decisions that impact the company as a whole. As set forth in detail below,

the Eligible Employees only receive the Salary Incentives if their plant meets objective

performance standards based on earnings before interest, taxes and amortization ("EBITA") as

calculated by the chief financial officer of each plant.

54.     If the Eligible Employees meet their goals, then each of the Eligible

Employees will be entitled to divide an aggregate incentive payment equal to a percentage of the

adjusted earnings for their manufacturing facility. Salary Incentives are calculated based upon

the quarterly performance of the facilities, but are typically paid at least one month in arrears to

permit senior management and the Debtors' financial advisors to determine an accurate

calculation for the earnings of each of the Debtors' manufacturing facilities. On November 6,

2009, the Debtors paid the Salary Incentive payments due to Eligible Employees for the calendar

quarter ending September 30, 2009.

55.     In addition, the Debtors retain 15% of the quarterly payments to be made

as Salary Incentives (the "Incentive Holdback") as a hedge against potential unforeseen

reduction in future Salary Incentive payments throughout the remainder of the calendar year.

These Incentive Holdbacks are paid to Eligible Employees at the end of the calendar year with

the fourth quarter Salary Incentive payments. As of the Petition Date, the Debtors owe

26

approximately $112,867 to approximately 45 of the Eligible Employees for Incentive Holdbacks

collected from Eligible Employees during the first three quarters of 2009. The Debtors seek

authority to pay all Incentive Holdbacks earned prior to the Petition Date and to continue to

provide the Salary Incentives to the Eligible Employees postpetition in the ordinary course of the

Debtors' businesses.

### Relief Requested[3]

56.    Pursuant to sections 105(a), and 363(b)(1) and (c)(1) of the Bankruptcy

Code and the "necessity of payment" doctrine, the Debtors seek authority to pay or honor, in

their sole discretion:

a.    the Unpaid Wages, including any associated payroll processing obligations;

b.    any prepetition obligations owed to Independent Contractors for services rendered prior to the Petition Date pursuant to the agreements with such Independent Contractors;

c.    any Employer Tax Obligations attributable to the period prior to the Petition Date and to remit the same to applicable taxing authorities or other appropriate third-parties;

d.    the General Reimbursement Obligations;

e.    all prepetition obligations under the Medical Plan including the Medical Plan Obligations;

f.    all prepetition obligations under the Workers' Compensation Policy, including those obligations incurred prepetition and liquidated post-petition;

g.    honor vacation and sick time earned prepetition by Employees;

h.    all Salary Incentives and Incentive Holdbacks to Eligible Employees; and

i.    any other prepetition claims or obligations described in this Motion for which such authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Prepetition Employee Obligations.").

---

[3] Nothing in this Motion is intended to or shall convert any prepetition claim into an administrative claim.

57.     The Debtors also seek authority to continue, in their sole discretion, on a

postpetition basis:

      a.     the Health Plan, including the Medical Plan, the Kaiser Permanente Medical Plan, the Dental Plan and the Vision Plan;

      b.     the Stop Loss Coverage;

      c.     the Disability Insurance, Life Insurance and Voluntary Life Insurance Programs;

      d.     the Workers' Compensation Policy;

      e.     vacation and time-off policies pursuant to the terms of the Debtors' applicable policies and this Motion;

      f.     their existing 401(k) Plan including payment of any 401(k) fees in the ordinary course of the Debtors' business;

      g.     their existing programs to pay Salary Incentives to Eligible Employees; and

      h.     any other benefit program described in this Motion for which authority is specifically requested herein

(with each of the foregoing referred to collectively as the "Employee Programs.").

58.     The Debtors represent that (i) they will not distribute any amounts over

$10,950 directly to any individual employee on account Unpaid Wages, and (ii) they will not pay

any amounts in excess of the estimated outstanding amounts for each category of prepetition

claim identified herein without further order from this Court.

59.     To enable the Debtors to accomplish the foregoing, the Debtors request

that the Court authorize and direct the Debtors' banks and other financial institutions to receive,

process, honor, and pay all checks presented for payment and electronic payment requests

relating to the foregoing.

60.     Notwithstanding the authority requested in this Motion, the Debtors, in the

ordinary course of business sometimes modify, change and discontinue employee programs and

implement new employee programs and will continue to do so during these Chapter 11 Cases, and will provide notice thereof as required by applicable rules and law.

## Basis for Relief

61. Statutory support for the requested relief exists pursuant to sections 105(a), 363(b)(1) and (c)(1), and 507(a) of the Bankruptcy Code and the "necessity of payment" doctrine (discussed *infra*). Bankruptcy Code section 363(b)(1) authorizes a debtor in possession to use property of the estate other than in the ordinary course of business after notice and a hearing. Bankruptcy Code section 363(c) authorizes a debtor in possession to enter into transactions in the ordinary course of business without notice and a hearing. Bankruptcy Code section 105(a) further provides, in pertinent part, that this Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code.

62. The relief requested in this Motion is supported by the well-established "necessity of payment" doctrine.[4] The "necessity of payment" doctrine, which has been embraced by the Third Circuit, "teaches no more than, if payment of a claim which arose prior to reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus." *In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3rd Cir. 1981). *See also In re Sharon Steel Corp.*, 159 B.R. 730, 737 (Bankr. W.D. Pa. 1993) (embracing "necessity of payment" doctrine and citing *Lehigh & New*

---

[4] The doctrine was first articulated by the Supreme Court in railroad reorganization cases, *see Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882), and it has been held to be equally applicable to non-railroad debtor cases. *See, e.g., Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (hotel); *In re Gulf Air, Inc.*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (airline).

29

*England Ry. Co.* with approval). Similarly, the court in *In re Ionosphere Clubs, Inc.*, 98 B.R. 174 (Bankr. S.D.N.Y. 1989), stated that the "necessity of payment" doctrine "recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor." *Id.* at 176. In that case, the court permitted Eastern Air Lines, Inc., to pay its current employees' prepetition wages, salaries, medical benefits, and business expense claims. Judge Lifland relied on his equitable powers under Bankruptcy Code section 105(a) and, in particular, the "necessity of payment" doctrine to authorize such payments, recognizing that the debtor had to make the payments in order to retain its current employees and maintain positive employee moral--two factors that he deemed critical to the rehabilitation of an operating debtor. *Id.* at 176-77 (*citing* H.R. Rep. No. 595 95th Cong. 1st Sess. 16 (1977)). Other courts also have found that the "necessity of payment" doctrine applies to the payment of prepetition employee compensation and benefits. *See In re Chateaugay Corp.*, 80 B.R. 279, 281 (Bankr. S.D.N.Y. 1987) (under the "necessity of payment" doctrine, bankruptcy court should defer to the debtor's business judgment in permitting payment of certain workers' compensation claims).

63.     This Court similarly has approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that the payment of such claims was necessary to effectuate a successful reorganization or liquidation. *See, e.g., In re DHP Holdings II Corp.,* Case No. 08-183422 (Bankr. D. Del. Jan. 5, 2009); *In re EZ Lube, LLC.*, Case No. 08-13256 (CSS) (Bankr. D. Del. Dec. 10, 2008); *In re NetEffect, Inc.*, Case No. 08-12008 (KJC) (Bankr. D. Del. Aug. 28, 2008); *In re Western Nonwovens Inc.*, Case No. 08-

30

11435 (PJW) (Bankr. D. Del. July 15, 2008); *In re Global Motorsport Group, Inc.*, Case No. 08-
10192 (KJC) (Bankr. D. Del. Feb. 1, 2008)*; In re Answer Financial Inc.*, Case No. 08-10140
(MFW) (Bankr. D. Del. Jan. 23, 2008); *In re Aegis Mortgage Corporation*, Case No. 07-11119
(BLS) (Bankr. D. Del. Aug. 15, 2007); *In re Mortgage Lenders Network USA, Inc.*, Case No.
07-10146 (Bankr. D. Del. Feb. 7, 2007) (PJW); *In re Global Home Products LLC, et al.*, Case
No. 06-10340 (Bankr. D. Del. Apr. 11, 2006)(KG); *In re Proxim Corp.*, Case No. 05-11639
(PJW) (Bankr. D. Del. June 15, 2005); *In re Maxide Acquisition, Inc.*, Case No. 05-10429
(MFW) (Bankr. D. Del. Feb. 15, 2005); *In re Redback Networks, Inc.*, Case No. 03-13359
(MFW) (Bankr. D. Del. Nov. 5, 2003).

64.     The "necessity of payment" doctrine authorizes the Debtors to pay the
amounts it seeks authority to pay pursuant to this Motion because the Debtors' Employees are
critical assets necessary both to the Debtors' operations and the successful prosecution of these
Chapter 11 Cases.

65.     Pursuant to sections 507(a)(4) of the Bankruptcy Code, claims of
Employees of the Debtors for "wages, salaries, or commissions, including vacation, severance,
and sick leave pay" earned within 180 days before the Petition Date are afforded priority
unsecured status to the extent of $10,950 per Employee. The Debtors believe that all of the
Unpaid Wages relating to the period prior to the Petition Date constitute priority claims under
sections 507(a)(4) of the Bankruptcy Code. As priority claims, the Unpaid Wages must be paid
in full before any general unsecured obligations of the Debtors may be satisfied. Accordingly,

31

the relief requested may affect only the timing of the payment of these priority obligations, and will not prejudice the rights of general unsecured creditors or other parties in interest.

66.     Pursuant to the relief requested herein, the Debtors request authority only to pay up to the $10,950 statutory cap under Bankruptcy Code section 507(a)(4) to each Employee on account of all Unpaid Wages collectively owing to such Employee.[5]

67.     Many Employees live from paycheck to paycheck and rely exclusively on receiving their full compensation or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtors are not permitted to pay and/or honor the Unpaid Wages and Benefits, and the expenses associated therewith, in the ordinary course of the Debtors' business. Moreover, the Debtors believe that if they are unable to honor accrued Unpaid Wages and the Benefits described above, including honoring earned vacation time, Employee morale and loyalty will be jeopardized at a time when Employee support is critical.

68.     If the Debtors are not authorized to pay for medical benefits, then many of the Debtors' Employees may not be reimbursed or otherwise have their medical benefits claims paid. In addition, certain Employees may become primarily obligated for the payment of these claims in cases where health care providers have not been reimbursed. The Debtors believe that potentially enormous hardship could be visited upon these employees if the Debtors are not authorized to honor the resultant Medical Plan Obligations. The Debtors believe the uncertainty

---

[5] In the event any unpaid amounts owing to any Employee on account of Unpaid Wages exceed the $10,950 statutory cap, the Debtors reserve the right to petition the Court for authority to pay such amounts.

32

regarding the payment of Medical Plan Obligations will cause significant anxiety at precisely the time the Debtors needs their Employees to perform their jobs at peak efficiency. Furthermore, the Debtors believe that the Medical Plan Obligations are entitled to priority status under sections 507(a)(5)(A) and (B) of the Bankruptcy Code.

69.    The Employer Tax Obligations and other amounts either voluntarily or involuntarily withheld from Employee paychecks (collectively, the "Withholding Obligations") do not constitute property of the Debtors' estate and principally represent employee earnings that governments (in the case of taxes), Employees (in the case of voluntary Withholding Obligations), and judicial authorities (in the case of involuntary Withholding Obligations), have designated for deduction from Employee paychecks. The failure to transfer these withheld funds could result in hardship to certain Employees. The Debtors expect inquiries from garnishers regarding the Debtors' failure to submit, among other things, child support and alimony payments, which are not the Debtors' property but, rather, have been withheld from Employee paychecks. Moreover, if the Debtors cannot remit these amounts, the Debtors' Employees may face legal action due to the Debtors' failure to submit these payments.

70.    Finally, the Debtors submit that with respect to the wage-related taxes that constitute "trust fund" taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estate given that the relevant taxing authorities would have a priority claim under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the monies payable for trust fund taxes, as well as the other funds that are held in trust for the benefit of third parties, such as withheld funds with respect to the 401(k) Plan, are not property of the Debtors'

33

estate. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (withholding taxes are property held by a debtor in trust for another and, as such, are not property of the debtor's estates).

71.     The Employees have an intimate knowledge of the operation of the Debtors' business and are critical components to the success of these Chapter 11 Cases. Deterioration in the morale and welfare of the Employees at this critical time undoubtedly would adversely impact the Debtors and their ability to maximize the value of their assets. Satisfaction of the Unpaid Wages and Benefits, as described herein, is necessary to maintain the Employees' morale during the case and to insure continued, efficient operation in order to maximize value for all creditors.

### Payment of Salary Incentives is Proper Under the Bankruptcy Code

72.     Section 503(c) of the Bankruptcy Code provides criteria for courts to use in approving certain types of payments to insiders and "other transfers of obligations that are outside of the ordinary course of business." Section 503(c) contains: (1) a general prohibition of retention plans for insiders of a debtor; (2) limitations on severance payments to insiders of a debtor; and (3) standards governing other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the Petition. 11 U.S.C. § 503(c). As discussed in detail below, neither section 503(c)(1) nor 503(c)(2) are applicable to the payment of the Salary Incentives. Further, section 503(c)(3) also does not restrict payment of the Salary Incentive

34

payments because such payments are to be made (and have routinely been made prior to the

Petition Date) in the ordinary course of the Debtors' businesses.

73. First, sections 503(c)(1) and 503(c)(2) don't restrict payment of the Salary

Incentives. Pursuant to the statute's plain language, section 503(c)(1) of the Bankruptcy Code

pertains solely to retention plans, and section 503(c)(2) only addresses the requirements for

severance plans. Neither section applies to performance-based incentive plans. *See, e.g., Global

Home Products*, 2007 Bankr. LEXIS 758, at *14 ("If [the proposed plans] are plans to

incentivize management, the analysis utilizes the more liberal business judgment review under §

363."); *In re Nobex Corp.*, Case No. 05-20050, 01/12/06 Hearing Tr. at 67 (Bankr. D. Del. 2006)

(MFW); *In re Calpine Corp.*, Case No. 05-60200, 04/26/2006 Hearing Tr. at 87 (Bankr.

S.D.N.Y. 2006(BRL). Indeed, Judge Lifland has held that:

> If sections 503(c)(1) and (c)(2) are not operative, a court may consider
> whether the payments are permissible under section 503(c)(3), which
> limits payments made to management and employees, among other things,
> outside of the ordinary course, unless such payments are shown to be
> justified under the facts and circumstances of the chapter 11 case. As one
> treatise points out, the test appears to be no more stringent a test than the
> one courts must apply in approving any administrative expense under
> section 503(b)(1)(A).

*In re Dana Corporation*, 358 B.R. 567, 576 – 77 (Bankr. S.D.N.Y. 2006). The Salary Incentives

are neither a retention plan nor a severance plan. Instead, the Salary Incentives are a

performance-based plan that provides for targeted payments to certain employees if they meet

the objective performance goals based on plant earnings. The purpose of the Salary Incentives

are to motivate the Eligible Employees to work very hard in order to obtain the payments.

35

Neither the performance goals nor the incentive payments provided under the Salary Incentives have an impermissible retention or severance component. Therefore, sections 503(c)(1) and (c)(2) are not applicable to the Salary Incentives.

74.     Second, section 503(c)(3) restricts certain other transfers or obligations proposed to be made to employees by a trustee or debtor-in-possession. But § 503(c)(3) applies only to transactions that are out of the ordinary course of the Debtor's business. The Debtors, prior to the filing of this case, regularly paid the Eligible Employees the Salary Incentives. Accordingly, § 503(c)(3) does not apply. *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 804 (Bankr.D.Del. 2007).

75.     Third, even if the Debtors had not formulated incentive plans for certain of its employees prepetition, and the payment of the Salary Incentives was not in the ordinary course (which it is), the Court should authorize the proposed Salary Incentives because it is "justified by the facts and circumstances of the case," and was formulated by the Debtors in the exercise of their business judgment. *See, e.g., Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp.*, (*In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (affirming bankruptcy court approval of key employee retention program; stating that "in determining whether to authorize the use, sale, or lease of property of the estate under [section 363(b)], courts require the debtors to show that a sound business purpose justifies such actions"); *In re Global Home Products, LLC*, 2007 Bankr. LEXIS 758, at *15 (Bankr. D. Del. March 6, 2007) ("The reasonable use of incentives and performance bonuses are considered the proper exercise of a debtor's business judgment."); *In re Nobex Corp.*, 2006 Bankr. LEXIS 417 (Bankr.

36

D. Del. Jan 19, 2006) (approving incentive pay outside of ordinary course where it was "an appropriate exercise of the Debtor's business judgment."); *In re America West Airlines, Inc.*, 171 B.R. 674, 678 (Bankr. D. Ariz 1994) (it is the proper use of a debtors' business judgment to propose bonuses for employees who helped propel the debtor successfully through the bankruptcy process); *In re Interco Inc.*, 128 B.R. 229, 234 (Bankr. E.D. Mo 1991) ("debtors' business judgment" was controlling in the approval of a "performance/retention program"); *see also, In re Riverstone Networks, Inc.*, Case No. 06-10110 (CSS) (Bankr. D. Del. March 28, 2006); *In re Pliant Corp.*, Case No. 06-10001 (Bankr. D. Del. March 14, 2004).

76.     The cost of the Salary Incentives is reasonable by comparison to the ongoing benefits to the Debtors and their estates. The work of the Eligible Employees is critical to the continued manufacturing operations of the Debtors. The Salary Incentives provide a mechanism by which to motivate the Eligible Employees to continue to perform despite the distractions and uncertainties that may have occurred due the filing of the cases. The Salary Incentives are fair and reasonable and applies to rank-and-file, operational, non-insider employees, is consistent with industry standards, and is narrowly focused on those employees whose services are specifically required to ensure that the Debtors' manufacturing facilities continue to produce at peak efficiency during the pendency of these Chapter 11 cases.

77.     The Salary Incentives provide performance-based incentives necessary for the Eligible Employees to remain focused on the task of maximizing the Debtors' financial and manufacturing performance for the benefit of their estates. Moreover, given the mechanism for payment of the Salary Incentives, there is no downside to the estates. If the performance

37

objectives necessary for payment are not achieved, then Eligible Employees will not receive any payment of the Salary Incentives.

78. For these reasons, the Debtors believe that payment of the Salary Incentives are supported by sound business purposes and should be approved under § 363(b) of the Bankruptcy Code.

## Satisfaction Of Bankruptcy Rule 6003 And Waiver Of Bankruptcy Rule 6004

79. Finally, Pursuant to Rule 6003(b) of the Federal Rules of Bankruptcy Procedure, which became effective December 1, 2007, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b). For the reasons described more fully above and as supported by the Knight Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.

80. To implement the foregoing successfully and insure the wages and benefits owed to Employees are not interrupted, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

38

## No Assumption or Assignment of Employee Benefits

81.     To the extent any Employee Benefits or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do not, at this time, seek to assume any such contract. Accordingly, if the Court authorizes the payments described above, such payments should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code. Moreover, authorization to pay all amounts on account of Unpaid Wages and Benefits shall not affect the Debtors' right to contest the amount or validity of these obligations.

### Request for Authority for Banks and Other Financial Institutions to Honor Checks Issued to Pay Wages and Benefits, to Honor All Fund Transfer Requests Relating to the Foregoing, and to Pay All Processing Fees Associated with Payment of Employee Wages and Benefits

82.     The Debtors request that all applicable banks and other financial institutions be authorized to receive, process, honor, and pay all checks presented for payment and to honor all fund transfer requests made by the Debtors to Employees, whether such checks were presented or fund transfer requests were submitted prior to, on, or after the Petition Date. The Debtors represent that they have (or will have) sufficient postpetition funding to pay promptly all Unpaid Wages and Benefits, to the extent described herein, on an ongoing basis and in the ordinary course of business. Nothing contained in this Motion, however, shall constitute a request for authority to assume any agreements, policies, or procedures relating to Unpaid Wages and Benefits. Further, the Debtors seek to retain the discretion to decide which Unpaid Wages

39

and Benefits it will pay and honor, and nothing in this Motion shall be deemed an admission by the Debtor that any Unpaid Wages and Benefits will in fact be paid or honored.

83.     Finally, the Debtors request authority to pay all of the processing fees associated with payment of the Unpaid Wages and Benefits including, but not limited to, any fees owed to any third party administrators of Benefits as described in the Motion.

## Notice

84.     Notice of this Motion has been given to (i) the Office of the United States Trustee and (ii) the Debtors' prepetition and postpetition secured lenders or, in lieu thereof, to their counsel, if known. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

85.     No prior motion for the relief requested herein has been made to this or any other court.

40

WHEREFORE the Court should authorize, but not require, the Debtors to pay all of the above listed in this Motion, including: prepetition wages, salaries, and other compensation, employee medical and similar benefits, and reimbursable employee expenses, and authorize banks and other financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing, and grant such other and further relief as is just and proper.

Dated: November 15, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
Mark M. Billion (Bar No. 5263)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:       ljones@pszjlaw.com
              dbertenthal@pszjlaw.com
              tcairns@pszjlaw.com
              mbillion@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession