UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------x
In re:                                     :      Chapter 11
                                           :
CHAMPION ENTERPRISES, INC., *et al.*,[1]   :      Case No. 09-14019 (___)
                                           :
        DEBTORS.                           :      (Jointly Administered)
                                           :
------------------------------------------------------------x

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 365 FOR AUTHORIZATION TO: (1) INCUR SENIOR SECURED SUPERPRIORITY POSTPETITION FINANCING; (2) USE CASH COLLATERAL; (3) GRANT LIENS AND PROVIDE SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (4) GRANT ADEQUATE PROTECTION; (5) MODIFY THE AUTOMATIC STAY; AND (6) SCHEDULE A FINAL HEARING**

The debtors and debtors in possession (the "Debtors") in the above-captioned

chapter 11 cases hereby move this Court (the "Motion"), pursuant to sections 105, 361, 362, 363,

364, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001

and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule

4001-2 of the Local Rules for the United States Bankruptcy Court of the District of Delaware

(the "Local Rules"), for entry of an interim order on an expedited basis, substantially in the form

attached hereto as Exhibit A (the "Interim Order"), and ultimately, at a final hearing to be set by

the Court (the "Final Hearing"), a final order as set forth herein (the "Final Order").

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642). The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

# I.

## Concise Summary of DIP Credit Agreement

1.    Pending the Final Hearing and entry of the Final Order, the Debtors request authority to obtain credit and incur debt on an interim basis under that certain *Debtor-in-Possession Credit Agreement* dated as of November 15, 2009, in the form annexed hereto as Exhibit B (the "DIP Credit Agreement"), excluding applicable exhibits and schedules.[2]

2.    Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following are the material provisions of the DIP Credit Agreement and/or Interim Order:[3]

| | |
|---|---|
| **Borrower**: | Champion Home Builders Co. ("CHBC" or the "Borrower"). |
| **Guarantors**: | (i) Champion Enterprises, Inc. ("Champion" or the "Parent"), (ii) the domestic subsidiaries of the Borrower that are Debtors in these chapter 11 cases, (iii) the three Canadian subsidiaries of the Borrower (the "Canadian Guarantors"), and (iv) certain other foreign subsidiaries of the Borrower (collectively (i) through (iv), the "Guarantors"). DIP Credit Agreement at § 7.8 and Article II. |
| **Lenders**: | A syndicate of banks, financial institutions, and other institutional lenders (collectively, the "Lenders") arranged by the Lead Arranger (as defined below). |
| **Administrative Agent**: | Credit Suisse AG, Cayman Islands Branch (in such capacity, "Credit Suisse" or "Administrative Agent"). |

---

[2] All capitalized terms that are not expressly defined in this Motion shall have the meanings ascribed to such terms in the DIP Credit Agreement, and any associated loan or collateral documents memorializing the financing thereunder with terms that substantially conform to the DIP Credit Agreement (collectively, the "DIP Facility Documents").

[3] The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and Interim Order. In the event there is any conflict between this Motion and the DIP Credit Agreement or Interim Order, the DIP Credit Agreement or Interim Order, as applicable, will control in all respects.

| | |
|---|---|
| **Lead Arranger,** <br> **Sole Book Runner,** <br> **and Syndication Agent**: | Credit Suisse Securities (USA) LLC (in such capacities, the "Lead Arranger"). |
| **Collateral Agent**: | Credit Suisse and Credit Suisse, Toronto Branch or an entity to be designated by Credit Suisse (in such capacities, the "Collateral Agent"), and together with the Administrative Agent, the "Agent"). |
| **Use of Cash Collateral**: | Authorizing the Debtors' use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code, according to an Approved DIP Budget (as defined below) on the terms and conditions set forth in the Interim Order and the DIP Facility Documents. *See* DIP Credit Agreement at § 5.1.17; Interim Order at ¶ 16. |
| **DIP Credit Facility**: | A senior secured first priority debtor in possession credit facility, comprising (A) up to $2 million synthetic letter of credit facility for new letters of credit ("DIP LCs"), (B) up to $38 million in principal amount of new money loans (the "New Money Loan"), of which up to $30,335,052 in principal amount will be advanced on the closing date and the remaining balance will be made available upon entry of the Final Order, and (C) a dollar-for-dollar roll-up of up to $40 million in principal amount of outstanding prepetition loans and other credit extensions of the lenders under the Prepetition Credit Agreement (and/or their affiliates) who fund the New Money Loans and DIP LCs, plus an additional principal amount equal to any amount of interest on the Roll-Up Loans that is paid in kind (the "Roll-Up Loan" and, together with the New Money Loan and the DIP LCs, the "DIP Loan"). *See* DIP Credit Agreement at Article II; Interim Order at ¶ 6. |
| **Use of Proceeds**: | Proceeds of the DIP Loan are to be used to fund the operating expenses, capital expenditures, lender expenses, professional fees, and expenses incurred by the Debtors and their estates and similar costs according to an Approved DIP Budget (as defined below). *See* DIP Credit Agreement at § 7.7. |
| **Maturity Date**: | The Borrower shall repay any outstanding advances and loans (and terminate all letters of credit) under the DIP Loan on the earliest of (i) four and one half months (20 weeks) after the date of the commencement of these cases or such later date, if any, as the Lenders shall agree to in their sole discretion; (ii) the date of the acceleration of the DIP Loan; (iii) 30 calendar days after the entry of the Interim Order approving the DIP Loan by the Court, unless |

the Final Order approving the DIP Loan shall have been entered and become effective prior thereto; (iv) the date of consummation of a sale of all or substantially all of the Debtors' or the Guarantors' assets (with certain exceptions); and (v) the effective date of a plan of reorganization in the Debtors' chapter 11 cases. *See* DIP Credit Agreement at § 1.1.

**Interest**:

Interest on the New Money Loan will be payable on the last business day at the end of each fiscal month, at a rate per annum equal to, at the Borrower's option depending whether it has selected LIBO Rate Loans or Base Rate Loans under the DIP Credit Agreement: (i) 10% plus (A) Adjusted LIBO Rate, or (ii) 9.00% plus the greatest of (A) Adjusted Base Rate from the time in effect, or (B) Adjusted LIBO Rate.

Participation fees on the DIP LCs will accrue at a rate per annum equal to the sum of the Adjusted LIBO Rate for the relevant investment period plus an applicable margin of 10.00%; provided that the amount due and payable by the Borrower under this clause shall be the amount set forth above less the synthetic deposit return payable by the Agent to the synthetic lenders pursuant to section 2.4(c) of the DIP Credit Agreement for the applicable period. All synthetic deposits shall accrue fees at all times that they are on deposit in the Synthetic Deposit Account.

Interest on the Roll-Up Loan (to the extent comprising Revolving Loans, U.S. Term Loans, and Sterling Term Loans under the Prepetition Credit Agreement) will be payable on the last business day at the end of each fiscal month, at a rate per annum equal to, at the Borrower's option, (i) 8.5% plus the Adjusted LIBO Rate (all of which is paid in kind and added to the principal amount of the Roll-Up Loan) (the "Applicable LIBOR Margin"), (and with respect to any Sterling Term Loan, any UK Mandatory Costs) (collectively, the "Roll-Up Adjusted LIBOR Rate"), or (ii) 7.50% plus the greatest of (A) Adjusted Base Rate and (B) Adjusted LIBO Rate (collectively, the "Roll-Up ABR Rate") (all of which is paid in kind and added to the principal amount of the Roll-Up Loan); *provided, however*, that the option under the foregoing clause (ii) shall not be available with respect to the Roll-Up Loans comprised of Sterling Term Loans. *See* DIP Credit Agreement at § 3.2; Interim Order ¶6(a)

**Default Rate**:

During the continuance of a default, the interest rate applicable to the DIP Loan shall bear interest at a rate that is two percent 2% per annum in excess of (i) the ABR Rate with respect to the New Money Loans and the synthetic deposits (DIP LCs) and (ii) the

Roll-Up ABR Rate with the respect to the Roll-Up Loans, except that the interest rate applicable to any Sterling Term Loan will be the Roll-Up Adjusted LIBO Rate (the "Default Rate"). Such interest will be payable on demand. The incremental interest attributable to the Default Rate, if in effect, shall not be paid out of the Interest Reserve Account. *See* DIP Credit Agreement at § 3.2.2; Interim Order ¶ 6(a)

**Original Issue Discount**: The New Money Loan and DIP LCs shall be made available to the Borrower at an original issue discount of 3.00%. *See* DIP Credit Agreement at § 2.2.

**Fees**:[4]

Upon the occurrence of the Maturity Date or the refinancing of the DIP Loan, each Lender shall be entitled to receive an exit fee equal to the product of .25% and the then outstanding principal amount of such Lender's DIP Loan.

The Borrower shall pay upfront fees to (a) the Administrative Agent and the Lead Arranger as set forth in a separate letter among the Administrative Agent, the Lead Arranger and the Borrower, and (b) the Backstop Lenders as set forth in a separate letter among the Backstop Lenders, the Lead Arranger and the Borrower based on the principal amount of the commitments for the New Money Loan and the DIP LCs.

Upon the occurrence of the closing of the DIP Credit Agreement, the Borrower shall pay to each lender under the Prepetition Credit Agreement that consents to the transactions referred to herein a consent fee of .50% on the amount of such lender's outstanding loans and commitments under the Prepetition Credit Agreement, such fee to be payable in kind by adding the amount thereof to the principal amount of such lender's loans under the Prepetition Credit Agreement. *See* DIP Credit Agreement at § 3.3; Interim Order ¶ 6(b)

---

[4] Champion Enterprises, Inc. and Champion Home Builders Co. are parties with Credit Suisse to a pre-petition engagement letter ("Engagement Letter"), a fee letter ("Fee Letter"), and a backstop fee letter (collectively, the "DIP Letters"), under which Credit Suisse was engaged on behalf of the Debtors to arrange the DIP Loan and the Debtors agreed to pay an arrangement fees on account of such services. Due to the commercially sensitive nature of the terms of the DIP Letters, the Debtors have not attached a copy of the DIP Letters to the Motion and the Debtors have not disclosed the amount of the fees payable thereunder in this Motion. However, the Debtors propose to provide the Office of the United States Trustee with a copy of the DIP Letters (on a confidential basis) in advance of the hearing on this Motion. In addition, the Debtors propose to submit a copy of the DIP Letters to the Court at the initial hearing on the Motion (pursuant to a motion to file the DIP Letters under seal pursuant to section 107(b) of the Bankruptcy Code and Bankruptcy Rule 9018). In addition, the Debtors will provide a copy of the DIP Letters to any statutory committee formed in these cases prior to the Final Hearing (also on a confidential basis).

**Collateral:**

To secure all obligations of each Debtor and Guarantor under the DIP Credit Agreement, the Collateral Agent, for the benefit of the Lenders, will receive a fully perfected first priority pledge of all equity interests in the Borrower, each Guarantor (other than the Parent) and CBS Monaco Limited, all inter-company notes or inter-company receivables due to the Borrower and each Guarantor and all other instruments of the Borrower and each Guarantor, and a fully perfected first priority security interest (solely with respect to the Canadian Guarantors, subject to specifically enumerated permitted liens in the sole discretion of the Administrative Agent) in all prepetition and postpetition assets of each Debtor including the Accounts, as well as in substantially all now owned or hereafter acquired assets of each Canadian Guarantor, and in each case, all proceeds resulting therefrom, including any and all claims, defenses, causes of action or rights as arise under sections 542-553 of the Bankruptcy Code (the "Collateral"), provided that the Collateral shall not include any property which is otherwise subject to a valid and perfected first priority consignment claim under applicable law and shall be subject to the Carve-Out (as defined below).

The Collateral Agent's first priority security interest in prepetition assets of each Debtor shall not extend to assets subject to preexisting validly perfected and unavoidable liens senior to the liens securing the obligations under the Prepetition Credit Agreement ("Third Party Liens"). The Collateral Agent shall be entitled to a fully perfected second priority security interest in the collateral securing the Third Party Liens, subject to the Carve-Out. Notwithstanding the foregoing, upon the entry of a Final Order, the Collateral Agent shall receive a fully perfected first priority security interest in the proceeds of collateral securing Third Party Liens but only to the extent necessary to secure the repayment obligation in that portion of the proceeds of the DIP Loan that are used to satisfy the reasonable and necessary costs and expenses of preserving such collateral to the extent of any direct benefit to any holder of a Third Party Lien, including the payment of all ad valorem property taxes with respect to such collateral.

All obligations of the Debtors under and with respect to the DIP Loan (the "DIP Obligations"), pursuant to sections 364(c)(1), (2) and (3) and section 364(d)(1) of the Bankruptcy Code, will be secured by a first priority lien senior to all prepetition liens (other than the Third Party Liens for which the Debtors' obligations will be secured by a second priority lien that will otherwise be senior to all prepetition liens other than the Third Party Liens and except to the extent the DIP Loan is used for the costs and expenses of

preserving such collateral) and will also receive and be entitled to a super-priority administrative expense claim (the "Superpriority Claim") over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out. The liens described in this and the preceding paragraphs are sometimes referred to as the "DIP Priming Lien". *See* DIP Credit Agreement at Exhibits G and H; Interim Order ¶ 11.

**Carve-Out:**

So long as there is no Event of Default (or an event which with the giving of notice or lapse of time or both would constitute an Event of Default), (x) notice of which has been given by the Administrative Agent to the Borrower or (y) in respect of which the Borrower has knowledge of such Event of Default and fails to provide notice to the Administrative Agent within two Business Days of obtaining such knowledge) (in each case, a "Carve-Out Event"), the allowed professional fees and disbursements incurred by professional persons employed by the Debtors or a statutory committee in the chapter 11 cases (including, any expenses of the members of such statutory committee) ("Professional Expenses") may be paid (without reducing the Carve-Out) to the extent authorized in the Approved DIP Budget and subject to entry of a customary order of the Bankruptcy Court, in form and substance reasonably acceptable to the Administrative Agent, allowing for the interim payment of such amounts, and subject further to final Bankruptcy Court approval of any such Professional Expenses.

In addition, (i) the Collateral Agent's liens on the Collateral, including any Superpriority Claims, and (ii) the liens, security interests and claims of the Prepetition Lenders (including replacement liens and super priority claims), will be subject to a carve out (the "Carve-Out"), for the purpose of, and in an amount not to exceed: (A) all accrued but unpaid Professional Expenses incurred by the Borrower prior to the date of delivery by the Administrative Agent to the Borrower and its counsel of record of a notice of cessation of funding from the Reserve Account (the "Pre-Carve-Out Notice Amount"), *provided*, such Pre-Carve-Out Notice Amount shall not exceed the amounts set forth in the Approved DIP Budget for such items through the date of such notice (including any unused amounts for Professional Expenses that are rolled forward under such Approved DIP Budget), plus (B) $625,000 for the payment of Professional Expenses arising after the date of delivery by the Administrative Agent to the Borrower and its counsel of record of a notice of cessation of funding from the Reserve Account (the "Post-Carve-Out Notice

Amount"), plus (C) fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Bankruptcy Court, to the extent such fees were incurred prior to delivery by the Administrative Agent to the Borrower of a notice of an Event of Default. The Interim Order will include provisions providing that (a) the Borrower shall fund on a monthly basis an account (the "Carve-Out Account") out of the Reserve Account or Operating Account and not to exceed the amounts contained in the Approved DIP Budget, to satisfy accrued but unpaid Professional Expenses included within the Pre-Carve-Out Notice Amount, provided that, if there is any shortfall, the Carve-Out Account shall be funded out of receivable collected by the Debtors, and (b) following the occurrence of a Carve-Out Event that is not waived or otherwise cured, the Post-Carve-Out Notice Amount shall be deposited into the Carve-Out Account from amounts on deposit in the Reserve Account or Operating Account and, if insufficient, the shortfall will be funded by receivables collected by Debtors. Amounts on deposit in the Carve-Out Account shall be used to satisfy Professional Expenses that are allowed and authorized to be paid as provided herein and by the Bankruptcy Court.

Upon a sale of the assets of the Debtors for cash, the net cash proceeds of such sale shall be first applied to pay the "Sale Transaction Fee" to Morgan Joseph specified in the fee letter between the Borrower and Morgan Joseph (to the extent such fee is approved and allowed by the Bankruptcy Court and payable after giving effect to the crediting of monthly fees received by Morgan Joseph prior to such date) (the "MoJo Fee"). Upon a sale of the assets of the Debtors pursuant to a credit bid, the MoJo Fee, if any, shall be payable out of the Reserve Account or Operating Account.

Notwithstanding the foregoing, no portion of the Carve-Out or amounts on deposit in the Carve-Out Account and no portion of any amounts approved for payment prior to an Event of Default are to be utilized in a manner prohibited in the Use of Proceeds section above. *See* DIP Credit Agreement at §§ 1.1 and 2.11; Interim Order ¶ 10

**Adequate Protection**:    As adequate protection to the Prepetition Lenders for any diminution in the value of their interests in the Debtors' property resulting from (i) the priming liens granted in favor of the Collateral Agent and the Lenders under the DIP Loan pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use, sale or lease of the Debtors' property (including any cash collateral) pursuant to section 363(c) of the Bankruptcy Code and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy

Code: the Prepetition Lenders will, subject to the terms of the Interim Order (a) maintain their prepetition liens on the Collateral, junior and subordinate to the Carve-Out and the liens securing the DIP Loan; (b) receive replacement liens on, and security interests in, the Collateral, subject only to the Carve-Out and the liens on, and security interests in, the Collateral granted to the Collateral Agent and the Lenders under the DIP Loan and the Orders, as the case may be, and the Third Party Liens; and (c) receive an administrative claim with priority over all administrative expense claims and unsecured claims against the Debtors, subject only to the Carve-Out and to the superpriority claims granted to the Administrative Agent, Collateral Agent and the Lenders under the DIP Credit Agreement. *See* DIP Credit Agreement at §§ 1.1 and 5.1.17; Interim Order ¶ 17

**Challenge Period**:

Any statutory committee appointed in these chapter 11 cases have the right, on or prior to 60 days after the appointment of such committee, to challenge the claims, liens, priority, and actions or inactions of the Lenders, Administrative Agent, and Prepetition Lenders, as applicable, *provided*, that only $25,000 of the DIP Loan proceeds may be used to investigate (but not file) such challenge. *See* DIP Credit Agreement at § 5.1.20; Interim Order ¶¶ 21 and 23.

**Covenants:**

In addition to the specific affirmative and negative covenants as set forth in the DIP Credit Agreement, the Debtors and their subsidiaries will not permit (i) the sum of the Debtors' and their subsidiaries' cash and Cash Equivalent Investments (excluding amounts in the Reserve Account) as of the end of each week to be less than the greater of (a) the total ending operating cash projected in the Approved DIP Budget less $2.5 million and (b) $4.5 million; and (ii) beginning with respect to the third week after the Closing Date, the cumulative deviations with respect to the sum of each of (a) net operating cash flow, (b) cash advance from/to Canada, (c) cash advance from/to U.K. and (d) professional fees, all as set forth in the Approved DIP Budget, to exceed $2.5 million. See DIP Credit Agreement at § 8.4.

**Milestones**:

Debtors shall have (i) filed a motion, in form and substance acceptable to the Administrative Agent, to sell substantially all of their assets (on terms and other documentation in form and substance acceptable to the Administrative Agent and the Required Lenders), by no later than thirty-seven (37) days from the Petition Date, (the "Sale Motion Milestone"), (ii) by no later than sixty (60) days from the Petition Date, obtained entry of an order of the Bankruptcy Court, in form and substance acceptable to the

Administrative Agent (the "Bidding Procedures Order"), approving bidding procedures with respect to such sale, (iii) by no later than ninety (90) days from the Petition Date, conducted an auction pursuant to the Bidding Procedures Order, (iv) by no later than one hundred (100) days from the Petition Date, obtained entry of an order approving a sale of substantially all of the Debtors' assets, in form and substance acceptable to the Administrative Agent (the "Sale Order"), and (v) by no later than one hundred and ten (110) days from the Petition Date, consummated the sale approved by the Sale Order. *See* DIP Credit Agreement at § 6.26.

**Defaults and Remedies:** Usual and customary for facilities of this type, as set forth in the DIP Credit Agreement, including but not limited to: (i) dismissal or conversion of any of these chapter 11 cases; (ii) the appointment of a chapter 11 trustee; (iii) granting a superpriority claim or lien on the Collateral that is superior to the Lenders' claims or liens; (iv) appointment of an examiner with enlarged powers to operate the Debtors' business; (v) failure to pay principal, interest, and fees; (vi) entry of the Interim Order shall not have occurred within five (5) days after Petition Date and entry of the Final Order shall not have occurred within thirty (30) days after the Interim Order; (vii) entry of an order granting relief from the automatic stay permitting a party to proceed against the Collateral; (viii) termination of the Debtors' exclusivity periods; (ix) failure to meet milestones as set forth in section 6.26 of the DIP Credit Agreement; and (x) any of the Canadian Guarantors becomes insolvent, is unable to pay debts as they become due, or commences bankruptcy proceedings (collectively, "Events of Default").

Upon the occurrence of an Event of Default, the automatic stay shall be lifted to allow the Agent to pursue any and all remedies under the Control Agreement and the related Accounts, subject to the Carve-Out and upon five (5) business days' notice to the Borrower, counsel to a statutory committee, and the United States Trustee exercise certain rights set forth under the DIP Credit Agreement. The Debtors shall be entitled to an emergency hearing with the Bankruptcy Court for the sole purpose of contesting whether an Event of Default has occurred. *See* DIP Credit Agreement at Article IX; Interim Order ¶ 13

**Indemnification:** The Debtors and Guarantors shall jointly and severally indemnify and hold harmless, and provide limitations of liability to, the Agent, the Lead Arranger, the Lenders, and each of their affiliates and each of their respective officers, directors, employees, agents, advisors, attorneys, and representatives in connection with the DIP

Loan, subject to customary limitations for gross negligence and willful misconduct. *See* DIP Credit Agreement at § 12.4.

3.       The Debtors further request that the Court (i) set an emergency interim hearing (the "Interim Hearing") on the Motion for the Court to consider entry of the Interim Order, which authorizes the Debtors to borrow under the DIP Facility Documents, on an interim basis, up to an aggregate principal amount not to exceed $32,335,052 million (consisting of $30,335,052 in New Money Loans and $2 million in DIP LCs) (ii) schedule the Final Hearing on the Motion within thirty (30) days of the entry of the Interim Order (as hereinafter defined) to consider entry of the Final Order authorizing the balance of the borrowings under the DIP Facility Documents and authorizing the Debtors to use cash collateral in accordance with the Approved DIP Budget on a final basis, and (iii) approve notice procedures with respect thereto.

4.       Notice of the Interim Hearing has been given to (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), (ii) counsel to the Administrative Agent under the DIP Credit Agreement, (iii) counsel to the agents for the Prepetition Lenders (as defined below); (iii) all other parties with liens of record on assets of the Debtors as of the Petition Date; and (iv) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions. The Debtors submit that such notice was good and sufficient under the circumstances, and no other or further notice is or shall be required.

## II.

### Jurisdiction and Venue

5.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for proceedings on this Motion is proper in this district pursuant to 28 U.S.C. § 1409.

6.     The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, 364 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4001-2.

### Background

7.     On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

8.     The Debtors and their non-debtor affiliates are leading producers of manufactured and modular housing, as well as modular buildings for government and commercial applications. The Debtors distribute these products through independent retailers, builders and developers. In addition to their manufacturing operations, the Debtors also sell manufactured homes directly to certain manufactured home parks in California and transport manufactured homes, recreational vehicles and a variety of other products including semi

trailers, flat beds, tankers, boats, conversion vans, cargo trailers and horse trailers from manufacturing factories to retailers.

9.     The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Phyllis Knight, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Knight Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

A.     **The Prepetition Credit Facility**

10.     Prior to the Petition Date, CHBC entered into that certain *Amended and Restated Credit Agreement*, dated as of April 7, 2006 (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), among CHBC, as borrower, Champion and certain other direct and indirect subsidiaries of CHBC as guarantors, the lenders from time to time party thereto (the "Prepetition Lenders"), and Credit Suisse, as administrative agent for the Prepetition Lenders, pursuant to which the Prepetition Lenders extended credit to CHBC on the terms set forth therein.[5]

11.     Pursuant to the Prepetition Credit Agreement and associated documentation, CHBC borrowed certain funds under (a) a revolving loan commitment (the "Revolving Loan"), (b) a domestic term loan commitment (the "U.S. Term Loan"), and (c) a further term loan commitment denominated in UK pounds sterling (the "Sterling Term Loan").

---

[5]     The Prepetition Credit Agreement is an amendment and restatement in its entirety of that certain *Credit Agreement* dated as of October 31, 2005. Under the Prepetition Credit Agreement, as amended, certain additional loans and loan commitments were made in favor of CHBC, as borrower.

12.     In addition, pursuant to the Prepetition Credit Agreement, certain letters of credit were issued on behalf of the Debtors for the benefit of various insurers, sureties and other third parties. The letters of credit were issued on an unfunded basis (pursuant to a sub-facility under the Revolving Loan) or a funded basis (as so-called synthetic letters of credit). The stated amount of the issued and outstanding letters of credit issued under the Revolving Loan is referred to as the "Revolving Letter of Credit Outstandings." The stated amount of the issued and outstanding letters of credit issued under the synthetic letter of credit facility is referred to as the "Synthetic Letter of Credit Outstandings."

13.     As of the Petition Date, the Debtors estimate that no less than $187 million remains outstanding under the Prepetition Credit Agreement, comprised of approximately, $26.6 million in principal obligations (*excluding* letters of credit) outstanding under the Revolving Loan, $12.9 million in Revolving Letter of Credit Outstandings, $45.4 outstanding under the U.S. Term Loan, and the pound sterling equivalent of approximately $59.9 million outstanding under the Sterling Term Loan. Furthermore, the Synthetic Letter of Credit Outstandings were approximately $42.1 million, plus, in each case, certain interest and fees.[6] As noted above, the beneficiaries of the letters of credit include the Debtors' insurers under their workers' compensation, auto and comprehensive general liability policies, and issuers of surety or licensing bonds in connection with the Debtors' projects.

---

[6]     Unlike the letters of credit issued under the Revolving Loan, potential draws under the synthetic letters of credit are supported by a synthetic deposit account that contains funds equal to the aggregate amount of the Synthetic Letter of Credit Outstandings. Such deposits are not collateral under the Prepetition Credit Agreement, nor loans, extensions of credit or other financial obligations thereunder. Rather, such deposited funds are the property of and were provided by the synthetic lenders as security for any disbursements under a synthetic letter of credit that are not timely reimbursed by the borrowers under the Prepetition Credit Agreement.

14.     Subject to certain validly perfected prior liens, the obligations under the
Prepetition Credit Agreement are secured by a first priority, senior lien on substantially all assets
of CHBC pursuant to a *Pledge and Security Agreement* dated as of October 31, 2005 (as
amended, restated, supplemented or otherwise modified from time to time). As additional
security under the Prepetition Credit Agreement, certain real property assets of CHBC have also
been pledged as collateral. In addition, the guaranty obligations of Champion and the various
subsidiary guarantors are also secured by substantially all of their respective assets.

B.     **Reasons Leading to the Necessity for a Chapter 11 Filing**

15.     Each of the Debtors' operating segments serve a unique end market and is
influenced by different risk factors. The severity and breadth of the global economic downturn
has significantly impacted each respective end market, resulting in trough-level operating
performance across all of the Debtors' business units. The market for factory-built housing is
affected by a number of factors, including the availability, cost and credit underwriting standards
of consumer financing, consumer confidence, employment levels, general housing market and
other economic conditions and the overall affordability of factory-built housing versus other
forms of housing.

Reduced Demand for Housing

16.     During 2007 and 2008, the broader U.S. housing market declined
considerably, with 2008 registering a 41% decline in new single-family housing starts and a 38%
decline in new home sales versus 2007 levels. In addition, average selling prices in many U.S.
markets saw significant declines, and inventories of unsold homes continued to increase.

Industry shipments of modular homes, which are more directly impacted by conditions in the traditional housing market, totaled an estimated 21,500 homes in 2008, a decrease of 33% versus 2007. The Debtors' sales of modular homes in 2008 were 32% lower than its sales of modular homes in 2007 and 23% lower than its modular sales in 2004.

17.     Declining home prices, an oversupply of existing homes, and financial struggles for key demographics served by the U.S. manufacturing segment have continued to result in a steep decline in U.S. factory-built housing shipments over the past year. As a result of the difficult housing environment, the U.S. manufacturing segment operated at a cash loss over the past year. Management reacted quickly to correct the negative cash flow by idling certain plants to reduce capacity and by instituting a number of cash conservation initiatives designed to maximize labor efficiency and limit excess spending on inventory. Since mid-2006, Champion has closed, idled, sold, or consolidated 15 manufacturing facilities, eliminating under-performing operations and rationalizing its operations and capacity for industry conditions. The Company has reduced the total number of employees from approximately 6,500 at the end of 2006 to 2026 as of the Petition Date.

18.     Management's efforts substantially reduced the cash burn and, as a result, the U.S. manufacturing assets were cash flow breakeven from operations in the months of July and August of 2009. At current volumes, the Debtors anticipate that the U.S. manufacturing segment will continue to operate at breakeven profitability until the overall housing market recovers.

Tightening Credit Markets

19.     Independent retailers of factory-built homes generally finance their inventory purchases from manufacturers with floor plan financing[7] provided by third party lending institutions and secured by a lien on the homes. The availability and cost of floor plan financing can affect the amount of retailer new home inventory, the number of retail sales centers and related wholesale demand. During the past five years, there has been consolidation among the major national floor plan lenders, and a number of local and regional banks have entered the market or increased lending volumes.

20.     During 2008, approximately 42% of the Debtors' sales to independent retailers were financed by retailers under floor plan agreements with national lenders, while the remaining 58% were financed under various arrangements with local or regional banks or paid in cash. In accordance with trade practice, the Debtors have entered into repurchase agreements with each of the national lenders and with a small number of local and regional banks providing floor plan financing.[8] As a result of the credit crisis, during the fourth quarter of 2008 each of the national floor plan lenders substantially curtailed their lending activities, and one announced

---

[7] The Debtors' floor plan facilities are provided by third-party lending institutions that are given a lien on a retailer's housing inventory as security for the loan. The availability and cost of floor plan financing can have a significant effect upon the amount of inventory carried by retailers and the number of retail sales centers. During the past five years, there has been consolidation among the major national floor plan lenders. As a result of the credit crisis during the fourth quarter of 2008, national floor plan lenders substantially curtailed their lending to the Debtors' independent retailer network. As a result, the Debtors' independent retailers have been forced to proactively seek financing from local and regional banks as a replacement source of inventory financing.

[8] In connection with a floor plan arrangement for the Debtors' manufacturing shipments to independent retailers, the financial institution that provides the retailer financing customarily requires the Debtors to enter into a separate repurchase agreement with the financial institution. Under this separate agreement, generally for a period up to 18 months from the date of sale to the retailer, upon default by the retailer and repossession of the home by the financial institution, the Debtors are generally obligated to repurchase the home from the lender at a price equal to the unpaid principal amount of the loan, plus certain administrative and handling expenses, reduced by the cost of any damage to the home and any missing parts or accessories. The Debtors' estimated aggregate contingent repurchase obligation at November 5, 2009, was approximately $40 million and included significant contingent repurchase obligations relating to its largest independent retail customers.

its intention to exit the business in 2009. The limitation of lending has had a negative impact on the manufactured home industry.

21.    The number of factory-built homes that are sold to consumers and related wholesale demand are significantly affected by the availability, credit underwriting standards, loan terms and cost of consumer financing. During 2008, as the credit crisis deepened, credit terms and pricing for traditional mortgages were tightened substantially resulting in a more challenging lending environment for most home buyers. Buyers of the Debtors' homes generally need to finance the purchase. For the past several years consumer financing has been harder to obtain and has been more expensive than traditional mortgage lending.

22.    Although the housing crisis in Canada has been far less severe than in the U.S., Canadian manufacturing has also experienced a decline in performance due to general economic conditions, in addition to declining commodity prices that have slowed development in western Canada. During the first half of 2009, the Debtors conducted an extensive marketing process of their Canadian operations. Despite difficulties in the Canadian end markets, Canada manufacturing has been the most consistently profitable segment of the Debtors over the past year and has generated positive cash flows that have been used to offset the cash losses attributable to U.S. manufacturing operations. Following due diligence and negotiations with several prospective purchasers, the final offers were deemed inadequate at the time to justify a divestiture of the Canadian manufacturing operations.

23.    The general lack of construction financing available in the U.K. has limited the number of new projects available to the Debtors' international segment. After the completion of a number of large custodial and prison projects during the first half of 2008, net sales have fallen off significantly from the prior year. The international segment generally

operates with negative working capital and as sales have dropped in 2009, that negative working capital position has narrowed, requiring a significant outflow of capital. As of July 2009, year-to-date the international segment's working capital changes have resulted in a cash loss of £10.5 million. The majority of the loss has been attributed to a reduction in payables, as sub-contractors from completed projects have been paid and new project activity has slowed. This trend has begun to reverse over the past two months as accounts payable balances have been growing again, indicating that the international segment may have reached a trough in project activity. Based on the current backlog and estimated government spending in connection with existing framework agreements, the international segment expects that net sales have indeed reached a trough and no significant additional cash losses from working capital changes will occur. As the credit markets normalize and project financing becomes more readily available, The international segment will be able to generate cash from its negative working capital position as the business grows again.

24. The cash losses attributed to the U.S. manufacturing operations, the unwinding of the negative working capital position at the international segment, and reduced earnings from the Canadian operations have combined with the Debtors' significant cash interest burden to consume their liquidity, leading to the decision to file for protection under the Bankruptcy Code.

25. As a result of these conditions, and to help ensure that day-to-day operations can continue and that an orderly process can be put in place to create an ongoing path for the Debtors, the Debtors determined that it was in the best interest of the Debtors, their estates, and their creditors to commence the chapter 11 cases.

# III.

## Relief Requested

26.     The Debtors require financing and authority to use cash collateral to fund,
among other things, the Debtors' cash requirements for working capital and general corporate
needs.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503
of the Bankruptcy Code as an administrative expense or other financing under sections 364(c) or
364(d) of the Bankruptcy Code on equal or more favorable terms as described herein and as set
forth in the DIP Credit Agreement.  A loan facility in the amount and in the manner provided by
the DIP Credit Agreement is not available to the Debtors, generally, without granting to the
Agents and Lenders, pursuant to sections 364(c)(1), (2), (3) and 364(d) of the Bankruptcy Code,
the benefits set forth in the DIP Credit Agreement.  After considering all alternatives, the
Debtors have concluded in the exercise of their prudent business judgment that the loan facility
provided under the DIP Credit Agreement represents the best working capital financing available
to them.  Hence, the Debtors request approval of the DIP Credit Agreement and authority to use
cash collateral to maintain their going concern operations and maximize the value of their
estates.

A.     **Efforts to Obtain DIP Financing**

27.     Prior to the Petition Date, the Debtors and their advisors surveyed various
sources of prospective postpetition financing, including financing from the Prepetition Lenders
and certain unrelated third parties.

28.     In considering their options, the Debtors recognized that the obligations
owed to the Prepetition Lenders are secured by substantially all of the Debtors' property and that
such liens would either have to be primed to obtain postpetition financing or the Debtors would

need to locate a lender willing to extend credit that would be junior to the liens of the Prepetition Lenders. Borrowing from another postpetition lender or lending group that required security senior to that of the of the Prepetition Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. In light of the risk involved, the fees and expenses that would be incurred, and economics offered by the proposed Lenders, the Debtors determined that the proposed DIP Credit Agreement is the best financing available under the circumstances.

29.     The Debtors negotiated the proposed DIP Credit Agreement with the Lenders at arms' length and in accordance with their sound business judgment.

B.     **Implementation of DIP Credit Agreement**

30.     The Debtors, Lenders, and Administrative Agent engaged in extensive, arm's-length negotiations with respect to the terms and conditions of the Proposed DIP Credit Agreement. Significantly, the DIP Credit Agreement permits the Debtors to draw immediately $32,335,052 from the New Money Loan, $2 million of which is DIP LCs, after entry of the Interim Order and pending entry of the Final Order. This commitment will enable the Debtors to meet all of their administrative obligations during the initial stages of these chapter 11 cases.

31.     The Debtors have provided a budget to the Administrative Agent, setting forth in reasonable detail all projected receipts and disbursements of the Debtors on a weekly basis through and including the date that is four and one-half months (20 weeks) after the Petition Date, which budget has been approved in form and substance by the Administrative Agent (as amended from time to time, the "Approved DIP Budget"), a summary of which is

annexed hereto as Exhibit C. In addition, the Debtors will deliver, on a monthly basis, an

updated four and one-half month budget in form and substance reasonably acceptable to the

Administrative Agent. The Approved DIP Budget will be annexed to the Interim Order. The

Debtors believe that the Approved DIP Budget is achievable and will enable them to operate

their business without the accrual of unpaid administrative expenses.

## C.   **Liens and Claims**

32.    Pursuant to the Interim Order and, upon entry of the Final Order, all loans

and obligations under the proposed DIP Credit Agreement will:

a) Pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a (i) fully perfected first priority pledge of all (a) equity interests in the Borrower, each Guarantor (other than Champion), and CBS Monaco Limited and (b) inter-company notes or inter-company receivables due to the Borrower and each Guarantor and all other instruments of the Borrower and each Guarantor, and (ii) fully perfected first priority liens (solely with respect to the Canadian Guarantors, subject to specifically enumerated permitted liens in the sole discretion of the Administrative Agent) in all prepetition and postpetition assets of each Debtor, as well as in substantially all now owned or hereafter acquired assets of each Canadian Guarantor, and in each case, all proceeds resulting therefrom, including any and all claims, defenses, causes of action or rights under sections 542-553 of the Bankruptcy Code, subject to any valid, preexisting first priority liens of third parties (the "Third Party Liens"), perfected first priority consignment claims under applicable law, and the Carve-Out;

b) Pursuant to section 364(d)(1)(A), be secured by fully perfected first priority, senior priming liens on all Collateral that is subject to existing liens securing the obligations of the Debtors to the Prepetition Lenders, subject to only the Third Party Liens and the Carve-Out;

c) Pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by fully perfected second priority liens on all Collateral subject to the Third Party Liens and the Carve-Out; *provided, however,* the Lenders will receive fully perfected first priority liens on all of the proceeds of collateral subject to the Third Party Liens to the extent necessary to

secure the repayment of the proceeds of the DIP Loan used to preserve such collateral subject to Third Party Liens; and

d) Pursuant to section 364(c)(1), receive and be entitled to a superpriority administrative expense claim over all costs and expenses of the kinds specified in, or ordered pursuant to sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision under the Bankruptcy Code, subject to only the Third Party Liens and the Carve-Out.

D.    **The Roll-Up**

33.    Upon entry of the Interim Order and only to the extent of the borrowing authorized under such order, the Debtors are seeking authorization to effectuate a dollar-for-dollar roll-up of prepetition loans and other credit extensions of those lenders under the Prepetition Credit Agreement that fund the New Money Loan and DIP LCs, plus an additional principal amount equal to the interest payable in kind on the roll-up loan (the "Roll-Up Loan").

34.    As a result, the Roll-Up Loan will have the effect of deeming certain funds that were borrowed under the Revolving Loans, U.S. Term Loans, or Sterling Term Loans, each pursuant to the Prepetition Credit Agreement, as having been repaid but only to the extent a Lender provides funding under the New Money Loan and DIP LCs. If a Lender holds claims under more than one of the Revolving Loans, U.S. Term Loans, or Sterling Term Loans, then such Lender will allocate the deemed repayment among its claims.

35.    The Debtors believe that the proposed Roll-Up Loan is warranted for several reasons:

- It represents a conversion of approximately 22% of the claims under the Prepetition Credit Agreement and accordingly would not result in a conversion of an undersecured claim;

- At the interim hearing, the Debtors are seeking authority to roll-up an amount equal to only that portion actually borrowed by the Debtors pending entry of the Final Order;

- Debtors are not required to pay any cash interest on account of the Roll-Up Loan and as a result it will not affect the Debtors' cash flow;

- It does not prejudice the Prepetition Lenders since each such lender was provided an opportunity to participate in the Roll-Up Loan by their participation in the DIP Loan;

- The Debtors believe the amount of the Roll-Up Loan is below the value of the Prepetition Lenders' collateral;

- A statutory committee will have the required opportunity to review the validity of the prepetition liens;

- Approval of the Roll-Up Loan pursuant to the Interim Order is a condition to the DIP Loan and was a critical element in procuring the DIP Lenders' agreement to the terms of the DIP Facility Documents; and

- Significantly, appropriate limitations have been included in the proposed Interim Order allowing the Roll-Up Loan portion of the DIP Loan to be treated under section 1129 of the Bankruptcy Code, as opposed to being paid in cash in full under all circumstances.

36. The Lenders under the DIP Credit Agreement are a subset of the lenders under the Prepetition Credit Agreement. The priming features of the DIP Credit Agreement and the use of Cash Collateral are consensual and not contested by the affected parties.

E. **Provisions To Be Highlighted Pursuant To The Bankruptcy Rules And Local Rule 4001-2**

37. The Debtors believe that the following provisions of the proposed DIP Credit Agreement must be highlighted pursuant to Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2:

a) **Cross-Collateralization**. The Roll-Up discussed above will result in the cross-collateralization of the obligations under the Prepetition Credit Agreement. DIP Credit Agreement at § 2.2; Interim Order ¶¶ 6 and 25.

b) **Provisions that Deem Prepetition Debt to be Postpetition Debt**. The Roll-Up proposed in the DIP Credit Agreement provides that certain claims under the Prepetition Credit Agreement of Lenders that provide funding for the New Money Loan and DIP LCs will be deemed to have been repaid and converted into postpetition obligations under the DIP Credit Agreement to the extent Debtors are authorized by the Court to borrow under the DIP Loan on an interim basis pursuant to the proposed Interim Order. DIP Credit Agreement at § 2.2; Interim Order ¶¶ 6 and 25.

c) **Binding Estates to Validity, Perfection, or Amount of Secured Debt**. The Debtors will waive any and all claims arising from or related to the Lenders' and Prepetition Lenders' claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of the DIP Loan or the Prepetition Obligations or the liens on or security interests in the assets of the Debtors securing the DIP Loan or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Prepetition Obligations; *provided, however*, the foregoing waivers will be subject to the right of a statutory committee appointed in these chapter 11 cases, on or prior to 60 days after the appointment of such committee, to challenge the claims, liens, priority, and actions or inactions of the Prepetition Lenders *provided*, that only $25,000 of the DIP Loan proceeds may be used to fund an investigation relating to such challenge. DIP Credit Agreement at § 5.1.20; Interim Order ¶ 21.

d) **Waiver of Rights Under Section 506(c) and 552(b)**. The proposed waiver of the estates' rights under sections 506(c) and 552(b) of the Bankruptcy Code will be effective only after notice to parties in interest and entry of the Final Order granting such relief. DIP Credit Agreement at § 8.20; Interim Order ¶ 14.

e) **Granting Liens on Debtors Causes of Action Under Sections 542-553**. The DIP Credit Agreement and Interim Order provide that the obligations thereunder are secured by the proceeds of the Debtors causes of action under sections 542-553 of the Bankruptcy Code. Interim Order ¶ 11(a).

f) **Limitations Regarding Proposed Plan of Reorganization**. The DIP Credit Agreement and Interim Order provides that the Debtors shall

not propose or support any plan of reorganization or entry of any confirmation order that is not conditioned upon the indefeasible payment in full in cash on or prior to the effective date of such plan all of Debtors' obligations under the DIP Credit Agreement. Interim Order ¶20(c).

g) **Modification of the Automatic Stay**. The DIP Credit Agreement and Interim Order provide that the automatic stay under section 362(a) of the Bankruptcy Code will be automatically lifted upon an Event of Default under the DIP Credit Agreement. DIP Credit Agreement at § 9.2; Interim Order ¶ 13(c).

h) **Indemnification**. The DIP Credit Agreement provides that the Debtors jointly and severally indemnify the Secured Parties (as defined in DIP Credit Agreement with respect to actions arising from the DIP Credit Agreement, excluding gross negligence and willful misconduct by the Secured Parties. DIP Credit Agreement at § 12.4.

F.    **Sale Process Milestones**

38.    Pursuant to the DIP Credit Agreement, the Debtors will have to meet the following timelines for the proposed sale process. The Debtors will have (i) filed a motion, in form and substance acceptable to the Administrative Agent, to sell substantially all of their assets (on terms and other documentation in form and substance acceptable to the Administrative Agent and the Required Lenders), by no later than thirty-seven (37) days from the Petition Date, (as defined above, the "Sale Motion Milestone"), (ii) by no later than sixty (60) days from the Petition Date, obtained entry of an order of the Bankruptcy Court, in form and substance acceptable to the Administrative Agent (as defined above, the "Bidding Procedures Order"), approving bidding procedures with respect to such sale, (iii) by no later than ninety (90) days from the Petition Date, conducted an auction pursuant to the Bidding Procedures Order, (iv) by no later than one hundred (100) days from the Petition Date, obtained entry of an order approving a sale of substantially all of the Debtors' assets, in form and substance acceptable to

the Administrative Agent (as defined above, the "Sale Order"), and (v) by no later than one hundred and ten (110) days from the Petition Date, consummated the sale approved by the Sale Order.

39.     The Administrative Agent, with the requisite consent of the Lenders, may waive in writing any or all of the foregoing milestones.

## G.     **Events of Default**

40.     The DIP Credit Agreement contains customary events of default for loan agreements of this type. They include, but are not limited to, the following:

a)  entry of an order dismissing any of the Debtors' chapter 11 cases or converting any of the Debtors' chapter 11 cases to a chapter 7 case;

b)  entry of an order appointing a chapter 11 trustee in any of the Debtors' chapter 11 cases;

c)  entry of an order granting any other party a super-priority claim or lien equal or superior to that granted to the Lenders;

d)  entry of an order staying, reversing, vacating or otherwise modifying, in each case in a manner adverse to the Lenders (in the judgment of the Lenders) and without the prior written consent of the Lenders, the DIP Loan, the Interim Order or the Final Order approving the DIP Loan;

e)  entry of an order in any of the Debtors' chapter 11 cases appointing an examiner having enlarged powers to operate or manage the financial affairs of the Borrower or any of the Debtors;

f)  entry of an order in any of the Debtors' chapter 11 cases under Sections 506(c) or 552(b) of the Bankruptcy Code against the Lenders or the Prepetition Lenders regarding the DIP Loan or the Prepetition Obligations adverse to their respective rights and remedies under the DIP Loan, the Prepetition Obligations or any Bankruptcy Court order;

g)  failure of Debtors to pay principal, interest, fees, or other amounts owing in connection with the DIP Loan when due;

h) the Debtors engaging in or supporting any challenge to the validity, perfection, priority, extent or enforceability of the DIP Loan or the Prepetition Obligations or the liens on or security interests in the assets of the Debtors securing the DIP Loan or the Prepetition Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the Prepetition Obligations, or the Debtors engaging in or supporting any investigation of any claims or causes of action (or supporting the assertion of the same) against (x) the Lenders, the Administrative Agent, the Collateral Agent or the Lead Arranger, or (y) the Prepetition Lenders, and as defined in the Prepetition Credit Agreement: the Administrative Agent, the Syndication Agent, the Collateral Trustee, or any Issuer, or the Lead Arranger and Sole Book Runner for the Prepetition Credit Facility; *provided* that, making information available to a statutory committee of unsecured creditors shall not be a violation of this provision;

i) entry of the Interim Order shall not have occurred within 5 days after the Petition Date and entry of the Final Order shall not have occurred within 30 days after the entry of the Interim Order;

j) entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material assets of the Debtors;

k) entry of an order terminating, or the lapsing or termination of, the exclusive periods during which only the Debtors may file a plan and solicit acceptances thereto;

l) change in control;

m) failure to meet the sale milestone requirements; and

n) any of the Canadian Guarantors become insolvent, are unable to pay their debts as they come due, or commence bankruptcy cases.

## H. **Waivers of Rights**

41. In addition to the aforementioned limitations on the right to challenge the claims and liens of the Prepetition Lenders, the Debtors will waive any and all claims arising from or related to the Lenders' and Prepetition Lenders' claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of the DIP Loan or the Prepetition Credit Agreement or the liens

on or security interests in the assets of the Debtors securing the DIP Loan or the Prepetition

Credit Agreement, including without limitation seeking to equitably subordinate or avoid the

liens securing the Prepetition Credit Agreement; *provided, however*, the foregoing waivers will

be subject to the right of the statutory committee of unsecured creditors to investigate and bring

any such claims against, and, with respect to the claims held by, the Prepetition Lenders within

60 days after the appointment of such committee, *provided*, that no more than $25,000 of the

DIP Loan proceeds may be used to investigate any such challenge.

I.     **Indemnification**

      42.    The Debtors and Guarantors shall jointly and severally indemnify and hold

harmless, and provide limitations of liability to, the Agent, the Lead Arranger, the Lenders, and

each of their affiliates and each of their respective officers, directors, employees, agents,

advisors, attorneys, and representatives in connection with the DIP Loan, subject to customary

limitations for gross negligence and willful misconduct.

J.     **Use of Cash Collateral and Proposed Adequate Protection**

      43.    Proceeds of collateral and the cash and other amounts on deposit or

maintained in the Debtors' bank accounts constitute proceeds which, to the extent subject to

valid and perfected liens, are the cash collateral of the Prepetition Lenders, subject to security

interests of such parties in accordance with section 552(b) of the Bankruptcy Code (collectively,

the "Cash Collateral").

      44.    To the extent their interests in the Collateral constitute valid and perfected

security interests and liens as of the Petition Date, the Prepetition Lenders are entitled, pursuant

to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection of their interests in collateral under the Prepetition Credit Agreement to the extent there is any diminution in value of such collateral from and after the Petition Date.

45.     The Prepetition Lenders have consented to the Debtors' use of Cash Collateral in the ordinary course of business in accordance with the Approved DIP Budget, subject to the approval and entry of the Interim Order and the adequate protection liens and payments discussed below. As adequate protection for any such diminution in value, the Prepetition Lenders will: (i) maintain their liens on the Collateral, junior and subordinate to the Carve-Out and the liens securing the DIP Loan; (ii) be granted replacement liens on, and security interests in, the Collateral, subject only to the Carve-Out and the liens on, and security interests in, the Collateral granted to the Collateral Agent and the Lenders under the DIP Loan and the Orders, as the case may be, and any valid and perfected preexisting third party liens; and (iii) be granted an administrative claim with priority over all administrative expense claims and unsecured claims against the Debtors, subject only to the Carve-Out and to the superpriority claims granted to the Administrative Agent, Collateral Agent and the Lenders under the DIP Credit Agreement.

K.     **Carve-Out**

46.     So long as a Carve-Out Event has not occurred, all allowed professional fees and disbursements incurred by professional persons employed by the Debtors or the statutory committee of unsecured creditors in these chapter 11 cases (including expenses of members of a statutory committee of unsecured creditors, the "Professional Expenses") may be

paid to the extent provided under the Approved DIP Budget and approved by the Court, without reducing the Carve-Out.

47.     In addition, any liens and claims granted under this Motion will be subject to (i) all accrued but then unpaid Professional Expenses to the extent provided for under the Approved DIP Budget incurred prior to the date the Administrative Agent delivers a notice of cessation of funding from the Reserve Account, (as defined above, the "Pre-Carve-Out Notice Amount"), (ii) plus $625,000 for the payment of Professional Expenses arising after the date the Administrative Agent delivers a notice of cessation of funding from the Reserve Account (as defined above, the "Post-Carve-Out Notice Amount"), and (iii) the fees incurred pursuant to 28 U.S.C. § 1930 and fees payable to the clerk of the Bankruptcy Court, to the extent such fees were incurred prior to the delivery of a notice of cessation of funding from the Reserve Account.

48.     The Interim Order contains a proposed provision requiring the Borrower to fund the Carve-Out Account on a monthly basis from the Reserve Account and Operating Account and, if insufficient, the receivables collected by the Debtors and not to exceed the limits set forth in the Approved DIP Budget, for the purpose of satisfying Professional Expenses accrued and included within the Pre-Carve-Out Notice Amount. If an event of default occurs and is not waived, then the Post-Carve-Out Notice Amount will be deposited into the Carve-Out Account from the funds on deposit in the Reserve Account and Operating Account and, if insufficient, the receivables collected by the Debtors.

49.     Further, upon the sale of the Debtors' assets in exchange for cash, the Debtors propose to allocate the net proceeds towards the MoJo Fee in accordance with the

applicable fee letter and to the extent such fee is approved by the Court. If, however, the Debtors' assets are purchased pursuant to a credit bid, the Mojo Fee, if any, will be paid from the funds in the Reserve and/or the Operating Account.

## IV.

### The DIP Credit Agreement and
### Use of Cash Collateral Should Be Authorized

50.     Approval of the DIP Credit Agreement and use of Cash Collateral will provide the Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including postpetition wages and salaries and utility and vendor costs. Unless these expenditures are made, the Debtors will be forced to cease operations, which would (i) result in irreparable harm to their business, (ii) destroy going concern value, and (iii) deny the Debtors the opportunity to reorganize and maximize value.

51.     Because the Debtors' available Cash Collateral is insufficient to fund such expenditures, the borrowing under the DIP Credit Agreement is critically necessary to preserve and enhance the value of the Debtors' estates for the benefit of all stakeholders in these chapter 11 cases. In addition, the availability under the DIP Credit Agreement will provide confidence to the Debtors' vendors and will be viewed favorably by the Debtors' employees, thereby aiding in the administration of the Cases and promoting a successful reorganization. Accordingly, the timely approval of the relief requested herein is imperative and should be approved.

A. **Debtor-in-Possession Financing**

(i) Approval Under Section 364(c) of the Bankruptcy Code

52.     Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estates. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties.").

53.     Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(l) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2)     secured by a lien on property of the estates that is not otherwise subject to a lien; or
>
> (3)     secured by a junior lien on property of the estates that is subject to a lien.

11 U.S.C. § 364(c).

54.     In satisfying the standards of section 364(c) of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available of the type set forth in sections 364(a) and (b) of the

Bankruptcy Code. *See, e.g., Bray v. Shenandoah Federal Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good-faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames Dept. Stores*, 115 B.R. at 40 (finding that debtor demonstrated the unavailability of unsecured financing where debtor approached several lending institutions).

55.     Instead, the debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the Court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the Debtors' approach of only four lenders was sufficient under such circumstances. *See also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) satisfied where two banks refused to provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D. N.Y. 1992) (element satisfied where "specialist in commercial lending practices ... explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property ... because there is no property in the estate which is not already subject to a lien.").

56. The Debtors satisfy the requirements of section 364(c) of the Bankruptcy Code because the Debtors are unable to obtain credit otherwise, relevant secured creditors are adequately protected, and the proposed financing is in the best interests of the estates.

57. The Debtors believe that any reorganization of their business is not possible without access to sufficient working capital and liquidity through the incurrence of postpetition financing under the DIP Credit Agreement and the use of Cash Collateral. The use of Cash Collateral alone is insufficient to meet the Debtors' postpetition liquidity needs. The Debtors are unable to obtain (i) adequate unsecured credit allowable either (a) under sections 364(b) and 503(b)(1) of the Bankruptcy Code or (b) under section 364(c)(1) of the Bankruptcy Code, (ii) adequate credit secured by (x) a senior lien on unencumbered assets of the Debtors' estates under section 364(c)(2) of the Bankruptcy Code and (y) a junior lien on encumbered assets under section 364(c)(3) of the Bankruptcy Code, or (iii) secured credit under section 364(d)(1) of the Bankruptcy Code from sources other than the Lenders on terms more favorable than the terms of the DIP Credit Agreement. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Credit Agreement.

58. The Debtors believe that their efforts to obtain credit except as provided under the DIP Credit Agreement have been impacted by the fact that all or substantially all of the Debtors' assets are encumbered. Prior to the commencement of these chapter 11 cases, the Debtors solicited potential debtor in possession financing from several sources. Such financing proposals would, however, have entailed the "priming" of the lenders' pre-petition "blanket" liens, which the Debtors concluded would likely necessitate the consent of the pre-petition

35

lenders. Although the Debtors requested that the pre-petition lenders entertain certain proposals for alternative financing, the pre-petition lenders were not willing to consent to any alternative financing except on the terms and conditions offered by the DIP Lenders under the DIP Credit Agreement. After considering all of their alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing to be provided by the DIP Lenders pursuant to the terms of the DIP Credit Agreement represents the best financing presently available to the Debtors. Moreover, the Debtors and their advisors have further concluded, in the exercise of their business judgment, that the loan terms and pricing provided under the DIP Credit Agreement are within the range of comparable financing arrangements recently effectuated in other chapter 11 cases.

59. The Debtors further submit that the other terms and conditions of the DIP Credit Agreement are the best possible under the circumstances of these cases, and were negotiated in good faith and at arm's-length with all parties represented by experienced counsel. Accordingly, the Lenders should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Credit Agreement are later modified, vacated, or terminated by subsequent order of this or any other Court, the Lenders will be fully protected with respect to any amounts previously disbursed.

60. Finally, the Roll-Up Loan contemplated by the DIP Credit Agreement is appropriate under the circumstances and will not prejudice the Debtors or their estates. As noted above, the Roll-Up Loan reflects the deemed issuance under the DIP Loan of certain pre-petition loans and other credit extensions of the various lenders who will initially back-stop the New

Money Loan and DIP LCs (subsequently, other pre-petition lenders who participate in the New Money Loan and DIP LCs would be assigned ratable portions of the Roll-Up Loan corresponding to the respective amounts of their participation in the New Money Loan and DIP LCs). The Roll-Up Loan would be comprised of the various underlying loans made under the Prepetition Credit Agreement, *e.g.*, Revolving Loans, U.S. Term Loans, Sterling Term Loans, and outstanding amounts under revolving or synthetic letters of credit (and would be allocated among such components by each lender participating in the DIP Loan). The amount of the Roll-Up Loan is tied specifically to the amounts of the New Money Loan and the DIP LCs that are provided by the DIP Credit Agreement, and will occur ratably with the funding of the New Money Loan and DIP LCs (in other words, only amounts funded on an interim basis under the New Money Loan would qualify for corresponding Roll-Up Loans).

61.    The Debtors believe that the Roll-Up Loan is permissible and appropriate and should be approved by the Court. First, the validity, enforceability and priority of the liens granted by the Debtors under the Prepetition Credit Agreement is subject to the "challenge" rights of a statutory committee. Hence, insofar as the Roll-Up Loan is premised upon the validity of the blanket liens granted by the Debtors under the Prepetition Credit Agreement, a committee will have an opportunity to examine the propriety of the Roll-Up Loan. Second, the Debtors believe that the amount of the Roll-Up Loan is less than the value of the Collateral securing the claims under the Prepetition Credit Agreement. Courts have permitted debtors to cross-collateralize or use postpetition financing to pay prepetition claims of the lender when the loan cannot be obtained on any other basis and the claims of the prepetition lender are fully

secured. *In re Beker Indus. Corp.*, 58 B.R. 725, 742 (Bankr. S.D.N.Y. 1986) (recognizing that

unsecured creditors do not object to cross collateralization when the lender's prepetition claim is

fully secured by a perfected first priority lien). Similarly, the proposed Roll-Up Loan does not

affect the priority of payment since the Collateral cannot be primed to pay administrative claims.

*Hartford Underwriters Ins. Co. v. Union Planters Bankr, N.A.*, 530 U.S. 1, 4-5 (2000)

(recognizing that an administrative expense claim allowable under section 503(b) of the

Bankruptcy Code may not prime the claims held by a creditor having a perfected, first priority

lien against all of the debtor's assets).

62.     Hence, there should be no prejudice from the proposed Roll-Up Loan to

other creditors of these estates because the Prepetition Lenders already assert security interests in

the assets that the Debtors propose to pledge to the Lenders providing the Roll-Up Loan under

the DIP Credit Agreement.

(ii)     Approval Under Section 364(d) of the Bankruptcy Code

63.     When a debtor is not able to obtain financing pursuant to the provisions of

section 364(c) of the Bankruptcy Code, the debtor may obtain such financing that is secured by a

"priming lien" that is senior or equal to existing liens against property of the estate. 11 U.S.C. §

364(d). Section 364(d)(1) of the Bankruptcy Code governs financing that is secured by a

priming lien and provides that a court may authorize a debtor to obtain such debt provided that

(i) the debtor is not able to obtain credit otherwise and (ii) the lien being primed is adequately

protected.

64.     In the context of section 364(d), collateral only requires adequate

protection to the extent that a priming lien will result in a decrease in the value of such entity's

interest in the subject property. *See In re 495 Central Park Ave. Corp.*, 136 B.R. at 631 ("The

goal of adequate protection is to safeguard the secured creditor from diminution in the value of

its interest during the Chapter 11 reorganization."); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865

(Bankr. W.D. Pa. 2003) (quoting *In re Sharon Steel Corp.*, 159 B.R. 165 (Bankr. W.D. Pa. 1993)

("The purpose of providing 'adequate protection' is to insure that a secured creditor receives in

value essentially what he bargained for."); *In re Hubbard Power & Light*, 202 B.R. 680 (Bankr.

E.D.N.Y. 1996) (citing *In re 495 Central Park Ave. Corp.*).   What constitutes adequate

protection is decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 289 (Bankr.

S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to

the vagaries of each case"); *In re Realty Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y.

1992); *In re Becker Indus. Corp.*, 58 B.R. 725, 236 (Bankr. S.D.N.Y. 1986).

65.     The Debtors satisfy the standard under section 364(d) of the Bankruptcy

Code.  Here, the Prepetition Lenders have not only consented to the relief requested herein but

their interest in the Collateral is protected by the adequate protection relief proposed herein.  As

adequate protection, the Prepetition Lenders will (a) maintain liens on the Collateral, junior and

subordinate to the Carve-Out and the liens securing the DIP Loan; (b) will be granted

replacement liens on, and security interests in, the Collateral, subject only to the Carve-Out and

the liens on, and security interests in, the Collateral granted to the Collateral Agent and the

Lenders under the DIP Loan and the Orders, as the case may be, and any valid and perfected

preexisting liens held by third parties; and (c) will be granted an administrative claim with

priority over all administrative expense claims and unsecured claims against the Debtors, subject

only to the Carve-Out and to the superpriority claims granted to the Administrative Agent,

Collateral Agent and the Lenders under the DIP Credit Agreement.

66.     In light of the foregoing, the DIP Credit Agreement is vital to maximizing

the value of the Debtors' estates.  Consequently, without access to the DIP Loans and the

continued use of Cash Collateral, the Debtors and their estates would suffer immediate and

irreparable harm because they could not continue to operate.

B.     **Use of Cash Collateral**

67.     The Debtors' use of property of the estates is governed by section 363 of

the Bankruptcy Code.  Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under
> section . . . 1108 . . . of this title and unless the court orders
> otherwise, the trustee [or debtor-in-possession] may enter into
> transactions, including the sale or lease of property of the estates,
> in the ordinary course of business, without notice or hearing, and
> may use property of the estates in the ordinary course of business
> without notice or hearing.

11 U.S.C. § 363(c)(1).

68.     The Bankruptcy Code establishes a special requirement, however,

regarding the debtor in possession's use of "cash collateral," defined as "cash, negotiable

instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever

acquired in which the estates and an entity other than the estates have an interest . . .." 11 U.S.C.

§ 363(a).  Section 363(c)(2) of the Bankruptcy Code permits the debtor in possession to use, sell

or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances exist:

> (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

69.     Here, the Prepetition Lenders and the Lenders consent to the Debtors' use of Cash Collateral on the terms set forth in the Approved DIP Budget and this Motion.

## V.

## Interim Authorization

70.     The authorization to obtain the DIP Credit Agreement and use of Cash Collateral pending Final Hearing will preserve the value of the Debtors' business only if authorization is granted immediately.

71.     Delaware Bankruptcy Rule 4001-2(b) specifically contemplates that it might be necessary to grant interim authorization to obtain postpetition financing or use of cash collateral because of the business exigencies of individual cases. *See also* 11 U.S.C. § 102(1) (defining "after notice and a hearing" to mean after such notice and such opportunity for a hearing as is appropriate in the particular circumstances of a given case).

72.     In this instance, the Debtors must have immediate use of the funds provided under the DIP Credit Agreement and the Cash Collateral to the extent contemplated herein to pay their ongoing operational expenses and to maximize the value of their estates. Funds are urgently needed to meet all of the Debtors' liquidity needs and to administer these

cases in an orderly and efficient manner. In the absence of immediate postpetition financing, the Debtors' ability to preserve the value of their business and assets will be immediately and irreparably jeopardized, resulting in significant harm to the Debtors' estates.

73. The Debtors seek authorization on an interim basis to borrow up to $30,335,052 in new money and $2 million letters of credit under the DIP Credit Agreement and to use Cash Collateral for the purposes set forth in the Approved DIP Budget pending the Final Hearing.

74. Based on the foregoing, the Debtors submit that interim relief requested in this Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors.

## Notice

75. The Debtors have provided notice of the Motion and the Interim Hearing by facsimile or overnight mail to: (i) the U.S. Trustee, (ii) counsel to the Agent under the DIP Credit Agreement, (iii) counsel to the agents for the Prepetition Lenders; (iii) parties having Third Party Liens under the DIP Credit Agreement; (iv) all other parties with liens of record on assets of the Debtors as of the Petition Date; and (v) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

76.     Upon entry of the Interim Order, the Debtors shall give notice of the request for entry of a Final Order to: (i) the U.S. Trustee, (ii) counsel to the Agent under the DIP Credit Agreement, (iii) counsel to the agents for the Prepetition Lenders; (iii) parties having Third Party Liens under the DIP Credit Agreement; (iv) all other parties with liens of record on assets of the Debtors as of the Petition Date; (v) the Debtors' thirty-five (35) largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; and (vi) all other parties requesting notice pursuant to Bankruptcy Rule 2002.

**No Prior Request**

77.     No previous application for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request: (i) entry of the Interim Order attached

to this Motion, approving the DIP Credit Agreement and use of Cash Collateral on an interim

basis pending the Final Hearing; (ii) scheduling the Final Hearing on this Motion for approval of

the DIP Credit Agreement and use of Cash Collateral on a final basis; (iii) final approval of the

DIP Credit Agreement and use of Cash Collateral following the Final Hearing; and (iv) such

further relief as is just and proper.

Dated:  November 15, 2009          PACHULSKI STANG ZIEHL & JONES LLP


                                   Laura Davis Jones (Bar No. 2436)
                                   Henry C. Kevane (CA Bar No. 125757)
                                   David M. Bertenthal (CA Bar No. 167624)
                                   Timothy P. Cairns (Bar No. 4228)
                                   Mark M. Billion (Bar No. 5263)
                                   919 N. Market Street, 17th Floor
                                   Wilmington, DE 19801
                                   Telephone:  302/652-4100
                                   Facsimile:  302/652-4400
                                        Email:  ljones@pszjlaw.com
                                                dbertenthal@pszjlaw.com
                                                tcairns@pszjlaw.com
                                                mbillion@pszjlaw.com

                                   Proposed Counsel for the Debtors and
                                   Debtors in Possession