# EXHIBIT B

## (DIP Credit Agreement)

DEBTOR-IN-POSSESSION CREDIT AGREEMENT,

dated as of November 15, 2009,

among

CHAMPION HOME BUILDERS CO.,
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as the Borrower,

CHAMPION ENTERPRISES, INC.,
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,
as the Parent,

VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS FROM TIME TO TIME
PARTIES HERETO,
as the Lenders,

and

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent and Collateral Agent

---

LEAD ARRANGER AND SOLE BOOK RUNNER
AND SYNDICATION AGENT:

CREDIT SUISSE SECURITIES (USA) LLC

# TABLE OF CONTENTS

Page

ARTICLE I       DEFINITIONS AND ACCOUNTING TERMS ........................................................ 2
    SECTION 1.1.     Defined Terms ............................................................................................. 2
    SECTION 1.2.     Use of Defined Terms ............................................................................... 36
    SECTION 1.3.     Cross-References ....................................................................................... 36
    SECTION 1.4.     Accounting and Financial Determinations; Time ............................... 36

ARTICLE II      COMMITMENTS AND CREDIT EXTENSIONS ..................................................... 37
    SECTION 2.1.     Commitments .............................................................................................. 37
    SECTION 2.2.     The NM Loans and the Roll-Up Loans ................................................... 37
    SECTION 2.3.     DIP Letters of Credit ................................................................................ 39
    SECTION 2.4.     Synthetic Deposit Account. ...................................................................... 39
    SECTION 2.5.     Reduction of the Commitment Amounts ................................................ 42
    SECTION 2.6.     Borrowing Procedures. ............................................................................. 42
    SECTION 2.7.     Continuation and Conversion Elections ................................................. 43
    SECTION 2.8.     Funding ........................................................................................................ 43
    SECTION 2.9.     DIP Letter of Credit Issuance Procedures ............................................ 44
    SECTION 2.10.    Register; Notes ........................................................................................... 46
    SECTION 2.11.    Accounts ...................................................................................................... 47
    SECTION 2.12.    Allocation Mechanism with respect to NM Loans and DIP Letters of Credit..... 50

ARTICLE III     REPAYMENTS, PREPAYMENTS, INTEREST AND FEES ................................... 51
    SECTION 3.1.     Repayments and Prepayments; Application ......................................... 51
    SECTION 3.2.     Interest Provisions .................................................................................... 54
    SECTION 3.3.     Fees .............................................................................................................. 56

ARTICLE IV      CERTAIN LIBO RATE AND OTHER PROVISIONS ........................................... 56
    SECTION 4.1.     LIBO Rate Lending Unlawful ................................................................. 56
    SECTION 4.2.     Deposits Unavailable ................................................................................ 57
    SECTION 4.3.     Increased LIBO Rate Loan Costs, etc .................................................... 57
    SECTION 4.4.     Funding Losses ........................................................................................... 58
    SECTION 4.5.     Increased Capital Costs ............................................................................ 58
    SECTION 4.6.     Taxes ............................................................................................................ 59
    SECTION 4.7.     Payments, Computations, etc ................................................................... 62
    SECTION 4.8.     Sharing of Payments ................................................................................. 63
    SECTION 4.9.     Setoff ............................................................................................................ 63
    SECTION 4.10.    Change of Lending Office ......................................................................... 64
    SECTION 4.11.    Replacement of Lenders ........................................................................... 64
    SECTION 4.12.    Application to Participation Fees ............................................................ 65
    SECTION 4.13.    Payment of Obligations ............................................................................ 65
    SECTION 4.14.    No Discharge; Survival of Claims .......................................................... 65

ARTICLE V       CONDITIONS TO CLOSING ........................................................................... 65
    SECTION 5.1.     Initial Credit Extension ............................................................................ 65
    SECTION 5.2.     All Credit Extensions ................................................................................ 73
    SECTION 5.3.     NM Lender Delayed Draw Commitment Amount Availability .......... 74

ARTICLE VI      REPRESENTATIONS AND WARRANTIES ......................................................... 75

SECTION 6.1.    Organization, etc ............................................................................. 75
SECTION 6.2.    Due Authorization, Non-Contravention, etc ...................................... 75
SECTION 6.3.    Government Approval, Regulation, etc .............................................. 75
SECTION 6.4.    Validity, Enforceability, etc ............................................................. 76
SECTION 6.5.    Financial Information ....................................................................... 76
SECTION 6.6.    No Material Adverse Change ............................................................ 76
SECTION 6.7.    Litigation, Labor Controversies, etc ................................................. 77
SECTION 6.8.    Subsidiaries ..................................................................................... 77
SECTION 6.9.    Ownership of Properties ................................................................... 77
SECTION 6.10.   Taxes; Other Laws ........................................................................... 78
SECTION 6.11.   ERISA Matters................................................................................. 78
SECTION 6.12.   Environmental Warranties ................................................................ 79
SECTION 6.13.   Accuracy of Information; Projections................................................ 80
SECTION 6.14.   Regulations T, U and X ................................................................... 80
SECTION 6.15.   [Reserved]........................................................................................ 81
SECTION 6.16.   Accounts and Cash Management Accounts........................................ 81
SECTION 6.17.   Labor Matters................................................................................... 81
SECTION 6.18.   UK Pension Matters.......................................................................... 81
SECTION 6.19.   UK Financial Assistance................................................................... 82
SECTION 6.20.   Intellectual Property.......................................................................... 82
SECTION 6.21.   Insurance ......................................................................................... 83
SECTION 6.22.   [Reserved]........................................................................................ 84
SECTION 6.23.   [Reserved]........................................................................................ 84
SECTION 6.24.   Use of Proceeds ............................................................................... 84
SECTION 6.25.   Waiver of any Priming Rights .......................................................... 85
SECTION 6.26.   Milestones........................................................................................ 85
SECTION 6.27.   Secured, Super-Priority Obligations. ................................................ 85

ARTICLE VII   AFFIRMATIVE COVENANTS ........................................................... 87
SECTION 7.1.    Financial Information, Financing Reporting, Notices, etc................... 87
SECTION 7.2.    Maintenance of Existence; Compliance with Contracts, Laws, etc ..... 90
SECTION 7.3.    Maintenance of Properties ................................................................ 90
SECTION 7.4.    Insurance.......................................................................................... 91
SECTION 7.5.    Books and Records; Inspections ........................................................ 91
SECTION 7.6.    Environmental Laws......................................................................... 92
SECTION 7.7.    Use of Proceeds ............................................................................... 93
SECTION 7.8.    Subsidiary Guarantors, Security, Further Assurances, etc.................. 93
SECTION 7.9.    Maintenance of Corporate Separateness............................................ 96
SECTION 7.10.   Rating of Loans................................................................................ 96
SECTION 7.11.   Cash Management............................................................................. 96
SECTION 7.12.   Post-Closing Requirements............................................................... 96
SECTION 7.13.   UK Pension Matters.......................................................................... 97
SECTION 7.14.   [Reserved]........................................................................................ 98
SECTION 7.15.   Financial Consultant......................................................................... 98
SECTION 7.16.   Entry of the Final Order.................................................................... 98
SECTION 7.17.   Updated DIP Approved Budget......................................................... 98
SECTION 7.18.   Certain Milestones ........................................................................... 99
SECTION 7.19.   Payment Obligations........................................................................ 99

ARTICLE VIII  NEGATIVE COVENANTS................................................................. 100
SECTION 8.1.    Business Activities............................................................................ 100

SECTION 8.2.    Indebtedness ....................................................................................... 100
SECTION 8.3.    Liens ................................................................................................. 101
SECTION 8.4.    Financial Covenants ........................................................................... 103
SECTION 8.5.    Investments ....................................................................................... 104
SECTION 8.6.    Restricted Payments, etc .................................................................... 104
SECTION 8.7.    [Reserved]......................................................................................... 104
SECTION 8.8.    Issuance of Capital Securities ............................................................ 104
SECTION 8.9.    Consolidation, Merger and Other Fundamental Changes.................... 104
SECTION 8.10.   Permitted Dispositions ....................................................................... 105
SECTION 8.11.   Modification of Certain Agreements ................................................... 105
SECTION 8.12.   Transactions with Affiliates................................................................ 105
SECTION 8.13.   Payment of Prepetition Claims .......................................................... 106
SECTION 8.14.   Restrictive Agreements, etc ............................................................... 106
SECTION 8.15.   Accounting Changes .......................................................................... 106
SECTION 8.16.   Activities of the Parent ...................................................................... 106
SECTION 8.17.   [Reserved]......................................................................................... 107
SECTION 8.18.   Use of Proceeds ................................................................................ 107
SECTION 8.19.   [Reserved]......................................................................................... 107
SECTION 8.20.   Claims Against a Lender..................................................................... 107
SECTION 8.21.   Existence of Claims Entitled to Super-Priority.................................... 107
SECTION 8.22.   Contingent Liabilities ........................................................................ 107

ARTICLE IX      EVENTS OF DEFAULT ..................................................................... 108
SECTION 9.1.    Listing of Events of Default................................................................ 108
SECTION 9.2.    Remedies............................................................................................ 115
SECTION 9.3.    Additional Remedies for Other Events of Default................................ 115
SECTION 9.4.    Reservation of Rights......................................................................... 116

ARTICLE X       THE AGENTS .................................................................................... 116
SECTION 10.1.   Actions .............................................................................................. 116
SECTION 10.2.   Funding Reliance, etc ........................................................................ 117
SECTION 10.3.   Exculpation; Notice of Default ........................................................... 117
SECTION 10.4.   Successor .......................................................................................... 118
SECTION 10.5.   Credit Extensions by the Administrative Agent and the DIP Letter of Credit
                Issuer................................................................................................ 119
SECTION 10.6.   Credit Decisions................................................................................ 119
SECTION 10.7.   Copies, etc......................................................................................... 119
SECTION 10.8.   Reliance by the Administrative Agent and DIP Letter of Credit Issuer ............ 120
SECTION 10.9.   The Agents and the DIP Letter of Credit Issuer .................................. 120
SECTION 10.10.  Posting of Approved Electronic Communications .............................. 120

ARTICLE XI      PARENT GUARANTY ........................................................................ 122
SECTION 11.1.   Guaranty ........................................................................................... 122
SECTION 11.2.   Acceleration of Obligations Hereunder ............................................. 122
SECTION 11.3.   Obligations Hereunder Absolute, etc.................................................. 122
SECTION 11.4.   Reinstatement, etc............................................................................. 123
SECTION 11.5.   Waiver, etc........................................................................................ 124
SECTION 11.6.   Postponement of Subrogation ............................................................ 124
SECTION 11.7.   Successors, Transferees and Assigns; Transfers of Notes, etc ........... 124

ARTICLE XII     MISCELLANEOUS PROVISIONS ....................................................... 124

| | | |
|---|---|---|
| SECTION 12.1. | Waivers, Amendments, etc | 124 |
| SECTION 12.2. | Notices; Time | 126 |
| SECTION 12.3. | Payment of Costs and Expenses | 126 |
| SECTION 12.4. | Indemnification | 127 |
| SECTION 12.5. | Survival | 128 |
| SECTION 12.6. | Severability | 129 |
| SECTION 12.7. | Headings | 129 |
| SECTION 12.8. | Execution in Counterparts | 129 |
| SECTION 12.9. | Governing Law; Entire Agreement | 129 |
| SECTION 12.10. | Successors and Assigns | 129 |
| SECTION 12.11. | Sale and Transfer of Credit Extensions; Participations in Credit Extensions; Notes | 129 |
| SECTION 12.12. | Other Transactions | 135 |
| SECTION 12.13. | Independence of Covenants and Default Provisions | 135 |
| SECTION 12.14. | Confidentiality | 136 |
| SECTION 12.15. | Forum Selection and Consent to Jurisdiction | 137 |
| SECTION 12.16. | Waiver of Jury Trial | 137 |
| SECTION 12.17. | Counsel Representation | 138 |
| SECTION 12.18. | PATRIOT Act | 138 |
| SECTION 12.19. | Certain Matters Relating to Roll-Up Loans | 138 |
| SECTION 12.20. | Parallel Debt with Respect to Obligations Enforceable Under Dutch Law | 138 |
| SECTION 12.21. | Consent to Amendment of Prepetition Credit Agreement | 140 |

| | | |
|---|---|---|
| SCHEDULE I | - | Disclosure Schedule |
| SCHEDULE II | - | Allocation Schedule |
| SCHEDULE III | - | UK Mandatory Cost Calculation |
| SCHEDULE IV | - | List of US Guarantors |
| EXHIBIT A-1 | - | Form of Roll-Up Note |
| EXHIBIT A-2 | - | Form of NM Note |
| EXHIBIT B-1 | - | Form of Borrowing Request |
| EXHIBIT B-2 | - | Form of Issuance Request |
| EXHIBIT C | - | Form of Continuation/Conversion Notice |
| EXHIBIT D | - | Form of Lender Assignment Agreement |
| EXHIBIT E | - | Form of Compliance Certificate |
| EXHIBIT F | - | Copy of Subsidiary Guaranty |
| EXHIBIT G | - | Copy of Pledge and Security Agreement |
| EXHIBIT H | - | Forms of Canadian Collateral Documents |
| EXHIBIT I | - | Initial DIP Approved Budget |
| EXHIBIT J | - | Copy of Interim Order |
| EXHIBIT K | - | Forms of UK Collateral Documents |
| EXHIBIT L | - | Forms of Dutch Collateral Documents |

## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of November 15, 2009, is made by and among CHAMPION HOME BUILDERS CO., a Michigan corporation, as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (as defined below) (the "Borrower"), CHAMPION ENTERPRISES, INC., a Michigan corporation, as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code (the "Parent" or "Parent Guarantor"), the Subsidiaries (as defined below) of the Borrower listed on the signature pages hereof as Subsidiary Guarantors (the "Subsidiary Guarantors" and together with the Parent Guarantor, the "Guarantors"), with each U.S. Guarantor (as defined below) as a debtor and debtor-in-possession under chapter 11 of the Bankruptcy Code, various financial institutions and other Persons (as defined below) from time to time parties hereto (the "Lenders"), and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH ("Credit Suisse"), as the administrative agent (in such capacity, the "Administrative Agent"), and as collateral agent for the Lenders (in such capacity, and together with the Canadian Collateral Agent (as defined below) and their respective successors and assigns, the "Collateral Agent").

## W I T N E S S E T H:

WHEREAS, on November 15, 2009 (the "Petition Date"), the Borrower and the U.S. Guarantors (each a "Debtor" and together, the "Debtors") each filed a voluntary petition for relief (collectively, the "Cases") under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"); and

WHEREAS, the Borrower and the U.S. Guarantors are continuing to operate their respective businesses and manage their respective properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code; and

WHEREAS, the Borrower has requested that the Lenders provide a two draw new money term loan facility (the "DIP Term Loan Facility") in an aggregate principal amount not to exceed $38,000,000 to fund the continued operation of the Borrower's and the Guarantor's businesses as debtors and debtors-in-possession under the Bankruptcy Code and for the other purposes specified herein; and

WHEREAS, the Borrower has also requested that certain financial institutions (which may include one or more Lenders) provide it with a synthetic letter of credit facility (the "DIP Letter of Credit Facility" and, together with the DIP Term Loan Facility, the "DIP Loan Facility") to provide for the issuance of letters of credit in an aggregate stated amount not to exceed $2,000,000 to fund the continued operation of the Borrower's and the Guarantor's businesses and for the other purposes specified herein, and in particular, to support the continued availability of crucial financing to the Canadian Guarantors; and

WHEREAS, as a condition to the agreement of the Lenders to provide the DIP Term Loan Facility and the DIP Letter of Credit Facility, the Borrower and the Lenders have agreed to roll up loans and letter of credit exposure under the Prepetition Credit Agreement (as defined below) at the times and in the amounts specified herein up to an aggregate principal and stated

amount equal to $40,000,000, which shall hereafter be obligations under and governed by this Agreement and the Orders; and

WHEREAS, as a condition to the effectiveness hereof and in consideration of the direct and indirect benefits provided hereby, each of the Guarantors has agreed to guaranty the obligations of the Borrower hereunder and the Borrower and each of the Guarantors has agreed to secure its obligations to the Lenders hereunder with, *inter alia*, security interests in, and liens on, substantially all of its property and assets, whether real or personal, tangible or intangible, now existing or hereafter acquired or arising, and to cause all other Collateral (as defined below) to be granted, all as more fully provided herein; and

WHEREAS, the Lenders are willing to make available to the Borrower such post-petition loans and letters of credit and to roll up loans and letter of credit exposure under the Prepetition Credit Agreement, but only upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1. <u>Defined Terms</u>. The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"<u>ABR Rate</u>" is defined in <u>Section 3.2.1</u>.

"<u>Account</u>" means, collectively, the Reserve Account, the Operating Account, the Interest Reserve Account, the Carve-Out Account, each Deposit Account and each other "securities account" and "deposit account" (as such terms are defined in Section 9-102 of the UCC) established by the Borrower with a financial institution satisfactory to the Administrative Agent; each foregoing account, an "<u>Account</u>".

"<u>Additional NM Loans</u>" is defined in <u>Section 2.2(b)</u>.

"<u>Additional Roll-Up Entitlements</u>" is defined in <u>Section 2.2(c)</u>.

"<u>Adequate Protection Obligations</u>" means, as adequate protection for the use of the Prepetition Collateral, the Debtors' obligations to provide the Prepetition Lenders with, subject to the terms of the Orders: (a) continued liens on the Collateral, junior and subordinate to the Carve Out and the liens securing the Loans; (b) replacement liens on, and security interests in, the Collateral, subject only to the Carve Out and the liens on, and security interests in, the Collateral granted to the Collateral Agent and the Lenders under the Loans and the Orders, as the case may be, and any Third Party Liens; and (c) an administrative expense claim with priority over all other administrative expense claims and unsecured claims against the Debtors, subject

2

only to the Carve Out and to the Superpriority Claims granted to the Administrative Agent, Collateral Agent and the Lenders under the Loans and the Orders, as the case may be.

"Adjusted Base Rate" means, for any day, a rate per annum equal to the greater of (a) the Base Rate in effect on such day, and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. Any change in the Adjusted Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively. The Administrative Agent will give notice promptly to the Borrower and the Lenders of changes in the Adjusted Base Rate; provided that the failure to give such notice shall not affect the Adjusted Base Rate in effect after any such change.

"Adjusted LIBO Rate" means, with respect to any NM Loan or Rolled-Up Loan maintained as a LIBO Rate Loan, or with respect to Participation Fees, for any Interest Period, an interest rate per annum equal to (a) the LIBO Rate of such Interest Period multiplied by (b) the Statutory Reserve Rate.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 10.4.

"Affected Lender" is defined in Section 4.11.

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person. "Control" of a Person means the power, directly or indirectly, (a) to vote (under ordinary circumstances) 10% or more of the Capital Securities (on a fully diluted basis) of such Person for the election of directors, managing members or general partners (as applicable) or (b) to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"Agent" or "Agents" means, collectively, the Administrative Agent, the Collateral Agent, the Lead Arranger and Sole Book Runner and the Syndication Agent, together with any successors in any such capacity.

"Agreement" means, on any date, this Debtor-in-Possession Credit Agreement, as the same may thereafter from time to time be further amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms and in effect on such date.

"Allocation Percentage" shall mean, as to each Lender, a fraction, expressed as a decimal, of which (a) the numerator shall be the aggregate of the sum, without duplication, of (i) the Obligations owed to such Lender on the Exchange Date (whether or not at the time due and payable) in respect of the NM Commitments, the NM Loans, the DIP Letter of Credit Commitment and the DIP Letter of Credit Outstandings and (b) the denominator shall be the aggregate of the Obligations owed to all the Lenders (whether or not at the time due and payable) immediately prior to the occurrence of the Exchange Date in respect of the NM Commitments, the NM Loans, the DIP Letter of Credit Commitment and the DIP Letter of Credit Outstandings.

"Allocation Schedule" means the table set forth on Schedule II listing, as of the Closing Date, for each Lender the amount, if any, of (a) the NM Loans and Synthetic Deposit Percentage

of such Lender, and (b) such Lender's, or such Lender's Related Prepetition Lender's, corresponding Roll-Up Amount.

"Applicable LIBOR Margin" is defined in Section 3.2.1(b).

"Approved Fund" means any Person (other than a natural Person) that (a) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"Authorized Officer" means, relative to any Obligor, any individual holding the position of chairman of the board (if an officer), chief executive officer, president or one of its vice presidents (or equivalent thereof), and such Obligor's chief financial officer or chief accounting officer.

"Backstop Fee Letter" means the confidential letter, dated November 8, 2009, between the Borrower and the Prepetition Lenders that are Lenders hereunder on the Closing Date.

"Bankruptcy Code" means title 11, United States Code, as amended from time to time.

"Bankruptcy Court" is defined in the recitals of this Agreement.

"Base Rate" means, at any time, the rate of interest then most recently established by the Administrative Agent in New York as its base rate for Dollars loaned in the United States. The Base Rate is not necessarily intended to be the lowest rate of interest determined by the Administrative Agent in connection with extensions of credit; provided that any term or provision hereof to the contrary notwithstanding, at no time shall the Base Rate be less than (a) 4.00%, in the case of NM Loans, nor (b) 4.25%, in the case of Roll-Up Loans, regardless of any rate established by the Administrative Agent in accordance with the foregoing.

"Base Rate Loan" means a Loan bearing interest at a fluctuating rate determined by reference to the Adjusted Base Rate.

"Base Return" means an amount equal to the Adjusted LIBO Rate (but without giving effect to clause (ii) of the proviso at the end of the definition of LIBO Rate) for the applicable Investment Period if such deposit were deemed to be a LIBO Rate Loan hereunder for such Investment Period (exclusive of any applicable margin that would otherwise be applicable thereto).

"BIA" means the Bankruptcy and Insolvency Act (Canada).

"Bidding Procedures Order" is defined in Section 7.18(a).

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Borrower" is defined in the preamble.

4

"Borrowing" means a borrowing (or, in the case of Roll-Up Loans, roll-up) consisting of simultaneous Loans of the same type and, in the case of LIBO Rate Loans, having the same Interest Period made by all Lenders required to make such Loans on the same Business Day and pursuant to the same Borrowing Request in accordance with Section 2.2.

"Borrowing Request" means a request and certificate duly executed by an Authorized Officer of the Borrower substantially in the form of Exhibit B1 hereto.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided, that when used in connection with a LIBO Rate Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollar and Sterling deposits in the London interbank market.

"Canadian Collateral Agent" means Credit Suisse AG, Toronto Branch or any nominee or trustee designated by the Collateral Agent from time to time and their respective successors and assigns.

"Canadian Collateral Documents" means the Canadian Guaranty, the Canadian Pledge and Security Agreement, and each other agreement pursuant to which the Administrative Agent or the Collateral Agent is granted a Lien to secure the Obligations, or the obligations under the Canadian Guaranty, and each other agreement, certificate, document or instrument delivered in connection with any Canadian Collateral Document, whether or not specifically mentioned herein or therein.

"Canadian Guarantor" means a Guarantor that is domiciled in Canada.

"Canadian Guaranty" means the guaranty, to be dated as of the Closing Date, by each of Moduline Industries (Canada) ULC, SRI Homes ULC, Dynamic Modular Homes Ltd. and any other Canadian Guarantor, in favor of the Administrative Agent, substantially in the form of Exhibit H hereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"Canadian Pledge and Security Agreement" means the pledge and security agreement, to be dated as of the Closing Date, by each of the Canadian Guarantors and CHB Holdings B.V. in favor of the Collateral Agent, to secure the Obligations of the Canadian Guarantors and the Borrower, substantially in the form of Exhibit H hereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"Canadian Subsidiary" means a Subsidiary of the Borrower that is domiciled in Canada.

"Canadian Support Agreement" is defined in Section 5.1.21.

"Capital Expenditures" means for any period, the sum of (a) the aggregate amount of all expenditures of the Parent and its Subsidiaries for fixed or capital assets made during such period which, in accordance with GAAP, would be classified as capital expenditures, and (b) the aggregate amount of the principal component of all Capitalized Lease Liabilities incurred during such period by the Parent and its Subsidiaries.

"Capital Securities" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital, whether now outstanding or issued after the Closing Date.

"Capitalized Lease Liabilities" means all monetary obligations of the Borrower or any of its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases.

"Carve-Out" means (a) all unpaid fees required to be paid in the Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), to the extent such fees were incurred prior to the date of delivery by the Administrative Agent to the Borrower of a notice of an Event of Default; (b) prior to the date of delivery by the Administrative Agent of a Carve-Out Notice to the Borrower, all accrued but unpaid fees and expenses then incurred by professionals retained by the Debtors or the professionals retained by a Committee (including reasonable expenses of the members of a Committee) in these Cases and allowed by the Bankruptcy Court (collectively, the "Professional Expenses")(the "Pre-Carve-Out Notice Amount"), provided that the Pre-Carve-Out Notice Amount shall not exceed the amounts set forth in the DIP Approved Budget for such items (including, any unused amounts for Professional Expenses prior to the date of a Carve Out Event that are rolled forward under such DIP Approved Budget); and (c) all Professional Expenses incurred after the date of delivery of a Carve-Out Notice that are subsequently allowed by order of the Bankruptcy Court (the "Post-Carve-Out Notice Amount"), provided that the Post-Carve-Out Notice Amount shall not exceed $625,000 in the aggregate; provided, however, that the Carve Out shall not include, apply to or be available for any fees, disbursements, costs or expenses incurred by any party in connection with: (i) challenging the amount, extent, validity, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the obligations under the Prepetition Credit Agreement, or the security interests and liens of the Secured Parties or the Prepetition Lenders in respect thereof; or (ii) the investigation (including discovery proceedings), initiation or prosecution of any other claims, causes of action, adversary proceedings or other litigation against the Lenders, the Administrative Agent, the Collateral Agent, any other Agent, the Prepetition Lenders, the Prepetition Administrative Agent, the Prepetition Lead Arranger and Sole Book Runner, the Prepetition Syndication Agent, the Prepetition Collateral Trustee or any other Prepetition Credit Agreement Agent; provided, further, that the Committee may expend up to $25,000 in fees and expenses investigating the obligations under the Prepetition Credit Agreement and any claims, causes of action or adversary proceedings or other litigation with respect to the security interest and liens of the Prepetition Lenders, so long as no claim or challenge is filed by the Committee under either clause (i) or (ii) herein.

"Carve-Out Event" means the occurrence of an Event of Default (or an event which with the giving of notice or lapse of time or both would constitute an Event of Default), (a) notice of which has been given by the Administrative Agent to the Borrower, or (b) in respect of which the Borrower has knowledge of such Event of Default and fails to provide notice to the Administrative Agent within two (2) Business Days of obtaining such knowledge.

"Carve-Out Notice" means written notice from the Administrative Agent, notifying the Borrower that the Administrative Agent is exercising, or is entitled to exercise, any remedies on its behalf or on behalf of the other Secured Parties under Article IX of this Agreement. A Carve-

Out Notice shall be deemed to have been given automatically upon the occurrence of a Carve-Out Event of the type specified in clause (b) of the definition thereof.

"Cases" is defined in the recitals to this Agreement.

"Cash Collateralize" means, with respect to any Letter of Credit, the deposit of immediately available funds into a cash collateral account maintained with (or on behalf of) the Administrative Agent on terms reasonably satisfactory to the Administrative Agent in an amount equal to 105% of the Stated Amount of such Letter of Credit.

"Cash Equivalent Investment" means, at any time:

(a)    any direct obligation of (or unconditionally guaranteed by) the United States (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States) maturing not more than one year from the date of acquisition thereof;

(b)    commercial paper maturing not more than 365 days from the date of acquisition and rated A-1 or higher by S&P or P-1 or higher by Moody's;

(c)    any certificate of deposit, time deposit, or bankers acceptance, maturing not more than one year after its date of acquisition, or any demand deposit account which, in any case, is issued by or established at any bank organized under the laws of the United States (or any State thereof) and which (i) has (A) a credit rating of A2 or higher from Moody's or A or higher from S&P and (B) a combined capital and surplus greater than $250,000,000 or (ii) is a Lender;

(d)    any repurchase agreement having a term of 7 days or less entered into with any Lender or any commercial banking institution satisfying the criteria set forth in clause (c) which (i) is secured by a fully perfected security interest in any obligation of the type described in clause (a), and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder;

(e)    taxable and tax-exempt auction rate securities rated AAA by S&P and Aaa by Moody's and with a reset of less than 90 days;

(f)    shares of investment companies that are registered under the Investment Company Act of 1940, as amended, and that invest solely in one or more of the types of securities described in clauses (a) through (e) above;

(g)    in the case of any Foreign Subsidiary, (i) any direct obligation of (or direct obligation unconditionally guaranteed by) the sovereign nation (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of such nation) in which such Foreign Subsidiary is organized and is conducting business, or (ii) investments of the type and maturity described in clauses (a) through (e) above of foreign obligors, which investments or obligors (or the direct or indirect parents

7

of such obligors) have ratings described in such clauses or equivalent ratings from comparable foreign rating agencies; or

(h)     other investments similar to the foregoing as may from time to time be approved in writing by the Administrative Agent in its reasonable discretion.

"Casualty Event" means any event that gives rise to the receipt by the Parent or any Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property; provided, that "Casualty Event" shall not include those events occurring prior to the Petition Date and set forth on the Disclosure Schedule.

"CCAA" is defined in Section 9.1.28(c).

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response Compensation Liability Information System List.

"Challenge" is defined in Section 5.1.17.

"Change in Control" means

(a)     any person or group (within the meaning of Sections 13(d) and 14(d) under the Exchange Act) becoming the ultimate "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of Voting Securities representing 35% or more of the Voting Securities of the Parent on a fully diluted basis; or

(b)     the failure of the Parent at any time to directly own beneficially and of record on a fully diluted basis 100% of the outstanding Voting Securities of the Borrower, such Voting Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document or pursuant to the Orders); or

(c)     during any period of 24 consecutive months, individuals who at the beginning of such period constituted the Board of Directors (or similar governing body) of the Parent (together with any new directors whose election to such Board or whose nomination for election by the stockholders of the Parent was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors (or similar governing body) of the Parent then in office.

"Closing Date" means the date on which the conditions set forth in Section 5.1 are satisfied and the initial Credit Extensions under this Agreement are made.

"Closing Date Certificate" means the closing date certificate executed and delivered by an Authorized Officer of the Borrower on the Closing Date.

"Closing Date Notice" is defined in Section 12.11.10.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collateral" means all collateral security granted pursuant to the Collateral Documents.

"Collateral Agent" is defined in the preamble, and includes any successor in such capacity.

"Collateral Documents" means the Pledge and Security Agreement, each Mortgage, the UK Collateral Documents, the Dutch Collateral Documents, the Canadian Collateral Documents and each other agreement pursuant to which the Administrative Agent or the Collateral Agent is granted a Lien to secure the Obligations and each other agreement, certificate, document or instrument delivered in connection with any Collateral Document, whether or not specifically mentioned herein or therein.

"Collections" means all cash, checks, notes, instruments and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Parent, Borrower and the Subsidiary Guarantors.

"Commitment" means, as the context may require, the NM Commitment or the DIP Letter of Credit Commitment.

"Commitment Amount" means, as the context may require, the NM Commitment Amount or the DIP Letter of Credit Available Amount.

"Committee" means the official statutory committee of unsecured creditors, if any, appointed in the Cases pursuant to section 1102 of the Bankruptcy Code.

"Communications" is defined in clause (a) of Section 10.10.

"Compliance Certificate" means a certificate duly completed and executed by the chief financial officer or chief accounting officer of the Parent, substantially in the form of Exhibit E hereto, together with such changes thereto as the Administrative Agent may from time to time reasonably request in writing for the purpose of monitoring the Parent's and the Borrower's compliance with the financial covenants contained herein.

"Contingent Liability" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Liability is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, or (b) with respect to any letter of credit issued for the account of

that Person or as to which that Person is otherwise liable for reimbursement of drawings. Contingent Liability shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence, and Contingent Liability shall exclude interest rate cap agreements, interest rate hedge agreements or other interest rate protection agreements entered into with the consent of the Administrative Agent. The amount of any Contingent Liability shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Liability is specifically limited.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit C hereto.

"Contribution Notice" means a contribution notice issued by the Pensions Regulator under Section 38 or Section 47 of the UK Pensions Act.

"Control Agreement" means an agreement in form and substance reasonably satisfactory to the Administrative Agent which provides for the Administrative Agent to have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts).

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Corporate Chart" means a corporate organizational chart, list or other similar document in each case in form reasonably acceptable to the Administrative Agent and setting forth, for the Parent and each Person that is an Obligor or that is a Subsidiary of the Parent or an Obligor, (a) the full legal name of such Person (and any trade name, fictitious name or other name such Person may have had or operated under in the past five years), (b) the jurisdiction of organization, the organizational number (if any) and the tax identification number (if any) of such Person, (c) the location of such Person's chief executive office (or sole place of business) and (d) the number of shares of each class of such Person's Stock authorized (if applicable), the number outstanding as of the date of delivery and the number and percentage of such outstanding

shares for each such class owned (directly or indirectly) by the Parent, any Obligor or any Subsidiary of any of them.

"Copyright Security Agreement" means any Copyright Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit C to its Pledge and Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"Credit Extension" means, as the context may require:

      (a)    the making of a Loan by a Lender; or

      (b)    the issuance of any DIP Letter of Credit, the increase of the Stated Amount of any existing DIP Letter of Credit or the extension of any Stated Expiry Date of any existing DIP Letter of Credit, by a DIP Letter of Credit Issuer (whether automatically by its terms or upon request of the Borrower).

"Credit Parties" means, collectively, the Lenders, the DIP Letter of Credit Issuer, the Administrative Agent and each other Agent and each of their respective successors, transferees and assigns.

"Current GAAP Financials" is defined in Section 1.4(b).

"Debtors" is defined in the recitals to this Agreement.

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Default Rate" is defined in Section 3.2.2.

"Defaulting Lender" means any Lender that has notified the Administrative Agent or an Obligor in writing that it does not intend to satisfy any obligation to fund any NM Loans or to fund its participation in a DIP Letter of Credit, or any Lender that has become insolvent or the assets or management of which has been taken over by any Governmental Authority.

"Deposit Account" means a "deposit account" as that term is defined in Section 9-102(a) of the UCC.

"DIP Approved Budget" is defined in Section 5.1.7(a).

"DIP Budget" is defined in Section 5.1.7(a).

"DIP L/C Lender" means, as at any time of determination, any Lender which has a DIP Letter of Credit Participation Obligation pursuant to the Allocation Schedule attached hereto, or pursuant to a Lender Assignment Agreement, in either case, greater than 0%.

"DIP Letter of Credit" is defined in Section 2.3.

"DIP Letter of Credit Available Amount" means, as of any date, $2,000,000.

11

"DIP Letter of Credit Commitment" means the DIP Letter of Credit Issuer's obligation to issue DIP Letters of Credit pursuant to Section 2.3 and, with respect to each DIP L/C Lender, such Lender's DIP Letter of Credit Participation Obligation.

"DIP Letter of Credit Facility" is defined in the recitals to this Agreement.

"DIP Letter of Credit Issuer" means Credit Suisse in its capacity as issuer of the DIP Letters of Credit, or another Lender acting in such capacity at the request of Credit Suisse with the consent of the Borrower (which consent shall not be unreasonably withheld or delayed), in either case together with its permitted successors and assigns in such capacity.

"DIP Letter of Credit Outstandings" means, at any time of determination, the sum of (a) the aggregate Stated Amount of all issued and outstanding DIP Letters of Credit, plus (b) all outstanding DIP Letter of Credit Reimbursement Obligations, in each case as of such time.

"DIP Letter of Credit Participation Obligation" is defined in Section 2.9.1.

"DIP Letter of Credit Reimbursement Obligations" is defined in Section 2.9.3.

"DIP Loan Facility" is defined in the recitals to this Agreement.

"DIP Participation Election" is defined in Section 12.11.10

"DIP Term Loan Facility" is defined in the recitals to this Agreement.

"Disbursement" is defined in Section 2.9.2.

"Disbursement Date" is defined in Section 2.9.2.

"Disclosure Schedule" means the Disclosure Schedule attached hereto as Schedule I, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrower with the written consent of the Required Lenders.

"Disposition" (or similar words such as "Dispose") means any sale, transfer, lease, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's or its Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any other Person (other than to another Obligor) in a single transaction or series of related transactions.

"Dollar" and the sign "$" mean lawful money of the United States.

"Domestic Office" means the office of a Lender designated as its "Domestic Office" on the Allocation Schedule hereto or in a Lender Assignment Agreement, or such other office within the United States as may be designated from time to time by notice from such Lender to the Administrative Agent and the Borrower.

"Domestic Subsidiary" means any Subsidiary that is incorporated or organized in or under the laws of the United States, any State thereof or the District of Columbia.

"Dutch Collateral Documents" means (a) the deed of pledge of shares in the capital of CHB International B.V and (b) the deed of pledge of shares in the capital of CHB Holdings B.V., and each other security and pledge agreements granted by CHB International B.V. and CHB Holdings B.V., in favor of the Collateral Agent to secure the Obligations of the Borrower and certain Guarantors, substantially in the form of Exhibit O hereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"Effective Date" means the date upon which a Reorganization Plan for the Debtors becomes effective.

"Eighth Amendment to the Prepetition Credit Agreement" is defined in Section 5.1.23.

"Eligible Assignee" means in the case of an assignment of a NM Loan or a Synthetic Deposit: (a) a Lender or any Prepetition Lender, (b) an Affiliate of a Lender or of any Prepetition Lender, (c) an Approved Fund, (d) a Prepetition Issuer or (e) any other Person approved by the Administrative Agent, provided that any other Person approved pursuant to clause (e) above shall not be (v) a natural Person, (w) the Borrower, (x) any Affiliate of the Borrower, (y) any other Person taking direction from, or working in concert with, the Borrower or any of the Borrower's Affiliates or (z) any Person who is (i) listed on the Specially Designated Nationals and Blocked Persons List maintained by the U.S. Department of Treasury Office of Foreign Asset Control (the "OFAC") and/or on any other similar list that is readily accessible to the public and maintained by the OFAC pursuant to any authorizing statute, Executive Order or regulation; or (ii) either (A) included within the term "designated national" as defined in the Cuban Asset Control Regulations, 31 G.F.R. Part 515, or (B) designated under Section 1(a), 1(b), 1(c) or 1(d) of Executive Order No. 13224, 66 Fed. Reg. 49079 (published September 25, 2001), or similarly designated under any related enabling legislation or any other similar Executive Orders that are readily accessible to the public.

"Engagement Letter" means the confidential engagement letter, dated October 5, 2009, between the Borrower and Credit Suisse and Credit Suisse Securities (USA) LLC.

"Environmental Laws" means all applicable federal, state, local or foreign statutes, Laws, ordinances, codes, rules, regulations, notices or binding agreements, decrees or orders relating in any way to public health and safety, protection or preservation of the environment or natural resources or the management, Release or threatened Release of any Hazardous Material.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time. References to Sections of ERISA also refer to any successor Sections thereto.

"ERISA Event" means (a) any event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section) with respect to any Plan, (b) any event that causes the Parent or any other member of the Controlled Group to incur liability under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201, 4204 or 4212 of ERISA or Section 4971 or 4975 of the Internal Revenue Code, (c) the filing of a notice of intent to terminate any Plan or the treatment

of any Plan amendment as a termination under Section 4041 of ERISA, (d) the institution of proceedings by the PBGC to terminate any Plan, or (e) any other event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan.

"Event of Default" is defined in Section 9.1.

"Exchange" shall mean each exchange of the Lenders' interests provided for in Section 2.12.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange Date" shall mean the first date on which there shall occur (a) any event referred to in Sections 9.1.11, 9.1.28 or 9.1.29, or (b) an acceleration of the Obligations pursuant to Section 9.2.

"Exemption Certificate" is defined in clause (f) of Section 4.6.

"Exit Fee" means, with respect to any prepayment or repayment of the Loans and DIP Letter of Credit Participation Obligations or a reduction of the DIP Letter of Credit Commitment (including any repayment and termination of commitments on the Maturity Date), an amount equal to the product of: (a) 0.25% and (b) each Lender's pro rata share of the principal amount of the Loans and/or DIP Letter of Credit Participation Obligations being repaid and/or DIP Letter of Credit Commitment being terminated.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter" means the confidential fee letter, dated October 5, 2009, between the Borrower and Credit Suisse and Credit Suisse Securities (USA) LLC.

"Filing Agent" is defined in Section 5.1.11

"Filing Statements" is defined in Section 5.1.11.

"Final Order" means, the order(s) of the Bankruptcy Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to the Administrative Agent and the Required Lenders, and which shall be in full force and effect and shall not have been stayed, reversed, vacated, subject to appeal, or otherwise modified in a manner opposed by the Administrative Agent or the Required Lenders, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this

Agreement and the other Loan Documents, as the case may be, and provides for the first priority Liens and super-priority claims of Agents and Lenders in and to the Collateral, subject to the Carve-Out.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Support Direction" means a financial support direction issued by the Pensions Regulator under Section 43 of the UK Pensions Act.

"First Day Order" means all orders entered by the Bankruptcy Court on the Petition Date or within five (5) business days of the Petition Date or based on motions filed on the Petition Date.

"Fiscal Quarter" means a fiscal quarter of the Parent.

"Fiscal Year" means a fiscal year of the Parent; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2008 Fiscal Year") refer to the Fiscal Year ending on or about December 31 of such calendar year.

"Floor-Plan Financing Lines" means Indebtedness in the form of inventory financings or purchase money obligations used solely to fund floor plan financing with respect to the U.S. and Canadian operations of the Obligors; provided that such Indebtedness (a) is provided by a Person that is not an Affiliate of the Borrower, (b) is secured only by otherwise unencumbered retail inventory of the Borrower or any of its Subsidiaries, and fixtures, furniture and other household items attached to or inside such inventory, and the proceeds thereof, and (c) constitutes, in the opinion of the Administrative Agent and the Required Lenders, non-recourse Indebtedness (other than with respect to the Repurchase Obligations of the Obligors).

"Foreign Person" means any Person that is incorporated, organized or otherwise formed in or under the laws of any jurisdiction other than the United States, any State thereof or the District of Columbia.

"Foreign Pledge Agreement" means any supplemental pledge agreement governed by the laws of a jurisdiction other than the United States or a State thereof executed and delivered from time to time by the Parent, the Borrower or any Subsidiary Guarantor pursuant to the terms of the Pledge and Security Agreement, in form and substance reasonably satisfactory to the Administrative Agent, as may be necessary or desirable under the laws of organization or incorporation of a Subsidiary to further protect or perfect the Lien on and security interest in any Collateral (as defined in the Pledge and Security Agreement), including without limitation, the Dutch Collateral Documents and the UK Share Charge, in each case, as amended or otherwise modified from time to time.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Funds Flow Memorandum" is defined in Section 5.1.22(d).

"FX Trading Office" means the Administrative Agent's foreign currency desk in New York, New York, or such other office or source of information as the Administrative Agent may designate.

"GAAP" means, with respect to the interpretation of all accounting terms used herein and in each other Loan Document, the calculation of all accounting determinations and computations required to be made hereunder or thereunder (including under Section 8.4 and in respect of any defined terms used herein or in any other Loan Document), those U.S. generally accepted accounting principles applied in the preparation of the financial statements of the Parent required to be delivered hereunder.

"Government Account" means any Account the debtor of which is the United States or any department or instrumentality thereof.

"Governmental Authority" means the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, the NAIC or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantor" means the Parent, each Subsidiary Guarantor and each other party that has guaranteed the Obligations.

"Guaranty" means each of the Subsidiary Guaranty and the guaranty entered into by the Parent under Article XI.

"Hazardous Material" means

      (a)     any "hazardous substance", as defined by CERCLA;

      (b)     any "hazardous waste", as defined by the Resource Conservation and Recovery Act, as amended;

      (c)     any petroleum product; or

      (d)     any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product, asbestos or asbestos-containing materials) within the meaning of any other Environmental Laws or with respect to which liability or standards of conduct are imposed under any Environmental Law.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under currency exchange agreements, interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, commodity price protection agreements, equity derivative agreements and all other agreements or arrangements designed to protect a Person against fluctuations in interest rates or currency exchange rates, commodity prices or equity security prices or values.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular section, paragraph or provision of such Loan Document.

"Immaterial Subsidiary" means, as of any date of determination, (a) each Subsidiary of the Parent identified on Item 1.1(b) of the Disclosure Schedule; provided that such Subsidiaries shall not have any assets other than the assets identified on Item 1.1(b) of the Disclosure Schedule, and (b) after the Closing Date, any other Subsidiary, which is inactive or has immaterial assets and which has been requested in writing by the Borrower to be treated, and agreed to by the Administrative Agent, in its sole discretion, as being an "Immaterial Subsidiary."

"Impermissible Qualification" means, relative to the opinion or certification of any independent public accountant as to any financial statement of any Obligor, any qualification or exception to such opinion or certification (a) which is of a "going concern" or similar nature, (b) which relates to the limited scope of examination of matters relevant to such financial statement (except, in the case of matters relating to any acquired business or assets, in respect of the period prior to the acquisition by such Obligor of such business or assets), (c) which relates to the treatment or classification of any item in such financial statement and which, as a condition to its removal, would require an adjustment to such item the effect of which would be to cause the Borrower to be in default of any of its obligations under Section 8.4 or (d) which is another material qualification or exception (other than a material qualification or exception that results directly from changes promulgated by the Financial Accounting Standards Board).

"including" and "include" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of *ejusdem generis* shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indebtedness" of any Person means, without duplication:

(a)     all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(b)     all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, and banker's acceptances issued for the account of such Person;

(c)     all Capitalized Lease Liabilities;

(d)     net Hedging Obligations of such Person;

(e)     whether or not so included as liabilities in accordance with GAAP, all obligations secured by any Lien on any property or assets owned or held by that Person regardless of whether the obligations secured thereby shall have been assumed by that Person or are non-recourse to the credit of that Person; provided, that the amount of any

Indebtedness of others that constitutes Indebtedness of such Person solely by reason of this clause (e) shall, in the event that such Indebtedness is limited recourse to such property (without recourse to such Person), for purposes of this Agreement, be equal to the lesser of the amount of such obligation and the fair market value of the property or assets to which the Lien attaches, determined in good faith by such Person;

(f)     whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts for property or services payable in the ordinary course of business which are not overdue for a period of more than 45 days or, if overdue for more than 45 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of such Person), including obligations of such Person ("Deferred Acquisition Obligations"), whether liquidated or unliquidated, fixed or contingent, arising from the acquisition of a business or a line of business (whether pursuant to an acquisition of Capital Securities, assets or otherwise) and payable to the seller or sellers thereof, including obligations in respect of deferred purchase price or "earn-outs" or other contingent payments (whether based on revenue or otherwise);

(g)     for purposes of Section 9.1.5 only, all other items which, in accordance with GAAP, would be included as liabilities on the liability side of the balance sheet of such Person as of the date at which Indebtedness is to be determined;

(h)     obligations arising under Synthetic Leases; and

(j)     all Contingent Liabilities of such Person in respect of any of the foregoing.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent that such Person is not liable therefor (by contract, as a matter of law or otherwise). Notwithstanding any of the foregoing, Indebtedness shall not include operating lease obligations.

"Indemnified Liabilities" is defined in Section 12.4.

"Indemnified Parties" is defined in Section 12.4.

"Initial DIP L/C Lenders" means those DIP L/C Lenders that will fund (directly or through a Related Prepetition Lender acting as a "fronting bank") Synthetic Deposits on the Closing Date pursuant to the Interim Order.

"Initial NM Lenders" means those Lenders that will make (directly or through a Related Prepetition Lender acting as a "fronting bank") Initial NM Loans on the Closing Date pursuant to the Interim Order.

"Initial NM Loan Amount" means $30,335,052.

"Initial NM Loans" is defined in Section 2.2(a).

"Initial Roll-Up Entitlements" is defined in Section 2.2(c).

"Insured Peril" is defined in Section 7.4.

"Intellectual Property" means the licenses that the Obligors own or otherwise possess the right to use along with all of the trademarks, service marks, trade names, domain names, copyrights, patents, trade secrets, know-how, database rights, design rights and other intellectual property rights.

"Interest Period" means, relative to any LIBO Rate Loan, the period beginning on (and including) the date on which such LIBO Rate Loan is made or continued as, or converted into, a LIBO Rate Loan pursuant to Section 2.6 or 2.7 and shall end on (but exclude) the day which numerically corresponds to such date one month thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month), as the Borrower may select in its relevant notice pursuant to Section 2.6 or 2.7; provided that,

    (a)    if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day (unless such next following Business Day is the first Business Day of a calendar month, in which case such Interest Period shall end on the Business Day next preceding such numerically corresponding day); and

    (b)    no Interest Period for any Loan may end later than the Maturity Date for such Loan.

"Interest Reserve Account" means the Account referred to in Section 2.11.2.

"Interim Order" means that certain order issued by the Bankruptcy Court in substantially the form of Exhibit J and otherwise in form and substance satisfactory to the Obligors and the Administrative Agent.

"Investment" means, relative to any Person,

    (a)    any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person; and

    (b)    any Capital Securities acquired by such Person in any other Person.

The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or equity thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"Investment Period" means, relative to any Synthetic Deposits earning a Participation Fee, the period beginning on (and including) the date on which such Synthetic Deposit is deposited or on the last day of the preceding Investment Period and ending on (but excluding) the day which numerically corresponds to such date one month thereafter; provided, however,

that if any such Investment Period would otherwise end on a day which is not a Business Day, such Investment Period shall end on the next following Business Day (unless such next following Business Day is the first Business Day of a calendar month, in which case such Investment Period shall end on the next preceding Business Day.

"ISP Rules" is defined in Section 12.9.

"Issuance Request" means a Letter of Credit request and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit B-2 hereto.

"Law" means, as to any Person, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case binding on such Person or to which such Person or any of its property or assets is subject.

"Lender Assignment Agreement" means an assignment agreement in the form of Exhibit D hereto with such changes and modifications as deemed necessary or advisable by the Administrative Agent to effect assignments permitted by the terms of this Agreement, including Section 12.11 hereto.

"Lenders" is defined in the preamble and includes each NM Lender, DIP L/C Lender, DIP Letter of Credit Issuer and Roll-Up Lender and any Person that becomes one of them pursuant to Section 12.11.

"Lender's Environmental Liability" means any and all, contingent or otherwise, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, costs, judgments, suits, proceedings, indemnities, damages (including consequential damages), disbursements or expenses of any kind or nature whatsoever (including reasonable attorneys' fees at trial and appellate levels and experts' fees, disbursements and expenses reasonably incurred in investigating, defending against or prosecuting any litigation, claim or proceeding) which may at any time be imposed upon, or asserted or awarded against, the Administrative Agent any other Agent, any Lender, the DIP Letter of Credit Issuer or any of such Person's Affiliates, shareholders, directors, officers, employees, and agents in connection with or arising from:

      (a)    any Release or threatened Release of any Hazardous Material into the environment;

      (b)    any investigation, claim, litigation or proceeding related to personal injury arising from exposure or alleged exposure to Hazardous Materials handled by the Borrower or any of its Subsidiaries;

      (c)    any misrepresentation, inaccuracy or breach of any warranty contained or referred to in Section 6.12;

(d)     any violation or claim of violation by the Borrower or any of its Subsidiaries of any Environmental Laws;

(e)     the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Material; or

(f)     the imposition of any Lien, or contract or agreement, for damages caused by or the recovery of any costs for the cleanup, release or threatened release of Hazardous Material by the Borrower or any of its Subsidiaries, or in connection with any property owned or formerly owned by the Borrower or any of its Subsidiaries.

"Letter of Credit" means a DIP Letter of Credit.

"LIBO Rate" means, with respect to any LIBO Rate Loans for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of the relevant Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in (a) NM Loans or Roll-Up Loans made in Dollars or (b) in the case of Sterling Term Loans, Pounds Sterling (in each case as set forth by the Bloomberg Information Service or any successor thereto or any other service reasonably selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates), for a period equal to such Interest Period; provided that, (i) to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate per annum reasonably determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two (2) Business Days prior to the beginning of such Interest Period, and (ii) notwithstanding any term or provision hereof to the contrary, the LIBO Rate shall not be less than (A) 3.0% in the case of NM Loans, nor (B) 3.25% in the case of Roll-Up Loans, at any time regardless of any referenced or displayed rate described above.

"LIBO Rate Loan" means a Loan bearing interest, at all times during an Interest Period applicable to such Loan, at a rate of interest determined by reference to the Adjusted LIBO Rate or the UK Adjusted LIBO Rate, as applicable.

"LIBOR Office" means the office of a Lender designated as its "LIBOR Office" on the Allocation Schedule hereto or in a Lender Assignment Agreement, or such other office designated from time to time by notice from such Lender to the Borrower and the Administrative Agent, whether or not outside the United States, which shall be making or maintaining the LIBO Rate Loans of such Lender.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, to secure payment of a debt or performance of an obligation.

"Lien Item" is defined in Section 8.4(b).

"Loan Documents" means, collectively, this Agreement, the Orders, any DIP Letter of Credit, the Notes, the Subsidiary Guaranty, the Collateral Documents, the Engagement Letter, the Fee Letter, the Backstop Fee Letter, the Canadian Support Agreement and each other agreement, certificate, document or instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Loans" means, as the context may require, an NM Loan and/or a Roll-Up Loan.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, liabilities, operations, condition (financial or otherwise), operating results or prospects of the Parent and its Subsidiaries taken as a whole, (b) the rights and remedies of any Secured Party under any Loan Document, (c) the Collateral, taken as a whole or (d) the validity or enforceability of any Loan Document.

"Maturity Date" means the earliest of: (a) the Scheduled Maturity Date, (b) the Effective Date, (c) the date of consummation of any sale of all or a material portion of the assets of the Obligors pursuant to section 363 of the Bankruptcy Code, other than (i) asset sales approved by the Required Lenders, and (ii) Permitted Asset Sales, (d) if the Final Order has not been entered, the date that is thirty (30) days after entry of the Interim Order, (e) the date of termination of the Commitments pursuant to Sections 2.5.2, 9.2 or 9.3, and (f) the date on which the Obligations become due and payable pursuant to Sections 9.2 or 9.3.

"Milestone Date" is defined in Section 7.18.

"Milestone Requirement" is defined in Section 7.18.

"Moody's" means Moody's Investors Service, Inc.

"Morgan Joseph" means Morgan Joseph & Co. Inc.

"MoJo Fee" means the "Sale Transaction Fee" as set forth in the Morgan Joseph Fee Letter, to the extent approved and allowed by the Bankruptcy Court. The amount of any such "transaction fee" shall be reduced dollar for dollar by the Borrower's payment of any monthly fee received by Morgan Joseph prior to the date of any sale of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code.

"Morgan Joseph Fee Letter" means the fee letter between the Borrower and Morgan Joseph, dated as of November 10, 2009.

"Mortgage" means each mortgage, leasehold mortgage, deed of trust, leasehold deed of trust or other agreement, in any case in form and substance reasonably satisfactory to the Administrative Agent, executed and delivered by any Obligor in favor of the Collateral Agent for the benefit of the Secured Parties, pursuant to the requirements of this Agreement, under which a Lien is granted on the real property, fixtures, personal property and/or the leasehold estate described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"Mortgaged Property" means all real property owned or leased by any Obligor on the Closing Date identified as "Mortgaged Property" in Item 1.1(d) of the Disclosure Schedule.

"NAIC" means the National Association of Insurance Commissioners.

"Net Cash Proceeds" means proceeds received by any Obligor or any of its Subsidiaries after the Closing Date in cash or Cash Equivalents from any Disposition approved by the Required Lenders and the Bankruptcy Court net of: (a) the reasonable and customary cash costs of sale, assignment or other disposition, including, for the avoidance of doubt, any MoJo Fee, (b) taxes paid or reasonably estimated in good faith to be payable as a result thereof (provided, however, that if, after the payment of all taxes with respect to such Disposition, the amount of such estimated taxes exceeded the amount of taxes actually paid in cash in respect of such Disposition, the aggregate fixed amount of such excess shall, at such time, constitute Net Cash Proceeds), (c) any amount required by the Bankruptcy Court to be paid or prepaid on Indebtedness (other than the Obligations) secured by a perfected and unavoidable Lien on the assets subject to such Disposition, and (d) any proceeds that the DIP Approved Budget contemplates will be used to fund expenses, provided, however, that evidence of each of (a), (b) and (c) are provided to the Administrative Agent in form and substance satisfactory to the Administrative Agent.

"Net Casualty Proceeds" means, with respect to any Casualty Event, the cash amount of any insurance proceeds (other than for business interruption) under any casualty insurance policy or condemnation awards received by the Parent or any of its Subsidiaries in connection therewith, but excluding any proceeds or awards required to be paid to a creditor (other than the Lenders) which holds a Lien on the property which is the subject of such Casualty Event which Lien (a) is a Permitted Lien and (b) has priority over the Liens securing the Obligations, less reasonable and customary amounts expended by the Parent or any of its Subsidiaries on legal, accounting and other professional fees, expenses and charges incurred in connection with collecting such insurance proceeds (including in connection with the adjustment or settlement of any such claims).

"New Collateral" is defined in Section 7.8(b).

"NM Commitment" means, as to each Lender, its obligation to make NM Loans to the Borrower pursuant to Section 2.2 (a) and Section 2.2(b) in an aggregate amount not to exceed the amount set forth opposite such Lender's name on the Allocation Schedule under the caption "NM Commitment" or in the Lender Assignment Agreement pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate amount of the NM Commitments as of the Closing Date is $38,000,000.

"NM Lender Delayed Draw Commitment Amount" means $7,664,948.

"NM Lenders" means each Lender with a NM Commitment or that holds an NM Loan and/or has a DIP Letter of Credit Participation Obligation, in each case, either directly or through a Related Prepetition Lender that is a "fronting bank."

"NM Loan" is defined in Section 2.2(b).

"NM Loan Percentage" means, relative to any NM Lender, the applicable percentage relating to NM Loans set forth opposite its name on the Allocation Schedule under the NM Commitment column or set forth in a Lender Assignment Agreement under the NM Commitment column, as such percentage may be adjusted from time to time pursuant to Lender Assignment Agreements executed by such Lender and an Eligible Assignee and delivered pursuant to Section 12.11. An NM Lender shall not have any NM Loan Commitment if its percentage under the NM Commitment column is zero.

"NM Note" means a promissory note of the Borrower payable to any NM Lender or its registered assigns, in substantially the form of Exhibit A-2 hereto, evidencing the aggregate indebtedness of the Borrower to such NM Lender resulting from the NM Loans made by such NM Lender.

"Non-Domestic Credit Party" means any Credit Party that is not a "United States person," as defined under Section 7701(a)(30) of the Code.

"Non-Excluded Taxes" means any Taxes other than net income and franchise Taxes imposed with respect to any Credit Party by a Governmental Authority under the Laws of which such Credit Party is organized or in which it maintains its applicable lending office.

"Non-U.S. Lender" means any Lender that is not a "United States person," as defined under Section 7701(a)(30) of the Code.

"Note" means, as the context may require, a NM Note and/or a Roll-Up Note.

"Obligations" means the Loans, the DIP Letters of Credit and all other amounts, obligations, covenants and duties owing by any Obligor to the Administrative Agent or any other Agent, any Lender, any Affiliate of any of them, any Indemnified Party or any other Secured Party, of every type and description (whether by reason of an extension of credit, protective advance, loan, guaranty, indemnification, foreign exchange or currency swap transaction, interest rate hedging transaction or otherwise), present or future, arising under this Agreement, any other Loan Document (including the Orders), any agreement for cash management services entered into in connection with this Agreement or any other Loan Document (including the Orders), whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired and whether or not evidenced by any note, guaranty or other instrument or for the payment of money, including all cash management and other fees, interest, charges, expenses, fees, attorneys' fees and disbursements and other sums chargeable to the Loan Parties under this Agreement, any other Loan Document, any Rate Protection Agreement or the Orders, or any agreement for cash management services entered into in connection with this Agreement or any other Loan Document (including the Orders).

"Obligor" means, as the context may require, the Borrower, each Guarantor and each other Person (other than a Secured Party, and other than CBS Monaco Limited and its Subsidiaries) that is a party to any Loan Document.

"Operating Account" means the Account referred to in Section 2.11.3.

"Orders" means the Interim Order and the Final Order, collectively.

"Organic Document" means, relative to any Person, as applicable, its certificate of incorporation, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, articles and memorandum of association and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Person's partnership interests, limited liability company interests or authorized shares of Capital Securities.

"Other Mortgage Deliverables" means:

(i)     evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of any Mortgage contemplated hereunder as may be necessary or, in the reasonable opinion of the Administrative Agent or Collateral Agent, desirable effectively to create a valid, perfected first priority Lien, subject only to Permitted Liens, against the property purported to be covered thereby;

(ii)    evidence of the payment of (or satisfactory arrangements for the payment of) all Title Policy premiums, search and examination charges and related charges, mortgage recording taxes, fees, costs and expenses of filing of each Mortgage contemplated hereunder as may be necessary in the reasonable opinion of the Administrative Agent, to create a valid, perfected super priority first Lien against the property identified in such Mortgage, subject only to Permitted Liens;

(iii)   with respect to each Mortgage contemplated hereunder, a mortgagee's title insurance policy or signed commitment to issue such policy in favor of the Collateral Agent as mortgagee for the ratable benefit of the Secured Parties, in an amount equal to 105% of the fair market value of the property encumbered by such Mortgage, and in form and substance and issued by insurers, in each case reasonably satisfactory to the Administrative Agent, with respect to the property purported to be covered by such Mortgage, insuring that title to such property is marketable and that the interest created by the Mortgage constitutes a valid first priority perfected Lien on such real property and fixtures described therein free and clear of all defects and encumbrances, other than Permitted Liens, such policy to include, to the extent available, a revolving credit endorsement, comprehensive endorsement, variable rate endorsement, first loss, last dollar, survey, contiguity, doing business, access and utilities endorsements, mechanic's lien endorsement, and such other endorsements as the Administrative Agent shall reasonably request, and such policy to be accompanied by evidence of the payment in full of all premiums thereon (such policy, the "Title Policy");

(iv)    with respect to each Mortgage contemplated hereunder, such UCC financing statements as may be necessary to perfect the Lien of the Collateral Agent for the benefit of the Secured Parties on the fixtures granted in such Mortgage;

(v)     opinions of counsel to the Obligors in each jurisdiction where the property to be encumbered by a Mortgage contemplated hereunder is located, in each case in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent;

(vi)     a survey (which may be the relevant survey previously delivered under the Prepetition Credit Agreement, unless requested by the Administrative Agent, to be a Survey) with respect to each parcel of real property to be encumbered by a Mortgage contemplated hereunder; and

(vii)     such other affidavits, certificates, approvals, opinions or documents as the Administrative Agent may reasonably request.

"Other Taxes" means any and all stamp, documentary or similar taxes, or any other excise or property taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of any Loan Document.

"Participant" is defined in Section 12.11.4.

"Participation Fees" is defined in clause (c) of Section 3.2.1.

"Patent Security Agreement" means any Patent Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit A to the Pledge and Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"PATRIOT Act" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended or otherwise modified from time to time.

"PATRIOT Act Disclosures" means all documentation and other information which the Administrative Agent or any Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA (other than a multiemployer plan as defined in Section 4001(a)(3) of ERISA), and to which the Parent or any corporation, trade or business that is, along with the Parent, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Pensions Regulator" means the body corporate called the Pensions Regulator established under Part I of the UK Pensions Act.

"Permitted Asset Sales" means the sale of those assets as set forth in Section 8.10, clauses (a), (b) and (c).

"Permitted Lien" is defined in Section 8.3.

"Permitted Refinancing" means, as to any Indebtedness (other than the Obligations), the incurrence of other Indebtedness (whether with the same or different lenders) to refinance such existing Indebtedness or the amendment, renewal or other modification of such existing Indebtedness; provided that, in the case of such other Indebtedness or modified Indebtedness, the following conditions are satisfied:

   (a) the weighted average life to maturity of such refinancing or modified Indebtedness shall be greater than or equal to the weighted average life to maturity of the Indebtedness being refinanced or modified, and the first scheduled principal payment in respect of such refinancing or modified Indebtedness shall not be earlier than the first scheduled principal payment in respect of the Indebtedness being refinanced or modified;

   (b) the principal amount of such refinancing or modified Indebtedness shall be less than or equal to the principal amount then outstanding of the Indebtedness being refinanced or modified;

   (c) each obligor on the refinancing or modified Indebtedness shall have been an obligor on the Indebtedness being refinanced or modified;

   (d) the security, if any, for the refinancing or modified Indebtedness shall be the same as that for the Indebtedness being refinanced or modified (except to the extent that less security is granted to holders of the refinancing Indebtedness or modified Indebtedness); and

   (e) the refinancing or modified Indebtedness is subordinated to the Obligations to the same degree, if any, or to a greater degree as the Indebtedness being refinanced or modified.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Petition Date" is defined in the recitals of this Agreement.

"Plan" means any Pension Plan or Welfare Plan.

"Platform" is defined in clause (b) of Section 10.10.1.

"Pledge and Security Agreement" means the Pledge and Security Agreement, dated as of the Closing Date, executed and delivered by an Authorized Officer of each Obligor, a copy of which is attached hereto as Exhibit G hereto, together with any supplemental Foreign Pledge Agreements delivered from time to time pursuant to any Loan Document, in each case as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"Pledging Parent" is defined in Section 7.8(a).

"Post-Carve-Out Notice Amount" is defined in the definition of Carve-Out.

"Pounds Sterling", "Sterling" and the sign "£" mean lawful money of the United Kingdom.

"Pre-Carve Out Notice Amount" is defined in the definition of Carve-Out.

"Prepetition Collateral" means the collateral (including cash collateral) securing the Prepetition Credit Agreement Obligations under the Prepetition Credit Agreement and all related documents.

"Prepetition Collateral Trustee" means Wells Fargo Bank, N.A., and any successor thereto in such capacity.

"Prepetition Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of April 7, 2006, by and among the Borrower, the Parent, various other financial institutions as the Lenders, Credit Suisse, Cayman Islands Branch, as Administrative Agent and Credit Suisse Securities (USA) LLC as Syndication Agent, Lead Arranger and Sole Book Runner, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Prepetition Credit Agreement Agent" means any agent or trustee for the Prepetition Lenders under the Prepetition Credit Agreement.

"Prepetition Credit Agreement Obligations" means all obligations owing by the Parent and its Subsidiaries under or in respect of the Prepetition Credit Agreement, including the loans, all contingent and reimbursement obligations in respect of letters of credit and all other amounts, obligations, covenants and duties owing by the Parent or any of its Subsidiaries party thereto to the administrative agent, any lender, any letter of credit issuer, any affiliate of any of them or any indemnitee, of every type and description (whether by reason of an extension of credit, opening or amendment of a letter of credit or payment of any draft drawn thereunder, loan, guaranty, indemnification, or otherwise), present or future, arising under the Prepetition Credit Agreement, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired and whether or not evidenced by any note, guaranty or other instrument or for the payment of money, and includes all letter of credit, cash management and other fees, interest, charges, expenses, fees, attorneys' fees, disbursements and other sums chargeable to the Parent or any of its Subsidiaries party thereto under the Prepetition Credit Agreement, or any agreement for cash management services entered into in connection with the Prepetition Credit Agreement and all obligations of the Parent or any of its Subsidiaries party thereto to cash collateralize all contingent and reimbursement obligations in respect of letters of credit issued pursuant to the Prepetition Credit Agreement.

"Prepetition Credit Percentage" means, as to any Prepetition Lender, the percentage of the Total Exposure Amount (as defined in the Prepetition Credit Agreement) held by such Prepetition Lender.

"Prepetition Issuer" means the Revolving Credit Issuer and the Synthetic Issuer as defined in the Prepetition Credit Agreement.

"Prepetition Lead Arranger and Sole Bookrunner" means Credit Suisse, Cayman Islands Branch.

"Prepetition Lenders" means the lenders or any letter of credit issuer party to the Prepetition Credit Agreement.

"Prepetition Loans" means loans made by the Prepetition Lenders under the Prepetition Credit Agreement.

"Prepetition Syndication Agent" means Credit Suisse Securities (USA) LLC and includes each other person appointed as the successor Syndication Agent pursuant to the Prepetition Credit Agreement.

"Prior GAAP Financials" is defined in Section 1.4(b).

"Professional Expenses" is defined in the definition of Carve-Out.

"Purchase Price" is defined in Section 12.11.10.

"Rate Protection Agreement" means, collectively, any agreements with respect to Hedging Obligations entered into by the Borrower or any of its Subsidiaries under which the counterparty of such agreement is (or at the time such agreement was entered into, was) the Administrative Agent, a Lender or an Affiliate of a Lender or an Affiliate of the Administrative Agent.

"Reallocation Date" means such date or dates as designated by the Administrative Agent in the Closing Date Notice or at a later time, pursuant to the Closing Date Notice.

"Reallocation Date Lender" means an Initial NM Lender or an Initial DIP L/C Lender, and/or their respective assignees who are Lenders as of each Reallocation Date immediately prior to giving effect to any assignments done pursuant to Section 12.11.10 on such Reallocation Date.

"Register" is defined in Section 2.10(b).

"Reimbursement Obligation" means a DIP Letter of Credit Reimbursement Obligation.

"Related Prepetition Lender" means, with respect to any NM Lender or DIP L/C Lender: (a) any of its Affiliates, and/or (b) any other Prepetition Lender or any of its affiliates approved by the Administrative Agent as a "fronting lender" for such NM Lender or DIP L/C Lender in accordance with the procedures separately agreed among the Administrative Agent and the Initial NM Lenders and DIP L/C Lenders.

"Release" means a "release", as such term is defined in CERCLA, and shall include migration of Hazardous Materials.

"Reorganization Plan" means a plan of reorganization, a plan of liquidation, or any other plan provided for a restructuring of one or more of the Debtors in any of the Cases, as confirmed by the Bankruptcy Court.

"Replacement Lender" is defined in Section 4.11 and again in Section 12.11.

"Replacement Notice" is defined in Section 4.11 and again in Section 12.11.

"Repurchase Obligations" means obligations incurred pursuant to inventory repurchase agreements entered into in the ordinary course of the business of the Borrower and its Subsidiaries consistent with reasonable and customary industry practices in such business in connection with Floor-Plan Financing Lines provided by financial institutions to retailers; provided that in no event shall the terms of such obligations require the obligor thereof to make any cash payment in respect thereof until title to such inventory has been transferred to the Borrower or any such Subsidiary, as applicable.

"Required Lenders" means, at any time, Lenders holding more than 50% of the Total Exposure Amount; provided that the Commitments and Loans of any Lender that is a Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time, and provided further that for the purposes of determining Required Lenders hereunder, the aggregate outstanding principal amount of Roll-Up Loans held by such Roll-Up Lenders shall not be included in calculating the Required Lenders.

"Reserve Account" means the Account referred to in Section 2.11.1.

"Resource Conservation and Recovery Act" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

"Restricted Payment" means the declaration or payment of any dividend on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of any class of Capital Securities of the Parent or any of its Subsidiaries or any warrants or options to purchase any such Capital Securities, whether now or hereafter outstanding, or the making of any other payment or distribution in respect thereof, either directly or indirectly, whether in cash or property, obligations of the Parent or any of its Subsidiaries or otherwise.

"Revolving Letter of Credit Outstandings" is defined in the Prepetition Credit Agreement, but, unless the context otherwise requires, only refers to such Revolving Letter of Credit Outstandings that have become part of the Roll-Up Loans.

"Revolving Loan" is defined in the Prepetition Credit Agreement, but, unless specifically stated to the contrary, only refers to such Revolving Loans that have become part of the Roll-Up Loans.

"Roll-Up ABR Rate" is defined in Section 3.2.1(b).

"Roll-Up Adjusted LIBOR Rate" is defined in Section 3.2.1(b).

"Roll-Up Amount" means with respect to any NM Lender the amount, if any, set forth opposite such NM Lender's name on the Allocation Schedule, as such schedule may be updated from time to time, under the caption "Roll-Up Amount". The aggregate amount of the Roll-Up Amounts shall be: (a) as of the Closing Date, $32,335,052, and (b) as of the Final Order Entry Date, an additional $7,664,948, for a Total Roll-Up Amount of $40,000,000.

"Roll-Up Conversion Rate" means the Spot Rate of conversion.

"Roll-Up Entitlements" is defined in Section 2.2(c).

"Roll-Up Lenders" means each Lender that holds a Roll-Up Entitlement or a Roll-Up Loan.

"Roll-Up Loans" is defined in Section 2.2(c).

"Roll-Up Note" means a promissory note of the Borrower payable to any Roll-Up Lender or its registered assigns, in substantially the form of Exhibit A-1 hereto, evidencing the aggregate Indebtedness of the Borrower to such Roll-Up Lender resulting from the Roll-Up Loans made by such Roll-Up Lender.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"Sale Order" is defined in Section 7.18(a).

"Scheduled Maturity Date" means the twentieth week anniversary of the Closing Date or, if such date is not a Business Day, the preceding date that is a Business Day.

"SEC" means the United States Securities and Exchange Commission.

"Secured Parties" means, collectively, the Lenders, the DIP Letter of Credit Issuer, the Administrative Agent, the Collateral Agent, each other Agent and each of their respective successors, transferees and assigns.

"Senior First Lien Loans" means the "Loans" as defined in the Prepetition Credit Agreement.

"Spot Rate" for a currency means the rate quoted (expressed as a decimal, rounded to the fourth decimal place) to the Administrative Agent as the spot rate for the purchase of such currency with another currency through the FX Trading Office at approximately 10:00 a.m. on the date two Business Days prior to the date as of which the foreign exchange settlement is made.

"Stated Amount" means, on any date and with respect to any DIP Letter of Credit, the total amount then available to be drawn under such DIP Letter of Credit.

"Stated Expiry Date" means, with respect to any DIP Letter of Credit, its date of expiration.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number of one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board to which the Administrative Agent is subject with respect to the Adjusted LIBO Rate, for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Such reserve percentages shall include those imposed pursuant to such Regulation D, LIBO Rate Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Sterling Term Loan" is defined in the Prepetition Credit Agreement, but, unless the context otherwise requires, only refers to such Sterling Term Loans that have become part of the Roll-Up Loans.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership or other entity ("Other Person") of which more than 50% of the Voting Securities of such Other Person (irrespective of whether at the time Capital Securities of any other class or classes of such Other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.

"Subsidiary Guarantor" means each Subsidiary that has executed and delivered its Subsidiary Guaranty to the Administrative Agent.

"Subsidiary Guaranty" means the Subsidiary Guaranty, dated as of the Closing Date, executed and delivered by each Subsidiary Guarantor, substantially in the form of Exhibit F hereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"Superpriority Claims" means a claim against the Borrower and any Guarantor in any of the Cases which is an administrative expense of the type specified in Sections 364(c) of the Bankruptcy Code.

"Survey" means a survey of any parcel of real property purported to be covered by any Mortgage contemplated hereunder (and all improvements thereon): (a) prepared by a surveyor or engineer licensed to perform surveys in the state where such real property, is located, (b) dated (or redated) not earlier than six months prior to the date of delivery thereof unless there shall have occurred within six months prior to such date of delivery any exterior construction on the site of such Mortgaged Property in which event such survey shall be dated (or redated) after the completion of such construction or if such construction shall not have been completed as of such date of delivery, not earlier than 20 days prior to such date of delivery, (c) certified by the surveyor (in a manner reasonably acceptable to the Administrative Agent) to the Administrative Agent and the title company issuing the Title Policy specified in clause (iii) of the definition of

32

Other Mortgage Deliverables, (d) complying in all respects with the minimum detail requirements of the American Land Title Association as such requirements are in effect on the date of preparation of such survey and (e) sufficient for the company issuing a Title Policy to remove all standard survey exceptions from the title insurance policy (or commitment) relating to such real property and issue the endorsements of the type required by clause (iii) of the definition of Other Mortgage Deliverables, or such other survey as is in form and substance reasonably acceptable to the Administrative Agent.

"Syndication Agent" means Credit Suisse Securities (USA) LLC and includes each other Person appointed as the successor Syndication Agent pursuant to Section 10.4.

"Synthetic Account Balance" means, at any time, the amount on deposit in the Synthetic Deposit Account excluding any interest accrued thereon and deposited or credited therein.

"Synthetic Deposit" is defined in Section 2.4(a).

"Synthetic Deposit Account" means the account established by the Administrative Agent or an Affiliate thereof at Credit Suisse with the title "DIP L/C Lenders (Champion Home Builders) Credit-Linked Deposit Account" pursuant to Section 2.4.

"Synthetic Deposit Amount" means, with respect to any DIP L/C Lender as of any date, an amount equal to the product of (a) such Lender's Synthetic Deposit Percentage as of such date multiplied by (b) the DIP Letter of Credit Available Amount as of such date.

"Synthetic Deposit Percentage" means, relative to any DIP L/C Lender, the applicable percentage relating to Synthetic Deposits set forth opposite its name on the Allocation Schedule under the Synthetic Deposit column or set forth in a Lender Assignment Agreement under the Synthetic Deposit column, as such percentage may be adjusted from time to time pursuant to Lender Assignment Agreements executed by such Lender and its assignee Lender and delivered pursuant to Section 12.11.

"Synthetic Deposit Return" is defined in clause (d) of Section 2.4.

"Synthetic Deposit Sub-Account" is defined in Section 2.4.

"Synthetic Lease" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"Synthetic Letter of Credit Outstandings" is defined in the Prepetition Credit Agreement, but, unless the context otherwise requires, only refers to such Synthetic Letter of Credit Outstandings that have become part of the Roll-Up Loans.

"Taxes" means any and all income, stamp or other taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected,

withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"Term Loan" means, as the context may require, any: (a) NM Loan, or (b) US Term Loan, or Sterling Term Loan that forms a part of the Roll-Up Loans hereunder.

"Terrorism Laws" means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 C.F.R.), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 C.F.R.), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the C.F.R.), (e) the PATRIOT Act, (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts and acts of war.

"Third Party Liens" means those existing liens set out in Item 1.1(f) to the Disclosure Schedule, but only to the extent validly perfected and unavoidable and senior to the liens of the Prepetition Lenders.

"Title Policy" is defined in clause (iii) of the definition of Other Mortgage Deliverables.

"Total Exposure Amount" means, on any date of determination, the sum of (a) the outstanding principal amount of all Loans, plus (b) the unused amount of the NM Commitment, plus (c) the DIP Letter of Credit Available Amount, in each case, as of such date.

"Total Facility Amount" means $40,000,000.

"Trademark Security Agreement" means any Trademark Security Agreement executed and delivered by any Obligor substantially in the form of Exhibit B to any Pledge and Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms.

"Transactions" means the transactions contemplated under this Agreement.

"Trustee" means the United States Trustee for the District of Delaware.

"Type" means, relative to any Loan, the portion thereof, if any, being maintained as a Base Rate Loan or a LIBO Rate Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, that if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, UCC means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection.

"UK Adjusted LIBO Rate" means, with respect to any Sterling Term Loan for any Interest Period, an interest rate per annum equal to (a) the LIBO Rate for such Interest Period plus (b) the UK Mandatory Costs, if any.

"UK Collateral Documents" means, (a) the fixed and floating first priority charge granted by CBS Monaco Limited to secure its intercompany note obligations to CHB Holdings B.V., executed and delivered by an Authorized Officer of CBS Monaco Limited, (b) the fixed and floating second priority charge granted by Caledonian Building Systems Limited, to secure its inter-company note obligations to the Borrower, executed and delivered by an Authorized Officer of Caledonian Building Systems Limited, substantially in the form of Exhibit M hereto, as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with its terms, (c) the share charge with respect to the Capital Securities of CBS Monaco Limited, executed and delivered by an Authorized Officer of the CHB Holdings B.V., each of the foregoing, substantially in the forms attached as Exhibit M hereto, as such may be amended, supplemented, amended and restated or otherwise modified from time to time in accordance with their terms.

"UK Mandatory Cost" means, with respect to Sterling Term Loans which form part of the Roll-Up Loans, the percentage rate per annum calculated by the Administrative Agent as set forth on Schedule III.

"UK Pensions Act" means the Pensions Act 2004, as amended from time to time and in effect in the United Kingdom.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"U.S Guarantor" means: (a) each Domestic Subsidiary that becomes a party to the Subsidiary Guaranty, (b) the Parent, and (c) each other Domestic Subsidiary of the Borrower that on the Petition Date was a guarantor under the Prepetition Credit Agreement. The U.S. Guarantors as of the Closing Date are listed on Schedule IV. It is understood and agreed that such schedule shall include Champion Development Corp., HomePride Finance Corp. and MHCDC, LLC.

"US Term Loan" is defined in the Prepetition Credit Agreement, but, unless specifically stated to the contrary, only refers to such US Term Loans that have become part of the Roll-Up Loans.

"UST Guidelines" means U.S. Department of Justice, Office of the U.S. Trustee, District of Delaware Operating Guidelines for Chapter 11 Cases.

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote (that is, not contingent on the happening of any event) for the election of directors, managers or other voting members of the governing body of such Person.

"Welfare Plan" means a "welfare plan," as such term is defined in Section 3(1) of ERISA.

35

"wholly owned Subsidiary" refers to any Subsidiary all of the outstanding common stock (or similar equity interest) of which (other than any director's qualifying shares or investments by foreign nationals mandated by applicable laws) is owned directly or indirectly by the Parent.

SECTION 1.2. Use of Defined Terms. Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule, and each notice and other communication delivered from time to time in connection with any Loan Document.

SECTION 1.3. Cross-References. Unless otherwise specified, references in a Loan Document to any Schedule, Article or Section are references to such Schedule, Article or Section of such Loan Document, and references in any Schedule, Article, Section or definition to any clause are references to such clause of such Schedule, Article, Section or definition.

SECTION 1.4. Accounting and Financial Determinations; Time. (a) Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under Section 8.4 and the definitions used in such calculations) shall be made, in accordance with GAAP. Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Parent and its Subsidiaries, in each case without duplication.

(b)     If the Borrower notifies the Administrative Agent that the Borrower wishes to amend any covenant in Article VII or VIII or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article VII or VIII or any related definition for such purpose), then the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the Required Lenders. In the event of any such notification from the Borrower or the Administrative Agent and until such notice is withdrawn or such covenant is so amended, the Borrower will furnish to each Lender and the Administrative Agent, in addition to the financial statements required to be furnished pursuant to Section 7.1 (the "Current GAAP Financials"), (i) the financial statements described in such Section based upon GAAP as in effect at the time such covenant was agreed to (the "Prior GAAP Financials") and (ii) a reconciliation between the Prior GAAP Financials and the Current GAAP Financials.

(c)     Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York, New York time.

ARTICLE II

COMMITMENTS AND CREDIT EXTENSIONS

SECTION 2.1. <u>Commitments</u>.  On the terms and subject to the conditions of this Agreement, the NM Lenders and the DIP Letter of Credit Issuer severally agree to make Credit Extensions as set forth below.

SECTION 2.2. <u>The NM Loans and the Roll-Up Loans</u>.

(a)    <u>The Initial NM Loans</u>.  Subject to the terms and conditions set forth herein and in the Interim Order, each Initial NM Lender agrees, severally and not jointly, to make a Term Loan (the "<u>Initial NM Loans</u>") in Dollars to the Borrower on the Closing Date, equal to such Initial NM Lender's NM Loan Percentage of the aggregate amount of the Initial NM Loan Amount, less an original issue discount of 3.00%.  As of the Closing Date, the principal amount of the Initial NM Loans (before applying the foregoing original issue discount) of each Initial NM Lender is set forth opposite such Initial NM Lender's name on the Allocation Schedule under the caption "<u>Initial NM Loans</u>".  The proceeds of the Initial NM Loans shall, on the Closing Date, be deposited by the Initial NM Lenders into the Reserve Account.

(b)    <u>The Additional NM Loans</u>.  Subject to the terms and conditions set forth herein and in the Orders, each NM Lender agrees, severally and not jointly, to make an additional Term Loan (the "<u>Additional NM Loans</u>" and, together with the Initial NM Loans, the "<u>NM Loans</u>") in Dollars to the Borrower on the Final Order Entry Date (or, if not practicable, on the following Business Day), equal to such Lender's NM Loan Percentage of the aggregate amount of the NM Lender Delayed Draw Commitment Amount, less an original issue discount of 3.00%.  Any unused NM Commitments shall terminate within three (3) Business Days following the occurrence of the Final Order Entry Date.  The proceeds of the Additional NM Loans shall, on the Final Order Entry Date, be deposited by the NM Lenders into the Reserve Account.

(c)    <u>The Roll-Up Loans</u>.  Subject to the terms and conditions set forth herein and in the Orders, Prepetition Loans and letters of credit under the Prepetition Credit Agreement held by the Roll-Up Lenders shall be substituted and exchanged for roll-up loans and roll-up letters of credit (collectively, hereinafter, the "<u>Roll-Up Loans</u>") as follows:

(i) On the Closing Date, each Initial NM Lender and/or Related Prepetition Lender is entitled to roll up an aggregate principal amount of Senior First Lien Loans held by such Initial NM Lender and/or Related Prepetition Lender, as the case may be, equal to the aggregate principal amount of such Initial NM Lender's and/or Related Prepetition Lender's Initial NM Loans and DIP Letter of Credit Participation Obligations with respect to the DIP Letter of Credit Available Amount, into Roll-Up Loans hereunder (collectively, with respect to such Initial NM Lender or each such Related Prepetition Lender, such Person's "<u>Initial Roll-Up Entitlements</u>").  For the purpose of determining the principal amount of Sterling Term Loans which comprise part of the Senior First Lien Loans to be rolled up hereunder, such Sterling Term Loan amounts shall be converted by the Administrative Agent into U.S. Dollar amounts in accordance with the Roll-Up Conversion Rate.

(ii) On the Final Order Entry Date, each NM Lender and/or Related Prepetition Lender thereof shall become entitled to roll up an aggregate principal amount of Senior First Lien Loans held by such NM Lender and/or Related Prepetition Lender as the case may be, equal to the amount of such NM Lender's and/or Related Prepetition Lender's NM Lender Delayed Draw Commitment Amount into Roll-Up Loans with an aggregate principal amount equal to the amount of such NM Lender's NM Lender Delayed Draw Commitment Amount (the "Additional Roll-Up Entitlements" and, together with the Initial Roll-Up Entitlements, the "Roll-Up Entitlements"). For the purpose of determining the principal amount of Sterling Term Loans which comprise part of the Senior First Lien Loans to be rolled up hereunder, such Sterling Term Loan amounts shall be converted by the Administrative Agent into U.S. Dollar amounts in accordance with the Roll-Up Conversion Rate.

(iii) On the Closing Date or the Final Order Entry Date (as the case may be), each NM Lender and/or Related Prepetition Lender is entitled to roll up an aggregate principal amount of the Revolving Letter of Credit Outstandings and the Synthetic Letter of Credit Outstandings held by such NM Lender and/or Related Prepetition Lender as the case may be, under the Prepetition Credit Agreement, equal to the balance, if any, after giving effect to paragraphs (i) or (ii) above, as applicable, of the aggregate principal amount of such NM Lender's and/or Related Prepetition Lender's Initial NM Loans and/or Additional NM Loans and DIP Letter of Credit Participation Obligation with respect to the DIP Letter of Credit Available Amounts on the Closing Date or the Final Order Entry Date (as the case may be) for which there has not been a corresponding roll-up of Senior First Lien Loans into Roll-Up Loans hereunder; provided that on the Closing Date or the Final Order Entry Date (as the case may be), the aggregate principal amount outstanding of such NM Lender's Roll-Up Loans does not exceed the aggregate principal amount of such NM Lender's NM Loans and DIP Letter of Credit Participation Obligation with respect to the DIP Letter of Credit Available Amount.

(d) Designation of Roll-Up Loans. Subject to the terms and conditions set forth herein and in the Orders, on the Closing Date and the Final Order Entry Date (as the case may be), and without any further action by any party to this Agreement, each NM Lender's or DIP Letter of Credit Issuer's Roll-Up Amount shall be administered, and shall from and after such date be designated, as Roll-Up Loans hereunder. The Administrative Agent shall, and each NM Lender and the DIP Letter of Credit Issuer authorizes the Administrative Agent to, promptly notify Credit Suisse AG, Cayman Islands Branch or its successor as administrative agent under the Prepetition Credit Agreement of the amount of each NM Lender's and/or DIP Letter of Credit Issuer's Roll-Up Loans so that Credit Suisse AG, Cayman Islands Branch or such successor administrative agent under the Prepetition Credit Agreement may update the register of the Senior First Lien Loans to reflect the transactions described in this Section 2.2 (c) and (d) (it being understood and agreed that the Administrative Agent shall have no liability for providing such information, absent gross negligence or willful misconduct).

(e) Certain Matters Relating to Roll-Up Loans. By becoming a party to this Agreement, including by executing this Agreement or a Lender Assignment Agreement or by rolling up Senior First Lien Loans and, if applicable, Revolving Letter of Credit Outstandings and Synthetic Letter of Credit Outstandings under Section 2.2(c), each Roll-Up Lender represents and warrants that its Roll-Up Amount as of the Closing Date does not exceed the aggregate principal amount of the Senior First Lien Loans and Revolving Letter of Credit

Outstandings and the Synthetic Letter of Credit Outstandings held of record by such Roll-Up Lender as of the Closing Date.

(f)     Amounts borrowed (or, in the case of Roll-Up Loans, rolled up) under this Section 2.1 and repaid or prepaid may not be reborrowed.

SECTION 2.3. <u>DIP Letters of Credit</u>. From time to time on any Business Day occurring from the Closing Date but thirty (30) days prior to the Maturity Date, the DIP Letter of Credit Issuer agrees that it will, to the extent requested by the Borrower, (a) issue one or more synthetic letters of credit (its "<u>DIP Letter of Credit</u>") for the account of the Borrower or any Subsidiary Guarantor in the Stated Amount requested by the Borrower on such day or (b) extend the Stated Expiry Date of an existing DIP Letter of Credit issued hereunder. The Stated Expiry Date of each DIP Letter of Credit shall be no later than a date mutually agreed with the DIP Letter of Credit Issuer. The DIP Letter of Credit Issuer shall not be required to issue any DIP Letter of Credit if, after giving effect thereto: (i) the aggregate amount of all DIP Letter of Credit Outstandings would exceed the DIP Letter of Credit Available Amount, (ii) the sum of the aggregate amount of all DIP Letter of Credit Outstandings would exceed the amount on deposit in the Synthetic Deposit Account; or (iii) the sum of (A) the aggregate amount of all DIP Letter of Credit Outstandings, and (B) the sum of all NM Loans, would exceed the Total Facility Amount.

SECTION 2.4. <u>Synthetic Deposit Account</u>.

(a)     On or prior to the Closing Date, the Administrative Agent shall establish the Synthetic Deposit Account. The Administrative Agent shall maintain records enabling it to determine at any time the amount of the interest of each DIP L/C Lender in the Synthetic Deposit Account (the interest of each DIP L/C Lender in the Synthetic Deposit Account, as evidenced by such records, being referred to as such Lender's "<u>Synthetic Deposit Sub-Account</u>"). The Administrative Agent shall establish such additional Synthetic Deposit Sub-Accounts for assignee Lenders as shall be required pursuant to Section 12.11. No Person (other than the Administrative Agent or any of its sub-agents) shall have the right to make any withdrawals from the Synthetic Deposit Account or exercise any other right or power with respect thereto, except as expressly provided herein. Without limiting the generality of the foregoing, each party hereto acknowledges and agrees that no amount on deposit at any time in the Synthetic Deposit Account (i) shall be the property of any Secured Party (other than the Administrative Agent for the benefit of the DIP Letter of Credit Issuer) and (ii) shall constitute Collateral under the Loan Documents other than in favor of the DIP Letter of Credit Issuer in respect of DIP Letter of Credit Participation Obligations. In addition, each DIP L/C Lender hereby grants to the Administrative Agent for the benefit of the DIP Letter of Credit Issuer a security interest in its rights and interests in such DIP L/C Lender's Synthetic Deposit to secure the obligations of such DIP L/C Lender hereunder. Each DIP L/C Lender agrees that its right, title and interest with respect to the Synthetic Deposit Account shall be limited to the right to require amounts in its Synthetic Deposit Sub-Account to be used as expressly set forth herein and that it will have no right to require the return of its Synthetic Deposit other than as expressly provided herein (each DIP L/C Lender hereby acknowledging that its Synthetic Deposit constitutes payment for its DIP Letter of Credit Participation Obligations and that the DIP Letter of Credit Issuer will be issuing, amending, renewing and extending DIP Letters of Credit in reliance on the availability of such

Lender's Synthetic Deposit to discharge such Lender's obligations in accordance with clause (c) of this Section 2.4 and Section 2.9.3). The funding of the Synthetic Deposits and the agreements with respect thereto set forth in this Agreement constitute arrangements solely among the Administrative Agent, the DIP Letter of Credit Issuer and the DIP L/C Lenders with respect to the funding and reimbursement obligations of the DIP L/C Lenders under this Agreement, and do not constitute loans, extensions of credit or other financial accommodations to any Obligor.

(b)     On the Closing Date, each DIP L/C Lender shall deposit in the Synthetic Deposit Account an amount in Dollars equal to such Lender's Synthetic Deposit Amount less an original issue discount of 3.00%; (each amount so deposited, such Lender's "Synthetic Deposit"); provided, however, that an amount equal to the foregoing amount of original issue discount shall, immediately upon the occurrence of the Closing Date, be funded into the Synthetic Deposit Account from the NM Loans funded on the Closing Date into the Reserve Account and deemed to be a Synthetic Deposit of the DIP L/C Lenders who received such original issue discount for all purposes hereunder, and after the Closing Date treated the same as all other Synthetic Deposits of such DIP L/C Lenders.

(c)     Each DIP L/C Lender irrevocably and unconditionally agrees that its Synthetic Deposits in the Synthetic Deposit Account shall be withdrawn and distributed as follows:

(i)     In the event the Borrower does not reimburse the DIP Letter of Credit Issuer pursuant to Section 2.9.3, the Administrative Agent shall withdraw from the Synthetic Deposit Account the amount of such unreimbursed Disbursement (and debit the Synthetic Deposit Sub-Account of each DIP L/C Lender in the amount of such DIP L/C Lender's Synthetic Deposit Percentage of such unreimbursed Disbursement) and make such amount available to the DIP Letter of Credit Issuer and the DIP Letter of Credit Available Amount shall be reduced by such amount.

(ii)     In the event the Borrower voluntarily decides to permanently reduce the DIP Letter of Credit Available Amount, the Administrative Agent will, subject to payment of the Exit Fee, withdraw from the Synthetic Deposit Account an amount equal to such reduction, and pay to each DIP L/C Lender an amount equal to the product of (A) such Lender's Synthetic Deposit Percentage multiplied by (B) the aggregate amount of such reduction. In no event shall the DIP Letter of Credit Available Amount be reduced to an amount that is less than the aggregate amount of the DIP Letter of Credit Outstandings.

(iii)     Concurrently with the effectiveness of any assignment by any DIP L/C Lender of all or any portion of its Synthetic Deposit, the corresponding portion of the assignor's Synthetic Deposit Sub-Account shall be transferred from the assignor's Synthetic Deposit Sub-Account to the assignee's Synthetic Deposit Sub-Account in accordance with Section 12.11 and, if required by Section 12.11, the Administrative Agent shall close such assignor's Synthetic Deposit Sub-Account.

(iv)     Upon the occurrence of the Maturity Date (other than the return of the portion of the Synthetic Deposit of each DIP L/C Lender on deposit in the Synthetic Deposit Account), in the event that all DIP Letters of Credit have been returned, replaced, cancelled or Cash Collateralized (other than with Synthetic Deposits), all amounts remaining in the Synthetic Deposit Account shall be returned to the DIP L/C Lenders based on such DIP L/C Lender's Synthetic Deposit Percentage.

(d)     On each day on which Participation Fees are required to be paid with respect to all or any portion of the Synthetic Deposits pursuant to clause (c) of Section 3.2.1, the Administrative Agent shall pay to each DIP L/C Lender an amount (the "Synthetic Deposit Return") equal to (i) the Base Return for the relevant Investment Period less an amount equal to 0.10% per annum on such Synthetic Deposits multiplied by (ii) such DIP L/C Lender's Synthetic Deposit Percentage. Any amounts earned and received with respect to Synthetic Deposits during any applicable Investment Period in excess of the Base Return shall be for the account of the Administrative Agent. No Person other than the Administrative Agent shall have any obligation under or in respect of this clause.

(e)     Notwithstanding anything to the contrary in this Agreement, the Borrower shall not be liable for any losses due to (i) the misappropriation of any Base Return or Synthetic Deposit or (ii) the failure of the Administrative Agent to pay the Synthetic Deposit Return to any DIP L/C Lender (it being understood and agreed for greater certainty that this clause shall not limit any obligation of the Borrower hereunder to pay any Participation Fee). Neither the Administrative Agent, the DIP Letter of Credit Issuer nor any other Person guarantees any rate of return on the investment of any Synthetic Deposit held in the Synthetic Deposit Account.

(f)     Notwithstanding any other provision of this Agreement, no DIP Letter of Credit shall be issued nor any Stated Amount of any DIP Letter of Credit increased, if, after giving effect thereto, the DIP Letter of Credit Outstandings would exceed the Synthetic Account Balance.

(g)     If the DIP Letter of Credit Issuer is enjoined from taking any action referred to in clause (d) of this Section 2.4, or if the DIP Letter of Credit Issuer reasonably determines that, by operation of law, it may reasonably be precluded from taking any such action, or if any Obligor or DIP L/C Lender challenges in any legal proceeding any of the acknowledgements, agreements or characterizations set forth in clause (a) of this Section 2.4, then, in any such case (and so long as such event or condition shall be continuing), and notwithstanding anything contained herein to the contrary, the DIP Letter of Credit Issuer shall not be required to issue, renew or extend any DIP Letter of Credit.

(h)     In the event any payment of a DIP Letter of Credit Reimbursement Obligation shall be required to be refunded by the DIP Letter of Credit Issuer to the Borrower after the return of the Synthetic Deposits to the DIP L/C Lenders as permitted hereunder, each DIP L/C Lender agrees to acquire and fund a participation in such refunded amount equal to the lesser of its Synthetic Deposit Percentage thereof and the amount of its Synthetic Deposit that shall have been so returned.

SECTION 2.5. <u>Reduction of the Commitment Amounts</u>. The Commitment Amounts of each NM Lender and DIP Letter of Credit Issuer are subject to reduction from time to time pursuant to this Section.

SECTION 2.5.1. <u>Optional Reductions</u>. Subject to the payment of the Exit Fee under <u>Section 3.3.1</u>, the Borrower may, from time to time on any Business Day occurring on and after the Closing Date or the Final Order Entry Date (as the case may be), voluntarily reduce the amount of any Commitment Amount on the Business Day so specified by the Borrower; provided, however, that all such reductions shall require at least three Business Days' prior notice to the Administrative Agent and be permanent, and any partial reduction of any Commitment Amount shall be in a minimum amount of $1,000,000 and in an integral multiple of $500,000.

SECTION 2.5.2. <u>Termination, Reduction of Commitments</u>. Each NM Lender's Commitment Amount shall be automatically and permanently reduced on each date on which a Borrowing is made under <u>Section 2.2</u> by an aggregate amount equal to such NM Lender's ratable portion of the Borrowing made on such date and all Commitment Amounts shall automatically and permanently terminate at the end of the third (3rd) Business Day following the Final Order Entry Date.

SECTION 2.6. <u>Borrowing Procedures</u>.

SECTION 2.6.1. <u>NM Loans</u>. By delivering a Borrowing Request to the Administrative Agent on or before 12:00 noon on the Business Day following each of the entry of the Interim Order and the Final Order, the Borrower may irrevocably request, on not less than one Business Day's notice in the case of Base Rate Loans, or three Business Days' notice in the case of LIBO Rate Loans, and in either case not more than five Business Days' notice (which notice requirements may be waived by the Administrative Agent in its sole discretion), that a Borrowing be made, in the case of either LIBO Rate Loans or Base Rate Loans, (a) in a minimum amount of $1,000,000, or (b) in the unused amount of the applicable NM Commitment, in each case to the extent permitted by the Interim Order or the Final Order, as applicable. Each such irrevocable request shall be made by telephone confirmed promptly by hand delivery or facsimile to the Administrative Agent of the applicable Borrowing Request. On the terms and subject to the conditions of this Agreement, each Borrowing shall comprising the type of Loans, and shall be made on the Business Day, specified in such Borrowing Request. On or before 1:00 p.m. on such Business Day, each Lender that has a Commitment to make the Loans being requested shall deposit with the Administrative Agent same day funds in an amount equal to such Lender's Percentage of the requested Borrowing. Such deposit will be made to an account which the Administrative Agent shall specify from time to time by notice to the Lenders. Unless the Administrative Agent shall have received notice from a Lender prior to such time that such Lender will not make such deposit, the Administrative Agent may assume that such Lender has made such deposit on such Business Day and may, in reliance upon such assumption, make available to the Borrower a corresponding amount. In such event, if a Lender has not in fact made such deposit, then the applicable Lender and the Borrower each agrees to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding

amount with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of (A)(1) the Federal Funds Effective Rate, and (2) the rate reasonably determined by the Administrative Agent to be the cost to it of funding such amount, and (B) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of the Borrower, the Adjusted Base Rate. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing. If the Borrower pays such amount to the Administrative Agent, then such amount shall constitute a reduction of such Borrowing. No Lender's obligation to make any Loan shall be affected by any other Lender's failure to make any Loan.

SECTION 2.6.2. <u>Synthetic Deposits.</u> In the case of any Synthetic Deposits, the Borrower may irrevocably request that Synthetic Deposits be made by the applicable Lender by delivering a Borrowing Request to the Administrative Agent on or prior to the Closing Date or the Final Order Entry Date (as the case may be).

SECTION 2.7. <u>Continuation and Conversion Elections.</u> By delivering a Continuation/Conversion Notice to the Administrative Agent on or before 12:00 noon on a Business Day, the Borrower may from time to time irrevocably elect, on not less than one Business Day's notice in the case of Base Rate Loans, or three Business Days' notice in the case of LIBO Rate Loans, and in either case not more than ten Business Days' notice, that all, or any portion in an aggregate minimum amount of (i) in the case of NM Loans or Roll-Up Loans that are US Term Loans or Revolving Loans, $1,000,000 and (ii) in the case of Roll-Up Loans that are Sterling Term Loans £1,000,000, be, in the case of Base Rate Loans, converted into LIBO Rate Loans or be, in the case of LIBO Rate Loans, converted into LIBO Rate Loans or be, in the case of LIBO Rate Loans, converted into Base Rate Loans or continued as LIBO Rate Loans (in the absence of delivery of a Continuation/Conversion Notice with respect to any LIBO Rate Loan at least three Business Days (but not more than ten Business Days) before the last day of the then current Interest Period with respect thereto, such LIBO Rate Loan shall, on such last day, automatically convert to a Base Rate Loan); <u>provided</u>; <u>however</u>, that (a) each such conversion or continuation shall be prorated among the applicable outstanding Loans of all Lenders that have made such Loans, and (b) no portion of the outstanding principal amount of any Loans, other than the Roll-Up Loans that are Sterling Term Loans, may be continued as, or be converted into, LIBO Rate Loans when any Default has occurred and is continuing. Each such irrevocable election shall be made by telephone confirmed promptly by hand delivery or facsimile to the Administrative Agent of the applicable Continuation/Conversion Notice.

SECTION 2.8. <u>Funding.</u> Each Lender may, if it so elects, fulfill its obligation to make, continue or convert LIBO Rate Loans hereunder by causing one of its foreign branches or Affiliates (or an international banking facility created by such Lender) to make or maintain such LIBO Rate Loan; <u>provided, however,</u> that such LIBO Rate Loan shall nonetheless be deemed to have been made and to be held by such Lender, and the obligation of the Borrower to repay such LIBO Rate Loan shall nevertheless be to such Lender for the account of such foreign branch, Affiliate or international banking facility. In addition, the Borrower hereby consents and agrees that, for purposes of any determination to be made for purposes of <u>Sections 4.1, 4.2, 4.3</u> or <u>4.4</u>, it

shall be conclusively assumed that each Lender elected to fund all LIBO Rate Loans by purchasing Dollar deposits in its LIBOR Office's interbank Eurodollar market.

SECTION 2.9. <u>DIP Letter of Credit Issuance Procedures</u>. By delivering to the Administrative Agent an Issuance Request on or before 12:00 noon on a Business Day, the Borrower may from time to time irrevocably request on not less than two (nor more than ten Business Days' notice, in the case of the initial issuance of a DIP Letter of Credit) and not less than two Business Days' prior notice, in the case of a request for the extension of the Stated Expiry Date (in each case, unless a shorter period is agreed to by the DIP Letter of Credit Issuer, in its sole discretion) that such DIP Letter of Credit Issuer issue, or extend the Stated Expiry Date of, a DIP Letter of Credit in such form as may be requested by the Borrower and approved by such DIP Letter of Credit Issuer, solely for the purposes described in <u>Section 6.24</u>. Each DIP Letter of Credit Issuer will make available to the beneficiary thereof the original of the DIP Letter of Credit which it issues. The Borrower shall only request a DIP Letter of Credit under this <u>Section 2.9</u> if such letter of credit is included in the DIP Approved Budget.

SECTION 2.9.1. <u>Other Lenders' Participation</u>. Upon the issuance of each DIP Letter of Credit or an increase in the Stated Amount thereof, and without further action, each DIP L/C Lender shall be deemed to have irrevocably purchased, to the extent of its Synthetic Deposit Percentage, a participation interest in such DIP Letter of Credit, including any Contingent Liability or DIP Letter of Credit Reimbursement Obligation created as a result of any issuance thereof or Disbursement with respect thereto (each, a "<u>DIP Letter of Credit Participation Obligation</u>"). Each DIP L/C Lender's DIP Letter of Credit Participation Obligation shall be Cash Collateralized (as provided in <u>Section 2.4</u>), in favor of the DIP Letter of Credit Issuer, by such DIP L/C Lender's Synthetic Deposit. Such DIP L/C Lender's Synthetic Deposit shall be available for withdrawal by the Administrative Agent, in the amounts contemplated by and otherwise in accordance with <u>clause (c)(i)</u> of <u>Section 2.4</u>, to reimburse the DIP Letter of Credit Issuer for DIP Letter of Credit Reimbursement Obligations.

SECTION 2.9.2. <u>Disbursements</u>. The DIP Letter of Credit Issuer will promptly notify the Borrower and the Administrative Agent by telephone (confirmed by facsimile) of the presentment for payment of any DIP Letter of Credit issued by such DIP Letter of Credit Issuer, together with notice of the date (the "<u>Disbursement Date</u>") such payment shall be made (each such payment, a "<u>Disbursement</u>"). Subject to the terms and provisions of such DIP Letter of Credit and this Agreement, the applicable DIP Letter of Credit Issuer shall make such payment to the beneficiary (or its designee) of such DIP Letter of Credit. Prior to 1:00 p.m. on the first Business Day following the Disbursement Date, the Borrower will reimburse the Administrative Agent for the account of the DIP Letter of Credit Issuer for all amounts which such DIP Letter of Credit Issuer has disbursed under such DIP Letter of Credit, together with interest thereon at a rate per annum equal to the rate per annum then in effect for the NM Loans that are Base Rate Loans pursuant to <u>Section 3.2.1(a)</u> for the period from the Disbursement Date through the date of such reimbursement. Without limiting in any way the foregoing and notwithstanding anything to the contrary contained herein or in any separate application for any DIP Letter of Credit, the Borrower hereby acknowledges and agrees that it shall be obligated to reimburse the applicable DIP Letter of Credit Issuer upon each