Disbursement of a DIP Letter of Credit, and it shall be deemed to be the Obligor for purposes of each such DIP Letter of Credit issued hereunder (whether the account party on such DIP Letter of Credit is the Borrower or a Subsidiary Guarantor).

SECTION 2.9.3. Reimbursement. The obligation (a "DIP Letter of Credit Reimbursement Obligation" in the case of a drawing under a DIP Letter of Credit) of the Borrower under Section 2.9.2 to reimburse, without duplication, the applicable DIP Letter of Credit Issuer and applicable Lenders with respect to each Disbursement (including interest thereon), and the right of the DIP Letter of Credit Issuer to be paid with amounts on deposit in the Synthetic Deposit Account, pursuant to clause (c) of Section 2.4, shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment which the Borrower or such Lender may have or have had against such DIP Letter of Credit Issuer or any Lender, including any defense based upon the failure of any Disbursement to conform to the terms of the applicable DIP Letter of Credit (if, in such DIP Letter of Credit Issuer's good faith opinion, such Disbursement is determined to be appropriate) or any non-application or misapplication by the beneficiary of the proceeds of such Letter of Credit; provided, however, that after paying in full its DIP Letter of Credit Reimbursement Obligation hereunder, nothing herein shall adversely affect the right of the Borrower or such Lender, as the case may be, to commence any proceeding against such DIP Letter of Credit Issuer for any wrongful Disbursement made by such DIP Letter of Credit Issuer under a DIP Letter of Credit as a result of acts or omissions constituting gross negligence or willful misconduct on the part of such DIP Letter of Credit Issuer.

SECTION 2.9.4. Deemed Disbursements. Upon the occurrence and during the continuation of any Event of Default:

(i) the aggregate Stated Amount of all DIP Letters of Credit shall, without demand upon or notice to the Borrower or any other Person, be deemed to have been paid or disbursed by the applicable DIP Letter of Credit Issuer of such DIP Letters of Credit (notwithstanding that such amount may not in fact have been paid or disbursed);

(ii) the Borrower shall be immediately obligated to reimburse such DIP Letter of Credit Issuer for the amount deemed to have been paid or disbursed by such DIP Letter of Credit Issuer; and

(iii) the Borrower shall be immediately obligated to deposit with (or for the benefit of) such DIP Letter of Credit Issuer an amount equal to 5% of the amount deemed to have been paid or disbursed by such DIP Letter of Credit Issuer pursuant to the preceding clause (i).

Amounts payable by the Borrower pursuant to this Section shall be deposited in immediately available funds with the Administrative Agent and held as collateral security for the Reimbursement Obligations. When all of the Events of Default giving rise to the deemed disbursements under this Section have been cured or waived, the Administrative Agent shall return to the Borrower all amounts then on deposit with the Administrative

Agent pursuant to this Section (together with any interest accrued thereon) which have not been applied to the satisfaction of the Reimbursement Obligations.

SECTION 2.9.5. Nature of Reimbursement Obligations. The Borrower, each other Obligor and, to the extent set forth in Section 2.9.1, each DIP L/C Lender, shall assume all risks of the acts, omissions or misuse of any DIP Letter of Credit by the beneficiary thereof. No DIP Letter of Credit Issuer (except to the extent of its own gross negligence or willful misconduct) shall be responsible for:

(a) the form, validity, sufficiency, accuracy, genuineness or legal effect of any DIP Letter of Credit or any document submitted by any party in connection with the application for and issuance of a DIP Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged;

(b) the form, validity, sufficiency, accuracy, genuineness or legal effect of any instrument transferring or assigning or purporting to transfer or assign a DIP Letter of Credit or the rights or benefits thereunder or the proceeds thereof in whole or in part, which may prove to be invalid or ineffective for any reason;

(c) failure of the beneficiary to comply fully with conditions required in order to demand payment under a DIP Letter of Credit;

(d) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise; or

(e) any loss or delay in the transmission or otherwise of any document or draft required in order to make a Disbursement under a DIP Letter of Credit.

None of the foregoing shall affect, impair or prevent the vesting of any of the rights or powers granted to any DIP Letter of Credit Issuer or any DIP L/C Lender hereunder. In furtherance and not in limitation or derogation of any of the foregoing, any action taken or omitted to be taken by a DIP Letter of Credit Issuer in good faith (and not constituting gross negligence or willful misconduct) shall be binding upon each Obligor and each such Secured Party, and shall not put such DIP Letter of Credit Issuer under any resulting liability to any Obligor or any Secured Party, as the case may be.

SECTION 2.10. Register; Notes. The Register shall be maintained on the following terms:

(a) Each Lender may maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder. In the case of a Lender that does not request, pursuant to clause (c) below, execution and delivery of a Note evidencing the Loans made by such Lender to the Borrower, such account or accounts shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be conclusive and binding on the Borrower absent manifest error; provided, however, that the failure of any Lender to maintain

such account or accounts or any error in any such account shall not limit or otherwise affect any Obligations of any Obligor.

(b) The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for the purpose of this clause, to maintain a register (the "Register") on which the Administrative Agent will record each Lender's Commitments, the Loans made by each Lender and each repayment in respect of the principal amount of the Loans of each Lender and annexed to which the Administrative Agent shall retain a copy of each Lender Assignment Agreement delivered to the Administrative Agent pursuant to Section 12.11. Failure to make any recordation, or any error in such recordation, shall not affect the Borrower's obligation in respect of such Loans. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person in whose name a Loan is registered as the owner thereof for all purposes of this Agreement, notwithstanding notice or any provision herein to the contrary. A Lender's Commitment and the Loans made pursuant thereto may be assigned or otherwise transferred in whole or in part only by registration of such assignment or transfer in the Register. Any assignment or transfer of a Lender's Commitment or the Loans made pursuant thereto shall be registered in the Register only upon delivery to the Administrative Agent of a Lender Assignment Agreement duly executed by the assignor thereof and the compliance by the parties thereto with the other requirements of Section 12.11. No assignment or transfer of a Lender's Commitment or the Loans made pursuant thereto shall be effective unless such assignment or transfer shall have been recorded in the Register by the Administrative Agent as provided in this Section.

(c) The Borrower agrees that, upon the request of any Lender, the Borrower will execute and deliver to such Lender, as applicable, a Note evidencing the Loans made by such Lender. The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Notes (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby. Such notations shall, to the extent not inconsistent with the notations made by the Administrative Agent in the Register, be conclusive and binding on the Borrower absent manifest error; provided, however, that the failure of any Lender to make any such notations or any error in any such notations shall not limit or otherwise affect any Obligations of any Obligor. A Note and the Obligation evidenced thereby may be assigned or otherwise transferred in whole or in part only in accordance with Section 12.11.

SECTION 2.11. Accounts. On or prior to the Closing Date, the Borrower shall establish the following Accounts (it being understood that the Borrower may use its current cash management system pursuant to Section 7.11 and is not required to establish new Accounts so long as the Borrower's accounts operate in the manner described in this Section 2.11 and the Accounts are secured by a valid and fully perfected first priority lien, subject only to the Carve-Out, in favor of the Administrative Agent).

SECTION 2.11.1. Reserve Account. (a) On the Closing Date and/or the Final Order Entry Date (as the case may be), subject to the terms and conditions hereof, an amount as set forth in the Funds Flow Memorandum, or such lesser amount as approved by the Bankruptcy Court under the terms of the Interim Order or the Final Order (as the

case may be), shall be deposited by the NM Lenders into the Reserve Account. Amounts on deposit in the Reserve Account may be withdrawn only with the consent of the Administrative Agent.

(b) On the Closing Date and the Final Order Entry Date (as the case may be), subject to the terms and conditions hereof, the amount shown on the Funds Flow Memorandum or such lesser amount approved by the Bankruptcy Court under the terms of the Interim Order or the Final Order (as the case may be), shall be withdrawn from the Reserve Account and deposited into the Interest Reserve Account.

(c) Amounts in the Reserve Account may be withdrawn for deposit into the Operating Account on any Business Day of the first calendar week of each calendar month (or, if in respect of the first withdrawal from the Reserve Account following the Closing Date, the first Business Day following the deposit of the proceeds into the Reserve Account) (each withdrawal, a "Monthly Allocation") only if: (i) no Default has occurred and is continuing, provided that amounts can be disbursed, notwithstanding a Default, if such disbursement is permitted under Sections 2.11.4 or 2.11.6, and (ii) such amounts are necessary to satisfy: (A) the permitted expenses in the DIP Approved Budget for such month, including permitted variances under such DIP Approved Budget (or the balance of the month, if in respect of the initial withdrawal from the Reserve Account)(taking into account the then existing balance of the Operating Account and the other Accounts of the Borrower exclusive of the Reserve Account, the Interest Reserve Account and the Carve-Out Account), and (B) all other payments and reimbursements due to the Agents and the Lenders under the Loans other than interest and fee payments to be funded out of the Interest Reserve Account pursuant to Section 2.11.2. Other than as necessary to comply with Sections 2.11.4 and 2.11.6, a Monthly Allocation shall not be deposited to the Operating Account unless within three (3) Business Days prior to each Monthly Allocation (or one (1) Business Day, if in respect of the first withdrawal from the Reserve Account) the Borrower makes a request for disbursement in a form acceptable to the Administrative Agent (which form of disbursement request must specifically tie the amount of each request to specific line items in the DIP Approved Budget) and simultaneously represents in writing to the Administrative Agent that (x) no Material Adverse Effect has occurred since the Closing Date or the Final Order Entry Date (as the case may be), (y) no Default by the Borrower has occurred and is continuing, and (z) the Borrower reaffirms the truth and accuracy, as of the date of the request, of the representations and warranties in Loan Documents, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date.

SECTION 2.11.2. Interest Reserve Account. Funds deposited into the Interest Reserve Account as provided in Section 2.11.1(b) may be withdrawn by the Administrative Agent for the purpose of making monthly interest payments and other fees due to the Lenders, including with respect to the DIP Letter of Credit Facility, and until the Maturity Date no funds in the Interest Reserve Account shall be withdrawn for the purpose of making payments of the incremental interest comprising default interest in accordance with Section 3.2.2.

SECTION 2.11.3. Operating Account. The Operating Account shall be funded out of the Reserve Account in accordance with the provisions of Section 2.11.1. Provided no Default has occurred and is continuing, funds in the Operating Account may be disbursed at the direction of the Borrower to other Accounts or directly to the applicable recipient through the Borrower's cash management system, for the payment by the Borrower of permitted expenses, all in accordance with the DIP Approved Budget. The Borrower shall not be permitted to disburse funds from the Operating Account unless, on the first and fifteenth day of each month, the Borrower represents in writing to the Administrative Agent that: (a) no Material Adverse Effect has occurred since the Closing Date or the Final Order Entry Date (as the case may be), and (b) no Default has occurred and is continuing. Notwithstanding the foregoing, funds may be disbursed from the Operating Account, whether or not a Default exists and is continuing, to the extent necessary to comply with Sections 2.11.4 and 2.11.6.

SECTION 2.11.4. Carve-Out Account. (a) On any Business Day of the first calendar week of each calendar month following the Closing Date (or, if in respect of the first withdrawal from the Reserve Account or Operating Account following the Closing Date, the first Business Day following the deposit of the proceeds into the Reserve Account), an amount shall be withdrawn by the Borrower from the Reserve Account and/or Operating Account (and, if insufficient, funded out of receivables collected by the Debtors) and deposited by the Borrower into the Carve-Out Account for the purpose of paying accrued but unpaid Professional Expenses, budgeted to be paid for such Calendar Month in the DIP Approved Budget, payable to the extent later authorized or allowed to be paid by the Bankruptcy Court. Such amounts periodically deposited in the Carve-Out Account shall not be available to pay any Professional Expenses incurred after a Carve-Out Event.

(b) Following the occurrence of a Carve-Out Event that is not waived or otherwise cured, the Post-Carve Out Notice Amount shall be withdrawn by the Borrower from the Reserve Account and/or Operating Account (and, if insufficient, funded out of receivables collected by the Debtors) and deposited into the Carve-Out Account, for the purpose of paying Professional Expenses incurred by the Borrower after the Carve-Out Event to the extent allowed or authorized by the Bankruptcy Court.

(c) If a sale of the assets of the Debtors occurs via a credit bid under Section 363 of the Bankruptcy Code, an amount, equal to the MoJo Fee, if any, shall be withdrawn by the Borrower from the Reserve Account and/or Operating Account of the Borrower and deposited as required under the terms of the Morgan Joseph Fee Letter. If a cash sale of the assets of the Debtors occurs under Section 363 of the Bankruptcy Code, an amount,

equal to the MoJo Fee, if any, shall be payable to Morgan Joseph, without duplication, from the Net Cash Proceeds of such sale.

SECTION 2.11.5. General Requirements for the Accounts. Each of the above-mentioned Accounts shall at all times be: (a) held as collateral for the Obligations but subordinated to the Carve-Out, (b) held at a financial institution selected by the Administrative Agent from a list of approved financial institutions published by the Trustee, and (c) subject to an effective Control Agreement in favor of the Collateral Agent (for the benefit of the Lenders) in form and substance satisfactory to the Collateral Agent and in which the Collateral Agent (for the benefit of the Lenders) has a perfected first priority Lien subordinated only to the Carve-Out, with all rights and remedies in respect thereto as shall be set forth in the Loan Documents. The Borrower and its Subsidiaries may not open new Accounts or any other account at a financial institution without the prior written consent of the Administrative Agent, which consent may be withheld in the Administrative Agent's sole discretion. Upon the acceleration of the Loans and the demand for the repayment thereof, the Administrative Agent may withdraw and apply, without notice or demand to the Borrower, all funds in every Account for the repayment of the Obligations in such order and priority as the Administrative Agent may determine, subject to the Carve-Out and Section 2.11.6.

SECTION 2.11.6. Utilization of Funds in the Operating Account and/or Reserve Account. Notwithstanding anything to the contrary contained in this Section 2.11, the Borrower shall be permitted to withdraw funds in either the Operating Account or the Reserve Account in an amount of up to $3,000,000 in the aggregate, whether or not a Default has occurred, provided that: (a) such funds are used by the Borrower solely to pay unpaid employee salaries that have been properly incurred prior to the occurrence of a Default, and (b) such application of proceeds is in accordance with the DIP Approved Budget.

SECTION 2.11.7. Receivables. The Borrower shall deposit, immediately upon receipt, any and all collections of any type, including without limitation any and/all proceeds of the Collateral, into its concentration or main operating account existing on the Petition Date consistent with the Borrower's cash management system as in effect prior to the Petition Date and in accordance with the terms of Section 7.11.

SECTION 2.12. Allocation Mechanism with respect to NM Loans and DIP Letters of Credit.

(a) On the Exchange Date, the Lenders party to each of the NM Commitments, the NM Loans, the DIP Letter of Credit Commitment or the DIP Letter of Credit Outstandings shall automatically and without further act (and without regard to the provisions of Section 12.11 (but which such provisions shall remain applicable following such exchange)) be deemed to have exchanged interests in the NM Commitments, the NM Loans, the DIP Letter of Credit Commitment and the DIP Letter of Credit Outstandings, such that in lieu of the interest of each Lender in such NM Commitments, the NM Loans, the DIP Letter of Credit Commitment and DIP Letter of Credit Outstandings in which it shall participate as of such date (including such Lender's interest in the Obligations of each Loan Party in respect thereof), such Lender

shall instead hold an interest in every one of the NM Commitments, the NM Loans, the DIP Letter of Credit Commitment and the DIP Letter of Credit Outstandings (including the Obligations of each Loan Party in respect thereof), whether or not such Lender shall previously have participated therein, equal to such Lender's Allocation Percentage thereof. It is understood and agreed that each Exchange, in itself, will not affect the aggregate amount of the Obligations owing by each of the Obligors on the Exchange Date. Each Lender and each Obligor hereby consents and agrees to the Exchange, and each Lender agrees that the Exchange shall be binding upon its successors and assigns and any person that acquires a participation in its interests in any NM Commitments, NM Loans, DIP Letter of Credit Commitment or DIP Letter of Credit Outstandings. Each Obligor agrees from time to time to execute and deliver to the Administrative Agent all such promissory notes and other instruments and documents as the Administrative Agent shall reasonably request to evidence and confirm the respective interests of the Lenders after giving effect to the Exchange, and each Lender agrees to surrender any promissory notes originally received by it in connection with its NM Commitments, NM Loans, DIP Letter of Credit Commitment or DIP Letter of Credit Outstandings hereunder to the Administrative Agent against delivery of any promissory notes evidencing its interests in the NM Commitments, NM Loans, DIP Letter of Credit Commitment or DIP Letter of Credit Outstandings so executed and delivered; provided, however, that the failure of any Loan Party to execute or deliver or of any Lender to accept any such promissory note, instrument or document shall not affect the validity or effectiveness of the Exchange.

(b) As a result of the Exchange, upon and after the Exchange Date, each payment received by the Administrative Agent pursuant to any Loan Document in respect of the Obligations and each distribution made by the Administrative Agent pursuant to any Collateral Document in respect of the Obligations to the Lenders under the NM Commitments, NM Loans, DIP Letter of Credit Commitment or DIP Letter of Credit Outstandings, shall be distributed to the Lenders under such NM Commitments, NM Loans, DIP Letter of Credit Commitment or DIP Letter of Credit Outstandings, as applicable, pro rata in accordance with their respective Allocation Percentages. Any direct payment received by a Lender on or after the Exchange Date, including by way of set-off, in respect of an Obligation shall be paid over to the Administrative Agent for distribution to the Lenders in accordance herewith.

## ARTICLE III

## REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1. Repayments and Prepayments; Application. The Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

SECTION 3.1.1. Repayments and Prepayments. The Borrower shall repay in full in cash to the Administrative Agent for the ratable account of the Lenders the unpaid principal amount of each Loan and all accrued but unpaid interest thereon upon the Maturity Date, or earlier, if otherwise required by the terms hereof, together with any fees payable therewith as provided hereunder. Prior thereto, payments and prepayments of the Loans shall or may be made as follows:

(a) From time to time on any Business Day, the Borrower may make, upon notice to the Administrative Agent, a voluntary prepayment, in whole or in part, of the outstanding principal amount of any NM Loans; provided that (A) any prepayment of the NM Loans is to be applied pro rata among the NM Loans so prepaid of the same type and, if applicable, having the same Interest Period of all NM Lenders that have made such NM Loans (to be applied as set forth in Section 3.1.2); (B) all such voluntary prepayments shall require at least one but no more than five Business Days' (and at least three Business Days' in the case of LIBO Rate Loans) prior telephonic notice (promptly confirmed by facsimile) to the Administrative Agent; (C) all such voluntary partial prepayments of any Loans shall be in an aggregate minimum amount of $1,000,000; and (D) the Exit Fee is paid as provided hereunder; provided, further, that no voluntary prepayment of Roll-Up Loans may be made until all NM Loans and other Obligations existing in respect thereof have been paid in full in cash and the NM Commitments have terminated. Each such notice shall specify the date and amount of such prepayment and the type of Loans to be prepaid. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's pro rata share of such prepayment. The Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein, provided that a notice of prepayment of the NM Loans delivered by the Borrower may state that such notice is conditional upon the effectiveness of another financing and such notice may (subject to the payment of any customary breakage costs) be revoked by the Borrower (by written notice to the Administrative Agent a reasonable time prior to the specified effective date) if such condition is not satisfied. Each prepayment of principal of, and interest on, the NM Loans shall be made in Dollars.

(b) From time to time on any Business Day, the Borrower may cause the Synthetic Deposits to be returned to the DIP L/C Lender by reducing the DIP Letter of Credit Facility Available Amount; provided that (A) all such voluntary reductions shall require at least one but no more than five Business Days' prior telephonic notice (promptly confirmed by facsimile) to the Administrative Agent; and (B) all such voluntary partial returns shall be in an aggregate minimum amount of $1,000,000 and an integral multiple of $500,000.

(c) On each date when the aggregate amount of all DIP Letter of Credit Outstandings exceeds the DIP Letter of Credit Available Amount, the Borrower shall Cash Collateralize all DIP Letter of Credit Outstandings in an aggregate amount equal to such excess.

(d) In the event the DIP Letter of Credit Issuer has made a withdrawal from the Synthetic Deposit Account to repay unreimbursed DIP Reimbursement Obligations, the Borrower shall make a mandatory deposit in the Synthetic Deposit Account equal to such amount.

(e) (i) Upon receipt by any Obligor or any of its Subsidiaries of any Net Cash Proceeds (other than any Net Cash Proceeds from a Disposition under Section 8.10(a)), or Net Casualty Proceeds, the Borrower shall deliver to the Administrative Agent a calculation of such proceeds and immediately make a mandatory prepayment of

the Obligations hereunder in an amount equal to 100% of such Net Cash Proceeds or Net Casualty Proceeds (as the case may be), subject to Section 2.11.4(c).

(ii) Immediately upon any acceleration of the Maturity Date of any Loans pursuant to Section 9.2 or Section 9.3, the Borrower shall repay all of the Loans.

Each prepayment of any Loans made pursuant to this Section shall be without premium or penalty, other than the payment of an Exit Fee pursuant to Section 3.3.1 and as may be required by Section 4.4. The Borrower shall give prior telephonic notice (promptly confirmed by facsimile) to the Administrative Agent of any mandatory prepayment required under this Section 3.1.1 (including the date, an estimate of the aggregate amount of such mandatory prepayment and a description of the events giving rise to such prepayment at least five (5) Business Days prior thereto); provided that the failure to give such notice shall not relieve the Borrower of its obligation to make such mandatory prepayments on or prior to the dates set forth in this Section 3.1.1 and the Borrower shall be permitted to make such mandatory prepayments on or prior to such dates.

SECTION 3.1.2. Application of Proceeds from Mandatory Prepayment Events or Voluntary Prepayments.

(a) Amounts to be applied in connection with the prepayment of Loans pursuant to Section 3.1.1 (other than Section 3.1.1(e)(i)) shall be applied in accordance with Section 4.7 and Section 4.8; provided that each prepayment or repayment of the principal of the Loans shall be applied, to the extent of such prepayment or repayment, first, to the principal amount thereof being maintained as Base Rate Loans, and second, subject to the terms of Section 4.4, to the principal amount thereof being maintained as LIBO Rate Loans.

(b) Amounts to be applied in connection with the prepayment of Loans pursuant to Section 3.1.1(e)(i)) shall be applied as follows:

(i) First, to pay all amounts with respect to the Obligations under DIP Loan Facility that represent the reasonable and necessary costs and expenses of preserving the asset that is disposed of and that are senior to any Third Party Liens encumbering such asset;

(ii) Second, to pay any obligations secured by Third Party Liens encumbering the asset sold (unless otherwise subject to bona fide dispute);

(iii) Third, to pay any fees, expenses and accrued interest under the DIP Loan Facility; and

(iv) Fourth, to prepay amounts (without penalty, but subject to customary breakage costs and the Exit Fee payable) outstanding under the DIP Loan Facility;

provided that, each prepayment or repayment of the principal of the Loans shall be applied, to the extent of such prepayment or repayment, first, to the principal

amount thereof being maintained as Base Rate Loans, and second, subject to the terms of Section 4.4, to the principal amount thereof being maintained as LIBO Rate Loans; provided, further, that each prepayment of principal or interest of the Loans pursuant to this Section 3.1.1 shall be applied (i) first, pro rata to the repayment of, or interest or Participation Fees with respect to, the New Money Loans and DIP Letter of Credit Participation Obligations and (ii) second, once all DIP Loans have been repaid in full, pro rata to the repayment of any outstanding Roll-Up Loans and all uncured but unpaid fees with respect thereto, including, for the avoidance of doubt, the fees due and payable pursuant to Section 3.3.6.

SECTION 3.2. Interest Provisions. Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

SECTION 3.2.1. Rates; Fees. (a) New Money Loans. Pursuant to an appropriately delivered Borrowing Request or Continuation/Conversion Notice, interest on the NM Loans will be payable by the Borrower on the last Business Day of each fiscal month, at a rate per annum equal to, at the Borrower's option depending upon whether it has selected LIBO Rate Loans or Base Rate Loans, respectively, in accordance with the requirements of this Agreement: (i) 10.00% per annum, plus the Adjusted LIBO Rate, or (ii) 9.00% per annum plus the greater of (A) the Adjusted Base Rate from time to time in effect, or (B) the Adjusted LIBO Rate (the rate described in this sub paragraph (ii), the "ABR Rate"). Interest shall be payable by the Borrower from and including the first Business Day of the calendar month to (but not including) the last Business Day of each calendar month at the interest rate as determined in this subparagraph.

(b) Roll-Up Loans. Interest on any Roll-Up Loan (all of which shall be paid in kind and added to the principal amount of the Roll-Up Loan) will be payable by the Borrower on the last Business Day of each fiscal month, at a rate per annum equal to, at the Borrower's option (i) 8.50% per annum (of which all shall be paid in kind and added to the principal amount outstanding of the Roll-Up Loans) (the "Applicable LIBOR Margin"), plus the Adjusted LIBO Rate (and with respect to any Sterling Term Loan, any UK Mandatory Costs) (collectively, the "Roll-Up Adjusted LIBOR Rate"), or (ii) 7.50% per annum (of which all shall be paid in kind and added to the principal amount outstanding of the Roll-Up Loans), plus the greatest of: (A) the Adjusted Base Rate and (B) the Adjusted LIBO Rate (collectively, the "Roll-Up ABR Rate"), provided that the option under sub-paragraph (ii) shall not be available to the Borrower with respect to the Sterling Term Loans. Interest shall be payable by the Borrower from and including the first Business Day of the fiscal month to (but not including) the last Business Day of each fiscal month at the interest rate as determined above.

(c) Upon the deposit of the Synthetic Deposits in the Synthetic Deposit Account, the fees ("Participation Fees") relative to the Synthetic Deposits shall accrue at a rate per annum equal to the sum of the Adjusted LIBO Rate for the relevant Investment Period plus an applicable margin of 10.00%; provided that the amount due and payable by the Borrower under this clause shall be the amount set forth above less the Synthetic Deposit Return payable by the Administrative Agent to the Synthetic Lenders pursuant to

clause (c) of Section 2.4 for the applicable period. All Synthetic Deposits shall accrue fees at all times that they are on deposit in the Synthetic Deposit Account.

SECTION 3.2.2. Post-Default Rates. Notwithstanding the rates of interest specified in Section 3.2.1 or elsewhere herein, effectively immediately upon the occurrence of a Default, the principal amount of all Loans and the Synthetic Deposits shall bear interest at a rate which is two percent (2%) per annum in excess of, with respect to the NM Loans and Synthetic Deposits, the ABR Rate and with respect to the Roll-Up Loans, the Roll-Up ABR Rate, except that the interest rate applicable to any Sterling Term Loan shall be the Roll-Up Adjusted LIBO Rate (the "Default Rate"). Such interest shall be payable on demand. The incremental interest attributable to the Default Rate, if in effect, shall not be paid by the Borrower out of proceeds in the Interest Reserve Account.

SECTION 3.2.3. Payment Dates. (a) Interest accrued (including, without limitation, any payment of in-kind interest) on each Loan shall be payable, without duplication:

(i) on the Maturity Date;

(ii) on the date of any payment or prepayment, in whole or in part, of principal outstanding on any Loan on the principal amount so paid or prepaid;

(iii) on that portion of any Loans the Maturity Date of which is accelerated pursuant to Section 9.2 or Section 9.3, immediately upon such acceleration; and

(iv) on the last Business Day of each calendar month, and provided that sufficient amounts are held in the Interest Reserve Account (other than payment of in-kind interest and any Default Interest), by the Borrower out of the Interest Reserve Account.

Interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

(b) Participation Fees accrued on each Synthetic Deposit shall be payable, without duplication:

(i) on the Maturity Date;

(ii) on the date of any return of a Synthetic Deposit pursuant to this Agreement, on the amount of such Synthetic Deposits so returned; and

(iii) on each monthly interest payment date occurring after the Closing Date beginning with November 30, 2009.

SECTION 3.3. Fees. The Borrower agrees to pay the fees set forth below. All such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

SECTION 3.3.1. Exit Fees. On any date on which any Loans are prepaid or repaid (including, for the avoidance of doubt, on the Maturity Date), the Borrower shall pay to each Lender its pro rata share of the Exit Fee applicable to such prepayment or repayment of the Loans.

SECTION 3.3.2. Arranger's Fees; Prepetition Lender Fees. The Borrower agrees to pay to: (a) Credit Suisse and Credit Suisse Securities (USA) LLC, for their own account, the fees in the amounts and on the dates set forth in the Engagement Letter and Fee Letter, and (b) the Prepetition Lenders who provide the NM Money Loans and the DIP Letter of Credit Facility on the Closing Date and the Final Order Entry Date, the fees in the amounts and on the dates set forth in the Backstop Fee Letter.

SECTION 3.3.3. Consent Fee. The Borrower agrees to pay, on the Closing Date, the consent fee in the manner set forth in Section 5.1.23.

SECTION 3.3.4. Defaulting Lender Fees. Notwithstanding anything to the contrary contained in this Section 3.3, the Administrative Agent may withhold any fees payable to a Lender pursuant to this Section 3.3 in its sole discretion for so long as such Lender remains a Defaulting Lender.

SECTION 3.3.5. Fees for Roll-Up of Revolving Letter of Credit Outstandings and/or Synthetic Letter of Credit Outstandings. The Borrower agrees to pay, to the Roll-Up Lenders who roll up any Revolving Letter of Credit Outstandings and Synthetic Letter of Credit Outstandings hereunder, such fees as were applicable to such Revolving Letter of Credit Outstandings and Synthetic Letter of Credit Outstandings under the Prepetition Credit Agreement, with, for the purposes of clarity, the "Applicable Margin" and the "Participation Fees" (each, as defined in the Prepetition Credit Agreement) being equal to 8.50%. All such fees shall be payable by the Borrower in kind by capitalizing all such fees and adding them to the Revolving Letter of Credit Outstandings or Synthetic Letter of Credit Outstandings, as applicable, for the purpose of accruing further fees prior to the Maturity Date. All accrued but unpaid fees under this Section 3.3.5 shall be due and payable by the Borrower in cash on the Maturity Date pursuant to the order specified in Sections 4.7 or 4.8, as applicable.

SECTION 3.3.6. Other Costs and Expenses. The Borrower agrees to pay, on the Closing Date and from time to time upon demand, all outstanding fees, costs and expenses payable pursuant to Section 12.3 hereof and Section 12.3 of the Prepetition Credit Agreement.

## ARTICLE IV

## CERTAIN LIBO RATE AND OTHER PROVISIONS

SECTION 4.1. LIBO Rate Lending Unlawful. If any Lender shall determine (which determination shall, upon notice thereof to the Borrower and the Administrative Agent, be

conclusive and binding on the Borrower) that the introduction of or any change in or in the interpretation of any law, after the Closing Date, makes it unlawful, or any Governmental Authority asserts that it is unlawful, for such Lender to make or continue any Loan as, or to convert any Loan into, a LIBO Rate Loan, the obligations of such Lender to make, continue or convert any such LIBO Rate Loan shall, after the determination thereof, forthwith be suspended until such Lender shall notify the Administrative Agent that the circumstances causing such suspension no longer exist, and all outstanding LIBO Rate Loans payable to such Lender shall automatically convert into Base Rate Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

SECTION 4.2. Deposits Unavailable. If the Administrative Agent shall have determined that:

(a) Dollar deposits in the relevant amount and for the relevant Interest Period are not available to it in its relevant market; or

(b) by reason of circumstances affecting its relevant market, adequate means do not exist for ascertaining the interest rate applicable hereunder to LIBO Rate Loans;

then, upon notice by telephone or facsimile from the Administrative Agent to the Borrower and the Lenders, the obligations of all Lenders under Section 2.6 and Section 2.7 to make or continue any Loans as, or to convert any Loans into, LIBO Rate Loans shall forthwith be suspended until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances causing such suspension no longer exist.

SECTION 4.3. Increased LIBO Rate Loan Costs, etc. The Borrower agrees to reimburse each Lender and each DIP Letter of Credit Issuer for any increase in the cost to such Lender or such DIP Letter of Credit Issuer of, or any reduction in the amount of any sum receivable by such Credit Party in respect of, such Credit Party's Commitments and the making of Credit Extensions hereunder (including the making, continuing or maintaining (or of its obligation to make or continue) any Loans as, or of converting (or of its obligation to convert) any Loans into, LIBO Rate Loans) or such Credit Party's Synthetic Deposit that arises in connection with any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase-in after the Closing Date of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority, except for (i) such changes with respect to increased capital costs and Taxes which are governed by Sections 4.5 and 4.6, respectively, and (ii) increased costs which are already included in the determination of the Statutory Reserve Rate. Each affected Credit Party shall promptly notify the Administrative Agent and the Borrower in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required to fully compensate such Credit Party for such increased cost or reduced amount. Such additional amounts shall be payable by the Borrower directly to such Credit Party within ten days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrower. Such notice shall be in reasonable detail and shall certify that the claim for additional amounts referred to therein is generally consistent with such Lender's treatment of similarly situated customers of such Lender whose transactions with such Lender are similarly affected by the change in circumstances

giving rise to such payment, but such Lender shall not be required to disclose any confidential or proprietary information therein.

SECTION 4.4. Funding Losses. In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Loan as, or to convert any portion of the principal amount of any Loan into, a LIBO Rate Loan) as a result of

(a) any conversion or repayment or prepayment of the principal amount of any LIBO Rate Loan on a date other than the scheduled last day of the Interest Period applicable thereto, whether pursuant to Article III or otherwise;

(b) any Loans not being made as LIBO Rate Loans in accordance with the Borrowing Request therefor;

(c) any Loans not being continued as, or converted into, LIBO Rate Loans in accordance with the Continuation/Conversion Notice therefor; or

(d) any LIBO Rate Loans not being prepaid in accordance with any notice delivered pursuant to Section 3.1.1 (as a result of a revocation of such notice or as a result of such payment not being made),

but in each case other than due to such Lender's failure to fulfill its obligations hereunder, then, upon the written notice of such Lender to the Borrower, the Borrower shall, within ten days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense. Such written notice (which shall include calculations in reasonable detail) shall, in the absence of manifest error, be conclusive and binding on the Borrower.

SECTION 4.5. Increased Capital Costs. If, after the Closing Date, any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase-in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority affects or would affect the amount of capital required or expected to be maintained by any Credit Party or any Person controlling such Credit Party, and such Credit Party determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Commitments or the Credit Extensions made, or the Letters of Credit participated in, by such Credit Party is reduced to a level below that which such Credit Party or such controlling Person could have achieved but for the occurrence of any such circumstance, then, upon notice from time to time by such Credit Party to the Borrower, the Borrower shall within five days following receipt of such notice pay directly to such Credit Party additional amounts sufficient to compensate such Credit Party or such controlling Person for such reduction in rate of return. A statement of such Credit Party as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrower. In determining such amount, such Credit Party may use any reasonable method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable. Such statement shall be in reasonable detail and shall certify that the claim for

additional amounts referred to therein is generally consistent with such Lender's treatment of similarly situated customers of such Lender whose transactions with such Lender are similarly affected by the change in circumstances giving rise to such payment, but such Lender shall not be required to disclose any confidential or proprietary information therein. Failure or delay on the part of any Lender to demand compensation pursuant to Section 4.3 or 4.4 or this 4.5 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to such Sections for any increased costs incurred more than 90 days prior to the date that such Lender notifies the Borrower of the change giving rise to such increased costs and of such Lender's intention to claim compensation therefor; provided further that, if the change giving rise to such increased costs is retroactive, then the 90-day period referred to above shall be extended to include the period of retroactive effect thereof. If a Lender demands compensation under Sections 4.3 or 4.4 or this Section 4.5 with respect to LIBO Rate Loans, the Borrower may, upon at least three Business Days' notice to the Lender (with a copy of such notice to the Administrative Agent), elect that, until the circumstances causing such demand for compensation no longer apply to such Lender, all LIBO Rate Loans that would otherwise be made by such Lender as part of any Borrowing shall be made instead as Base Rate Loans and all payments of principal of and interest on such Base Rate Loans shall be made at the same time as payments on the LIBO Rate Loans otherwise constituting part of such Borrowing. Each Lender will use all reasonable efforts to give prompt notice to the Borrower of the event giving rise to any such demand for compensation.

SECTION 4.6. Taxes. The Borrower covenants and agrees as follows with respect to Taxes.

(a) Any and all payments by any Obligor or the Administrative Agent under each Loan Document shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes, except to the extent any Taxes are imposed by law. In the event that any Taxes are required by law to be deducted or withheld from any payment required to be made by any Obligor or the Administrative Agent to or on behalf of any Credit Party under any Loan Document, then:

(i) subject to clause (g), if such Taxes are Non-Excluded Taxes, the amount of such payment shall be increased as may be necessary such that such payment is made, after withholding or deduction for or on account of such Non-Excluded Taxes, in an amount that is not less than the amount provided for in such Loan Document (and for the avoidance of doubt, it shall be the sole responsibility of the Borrower to pay such increased amounts without regard to whether such Taxes are imposed on the Borrower or another party); and

(ii) each Obligor or Administrative Agent, as the case may be, shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a)(i), if applicable) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b) In addition, the Borrower shall pay any and all Other Taxes imposed on or with respect to a Credit Party to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c) As promptly as practicable after the payment of any Taxes or Other Taxes, and in any event within forty-five (45) days of any such payment, the Borrower shall furnish to the Administrative Agent a copy of an official receipt (or a certified copy thereof), or if obtaining such receipt or copy is impractical, other documentation necessary for purposes of claiming a foreign tax credit evidencing the payment of such Taxes or Other Taxes. The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d) Subject to clause (g), the Borrower shall indemnify each Lender, within thirty (30) days after written demand therefor, for the full amount of any Non-Excluded Taxes or Other Taxes withheld by the Administrative Agent with respect to any and all payments of the Synthetic Deposit Return to the Lenders (including Non-Excluded Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 4.6), whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on behalf of the applicable Lender, shall be conclusive absent manifest error. If the Lender or Administrative Agent, as applicable, fails to give notice to the Borrower of the imposition of any Non-Excluded Taxes or Other Taxes within one hundred and twenty (120) days following its receipt of actual written notice of the imposition of such Non-Excluded Taxes or Other Taxes, there will be no obligation for the Borrower to pay interest or penalties attributable to the period beginning after such 120th day and ending seven (7) days after the Borrower receives notice from the Lender or Administrative Agent, as applicable. In addition, the Borrower will not be obligated to pay interest or penalties attributable to any Non-Excluded Taxes or Other Taxes if such interest or penalties resulted from the gross negligence or willful misconduct of the Administrative Agent or such Lender.

(e) Subject to clause (g), the Borrower shall indemnify each Credit Party for any Non-Excluded Taxes and Other Taxes levied, imposed, assessed on or actually paid by or on behalf of such Credit Party (whether or not such Non-Excluded Taxes or Other Taxes are correctly or legally asserted by the relevant Governmental Authority). Promptly upon having actual knowledge that any such Non-Excluded Taxes or Other Taxes have been levied, imposed or assessed, and promptly upon notice thereof by any Credit Party, the Borrower shall pay such Non-Excluded Taxes or Other Taxes directly to the relevant Governmental Authority. In addition, the Borrower shall indemnify each Credit Party for any incremental Taxes that are paid or payable by such Credit Party as a result of any failure of the Borrower to pay any Taxes when due to the appropriate Governmental Authority or to deliver to the Administrative Agent, pursuant to clause (c), documentation evidencing the payment of Taxes or Other Taxes, provided that if the Lender or Administrative Agent, as applicable, fails to give notice to the Borrower of the imposition of any Non-Excluded Taxes or Other Taxes within 120 days following its receipt of actual written notice of the imposition of such Non-Excluded Taxes or Other Taxes, there will be no obligation for the Borrower to pay interest or penalties attributable to the period beginning after such 120th day and ending 7 days after the Borrower receives notice from the Lender or Administrative Agent, as applicable. In addition, the Borrower will not be obligated to pay

interest or penalties attributable to any Non-Excluded Taxes or Other Taxes if such interest or penalties resulted from the gross negligence or willful misconduct of the Administrative Agent or such Lender. With respect to indemnification for Non-Excluded Taxes and Other Taxes actually paid by any Credit Party or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date such Credit Party makes written demand therefor. The Borrower acknowledges that any payment made to any Credit Party or to any Governmental Authority in respect of the indemnification obligations of the Borrower provided in this clause shall constitute a payment in respect of which the provisions of clause (a) and this clause (e) shall apply.

(f) Each Non-Domestic Credit Party, on or prior to the date on which such Non-Domestic Credit Party becomes a Credit Party hereunder (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only for so long as such Non-Domestic Credit Party is legally entitled to do so), shall deliver to the Borrower and the Administrative Agent either

(i) two properly completed and duly executed copies of Internal Revenue Service Form W-8BEN or W-8ECI or an applicable successor form; or

(ii) in the case of a Non-Domestic Credit Party that is not legally entitled to deliver either form listed in clause (f)(i), (x) a certificate of a duly authorized officer of such Non-Domestic Credit Party to the effect that such Non-Domestic Credit Party is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (such certificate, an "Exemption Certificate") and (y) two properly completed and duly executed copies of Internal Revenue Service Form W-8BEN or W-8ECI or applicable successor form.

(g) The Borrower shall not be obligated to gross up any payments to any Credit Party pursuant to clause (a)(i), or to indemnify any Credit Party pursuant to clause (d) or clause (e), in respect of United States federal withholding taxes to the extent imposed as a result of (i) the failure of such Credit Party to deliver to the Borrower the form or forms and/or an Exemption Certificate, as applicable to such Credit Party, pursuant to clause (f), (ii) the information or certifications made therein by the Credit Party being untrue or inaccurate on the date delivered in any material respect, or (iii) the Credit Party designating a successor lending office at which it maintains its Loans which has the effect of causing such Credit Party to become obligated for Tax payments in excess of those in effect immediately prior to such designation; provided, however, that the Borrower shall be obligated to gross up any payments to any such Credit Party pursuant to clause (a)(i), and to indemnify any such Credit Party pursuant to clause (d) and clause (e), in respect of United States federal withholding Taxes if (A) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a partial or complete exemption from U.S. federal withholding Tax or inaccuracy or untruth contained therein resulted from a change in any applicable statute, treaty, regulation or other applicable law or any interpretation of any of the foregoing occurring after the date on which such Credit Party became a Credit Party hereunder,

which change rendered such Credit Party no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding Tax, or rendered the information or certifications made in such form or forms or Exemption Certificate untrue or inaccurate in a material respect, (B) the redesignation of such Credit Party's lending office was made at the request of the Borrower or (C) the obligation to gross up payments to any such Credit Party pursuant to clause (a)(i) or to indemnify any such Credit Party pursuant to clause (d) or clause (e) is with respect to an assignee Credit Party as a result of an assignment made at the request of the Borrower.

SECTION 4.7. Payments, Computations, etc. Unless otherwise expressly provided in a Loan Document, all payments by the Borrower pursuant to each Loan Document shall be made by the Borrower to the Administrative Agent for the pro rata account of the Secured Parties entitled to receive such payment. All payments shall be made without setoff, deduction or counterclaim not later than 1:00 p.m. on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrower. Funds received after that time shall be deemed to have been received by the Administrative Agent on the next succeeding Business Day. The Administrative Agent shall promptly remit in same day funds to each Secured Party its share, if any, of such payments received by the Administrative Agent for the account of such Secured Party. All interest (including interest on Dollar-denominated LIBO Rate Loans) and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days (or, in the case of interest on a Base Rate Loan calculated at other than the Federal Funds Effective Rate, 365 days or, if appropriate, 366 days). Except as otherwise set forth herein, payments due on a day other than a Business Day shall be made on the preceding Business Day. Except as otherwise set forth in any Loan Document, all payments made under any Loan Document shall be applied upon receipt in the following order: (a) first, to payment of that portion of the payment Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including the fees and expenses of counsel to the Administrative Agent) payable to the Administrative Agent or the Collateral Agent in its capacity as such; (b) second, to payment of that portion of the payment Obligations constituting fees (including any Exit Fee), indemnities and other amounts (other than principal and interest) payable to the Lenders, ratably among them in proportion to the amounts described in this clause second payable to them; (c) third, to payment of that portion of the payment Obligations constituting accrued and unpaid interest on the Loans, ratably among the Secured Parties in proportion to the respective amounts described in this clause third payable to them; (d) fourth, to payment of that portion of the payment Obligations constituting unpaid principal of the Loans and the aggregate Reimbursement Obligations then owing (and each DIP L/C Lender shall be entitled to receive amounts in the Synthetic Deposit Account to the extent such amounts are not being used, after giving effect to this clause fourth, to cash collateralize DIP Letters of Credit Outstandings), ratably among the Secured Parties in proportion to the respective amounts described in this clause fourth held by them; (e) fifth, to the payment of all other payment Obligations of the Borrower that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date, and (f) last, the balance, if any, after all the payment Obligations have been paid in full in cash, following the Maturity Date, to the Borrower, or any other Person lawfully entitled to receive such surplus pursuant to

an order of a Governmental Authority, provided that, no payments shall be made to Roll-Up Lenders in respect of Roll-Up Loans or other Obligations related thereto pursuant to clause third, fourth or fifth above until (x) all Obligations in respect of the NM Loans and the DIP Letter of Credit Facility (including the termination of any letters of credit outstanding thereunder pursuant to the terms thereof) have been paid in full and (y) the NM Commitments and the DIP Letter of Credit Commitments have been terminated. The Administrative Agent is hereby authorized to charge any Account (other than the Carve-Out Account) for any amounts due and owing under this Agreement or the other Loan Documents.

SECTION 4.8. Sharing of Payments. If any Credit Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Credit Extension or Reimbursement Obligation (other than pursuant to the terms of Section 4.3, 4.5 or 4.6) in excess of its pro rata share of payments obtained by all Credit Parties, such Credit Party shall purchase from the other Credit Parties such participations in Credit Extensions made by them as shall be necessary to cause such purchasing Credit Party to share the excess payment or other recovery ratably (to the extent such other Credit Parties were entitled to receive a portion of such payment or recovery) with each of them; provided, however, that if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Credit Party, the purchase shall be rescinded and each Credit Party which has sold a participation to the purchasing Credit Party shall repay to the purchasing Credit Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Credit Party's ratable share (according to the proportion of (a) the amount of such selling Credit Party's required repayment to the purchasing Credit Party to (b) the total amount so recovered from the purchasing Credit Party) of any interest or other amount paid or payable by the purchasing Credit Party in respect of the total amount so recovered. The Borrower agrees that any Credit Party purchasing a participation from another Credit Party pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 4.9) with respect to such participation as fully as if such Credit Party were the direct creditor of the Borrower in the amount of such participation. If under any applicable bankruptcy, insolvency or other similar law any Credit Party receives a secured claim in lieu of a setoff to which this Section 4.8 applies, such Credit Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Credit Parties entitled under this Section 4.8 to share in the benefits of any recovery on such secured claim.

SECTION 4.9. Setoff. Subject to the provisions of Sections 9.2 and 9.3, each Credit Party, upon the occurrence and during the continuance of a Default is hereby authorized at any time and from time to time, to the fullest extent permitted by law and without further order of or application to the Bankruptcy Court, but subject to the Carve-Out and Section 2.11.6, to set off and apply any and all deposits at any time held and other indebtedness at any time owing by the Administrative Agent and each such Lender to or for the credit or the account of the Borrower or any Obligor against any and all of the obligations of the Borrower or Obligor now or hereafter existing under the Loan Documents, irrespective of whether or not such Lender shall have made any demand under any Loan Document and although such obligations may not have been accelerated; provided, however, that any such appropriation and application shall be subject to the provisions of Section 4.8. Each Credit Party agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Credit Party; provided, however, that the failure to give such notice shall not affect the validity of such setoff and

application. The rights of each Credit Party under this Section are in addition to other rights and remedies (including other rights of setoff under applicable law or otherwise) which such Credit Party may have.

SECTION 4.10. Change of Lending Office. Each Credit Party agrees that if it makes any demand for payment under Section 4.3, 4.5 or 4.6, or if any adoption or change of the type described in Section 4.1 shall occur with respect to it, it will, if requested by the Borrower, file a certificate or document reasonably requested by the Borrower and/or use reasonable efforts (in either case, consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it, as determined in its sole discretion) to designate a different lending office if the filing of such certificate or document or the making of such a designation would reduce or obviate the need for the Borrower to make payments under Section 4.3, 4.5 or 4.6, or would eliminate or materially reduce the effect of any adoption or change described in Section 4.1; provided, however, that nothing in this Section 4.10 shall affect or postpone any of the Obligations of the Borrower or the right of any Credit Party provided in Section 4.1, 4.3, 4.5 or 4.6.

SECTION 4.11. Replacement of Lenders. If any Lender (an "Affected Lender") (a) fails to consent to an election, consent, amendment, waiver or other modification to this Agreement or other Loan Document that requires the consent of the Required Lenders, or of a greater percentage of Lenders than the Required Lenders, and such election, consent, amendment, waiver or other modification is otherwise consented to by the Required Lenders or (b) makes a demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to Section 4.3, 4.5 or 4.6 (and the payment of such amounts are, and are likely to continue to be, more onerous in the reasonable judgment of the Borrower than with respect to the other Lenders), or (c) gives notice pursuant to Section 4.1 requiring a conversion of such Affected Lender's LIBO Rate Loans to Base Rate Loans or suspending such Lender's obligation to make Loans as, or to convert Loans into, LIBO Rate Loans, or (d) becomes a Defaulting Lender, then, upon the occurrence of any of the events set forth in clauses (a), (b), (c) or (d), the Borrower may, within 30 days following such failure to consent or receipt by the Borrower of such demand or notice, as the case may be, give notice (a "Replacement Notice") in writing to the Administrative Agent and such Affected Lender of its intention to cause such Affected Lender to sell all or any portion of its Loans, Commitments, Notes and/or Synthetic Deposit to another financial institution or other Person (a "Replacement Lender") designated in such Replacement Notice; provided, however, that no Replacement Notice may be given by the Borrower if (i) such replacement conflicts with any applicable law or regulation, (ii) any Event of Default shall have occurred and be continuing at the time of such replacement or (iii) prior to any such replacement, such Lender shall have taken any necessary action under Section 4.5 or 4.6 (if applicable) so as to eliminate the continued need for payment of amounts owing pursuant to Section 4.5 or 4.6. If the Administrative Agent shall, in the exercise of its reasonable discretion and within 30 days of its receipt of such Replacement Notice, notify the Borrower and such Affected Lender in writing that the Replacement Lender is satisfactory to the Administrative Agent (such consent not to be unreasonably withheld or delayed and not being required where the Replacement Lender is already a Lender), then such Affected Lender shall, subject to the payment of any amounts due pursuant to Section 4.4, assign, in accordance with Section 12.11, the portion of its Commitments, Loans and/or Notes (if any), Synthetic Deposits and other rights and obligations under this Agreement and all other Loan Documents (including

Reimbursement Obligations, if applicable) designated in the replacement notice to such Replacement Lender; provided, however, that (i) such assignment shall be without recourse, representation or warranty and shall be on terms and conditions reasonably satisfactory to such Affected Lender and such Replacement Lender, (ii) the purchase price paid by such Replacement Lender shall be in the amount of such Affected Lender's Loans designated in the Replacement Notice, Synthetic Deposits and/or its Percentage of outstanding Reimbursement Obligations, as applicable, together with all accrued and unpaid interest and fees in respect thereof, plus all other amounts (including the amounts demanded and unreimbursed under Sections 4.3, 4.5 and 4.6), owing to such Affected Lender hereunder and (iii) the Borrower shall pay to the Affected Lender and the Administrative Agent all reasonable out-of-pocket expenses incurred by the Affected Lender and the Administrative Agent in connection with such assignment and assumption (including the processing fees described in Section 12.11). Upon the effective date of an assignment described above, the Replacement Lender shall become a "Lender" for all purposes under the Loan Documents. Each Lender hereby grants to the Administrative Agent an irrevocable power of attorney (which power is coupled with an interest) to execute and deliver, on behalf of such Lender as assignor, any assignment agreement necessary to effectuate any assignment of such Lender's interests hereunder in the circumstances contemplated by this Section.

SECTION 4.12. Application to Participation Fees. The foregoing provisions of this Article IV shall apply, mutatis mutandis, to Participation Fees as if Participation Fees were interest on Loans and to Synthetic Deposits as if Synthetic Deposits were LIBO Rate Loans.

SECTION 4.13. Payment of Obligations. Subject to the provisions of Section 9, upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, the Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

SECTION 4.14. No Discharge; Survival of Claims. Each of the Obligors agrees that: (i) its Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and each Obligor, pursuant to section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge of such outstanding Obligations) and (ii) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Orders and described in Section 6.27 and the Liens granted to the Administrative Agent pursuant to the Orders and described in Section 6.27 shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

## ARTICLE V

## CONDITIONS TO CLOSING

SECTION 5.1. Initial Credit Extension. The obligations of the Lenders and the DIP Letter of Credit Issuer to make any Loans and issue any DIP Letter of Credit requested to be made by it on the Closing Date are subject to the satisfaction or waiver of all of the following conditions precedent.

SECTION 5.1.1. Resolutions, etc. The Administrative Agent shall have received from each Obligor, as applicable, (i) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (ii) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to:

(a) resolutions of each such Person's Board of Directors (or other managing body, in the case of other than a corporation) then in full force and effect authorizing the execution, delivery and performance of each Loan Document to be executed by such Person and the transactions contemplated hereby and thereby;

(b) the incumbency and signatures of those of its officers, managing member or general partner, as applicable, authorized to act with respect to each Loan Document to be executed by such Person; and

(c) the full force and validity of each Organic Document of such Person and copies thereof,

upon which certificates each Secured Party may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person.

SECTION 5.1.2. Closing Date Certificate. The Administrative Agent shall have received the Closing Date Certificate, dated the Closing Date and duly executed and delivered by an Authorized Officer of the Borrower, in which certificate the Borrower shall agree and acknowledge that the statements made therein shall be deemed to be true and correct representations and warranties in all material respects of the Borrower as of such date, and, at the time each such certificate is delivered, such statements shall in fact be true and correct in all material respects (it being understood that the Borrower shall not have to certify as to any matter set forth in this Agreement to the extent that the determination thereof is to be made (as expressly provided for in this Agreement) by the Administrative Agent or any Lender). All documents and agreements required to be appended to the Closing Date Certificate shall be in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 5.1.3. Material Adverse Change. Evidence that, except for the commencement of the Cases and as caused by such commencement and except as may otherwise be disclosed in writing to the Administrative Agent and the Lenders prior to the Closing Date, there has not occurred any event, change or condition since July 4, 2009 that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 5.1.4. Consummation of Transactions. (a) Each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by

each party thereto and shall be in full force and effect; (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent; and (c) after giving effect to the transactions contemplated hereby, the Debtors shall have no outstanding Indebtedness or preferred stock other than (i) the Loans under this Agreement, (ii) Indebtedness of the Debtors incurred prior to the Petition Date, and (iii) Indebtedness permitted under Section 8.2.

SECTION 5.1.5. Delivery of Notes. The Administrative Agent shall have received, for the account of each Lender that has requested a Note in writing three Business Days prior to the Closing Date, such Lender's Notes duly executed and delivered by an Authorized Officer of the Borrower.

SECTION 5.1.6. Arranger's Fees, Closing Fees, Expenses, etc. Simultaneously with the funding of the Loans on the Closing Date, the Borrower shall have paid: (i) to the Administrative Agent any and all fees and expenses of the Agents or any Lender that are then due and owing or accrued and not yet paid under or in connection with the Loan Documents or as required under the Engagement Letter, the Fee Letter and the Backstop Fee Letter, and (ii) to the appropriate Persons (including legal and financial advisors) any and all outstanding fees and expenses incurred by the Agents through to the Closing Date in connection with the negotiation, drafting and execution of the Loan Documents.

SECTION 5.1.7. Financial Information. The Administrative Agent shall have received:

(a) on or prior to the Closing Date, in form and substance satisfactory to the Administrative Agent and the Administrative Agent's counsel, and in sufficient copies for each of the Administrative Agent and each Lender, an operating budget, which shall be attached hereto as Exhibit N for the Obligors and their Subsidiaries setting forth the projected financial operations of the Obligors and their Subsidiaries on a line by line basis for a twenty (20) week period commencing on November 16, 2009 (the "DIP Budget"), which budget shall be in form and substance satisfactory to the Administrative Agent and the Required Lenders (upon such approval, the "DIP Approved Budget") and shall in any event include such line items as: (i) "net operating cash flow," (ii) "cash advance from/to Canada", (iii) "cash advance from/to UK" and, (iv) "professional fees." The DIP Approved Budget shall be updated and replaced from time with approval from the Required Lenders as provided herein;

(b) evidence satisfactory to the Administrative Agent and Collateral Agent of the establishment of a secure cash management system (including cash dominion) with respect to all cash flows; and

(c) unaudited consolidated balance sheets and related statements of income, and cash flows of the Parent and its Subsidiaries for (a) the Fiscal Quarter ending July 4, 2009, and (b) management reports only for each fiscal month after the most recent Fiscal Quarter for which financial statements were received by the

Administrative Agent as described above and ending forty (40) days before the Closing Date, together with all supporting documentation for any of the foregoing reasonably requested by the Administrative Agent, which financial statements shall not be materially inconsistent with the financial statements previously provided to the Administrative Agent.

SECTION 5.1.8. Opinions of Counsel. The Administrative Agent shall have received opinions, dated the Closing Date and addressed to the Administrative Agent and all Lenders, from:

(a) Pachulski Stang Ziehl & Jones LLP, Delaware counsel to the Obligors with respect to the entry of the Interim Order, in form and substance reasonably satisfactory to the Administrative Agent;

(b) Dykema Gossett PLLC, Michigan counsel to Borrower and the Parent, in form and substance reasonably satisfactory to the Administrative Agent; and

(c) Canadian, Dutch and UK counsel to the Obligors or the Secured Parties, in form and substance, and from counsel, in each case reasonably satisfactory to the Administrative Agent; provided, however, that if any of the Canadian Collateral Documents, Dutch Collateral Documents or UK Collateral Documents are deferred by the Administrative Agent to a post-closing period, the opinion with respect to such Loan Documents shall also be deferred until such time.

SECTION 5.1.9. Subsidiary Guaranty. The Administrative Agent shall have received the Subsidiary Guaranty, dated as of the Closing Date, duly executed and delivered by an Authorized Officer of each Subsidiary Guarantor.

SECTION 5.1.10. Collateral Documents. The Administrative Agent shall have received (unless the Administrative Agent in its sole discretion shall have otherwise agreed to in writing, which writing shall be deemed a Loan Document for purposes hereof, to waive, modify or defer such requirements to a post-closing period):

(a) the Pledge and Security Agreement, dated as of the Closing Date, duly executed and delivered by an Authorized Officer of the Parent, the Borrower and each Subsidiary Guarantor party thereto (including, for the avoidance of doubt, the U.S. Guarantors and CHB Holdings B.V.), together with:

(i) the certificates evidencing all of the issued and outstanding shares of Capital Securities pledged pursuant to the Pledge and Security Agreement, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, or, if any such shares of Capital Securities pledged pursuant to the Pledge and Security Agreement are uncertificated securities, the Collateral Agent shall have obtained "control" (as defined in the UCC) over such shares of Capital Securities and such other instruments and documents as shall be necessary in the reasonable opinion of the Administrative

Agent under applicable law to perfect (subject to certain Permitted Liens) the first priority security interest of the Collateral Agent in such shares of Capital Securities;

(ii) executed copies of UCC financing statements (Form UCC-1) naming each such Obligor executing the Pledge and Security Agreement as a debtor and the Collateral Agent as the secured party, or other similar instruments or documents to be filed under the UCC of all jurisdictions as may be necessary in the reasonable opinion of the Administrative Agent and its counsel, to perfect the security interests of the Collateral Agent pursuant to the Pledge and Security Agreement; and

(iii) certified copies of UCC Requests for Information or Copies (Form UCC-11), or a similar search report certified by a party reasonably acceptable to the Administrative Agent, dated a date reasonably near to the Closing Date, listing effective financing statements which name such Obligor executing the Pledge and Security Agreement (under its present name and certain of its previous names) as the debtor and which are filed in certain of the jurisdictions in which filings are to be made pursuant to clause (ii) above, together with copies of such financing statements;

(b) [Reserved];

(c) each of the Dutch Collateral Documents, dated as of the Closing Date, duly executed by an Authorized Officer of the Obligors party thereto and any, share certificates, instruments, financing statements or other documents as may be necessary, in the reasonable opinion of the Administrative Agent and its counsel, to perfect the security interests of the Administrative Agent and/or Collateral Agent pursuant to the Dutch Collateral Documents;

(d) each of the UK Collateral Documents, dated as of the Closing Date, duly executed and delivered by an Authorized Officer of the Obligors party thereto and any, share certificates, instruments, financing statements or other documents as may be necessary, in the reasonable opinion of the Administrative Agent and its counsel, to perfect the security interests of the Administrative Agent and/or Collateral Agent pursuant to the UK Collateral Documents; provided, however that, with respect to any UK Collateral Documents encumbering the assets of Caledonian Building Systems Limited, the Borrower shall only be required to exercise reasonable commercial efforts to deliver such UK Collateral Documents within 15 Business Days after the Closing Date, as such period may be extended in the sole discretion of the Administrative Agent;

(e) the Canadian Collateral Documents, dated as of the Closing Date, duly executed and delivered by an Authorized Officer of the Obligors party thereto and any, share certificates, instruments, financing statements or other documents as may be necessary, in the reasonable opinion of the Administrative Agent and its counsel, to perfect the security interests of the Administrative Agent and/or Collateral Agent pursuant to the Canadian Collateral Documents;

(f) the Administrative Agent shall have received fully executed Control Agreements with respect to the Accounts, each of which is in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 5.1.11. Filing Agent, Collateral, etc. All UCC financing statements (Form UCC-1) or other similar financing statements and UCC termination statements (Form UCC-3) required pursuant to the Loan Documents (collectively, the "Filing Statements") shall have been delivered to Corporation Service Company or another similar filing service company acceptable to the Administrative Agent (the "Filing Agent"). The Obligors shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected first priority Lien on and in the Collateral of each Obligor in which a security interest can be granted and perfected under the UCC or other Law to the extent required by the Pledge and Security Agreement or other applicable Collateral Documents.

SECTION 5.1.12. [Reserved].

SECTION 5.1.13. Insurance. The Administrative Agent shall have received certificates of the liability, property insurance and any other insurance policies required by the Administrative Agent, from one or more insurance companies reasonably satisfactory to the Administrative Agent, evidencing coverage required to be maintained pursuant to each Loan Document, together with endorsements naming: (A) the Collateral Agent, on behalf of the Secured Parties, as an additional insured or loss payee, as applicable under all liability policies maintained by each Obligor; and (B) the Collateral Agent, on behalf of the Secured Parties, as an additional insured or loss payee, as applicable under all insurance policies maintained with respect to the properties of each Obligor.

SECTION 5.1.14. [Reserved].

SECTION 5.1.15. PATRIOT Act Disclosures. The Administrative Agent and each Lender shall have received all PATRIOT Act Disclosures requested by them prior to execution of this Agreement.

SECTION 5.1.16. Approvals. All governmental, shareholder and third party consents and approvals that are necessary or advisable in connection with this Agreement and the Transactions contemplated hereby shall have been duly obtained (without the imposition of any conditions that are not reasonably acceptable to the Administrative Agent), and no law or regulation shall be applicable in the judgment of the Administrative Agent that restrains, prevents or imposes materially adverse conditions upon the Loans or the transactions contemplated hereby. All such foregoing consents shall be satisfactory to the Administrative Agent in its sole and absolute discretion

SECTION 5.1.17. Interim Order. The Bankruptcy Court shall have entered the Interim Order, after notice given and a hearing conducted in accordance with Bankruptcy Rule 4001(c), certified by the clerk of the Bankruptcy Court as having been duly entered, within five (5) days after the Petition Date, in form and substance satisfactory to the

Administrative Agent, and entered with notice to such parties as may be satisfactory to the Administrative Agent, (a) authorizing and approving the transactions contemplated by the documents evidencing the DIP Loan Facility and expressly approving all Roll-Up Loans as contemplated herein; (b) approving the payment by the Debtors of all of the fees provided for herein, in any other Loan Document or in any separate fee letter, including the Engagement Letter, the Fee Letter and the Backstop Fee Letter, which may be filed under seal by the Bankruptcy Court; (c) finding that the Lenders are extending credit to the Debtors in good faith within the meaning of Bankruptcy Code section 364(e); (d) granting (w) super-priority status to the Obligations pursuant to section 364(c)(1) of the Bankruptcy Code, (x) Liens in all unencumbered assets of the Borrower and the Guarantors pursuant to section 364(c)(2) of the Bankruptcy Code, (y) junior liens on all encumbered assets of the Borrower and the Guarantors pursuant to section 364(c)(3) of the Bankruptcy Code, and (z) priming Liens on all assets of the Borrower and the Guarantors, that is subject to a perfected lien or security interest securing the Prepetition Credit Agreement, pursuant to section 364(d)(1) of the Bankruptcy Code (the preceding clauses (w), (x), (y) and (z), in each case, subject only to (i) the payment of the Carve-Out, (ii) the extent of any valid, perfected and unavoidable first priority right of consignment under applicable law, and (iii) with respect to clause (z) only, any Third Party Liens); (e) lifting or modifying the automatic stay under section 362 of the Bankruptcy Code to permit the Borrower and the Guarantors to perform their obligations and the Lenders to exercise their rights and remedies with respect to the DIP Loan Facility; (f) authorizing the use of cash collateral pursuant to section 363(c) of the Bankruptcy Code; and (g) providing adequate protection to the Prepetition Lenders pursuant to sections 361(a), 362(d), 363(c) and 364(d)(1) of the Bankruptcy Code and authorizing the granting of Adequate Protection Obligations, which Interim Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent. The Interim Order shall also include such other terms and conditions as are customary for transactions of this type, as determined by the Obligors and the Administrative Agent and in any event shall (a) approve the Borrower's and Guarantors' waiver of any and all claims and causes of action against the Prepetition Lenders, including, but not limited to, claims for preference, fraudulent conveyance or other claims arising under the Bankruptcy Code and claims regarding the validity, priority, perfection or avoidability of the secured claims of the Prepetition Lenders and the Prepetition Credit Agreement Agent, subject to the right of the Committee (and in the event that no Committee is appointed, any party in interest (other than the Borrower or the Guarantors)) to pursue such claims, (b) establish a deadline of the earlier of (i) seventy-five (75) days from the Petition Date and (ii) sixty (60) days from the appointment of a Committee (and in the event that no Committee is appointed, any party in interest (other than the Borrower and the Guarantors)) to bring any cause of action against the Prepetition Lenders based on the Prepetition Credit Agreement, or any acts or omissions of the Prepetition Lenders that occurred prior to the Petition Date (a "Challenge"), (c) effective upon entry of the Final Order, approve the waiver by the Borrower and the Guarantors of all surcharge claims under section 506(c) or section 552(b) of the Bankruptcy Code or otherwise and (d) effective upon entry of the Final

Order, provide for a Lien on the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code.

SECTION 5.1.18. Other Documents to Bankruptcy Court. All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with this Agreement and the approval thereof shall be in form and substance satisfactory to the Administrative Agent, and the Administrative Agent shall be satisfied with the form and amount of the Adequate Protection Obligations.

SECTION 5.1.19. First Day Orders. All material, operational First Day Orders and related orders (other than the Interim Order) sought to be entered by the Bankruptcy Court at the time of the commencement of the Cases, and all related orders and the motions in support thereof, shall be in form and substance satisfactory to the Administrative Agent.

SECTION 5.1.20. Waivers. Evidence of a waiver (which may be set forth in the Interim Order) by the Obligors and their bankruptcy estates of any and all claims and causes of action arising from, related to or against the Lenders' and Prepetition Lenders' claims, liens, priority, actions or inactions, including without limitation, waiving any right to challenge the validity, perfection, priority, extent or enforceability of the DIP Loan Facility or the Prepetition Loans or the liens on or security interests in the assets of the Obligors securing the DIP Loan Facility or the Prepetition Loans, including without limitation seeking to equitably subordinate or avoid the liens securing the Prepetition Credit Agreement Obligations (except to the extent set forth in the Final Order). The foregoing waivers shall be in a form satisfactory to the Administrative Agent under the Prepetition Credit Agreement in its sole discretion. The foregoing waivers are subject only to the right of any Committee (and in the event that no Committee is appointed, any party in interest (other than the Obligors)), to bring a Challenge in accordance with the terms of the Final Order.

SECTION 5.1.21. Canadian Guarantors. (a) Evidence to the satisfaction of the Administrative Agent of any release and removal of record of all material liens (other than Permitted Liens) on the assets of the Canadian Guarantors, and (b) the execution and delivery of a credit support agreement (the "Canadian Support Agreement") between the Borrower and the Guarantors, in form and substance satisfactory to the Administrative Agent, providing for, among other things, the ability of the Canadian Guarantors to offset any payments actually made to the Secured Parties under the Canadian Guaranty following the exercise of remedies thereunder against inter-company advances owing to the Borrower or any Guarantor other than the Canadian Guarantors, and acknowledging the direct benefits of the DIP Loan Facility to the ongoing business and viability of the Canadian Subsidiaries, including without limitation by enabling the Canadian Guarantors to obtain financing.

SECTION 5.1.22. DIP Loan Facility Documentation. The Administrative Agent shall have received on or prior to the Closing Date each of the following, each dated the Closing Date unless otherwise agreed to by the Administrative Agent, in form and

substance satisfactory to the Administrative Agent and its counsel, and in sufficient copies for the Administrative Agent and each Lender:

(a) all Loan Documents (including all Guarantees and related Collateral Documents, and the filing of all perfection filings required by the Administrative Agent, unless such documents or evidence of perfection filings were provided to the Administrative Agent under Section 5.1.10);

(b) evidence of due authorization of the commencement of the Cases;

(c) a copy of the Corporate Chart dated as of the Closing Date and a certificate of an Authorized Officer of the Borrower certifying that such Corporate Chart is true, correct, complete and current as of the Closing Date;

(d) a funds flow memorandum, dated as of the Closing Date and executed by the Borrower (the "Funds Flow Memorandum") specifying: (i) the amounts to be paid on the Closing Date or the Final Order Entry Date (as the case may be) from the proceeds of the Borrowing and any amounts to be withdrawn on a monthly basis from the Reserve Account or Operating Account and deposited into the Carve-Out Account to pay Professional Expenses and (ii) the wiring or other payment instructions in respect of such payments; and

(e) such other certificates, documents, agreements and information in respect of any Obligor as any Lender through the Administrative Agent may request.

SECTION 5.1.23. Consent Fee. On the Closing Date, the Eighth Amendment Fee (as defined, and on the terms set forth, in the Eighth Amendment, Consent and Direction Agreement dated as of November 8, 2009 to the Prepetition Credit Agreement, hereinafter, the "Eighth Amendment to the Prepetition Credit Agreement") shall have accrued, and such amount added to the principal amount of the relevant Prepetition Lender's loans under the Prepetition Credit Agreement.

SECTION 5.1.24. Amendment to Prepetition Credit Agreement. As of the Closing Date, the Eighth Amendment to the Prepetition Credit Agreement shall be effective.

SECTION 5.2. All Credit Extensions. The obligation of each Lender and each DIP Letter of Credit Issuer to make any Credit Extension (including without limitation, any Credit Extension on the Final Order Entry Date), shall be subject to the satisfaction or waiver of each of the conditions precedent set forth below.

SECTION 5.2.1. Compliance with Warranties, No Default, etc. Both immediately before and immediately after giving effect to any Credit Extension, the following statements shall be true and correct:

(a) the representations and warranties set forth in each Loan Document shall, in each case, be true and correct (i) in the case of representations and

warranties not qualified by references to "materiality" or a Material Adverse Effect, in all material respects, and (ii) otherwise, in all respects, in each case with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(b) no Default shall have then occurred and be continuing.

SECTION 5.2.2. Credit Extension Request, etc. The Administrative Agent shall have received a Borrowing Request if Loans are being requested, or an Issuance Request if a Letter of Credit is being requested or extended. Each of the delivery of a Borrowing Request or Issuance Request and the acceptance by the Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by the Borrower that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the statements made in Section 5.2.1 are true and correct in all material respects.

SECTION 5.2.3. No Legal Impediments. The making of the Loans on such date (a) does not violate any Law applicable to any Obligor on the date of or immediately following the making of such Loan, and (b) is not enjoined temporarily, preliminarily or permanently.

SECTION 5.2.4. Compliance with DIP Approved Budget. The making of such Loan complies with the DIP Approved Budget.

SECTION 5.2.5. Additional Matters. The Administrative Agent shall have received such additional documents, information and materials as any Lender or the Administrative Agent may reasonably request.

Each submission by the Borrower to the Administrative Agent of a Borrowing Request and the acceptance by the Borrower of the proceeds of each Loan requested therein shall be deemed to constitute a making of the representations and warranties by the Borrower as to the matters specified in this Section 5.2 on the date of the making of such Loan.

SECTION 5.3. NM Lender Delayed Draw Commitment Amount Availability. The obligation of each NM Lender to make the NM Lender Delayed Draw Commitment Amount available, shall be subject to the satisfaction or waiver of the condition precedent set forth below (in addition to the conditions precedent set forth in Section 5.2):

SECTION 5.3.1. Entry of Final Order. After the Closing Date, but no later than thirty (30) days from the Petition Date, the Bankruptcy Court shall have entered the Final Order, in form and substance satisfactory to the Administrative Agent, certified by the Clerk of the Bankruptcy Court as having been duly entered, and the Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Administrative Agent.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

In order to induce the Credit Parties to enter into this Agreement and to make Credit Extensions hereunder, each of the Parent and the Borrower represents and warrants to the Administrative Agent and the Lenders that, on and as of the date hereof, and on and as of the Closing Date and the Final Order Entry Date (as the case may be) after giving effect to the making of the Loans and other financial accommodations on the Closing Date and the Final Order Entry Date (as the case may be), and on any Milestone Date:

SECTION 6.1. Organization, etc. Each Obligor (i) is validly incorporated or organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, (ii) is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, and (iii) has full power and authority and holds all requisite governmental licenses, permits and other approvals to enter into and perform its Obligations under each Loan Document to which it is a party and to own and hold under lease its property and to conduct its business substantially as currently conducted by it except, in the case of clauses (ii) and (iii) above, where the failure to so comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.2. Due Authorization, Non-Contravention, etc. The execution, delivery and performance by each Obligor of each Loan Document, and the execution, delivery and performance by the Borrower or (if applicable) any other Obligor of the agreements executed and delivered by it in connection with this Agreement, are in each case within each such Person's powers, have been duly authorized by all necessary action, and do not:

(a) contravene or require any consent under any (i) Organic Documents of any Obligor, (ii) contractual restriction binding on or affecting any Obligor (other than any such contractual restriction that shall have been waived on or prior to the Closing Date), (iii) court decree or order (including without limitation, the Orders and all orders of the Bankruptcy Court) binding on or affecting any Obligor, or (iv) Law or governmental regulation binding on or affecting any Obligor; or

(b) result in, or require the creation or imposition of, any Lien on any property of any Obligor (except as permitted or required by this Agreement or granted as adequate protection pursuant to this Agreement and the Orders).

SECTION 6.3. Government Approval, Regulation, etc. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than the Bankruptcy Court) is required for the consummation of the Transactions contemplated by this Agreement or the due execution, delivery or performance by any Obligor of any Loan Document to which it is a party. None of the Parent, the Borrower or any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

SECTION 6.4. Validity, Enforceability, etc. Subject to the entry by the Bankruptcy Court of the Interim Order and the Final Order, this Agreement is and each Loan Document to which any Obligor is a party will be when delivered hereunder, the legal, valid and binding obligation of such Obligor, as the case may be, enforceable against such Obligor in accordance with its respective terms.

SECTION 6.5. Financial Information. (a) The financial information of the Parent and its Subsidiaries furnished to the Administrative Agent and each Lender pursuant to Section 5.1.7), has been prepared in accordance with GAAP consistently applied, and fairly presents in all material respects the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

(a) All balance sheets, all statements of operations, shareholders' equity and cash flow, and all other financial information (other than projections) of each of the Parent and its respective Subsidiaries furnished pursuant to Section 7.1 have been and will for periods following the Closing Date be prepared in accordance with GAAP consistently applied, and do or will present fairly in all material respects the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

(b) There are no material liabilities of any Obligor of any kind whatsoever, whether accrued, contingent, absolute, determined, determinable or otherwise, other than (i) liabilities provided for or disclosed in the financial statements or the notes thereto referred to in paragraph (a) above, (ii) liabilities that have been disclosed in the Disclosure Schedule or that could not reasonably be expected to have a Material Adverse Effect, and (iii) liabilities associated with any litigation, action, proceeding, application, petition to deny, complaint, investigation or labor controversy not required to be set forth on Items 6.7(a) and (b) and Items 6.17(a) and (b) of the Disclosure Schedule in order for the representation and warranty set forth in Section 6.7 and Section 6.17 to be true and correct.

(c) The initial DIP Approved Budget is attached hereto as Exhibit N. The current DIP Approved Budget has been prepared by the Borrower in light of the past operations, but including future payments of known contingent liabilities, and reflects projections for the period beginning on the Petition Date on a week-by-week basis and ending on the Maturity Date. The current DIP Approved Budget reasonably presents, in all material respects, the projected financial operations of Parent and its Subsidiaries for the period set forth in such DIP Approved Budget and such projections are, in the view of management of the Borrower, reasonably achievable based upon the estimates and assumptions stated therein, all of which the Borrower believed at the time of delivery to be reasonable in light of current conditions and current facts known to the Borrower as of such delivery date.

SECTION 6.6. No Material Adverse Change. Other than the commencement of the Cases and as reasonably expected to be caused by such commencement, there has been no material adverse change in the business, assets, liabilities, operations, condition (financial or otherwise), operating results, or prospects of the Parent and its Subsidiaries, taken as a whole, since July 4, 2009.

SECTION 6.7. Litigation, Labor Controversies, etc. Other than the Cases, there is no pending or, to the knowledge of the Parent or any of its Subsidiaries, threatened litigation, action, proceeding or labor controversy:

(a) except as disclosed in Item 6.7(a) of the Disclosure Schedule, affecting the Parent or any of its Subsidiaries or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect, and no adverse development has occurred in any labor controversy, litigation, arbitration or governmental investigation or proceeding disclosed in such Item 6.7(b) of the Disclosure Schedule; or

(b) that purports to affect the legality, validity or enforceability of any Loan Document or the Transactions contemplated hereby.

SECTION 6.8. Subsidiaries. Neither the Parent nor the Borrower have any Subsidiaries, except those Subsidiaries existing on the Closing Date which are identified in Items 6.8(a) and 6.8(b) of the Disclosure Schedule. Item 6.8(c) of the Disclosure Schedule (a) lists, with respect to each Subsidiary of the Parent, (i) the correct name of each Subsidiary, the state or jurisdiction of such Subsidiary's incorporation or organization and (ii) the percentage of shares or interests of the Capital Securities of such Subsidiary owned by the Parent or another Subsidiary, (b) identifies each Subsidiary of the Parent which is a Foreign Subsidiary and (c) identifies each Immaterial Subsidiary. The Capital Securities of the Parent and each of its Subsidiaries have been duly authorized and validly issued and are fully paid and non-assessable. Except as set forth on Item 6.8(d) of the Disclosure Schedule, as of the Closing Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Parent or any of its Subsidiaries is a party requiring, and there is no membership interest or other Capital Securities of the Parent or any of its Subsidiaries outstanding upon which conversion or exchange would require, the issuance by the Parent or any of its Subsidiaries of any additional membership interests or other Capital Securities of the Parent or any of its Subsidiaries or other Capital Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Securities of the Parent or any of its Subsidiaries. Each Obligor has good title to all of the shares it purports to own of the Capital Securities of each of its respective Subsidiaries, free and clear in each case of any Lien (except as permitted by this Agreement). The Corporate Chart of the Parent and its Subsidiaries as of the Closing Date is as set forth in Item 6.8(c) of the Disclosure Schedule.

SECTION 6.9. Ownership of Properties. The Parent and each of its Subsidiaries owns (i) in the case of owned real property, good and marketable fee title to (or easements or other limited property interests in), and (ii) in the case of owned personal property, good and valid title to, or, in the case of leased or licensed real or personal property, valid and enforceable leasehold interests or license rights (as the case may be) in, all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever, free and clear in each case of all Liens or claims, except for Permitted Liens, and except where the failure to do so with respect to any such property could not reasonably be expected to interfere in any material respect with the value or use of such property. Each Obligor has paid or discharged, and has caused each Subsidiary to pay and discharge, all lawful claims arising after the Closing Date which, if unpaid, could reasonably be expected to interfere in any material respect with the value or use of such property or become a Lien against any properties of such Obligor that is not permitted by this

Agreement, except to the extent such claim is being (in the sole discretion of the Administrative Agent) properly contested, or except otherwise expressly provided in the DIP Orders. The Liens granted to the Collateral Agent pursuant to the Collateral Documents and/or the Interim and/or Final Order are first priority Liens, subject only to those Liens that are expressly permitted by the terms of this Agreement. The Parent and each of its Subsidiaries has complied with all obligations under all leases to which it is a party, except where the failure to comply would not have a Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Parent and each of its Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. None of the Parent, the Borrower or any Subsidiary has received any notice of any pending or contemplated condemnation proceeding affecting any Mortgaged Property or any sale or disposition thereof in lieu of condemnation that remains unresolved. None of the Parent, the Borrower or any Subsidiary is obligated under any right of first refusal, option or other contractual right to directly or indirectly sell, assign or otherwise dispose of any Mortgaged Property or any interest therein, except as permitted under Section 8.10 of this Agreement.

SECTION 6.10. Taxes; Other Laws. Each of the Parent and its Subsidiaries has filed all Federal, State and other material Tax returns and reports required by law to have been filed by it and has paid all Taxes and governmental charges thereby shown to be due and owing except any such Taxes or charges that are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books. The Parent and its Subsidiaries have complied with all applicable laws, rules, regulations and orders (other than any relating to the payment of Taxes covered by the previous sentence), except to the extent that failure to comply with all such laws, rules and regulations and orders would not result in a Material Adverse Effect.

SECTION 6.11. ERISA Matters. During the 12-consecutive-month period prior to the Petition Date and prior to the date of any Credit Extension hereunder, (i) there has been no ERISA Event and no ERISA Event is reasonably expected to occur with respect to any Plan, (ii) each Plan is in material compliance with ERISA and the Internal Revenue Code; (iii) no Plan had an accumulated or waived funding deficiency or permitted decrease that would create a deficiency in its funding standard account or has applied for an extension of any amortization period within the meaning of Section 412 of the Internal Revenue Code at any time during the previous 60 months, or (iv) no Lien imposed under the Internal Revenue Code or ERISA exists or is likely to arise on account of any Plan. No condition exists or event or transaction has occurred with respect to any Pension Plan that might result in the incurrence by the Parent, the Borrower or any member of the Controlled Group of any material liability, fine or penalty. Except as disclosed in Item 6.11 of the Disclosure Schedule, none of the Parent, the Borrower or any member of the Controlled Group has any contingent liability with respect to any post-retirement benefit under a Welfare Plan, other than liability for continuation coverage described in Part 6 of Title I of ERISA. None of the Parent or any member of the Controlled Group has (x) incurred any withdrawal liability under ERISA with respect to any Multiemployer Plan, or is aware of any facts indicating that it or any member of the Controlled Group may in the future incur any such withdrawal liability, (y) engaged in a nonexempt prohibited transaction described

in Sections 406 of ERISA or 4975 of the Internal Revenue Code, (z) failed to pay any required installment or other payment required under Section 412 of the Internal Revenue Code on or before the due date for such required installment or payment, (aa) engaged in a transaction within the meaning of Section 4069 of ERISA or (bb) incurred any liability to the PBGC that remains outstanding other than the payment of premiums, and there are no premium payments that have become due which are unpaid.

SECTION 6.12. Environmental Warranties. Except as set forth in Item 6.12 of the Disclosure Schedule:

(a) all facilities and property (including underlying groundwater) owned or leased by the Parent, the Borrower or any of their respective Subsidiaries have been, and continue to be, owned or leased by the Parent, the Borrower and their respective Subsidiaries in material compliance with all Environmental Laws;

(b) there have been no past, and there are no pending or threatened (in writing), (i) claims, complaints, notices or requests for information received by the Parent, the Borrower or any of their respective Subsidiaries with respect to any alleged violation of any Environmental Law, or (ii) complaints, notices or inquiries to the Parent, the Borrower or any of their respective Subsidiaries regarding potential liability under any Environmental Law, except, in the case of clauses (i) and (ii) of this Section 6.12(b), where the existence of any of the foregoing, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect;

(c) there have been no Releases of Hazardous Materials at, on or under any property now or previously owned or leased by the Parent, the Borrower or any of their respective Subsidiaries that, individually or in the aggregate, have, or could reasonably be expected to have, a Material Adverse Effect;

(d) the Parent, the Borrower and each of their respective Subsidiaries have been issued and are in compliance in all material respects with all permits, certificates, approvals, licenses and other authorizations relating to environmental matters;

(e) no property now or previously owned or leased by the Parent, the Borrower or any of their respective Subsidiaries is listed or proposed for listing (with respect to owned property only) on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar state list of sites requiring investigation or clean-up;

(f) there are no underground storage tanks, active or abandoned, including petroleum storage tanks, on or under any property now or previously owned or leased by the Parent, the Borrower or any of their respective Subsidiaries that individually or in the aggregate, have, or could reasonably be expected to have, a Material Adverse Effect;

(g) none of the Parent, the Borrower or any of their respective Subsidiaries has directly transported or directly arranged for the transportation of any Hazardous Material to any location which, to the Borrower's knowledge, is listed or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar state list or which is the subject of federal, state or local enforcement actions or

other investigations which may lead to material claims against the Parent, the Borrower or such Subsidiary for any remedial work, damage to natural resources or personal injury, including claims under CERCLA;

(h) there are no polychlorinated biphenyls, asbestos, radioactive materials, septic tanks or waste disposal pits present at any property now or previously owned or leased by the Parent, the Borrower or any of their respective Subsidiaries that, individually or in the aggregate, have or could reasonably be expected to have, a Material Adverse Effect;

(i) no conditions exist at, on or (to the Borrower's knowledge), under any property now or previously owned or leased by the Parent, the Borrower or any of their respective Subsidiaries which, with the passage of time or the giving of notice or both, would give rise to liability under any Environmental Law that has, or could reasonably be expected to have, a Material Adverse Effect; and

(j) to the Borrower's knowledge, no conditions (including wetlands, endangered species, environmental easements, etc.) exist at, on or under any property for which the Parent, the Borrower or any of their respective Subsidiaries owns or has the option to purchase which could give rise to development restrictions or delays or other liability under any Environmental Law that could reasonably be expected to have a Material Adverse Effect. Since January 1, 2007, neither the Parent, the Borrower nor any of their Subsidiaries has retained or assumed any liabilities (contingent or otherwise) that have, or could reasonably be expected to have, a Material Adverse Effect in respect of liability under Environmental Law, either: (x) under the terms of any contract or agreement currently in effect or (y) by operation of law as a result of the sale of assets or stock.

SECTION 6.13. Accuracy of Information; Projections. (a) None of the information (other than any projections and forward-looking industry data) heretofore or contemporaneously furnished, when furnished, to any Secured Party by or on behalf of any Obligor in connection with any Loan Document or any transaction contemplated hereby, contains any untrue statement of a material fact, or omitted to state any material fact necessary to make such information not misleading in light of the circumstances under which furnished on the date such information was furnished, and no other information (other than any projections and forward-looking industry data) hereafter furnished in connection with any Loan Document by or on behalf of any Obligor to any Secured Party, will contain any untrue statement of a material fact or will omit to state any material fact necessary to make such information not misleading in light of the circumstances under which furnished on the date as of which such information is dated or certified.

(b) Any projections or forward-looking industry data furnished in connection with any Loan Document have been prepared in good faith based upon (other than in the case of forward-looking industry data) accounting principles consistent with the historical audited financial statements of the Parent and upon assumptions that are reasonable at the time made.

SECTION 6.14. Regulations T, U and X. No Obligor is engaged in the business of extending credit for the purpose of buying or carrying margin stock (within the meaning of

Regulation U of the Federal Reserve Board), and no proceeds of any Credit Extensions will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with, Regulation T, U or X of the Federal Reserve Board.

SECTION 6.15. [Reserved].

SECTION 6.16. Accounts and Cash Management Accounts. Set forth on Item 6.16 of the Disclosure Schedule is a complete and accurate list, as of the Closing Date, of all Accounts of each Obligor.

SECTION 6.17. Labor Matters. (a) Except as set forth in Item 6.17(a) of the Disclosure Schedule, none of the Parent, the Borrower or any of their respective Subsidiaries is a party to any material labor dispute and there are no strikes or walkouts relating to any labor contracts to which such Person is a party or is otherwise subject; (b) there is no unfair labor practice complaint pending against the Parent, the Borrower or any of their respective Subsidiaries or, to the knowledge of the Parent or the Borrower, threatened against any of them, before the National Labor Relations Board that could reasonably be expected to have a Material Adverse Effect; (c) there is no grievance or significant arbitration proceeding arising out of or under any collective bargaining agreement pending against the Parent, the Borrower or any of their respective Subsidiaries or, to the knowledge of the Parent or the Borrower, threatened in writing against any of them that could reasonably be expected to have a Material Adverse Effect; (d) no slowdown or stoppage is pending against the Parent, the Borrower or any of their respective Subsidiaries, or to the knowledge of the Parent or the Borrower, threatened against the Parent, the Borrower or any of their respective Subsidiaries, that could reasonably be expected to have a Material Adverse Effect; (e) none of the Parent, the Borrower or any of their respective Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect; and (f) except as set forth in Item 6.17(b), of the Disclosure Schedule (none of which items disclosed therein, individually or in the aggregate, have, or may reasonably be expected to have, a Material Adverse Effect), there are no pending or threatened in writing claims, complaints, notices, inquiries or requests for information received by the Parent, the Borrower or any of their respective Subsidiaries with respect to any alleged violation of, or potential liability under, any law relating to employee health and safety (including the Occupational Safety and Health Act, 29 U.S.C.A. § 651 et seq.) which could reasonably be expected to result in a. Material Adverse Effect. As of the Closing Date, other than as set forth in Item 6.17(c) of the Disclosure Schedule, no Obligor is a party to or bound by any collective bargaining agreement. There are no material grievances, disputes or controversies with any union or any other labor or worker representative organization of the Obligors and their Subsidiaries.

SECTION 6.18. UK Pension Matters. Except for the Caledonian Mining Company Limited No. 1 Retirement Benefits Scheme and the Caledonian Mining Company Limited No. 2 Retirement Benefits Scheme:

(a) neither CBS Monaco Limited nor any of its Subsidiaries is or, to the knowledge of either the Parent or the Borrower, has at any time been an employer (for the purposes of Sections 38 to 51 of the UK Pensions Act) of an occupational pension scheme that is

not a money purchase scheme (both terms as defined in the Pensions Schemes Act 1993, as amended from time to time and in effect in the United Kingdom); and

(b) neither CBS Monaco Limited nor any of its Subsidiaries is or has at any time since April 27, 2004, been "connected" with or an "associate" of (as those terms are used in Sections 39 and 43 of the UK Pensions Act) such an employer.

SECTION 6.19. UK Financial Assistance. No Obligor or the UK Subsidiary is required to follow the procedures set out in Sections 151 to 158 of the UK Companies Act 1985 in connection with the execution and delivery of any of the UK Transaction Documents to which it is a party and to perform its obligations thereunder.

SECTION 6.20. Intellectual Property.

(a) Item 6.20 of the Disclosure Schedule lists all material Intellectual Property of such Obligor on the Closing Date, separately identifying that owned by such Obligor and that licensed to such Obligor. If before the Obligations shall have been irrevocably paid in full in cash, any Obligor shall obtain rights to any Intellectual Property not listed on Item 6.20(a) of the Disclosure Schedule such Obligor, within thirty (30) days after obtaining such rights, shall update Item 6.20(a) and provide Administrative Agent written notice thereof. The Intellectual Property set forth on the Disclosure Schedule for such Obligor constitutes all of the material Intellectual Property rights used, or necessary to conduct its business as currently conducted or as proposed to be conducted, and such Obligor owns, possesses or has a valid license to use such Intellectual Property.

(b) All Intellectual Property owned by such Obligor is in material compliance with all formal legal requirements (including the payment of filing, examination, annuity and maintenance fees and proofs of use), is valid, subsisting, unexpired and enforceable, has not been adjudged invalid and has not been abandoned and the use thereof in the business of such Obligor or the operation of the business of each Obligor as currently conducted or currently contemplated to be conducted and does not, to the Borrower's best knowledge, infringe upon, misappropriate, dilute, conflict with or otherwise violate any Intellectual Property or other rights of any other Person or constitute unfair competition or trade practices under the laws of any jurisdiction.

(c) Except as set forth in Item 6.20(c) of the Disclosure Schedule, on the Closing Date, none of the Intellectual Property owned by such Obligor is the subject of any licensing or franchise agreement pursuant to which such Obligor is the licensor or franchisor.

(d) Each Obligor has used, and for the duration of this Agreement will continue to use, proper statutory notice where appropriate in connection with the use of Intellectual Property.

(e) Each Obligor has used, and for the duration of this Agreement, will continue to use consistent standards of quality in its manufacture of products sold under the trademarks owned by or licensed to an Obligor.

(f) No Person has asserted or threatened to assert in writing any claims (A) contesting the right of any Obligor to use, exercise, sell, license, transfer or dispose of any

material Intellectual Property or any products, processes or materials covered thereby in any manner; or (B) challenging the ownership, validity or enforceability of any material Intellectual Property owned by an Obligor.

(g) No holding, decision or judgment has been rendered by any Governmental Authority against any Obligor or any Subsidiary of an Obligor that would limit, cancel or question the validity of, or such Obligor's rights in, any Intellectual Property.

(h) No claim, action or proceeding seeking to limit, cancel or question the validity of any Intellectual Property owned by such Obligor or such Obligor's ownership interest therein is on the Closing Date pending against any Obligor or any Subsidiary of a Obligor or, to the knowledge of such Obligor, threatened. There are no claims, judgments or settlements to be paid by such Obligor relating to the Intellectual Property.

(i) To the knowledge of the Obligors, none of the activities of any employees who are providing services to any Obligor in connection with the Intellectual Property is violating any agreement between any such employees and their former employers.

(j) The Obligors have not received any opinion of counsel regarding the validity, infringement or enforceability of any third party Intellectual Property or any owned Intellectual Property.

(k) The Obligors have complied with their obligations under 37 CFR § 1.56(a) to disclose to the United States Patent and Trademark Office, during the pendency of any United States patent application comprising the Intellectual Property. None of the Intellectual Property is involved in any interference, opposition or reexamination or other administrative or judicial proceeding, and no such proceeding is being threatened with respect to any of the Intellectual Property.

(l) To the extent that any material Intellectual Property has been developed or created independently or jointly by an independent contractor or other third party for an Obligor, or is incorporated into any of the Obligor's products, the Obligor has a written agreement with such independent contractor or third party and the Obligor thereby has obtained exclusive or joint ownership of all such independent contractor's or third party's Intellectual Property in such work, material or invention by operation of law or valid assignment, or has acquired rights sufficient to use such Intellectual Property in the business of the Obligors as currently conducted and as contemplated to be conducted by virtue of a license, and have obtained a waiver of moral rights from any independent contractor or third party in any Intellectual Property, where appropriate.

SECTION 6.21. Insurance. The Administrative Agent shall have received certificates of all policies of insurance of any kind or nature of each Obligor and any of its Subsidiaries, including policies of life, fire, theft, environmental, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance, each of which is in full force and effect, and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of the insured. Item 6.21 of the Disclosure Schedule lists all insurance policies of any nature

maintained, as of the Closing Date, by each Obligor, as well as a summary of the key business terms of each such policy such as deductibles, coverage limits and term of policy. No Obligor nor any of its Subsidiaries has been refused insurance for any material coverage for which it had applied or had any policy of insurance terminated (other than at its request).

SECTION 6.22. [Reserved].

SECTION 6.23. [Reserved].

SECTION 6.24. Use of Proceeds. The proceeds of the Loans are being used by the Borrower (and, to the extent provided to them by the Borrower, each other Obligor) solely as follows:

(a) with respect to the Initial NM Loans drawn on the Closing Date, to the extent authorized by the Bankruptcy Court pursuant to the First Day Orders and with respect to the Additional NM Loans drawn on the Final Order Entry Date, pursuant to the Final Order: (i) to fund a Reserve Account which in turn will be used to fund: (A) on a monthly basis, an Operating Account, pursuant to the DIP Approved Budget, (B) an Interest Reserve Account, and (C) a Carve-Out Account as provided under Section 2.11.4. Proceeds from the Operating Account will be used by Borrower to the extent set forth in the DIP Approved Budget (including permitted variances under such DIP Approved Budget) and in accordance with the terms of the Orders, for working capital, capital expenditures and other general corporate purposes of the Obligors (including, without limitation to fund intercompany transfers by the Borrower to fund the operating expenses of certain Subsidiaries (other than Immaterial Subsidiaries)) not in contravention of any Law or the Loan Documents and to pay certain costs and expenses of administration of the Case, including professional fees in accordance with the terms to be specified in the Orders. Proceeds in the Interest Reserve Account will be used by Borrower to fund payments of interest and Participation Fees under the DIP Loan Facility;

(b) with respect to the DIP Letter of Credit Facility and the Synthetic Deposit Account, to fund DIP Letters of Credit, upon an Issuance Request from the Borrower and to the extent required hereunder, to cash collateralize the DIP Letters of Credit issued and then outstanding under this Agreement; and

(c) No portion of the Loans, the Accounts, the Collateral or the Carve-Out are to be used to: (i) challenge the validity, perfection, priority, extent or enforceability of Prepetition Credit Agreement Obligations or the liens on or security interests in the assets of the Obligors securing the Loans or the Prepetition Credit Agreement Obligations, or (ii) investigate any other claims or causes of action against (A) the Lenders, the Administrative Agent, the Collateral Agent, any other Agent or the DIP Letter of Credit Issuer, or (B) the Prepetition Lenders or the Administrative Agent, any Prepetition Issuer, the Prepetition Syndication Agent, the Prepetition Collateral Trustee, the Prepetition Lead Arranger and Sole Book Runner; provided that the Committee may expend up to $25,000 in fees and expenses in investigating the foregoing

solely with respect to the Prepetition Credit Agreement Obligations (as opposed to filing a claim or challenge under subparagraphs (c)(i) or (ii) above).

SECTION 6.25. Waiver of any Priming Rights. Upon the Closing Date, and on behalf of itself and its estates, and for so long as any Obligations shall be outstanding, the Obligors hereby irrevocably waive any right, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations except as provided in Section 6.28.

SECTION 6.26. Milestones. As of each Milestone Date, the Borrower shall be in compliance with all Milestone Requirements then applicable to such Milestone Date. The Administrative Agent, with the consent of the Required Lenders, which consent may be withheld in their sole discretion, may waive in writing any or all Milestone Requirements applicable to any Milestone Date (unless the consent of the Administrative Agent is required to waive such milestone, in which case the Administrative Agent may waive in writing such Milestone Requirement applicable to such Milestone Date).

SECTION 6.27. Secured, Super-Priority Obligations.

(a) On and after the Closing Date, the provisions of the Loan Documents and the Orders are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests (having the priority provided for herein and in the Orders) in all right, title and interest in the Collateral, enforceable against each Obligor that owns an interest in such Collateral.

(b) All Obligations and all other amounts owing by the Borrower hereunder and under the other Loan Documents and by the Guarantors under the Guaranty in respect thereof (including, without limitation, all principal and accrued interest, costs, fees and expenses and any exposure of a Lender or any of its affiliates in respect of cash management or hedging transactions incurred on behalf of any Obligor ) will be secured:

(i) pursuant to section 364(c)(2) of the Bankruptcy Code and the Orders, by a valid, binding, continuing, enforceable and first priority fully perfected senior security interest in and Lien on, and mortgage against, all unencumbered property and assets of each of the Obligors and (if applicable) their estates of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and including, without limitation, all Capital Securities and all property of the estates of each of the Obligors (if applicable) within the meaning of section 541 of the Bankruptcy Code, all proceeds, rents and products of all of the foregoing and all distributions thereon that are unencumbered as of the Petition Date and all unencumbered Capital Securities of a Subsidiary of an Obligor, subject only to the Carve-Out and to any valid, perfected and unavoidable first priority right of consignment under applicable law;

(ii) pursuant to Section 364(c)(3) of the Bankruptcy Code and the Orders, by a valid, binding, continuing, enforceable and fully perfected junior security interest in, and mortgage against, all property and assets of each Obligor and (if applicable) their estates of every kind or type whatsoever (other than property described in clauses (b)(i) and (iii), as to which the liens and the security interests in favor of the Administrative Agent and the Lenders will be described in such clauses) that is subject only to (A) any valid, perfected and unavoidable first priority right of consignment under applicable law and (B) valid, perfected and non-avoidable liens in existence on the Closing Date, which security interests and liens in favor of the Administrative Agent and the Lenders are junior to the Carve-Out; and

(iii) pursuant to section 364(d)(1) of the Bankruptcy Code and the Orders, by a valid, binding, continuing, enforceable and fully perfected first priority, senior priming security interest in, and senior priming Lien on, all property and assets of each of the Obligors and (if applicable) their estates of every kind or type whatsoever, whether tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and including, without limitation, all property of the estates of each of the Obligors (if applicable) within the meaning of section 541 of the Bankruptcy Code, and all proceeds thereof that are subject to valid and perfected Liens in existence on the Petition Date or to valid Liens in existence on the Petition Date that are perfected subsequent to such date as permitted by subsection 546(b) of the Bankruptcy Code; provided, however, that such Liens and security interests granted to the Administrative Agent and the Lenders shall be subject to: (A) the Carve-Out, (B) any valid, perfected and unavoidable first priority right of consignment under applicable law, and (C) any Third Party Liens.

(c) Pursuant to section 364(c)(1) of the Bankruptcy Code and the Orders, all Obligations and other amounts owing by the Borrower hereunder and under the other Loan Documents and by the Guarantors under the Guaranty in respect thereof (including, without limitation, any exposure of a Lender in respect of cash management or hedging transactions incurred on behalf of any Obligor) at all times will constitute allowed super-priority administrative expense claims in the Case having priority over any and all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out.

(d) The Orders and the transactions contemplated hereby and thereby, are in full force and effect and have not been vacated, reversed, modified, amended or stayed without the prior written consent of the Lenders.

(e) Notwithstanding anything to the contrary in this Section 6.28, all liens granted under the Orders to the Administrative Agent and the Lenders to secure the Obligations under the NM Loans and the DIP Letter of Credit Facility shall be senior in priority to all liens

granted under the Orders to the Administrative Agent and the Lenders to secure the Obligations under the Roll-Up Loans.

## ARTICLE VII

## AFFIRMATIVE COVENANTS

Each of the Parent and the Borrower covenants and agrees with each Lender, each DIP Letter of Credit Issuer and the Administrative Agent that until the Maturity Date has occurred, and all Obligations have been paid in full, the Parent and the Borrower will, and will cause their respective Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.1. Financial Information, Financing Reporting, Notices, etc. The Parent will furnish the Administrative Agent with copies of the following financial statements (which shall be prepared on a consolidating and consolidated basis), reports, notices and other information:

(a) Weekly Statement. As soon as available and in any event not later than the third Business Day of each week, (i) an updated 13-week rolling cash flow statement, in form and substance satisfactory to the Lenders, setting forth all receipts and disbursements on a weekly basis for the next succeeding 13-week period, including a line item specifying the projected amount of cash and outstanding Loans as of the end of each week covered thereby, and the related variance report (such cash flow statement to include a breakdown of both "Beginning Cash" and "Ending Cash" under the column "Week 1" by cash in each country where the Parent and the Subsidiaries have operations); (ii) a progress report setting forth an update on capital raising and restructuring efforts and discussions and the then current plans for debt retirement; and (iii) a complete copy of the Borrower's sales and backlog flash reports provided to management during the preceding week, such reports to contain the same information as supplied to management of the Parent and its Subsidiaries;

(b) Monthly Reports. Within ten (10) Business Days after the end of each fiscal month in each Fiscal Year, financial information regarding the Parent, the Borrower and its Subsidiaries consisting of: (i) the unaudited consolidated balance sheet as at the end of each calendar month of the Borrower and its Subsidiaries, together with the related unaudited consolidated statement of income, and unaudited consolidated statement of cash flows of each for such month and for the period from the Petition Date to the end of such month, all prepared in accordance with GAAP by business segment, (ii) a comparison of the actual cash flows since the Petition Date to the corresponding figures from the DIP Approved Budget on a weekly and aggregate running basis since the Petition Date for operating and capital budget expenditures, (iii) a narrative report describing the consolidated operations of the Borrower and its Subsidiaries, taken as a whole, in the form prepared for presentation to senior management for such month and for the period from the Petition Date to the end of such month, including disclosure of any Material Adverse Effect (the reports under clauses (i) and (ii) above shall be in reasonable detail and accompanied by a certificate from the chief executive officer and the chief financial officer (or other principal financial officer) of the Borrower certifying that the financial statements fairly present, in all material respects, the consolidated financial condition of the Borrower and its respective Subsidiaries as at the dates indicated and the results of their

operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments and the absence of footnotes), (iv) monthly operating reports required under the UST Guidelines (at the times otherwise filed in the Cases consistent with applicable rules), and (v) a monthly summary of payments to and receipts from related parties, (vi) an update to the DIP Approved Budget required under Section 7.17 which update shall be in form and substance acceptable to the Administrative Agent and Required Lenders.

(c) Quarterly Reports. As soon as available and in any event within forty-five 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, an unaudited consolidated balance sheet of the Parent and its Subsidiaries as of the end of such Fiscal Quarter and consolidated statements of income and cash flow of the Parent and its Subsidiaries for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, and including (in each case), in comparative form the figures for the corresponding Fiscal Quarter in, and year-to-date portion of, the immediately preceding Fiscal Year, certified as complete and correct in all material respects, by the chief financial officer or chief accounting officer of the Parent (subject to normal year-end adjustments).

(d) Annual Reports. As soon as available and in any event within ninety 90 days after the end of each Fiscal Year, a copy of the consolidated balance sheets of the Parent and its Subsidiaries, and the related consolidated statements of income and cash flow of the Parent and its respective Subsidiaries for such Fiscal Year, setting forth in comparative form the figures for the immediately preceding Fiscal Year, audited (without any Impermissible Qualification) by independent public accountants acceptable to the Administrative Agent.

(e) Accountants' Reports. Promptly upon receipt thereof (unless restricted by applicable professional standards), copies of all reports submitted to the Borrower and its respective Subsidiaries by a national independent certified public accountants in connection with each annual, interim or special audit of the financial statements of the Borrower and its Subsidiaries made by such accountants, including, without limitation, any comment letter submitted by such accountants to management in connection with their annual audit.

(f) Compliance Certificate. (i) Concurrently with the delivery of the financial information pursuant to clauses (c) and (d), a Compliance Certificate, executed by the chief financial officer or chief accounting officer of the Parent, showing compliance with the financial covenants set forth in Section 8.4 and stating that no Default (other than as a consequence to the Cases and with respect to claims subject to the jurisdiction of the Bankruptcy Court) has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that the Parent, the Borrower or an Obligor has taken or proposes to take with respect thereto), and (ii) stating that no Subsidiary has been formed or acquired, and no Immaterial Subsidiary has, other than for *de minimis* amounts, acquired any assets or liabilities or has had any revenue or incurred expenses (except for expenses associated with the windup, dissolution or liquidation under applicable law) since becoming an Immaterial Subsidiary (or, if a Subsidiary has been formed or acquired, or a Subsidiary has acquired any assets or liabilities or has had any revenue or incurred expenses, since the delivery of the last Compliance Certificate, a statement that such Subsidiary has complied in all material respects with Section 7.8).

(g) Notices of Default. As soon as possible and in any event within two (2) Business Days after the Parent, the Borrower or any other Obligor obtains knowledge of the occurrence of a Default, a statement of an Authorized Officer of the Parent setting forth details of such Default and the action which the Parent, the Borrower or such Obligor has taken or proposes to take with respect thereto.

(h) Notices of Litigation, Material Adverse Effect, Material Contracts. As soon as possible and in any event within two (2) Business Days after the Parent, the Borrower or any other Obligor obtains knowledge of, since the date of entry of the Interim Order: (i) the occurrence of any material adverse development with respect to any litigation, action, proceeding, labor controversy or labor agreement, (ii) the commencement of any material litigation, action, proceeding or labor controversy, (iii) any changes in senior management, (iv) material changes to material contracts with suppliers and other customers, including new material contracts and contract renewals, or (v) the occurrence of a Material Adverse Effect, the relevant Obligor will notify the Administrative Agent in writing and provide such documents or other information as the Administrative Agent or Lender shall request.

(i) ERISA Notices. Promptly upon becoming aware of (i) the institution of any steps by any Person to terminate any Pension Plan, (ii) the failure to make a required contribution to any Pension Plan if such failure is sufficient to give rise to a Lien under Section 302(f) of ERISA, (iii) the taking of any action with respect to a Pension Plan which could result in the requirement that any Obligor furnish a bond or other security to the PBGC or such Pension Plan, or (iv) the occurrence of any event with respect to any Pension Plan that could result in the incurrence by any Obligor of any material liability, fine or penalty, or notice thereof and copies of all documentation relating thereto.

(j) Management Letters. Promptly upon receipt thereof, copies of all "management letters" submitted to the Parent, the Borrower, or any other Obligor by the independent public accountants in connection with each audit made by such accountants.

(k) PATRIOT Act Notices. Promptly (i) if the Parent or the Borrower obtains knowledge that one or more of the Parent, the Borrower or any Person which owns, directly or indirectly, any Capital Securities of the Parent or the Borrower or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Terrorism Laws, the Parent or the Borrower, as applicable, will notify the Administrative Agent and (ii) upon the request of any Lender, the Parent and the Borrower will provide any information such Lender believes is reasonably necessary to be delivered to comply with the PATRIOT Act.

(l) Other Information, Meetings, Borrower's Availability, Notices Such other financial and other information as any Lender or DIP Letter of Credit Issuer through the Administrative Agent may from time to time reasonably request (including information and reports in such detail as the Administrative Agent may reasonably request with respect to the terms of and information provided pursuant to the Compliance Certificate). Representatives of the Borrower shall make themselves available to discuss financial issues and the Transactions contemplated by this Agreement with the Administrative Agent and the Lenders on a bi-weekly basis. In addition, at least once per calendar month, or more frequently at the request of the

Administrative Agent, management of the Borrower shall provide a dial-in number and host a telephone conference call with the Lenders for the purpose of providing the Lenders with a meaningful update on the Cases and the Transactions and to answer any questions Lenders may have with respect thereto or to the most recent financial statements provided to the Lenders.

(m) Press Releases. Promptly upon their becoming available, drafts of all press releases and other statements to be made by the Borrower to the public concerning developments in the business of the Borrower.

Each notice delivered pursuant to this Section 7.1 shall be accompanied by a written statement of an Authorized Officer of the Obligor: (a) which provides the Section of this Agreement that such notice is being delivered pursuant to, and (b) which sets forth details of the occurrence referred to therein and states what action the Obligor has taken and proposes to take with respect thereto.

SECTION 7.2. Maintenance of Existence; Compliance with Contracts, Laws, etc. Each of the Parent and the Borrower will, and will cause each of their respective Subsidiaries to:

(a) preserve and maintain its legal existence and qualification in each jurisdiction where the nature of its business or the location of its assets requires it to be so qualified (except in the case of any Immaterial Subsidiary);

(b) perform in all material respects their obligations under material agreements to which the Parent, the Borrower or any of their Subsidiaries is a party;

(c) comply in all material respects with all applicable Laws, rules, regulations and orders, including the payment (before the same become delinquent) of all Taxes, imposed upon the Parent, the Borrower or a Subsidiary or upon their property except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of the Parent, the Borrower or a Subsidiary, as applicable; and

(d) ensure that no portion of the Loans will be used, disbursed or distributed for any purpose, or to any Person, directly or indirectly, in violation of any of the Terrorism Laws, and take all necessary action to comply with all Terrorism Laws with respect thereto.

SECTION 7.3. Maintenance of Properties. Each of the Parent and the Borrower will, and will cause each of their respective Subsidiaries to, (a) maintain, preserve, protect and keep its and their respective properties in good repair, working order and condition (ordinary wear and tear excepted), and make necessary repairs, renewals and replacements so that the business carried on by the Parent, the Borrower and their respective Subsidiaries may be properly conducted at all times and (b) maintain and preserve all rights, permits, licenses, approvals and privileges necessary, used or useful, whether because of its ownership, lease, sublease or other operation or occupation of property or other conduct of its business, and shall make all necessary or appropriate material filings with, and give all required material notices to, Government Authorities; provided, however, that (i) no repairs, renewals, replacements, alterations or additions shall materially reduce the fair market value of any such properties or materially impair the usefulness of such properties, (ii) any and all repairs, renewals, replacements, alterations or

additions shall be effected with due diligence and in a good an workmanlike manner and in compliance with all applicable laws and policies of insurance. No property shall be Disposed of unless the Disposition of such property is otherwise permitted by Section 8.10.

SECTION 7.4. Insurance. Each of the Parent and the Borrower will, and will cause each of their respective Subsidiaries (other than any Immaterial Subsidiary) to, maintain:

(a) insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area, by Persons of comparable size engaged in the same or similar business as the Parent, the Borrower and their respective Subsidiaries; and

(b) all worker's compensation, employer's liability or similar insurance as may be required under the laws of any state or jurisdiction in which it may be engaged in business,

provided that, in any event, the Parent and the Borrower each will maintain at a minimum (with respect to itself and each of its Subsidiaries) insurance (including loss of use of operating facilities and business interruption insurance) against loss (including loss of profits) and damage covering substantially all of the tangible real and personal property and improvements of the Parent and each of its Subsidiaries by reason of any Insured Peril (as defined below), as shall be reasonable and customary and sufficient to prevent the insured named therein from becoming a co-insurer of any loss under such policy. For purposes hereof, the term "Insured Peril" means, collectively, all risks (as such term is customarily used in the market for insurance) of physical loss including flood, earthquake and windstorm in the jurisdictions where the properties owned or operated by the Parent, the Borrower or any of their respective Subsidiaries are located.

Without limiting the foregoing, all insurance policies of the Obligors required pursuant to this Section 7.4 shall (i) name the Collateral Agent on behalf of the Secured Parties as mortgagee (in the case of property insurance) or additional insured (in the case of liability insurance), as applicable, and provide that no cancellation or modification of the policies will be made without thirty (30) days' prior written notice to the Collateral Agent and the Administrative Agent, and (ii) be in addition to any requirements to maintain specific types of insurance contained in the other Loan Documents. If at any time the area in which any parcel of real property encumbered by a mortgage (including, without limitation, a Mortgage) pursuant to the terms of this Agreement Premises is located is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), the Parent and the Borrower shall obtain flood insurance in such total amount as the Administrative Agent may from time to time reasonably require, and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time.

SECTION 7.5. Books and Records; Inspections. Each of the Parent and the Borrower will, and will cause each of their respective Subsidiaries to, keep books and records in accordance with GAAP which accurately reflect in all material respects all of its business affairs and transactions and permit the Administrative Agent, from time to time, as often as may be

reasonably requested, upon prior notice to any Borrower, to visit and inspect the properties of the Borrower and each of the other Obligors, conduct appraisals of the Borrower's properties, inspect, audit and make extracts from the Borrower's and the other Obligors' books and records, and discuss with their officers, employees and independent accountants, the Borrower's and other Obligor's business, financial condition, business prospects and results of operations. Representatives of the Borrower (including the Borrower's accountants) shall be authorized to accompany the Administrative Agent (or representative thereof) on any such visit or inspection, but such authorization shall in no respect be deemed to be a requirement or condition of the Administrative Agent's visits or inspections, and to the extent any of the Borrower's representatives accompany the Administrative Agent on any visit or audit, such Persons shall in no manner hinder or delay the audits or inspections of the Administrative Agent. Representatives of each Lender shall be authorized to accompany the Administrative Agent on each such visit and inspection and to participate with the Administrative Agent therein at the Borrower's expense. Neither the Administrative Agent nor any Lender shall have any duty to make any such inspection and shall not incur any liability by reason of its failure to conduct or its delay in conducting any such inspection. The Borrower shall pay any fees incurred in connection with any Secured Party's exercise of its rights pursuant to this Section 7.5.

SECTION 7.6. Environmental Laws. Each of the Parent and the Borrower will, and will cause each of their respective Subsidiaries to:

(a) exercise all due diligence in order to comply and cause (i) all tenants or subtenants under any leases or occupancy agreements affecting the real property Collateral, (ii) all contractors, engineers, architects and similar vendors and contractors, and (iii) all other Persons on or occupying the real property Collateral, to comply with all Environmental Laws and Governmental Authorities, except for any such noncompliance which could not reasonably be expected to cause a Material Adverse Effect;

(b) from time to time, at the Administrative Agent's request, retain at the Borrower's expense an independent professional consultant to review any report relating to Hazardous Materials prepared by or for the Borrower and to conduct their own investigation (the scope of which investigation shall be reasonable based upon the circumstances and shall not be duplicative of existing work product when feasible) of any real property asset currently owned, leased, operated or used by the Obligors if: (i) a Default shall have occurred and be continuing, or (ii) the Administrative Agent reasonably believes (A) that an occurrence relating to such real property asset is likely to give rise to an environmental claim or an environmental liability, or (B) that a violation of an Environmental Law on or around such real property asset has occurred or is likely to occur, which could, in either such case, reasonably be expected to result in a Material Adverse Effect. The Borrower shall use its best efforts to obtain for the Administrative Agent and its agents, employees, consultants and contractors the right, upon reasonable notice, to enter into or onto the real property assets currently owned, leased, operated or used by the Obligors to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation. Any such investigation of any real property asset shall be conducted, unless otherwise agreed to by the Borrower and the Administrative Agent, during normal business hours and, shall be conducted so as not to unreasonably interfere with the ongoing operations at any such real property asset or to cause any damage or loss to any property at such real property asset. The Borrower and the Administrative Agent hereby acknowledge

and agree that any report of any investigation conducted at the request of the Administrative Agent pursuant to this Section will be obtained and shall be used by the Administrative Agent and the Lenders for the purposes of the Lenders' internal credit decisions, to monitor and police the Loans and to protect the Lenders' security interests created by the Loan Documents. The Administrative Agent agrees to deliver a copy of any such report to the Borrower with the understanding that the Borrower acknowledges and agrees that (I) it will indemnify and hold harmless the Administrative Agent and each Lender from any costs, losses or liabilities relating to the Borrower's use of or reliance on such report, (II) neither the Administrative Agent nor any Lender makes any representation or warranty with respect to such report, and (III) by delivering such report to the Borrower, neither the Administrative Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report; and

(c) promptly advise the Administrative Agent in writing and in reasonable detail of (i) any release or threatened release of any Hazardous Materials, or to the Borrower's knowledge, any tenants under any leases or occupancy agreements affecting any portion of any real property asset, to any federal, state, local or foreign governmental or regulatory agency under any applicable Environmental Laws, in each case, that could reasonably be expected to cause a Material Adverse Effect, (ii) any and all material written communications with respect to any pending or threatened environmental claims and any and all material written communications with respect to any release or threatened release of Hazardous Materials the existence of which has a reasonable possibility of resulting in a material environmental liability, (iii) any cleanup performed by the Borrower or any other Person in response to any Hazardous Materials on, under or about any real property asset, the existence of which has a reasonable possibility of resulting in a material environmental liability, (iv) the Borrower's discovery of any occurrence or condition on any property that could cause any real property asset to be subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws, and (v) any written request for information from any Governmental Authority that suggests such agency is investigating whether the Obligors may be potentially responsible for a release or threatened release of Hazardous Materials that has a reasonable possibility of giving rise to a material environmental liability.

Without limiting the obligations under paragraphs (a) to (c) of this Section 7.6, the Borrower will, and will cause each Subsidiary to, conduct and complete any investigation, study, sampling or testing, and undertake any corrective, cleanup, removal, response, remedial or other action necessary to identify, report, remove and clean up all Hazardous Materials present or released at, on, in, under or from any of its facilities or real properties, to the extent any such actions are required for material compliance with Environmental Laws or to correct or resolve a material environmental claim to the extent required for compliance with applicable Environmental Laws.

SECTION 7.7. Use of Proceeds. The Borrower (and, to the extent distributed to them by the Borrower, each of the other Obligors) shall use the proceeds of the Loans solely as provided in Section 6.25.

SECTION 7.8. Subsidiary Guarantors, Security, Further Assurances, etc. (a) No new Subsidiaries shall be formed by the Obligors and no Person shall be acquired by the Obligors in any manner (including, without limitation, by merger, consolidation or otherwise) without the

prior written approval of the Administrative Agent. Notwithstanding the foregoing, in the event that any Person becomes a Subsidiary of the Obligors, the Borrower will promptly notify the Administrative Agent of that fact and, cause such Subsidiary (other than an Immaterial Subsidiary) on or prior to the time it becomes a Subsidiary to execute and deliver to the Administrative Agent and the Collateral Agent a counterpart of any Subsidiary Guaranty and to take all such further action and execute all such further documents and instruments (including, without limitation, with respect to any real property, a Mortgage in form for recording in the recording office of each political subdivision where such real property is located, together with the Other Mortgage Deliverables) as may be required to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a first priority Lien in all of the: (i) personal property assets of such Subsidiary; (ii) real property assets owned by such Subsidiary; and (iii) leasehold interests owned by such Subsidiary. In addition, the Borrower shall pledge (if it is the direct owner of Capital Securities of such Subsidiary) or shall cause each of the applicable Obligors to pledge (if any of such other Obligors is the direct owner of Capital Securities of such new Subsidiary)(each such owner, whether the Borrower or any of the other Obligors, the "Pledging Parent") all of the Capital Securities of such Pledging Parent's Subsidiary to the Collateral Agent pursuant to the applicable Collateral Documents and to take all such further action and execute all such further documents and instruments as may be reasonably required or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a first priority Lien in such Capital Securities. The Borrower shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document: (A) certified copies of such Subsidiary's organizational certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (B) a copy of such Subsidiary's Organic Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (C) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to: (x) the incumbency and signatures of the officers of such Subsidiary executing such Subsidiary Guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party, and (y) the fact that the attached authorizations of such Subsidiary authorizing the execution, delivery and performance of such Subsidiary Guaranty, such Collateral Documents and such other Loan Documents are in full force and effect and have not been modified or rescinded, and (D) a favorable opinion of counsel to such Subsidiary, that is reasonably satisfactory to the Collateral Agent and its counsel, as to (x) the due organization and good standing of such Subsidiary, (y) the due authorization, execution and delivery by such Subsidiary of such Subsidiary Guaranty, the Collateral Documents and any other Loan Documents to which it is a party, (z) the enforceability of such Subsidiary Guaranty and such Collateral Documents against such Subsidiary, (aa) the validity and perfection of the security interests granted by such Subsidiary (and by the Pledging Parent of such Subsidiary in respect of the Capital Securities of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents, and (bb) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel.