IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHAMPION ENTERPRISES, INC., et al., [1] | ) | Case No. 09-14019 (___) |
| | ) | |
| | ) | (Joint Administration Requested) |
| Debtors. | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER UNDER
11 U.S.C. SECTIONS 105(A), 361, 362, 363 AND 364 AND FED. R. BANKR. P. 6004(A)
FOR AN ORDER AUTHORIZING: (I) PAYMENT OF PREPETITION
OBLIGATIONS INCURRED IN THE ORDINARY COURSE OF
BUSINESS IN CONNECTION WITH WORKERS' COMPENSATION,
LIABILITY, PROPERTY, AND OTHER INSURANCE PROGRAMS, INCLUDING
PAYMENT OF POLICY PREMIUMS, AND BROKERS' FEES; AND (II)
CONTINUATION OF INSURANCE PREMIUM FINANCING PROGRAMS**

Champion Enterprises, Inc. and its affiliated chapter 11 debtors, debtors and

debtors in possession (collectively, the "Debtors"), move (the "Motion") the Court for entry of

an order authorizing, but not requiring, the Debtors to (i) continue their workers' compensation,

liability, property and other insurance programs and pay all policy premiums, brokers' fees and

other obligations arising thereunder or in connection therewith, including all such obligations

arising prepetition in the ordinary course of business, and (ii) continue their insurance premium

financing programs. In support of this Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Redman Homes, Inc. (4957); Champion Enterprises, Inc. (3168); Champion Home Builders Co. (4984); New Era Building Systems, Inc. (0928); North American Housing Corp. (1097); Homes of Merit, Inc. (8488); Western Homes Corporation (6910); Star Fleet, Inc. (0506); Champion Enterprises Management Co. (6726); Champion Retail, Inc. (2154); San Jose Advantage Homes, Inc. (1951); Highland Acquisition Corp. (8962); Highland Manufacturing Company LLC (6762); SSH Liquidating Corp. (6678); Champion Homes of Boaz, Inc. (3165); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and Champion Development Corp. (4642). The address for all Debtors is 755 W. Big Beaver, Suite 1000, Troy, MI 48084.

## Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105(a), 362 363, 366, 1107 and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules").

## Background

3.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or committee has been appointed in the Debtors' chapter 11 cases.

4.      The Debtors and their non-debtor affiliates are leading producers of manufactured and modular housing, as well as modular buildings for government and commercial applications. The Debtors distribute these products through independent retailers, builders and developers. In addition to their manufacturing and other sale operations, Debtors

2

also sell manufactured homes directly to certain manufactured home parks in California and transport their products from the factories to retailers.

5. The factual background relating to the Debtors' commencement of these chapter 11 cases is set forth in detail in the *Declaration of Phyllis Knight, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Knight Declaration") filed contemporaneously with this Motion and incorporated herein by reference.

### The Debtors' Insurance Programs

6. In connection with the operation of their businesses, the Debtors maintain workers' compensation, directors and officers liability, employment practices liability, fiduciary liability, crime, kidnap & ransom, inland cargo liability, foreign coverage, umbrella & excess liability and various other liability, property, and automobile insurance programs (collectively, the "Insurance Programs") through several different insurance carriers (the "Insurance Carriers") under insurance contracts listed on Exhibit A attached hereto.[2] A summary of the Debtors' existing Insurance Programs follows:

### A. Workers' Compensation Program.

7. Under applicable law, the Debtors are required to maintain workers' compensation policies and programs to provide their employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors (the "Workers'

_____

[2] The Debtors believe that they have listed all insurance contract on Exhibit A, but reserve the right to supplement this Motion as necessary. To the extent the Debtors subsequently determine they are parties to insurance contracts that were not listed on Exhibit A, the Debtors will provide supplemental disclosure to creditors and the Court.

3

Compensation Program"). The current Workers' Compensation Program insures losses arising during the period October 1, 2009 through October 1, 2010. The Workers' Compensation Program includes a $500,000 per occurrence deductible, and the annual premium payable for such coverage is approximately $908,191 (the "Workers' Compensation Premium").[3] This workers' compensation coverage premium is subject to audit and annual retroactive adjustments until all claims under the policy are closed. The Worker's Compensation Program coverage is underwritten by Travelers Insurance ("Travelers"). Under the Travelers program, the Debtors continue to be billed daily for all reimbursable charges and claim handling fees up to the $500,000 per occurrence deductible until all claims are closed. Total losses billed in 2008 by Travelers were $5,732,162.

## B.    Directors and Officers Insurance and Employment Practices Liability Insurance.

8.    As is common with large businesses of this kind, the Debtors maintain insurance coverage for all of their directors and officers that covers, among other things, defense costs, settlements, court awards and pre- and post judgment interest arising from claims brought by third parties alleging an insured is liable for an error, misstatement, misleading statement, improper act, omission, neglect or breach of duty (the "D&O Programs"). The aggregate limit of liability for these policies (primary and excess) is $50 million and the per occurrence deductible/self insured retentions, where applicable, are $0 for non-indemnifiable claims,

---

[3]  The Debtors' insurance carriers require the Debtors to post collateral to protect the insurer with respect to the Debtors' deductible obligations for all policy years (which includes the current policy year and prior periods), which the Debtors have done by posting letters of credit. The current aggregate amount of the letters of credit posted by the Debtors with Travelers, CNA and AIG for general liability, automobile liability and workers' compensation claims total $35,500,000. Nothing in this Motion shall be deemed to preclude the Debtors from seeking reduction of the amount of collateral they have posted on account of the Insurance Programs described herein.

4

$1,000,000 for SEC claims and $500,000 for all other claims. The aggregate annual premium is $1,249,500. The current policy period is April 4, 2009 to April 4, 2010.

## C. Liability, Property, Automobile, Property and Inland Cargo Insurance Programs.

9. The Debtors maintain general liability insurance that insures premises liability, products/completed operations liability, personal injury and certain excess employee benefits liability (the "Liability Insurance Programs"). The coverage provided by the Liability Insurance Programs is $250,000 per occurrence with aggregate annual limits of $3.5 million for product liability and $2.5 million for general liability. The per occurrence self insured retention under the general liability policy is $1,750,000. The aggregate annual premium for the general liability coverage is $67,646, and the current policy expires October 1, 2010.

10. The Debtors maintain automobile insurance that insures automobile liability, medical payments, uninsured and underinsured motorists and physical damage to hired vehicles (the "Automobile Insurance Programs"). The total amount of coverage provided by the Automobile Insurance Programs is $2,000,000 with a deductible of $500,000. The total aggregate annual deposit premium paid by Debtors for automobile insurance coverage is $231,680 and the current policy expires October 1, 2010.

11. The Debtors maintain property insurance that insures the Debtors' property for perils such as, but not limited to, fire, theft and earthquake (the "Property Insurance Programs"). The total amount of coverage provided by the Property Insurance Programs is $60,000,000 with a deductible of $1,000,000 per occurrence. The aggregate annual premiums

5

for the Property Insurance Programs coverage is approximately $970,256 and the current policy expires May 1, 2010.

12.     The Debtors maintain inland cargo insurance that insures direct physical loss or damage to property hauled for others in transit by Debtors. The total amount of coverage provided by these insurance programs is $100,000 with a deductible of $100,000 per occurrence. The aggregate annual deposit premium for the Inland Cargo Insurance Program coverage is $11,600 and the current policy expires August 1, 2010.

## D.     San Jose Advantage Homes

13.     San Jose Advantage Homes maintains four policies separate from the Champion insurance program. Those policies relate to auto liability, general liability, workers compensation and real estate errors & omissions.

a.     The annual limit of auto liability insurance coverage is $1,000,000 with a per occurrence deductible of $1,000. The premium for the auto liability policy is $1,638 per year.

b.     The annual limit of general liability insurance coverage is $1,000,000 with a per occurrence deductible of $1,000. The premium for the general liability policy is $56,895.

c.     The limits for workers compensation coverage are set by the various state laws in which the Debtors operate. The limits for employers liability insurance coverage is $1,000,000 per year. This policy has no deductible and an annual premium of 8,731

6

d.     The limits of real estate errors and omissions insurance coverage is $1,000,000 per claim with a $2,000,000 yearly aggregate and a per occurrence deductible of $5,000. The premium for the real estate errors and omissions policy is $9,095.

**E.     Miscellaneous Policies.**

14.     The Debtors maintain several other insurance policies that insure excess liability, engineers professional liability, foreign liability, fiduciary liability, employment practices liability, first party crime losses, and kidnap and ransom liability, ("Miscellaneous Policies"). The aggregate annual premium for the Miscellaneous Policies coverage is approximately $1,257,610.[4]

<strong>Payment of Insurance Obligations</strong>

15.     The Debtors pay all insurance obligations through their Insurance Programs. The Debtors pay the premiums for certain of their coverage in full when due, and for certain of the Insurance Programs the Debtors finance payment over the course of the coverage year.

**A.     Insurance Brokers.**

16.     Debtors employ an insurance broker, Aon Risk Services Central Inc. ("Aon"), to assist with the procurement and negotiation of the policies under the Insurance Programs. Aon provides services to and receives compensation from, the Debtors (the "Brokers'

---

[4] In addition to the Insurance Programs listed on Exhibit A, the Debtors maintain several other insurance policies and programs with respect to employee benefits, including health, dental, disability, and life insurance. These programs and policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employee wage policies and benefit programs.

7

Fees") in connection with these services. To date in 2009, Aon was paid approximately $375,000 for the placement of the Property Program, Primary and Excess Liability Insurance Programs, Automobile Insurance Program, Workers' Compensation Program, Foreign Liability Insurance Program, and Kidnap/Ransom Liability Program, which became effective the year starting October 1, 2008. Aon also received approximately $556,588 in commission for the placement of the D&O Program, Fiduciary Liability, Commercial Crime coverage, Employment Practices Liability and miscellaneous bonds placed since October 1, 2008. The Debtors believe that as of the Petition Date, Aon is not owed any Brokers' Fees for services rendered relating to the period prior to the Petition Date.

## B.    Insurance Premium Financing.

17.    As part of their existing cash management system and financing arrangements, the Debtors have entered into two separate premium financing agreements covering certain of the policies under their Insurance Programs. The first premium financing agreement finances the payment of premiums for directors and officers liability, fiduciary liability and commercial crime policies through First Insurance Funding Corp. ("First Insurance"). This financing arrangement is memorialized in a Commercial Premium Finance Agreement and Disclosure Statement dated April 17, 2009 attached as Exhibit B hereto (the "First Insurance Financing Agreement") between Champion Enterprises, Inc. and First Insurance. The total premiums under the policies subject to the First Insurance Financing Agreement equal $1,472,000. Pursuant to the Financing Agreement, the Debtors paid $292,500 to First Insurance on April 17, 2009 as an initial down payment, and, after the assessment of a

8

$22,126.72 finance charge, financed a total of $1,179,500. The First Insurance Financing Agreement requires 9 monthly payments to First Insurance, each in the total amount of $133,514.08, with the first installment paid on or about May 4, 2009. The Debtors have paid all obligations due prepetition under the First Insurance Financing Agreement. The next installment due after the Petition Date under the First Insurance Financing Agreement is due on December 4, 2009.

18.     The second premium financing agreement finances the payment of premiums for the Property Insurance Program policies through Aon Premium Finance, LLC ("APF"). This financing arrangement is memorialized in a Commercial Insurance Premium Finance and Security Agreement dated June 4, 2009 attached as Exhibit C hereto (the "APF Financing Agreement") between Champion Enterprises, Inc. and APF. The total premiums under the policies subject to the APF Financing Agreement equal $958,794. Pursuant to the APF Financing Agreement, the Debtors paid $97,408.34 to APF on June 4, 2009 as an initial down payment, and, after the assessment of a $15,289.40 finance charge, financed a total of $876,675.06. The APF Financing Agreement requires 9 monthly payments to APF, each in the total amount of $97,408.34, with the first installment paid on or about June 30, 2009. The Debtors have paid all obligations due prepetition under the APF Financing Agreement. The next installment due after the Petition Date under the APF Financing Agreement is due on November 30, 2009.

19.     The Debtors' obligations to First Insurance and APF under the First Insurance Financing Agreement and APF Financing Agreement are secured by certain sums

9

payable to the Debtors under the insurance policies covered by each Financing Agreement. The First Insurance Financing Agreement and the APF Financing Agreement are collectively referred to herein as the "Insurance Financing Agreements."

## **Relief Requested**

20.     The Debtors do not believe that they need Court approval to maintain the Insurance Programs or to amend, extend or renew them in the ordinary course of business. Moreover, with respect to outstanding amounts that come due after the Petition Date, the Debtors respectfully do not believe that they need Court approval as these obligations arguably constitute the postpetition use of the Debtors' property in the ordinary course of their business.

21.     However, in an abundance of caution and pursuant to Bankruptcy Code sections 105(a), 361, 362, 363(b), and 364 and Bankruptcy Rule 6003 and 6004(a), the Debtors hereby seek an order authorizing them in their business judgment to continue the Insurance Programs on an uninterrupted basis in accordance with the same practices and procedures as in effect immediately prior to the Petition Date, and to pay all premiums, claims, deductibles, excess payments, retrospective adjustments, settlement costs , insurance broker fees, and all other obligations arising under or in connection with the Insurance Programs (collectively, the "Insurance Obligations") including, in their sole discretion and business judgment, those Insurance Obligations that were due and payable or related to the period prior to the commencement of these Chapter 11 Cases. The Debtors also seek an order authorizing the Banks (as defined below) to honor, process, and pay, to the extent funds are available in their

10

accounts, any checks or wire transfer requests issued by the Debtors with respect to their Insurance Obligations.

22.     In addition, pursuant to Bankruptcy Code sections 105, 361, 362, 363 and 364, the Debtors request authority to continue, in the ordinary course of business, their insurance premium financing arrangements and, to the extent necessary, to pay prepetition insurance premium financing obligations owed by the Debtors on account of such arrangements. Pursuant to their business judgment, the Debtors determined that it was advantageous to finance the premiums for certain of their Insurance Programs rather than making a single, up-front, lump sum payment to the insurers. The monthly payment arrangements set forth in the current financing agreements minimize the cash strain placed upon the Debtors' businesses by its insurance costs.

## **Basis for Relief**

### A.     **The Debtors Are Authorized to Pay the Insurance Obligations**

23.     The Court may authorize the Debtors to pay prepetition premiums to maintain insurance coverage under section 363(b) of the Bankruptcy Code. In particular, section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and an hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Thus, under this section, a court may authorize a debtor to pay certain prepetition claims. *See Ionosphere Clubs*, 98 B.R. at 175 (affirming lower court order authorizing payment of prepetition wages pursuant to section 363(b) of the Bankruptcy Code); *In re Cooper-Standard Holdings Inc.*, Case No. 09-12743 (Bankr. D. Del. August 5, 2009); *In re J.L. French*, Case No.

11

09-12445 (Bankr. D. Del. July 14, 2009); *In re UAL Corp.*, Case No. 02-48191 (ERW) (Bankr.

N.D. Ill. Dec. 9, 2002) (authorizing payment of prepetition claims under section 363 of the

Bankruptcy Code as an out-of-the-ordinary-course transaction); *In re Jillian's Entm't Holdings*,

Inc., Case No. 04-33192 (DTS) (Bankr. W.D. Ky. June 22, 2004).

        24.     Maintaining the Debtors' insurance coverage under the Insurance

Programs is a crucial ordinary-course-of-business transaction. Authority to pay any prepetition

amounts that may be due and owing under the Insurance Programs – to the extent the Debtors

determine that such payment is necessary to avoid cancellation, default, alteration, assignment,

attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided

under the Insurance Programs – is necessary to the Debtors' continued operation. Continuation

of such coverage is required under the law and is imperative to the protection and preservation of

the Debtors' most valuable assets. *See* 28 U.S.C. § 959(b) (chapter 11 debtor obligated under

federal law to operate chapter 11 business according to the laws of the states where business and

properties are located).

        25.     In addition, the Debtors may need to renew or replace certain of their

Insurance Programs in the upcoming months. The nonpayment of any premiums, deductibles, or

related fees under one of the Insurance Programs could result in one or more of the Insurance

Carriers increasing future insurance premiums, declining to renew their insurance policies or

refusing to enter into new insurance agreements with the Debtors in the future. If the Insurance

Programs lapse without renewal, the Debtors may be exposed to substantial liability for

employees' worker's compensation claims, first party property claims, and third party liability claims to the detriment of all parties in interest.

26.     As of the Petition Date, the Debtors were contingently obligated through letters of credit (the "LCs") for approximately $35.5 million to support insurance reserves under their Insurance Programs. The Debtors' contingent obligations under these LCs are secured by all of the Debtors' assets pursuant to their credit agreement with their prepetition secured lenders. Pursuant to the rights granted to the beneficiaries of these LCs, any failure of the Debtors to meet their obligations under certain of their insurance policies may result an immediate draw upon the LCs by the beneficiary, and a maturing of the Debtors' contingent obligation under the LCs into a secured obligation on behalf of the banks that issued the LCs. The Debtors seek to continue to meet their current and future obligations under the Insurance Programs to avoid the potential secured obligation that may develop if these obligations are not met.

27.     The Insurance Programs are vital to the Debtors' ongoing operations. Pursuant to the terms of contracts and real property leases that the Debtors or their non-debtor affiliates are parties to, as well as the guidelines established by the Office of the United States Trustee, the Debtors are obligated to remain current with respect to the bulk of their primary Insurance Programs. Additionally, the funding of the Workers' Compensation Program is a requirement under applicable law for the Debtors' ability to employ personnel for its businesses and operations. The retention of qualified and dedicated senior management is also linked to the continued effectiveness of the D&O Programs. Therefore, the continuation of the Insurance

13

Programs and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Programs is essential to the Debtors' businesses and to preserve value for all parties in interest.

28. In addition to the foregoing, the relief requested herein is also supported by Section 105(a) of the Bankruptcy Code, which empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court may use its equitable powers under section 105 of the Bankruptcy Code to permit a debtor-in-possession to pay prepetition claims when payment is necessary to effectuate a debtors' bankruptcy goals and essential to the continued operation of the business. *See Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) (under necessity of payment doctrine prepetition claims may be paid if essential to the continued operation of the business during reorganization); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 192 (Bankr. D. Del. 1994) (recognizing that necessity of payment doctrine authorizes payment of prepetition claims when "such payment is essential to the continued operation of the business").

29. Courts in this District have granted the relief requested herein in other Chapter 11 Cases. *See e.g.*, *In re Cooper-Standard Holdings Inc.*, Case No. 09-12743 (Bankr. D. Del. August 5, 2009); *In re J.L. French*, Case No. 09-12445 (Bankr. D. Del. July 14, 2009); *In re World Health Alternatives, Inc.*, Case No. 06-10166 (PJW) (Bankr. D. Del. March 14, 2006); *In re Foamex Intl Inc.*, Case No. 05-12685 (KG) (Bankr. D. Del. Sept. 20, 2005); *In re FAO, Inc.*,

14

Case No. 03-10119 (KJC) (Bankr. D. Del. Jan. 14, 2003); *In re Fine Host Corp.*, Case No. 99-20 (PJW) (Bankr. D. Del. Jan. 7, 1999).

30.     Other courts have also permitted debtors-in-possession to pay prepetition obligations in connection with insurance and workers' compensation programs in furtherance of a successful reorganization. *See In re Loral Space & Commc'ns Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. July 15, 2003); *Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)*, 159 B.R. 730, 736 (Bankr. W.D. Pa. 1993); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (authorizing the payment of prepetition employee wages and benefits); *In re Gulf Air, Inc.,* 112 B.R. 152 (Bankr. W.D. La. 1989) (authorizing debtor-inpossession to pay prepetition employee wages and benefits, and health, life, and workers' compensation insurance premiums); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.).*, 80 B.R. 279 (Bankr. S.D.N.Y. 1987) (affirming order authorizing debtor to pay certain prepetition wages, salaries, employee reimbursement expenses, and benefits, including payments on workers' compensation claims).

**B.      Payment of Premium Financing Obligations is Necessary to Comply with United States Trustee Requirements.**

31.     The Debtors believe that the ordinary course maintenance of their insurance premium financing arrangements programs, including payment of all monthly obligations under the Financing Agreements is necessary and essential to the Debtors' operation of their businesses while they pursue the reorganization process, especially where, as here, the Debtors' failure to pay their monthly premium obligations to First Insurance and APF could have disastrous consequences for the Debtors. Because the Debtors are required to maintain insurance

15

coverage during their Chapter 11 Cases, the cancellation of these policies would be particularly

disastrous. *See* 3 United States Trustee Manual 113-3.2.3 (Oct. 1998) (requiring maintenance of

appropriate insurance coverage). At a minimum, the failure to meet the financing obligations

would result in certain motions for relief from stay as First Insurance and APF attempted to

enforce the default provisions of the financing agreements.

**C.      Payment of the Premium Financing Obligations is Warranted under Bankruptcy
         Code Sections 361, 362, and 363.**

      32.      Security interests created by premium finance arrangements generally are

recognized as secured claims in bankruptcy to the extent of the amount of unearned premiums

financed pursuant to such agreements. *See In re St. James Inc.,* 402 B.R. 209, 213 (Bankr. E.D.

Mich. 2009); *TIFCO, Inc. v. U.S. Repeating Arms Co.* (*In re U.S. Repeating Arms Co.*), 67 B.R.

990, 994-95 (Bankr. D. Conn. 1986); *Drabkin v. A.I. Credit Corp.* (*In re Auto-Train Corp.*), 9

B.R. 159, 164-66 (Bankr. D.D.C. 1981). As secured creditors, First Insurance and APF would be

entitled to seek relief from the automatic stay, either to cancel the Debtors' insurance policies in

accordance with the terms of their respective Financing Agreements, or to seek adequate

protection of their investment. *See Universal Motor Express*, 72 B.R. 208, 211 (Bankr.

W.D.N.C. 1987) (recognizing that a default under the financing arrangement and the resulting

decline in value of the unearned premiums justified relief from the automatic stay).

      33.      As duly perfected secured creditors, insurance premium financiers are

entitled to adequate protection of the value of their security, pursuant to Bankruptcy Code

section 361, to protect them against the diminution in the value of their collateral. Adequate

16

protection may take many forms, including relief from the automatic stay and authority to apply unearned premiums to the outstanding debt.

34.     Moreover, pursuant to the Financing Agreements, First Insurance and APF maintain a security interest in certain sums payable to the Debtors under the Financing Agreements, and therefore First Insurance and APF may be entitled to adequate protection in its interests in such sums under Bankruptcy Code section 363(e). The Debtors' failure to provide such adequate protection - for example by failing to pay the ongoing installments due under the Financing Agreement - may constitute cause under Bankruptcy Code section 362(d) for First Insurance and APF to obtain relief from the automatic stay and terminate the underlying policies.

35.     Even if the Debtors were successful in preventing First Insurance and APF from lifting the automatic stay to pursue their remedies, such litigation likely would be contested and thus very costly to the estates. More importantly, if unsuccessful in the automatic stay litigation, the Debtors may be unable to find a carrier willing to provide them similar insurance coverage or a company willing to finance the premiums without charging significantly higher premiums and fees.

## D.     Banks Should Be Authorized to Honor Prepetition Checks and Wire Transfer Requests

36.     To the extent that a check issued or a funds transfer requested prior to the Petition Date for payment of Insurance Obligations has not cleared the particular bank as of the Petition Date, the Debtors seek entry of an order (a) authorizing the banks where such checking accounts are kept to honor such checks and/or funds transfer requests and (b) authorizing the Debtors to issue replacement checks, submit replacement funds transfer requests or provide other

17

means of payment to the appropriate Insurance Carriers or Aon to the extent necessary to pay all outstanding Insurance Obligations described in the Motion.

37.     The Debtors represent that each of these checks or transfers is or will be drawn on the Debtors' general disbursement accounts and can be readily identified as relating directly to payments under the Insurance Programs. Accordingly, the Debtors believe that prepetition checks and transfers other than those relating to the Insurance Programs will not be honored inadvertently.

38.     The relief requested herein is not prejudicial to any party in interest and, in fact, only benefits the Debtors' estate and their creditors. For this reason, and the supporting authority found in sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors respectfully request entry of an order: (a) authorizing the Debtors to (i) continue the Insurance Programs on an uninterrupted basis in accordance with the same practices and procedures as were in effect before the Petition Date, and authorizing it to pay all premiums, deductibles, insurance broker fees, and all other Insurance Obligations relating to the periods before and after the Petition Date, and (ii) continue their insurance premium financing arrangements with First Insurance and APF and to pay the monthly obligations thereunder regardless of the prepetition or postpetition nature of such obligations; and (b) authorizing the Banks to honor, process, and pay, to the extent funds are available in their accounts, any checks or wire transfer requests issued by the Debtors with respect to their Insurance Obligations and premium financing obligations.

39.     To the extent any Insurance Program or related agreement is deemed an executory contract within the meaning of section 365 of the Bankruptcy Code, the Debtors do

18

not, at this time, seek to assume such contract. Accordingly, if the Court authorizes the payments described above, any such payment should not be deemed to constitute a postpetition assumption or adoption of the programs, policies, or agreements as executory contracts pursuant to section 365 of the Bankruptcy Code. Nothing in the Motion should be construed as impairing the Debtors' right to contest the amount or priority of any Insurance Obligations that may be owed to the Insurance Carriers, and the Debtors expressly reserves all of its rights with respect thereto.

## **Satisfaction of Bankruptcy Rule 6003 and Waiver of Bankruptcy Rule 6004**

40.     Pursuant to Rule 6003(b) *of* the Federal Rules of Bankruptcy Procedure, "a motion to pay all or part of a claim that arose before the filing of the petition" shall not be granted by the Court within 20 days of the Petition Date "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm . . . ." Fed. R. Bankr. P. 6003(b).  Because the benefits provided by the  Insurance Programs are vital for the Debtors' businesses, and for the reasons set forth in the Knight Declaration, the Debtors submit that the requirements of Rule 6003 have been met and that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.

41.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the ten-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent these rules are applicable.

19

## Notice

42.     Notice of this Motion has been given to (i) the Office of the United States Trustee and (ii) the Debtors' prepetition and postpetition secured lenders or, in lieu thereof, to their counsel, if known.  As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

43.     No prior Motion for the relief requested herein has been made to this or any other Court.

13814-001\DOCS_DE:153118.8

WHEREFORE, the Debtors respectfully request that the Court enter an order: (i) authorizing continuation of the Insurance Programs, including payment of prepetition obligations and premium financing obligations incurred under or in connection with the Insurance Programs, (ii) authorizing Banks to honor checks and wire transfers in connection with the Insurance Programs and premium financings, and (iii) granting such other and further relief as the Court deems appropriate.

Dated: November 15, 2009

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (Bar No. 4228)
Mark M. Billion (Bar No. 5263)
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
E-mail:     ljones@pszjlaw.com
            dbertenthal@pszjlaw.com
            tcairns@pszjlaw.com
            mbillion@pszjlaw.com

[Proposed] Counsel to Debtors and
Debtors in Possession

13814-001\DOCS_DE:153118.8