IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHAMPION ENTERPRISES, INC., et al.,[1] | ) | Case No. 09-14019 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

**Proposed Hearing Date: January 28, 2010 at 1:00 p.m.**
**Proposed Objection Deadline: January 25, 2010 at 4:00 p.m.**

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) APPROVING BIDDING
PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (B) SCHEDULING AN
AUCTION AND HEARING TO CONSIDER THE SALE AND APPROVE THE FORM
AND MANNER OF NOTICE RELATED THERETO; (C) ESTABLISHING
PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS;
(D) APPROVING CERTAIN EXPENSE REIMBURSEMENT PROVISIONS
AND BREAKUP FEE; AND (E) GRANTING RELATED RELIEF**

The captioned debtors and debtors in possession (the "Debtors") hereby move this

Court for the entry of an order: (a) approving bidding procedures and certain overbid protections

in connection with the sale of substantially all of the Debtors' assets; (b) scheduling an auction

and hearing to consider the sale of and approve the form and manner of notices related thereto;

(c) establishing procedures for the assumption and assignment of certain contacts that will be

assumed and assigned as part of the sale; (d) approving certain expense reimbursement

provisions and breakup fee; and (e) granting related relief (this "Motion"). In support of this

Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these cases are Redman Homes, Inc.; Champion Enterprises, Inc.; Champion Home
Builders Co.; New Era Building Systems, Inc.; North American Housing Corp.; Homes of Merit, Inc.;
Western Homes Corporation; Star Fleet, Inc.; Champion Enterprises Management Co.; Champion Retail,
Inc.; San Jose Advantage Homes, Inc.; Highland Acquisition Corp.; Highland Manufacturing Company
LLC; Champion Homes of Boaz, Inc.; Iseman Corp.; and SSH Liquidating Corp.

## Jurisdiction and Venue

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 1107 and 1108 of chapter 11 of title 11, United States Code (the "Bankruptcy Code"), Rules 2002(a)(2), 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Background

4.     On November 15, 2009 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.     No request has been made for the appointment of a trustee or an examiner in these cases.

6.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating the chapter 11 filings, is set forth in detail in the *Declaration of Phyllis Knight, Chief Financial Officer of the Debtors, in Support of*

*First Day Motions* (the "Knight Declaration"), previously filed in these cases and incorporated herein by reference.

7.     In order to maximize the value of their business and assets for the benefit of creditors, the Debtors in the exercise of their business judgment, have determined to market and sell all or substantially all of their assets related to the Debtors' factory-built homes and modular building manufacturing businesses and related Star Fleet transportation assets (the "Assets"), including the assumption and assignment of certain executory contracts and unexpired leases (the "Assumed Executory Contracts"), to the highest and best bidder(s) at auction, for the benefit of the estates and their creditors (a "Sale"). The transaction that is proposed herein is the culmination of a lengthy and exhaustive marketing process which has been ongoing for over four months and resulted in the contact of 169 entities as potential buyers. Pursuant to this process, the Debtors propose to sell the Assets to a proposed purchaser pursuant to the terms of the LOI (defined below) who will serve as the "stalking horse" (the "Stalking Horse Purchaser") in accordance with the proposed bidding procedures set forth herein.

8.     As set forth in detail below, the Debtors have determined in their business judgment that a sale process incorporating substantially all of their assets and pursuant to the procedures and timing set forth in this Motion will maximize the value of their assets and businesses for the benefit of their estates and creditors. Additionally, pursuant to the Debtors' debtor-in-possession financing facility (the "DIP Facility") approved by this Court by Final Order on January 6, 2010, the Debtors must meet certain milestones for a sale of the Assets, including that the Debtors shall consummate a sale no later than March 18, 2010. The

procedures set forth herein are designed to insure that the Debtors can meet those milestone requirements.

## The Sale Process

9.      In or about August 2009, the Debtors initiated a process to solicit bids ("Bids") for the Assets and engaged investment banker Morgan Joseph & Co. ("Morgan Joseph") for that purpose. As of the date of this Motion, Morgan Joseph has contacted approximately 166 parties on behalf of the Debtors, including potential financial buyers, strategic buyers, and other interested parties. Of these interested parties, 47 have executed confidentiality agreements, reviewed the confidential information memorandum, and/or obtained access to the data room set up by Morgan Joseph, while the remainder declined to proceed. Eleven parties have submitted non-binding indications of interest outlining the assets or segments of the Debtors' business that they have a potential interest in acquiring. After considering the proposals received, the Debtors, exercising their business judgment, decided to proceed with the agreement with the Stalking Horse Purchaser as described below.

10.      The Debtors, with the assistance of Morgan Joseph and their other professionals, intend to continue to market and seek Bids for the Assets and, pursuant to the procedures set forth on Exhibit A hereto (the "Bidding Procedures"), to hold an auction of such assets on or about March 1, 2010, or such other date specified by the Court. The Debtors believe that such additional marketing of the Assets over the period contemplated by the Bidding Procedures, combined with four months of marketing that has already elapsed, will result in the highest or otherwise best offer for the Assets.

4

11.     The Debtors believe that the consummation of a sale to the highest bidder at auction will provide their creditors and other stakeholders with the best opportunity possible for maximizing value by realizing upon the Assets through a Sale as a going concern.

### The Agreement with the Purchaser

12.     On January 15, 2010, after extensive negotiations, the Debtors entered into a Letter of Intent (the "LOI") with the Stalking Horse Purchaser. A true and correct copy of the LOI is attached hereto as Exhibit B. The LOI sets forth the materials terms of the asset purchase agreement (the "Agreement") that have been agreed to in principle by the Debtors and the Purchaser. The Debtors and the Stalking Horse Purchaser intend to file a final, executed copy of the Agreement prior to the hearing on the Motion. Pursuant to the terms of the Agreement, the Stalking Horse Purchaser, subject to (a) a court approved auction and sale process approval of which is sought by this Motion and (b) the submission of higher and better offers, will purchase the Assets, including certain contracts and leases.

13.     The Debtors, subject to such court-approved auction and sale process and higher and better offers, intend to sell and assign the Assets to the Stalking Horse Purchaser pursuant to the Agreement.

14.     The terms of the Stalking Horse Purchaser's offer to purchase the Assets will be set forth in detail in the Agreement, and are summarized below pursuant to the terms of the LOI.[2]

---

[2] The description of the terms of the LOI only provide a summary of the terms of the Agreement that the Debtors and the Stalking Horse Purchaser have agreed to in principle, and is completely qualified by the actual terms of the Agreement that will be executed by the parties and filed with the Court prior to the hearing on the Motion. Only those terms and conditions set forth in the executed and filed Agreement shall be binding upon the Debtors and the Purchaser.

(a.) **Assets**. Substantially all of the real, personal, tangible, intangible and other property, cash (other than cash specifically designated as an excluded asset) and other assets of the Debtors as a going concern (including equity interests in non-Debtor subsidiaries) and assignment of any and all contracts and leases designated by the Purchaser.

(b.) **Purchase Price**. The purchase price for the Sale shall consist of:

(1) a credit bid of all obligations (*i.e.,* approximately $80 million principal amount plus accrued interest) under the Debtor-in-Possession Credit Agreement dated as of November 15, 2009 (the "DIP Facility") among certain of the Debtors, the lenders party thereto (the "DIP Lenders") and Credit Suisse AG as administrative and collateral agent (the "DIP Agent");

(2) a credit bid of all obligations under the Company's Amended and Restated Credit Agreement, dated as of April 7, 2006 (as amended or otherwise modified, the "Pre-Petition Credit Agreement"),

(3) the agreement of the Purchaser (as hereinafter defined) to pay any and all cure payments required for the assumption of the Designated Contracts ("Cure Costs");

(4) as will be more particularly set forth in the Agreement, the agreement of the Purchaser to fund at or after the closing of the Acquisition, up to a maximum amount to be agreed and consistent with a budget to be agreed, (i) specified administrative expenses accrued through the closing date of the Acquisition and (ii) specified post-closing wind-down expenses of the bankruptcy estates; and

(5) as will be more particularly set forth in the Agreement, the agreement of the Purchaser to assume specified administrative expenses and the other Assumed Liabilities (as defined in the LOI).

(c.) **Excluded Assets**.  The following assets will not be acquired by the

Purchaser as part of the Acquisition:

(1)     interests in or under contracts that are not Designated
Contracts (other than Residual LC Beneficiary Rights (as
defined in the LOI);

(2)     the Carve-Out Account established pursuant to Section
2.11.4 of the DIP Facility and all amounts on deposit in
such Carve-Out Account in accordance with the terms of
the DIP Facility;

(3)     avoidance actions, other than those, if any, jointly specified
by the Purchaser and the Company in the Agreement (as
defined hereafter);

(4)     all documents, agreements, contracts and instruments,
including personnel files, relating to employees that do not
become employees of Purchaser (or any subsidiary thereof)
upon the closing;

(5)     except to the extent that any of the following are expressly
included as part of the acquired assets on or prior to the
date that is one business day prior to the due date for the
submission of qualifying competing bids established by the
Bidding Procedures Order (the "Interim Deadline"), any
shares of capital stock or other equity interest of any of the
Debtors or any securities convertible into, exchangeable or
exercisable for shares of capital stock or other equity
interest of any of the Debtors;

(6)     duplicate copies of any minute books, stock ledgers,
corporate seals and stock certificates of the Company, and
other similar books and records that the Debtors (other than
any Debtors whose equity interests are acquired pursuant to
the Acquisition) are required by law to retain;

(7)     any rights of the Company under the Agreement; and

(8)     such assets, if any, as the Purchaser designates for
exclusion on or  prior to the Interim Deadline.

7

(d.) **Assumed Liabilities**. As part of the Sale, at closing the Stalking

Horse Purchaser will assume (or cause one or more subsidiaries to assume) only the following

liabilities of the Debtors:

(1) post-closing obligations under Designated Contracts (including Cure Costs);

(2) such workers' compensation, IRB or other obligations, if any, as may be designated by the Stalking Horse Purchaser after the date of this LOI and prior to the Closing Date to become subject to the L/C 'rollover' replacement arrangements described in the LOI,

(3) such other obligations and liabilities (if any) as are designated by the Stalking Horse Purchaser after the date of this LOI and prior to the Closing Date as additional liabilities to be assumed, including any administrative claims that are designated by the Stalking Horse Purchasers as assumed liabilities (and that are not covered by Stalking Horse Purchaser's backstop commitment set forth in sub-clause (d) of the section of the LOI entitled "General"); and

(4) at the closing of the Sale, the Purchaser will also assume (or cause one or more of its subsidiaries to assume) (as part of the Assumed Liabilities) certain express contractual warranty obligations of the Debtors to third parties, certain ordinary course employee obligations, certain repurchase obligations to third parties and certain existing guarantee obligations of the Debtors made or given in connection with the Debtors' UK operations, each of the foregoing only to the extent agreed by the Company and the Purchaser and specified in the Agreement.

(e.) **Excluded Liabilities**. All liabilities that are not an Assumed

Liability shall be "Excluded Liabilities."

(f.) **Fees and Sponsor Advisory Services / Management**. Subject to

entry of the Bidding Procedures Order (defined below), Debtors shall pay or reimburse the

Stalking Horse Purchaser for any and all out-of-pocket fees and expenses incurred by it

8

(including the reasonable fees and disbursements of Latham & Watkins LLP up to a maximum amount of $75,000[3]) in connection with the Sale and the transactions contemplated by the LOI in an amount not to exceed, when taken together with the Alternative Transaction Fee, $4 million (i.e. the Expense Reimbursement (defined below)), as a super-priority administrative expense, ahead of the DIP claims (but expressly subject and subordinate to the Carve-Outs and agent expenses and claims provided for in the DIP Facility), to be paid upon (i) termination of the LOI or Agreement by the Stalking Horse Purchaser upon the occurrence of any Buyer Termination Event other than Buyer Termination

The Stalking Horse Purchaser and/or one or more of its subsidiaries will enter into a customary Sponsor Advisory Services / Management Agreement with Sankaty, MAK Capital and Centerbridge or their respective affiliates, which agreement will provide for annual management fees of $1.5 million per year payable in quarterly installments (*i.e.,* $125,000 per quarter to each of Sankaty, MAK Capital and Centerbridge (or, in each case, their respective affiliate designee); *provided, however,* that if the issuer of the New Notes at any time elects to pay the additional 200 bps of interest on the New Notes through in kind through the PIK election described above then (i) only that portion of such management fees as would be required for the recipient to pay its taxes (the "Tax Liability Payment") will be paid in cash, (ii) all relevant parties, including the Purchaser or its relevant subsidiaries and all management fee recipients, will report the full amount of such management fees as current income/expense (not deferred), and (iii) the amount of such fees in excess of the Tax Liability Payments will be paid in cash

---

[3] In the event that the Sale closes, the Stalking Horse Purchaser shall pay such reasonable fees and disbursements of Latham & Watkins LLP up to a maximum amount of $75,000.

upon the earliest to occur of (x) such time as the New Notes are paid in full, (y) such time as the

New Notes issuer no longer elects to pay any portion of the interest on New Notes in-kind

(*provided* that the New Notes issuer has paid in cash a portion of any accrued paid-in-kind

interest to the extent, if any, required to assure that the total amount of outstanding accrued paid-

in-kind interest obligations does not then exceed the maximum total amount of accrued paid-in-

kind interest that would accrue over a period equal to the sum of six months plus the length of

the covenant holiday period under the New Notes) and (z) such earlier time (if any) as may be

approved by Required Noteholders.

(g.)     **Alternative Transaction Fee**.  An alternative transaction fee of up

to $3 million (i.e.; the Breakup Fee (defined below)) payable to the Stalking Horse Purchaser or

its designees (*i.e.,* $1 million each to each of Centerbridge, MAK Capital and Sankaty) in the

event of consummation of a topping bid in the 363 auction or consummation of an alternative

plan of reorganization (other than following consummation the Acquisition described herein) (an

"Alternative Transaction"), which Breakup Fee shall be paid solely from the proceeds of a

topping bid in the 363 auction or as an administrative expense in the context of an alternative

plan of reorganization, and shall not otherwise prime the liens and claims of the DIP Lenders

under the DIP Facility.  The Alternative Transaction Fee shall be reduced to the extent that the

Expense Reimbursement (defined below) and the Breakup Fee required to be paid would

otherwise, in the aggregate, exceed $4 million (with any such reduction to be applied equally

among Centerbridge, MAK Capital and Sankaty).

15.     The Debtors believe that the sale of the Assets as a going concern to the

Stalking Horse Purchaser or a higher and better bidder determined in accordance with the

Bidding Procedures is far preferable to a piecemeal liquidation of the Debtors' Assets. The Debtors further believe that their obtaining the Stalking Horse Purchaser as a stalking horse bidder, marketing their Assets with the assistance of Morgan Joseph and the Debtors' other professionals for approximately five months as of the date of the proposed bid deadline, and holding the auction of such Assets on March 1, 2010, will result in the highest and best price for the Assets.

16. The Debtors have examined the alternatives to a going concern sale of the Assets and have determined that, in light of their financial situation and liquidity needs, a viable alternative to such a sale is not available. As noted above, among other things, the Debtors' DIP Facility, which provides the liquidity needed by the Debtors to run their businesses in the ordinary course, provides for certain milestones for a sale, including that the Debtors shall consummate a sale of substantially all of their assets by no later than March 18, 2010. In addition, the DIP Facility mature on April 8, 2010, and the Debtors do not believe they would be able to procure replacement refinancing that extends beyond that date. Finally, the Debtors believe in any event that it is imperative for a sale of their business on a going concern basis to take place as soon as possible and with the proposed time frame in any event, to prevent further damage to their business from the bankruptcy process.

17. For the reasons stated above, and in light of the obvious benefits to the estates, the Debtors have determined, in the exercise of their business judgment, to consummate the proposal submitted under the Agreement with the Stalking Horse Purchaser or, if applicable, another bidder in the event that the Debtors receives a higher and better bid to the one proposed by the Stalking Horse Purchaser.

11

## Relief Requested

18.     Pursuant to this Motion, the Debtors request that the Court, among other things:

(a.)     approve the Stalking Horse Purchaser's status as the stalking horse purchaser and approve the requested breakup fee of $3 million (the "Breakup Fee") (which shall be reduced to the extent that the Breakup Fee and the Expense Reimbursement (defined below) required to be paid would otherwise, in the aggregate, exceed $4 million) and expense reimbursement which, when taken together with the Breakup Fee, cannot exceed $4 million (the "Expense Reimbursement");

(b.)     approve the proposed bidding procedures (the "Bidding Procedures"), including the overbid provisions (which require minimal increments of $250,000), attached hereto as Exhibit A;

(c.)     approve the procedures set forth herein for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Cure Procedures");

(d.)     establish March 1, 2010 at 11:00 a.m. , or such other time chosen by the Court, as the date for holding the auction (the "Auction") and approve certain procedures in connection therewith;

(e.)     schedule the hearing (the "Sale Hearing") to approve any sale transaction(s) to the Stalking Horse Purchaser or to such other party(ies) that makes the higher or best offer for the Assets (the "Successful Bidder(s)") and establishing deadlines for objections and responses to the relief requested in the Sale Motion; and

12

(f.)    approve the form and manner of notice to be served upon certain parties, including: (i) the form of notice, substantially in the form attached hereto as <u>Exhibit C</u>, to be served on the Sale and Bidding Procedures Notice Parties (defined below); (ii) the form of notice, substantially in the form attached hereto as <u>Exhibit D</u>, to be served on all known creditors of the Debtors (the "Creditor Notice"); and (iii) the form of notice to parties holding Assumed Executory Contracts in conjunction with the proposed Sale, in substantially the form attached hereto as <u>Exhibit E</u> (the "Cure Notice").

## BIDDING PROCEDURES[4]

19.    <u>Qualified Bidders</u>: A Qualified Bidder under the Bidding Procedures is a Potential Bidder (i) who has entered into an acceptable confidentiality agreement, and (ii) whose most current audited and latest unaudited financial statements or other information provided to the Debtors demonstrate, in the Debtors' discretion, the financial capability to consummate a sale transaction and (iii) otherwise complies with the terms of the Bidding Procedures unless waived by the Debtors after consultation with the Committee and the Stalking Horse Purchaser.

20.    <u>Due Diligence Access</u>: Access to the electronic data room established by the Debtors with respect to the Assets will be provided to parties that meet the requirement for becoming a Qualified Bidder.

21.    <u>Bid Deadline</u>: All bids for the Assets (each a "Bid") must be submitted in writing by no later than 12:00 p.m. (Noon) prevailing Eastern Time on February 24, 2010 (the "Bid Deadline") to the Debtors' counsel – Pachulski Stang Ziehl & Jones LLP,

---

[4] The description of the Bidding Procedures set forth herein summarizes the Bidding Procedures attached hereto as <u>Exhibit B</u>. In the event of any inconsistency between this summary and the actual Bidding Procedures attached hereto as <u>Exhibit B</u>, the terms of the actual Bidding Procedures shall control.

13

Attn: Laura Davis Jones, Esq., 919 North Market Street, 17th Floor, P.O. Box 8705,

Wilmington, Delaware 19899-8705 (Courier 19801), facsimile number (302) 652-4400.

22.     Bid Requirements: A bid submitted for the purchase of all or some of the Assets will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder prior to the expiration of the Bid Deadline and complies with the following requirements (a "Qualified Bid"):

(a)     it states that the applicable Qualified Bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Agreement, including, without limitation, with respect to certainty and timing of closing, or pursuant to an alternative structure or upon alternative terms and conditions that the Debtors determine in their sole discretion are no less favorable than the terms and conditions of the Agreement;

(b)     it includes a letter stating that the bidder's offer is irrevocable until the closing of the Sale;

(c)     it includes the duly authorized and executed Asset Purchase Agreement (as modified by the Qualified Bidder to reflect the terms and conditions of its bid), including the purchase price for the Assets that the Qualified Bidder seeks to acquire expressed in U.S. Dollars, together with all exhibits and schedules thereto, including, to the extent required by the terms and conditions of such bid, any ancillary agreements as described in the Asset Purchase Agreement and such additional ancillary agreements as may be required by the bidder with all exhibits and schedules thereto, as well as copies of such materials marked to show those amendments and modifications to the Asset Purchase Agreement ("Marked Agreements") and such ancillary agreements (the "Marked Ancillary Agreements") and the proposed order to approve the Sale by the Bankruptcy Court (to the extent modified from the Order submitted by the Debtors with the Sale Motion) proposed by the Qualified Bidder;

(d)     it includes written evidence of a firm, irrevocable commitment for financing, or such other evidence of ability to consummate the proposed transaction acceptable to the Debtors that will allow the Debtors to make a determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Marked Agreements;

(e)     it is not conditioned on (i) the outcome of unperformed due diligence by the Qualified Bidder (and includes an acknowledgement and representation that the bidder has had an opportunity to conduct any and all required due diligence regarding the Assets prior to making its offer) and/or (ii) obtaining financing;

14

(f)     it fully discloses the identity of each entity that will be bidding for the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation;

(g)     it has a value to the Debtors, in the Debtors' business judgment that either individually or, when evaluated in conjunction with any other Qualified Bid for the Assets, is greater than or equal to the sum of the value offered under the Asset Purchase Agreement, plus (i) the amount of the Break-Up Fee and Expense Reimbursement (each as defined in the Asset Purchase Agreement), plus (ii) U.S.$500,000.

(h)     it includes an acknowledgment and representation that the Qualified Bidder will assume the Debtors' obligations under the executory contracts and unexpired leases proposed to be assigned pursuant to the Asset Purchase Agreement (or identifies with particularity in the Marked Agreement which of such contracts and leases the Qualified Bidder wishes not to assume, or alternatively which additional executory contracts or unexpired leases the Qualified Bidder wishes to assume), contains details of the Qualified Bidder's proposal for the treatment of related cure costs; and it identifies with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(i)     it includes an acknowledgement and representation that the Qualified Bidder: (i) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid; (ii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in any ancillary agreement; and (iii) is not entitled to any expense reimbursement or break-up fee in connection with its bid;

(j)     it includes evidence, in form and substance satisfactory to the Debtors, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Marked Agreements and Marked Ancillary Agreements;

(k)     it is accompanied by a good faith deposit (each, together with the good faith deposit of the Purchaser, a "Good Faith Deposit") in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to (i) $5 million if the Bid is for substantially all of the Assets, or (ii) the greater of ten percent of the bid purchase price (in no event greater than $5 million) or $250,000 if the Bid is for less than substantially all of the Assets, provided any such aggregation of bids shall be consistent in all respects with the requirements under the Debtors court-approved postpetition financing facility;

(l)     it includes evidence of the Qualified Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Potential Bidder's ability to perform in the future the

15

executory contracts and leases proposed in its bid to be assumed by the Debtors and assigned or subleased to the Potential Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such executory contracts and leases;

      (m)    it contains other information reasonably requested by the Debtors; and

      (n)    it is received by the Bid Deadline.

23.    The Debtors may waive non-material compliance with any of the foregoing provisions, and may waive material compliance with any of the foregoing provisions with the consent of the Purchaser or pursuant to order of the Court. The Debtors expressly reserve the right to reject any and all Qualified Bids (other than the Agreement). The Purchaser will be deemed a Qualified Bidder, and the Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction and the Sale.

24.    The Debtors shall deliver copies of any Bids to the Purchaser and counsel for the DIP Agent within 24 hours after the Debtors' receipt of such bids. By no later than February 26, 2010 at 12:00 p.m. (Noon), the Debtors shall determine which bids constitute Qualified Bids, and notify the Purchaser, counsel for the DIP Agent and all Qualified Bidders (or their representatives) of such determination by delivering copies of such Qualified Bid to them via email, facsimile, or overnight delivery.

25.    "As Is, Where Is" Sale: The sale of the Assets will be on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the Debtors, their agents, or estates, except to the extent, if any, set forth in the relevant sale agreements of the Purchaser or another Successful Bidder, if any. Each Qualified Bidder shall be deemed to acknowledge and represent that each has had an opportunity to conduct any and all

16

due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Procedures or the terms of the sale of the Assets that shall be set forth in the Agreement or final Marked Agreement.

26. <u>Auction</u>. The Auction, unless otherwise ordered by the Court, shall occur on March 1, 2010 at 11:00 a.m., prevailing Eastern Time at the Debtors' counsel's office at Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705, or such other place and time as the Debtors shall notify all Qualified Bidders, the Committee, the DIP Agent, and other invitees. If, however, no Qualified Bid is received by the Bid Deadline other than the Qualified Bid of the Stalking Horse Purchaser, then the Debtors may determine, in their discretion, that the Auction will not be held. In such circumstances, the Debtors will seek Court approval to consummate the Agreement.

27. Only the Debtors, the Stalking Horse Purchaser, the Committee, the DIP Agent (and the advisors to each of the foregoing), the Joint Bidders (as defined in the Letter of Intent by and among the Debtors, the New Equity Investors and the Supporting Lenders dated as of January 15, 2010), and any other Qualified Bidder that has timely submitted a Qualified Bid (and the advisors of such Qualified Bidder), may attend the Auction in person, and only the Purchaser and such other Qualified Bidders who have submitted Qualified Bids will be entitled to make any subsequent bids at the Auction.

17

28. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Debtors determine, in consultation with their advisors that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each incremental bid shall provide net value to the estate of at least U.S. $250,000. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid or combination of bids (and the value of such bid(s)) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Purchaser), the Debtors will, at each round of bidding, give effect to the Break-Up Fee and Expense Reimbursement that may be payable to the Stalking Horse Purchaser under the Agreement.

29. The Debtors reserve the right to accept Bids for less than all of the Assets and combination Bids for, in the aggregate, all of the Assets and/or to consider the value of Assets excluded from the Bid for the purpose of determining the highest Bid. The Debtors further reserve the right to reject any Bid and to declare at the conclusion of the Auction that no acceptable bids (excluding the Agreement) were submitted.

18

## Notice of Sale Hearing

30.     The Debtors request that the Court approve the manner of notice of the Sale Motion, the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached hereto as Exhibit C (the "Sale and Bidding Procedures Notice"), which the Debtors will serve on the following parties:

(a.)     the U.S. Trustee;

(b.)     counsel to the Committee;

(c.)     counsel to the DIP Agent;

(d.)     all parties known to be asserting a lien on any of the Assets and who would appear as potentially holding a lien on any search conducted to determine who asserts a lien on Sellers' assets;

(e.)     all entities known to have expressed an interest in purchasing the Assets;

(f.)     the United States Attorney's office;

(g.)     all state attorney generals in states in which the Debtors do business;

(h.)     state taxing authorities in the states in which the Debtors do business and the Internal Revenue Service;

(i.)     the Stalking Horse Purchaser and its counsel; and

(j.)     all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 9010(b) as of the

19

date of entry of the Bidding Procedures Order (collectively, the "Sale and Bidding Procedures Notice Parties").

31.     Additionally, the Debtors propose to serve the Creditor Notice substantially in the form attached hereto as Exhibit D on all known creditors of the Debtors.

32.     The Debtors propose to serve the Sale and Bidding Procedures Notice and the Creditor Notice within three (3) Business Days from the date of entry of an order granting the Bidding Procedures Motion (the "Bidding Procedures Order"), by first-class mail, postage prepaid, on the appropriate parties. Both the Sale and Bidding Procedures Notice and the Creditor Notice will provide that any party that has not received a copy of the Sale Motion or the Bidding Procedures Order that wishes to obtain a copy of such documents may make such a request, in writing, to Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box, 8705, Wilmington, Delaware, 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, Esquire).

## Sale Hearing

33.     At the Sale Hearing, the Debtors will present the results of the Auction to the Bankruptcy Court and seek Bankruptcy Court approval of the Sale of the Assets to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code, with all such liens, claims and interests to attach to the proceeds of the Sale, except as otherwise provided with the same validity and in the same order of priority as they attached to the Assets prior to the Sale, including the assumption by the Debtors and assignment to the Successful Bidder of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code. The Debtors will present additional evidence, as necessary, at the

13814-001\DOCS_LA:210175.5

Sale Hearing and submit that the relief sought herein, including the Sale and related assumption and assignment of contracts and leases, is fair, reasonable and in the best interest of their estate.

## Closing

34.    The Closing shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Bankruptcy Court at the Sale Hearing.

## Procedures for the Assumption and Assignment of Assumed Executory Contracts

35.    On or before eleven (11) calendar days following the entry of the order granting the Motion (the "Procedures Order"), the Debtors shall file and serve the Cure Notice, in substantially the form attached to hereto as Exhibit E (the "Cure Notice") upon the counterparties to the Assumed Executory Contracts, provided, however that the Debtors and the Stalking Horse Purchaser may mutually agree to designate an executory contract as an Assumed Executory more than eleven (11) calendar days after the entry of the Procedures Order; provided further, however, that, unless otherwise agreed by the Debtors and the Stalking Horse Purchaser, an executory contract may not be designated an Assumed Executory Contract later than fifteen (15) days prior to the Sale Hearing. If the Debtors and the Stalking Horse Purchaser agree to designate an executory contract an Assumed Executory Contract after more than eleven (11) calendar days after the entry of the Procedures Order, the Debtors shall file and serve by overnight mail the Cure Notice on the Counterparty (defined below) within one (1) business day of such contract being designated an Assumed Executory Contract. Counterparties to the

21

Assumed Executory Contracts[5] (each a "Counterparty", and together, the "Counterparties") must file and serve any objection to the assumption and assignment of any Assumed Executory Contract, including objections to any cure costs (the "Cure Costs" or "Cure Amounts"), by the date that is fifteen (15) days after service of the Cure Notice.

36.     The Stalking Horse Purchaser shall, if it is the Successful Bidder, be responsible for paying all Cure Amounts. Any Counterparty failing to timely file an objection to the Cure Amount set forth in the Cure Notice shall be forever barred from objecting to its Cure Amount and from asserting any additional cure or other amounts against the Debtors, their estates, and the Stalking Horse Purchaser with respect to the Assumed Executory Contract to which it is a Counterparty, and will be deemed to consent to its Cure Amount as set forth in the Cure Notice by the Debtors. Notwithstanding anything to the contrary, no executory contract or unexpired lease will be assumed unless and until the occurrence of the Closing Date and in accordance with the terms of the Agreement. Pursuant to the terms of the Agreement and this Order, the Stalking Horse Purchaser may remove any executory contract or lease from the list of Assumed Executory Contracts at any time prior to Closing.

37.     If any Counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (other than with respect to the amount of its Cure Amount, as set forth above), the Counterparty must file any such objection with the Court on or before February 23, 2010, at 4:00 p.m. (prevailing Eastern Time), and serve such objection in

---

[5] The inclusion of any agreement as an Assumed Executory Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included as an Assumed Executory Contract up until the time of the Sale Hearing

22

accordance with the Sale Notice and/or Creditor Notice so as to be received by such date and time by (a) counsel for the Debtors; (b) counsel for the Committee; (c) counsel for the DIP Agent; (d) the U.S. Trustee; and (e) counsel for the Stalking Horse Purchaser, with a courtesy copy to Chambers, failing which the Counterparty will deemed to consent to the proposed assumption and assignment to the Purchaser or other Successful Bidder of such Assumed Executory Contract to which it is a Counterparty.

38. Compliance with the foregoing notice provisions shall constitute sufficient notice of the Debtors' proposed sale of the Assets, the contemplated assumption and assignment of each Assumed Executory Contract and the proposed Cure Amounts with respect to each such Assumed Executory Contract, and no additional notice of such contemplated transactions need be given.

## Approval of the Expense Reimbursement, Breakup Fee and Bidding Procedures is Appropriate

39. The Expense Reimbursement, Breakup Fee and the Bidding Procedures described herein were necessary to induce the Stalking Horse Purchaser to agree to the Agreement and serve as the Stalking Horse Purchaser, and are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values. The Stalking Horse Purchaser will be the stalking horse for competitive bids, perhaps leading to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.

40. As indicated above, the Debtors hereby request that the Court approve such bidding protections and the Bidding Procedures, including (a) the Expense Reimbursement;

23

(b) the Breakup Fee, (c) the minimum incremental overbid amount of $250,000, plus the purchase price under the Agreement in respect of an offer for all or substantially all of the Assets; and (d) the other Bidding Procedures summarized in this Motion annexed hereto as Exhibit B. The Debtors submit that cause exists to approve such payments and procedures because they are fair and reasonable under the circumstances and will encourage competitive bidding and the highest and best price for the Assets.

41.     The Debtors believe that the payment of the Expense Reimbursement and the Breakup Fee under the terms of the Agreement, and the establishment of the Bidding Procedures, are reasonable and necessary to induce the Stalking Horse Purchaser to agree to the transactions encompassed by the Agreement and thus to enable the Debtors to obtain the highest and best price possible for the Assets.

42.     To compensate the Stalking Horse Purchaser for serving as the stalking horse bidder whose bid will be subject to higher and better offers, the Debtors seek approval of the Expense Reimbursement and the Breakup Fee in accordance with the terms of the Agreement. The Debtors and the Stalking Horse Purchaser believe that the Expense Reimbursement and the Breakup Fee are reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive asset purchase agreement with the Stalking Horse Purchaser and the risk to the Stalking Horse Purchaser that a third-party offer may ultimately be accepted, and that approval of the Expense Reimbursement and the Breakup Fee under the terms of the Agreement are necessary to preserve and enhance the value of the Debtors' estates.

24

43.     Bidding incentives encourage a potential purchaser to invest the requisite time, money and effort to negotiate with the Debtors and perform the necessary due diligence attendant to the acquisition of the Debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement and the Breakup Fee, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal quotation marks and citation omitted).

44.     The Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. *In Calpine Corp. v. O'Brien Envtl. Energy, Inc.,* 181 F. 3d 527 (3rd Cir. 1999), the court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code § 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the Debtors' estates. *See id.* at 533.

45.     The *O'Brien* court identified at least two instances in which bidding incentives such as expense reimbursements and break-up fees may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives

25

induces a bidder to research the value of the Debtors and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

46.     Whether evaluated under the "business judgment rule" or the Third Circuit's "administrative expense" standard, the Breakup Fee and Expense Reimbursement pass muster. The Agreement and the Debtors' agreement to pay the Breakup Fee and Expense Reimbursement pursuant to the terms are the product of good faith, arm's-length negotiations between the Debtors and Stalking Horse Purchaser. The Expense Reimbursement and the Breakup Fee are fair and reasonable in amount, and are reasonably intended to compensate for the risk to the Stalking Horse Purchaser of being used as a stalking horse bidder.

47.     Further, the Expense Reimbursement and the Breakup Fee already have encouraged competitive bidding, in that the Stalking Horse Purchaser would not have entered into the Agreement without these provisions. The Breakup Fee and Expense Reimbursement thus have "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." *O'Brien*, 181 F.3d at 537. Similarly, the Stalking Horse Purchaser's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Assets will be] sold will reflect [their] true worth." *Id.*

48.     The Bidding Procedures are fair and reasonable procedures reasonably intended to encourage competitive bidding, and the Expense Reimbursement and the Breakup Fee will permit the Debtors to insist that competing bids for the Assets made in accordance with

the Bidding Procedures be materially higher or otherwise better than the Agreement (or

competing agreement), which is a clear benefit to the Debtors' estates.

49.     Furthermore, the Expense Reimbursement and the Breakup Fee total less

than 3% of the credit bid under the LOI and is within the spectrum of expense reimbursement

and termination fees approved by bankruptcy courts in other chapter 11 cases in this District.

50.     *See e.g., In re Monaco Coach Corporation, et al.*, Case No. 09-10750

(KJC) (Bankr. D. Del. May 1, 2009) (Court approved a break up fee of approximately 5.77%, or

$3,000,000, in connection with sale); *In re Global Motorsport Group, Inc., et al.*, (Case No. 08-

10192 (KJC) (Bankr. D. Del. February 14, 2008) (Court approved a break up fee of

approximately 4%, or $500,000 in connection with sale); *In re Global Home Products*, Case No.

06-10340 (KG) (Bankr. D. Del. July 14, 2006) (Court approved a break-up fee of 3.3%, or

$700,000, in connection with sale); *In re Ameriserve*, Case No. 00-0358 (PJW) (Bankr. D. Del.,

September 27, 2000) (Court approved a break-up fee of 3.64%, or $4,000,000, in connection

with $110,000,000 sale); *In re Montgomery Ward Holding Corp.*, et al., Case No. 97-1409

(PJW) (Bankr. D. Del., June 15, 1998) (Court approved termination fee of 2.7%, or $3,000,000,

in connection with $110,000,000 sale of real estate assets); *In re Medlab, Inc.*, Case No, 97-1893

(PJW) (Bankr. D. Del. April 28, 1998) (Court approved termination fee of 3.12%, or $250,000,

in connection with $8,000,000 sale transaction); *In re Anchor Container Corp. et, al.*, Case Nos.

96-1434 and 96-1516 (PJW) (Bankr. D. Del. Dec. 20, 1996) (Court approved termination fee of

2.43%, or $8,000,000, in connection with $327,900,000 sale of substantially all of Debtors'

assets); *In re FoxMeyer Corp. et al.*, Case No. 96-1329 (HSB) through 96-1334 (HSB) (Bankr.

D. Del., Oct. 9, 1996) (Court approved termination fee of 7.47%, or $6,500,000, in connection

with $87,000,000 sale of substantially all of Debtors' assets); *In re Edison Bros. Stores. Inc. et al.*, Case No. 95-1354 (PJW) (Bankr. D. Del., Dec. 29, 1995) (Court approved termination fee of 3.5%, or $600,000, in connection with $17,000,000 sale of Debtors' entertainment division); *In re Continental Airlines, Inc.*, Case No. 90-932 (HSB) (Bankr. D. Del.) (Court approved breakup fee of 2.4%, or $1,500,000, in connection with $61,000,000 sale transaction).

51.    For the reasons set forth above, the Debtors respectfully request approval of: (a) the proposed overbid protections including the Expense Reimbursement and the Breakup Fee; (b) the Bidding Procedures for the conduct of overbidding, the Auction and selection of the Successful Bidder(s); (c) the procedures set forth herein for notice to counterparties under executory contracts and leases proposed to be assumed and assigned in connection with the proposed sale, and the determination and payment of Cure Costs to the counterparties to leases or contracts to be assumed and assigned; (d) the scheduling of the Sale Hearing and other matters for which scheduling is requested herein; and (e) the related relief sought hereby.

## No Prior Request

52.    No prior request for the relief sought in this Bidding Procedures Motion has been made to this or any other court.

## Notice

53.    Notice of this Motion either has been or will be given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee, (ii) the Debtors' prepetition and postpetition secured lenders, (iii) the Committee, (iv) those persons who have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (v) all entities known to have expressed an interest in purchasing the Assets. The

28

Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form filed contemporaneously with this Motion, granting the relief requested herein and such other and further relief as this Court deems appropriate.

Dated: January 15, 2010

PACHULSKI STANG ZIEHL & JONES LLP

Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Curtis A. Hehn (DE Bar No. 4264)
Timothy P. Cairns (Bar No. 4228)
Mark M. Billion (Bar No. 5263)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone: 302-652-4100
Facsimile: 302-652-4400

email: ljones@pszjlaw.com
dbertenthal@pszjlaw.com
chehn@pszjlaw.com
tcairns@pszjlaw.com
mbillion@pszjlaw.com

Counsel for Debtors and Debtors in Possession