# EXHIBIT B

## *Letter of Intent*

January 15, 2010

CHAMPION ENTERPRISES, INC.
755 W Big Beaver Rd, Suite 1000
Troy, Michigan 48084

Ladies and Gentlemen:

The Joint Bidders (as hereinafter defined) are pleased to present this proposal to acquire substantially all of the assets and business operations of Champion Enterprises, Inc., a Michigan Corporation (the "Company"), and each of its subsidiaries and affiliates that are debtors and debtors-in-possession in In re Champion Enterprises, Inc., et. al, Case No. 09-14019 (Bankr. D. Del. 2009) (together with the Company, collectively, the "CHB Companies" or the "Debtors") on the terms and subject to the conditions described herein (collectively, the "Acquisition").

THIS LETTER OF INTENT ("LOI" or "TERM SHEET") IS NOT A COMMITMENT TO PURCHASE, OR AN OFFER WITH RESPECT TO, ANY SECURITIES OR A SOLICITATION WITH RESPECT TO ANY RESTRUCTURING PLAN OF THE DEBTORS. ANY SUCH COMMITMENT, OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND THE PROVISIONS OF THE UNITED STATES BANKRUPTCY CODE (THE "BANKRUPTCY CODE"). THE ACQUISITION AND RELATED TRANSACTIONS, INCLUDING ALL TERMS AND CONDITIONS RELATING THERETO DESCRIBED HEREIN, ARE SUBJECT TO, AMONG OTHER THINGS, THE COMPLETION OF DEFINITIVE DOCUMENTATION SATISFACTORY TO THE COMPANY AND THE NEW EQUITY INVESTORS (AS DEFINED BELOW). THE PARTIES HERETO, INCLUDING THE DIP LENDERS AND PRE-PETITION LENDERS SIGNATORY HERETO AS "SUPPORTING LENDERS" (THE "SUPPORTING LENDERS"), WILL BE ENTITLED TO TERMINATE THEIR OBLIGATIONS IN RESPECT OF THE ACQUISITION AND RELATED TRANSACTIONS UPON THE OCCURRENCE OF CERTAIN EVENTS DESCRIBED HEREIN, INCLUDING IF A DEFINITIVE AGREEMENT (AS HEREIN DESCRIBED) IS NOT EXECUTED ON OR BEFORE THE DATE SPECIFIED HEREIN.

Based upon the information received to date, the New Equity Investors, the Supporting Lenders and the Debtors state their intent to consummate the Acquisition on the following terms:

### Joint Bid Proposal

| | |
|---|---|
| General: | The Joint Bidders (as hereinafter defined) propose to make a credit bid to acquire substantially all of the real, personal, tangible, intangible and other property, cash (other than cash specifically designated as an excluded asset) and other assets of the Debtors as a going concern (including equity interests in non-Debtor subsidiaries and assignment of any and all contracts and leases which the New Equity Investors designate for assignment (the "Designated Contracts") in accordance with the procedures to be specified by the Purchaser and the Company in the Agreement (as hereinafter defined), and |

excluding any assets excluded in the Agreement or that the New Equity Investors designate for exclusion prior to the Interim Deadline (as hereinafter defined)) free and clear of all claims, interests, liens and encumbrances (other than permitted encumbrances acceptable to the Company and the New Equity Investors) in an asset sale pursuant to Sections 365 and 363(b) of the U.S. Bankruptcy Code (the "Bankruptcy Code"), in exchange for a combination of:

(a) a credit bid of all obligations (*i.e.*, approximately $80 million principal amount plus accrued interest) under the Debtor-in-Possession Credit Agreement dated as of November 15, 2009 (the "DIP Facility") among certain of the Debtors, the lenders party thereto (the "DIP Lenders") and Credit Suisse AG as administrative and collateral agent (the "DIP Agent");

(b) a credit bid of all obligations under the Company's Amended and Restated Credit Agreement, dated as of April 7, 2006 (as amended or otherwise modified, the "Pre-Petition Credit Agreement"),

(c) the agreement of the Purchaser (as hereinafter defined) to pay any and all cure payments required for the assumption of the Designated Contracts ("Cure Costs");

(d) as will be more particularly set forth in the Agreement, the agreement of the Purchaser to fund at or after the closing of the Acquisition, up to a maximum amount to be agreed and consistent with a budget to be agreed, (i) specified administrative expenses accrued through the closing date of the Acquisition and (ii) specified post-closing wind-down expenses of the bankruptcy estates; and

(e) as will be more particularly set forth in the Agreement, the agreement of the Purchaser to assume specified administrative expenses and the other Assumed Liabilities (as hereinafter defined).

To the extent that the Purchaser acquires any asset encumbered by a permitted encumbrance that cannot legally be acquired subject to such permitted encumbrance, or in the event that the Purchaser cannot reach an alternative consensual agreement with the holder of such permitted encumbrance, the Purchaser shall bear the costs of paying the permitted encumbrance in full.

The following assets will not be acquired by the Purchaser as part of the Acquisition:

(1) interests in or under contracts that are not Designated Contracts (other than Residual LC Beneficiary Rights (defined below));

(2) the Carve-Out Account established pursuant to Section 2.11.4 of

the DIP Facility and all amounts on deposit in such Carve-Out Account in accordance with the terms of the DIP Facility;

(3) avoidance actions, other than those, if any, jointly specified by the Purchaser and the Company in the Agreement (as defined hereafter);

(4) all documents, agreements, contracts and instruments, including personnel files, relating to employees that do not become employees of Purchaser (or any subsidiary thereof) upon the closing;

(5) except to the extent that any of the following are expressly included as part of the acquired assets on or prior to the date that is one business day prior to the due date for the submission of qualifying competing bids established by the Bidding Procedures Order (the "Interim Deadline"), any shares of capital stock or other equity interest of any of the Debtors or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any of the Debtors;

(6) duplicate copies of any minute books, stock ledgers, corporate seals and stock certificates of the Company, and other similar books and records that the Debtors (other than any Debtors whose equity interests are acquired pursuant to the Acquisition) are required by law to retain;

(7) any rights of the Company under the Agreement; and

(8) such assets, if any, as the Purchaser designates for exclusion on or prior to the Interim Deadline.

Upon notice to the Company by the New Equity Investors on or prior to the Interim Deadline and with the Company's consent (such consent not to be unreasonably withheld), the New Equity Investors may elect to structure the Acquisition (as it relates to the acquisition of the business and assets of certain of the Debtors) as an acquisition of the shares of one or more of such CHB Companies or to structure those elements of the Acquisition as asset transfers.

| | |
|---|---|
| Joint Bidders; Structure: | The proponents of the joint bid described in this LOI (the "Joint Bidders") are:<br><br>(i) Centerbridge Capital Partners, L.P. ("Centerbridge"), MAK Capital Fund LP ("MAK Capital") and Sankaty Credit Opportunities II, L.P., Sankaty Credit Opportunities III, L.P., Sankaty Credit Opportunities IV, L.P. and Sankaty Credit Opportunities IV (Offshore Master), L.P. (collectively, "Sankaty" and together with Centerbridge and MAK Capital, the "New Equity Investors") will provide the following equity and backstop debt financing (the |

"New Money Equity Financing"):

    (A) a total of $50 million in cash in exchange for shares (the "New Money Purchased Shares") representing 60% of the primary equity of a new entity[1] (the "Purchaser") to be formed to consummate the Acquisition; and

    (B) additional cash to purchase the DIP Facility claims and Pre-Petition Credit Agreement claims of Opt-Out DIP Lenders (as defined below) pursuant to the Cash-Out Option (as defined below) in the amounts described further below.

  (ii) the DIP Lenders, acting in accordance with instructions of the Required Lenders (the term "Required Lenders" being used herein as defined in the DIP Facility but after giving effect to the closing of open trades and DIP Facility participation contemplated by this LOI and taking into account any pass-through of voting pursuant to participation arrangements), will (together with any and all other DIP Lenders who by signing this LOI or a support agreement agree to support the Acquisition) instruct the DIP Agent (such instruction to be in form and substance reasonably satisfactory to the DIP Agent) to credit bid all obligations (*i.e.,* approximately $80 million plus accrued interest, it being understood and agreed that the DIP Facility, with the exception of the L/C facility thereunder, will be fully drawn and funded prior to closing) under the DIP Facility as part of the joint bid, in exchange for which DIP obligations the DIP Lenders will receive aggregate consideration consisting of:

    (A) shares (the "DIP Loan Equitization Shares") representing 35% of the primary equity of the Purchaser;

    (B) a combination of (i) shares (the "New Debt Equity Kicker Shares") representing 5% of the primary equity of the Purchaser *plus* (ii) $40 million aggregate principal amount of new term loans of the Purchaser (the "New Notes") (subject to the Cash-Out Option provisions described herein).

  (iii) As part of the joint bid and as additional consideration for the Acquisition, the lenders under the Pre-Petition Credit Agreement (the "Pre-

---

[1] The New Equity Investors reserve the right to determine the form of the Purchaser (i.e., corporation vs. limited liability company vs. limited partnership). Specifically, the New Equity Investors contemplate that they may effectuate the Acquisition by (i) establishing the Purchaser as a limited liability company with multiple direct and indirect corporate subsidiaries, and (ii) electing to have these subsidiaries of the Purchaser acquire specific assets and designated contracts, which may include the shares of certain of the Company's subsidiaries, and assume specified liabilities. All references herein to "shares" of the Purchaser shall be deemed to be references to the equity interests of Purchaser (whether in the form of shares of a corporation or interests in a partnership or limited liability company).

Petition Lenders"), acting in accordance with the instructions of the Majority Lenders (as defined in the Pre-Petition Credit Agreement), will direct Credit Suisse, Cayman Islands Branch or any other agent thereunder to credit bid all of the obligations under the Pre-Petition Credit Agreement (the "Pre-Petition Credit Bid"). Each of the Pre-Petition Lenders is (or will be after giving effect to the closing of open trades) a DIP Lender and/or a New Equity Investor and will receive no additional consideration for the Pre-Petition Credit Bid.

The New Money Purchased Shares, the DIP Loan Equitization Shares and the New Debt Equity Kicker Shares (collectively, the "New Shares") will have the same per share economic rights, interests and priorities.

The New Shares will be subject to potential dilution as a result of any future issuances of equity by the Purchaser, including (without limitation) any issuances pursuant to any management equity incentive program adopted by the Purchaser.

| Cash-Out Option: | If any DIP Lender and Pre-Petition Lender (other than the New Equity Investors, the Supporting Lenders and their respective affiliates) provides notice to the New Equity Investors no later than three days following entry of the Sale Order of its election to opt out of receiving DIP Loan Equitization Shares, New Notes and New Debt Equity Kicker Shares in exchange for its DIP Facility claims and Pre-Petition Credit Agreement claims as described above (such DIP Lenders and Pre-Petition Lenders who so opt out being referred to herein as the "Opt-Out DIP Lenders" and such election being referred to herein as the "Cash-Out Option"), then, the New Equity Investors will offer to instead acquire from such Opt-Out DIP Lender, immediately prior to the closing of the Acquisition and subject to closing of such trades by the relevant agent prior to the closing, its DIP claims and Pre-Petition Credit Agreement claims for cash in an amount equal to the sum of: |
|---|---|

(A) the principal amount of New Notes that otherwise would have been issuable to such Opt-Out DIP Lender plus

(B) an amount equal to the product of (x) the number of DIP Loan Equitization Shares that otherwise would have been issuable to such Opt-Out DIP Lender multiplied by (y) the per share price for which the New Equity Investors subscribe for New Money Purchased Shares.

Notwithstanding the foregoing, if any DIP Lender (other than the New Equity Investors or any of their respective affiliates) managed by an institution elects to be repaid in cash in full on account of all of their claims under the new money portion of the DIP Facility instead of receiving DIP Loan Equitization Shares, New Notes and New Debt Equity Kicker Shares in respect of such

| | |
|---|---|
| | claims, such DIP Lender may designate a transfer agent (the "<u>Transfer Agent</u>") and cause it to repay such DIP Lender in exchange for the transfer of such claims to the Transfer Agent. In order to exercise such election, one or several affiliates of such electing institution (the "<u>New Noteholders</u>") must purchase all of such claims from the Transfer Agent. Such electing institution and its affiliates shall not be deemed to be Opt-Out DIP Lenders, and such institution's rollup DIP Lenders shall receive DIP Loan Equitization Shares, New Notes and New Debt Equity Kicker Shares on account of all of their claims under the rollup portion of the DIP Facility and such institution's New Noteholders shall receive DIP Loan Equitization Shares, New Notes and New Debt Equity Kicker Shares on account of their claims under the new money portion of the DIP Facility . |
| **New Money Purchased Shares Allocations:** | The New Equity Investors' respective commitments with respect to the New Money Equity Financing and with respect to purchasing DIP Facility claims and Pre-Petition Credit Agreement claims pursuant to the Cash-Out Option will be subject to the following allocations:<br><br>  - Centerbridge and its designees: 33⅓%<br>  - MAK Capital and its designees: 33⅓%<br>  - Sankaty and its designees:     33⅓%<br><br>Each New Equity Investor will have the right to allocate all or any portion of its subscription allocation for the purchase of New Money Purchased Shares, New Notes, New Debt Equity Kicker Shares, DIP Facility claims and Pre-Petition Credit Agreement claims to one or more co-investors, provided that:<br><br>    (A) in the case of an assignment of subscription rights to any co-investor other than an investment fund affiliated with one of the New Equity Investors such assignee is acceptable to the other New Equity Investors, and<br><br>    (B) no such assignment shall relieve any New Equity Investor from its commitment to subscribe for its full allocated portion of the New Money Purchased Shares, DIP Facility claims or Pre-Petition Credit Agreement claims, as the case may be, except to the extent the assignee actually subscribes for and purchases such shares and loan claims. |
| **New $40M Debt Facility:** | *General:* $40 million principal amount of debt evidenced by the New Notes, issued by Purchaser[2] to DIP Lenders as part of the credit bid of the DIP Facility, as described above.  Each DIP Lender will be provided the opportunity to opt-out of the New Notes and New Debt Equity Kicker Shares |

---

[2] In the event that the Purchaser is formed as an LLC, the Purchaser reserves the right to cause one of its subsidiaries to be the issuer of the New Notes.  In such event, the issuer will be the principal acquirer of the U.S. assets of the Debtors, and the New Notes will be subject to guarantee and backstop arrangements to be agreed on or prior to the Watershed Date and specified in the New Note term sheet to be attached to the Agreement.

pursuant to the Cash-Out Option described above. Each initial holder of New Notes (including DIP Lenders that receive New Notes as part of the credit bid and each New Equity Investor in its capacity as a backstop investor funding a portion of the Cash-Out Option described in this LOI) will also receive its pro rata share (based upon the percentage of the New Notes so acquired by it) of the New Debt Equity Kicker Shares.

*Backstop.* The New Equity Investors will backstop the new debt facility up to $40 million (in the form of purchasing the DIP Facility claims and Pre-Petition Credit Agreement claims of Opt-Out DIP Lenders as part of the Cash-Out Option), in relative amounts proportionate to the New Equity Investors' relative equity commitments (i.e., one-third each, as described above).

*Amortization:* One percent (1%) per year.

*Maturity:* _____ __, 2015 (fifth anniversary of closing).

*Interest:* Interest payable, as follows:

> (x) a base interest amount at a rate of LIBOR + 250 bps (subject to 2% LIBOR floor), payable in cash plus

> (y) an additional 200 bps of interest (which additional interest can be paid, at Purchaser's option, either in cash or PIK).

*Priority:* 1st Priority Lien.

*Covenants:* As used herein, the term "<u>Required DIP Lenders</u>" means DIP Lenders holding not less than sixty percent (60%) of obligations under the DIP Facility, after giving effect to the closing of open trades and DIP Facility participation contemplated by this LOI and taking into account any pass-through of voting pursuant to participation arrangements *provided* that such DIP Lenders include at least two holders of DIP Facility obligations that are not affiliates of each other or of any of the New Equity Investors. As used herein, the term "<u>Required Noteholders</u>" means any of the following: (a) holders of New Notes holding not less than sixty percent (60%) of the aggregate principal amount of New Notes then outstanding *provided* that such holders include at least two holders of Notes that are not affiliates of each other or of any of the New Equity Investors, (b) holders of New Notes holding not less than sixty-seven percent (67%) of the aggregate principal amount of New Notes then outstanding *provided* that such holders include at least one holder of New Notes that is not an affiliate of any of the New Equity

---

[3] That is, agreed to prior to closing by the Purchaser, the New Equity Investors and Required DIP Lenders (as hereinafter defined).

Investors; or (c) holders of New Notes holding not less than seventy-two and one-half percent (72.5%) of the aggregate principal amount of New Notes then outstanding, without regard to whether or not any of such holders are affiliates of the New Equity Investors.

The New Equity Investors, the Required DIP Lenders and the Debtors will work to agree on a mutually acceptable 5-year plan (the "5-Year Plan") for the CHB Companies and their subsidiaries. The obligations evidenced by the New Notes will be structured as loans under a new credit agreement, which would include:

- Total leverage (for the avoidance of doubt, excluding indebtedness arising from Letters of Credit or reimbursement obligations relating thereto) and interest coverage covenants on terms to be agreed among the Purchaser, the New Equity Investors and Required DIP Lenders in the context of the 5-Year Plan, with maintenance (but not incurrence) covenants to be subject to a mutually agreed "holiday" (time to be agreed) and to reasonable, mutually agreed exceptions and cushions (in amounts to be mutually agreed),[3]

- debt incurrence to be subject to compliance with ratio to be agreed by New Equity Investors and Required DIP Lenders prior to execution of the Agreement, and

- restricted payments covenant and related baskets to be agreed by New Equity Investors and Required DIP Lenders prior to execution of the Agreement.

*Amendment Governance:* As follows: (i) 100% required for any amendment, waiver, forbearance, etc. that extends maturity, changes interest rate or payment terms or results in release of all or substantially all collateral or release of all or substantially all guarantees or subordination of liens on all or substantially all collateral, (ii) any amendment, waiver, forbearance, etc. that disproportionately affects any holder will require the consent of such affected holder and (iii) other amendments, waivers, forbearances, etc. permitted with approval of holders of the Required Noteholders; *provided, however,* that if the Purchaser obtains the consent of holders of fifty-five percent (55%) or more of the New Notes to any amendment, waiver, forbearance, etc. but the number of consenting holders is less than the minimum required amount prescribed above, the Purchaser and/or the New Equity Investors may (at their option, if they elect to pursue such amendment, waiver, forbearance, etc.) elect to

(x) cause the issuer to redeem the New Notes held by one or more non-consenting noteholders (without regard to any pro rata prepayment provisions) at a redemption price equal to 85% of the outstanding face amount of the Notes being redeemed plus 100% of accrued and unpaid interest; *provided* that the redemption price shall be 100% of the

outstanding face amount of the New Notes being redeemed plus 100% of accrued and unpaid interest in the event of a forced redemption after the fourth anniversary of the date of issuance of the New Notes in connection with an amendment requiring 100% noteholder approval; or

(y) if one or more existing or new holders is willing to purchase from one or more of such non-consenting holders all of their New Notes for an aggregate purchase price equal to 85% of the outstanding face amount of such New Notes plus 100% of accrued and unpaid interest on such New Notes, then such non-consenting noteholders will be obliged to sell all of such New Notes to such purchasing holder or holders for said amount; *provided* that the sale price shall be 100% of the outstanding face amount of the New Notes being acquired plus 100% of accrued and unpaid interest in the event of a forced sale after the fourth anniversary of the date of issuance of the New Notes in connection with an amendment requiring 100% noteholder approval.

Any fees or other amounts paid to holders of New Notes in connection with any amendment, waiver, forbearance, etc. shall be offered to all holders of New Notes which are willing to consent on the same terms to such amendment, waiver, forbearance, etc.

*Events of Default Remedies:* The New Notes and related credit agreement shall contain customary events of default, including a change of control event of default. The new credit agreement will permit individual noteholders to exercise rights and remedies with respect to payment defaults under their respective New Notes (subject to mutually agreed notice and cure provisions) and as part of the negotiation of definitive documentation for the New Notes and related credit agreement the parties may discuss whether to include other individual noteholder enforcement rights.

| | |
|---|---|
| Securities Law Compliance: | Any securities issued as part of the joint bid, the Acquisition or related transactions described in this LOI (including, without limitation, the New Notes and the New Shares) will be issued pursuant to the exemption from registration requirements provided for private placements pursuant to Section 4(2) of the Securities Act of 1933, as amended, and/or the safe harbor of Regulation D promulgated thereunder; and as a condition to participating in such offerings all New Equity Investors will provide, and any other persons or entities to whom securities are to be issued will be required (as a condition to receiving such securities) to provide, customary representations necessary to establish an exemption from registration under the Securities Act of 1933, as amended, of the foregoing transactions, including representations regarding accredited investor status, investor sophistication and related matters. Any such person who fails to provide such representations will be deemed to have exercised the Cash-Out Option. |

| | |
|---|---|
| Letters of Credit: | As part of the 363(b) sale transaction and related financings, the parties (*i.e.*, the Company, other relevant CHB Companies, the DIP Lenders and the New Equity Investors), subject to the written agreement of all of the DIP Lenders and Pre-Petition Credit Agreement Lenders, will provide all lenders under the CHB Companies' existing letter of credit facilities (including the synthetic letter of credit facility and the letter of credit facility under the DIP Facility) an opportunity to 'roll' their share of the existing L/Cs and related facilities (including the L/C-related portion of the CHB Companies' revolving credit facility) into a replacement L/C facility, in the following manner:<br><br>(a) the Purchaser will assume the specified IRB, workers compensation, performance or other obligations backed by the pre-existing L/C's that are to be subject to such 'rollover' arrangements,<br><br>(b) replacement L/C's will be issued to backstop those assumed obligations of the Purchaser, rather than the corresponding obligations of the Debtors,<br><br>(c) the pre-existing L/C's that are to be subject to such 'rollover' arrangements will be surrendered (undrawn),<br><br>(d) the amounts in the synthetic deposit account relating to the 'rolled' portion of such L/C's will be rolled into such new synthetic L/C facility and<br><br>(e) the terms of the replacement letters of credit (and related revolving credit loans and synthetic term loans) will be modified in a manner to be agreed, including that loans with respect to reimbursement obligations on L/C drawings be secured by a second priority lien or otherwise be junior in priority to the New Notes (e.g., through a first out / last out structure), have a term of five and one-half (5-1/2) years and bear interest at a rate of LIBOR + 100 bps (payable in cash), no financial covenants and other covenants and events of default that are more lenient to the Purchaser than the New Notes.<br><br>Any such arrangements for the 'rollover' replacement of L/Cs and assumption of related liabilities will in each case be subject to the condition that the relevant beneficiaries / holders of the subject pre-existing L/Cs (e.g., Travelers, American Casualty, Liberty Mutual, RLI Group, Maricopa Industrial, Oneida Industrial and other L/C beneficiaries) surrender the pre-petition L/Cs (undrawn) for replacement L/Cs under the replacement L/C facility described above.<br><br>The obligations of the New Equity Investors, the DIP Lenders and the Purchaser to consummate the Acquisition will be subject to the condition that any such L/C 'rollover' replacement is on terms and subject to documentation |

and delivery requirements satisfactory to the New Equity Investors and the Required DIP Lenders.

The obligation of the Purchaser to "roll" the existing L/Cs will be subject to the parties having obtained, by not later than January 26, 2010, the consent of those lenders that are contingently liable with respect to outstanding L/Cs issued for the account of the Company (i.e., all of those lenders that are party to the synthetic L/C facility under the Pre-Petition Credit Agreement, the revolver Pre-Petition Lenders, and DIP Lenders) (it being understood and acknowledged that the execution of this LOI constitutes such consent by the Supporting Lenders signatory hereto). If all lenders have not timely agreed to having such L/C facility "rolled" as specified above, the Purchaser will have the option not to assume the underlying obligations which are the subject of the applicable L/Cs, but will in all events, acquire all of the Debtors' right, title and interest in and to any arrangements with the applicable L/C beneficiaries (subject to the related liabilities which are the subject of the related L/Cs), including the Debtors' residual rights to any cash held by such beneficiaries in the event that the subject L/Cs are not replaced, and are drawn, either after the satisfaction of the underlying liabilities to such beneficiaries or in the context of the Purchaser agreeing to assume such liabilities (such rights, subject to such related liabilities, the "Residual LC Beneficiary Rights"). For the avoidance of doubt, Purchaser is not acquiring the ability to object to or allow claims against the Debtors and their estates

In the event that the existing L/Cs are not "rolled", the parties shall agree on an alternative arrangement or consideration to reflect the fact that the L/Cs will be drawn and not "rolled" ("Alternative LC Consideration"), which alternative arrangement or consideration shall be satisfactory (which satisfaction will be acknowledged in writing not later than the Watershed Date) to the New Equity Investors and to DIP Lenders holding not less than fifty percent (50%) of obligations under the DIP Facility, after giving effect to the closing of open trades and DIP Facility participation contemplated by this LOI and taking into account any pass-through of voting pursuant to participation arrangements *provided* that such DIP Lenders include (i) General Electric Capital Corporation and (ii) CSAM Funding I or at least one affiliate or fund under management of Credit Suisse Alternative Capital, Inc.; provided that this requirement may be waived by DIP Lenders holding not less than fifty percent (50%) of obligations under the DIP Facility, after giving effect to the closing of open trades and DIP Facility participation contemplated by this LOI and taking into account any pass-through of voting pursuant to participation arrangements *provided* that such DIP Lenders include (i) General Electric Capital Corporation and (ii) CSAM Funding I or at least one affiliate or fund under management of Credit Suisse Alternative Capital, Inc.

The parties acknowledge that to the extent that the L/C "rollover"

| | |
|---|---|
| | arrangement or any alternative structure adversely affects the rights or obligations of the L/C issuer under the applicable L/C Facility, such L/C 'rollover' arrangement or alternative structure shall be subject to the consent of such L/C issuer. |
| Assumed Liabilities: | As part of the Acquisition, at closing the Purchaser will assume (or cause one or more subsidiaries to assume) only the following liabilities of the CHB Companies (the "Assumed Liabilities"): (i) post-closing obligations under Designated Contracts (including Cure Costs); (ii) such workers' compensation, IRB or other obligations, if any, as may be designated by the New Equity Investors after the date of this LOI and prior to the Closing Date to become subject to the L/C 'rollover' replacement arrangements described above, and (iii) such other obligations and liabilities (if any) as are designated by the New Equity Investors after the date of this LOI and prior to the Closing Date as additional liabilities to be assumed, including any administrative claims that are designated by the New Equity Investors as assumed liabilities (and that are not covered by Purchaser's backstop commitment set forth in sub-clause (d) of the section of this LOI entitled "General"). At the closing of the Acquisition, the Purchaser will also assume (or cause one or more of its subsidiaries to assume) (as part of the Assumed Liabilities) certain express contractual warranty obligations of the Debtors to third parties, certain ordinary course employee obligations, certain repurchase obligations to third parties and certain existing guarantee obligations of the Debtors made or given in connection with the Debtors' UK operations, each of the foregoing only to the extent agreed by the Company and the Purchaser and specified in the Agreement.<br><br>All other liabilities shall be "Excluded Liabilities." |
| Access: | The Debtors will afford the New Equity Investors, the Purchaser, their respective financing sources (including co-investors, if any), and each of the foregoing parties' counsel, accountants, advisors and other representatives (collectively, the "Representatives") reasonable access to the books, records and properties of the Debtors and their subsidiaries and the opportunity to discuss the business, affairs and finances of the CHB Companies and their subsidiaries with the officers, employees, accountants, attorneys, advisors and representatives of the Debtors and their Subsidiaries in order to enable the New Equity Investors and such other parties to make such investigations of the CHB Companies, their subsidiaries and their businesses as they deem reasonably appropriate. The Company agrees that it will cause the officers and employees of each of its subsidiaries, and their respective legal counsel, accountants and advisors, to reasonably cooperate so that the New Equity Investors and their financing sources can complete such review, including promptly disclosing to the New Equity Investors and their financing sources any material facts known to the Debtors which have resulted in, or would reasonably be expected to result in, a Material Adverse Change (as hereinafter defined). The foregoing access and cooperation shall be provided upon |

| | |
|---|---|
| | reasonable advance notice, and during business hours, and shall be reasonable in scope and manner so as not to unduly disrupt the business of the Debtors and their respective subsidiaries. |
| Conduct of Business: | Until closing of the Acquisition (or termination of obligations under this LOI and the Agreement as provided below), the Debtors and their subsidiaries will continue to operate their business in the ordinary course in accordance with the terms of the DIP Facility and orders of the bankruptcy court and the Debtors will continue to pay administrative expenses from available cash on hand, cash generated in the business during the pendency of the Debtors' bankruptcy proceedings and cash borrowed under the DIP Facility in accordance with the terms thereof and the orders of the bankruptcy court. |
| Agreement / Definitive Transaction Documents: | Subject to satisfaction of the conditions set forth herein, the terms of this proposal shall be documented in a mutually satisfactory, definitive purchase agreement (the "Agreement") which shall (i) be executed by the parties no later than Noon Eastern Time on January 27, 2010 (the "Watershed Date"), and (ii) contain representations and warranties, covenants and closing conditions customary for a transaction of this type, including, but not limited to, conditions that:<br><br>(i) on the Closing Date all representations and warranties of the CHB Companies are true and correct in all material respects; *provided*, however, that the Agreement will also provide that all such representations and warranties shall lapse and be of no further force or effect after the closing;<br><br>(ii) on the Closing Date, all covenants of the CHB Companies contained in the Agreement have been complied with in all material respects;<br><br>(iii) to the extent required after taking into account the Sale Order and as will be more particularly set forth in the Agreement, all material governmental, regulatory and third party approvals, licenses, authorizations, permits, waivers and/or consents relating to the Acquisition or the Purchaser's operation of the transferred business following the Acquisition shall have been obtained and shall remain in full force and effect (including, without limitation, termination or expiration of all Hart-Scott-Rodino or other applicable waiting periods), which condition may not be waived without the consent of each New Equity Investor and the Required DIP Lenders,<br><br>(iv) there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in writing, which challenges or would prohibit consummation of the transactions contemplated by the Agreement;<br><br>(v) at least ten business days before the Closing Date, delivery by the Debtors to the Purchaser, the Supporting Lenders and the New Equity Investors |

- unaudited financial statements for the year ended December 31, 2009 (subject to, *inter alia,* inclusion and incorporation of footnotes and year-end adjustments to the extent unavailable at the time of delivery);

- monthly cash reports from September 30, 2009 through the last business day of the month preceding closing of the Acquisition;

- updated reserve reports with respect to workers compensation; and

- such other information as may be reasonably requested by the New Equity Investors and identified in the Agreement;

(vi) there shall not have occurred since a date to be specified in the Agreement (the "Reference Date") any change in, or effect on, the business, operations, assets, liabilities, or condition (financial or otherwise) of the Company and its subsidiaries which, when considered either individually or in the aggregate together with all other adverse changes or effects with respect to which such phrase is used in the Agreement, is, or would be reasonably expected to be materially adverse to the business, operations, assets, liabilities or condition (financial or otherwise) of the transferred business and assets, taken as a whole; or any war, escalation of hostilities, material act of terrorism, unscheduled closing of the New York Stock Exchange or NASD National Market or any other international securities trading market, or material adverse change in the liquidity of the fixed income or equity markets ("Material Adverse Change"), it being understood that the bankruptcy filing by the Debtors in and of itself shall not constitute a Material Adverse Change (other carve-outs to the "Material Adverse Change" definition may be agreed by the Purchaser and the Company and specified in the Agreement); and

(vii) Achievement of minimum cash and working capital targets (to be agreed by the Purchaser and the Company and set forth in the Agreement).

It shall also be a condition precedent to the respective obligations of each of the New Equity Investors, the DIP Lenders and the Debtors to consummate the transactions contemplated by the Agreement that the New Notes, the related credit agreement and the stockholders agreement,[4] (collectively, the "Definitive Transaction Documents") (i) be in form and substance satisfactory to, in the case of the New Equity Investors, the New Equity Investors and, in the case of the DIP Lenders, the Required DIP Lenders and (ii) have a level of conditionality reasonably satisfactory to the Company; *provided* that such

---

[4] In the event that the Purchaser is formed as a limited liability company, the Purchaser reserves the right to replace the stockholders agreement with a security holders agreement or to include provisions in an LLC operating agreement that would otherwise be included in the stockholders agreement. In such case, references herein to Definitive Transaction Documents will include such LLC operating agreement and/or security holders agreement to the extent that no such separate stockholders agreement is executed.

| | |
|---|---|
| | determination shall be made by all such parties by no later than the Interim Deadline. |
| | This LOI does not include a description of all of the terms, conditions and other provisions that are to be contained in the definitive Agreement and related Definitive Transaction Documents. The definitive Agreement will provide the Purchaser flexibility to acquire assets and assume designated contracts and liabilities through distinct subsidiary entities, subject to the undertaking by the main purchasing subsidiary to backstop such assumed liabilities to the extent necessary to provide adequate assurance of performance with respect to Designated Contracts. |
| Purchaser / New Equity Investors' Conditions Precedent to entering into the Agreement; | The obligation of the Purchaser to enter into the Agreement and any obligation of the New Equity Investors to enter into any definitive agreement with respect to the Acquisition, the New Money Equity Financing or related matters will in each case be subject to the following conditions precedent (each, a "Buyer Condition Precedent"), each of which may be waived in writing by the Purchaser and the New Equity Investors, as applicable: |
| | 1. All open trades (open as of January 11, 2010) of debt of the CHB Companies under the Pre-Petition Credit Agreement and/or the DIP Facility to which any of the New Equity Investors (or any of their known affiliates) are party are not closed and properly recorded by the CHB Companies and the appropriate bank agents prior to 11:00 a.m. January 22, 2010 with the applicable transferees afforded their pro rata opportunity to participate in the DIP Facility; |
| | 2. On or prior to January 15, 2010, the New Equity Investors, the Company and the Required DIP Lenders shall have agreed upon, and the Debtors shall have filed a motion to approve, a mutually agreed form of Bidding Procedures Order (as defined below) reflecting the Acquisition as a stalking horse bid; |
| | 3. On or prior to January 19, 2010, the Company shall have delivered to the New Equity Investors the 5-Year Plan (to serve as the basis for negotiating covenants for the New Notes) in form satisfactory to the New Equity Investors; |
| | 4. The New Equity Investors shall be satisfied with the results of their confirmatory diligence review on or prior to the Watershed Date; |
| | 5. The Sale Order (as defined below) shall have been entered by the Bankruptcy Court in form satisfactory to the New Equity Investors and the Required DIP Lenders on or prior to March 3, 2010 and such order shall not have been amended, modified, reversed or stayed (and the time to seek rehearing or file a notice of appeal shall have expired and no appeal or request for stay or other review shall be pending); |
| | 6. Since the Reference Date, there shall not have occurred any Material Adverse Change; and |

| | | |
|---|---|---|
| | 7. | The DIP Facility shall not have been amended, extended, replaced or refinanced in a material manner that is not acceptable to the New Equity Investors and the Required DIP Lenders. |
| Termination Events: | 1. | This LOI or, upon execution of the Agreement, the Agreement may be terminated by the Company or by a majority of the New Equity Investors or by DIP Lenders (other than New Equity Investors and their respective affiliates) holding a majority in principal amount of the obligations under the DIP Facility held by DIP Lenders other than the New Equity Investors and their respective affiliates if any of the following occurs: |
| | | a. The Bidding Procedures Motion is not filed on or before January 15, 2010 (or such later date as may be approved by the Company, the New Equity Investors and the Required DIP Lenders); |
| | | b. The Bidding Procedures Order is not entered on or before January 28, 2010 (or such later date as may be approved by the Company, the New Equity Investors and the Required DIP Lenders); *provided* that the Company may only terminate this LOI or the Agreement pursuant to this sub-clause (b) if the Debtors have used their commercially reasonable efforts to have the Bidding Procedures Order entered by the required deadline; |
| | | c. The Company and the Purchaser shall fail to agree upon, and execute and deliver the Agreement in form and substance satisfactory to the Company, the Purchaser, the New Equity Investors and the Required DIP Lenders (including, as exhibits thereto, detailed term sheets describing (i) the New Notes and related credit agreement and covenants on terms satisfactory to the New Equity Investors and the Required DIP Lenders and in a level of detail and conditionality reasonably satisfactory to the Company and (ii) the Stockholders' Agreement[5] (as defined below) on terms satisfactory to the New Equity Investors and the Required DIP Lenders and in a level of detail and conditionality reasonably satisfactory to the Company on or before the Watershed Date (or such later date as may be approved by the Company, the New Equity Investors and the Required DIP Lenders); and |
| | | d. The Acquisition is not closed by March 18, 2010 (or such later date as may be approved by the Company, the New Equity Investors and the Required DIP Lenders); or |

[5] In the event that the Purchaser is formed as a limited liability company, the term "Stockholders Agreement" also refers to any LLC operating agreement of the Purchaser that contains terms that are otherwise intended to form part of the stockholders agreement.

2. This LOI or, upon execution of the Agreement, the Agreement may be terminated by the Company or by a majority of the New Equity Investors if any of the following occurs:

   a. The Sale Order is not entered on or before March 3, 2010 (or such later date as may be approved by the Company and the New Equity Investors) *provided* that the Company may only terminate this LOI or the Agreement pursuant to this sub-clause (a) if the Debtors have used their commercially reasonable efforts to have the Sale Order entered by the required deadline.

3. This LOI or, upon execution of the Agreement, the Agreement and any related equity commitment letters or other ancillary documents may be terminated by the Purchaser or the New Equity Investors, and all of the obligations of the parties hereto (other than the obligations, if any, to pay the Alternative Transaction Fee and Reimbursable Expenses in accordance with the Bidding Procedures Order) and obligations under such ancillary agreements shall be of no further force or effect, upon the giving of written notice of termination by not less than two of the three New Equity Investors, if any of the following "Buyer Termination Events" occurs, each of which may be waived in writing by two of the three New Equity Investors:

   a. The Debtors shall fail to file with the Bankruptcy Court, by January 15, 2010 (or such later date as may be approved by the New Equity Investors), a motion (the "Bidding Procedures Motion") seeking orders, in form and substance acceptable to the New Equity Investors and the Company in their sole discretion and the Required DIP Lenders in their reasonable discretion, (i) approving the payment of the Reimbursable Expenses and the Alternative Transaction Fee in accordance with the provisions of this LOI and the priority contemplated for each, (ii) approving bidding procedures reasonably acceptable to the Company, the New Equity Investors and the Required DIP Lenders and otherwise customary or appropriate for transactions of this type, including, without limitation, with respect to the mechanism for qualification of competing bids, an overbid amount, additional bid increments, establishing February 24, 2010 as the due date for submission of qualifying competing bids, establishing procedures for an auction sale for the assets to occur on March 1, 2010, if necessary (the "Bidding Procedures"), and (iii) scheduling a hearing (the "Sale Hearing") to approve the Agreement and the consummation of the Acquisition or sale pursuant to any higher and better bid received in accordance with the Bidding Procedures;

   b. The Bankruptcy Court shall fail to enter the order approving the Bid Procedures on or before the January 28, 2010;

   c. The Company and the Purchaser shall fail to agree upon, execute

and deliver the Agreement (including, as exhibits thereto, detailed term sheets describing (i) the New Notes and related credit agreement and covenants on terms satisfactory to the New Equity Investors and the Required DIP Lenders and (ii) the Stockholders' Agreement (as defined below) on terms satisfactory to the New Equity Investors and the Required DIP Lenders) on or before the Watershed Date (or such later date as may be approved by the New Equity Investors and the Required DIP Lenders);

d. The Bankruptcy Court shall fail to enter, on or before March 3, 2010, an order (the "Sale Order"), in form and substance acceptable to the New Equity Investors in their sole discretion (it being understood that an acceptable form of Sale Order may be attached as an exhibit to the Agreement), approving the Acquisition;

e. The Purchaser and Debtors shall fail to close the transactions contemplated hereby and by the Agreement on or before March 18, 2010 (or a later date approved by the Company, the Required DIP Lenders and all of the New Equity Investors);

f. The Debtors shall have failed to assume, or shall have failed to assign, all Designated Contracts (including without limitation customer agreements that are Designated Contracts) in accordance with the procedures and terms to be agreed by the parties and set forth in the Agreement;

g. All open trades (open as of January 11, 2010) of debt of the CHB Companies under the Pre-Petition Credit Agreement and/or the DIP Facility to which any of the New Equity Investors (or any of their known affiliates) are party are not closed and properly recorded by the CHB Companies and the appropriate bank agents prior to 11:00 a.m. January 22, 2010 with the applicable transferees afforded their pro rata opportunity to participate in the DIP Facility;

h. Any Material Adverse Change shall have occurred since the Reference Date;

i. In the event that, on or before January 26, 2010, none of following has occurred: (i) the requisite consents shall have been received to "roll" L/C's as contemplated in the Section entitled "Letters of Credit"; (ii) Alternative LC Consideration has been agreed upon by the Purchaser DIP Lenders holding not less than fifty percent (50%) of obligations under the DIP Facility, after giving effect to the closing of open trades and DIP Facility participation contemplated by this LOI and taking into account any pass-through of voting pursuant to participation arrangements *provided* that such DIP Lenders include (i) General Electric Capital Corporation and (ii) CSAM Funding I or at least one affiliate or fund under

| | |
|---|---|
| | management of Credit Suisse Alternative Capital, Inc.; or (iii) the requirement for Alternative LC Consideration has been waived by DIP Lenders holding not less than fifty percent (50%) of obligations under the DIP Facility, after giving effect to the closing of open trades and DIP Facility participation contemplated by this LOI and taking into account any pass-through of voting pursuant to participation arrangements *provided* that such DIP Lenders include (i) General Electric Capital Corporation and (ii) CSAM Funding I or at least one affiliate or fund under management of Credit Suisse Alternative Capital, Inc.; or<br><br>j.  In the event that the DIP Modification Order has not been entered, and the DIP Modification executed, by the dates set forth in the Section entitled " Fees and Sponsor Advisory Services / Management Agreement".<br><br>4.  This LOI or, upon execution of the Agreement, the Agreement may be terminated at any time by mutual agreement of the Company, the Required DIP Lenders and at least two of the three New Equity Investors. |
| Post-Closing Stockholder Agreement: | The Purchaser and its stockholders (including the New Equity Investors or their respective designees and any other DIP Lenders to whom New Shares will be issued) will enter into a shareholders' agreement (the "Stockholders' Agreement") acceptable to the New Equity Investors and the Required DIP Lenders, providing for:<br><br>• an initial board of director composed of seven directors, with the following designation and election rights:<br><br>  ° One member designated by Centerbridge for so long as it, together with its affiliates, holds at least ten percent (10%) of the Purchaser's outstanding shares, after which time such member will be elected by holders of a majority of all outstanding shares;<br><br>  ° One member designated by MAK Capital for so long as it, together with its affiliates, holds at least ten percent (10%) of the Purchaser's outstanding shares, after which time such member will be elected by holders of a majority of all outstanding shares;<br><br>  ° One member designated by Sankaty for so long as it, together with its affiliates, holds at least ten percent (10%) of the Purchaser's outstanding shares, after which time such member will be elected by holders of a majority of all outstanding shares;<br><br>  ° One member jointly designated by Centerbridge, MAK Capital and Sankaty for so long as they, together with their respective affiliates, hold in the aggregate at least ten percent (10%) of the Purchaser's outstanding shares, after which time such member will |

be elected by holders of a majority of all outstanding shares;

- One management representative;

- One member designated by Eligible Holders[6] holding a majority of all New Shares held by Eligible Holders for so long as Eligible Holders, together with their affiliates, hold in the aggregate at least ten percent (10%) of the Purchaser's outstanding shares (provided that such designee is reasonably acceptable to and approved by at least two of the three New Equity Investors, which approval rights shall be limited to the disinterestedness, independence and qualifications of such member), after which time such board member will be elected by holders of a majority of all outstanding shares; and

- One member designated by Eligible Holders holding a majority of all New Shares held by Eligible Holders for so long as Eligible Holders, together with their affiliates, hold in the aggregate at least ten percent (10%) of the Purchaser's outstanding shares (provided that such designee is acceptable to and approved by at least two of the three New Equity Investors), after which time such board member will be elected by holders of a majority of all outstanding shares.

- restrictions on transfers of shares, subject to exceptions for the following permitted transfers: (i) transfers of shares to an affiliate of the transferor that agrees to join the Stockholders Agreement and be bound to the same extent as the transferor, (ii) transfers pursuant to customary tag-along and drag-along provisions to be included in the Stockholders Agreement and (iii) such other permitted transfers (if any) as may be mutually agreed by the New Equity Investors and the Required DIP Lenders and incorporated into the terms of the definitive Stockholders' Agreement;

- holders to be entitled, based on ownership thresholds to be determined, to certain information rights (*i.e.*, right to receive annual and quarterly financial reports when made available to lenders) and a reasonable opportunity to communicate with management on a regular (at least annual) basis concerning the financial affairs of the Company, all on terms to be agreed in the definitive Stockholders Agreement and subject to customary confidentiality agreements;

- Centerbridge, MAK Capital and Sankaty to have certain demand and piggy-back registration rights; and other holders to have customary piggy-back registration rights; all parties to be subject to customary

---

[6] As used herein, the term "Eligible Holder" shall mean any holder of New Shares (*other* than the New Equity Investors) that received such New Shares at Closing, whether as part of the DIP Loan Equitization Shares or as New Debt Equity Kicker Shares.

| | |
|---|---|
| | lock-up and other registration rights provisions; |
| | - customary tag-along and drag-along provisions; |
| | - stockholders to have ability to exercise preemptive rights with respect to issuances of equity securities to significant stockholders (the definition of which is to be determined), subject to customary exceptions; and |
| | - prohibition on material transactions between Purchaser and any stockholder that holds, either individually or together with its affiliates, in excess of a percentage of outstanding shares to be determined (or between Purchaser and any group of such holders) unless such transaction is on arm-length terms that are fair to the Purchaser or all stockholders are given an opportunity to participate in such transaction on equivalent terms or such transaction is otherwise approved (after full disclosure of the interested nature of such transaction and all material terms thereof) by either (x) a majority of disinterested directors (*i.e.,* directors who are not employees, partners or affiliates of the stockholders with interests in such transaction – or any of their affiliates) or (y) holders of a majority of shares held by stockholders other than stockholders proposed to be party to the interested transaction. |
| | All stockholders of the Purchaser may be required to join the Stockholders' Agreement as a condition to receiving New Shares. |
| Fees and Sponsor Advisory Services / Management Agreement: | Subject to entry of the Bidding Procedures Order, Debtors shall pay or reimburse the Purchaser and the New Equity Investors for any and all out-of-pocket fees and expenses incurred by them (including the reasonable fees and disbursements of Latham & Watkins LLP up to a maximum amount of $75,000[7]) in connection with the Acquisition and the transactions contemplated by this LOI in an amount not to exceed, when taken together with the Alternative Transaction Fee, $4 million (the "<u>Reimbursable Expenses</u>"), as a super-priority administrative expense, ahead of the DIP claims (but expressly subject and subordinate to the Carve-Outs and agent expenses and claims provided for in the DIP Facility), to be paid upon (i) termination of the LOI or Agreement by the Purchaser or the New Equity Investors upon the occurrence of any Buyer Termination Event other than Buyer Termination Events specified in sub-clauses a., b., c., g. and i. of the definition thereof and subject in the case of the Buyer Termination Events specified in sub-clauses d., e., f. and j. of the definition thereof to the Purchaser having used commercially reasonable efforts to endeavor that the requirements of the applicable sub-clause are satisfied or (ii) consummation of an Alternative Transaction. This paragraph shall survive termination of this LOI and the Agreement to the extent that following such termination the |

[7] In the event that the Acquisition closes, Purchaser shall pay such reasonable fees and disbursements of Latham & Watkins LLP up to a maximum amount of $75,000.

24170945_15.DOC

New Equity Investors are entitled to receive payment of the Reimbursable Expenses pursuant to the Bidding Procedures Order.

The parties hereto shall use commercially reasonable efforts to have entered on or before January 28, 2010, an order of the Bankruptcy Court (the "DIP Modification Order") approving an amendment to the DIP Facility (the "DIP Modification"), provided the DIP Lenders have agreed to such an amendment and to the extent such approval is required, providing for the rollup of the Reimbursable Expenses into the DIP Facility (on a first out basis) upon the occurrence of any event that would give rise to payment to the New Equity Investors of Reimbursable Expenses, and such DIP Modification shall have been executed by the necessary parties thereto by not later than 3 Business Days thereafter.

Purchaser and/or one or more of its subsidiaries will enter into a customary Sponsor Advisory Services / Management Agreement with Sankaty, MAK Capital and Centerbridge or their respective affiliates, which agreement will provide for annual management fees of $1.5 million per year payable in quarterly installments (*i.e.,* $125,000 per quarter to each of Sankaty, MAK Capital and Centerbridge (or, in each case, their respective affiliate designee); *provided, however,* that if the issuer of the New Notes at any time elects to pay the additional 200 bps of interest on the New Notes through in kind through the PIK election described above then (i) only that portion of such management fees as would be required for the recipient to pay its taxes (the "Tax Liability Payment") will be paid in cash, (ii) all relevant parties, including the Purchaser or its relevant subsidiaries and all management fee recipients, will report the full amount of such management fees as current income/expense (not deferred), and (iii) the amount of such fees in excess of the Tax Liability Payments will be paid in cash upon the earliest to occur of (x) such time as the New Notes are paid in full, (y) such time as the New Notes issuer no longer elects to pay any portion of the interest on New Notes in-kind (*provided* that the New Notes issuer has paid in cash a portion of any accrued paid-in-kind interest to the extent, if any, required to assure that the total amount of outstanding accrued paid-in-kind interest obligations does not then exceed the maximum total amount of accrued paid-in-kind interest that would accrue over a period equal to the sum of six months plus the length of the covenant holiday period under the New Notes) and (z) such earlier time (if any) as may be approved by Required Noteholders.

| | |
|---|---|
| Alternative Transaction Fee: | Break-up fee of $3 million (the "Alternative Transaction Fee ") payable to the New Equity Investors or their designees (*i.e.,* $1 million each to each of Centerbridge, MAK Capital and Sankaty) in the event of consummation of a topping bid in the 363 auction or consummation of an alternative plan of reorganization (other than following consummation the Acquisition described herein) (an "Alternative Transaction"), which Alternative Transaction Fee shall be paid solely from the proceeds of a topping bid in the 363 auction or as an administrative expense in the context of an alternative plan of reorganization, and shall not otherwise prime the liens and claims of the DIP |

| | |
|---|---|
| | Lenders under the DIP Facility. The Alternative Transaction Fee shall be reduced to the extent that the Reimbursable Expenses and the Alternative Transaction Fee required to be paid would otherwise, in the aggregate, exceed $4 million (any such reduction to be applied equally among Centerbridge, MAK Capital and Sankaty). This paragraph shall survive termination of this LOI and the Agreement. |
| Conversion to Plan: | At any time on or prior to the Watershed Date, the New Equity Investors may, with the consent of the Required DIP Lenders and the Company (such consent not to be unreasonably withheld), elect to convert the structure of the Acquisition from an asset sale pursuant to Section 363(b) of the Bankruptcy Code to a Chapter 11 plan of reorganization structure with substantially equivalent terms and otherwise acceptable to the Company, the New Equity Investors and the Required DIP Lenders. Upon such election, the parties will take reasonable steps to effectuate a plan on such terms; provided that nothing in this LOI obligates and nothing in the Agreement or in any Definitive Transaction Document will obligate any party to vote in favor of any Chapter 11 plan. |
| Acquisition Support | The Supporting Lenders, being DIP Lenders and/or Pre-Petition Lenders who have agreed to support the Acquisition but are not New Equity Investors, hereby acknowledge and agree that (i) they approve the transactions contemplated by this LOI, (ii) they will take such actions as may reasonably be requested of them to support the Acquisition and the other transactions contemplated by this LOI (provided that nothing in this LOI obligates any party to vote in favor of any Chapter 11 plan), (iii) they will not contest or interfere with the transactions contemplated hereby and (iv) they will not directly or indirectly transfer any claim or interest in any of the CHB Companies, including any DIP Facility claim or any Pre-Petition Credit Agreement claim or any interest therein (whether by assignment, transfer of participation interest or otherwise) to any person or entity without the prior consent of the New Equity Investors (it being contemplated that the New Equity Investors will not approve such transfers unless the transferee is acceptable to them and has signed a lock-up, support or similar agreement in form satisfactory to the New Equity Investors to be bound to the foregoing terms of the Supporting Lenders; *provided* that the foregoing agreements shall expire upon any termination of this LOI in accordance with its terms, including, without limitation, any termination of the LOI by the Required DIP Lenders pursuant to Paragraph 1 in the section of this LOI captioned "Termination Events." The Supporting Lenders who are or become lenders under the CHB Companies' existing letter of credit facilities hereby further agree to 'roll' their share of the existing L/Cs and related facliities (including the L/C-related portion of the CHB Companies' revolving credit facility) into a replacement L/C facility of the Purchaser, as set forth in sub-clauses (a) through (e) of the section of this LOI entitled "Letters of Credit." In addition, the Supporting Lenders hereby further agree that they will <u>not</u> exercise the Cash-Out Option, it being understood that certain of such Supporting Lenders |

| | |
|---|---|
| | may elect to employ the transfer mechanic described in the last paragraph in the section of this LOI entitled "Cash Out Option." |
| Choice of Law: | The Agreement, and to the extent applicable this LOI, shall be governed in accordance with the laws of the State of New York and the parties hereto agree to submit to the exclusive jurisdiction of, and venue in, the United States Bankruptcy Court for the District of Delaware. |

This LOI: (a) supersedes all prior discussions, agreements, commitments, arrangements, negotiations or understandings, whether oral or written, of the parties with respect to the transactions contemplated hereby, including but not limited to the partially executed Letter of Intent dated December 30, 2009; (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto and the other DIP Lenders and Pre-Petition Lenders; and (c) may not be amended or waived except by an instrument in writing signed by the Company, the Required DIP Lenders and each of the New Equity Investors. It is understood that the New Equity Investors may bring in one or more additional parties as equity participants to subscribe for and purchase New Shares as part of the New Money Equity Financing. Any obligations of the New Equity Investors with respect to the New Money Equity Financing and other transactions contemplated hereby will be several, and not joint.

This LOI may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one and the same agreement. Delivery of an executed signature page of this LOI by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms hereof by returning to the Company and the New Equity Investors executed counterparts hereof.

-- -- -- *[Balance of page intentionally blank; Signature pages follow]* -- -- --

IN WITNESS WHEREOF, each of the undersigned has caused this LOI to be executed on its behalf by its duly authorized representative as of the date first written above.

*New Equity Investor:*

Centerbridge Capital Partners, L.P.

By: Centerbridge Associates, L.P.,
   its General Partner

By: Centerbridge GP Investors, LLC,
   its General Partner

By: _____
   Name: Steven M. Silver
   Title: Authorized Person

*[Signature page of New Equity Investors to Letter of Intent]*

*New Equity Investor:*                    MAK Capital Fund LP

By: _____
    Name:
    Title:

*[Signature page of New Equity Investors to Letter of Intent]*

*New Equity Investors:*   Sankaty Credit Opportunities II, L.P.

Name: Michael Bevacqua
Title: Managing Director


Sankaty Credit Opportunities III, L.P.

Name: Michael Bevacqua
Title: Managing Director


Sankaty Credit Opportunities IV, L.P.

Name: Michael Bevacqua
Title: Managing Director


Sankaty Credit Opportunities IV (Offshore Master), L.P.

Name: Michael Bevacqua
Title: Managing Director


*[Signature page of New Equity Investors to Letter of Intent]*

*Supporting Lender:*          GENERAL ELECTRIC CAPITAL CORPORATION

By_____
Name: Daniel Wallitt
Title    Vice President

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | $4,205,805 (pre-syndication) |
| Principal Amount of new money DIP obligations held by Supporting Lender | $4,205,805 (pre-syndication) |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | Sterling: $2,849,418 (pre-syndication) Revolving: $2,570,009 -Drawn (approx): $1,747,646 -Undrawn (approx): $822,403 Synthetic LC: $3,826,222 |

* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

**Supporting Lender:**

Arizona State Retirement System
By: Credit Suisse Alternative Capital, Inc., as
investment adviser

By _____

Name:

Title

THOMAS FLANNERY
AUTHORIZED SIGNATORY

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | |
| Principal Amount of new money DIP obligations held by Supporting Lender | 1,000,000 |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | |

\* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

*Supporting Lender:*

Cadogan Square CLO II B.V.

By _____

Name: ~~Roberta Girard~~

Title: ~~Vice President~~

Daragh Murphy
Vice President

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | $3,069,303.68 |
| Principal Amount of new money DIP obligations held by Supporting Lender | |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pro-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | Sterling Term Loan £2,614,533.16 |

\* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

*Supporting Lender:*

Cadogan Square CLO III B.V.

By _____

Name: ..arta Girard    Daragh Murphy
Title    President    Vice President

| Principal Amount of roll-up DIP obligations held by Supporting Lender | $ 1,526,217.74 |
| --- | --- |
| Principal Amount of new money DIP obligations held by Supporting Lender | |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | Sterling Term Loans £ 1,300,082.15 |

\* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

*Supporting Lender:*

Cadogan Square CLO IV B.V.

By _____
Name:    Roberta Girard
Title    Vice President

Daragh Murphy
Vice President

| Principal Amount of roll-up DIP obligations held by Supporting Lender | $ 1,124,544.52 |
|---|---|
| Principal Amount of new money DIP obligations held by Supporting Lender | |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | Sterling Term Loans £ 957,923.74 |

\* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

**Supporting Lender:**     Castle Garden Funding

By _[signature]_
Name:
Title     THOMAS FLANNERY
AUTHORIZED SIGNATORY

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | 170,017.44 |
| Principal Amount of new money DIP obligations held by Supporting Lender | |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | 335,666.02 · US TL |

* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

**Supporting Lender:**

Credit Suisse Credit Strategies Master Fund, Ltd.
By: Credit Suisse Alternative Capital, Inc., as
investment adviser

By _____

Name:
Title

THOMAS FLANNERY
AUTHORIZED SIGNATORY

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | 236,868.33 |
| Principal Amount of new money DIP obligations held by Supporting Lender | |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | 669,999.99 - synthetic LC<br><br>467,649.95 - US TL |

\* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

*Supporting Lender:*

Credit Suisse Dollar Senior Loan Fund, Ltd.
By: Credit Suisse Alternative Capital, Inc., as
investment manager

By _____

Name:
Title

THOMAS FLANNERY
AUTHORIZED SIGNATORY

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | 650,460.43 |
| Principal Amount of new money DIP obligations held by Supporting Lender | |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | 1,284,206.28 - US TL<br><br>1,528,106.94 - synth LC |

* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

*Supporting Lender:*

Credit Suisse Syndicated Loan Fund
By: Credit Suisse Alternative Capital, Inc. as Agent
(Subadvisor) for Credit Suisse Investments
(Australia) Limited, the Responsible Entity for
Credit Suisse Syndicated Loan Fund

By _____
Name:
Title

THOMAS FLANNERY
AUTHORIZED SIGNATORY

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | 562,421.93 |
| Principal Amount of new money DIP obligations held by Supporting Lender | 419,221.00 - DIP LC<br>2,615,773.73 - DIP TL |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | 1,110,392.36 - US TL<br>2,186,533.54 - Syth LC |

\* Please indicate any amounts that are subject to open trades.

[*Signature page of Supporting Lenders to Letter of Intent*]

***Supporting Lender:*** CSAM Funding I

By _____
    Name:         THOMAS FLANNERY
    Title         AUTHORIZED SIGNATOR

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | *(illegible)* |
| Principal Amount of new money DIP obligations held by Supporting Lender | 3,600,000 |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | *(illegible)* |

\* Please indicate any amounts that are subject to open trades.

[*Signature page of Supporting Lenders to Letter of Intent*]

**Supporting Lender:**

Madison Park Funding II, Ltd.
By: Credit Suisse Alternative Capital, Inc., as
collateral manager

By _____

Name:
Title     THOMAS FLANNERY
          AUTHORIZED SIGNATORY

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | |
| Principal Amount of new money DIP obligations held by Supporting Lender | |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | 1,362,734.97 *Synth* LC |

\* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

**Supporting Lender:**

Fraser Sullivan CLO II Ltd.
By: Fraser Sullivan Investment Management, LLC,
As Collateral Manger

By _____
Name: John W. Fraser
Title  Managing Partner

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | $650,872.75 |
| Principal Amount of new money DIP obligations held by Supporting Lender | $794,391.92 |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | $1,601,557.16 |

\* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

**Supporting Lender:**

Fraser Sullivan CLO I Ltd.
By: Fraser Sullivan Investment Management, LLC,
As Collateral Manger

By _John W. Fraser_
Name: John W. Fraser
Title: Managing Partner

| | |
|---|---|
| Principal Amount of roll-up DIP obligations held by Supporting Lender | $649,346.11 |
| Principal Amount of new money DIP obligations held by Supporting Lender | $792,528.65 |
| Principal Amount and facility type (e.g. term loans, sterling term loans, revolving loans, synthetic LC loans) of Pre-Petition Credit Agreement obligations held by Supporting Lender (including, with respect to revolver, specifying drawn amounts and undrawn commitments.) | $1,597,800.42 |

\* Please indicate any amounts that are subject to open trades.

*[Signature page of Supporting Lenders to Letter of Intent]*

**ACCEPTED AND AGREED:**

*Company:*                              Champion Enterprises, Inc.

By _____
                          Name: William C. Griffiths
                          Title:   Chairman, President and
                                      Chief Executive Officer

*[Signature page of the Company to Letter of Intent]*