# EXHIBIT E

ASSET PURCHASE AGREEMENT

BY AND AMONG

CHAMPION ENTERPRISES HOLDINGS, LLC

and

NEW CHAMPION HOMES, INC.

as Purchasers

AND

CHAMPION ENTERPRISES, INC.

and

CERTAIN SUBSIDIARIES OF CHAMPION ENTERPRISES, INC.

as Sellers

Dated as of February 5, 2010

# TABLE OF CONTENTS

**ARTICLE I**

| | | |
|---|---|---|
| 1.1. | Purchase and Sale of Assets by Asset Purchaser | 1 |
| 1.2. | Purchase and Sale of Assets by New Holdco | 5 |
| 1.3. | Excluded Assets | 5 |
| 1.4. | Assumption of Liabilities by the Asset Purchaser | 7 |
| 1.5. | No Assumption of Liabilities by New Holdco | 9 |
| 1.6. | Excluded Liabilities | 9 |
| 1.7. | Assumption and/or Assignment of Contracts | 11 |
| 1.8. | Updates to Purchased and Excluded Assets and Assumed and Excluded Liabilities | 15 |
| 1.9. | Designation of Seller Securities as Acquired Assets | 16 |
| 1.10. | Potential 338(g) Elections | 16 |
| 1.11. | Intercompany Loans | 16 |
| 1.12. | "As Is" Transaction | 17 |

**ARTICLE II**

| | | |
|---|---|---|
| 2.1. | Consideration to the Sellers. | 17 |
| 2.2. | Consideration to the DIP Lenders and First Lien Lenders. | 19 |

**ARTICLE III**

| | | |
|---|---|---|
| 3.1. | Closing | 19 |
| 3.2. | Closing Deliveries by Sellers | 20 |
| 3.3. | Closing Deliveries by the Purchaser | 21 |
| 3.4. | Termination of Agreement | 22 |
| 3.5. | Procedure Upon Termination | 24 |
| 3.6. | Effect of Termination | 24 |

**ARTICLE IV**

| | | |
|---|---|---|
| 4.1. | Corporate Organization and Qualification | 25 |
| 4.2. | Champion and Subsidiaries. | 25 |
| 4.3. | Authority Relative to This Agreement | 26 |
| 4.4. | Conflicts; Consents of Third Parties. | 26 |
| 4.5. | Absence of Certain Developments | 27 |
| 4.6. | Litigation | 27 |
| 4.7. | Intellectual Property. | 27 |
| 4.8. | Agreements, Contracts and Commitments; Certain Other Agreements | 28 |
| 4.9. | Regulatory Matters; Permits. | 28 |
| 4.10. | Brokers and Finders | 29 |
| 4.11. | Title to Assets; Sufficiency and Condition of Assets | 29 |
| 4.12. | Tangible Personal Property | 29 |
| 4.13. | Real Property. | 29 |
| 4.14. | Compliance with Law; Permits. | 30 |
| 4.15. | Tax Returns; Taxes | 31 |
| 4.16. | Employees. | 32 |
| 4.17. | Company Benefit Plans. | 33 |

|       |                                                                      |     |
|-------|----------------------------------------------------------------------|-----|
| 4.18. | SEC Filings                                                           | 36  |
| 4.19. | Affiliate Matters                                                    | 36  |
| 4.20. | Insurance Policies                                                   | 36  |
| 4.21. | Environmental Matters                                                | 37  |
| 4.22. | Customers, Vendors and Suppliers                                     | 38  |
| 4.23. | Accounts Receivable                                                  | 38  |
| 4.24. | Inventory                                                            | 39  |
| 4.25. | Financial Statements                                                 | 39  |
| 4.26. | Capital Expenditures                                                 | 39  |
| 4.27. | Absence of Undisclosed Liabilities                                   | 39  |
| 4.28. | Warranties                                                           | 39  |
| 4.29. | Trade Payables and Administrative Expenses                           | 39  |
| 4.30. | Permitted Encumbrances                                               | 40  |

**ARTICLE V**

|       |                                                                      |     |
|-------|----------------------------------------------------------------------|-----|
| 5.1.  | Corporate Organization and Qualification                             | 40  |
| 5.2.  | Authority Relative to This Agreement                                 | 40  |
| 5.3.  | Consents and Approvals; No Violation.                                | 40  |
| 5.4.  | Brokers and Finders                                                  | 41  |
| 5.5.  | Adequate Assurances Regarding Assigned Contracts                     | 41  |

**ARTICLE VI**

|       |                                                                      |     |
|-------|----------------------------------------------------------------------|-----|
| 6.1.  | Employees                                                            | 41  |
| 6.2.  | Seller Plans                                                         | 41  |
| 6.3.  | WARN Act Liability                                                   | 42  |
| 6.4.  | No Third-Party Beneficiaries.                                        | 42  |

**ARTICLE VII**

|       |                                                                      |     |
|-------|----------------------------------------------------------------------|-----|
| 7.1.  | Competing Bid and Other Matters.                                     | 43  |
| 7.2.  | Sale Order                                                           | 44  |

**ARTICLE VIII**

|       |                                                                      |     |
|-------|----------------------------------------------------------------------|-----|
| 8.1.  | Conduct of Business of Sellers.                                      | 45  |
| 8.2.  | Access to Information.                                               | 48  |
| 8.3.  | Assignability of Certain Contracts, Etc                              | 50  |
| 8.4.  | Rejected Contracts                                                   | 50  |
| 8.5.  | Further Agreements                                                   | 51  |
| 8.6.  | Further Assurances.                                                  | 51  |
| 8.7.  | Preservation of Records                                              | 52  |
| 8.8.  | Publicity                                                            | 53  |
| 8.9.  | Communication with Acquired Customers                                | 53  |
| 8.10. | Notification of Certain Matters                                      | 53  |
| 8.11. | Confidentiality                                                      | 54  |
| 8.12. | Notification of the Sale                                             | 55  |
| 8.13. | Termination of Tax Sharing and Similar Agreements and Arrangements   | 55  |
| 8.14. | Due Inquiry of Permitted Encumbrances                                | 55  |

**ARTICLE IX**

| | | |
|---|---|---|
| 9.1. | Conditions Precedent to the Obligations of the Purchaser and Sellers | 55 |
| 9.2. | Conditions Precedent to the Obligations of Sellers | 56 |
| 9.3. | Conditions Precedent to the Obligations of the Purchaser | 57 |

**ARTICLE X**

| | | |
|---|---|---|
| 10.1. | Certain Definitions | 59 |

**ARTICLE XI**

| | | |
|---|---|---|
| 11.1. | Additional Tax Matters. | 70 |

**ARTICLE XII**

| | | |
|---|---|---|
| 12.1. | Payment of Expenses | 71 |
| 12.2. | Survival of Representations and Warranties; Survival of Covenants | 71 |
| 12.3. | Entire Agreement; Amendments and Waivers | 71 |
| 12.4. | Counterparts | 71 |
| 12.5. | Governing Law | 72 |
| 12.6. | Jurisdiction, Waiver of Jury Trial, Venue | 72 |
| 12.7. | Notices | 72 |
| 12.8. | Third Party Beneficiaries | 73 |
| 12.9. | Binding Effect; Assignment | 74 |
| 12.10. | Severability | 74 |
| 12.11. | Bulk Sales Laws; Cooperation Regarding Sales or Use Tax Matters | 74 |
| 12.12. | Injunctive Relief | 74 |
| 12.13. | Non Recourse | 74 |
| 12.14. | No Waiver or Release | 75 |
| 12.15. | Time of the Essence | 75 |
| 12.16. | Certain Interpretations. | 75 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of Sale Order |
| Exhibit D | Form of Bidding Procedures Order |
| Exhibit E | Form of Assignment and Assumption Agreement (Real Property Leases) |
| Exhibit F | Summary of Equityholder Arrangements |
| Exhibit G | Term Loan Facility Term Sheet |

## SCHEDULES

| | |
|---|---|
| Schedule 1 | Subsidiaries of Champion |
| Schedule 1.1(a) | Assigned Contracts |
| Schedule 1.1(c) | Equipment |
| Schedule 1.1(d) | Assumed Owned Real Property |
| Schedule 1.1(f) | Assumed Intellectual Property |
| Schedule 1.1(g) | Purchased Names |
| Schedule 1.1(i) | Letters of Credit |

Schedule 1.1(k)        Deposits and Prepaid Expenses
Schedule 1.1(m)       Claims or Causes of Action
Schedule 1.1(o)        Acquired Insurance Policies
Schedule 1.1(p)(i)     Acquired Rights to Excess Insurance
Schedule 1.1(p)(ii)    Other Acquired Insurance Rights
Schedule 1.1(u)        Assumed Plans
Schedule 1.1(y)        Seller Securities
Schedule 1.3(c)        Avoidance Actions Assumed
Schedule 1.3(i)        Excluded Assets
Schedule 1.4(e)        Warranty Liabilities
Schedule 1.4(f)        Repurchase Liabilities
Schedule 1.4(j)        Overdue Property Taxes
Schedule 1.4(o)        Assumed Employee Liabilities
Schedule 1.4(p)        Existing Letters of Credit
Schedule 1.6(g)        Assumed Indebtedness
Schedule 1.6(n)        Excluded Warranty Liabilities
Schedule 3.4(f)(iv)    Designated Contracts
Schedule 8.1(d)        Transition Services
Schedule 8.4           Rejected Contracts
Schedule 8.1           Conduct of Business of Sellers
Schedule 9.3(k)        Minimum Cash and Working Capital Targets
Schedule 10.1(o)       Cure Costs
Schedule 10.1(ccc)     Non-Assumed Contracts
Schedule 10.1(iii)     Permitted Encumbrances
Schedule 10.1(ffff)    Wind-Down Budget

## SELLERS DISCLOSURE SCHEDULE

Section 4.1        Corporate Organization and Qualification
Section 4.2(a)     Seller Jurisdiction of Organization and Qualification
Section 4.2(b)     Ownership by Sellers
Section 4.4(a)     Conflicts and Consents of Third Parties
Section 4.4(b)     Notices
Section 4.5        Absence of Certain Developments
Section 4.6        Litigation
Section 4.7        Owned and Licensed Intellectual Property
Section 4.8        Material Contracts
Section 4.9(a)     Material Permits
Section 4.10       Brokers and Finders
Section 4.11       Title to Assets
Section 4.12       Default under Personal Property Leases
Section 4.13(a)    Owned Real Property
Section 4.13(b)    Leased Real Property
Section 4.15       Tax Returns; Taxes
Section 4.16(a)    Employees
Section 4.16(b)    Employment Loss

Section 4.16(c)       Employee Claims and Employees Represented by a Labor Union
Section 4.16(d)       Notice of Termination Received
Section 4.16(e)       Employment Agreements and Personnel Policies
Section 4.17          Seller Plans
Section 4.17(b)(viii) Foreign Seller Plans
Section 4.19          Affiliate Matters
Section 4.20          Insurance Policies
Section 4.21          Environmental Matters
Section 4.22          Significant Customers and Significant Vendors/Suppliers
Section 4.23          Accounts Receivable
Section 4.25          Financial Statements
Section 4.27          Undisclosed Liabilities
Section 4.28          Warranties
Section 4.29          Trade Payables and Administrative Expenses

## PURCHASER DISCLOSURE SCHEDULE

Section 5.3(a)        Conflicts
Section 5.3(b)        Consents of Third Parties

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of February 5, 2010 (the "Execution Date"), by and among Champion Enterprises, Inc., a Michigan corporation ("Champion") and the direct or indirect subsidiaries of Champion set forth on the signature pages hereto and also on Schedule 1 (collectively with Champion, "Sellers" and each, a "Seller"), and Champion Enterprises Holdings, LLC, a Delaware limited liability company (the "New Holdco") and New Champion Homes, Inc., a Delaware corporation (the "Asset Purchaser" and together with the New Holdco, the "Purchaser"). Certain capitalized terms used herein are defined in Article X.

## RECITALS

WHEREAS, the New Holdco owns 100% of the capital stock of the Asset Purchaser;

WHEREAS, Sellers currently conduct the Business (as defined herein) and the Purchaser desires to purchase the Business;

WHEREAS, each of the Sellers are debtors and debtors in possession in those certain bankruptcy cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") filed on November 17, 2009 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case Nos. 09-14018, 09-14019, 09-14020, 09-14021, 09-14022, 09-14023, 09-14024, 09-14025, 09-14026, 09-14027, 09-14028, 09-14029, 09-14030, 09-14031, 09-14032, 09-14034, 09-14035 and 09-14036 (as Jointly Administered, collectively, the "Chapter 11 Case"); and

WHEREAS, in connection with the Chapter 11 Case and subject to the terms and conditions contained herein and following the entry of the Sale Order (as defined herein) finding the Purchaser as the winning bidder and subject to the terms and conditions thereof, Sellers shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire from Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets (as defined herein), and the Asset Purchaser shall assume from Sellers the Assumed Liabilities (as defined herein), all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and Sellers hereby agree as follows:

## ARTICLE I.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

1.1. Purchase and Sale of Assets by Asset Purchaser. Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Asset Purchaser shall purchase, acquire and accept from each Seller, and each Seller shall sell, transfer, assign, convey and deliver to the Asset Purchaser, on the Closing Date all of such Seller's right, title and interest in, to and under, free

and clear of all Encumbrances to the extent provided in the Sale Order (other than Encumbrances included in the Assumed Liabilities and/or Permitted Encumbrances), all of the assets, properties and rights of any nature, tangible and intangible, real or personal, wherever located, of such Seller, now existing or hereafter acquired prior to the Closing Date, whether or not reflected on the books or financial statements of such Seller as the same shall exist on the Closing Date, including any assets acquired by such Seller on or after the date hereof but prior to the Closing but in all cases excluding the New Holdco Purchased Assets and the Excluded Assets (collectively, the "Asset Purchaser Purchased Assets" and together with the New Holdco Purchased Assets, the "Purchased Assets"). Without limiting the generality of the foregoing, the Asset Purchaser Purchased Assets shall include the following (except to the extent explicitly listed or otherwise included as a New Holdco Purchased Asset or as an Excluded Asset):

(a)     subject to Section 8.3, all Contracts listed or described on Schedule 1.1(a) (the "Assigned Contracts") and all rights pursuant thereto;

(b)     all Inventory;

(c)     all Equipment, including the Equipment listed or described on Schedule 1.1(c);

(d)     all Owned Real Property (together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, profits, proceeds (including condemnation and insurance proceeds), hereditaments and other appurtenances relating thereto (the "Assumed Owned Real Property"), including the Owned Real Property listed on Schedule 1.1(d);

(e)     all leases and subleases set forth in Schedule 1.1(a) for the Leased Real Property and all of Sellers' right, title and interest in and thereto (such leases and subleases, together with Sellers' interest in all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, profits, proceeds (including, without limitation, condemnation and insurance proceeds), hereditaments and other appurtenances relating thereto, the "Assumed Real Property Leases" and the underlying Leased Real Property, the "Assumed Leased Real Property");

(f)     all Seller Intellectual Property (collectively, the "Assumed Intellectual Property"), including the items listed on Schedule 1(f);

(g)     to the extent of Sellers' interest therein, the names listed on Schedule 1.1(g) and, in all cases, any derivations thereof (the "Purchased Names");

(h)     all Accounts Receivable;

(i)     all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts. including all rights of the Sellers to Cash and Cash Equivalents collateralizing the letters of credit listed on Schedule 1.1(i), but, in all events, excluding Excluded Cash (as defined below);

(j)    all of the right, title and interest of the Sellers in and to any arrangements with the beneficiaries of the Specified Letters of Credit, including the residual rights of the Sellers to any Cash and Cash Equivalents held by such beneficiaries either after satisfaction of the underlying liabilities to such beneficiaries or following assumption by the Asset Purchaser of such liabilities;

(k)    all deposits and prepaid expenses of Sellers, including but not limited to (i) security deposits with third party landlords, suppliers, vendors or service providers, ad valorem taxes and lease and rental payments (other than in connection with any Excluded Assets), (ii) rebates (other than rebates due in respect of Excluded Assets), (iii) tenant reimbursements, (iv) pre-payments and (v) those deposits and prepaid expenses set forth on Schedule 1.1(k);

(l)    all Permits and all pending applications therefor, including the Material Permits, in each case to the extent transferable to the Asset Purchaser;

(m)    all rights, claims, credits, causes of action or rights of set off of each Seller against third parties (including any DIP Lenders, New Equity Investors or any of their respective Affiliates and any and all officers, directors, employees and agents of any of the foregoing) and all rights of each Seller to sue any such third party at law or in equity, in all such cases to the extent relating to the other Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating, to the Assigned Contracts), CHB International or any of its direct or indirect subsidiaries (together with CHB International, the "International Subsidiaries") and the Assumed Liabilities, whether choate or inchoate, known or unknown, contingent or otherwise, including (i) the rights to receive all proceeds and damages therefrom; (ii) rights under vendors' and manufacturers' warranties, indemnities and guaranties to the extent relating to the Purchased Assets or Assumed Liabilities; (iii) rights of each Seller to claims, causes of action and rights of Seller to sue in law or in equity for any past, present or future infringement or other impairment of any Assumed Intellectual Property and (iv) rights under the claims or causes of action described in Schedule 1.1(m) but excluding (A) avoidance claims arising under the Bankruptcy Code or applicable state Law other than those set forth on Schedule 1.3(c), and (B) all claims of the Sellers against any current or former director or officer of any Seller that does not become an officer, director or employee of the New Holdco or the Asset Purchaser following the Closing;

(n)    any counterclaims, setoffs or defenses that any Seller may have to the extent relating to any Assumed Liabilities or to any International Subsidiary;

(o)    to the extent assignable or transferable in accordance with the terms and conditions of the applicable insurance policies (but, with respect to any restrictions on assignment or change of control provisions, solely to the extent enforceable under applicable Law) and applicable Law, and to the extent that the Assumed Liabilities include the Liabilities insured or covered thereby, all of Sellers' insurance policies identified on Schedule 1.1(o) (the "Acquired Insurance Policies") and all rights and benefits thereunder (including (A) all rights pursuant to and proceeds from such insurance policies; (B) all claims, demands, proceedings and causes of action asserted by any Seller under such insurance policies to the extent relating directly to any Purchased Asset or Assumed Liability or to the International Subsidiaries; (C) all rights to cash proceeds for unearned premiums upon cancellation thereof; and (D) all residual

rights (after the satisfaction, or the assumption by the Purchaser, of the underlying liabilities insured or covered thereby) to receive remittances from any insurers that are currently holding, or hold in future, cash collateral or other credit support under any such insurance policy);

(p)     all rights and benefits under (i) the insurance policies identified in Schedule 1.1(p)(i) in respect of coverage of Assumed Liabilities and Purchased Assets also covered by the Acquired Insurance Policies and (ii) the insurance policies identified in Schedule 1.1(p)(ii) in respect of coverage of Liabilities assumed pursuant to Section 1.4(p) (including (A) all rights pursuant to and proceeds from such insurance policies in relation to the coverage of such Liabilities; (B) all claims, demands, proceedings and causes of action asserted by any Seller under such insurance policies to the extent relating directly to any Purchased Asset or Assumed Liability or to the International Subsidiaries; and (C) all residual rights (after the satisfaction, or the assumption by the Purchaser, of the underlying liabilities insured or covered thereby) to receive remittances from any insurers that are currently holding, or hold in future, cash collateral or other credit support under any such insurance policy);

(q)     all Tax Returns or Tax Records of Sellers;

(r)     any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes, together with any interest due thereon or penalty rebate arising therefrom, for any Tax Period (or portion thereof) ending on or before the Closing Date;

(s)     all Rights of Indemnity (as defined herein) pursuant to the Assigned Contracts;

(t)     all goodwill and other intangible assets associated with the Business or the Purchased Assets;

(u)     all of the Seller Plans listed on Schedule 1.1(u) (the "Assumed Plans"), which shall include Seller Plans assumed by operation of law, and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with the Assumed Plans (to the extent transferable in accordance with the existing terms and conditions of the applicable Assumed Plan) and any applicable insurance policies;

(v)     all personnel files for Employees hired by the Purchaser at the Closing, except to the extent that any transfer or assignment is prohibited by applicable Law;

(w)     all Documents used in or relating to the Business, the Purchased Assets, the Assumed Liabilities or the International Subsidiaries, including all design and quality assurance manuals and all Documents relating to the customers of Sellers (the "Acquired Customers"), products, services, marketing, advertising and promotional activities, trade shows and all files, supplier lists, vendor lists, records, literature and correspondence with sufficient detail as reasonably available (including, in the case of acquired Documents covered by the attorney-client or work product privilege or similar privileges, all such privileges to the extent transferable under applicable Law) other than any Document (i) covered by the attorney-client, work product or similar privilege (along with the related attorney-client, work product or other similar privilege) to the extent relating primarily to the Excluded Assets, the Excluded Liabilities, the preparation, initial filing and administration of the Chapter 11 Case or

communications with the Sellers, their Subsidiaries or other Affiliates and/or their respective representatives in relation to the transactions contemplated by this Agreement or (ii) not transferrable to the Asset Purchaser under applicable Law;

(x)     all Documents (whether copies or originals) relating to formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, by-laws and other documents relating to the organization and existence of any Seller as a corporation or other legal entity, as applicable (together with analogous documentation), including, in the case of acquired Documents covered by the attorney-client or work product privilege or similar privileges, all such privileges to the extent transferable under applicable Law and excluding any Document (i) covered by the attorney-client, work product or similar privilege (along with the related attorney-client, work product or other similar privilege) to the extent relating primarily to the Excluded Assets, the Excluded Liabilities, the preparation, initial filing and administration of the Chapter 11 Case or communications with the Sellers, their Subsidiaries or other Affiliates and/or their respective representatives in relation to the transactions contemplated by this Agreement or (ii) not transferrable to the Asset Purchaser under applicable Law;

(y)     subject to consent requirements set forth in <u>Section 1.9</u>, the Seller Securities (as defined herein) specified on <u>Schedule 1.1(y)</u>; and

(z)     all equity interests owned by a Seller of an entity that is not a Seller.

1.2.  <u>Purchase and Sale of Assets by New Holdco</u>.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the New Holdco shall purchase, acquire and accept from Champion, CHBC (as defined below) or the applicable Seller, and Champion, CHBC or the applicable Seller shall sell, transfer, assign, convey and deliver to the New Holdco, on the Closing Date all right, title and interest in, to and under, free and clear of all Encumbrances to the extent provided in the Sale Order to the following (collectively, the "<u>New Holdco Purchased Assets</u>"):

(a)     all of the shares of capital stock or other equity interests (the "<u>Foreign Subsidiary Stock</u>") of CHB International, B.V., a *besloten vnnootschap* organized under the laws of The Netherlands ("<u>CHB International</u>"); and

(b)     all intercompany loans owed by CHB International to any Seller.

1.3.  <u>Excluded Assets</u>.  Notwithstanding anything to the contrary in this Agreement, in no event shall any Seller be deemed to sell, transfer, assign or convey, and each Seller shall retain all right, title and interest to, in and under the assets, properties, interests and rights of each Seller explicitly excluded in the foregoing description of the Purchased Assets or set forth below (collectively, the "<u>Excluded Assets</u>"):

(a)     all Non-Assumed Contracts;

(b)    the Carve-out Account (as defined in the DIP Credit Agreement) established pursuant to Section 2.11.4 thereof and all amounts on deposit in such Carve-Out Account in accordance with the terms thereof (the "Excluded Cash"); provided, that amounts remaining on deposit in the Carve-Out Account following the payment of all finally allowed professional fees and expenses and other amounts payable from funds on deposit in the Carve-Out Account in accordance with the terms thereof ("Excess Carve-Out Cash") shall not constitute Excluded Cash, and the Excess Carve-Out Cash shall be promptly remitted to the Purchaser;

(c)    except as set forth on Schedule 1.3(c), all avoidance claims arising under the Bankruptcy Code or applicable state Law, including avoidance claims of Sellers arising under Chapter 5 of the Bankruptcy Code;

(d)    all Documents (whether copies or originals) to the extent that they (i) relate solely to any of the Excluded Assets or Excluded Liabilities or which a Seller is required by Law to retain and, in each case, which the Sellers are prohibited by Law from providing a copy of to the Purchaser; (ii) relate solely to employees of the Sellers that do not become employees of the Purchaser; or (iii) are both covered by the attorney-client or work product privilege or similar privileges and excluded pursuant to Sections 1.1(w) and 1.1(x);

(e)    any shares of capital stock or other equity interest of any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest of any Seller (collectively, "Seller Securities"), other than Seller Securities set forth on Schedule 1.1(y);

(f)    all claims or causes of action to the extent arising from and relating to Excluded Assets or Excluded Liabilities, including all claims of the Sellers against any current or former director or officer of any Seller that does not become an officer, director or employee of the New Holdco or the Asset Purchaser following the Closing;

(g)    each Seller's rights under this Agreement;

(h)    all Seller Plans (other than the Assumed Plans) and any associated assets held in trust and service agreements, and all Documents created, filed or maintained in connection with such Seller Plans and any applicable insurance policies to the extent insuring the foregoing (collectively, the "Excluded Plans");

(i)    the properties and assets set forth on Schedule 1.3(i); and

(j)    all insurance policies other than the Acquired Insurance Policies (the "Seller Retained Insurance Policies").

For the avoidance of doubt and notwithstanding anything else to the contrary in this Agreement, to the extent that any Seller holds its rights to possession of any asset or property pursuant to a lease or license, such rights to possession of such asset or property shall be an Excluded Asset, except to the extent that the lease or license pursuant to which such Seller holds such rights is among the Assigned Contracts.

1.4. <u>Assumption of Liabilities by the Asset Purchaser</u>. On the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Asset Purchaser shall assume only the following Liabilities of the Sellers (collectively, but in all cases excluding the Excluded Liabilities, the "<u>Assumed Liabilities</u>"):

(a)   to the extent unpaid as of the Closing Date, all ordinary course trade payables of the Sellers for goods and services that (A) are booked, consistent with past practice, in the accounts named trade payables, pre-petition payables, unmatched receivers, accrued expenses and accrued delivery expense and (B) (i) were incurred by any Seller in respect of goods and constitute administrative claims under Section 503(b)(9) of the Bankruptcy Code or (ii) are incurred by any Seller received in the ordinary course of the Business after the filing of the Chapter 11 Case and prior to the Closing Date, but excluding, for the avoidance of doubt, expenses of the type included in the Wind-Down Budget and professional fees and disbursements of professionals retained in connection with the Bankruptcy Case (but including the professional fees and disbursements of ordinary course professionals retained pursuant to a Bankruptcy Court order authorizing the retention of ordinary course professionals in the Bankruptcy Case);

(b)   without in any way limiting the Purchaser's obligation to pay Cure Costs with respect to all Assigned Contracts, any and all Liabilities of the Sellers under each Assigned Contract arising on or after the Closing Date;

(c)   any and all Cure Costs with respect to each Assigned Contract;

(d)   except as set forth in <u>Section 6.2</u>, any and all Liabilities arising under or otherwise in respect of any Assumed Plan listed on <u>Schedule 1.1(u)</u>;

(e)   Liabilities of the Sellers under express written contractual warranties solely to the extent explicitly listed or described in Schedule 1.4(e) (the "<u>Assumed Warranty Liabilities</u>");

(f)   all repurchase obligations of the Sellers set forth on <u>Schedule 1.4(f)</u>;

(g)   the obligations of Champion under (i) the undated Parent Company Guarantee by and between Champion and Bovis Lend Lease Limited relating to a cluster contractor framework contract, and (ii) the Parent Company Guarantee dated October 30, 2008 by and between Champion and Carillion Construction Limited relating to a development at The Royal School of Military Engineering site at Minley, each in the form previously provided to the Purchaser (collectively, the "<u>UK Guarantees</u>");

(h)   any Liabilities with respect to (i) Permitted Encumbrances encumbering Purchased Assets or (ii) other liens, easements, rights of way, restrictive covenants, encroachments or title defects encumbering Purchased Assets that are senior to the Encumbrances securing the obligations under the DIP Loan Documents, except, in each case, to the extent that any such interest is in bona fide dispute within the meaning of Section 363(f)(4) of the Bankruptcy Code, <u>provided</u>, however, that any liabilities with respect to any allegedly senior interest in bona fide dispute that is subsequently determined by a final order of a court of competent jurisdiction to be a valid and enforceable senior interest shall be Assumed Liabilities;

(i)     Liabilities for all transfer, documentary, sales, use, stamp and registration Taxes, and any conveyance fees or recording charges (collectively, "Transfer Taxes"), in each case solely to the extent incurred in connection with the transfer of the Purchased Assets to the Purchaser contemplated by this Agreement and subject to the cap on aggregate Transfer Taxes to be borne by the Asset Purchaser set forth in Section 11.1(a);

(j)     any and all Liabilities for property Taxes owed by any Seller as of the Closing Date to the extent not overdue as of the Closing Date (other than as indicated in Schedule 1.4(j)) and to the extent relating to the Purchased Assets (whether relating to real property, personal property or intangible property) other than those consisting of a leasehold or license interest;

(k)     any and all Liabilities for the sales taxes owed by any Seller as of the Closing Date to the extent not overdue or subject to dispute as of the Closing Date and to the extent that the Sellers have collected such Taxes from third-parties as of the Closing Date;

(l)     any and all Liabilities under Assigned Contracts to refund hiring deposits made by drivers engaged by Star Fleet as independent contractors in the ordinary course of business, with such deposits to be refunded in accordance with their terms;

(m)     any and all Liabilities under Assigned Contracts to refund deposits made to Sellers by Seller customers in the ordinary course of business, but only to the extent such refund is required under the terms of the applicable customer deposit;

(n)     any and all Liabilities arising under the WARN Act caused by actions of the Purchaser on or after the Closing Date, provided, that any liability from an action taken by Purchaser in reliance on any inaccuracy in the disclosures required by Section 4.16(b) hereof is specifically excluded;

(o)     the liabilities set forth on Schedule 1.4(o) hereto with respect to (i) the compensation costs related to Employees and other service providers providing services to the Sellers during the periods specified in Schedule 1.4(o) immediately preceding the Closing Date; and (ii) all vacation and holiday entitlements accrued on the financial statements of the Sellers but unpaid through the Closing Date; and

(p)     The Sellers' Liabilities which are the subject of insurance, self insurance fronting policies or similar arrangements supported by, or which constitute Indebtedness and/or contingent Liabilities where credit support is provided by, in each case Existing Letters of Credit described on Schedule 1.4(p) ("Existing Letters of Credit"), but solely if and to the extent that the Asset Purchaser has obtained the consent of the applicable beneficiaries of such Letters of Credit to the issuance to such beneficiaries of replacement letters of credit to replace the applicable Existing Letter of Credit, and has arranged for the issuance of replacement letters of credit with respect to any such Existing Letter of Credit, and limited to the liability of the Sellers immediately prior to the Closing with respect to such Liabilities (e.g., subject to such defenses as are available to the Sellers (other than discharge in bankruptcy) and limited to any deductibles or self insurance obligations that the Sellers are liable to pay, but excluding, in any event, (i) Liabilities of the type described in Section 1.6(o) and (ii) Liabilities insured under any Seller

Retained Insurance Policies to the extent that the Purchaser does not acquire Sellers' rights and benefits to the insurance covering such Liabilities pursuant to Section 1.1(p), which Liabilities described in clauses (i) or (ii) above shall not be assumed regardless whether the subject of any Existing Letter of Credit.

1.5. <u>No Assumption of Liabilities by New Holdco</u>.  For the avoidance of doubt, but without limiting the foregoing obligations of Asset Purchaser set forth in <u>Section 1.4</u> above or elsewhere in this Agreement, the New Holdco shall not assume any Liabilities of any of the Sellers.

1.6. <u>Excluded Liabilities</u>.  Except for the Assumed Liabilities, the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any nature whatsoever, whether accrued or unaccrued (collectively, the "<u>Excluded Liabilities</u>"), including the following Excluded Liabilities to the extent not explicitly included as an Assumed Liability of the Asset Purchaser pursuant to <u>Section 1.4</u> above:

(a)     all Liabilities of the Sellers to the extent relating to or otherwise to the extent arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(b)     without in any way limiting the Asset Purchaser's obligation to pay Cure Costs as provided elsewhere in this Agreement, any and all Liabilities of each Seller arising from its breach of any term, covenant or provision of any Assigned Contract arising before the Closing Date (except as covered by <u>Section 1.4(c)</u> or <u>Section 1.4(e)</u>);

(c)     all Liabilities of the Sellers in respect of Non-Assumed Contracts (including any Liabilities of the Sellers under this Agreement);

(d)     any and all trade and vendor accounts payable other than trade and vendor accounts payable expressly assumed pursuant to <u>Section 1.4(a)</u>;

(e)     any and all litigation and related claims and Liabilities arising out of or in connection with events occurring on or prior to the Closing Date, no matter when raised (including Liability for breach, misfeasance or under any other theory relating to any Seller's conduct, performance or non-performance);

(f)     any and all Liabilities relating to any environmental, health or safety matter (including any Liability or obligation under any Environmental Law), arising out of or relating to any Seller's operation of its respective businesses, any handling, exposure to, disposal, or incorporation into any products of any Hazardous Materials, or their leasing, ownership, operation, or occupation of real property on or prior to the Closing Date no matter when raised and all claims discharged by the Bankruptcy Court or dischargeable under the Bankruptcy Code;

(g)     all Liabilities of each Seller in respect of Indebtedness, whether or not relating to the Business, other than any such Liabilities with respect to Industrial Revenue Bonds Indebtedness listed in <u>Schedule 1.6(g)</u>;

(h)     any and all Liabilities under the Excluded Plans;

(i)     any and all Liabilities for Taxes arising in connection with the transactions contemplated by this Agreement other than those specifically assumed in Sections 1.4(i), 1.4(j) and 1.4(k);

(j)     any and all Liabilities under or arising as a result of (A) any Tax sharing agreement or arrangement or similar agreement or arrangement to which any Seller is a party, (B) any gain recognition agreement, including without limitation any gain recognition agreement under Treasury Regulation Section 1.367(a)-8, to which any Seller is a party and (C) any cancellation or termination of any of the foregoing agreements or arrangements;

(k)     any and all Liabilities for Taxes attributable to the ownership of the Purchased Assets or the International Subsidiaries or the operation of the Business on or prior to the Closing Date other than those specifically assumed in Sections 1.4(i), 1.4(j) and 1.4(k);

(l)     any and all Liabilities that relate to compensation or benefits with respect to any current or former Employee, current or former director or current or former independent contractor incurred prior to the Closing, other than those Liabilities specifically assumed pursuant to Sections 1.4(n) and 1.4(o);

(m)     any payments due to any equityholders of Sellers in respect of management or other fees (other than compensation owed to equityholders who are employees of Sellers in the Ordinary Course of Business to the extent assumed pursuant to Section 1.4(o));

(n)     all warranty Liabilities described in Schedule 1.6(n);

(o)     product liability claims against any Seller (including all Liabilities arising out of or relating to any such claims), whether currently pending or relating to any product manufactured or sold by any Seller on or prior to the Closing, other than those Liabilities explicitly assumed pursuant to Section 1.4(e);

(p)     all repurchase obligations of the Sellers other than those set forth on Schedule 1.4(f);

(q)     any and all Liabilities of any Seller under any collective bargaining agreement or any agreement with any labor union;

(r)     all Liabilities of the Sellers attributable to, incurred in connection with, arising from, or relating to, a violation of any Laws governing employee relations, including anti-discrimination Laws, wage and hour Laws, labor relations Laws and occupational safety and health Laws; and

(s)     all Liabilities of the Sellers relating to discontinued and/or divested operations, assets or properties.

For the avoidance of doubt, none of the Excluded Liabilities shall be assumed by the Purchaser or otherwise constitute Assumed Liabilities. All of the Excluded Liabilities shall remain

Liabilities of Sellers to be treated and discharged in such manner as may be approved by the Bankruptcy Court.

### 1.7. <u>Assumption and/or Assignment of Contracts</u>

(a) Executory Contracts and Real Property Leases

    i.    Not later than February 8, 2010, the Sellers shall deliver to the Purchaser lists (collectively, the "<u>Contract List</u>") of all of the Sellers' executory Contracts ("<u>Executory Contracts</u>"), all real property leases, subleases, space licenses or other agreements permitting a Debtor to occupy real property which were entered into prior to the Petition Date and are "unexpired leases" for purposes of the Bankruptcy Code (the "<u>Real Property Leases</u>") and all other Contracts under which any Seller has ongoing rights (e.g., a right to indemnification) (the "<u>Other Contracts</u>"). In accordance with applicable law and subject to the provisions of any confidentiality agreement that may be entered into by and among the Sellers and the Purchaser, the Sellers will use their commercially reasonable efforts to (x) make available to the Purchaser in the electronic dataroom or by CD-ROM all material documentation relating to all such Executory Contracts, Real Property Leases and Other Contracts and (y) provide in the electronic dataroom or by CD-ROM all other information about such Executory Contracts and Real Property Leases that the Purchaser reasonably requests in writing. The Purchaser shall have until the date that is the Interim Deadline (the "<u>Contract Designation Date</u>") to remove, by written notice to Champion, Executory Contracts, Real Property Leases and Other Contracts from the Contract List. All Contracts remaining on the Contract List following Contract Designation Date shall be deemed to be included on <u>Schedule 1.1(a)</u> without further action by any party and shall be Assigned Contracts for all purposes of this Contract unless, in each case, later excluded from the Contract List in accordance with <u>sub-clause (vi)</u> or <u>sub-clause (ix)</u> below.

    ii.    Following the date hereof but on or prior to the Contract Designation Date, the Purchaser shall be entitled to, by written notice to Champion, elect to remove any Executory Contract, Real Property Lease or Other Contract from <u>Schedule 1.1(a)</u>, and, unless later re-inserted into <u>Schedule 1.1(a)</u> prior to the Contract Designation Date, such Executory Contract or Real Property Lease shall be a Non-

Assumed Contract and all Liabilities thereunder shall, except to the extent otherwise expressly included among the Assumed Liabilities, be Excluded Liabilities.

iii. At the Sale Hearing, the Sellers shall seek the approval of the Bankruptcy Court to the assumption and assignment, effective as of Closing, of all the Executory Contracts and Real Property Leases listed on Schedule 1.1(a) on the Contract Designation Date.

iv. On or before February 13, 2010, the Sellers shall serve a Cure Notice on counterparties to the Executory Contracts and Real Property Leases that are Assigned Contracts. The Cure Notice shall set forth the Cure Costs that such Counterparties shall be entitled to receive.

v. Counterparties must serve any objection to the assumption and/or assignment of any Executory Contract or Real Property Lease that is an Assigned Contract by the date that is fifteen (15) days after service of the Cure Notice or such other date approved by the Bankruptcy Court in the Bidding Procedures Order.

vi. The Purchaser may exclude from the Contract List and Schedule 1.1(a), by the date that is ten days after service of the counterparty's objection and notification of such objection to the Purchaser, any Executory Contract or Real Property Lease to which an objection from a contract counterparty has been received. In addition, at any time prior to the Closing Date, Purchaser may exclude any Executory Contract or Real Property Lease in the event that the cure amount submitted by the Sellers in relation to such Contract is adjusted upward by the Bankruptcy Court. If the cure amount is not finally determined by the Bankruptcy Court prior to the Closing Date, the assumption and assignment of such Executory Contract or Real Property Lease to the Purchaser shall be deferred until such final determination is made, and (i) at Purchaser's discretion, Sellers shall continue to honor the Contract and make benefits available to Purchaser, with all costs and obligations in connection therewith to be borne by Purchaser until ten days following the later to occur of any decision by the Purchaser to defer or exclude such Contract, and (ii) within 10 calendar days after the Bankruptcy Court's final determination, Purchaser may exclude such Executory Contract or Real Property Lease from the Contract List and Schedule 1.1(a) if the

Bankruptcy Court adjusts upward the cure amount; provided, however, Purchaser shall bear and be responsible for all costs and obligations associated with such Executory Contract until the date which is the first to occur of (ww) the assumption and assignment thereof by Sellers to Purchaser, (xx) Sellers' successfully rejecting the applicable Contract in accordance with Section 365 of the Bankruptcy Code and (yy) 15 days following Purchaser's written election to exclude such Contract and treat it as a Non-Assumed Contract. Any Executory Contracts and Real Property Leases excluded from Schedule 1.1(a) pursuant to this sub-clause (vi) shall be Non-Assumed Contracts, and all Liabilities thereunder shall, except to the extent otherwise expressly included among the Assumed Liabilities, be Excluded Liabilities. Purchaser's right to exclude Contracts pursuant to this sub-clause (vi) shall be its sole remedy to a counterparty objection to assumption and assignment of an Executory Contract or adjustment of a cure amount by the Bankruptcy Court.

vii. Notwithstanding anything to the contrary in this Section 1.7, from the date that is five (5) Business Days prior to the Contract Designation Date, if the Sellers identify any Executory Contract, Real Property Lease or Other Contract entered into by one or more Sellers prior to the Closing that was not previously provided to the Purchaser, Champion shall provide a copy of such Executory Contract, Real Property Lease or Other Contract to the Purchaser within two (2) Business Days of such identification, along with whatever other information about such Executory Contract, Real Property Lease or Other Contract that the Purchaser reasonably requests. The Purchaser may include the applicable Executory Contract, Real Property Lease or Other Contract on Schedule 1.1(a) as an Assigned Contract at any time within five (5) Business Days from receipt thereof, and, subject to following sentence (including the right to exclude the Contract following receipt of objection to assumption and assignment from the contract counterparty) and sub-clause (ix), shall be an Assigned Contract for all purposes of this Agreement. To the extent required under applicable law, Sellers shall, subject to Purchaser's obligation to bear and pay in accordance with Section 2.1(a)(iii) and out of the Wind-Down Facility all costs and obligations in connection with such Contract until the first to occur of (ww) the assumption and assignment thereof by Sellers to Purchaser, (xx) Sellers' successfully rejecting the applicable Contract in accordance with

Section 365 of the Bankruptcy Code and (yy) 15 days following Purchaser's written election to exclude such Contract and treat it as a Non-Assumed Contract, thereafter seek the approval of the Bankruptcy Court to the assumption and assignment, effective as of the Closing, of such Executory Contract or Real Property Lease, subject to the requirement to deliver Cure Notices set forth in sub-clause (iv) above, the right of the contract counterparties to object set forth in sub-clause (v) above and the right of the Purchaser to exclude the applicable Contract or Contracts in accordance with sub-clause (vi) above; provided that the deadlines set forth in each of sub-clauses (iv), (v) and (vi) shall run from the date that Purchaser includes the applicable Executory Contract or Real Property Lease on Schedule 1.1(a) as an Assigned Contract.

viii. Subsequent to the Contract Designation Date and except as set forth in this Section 1.7, the Purchaser shall not have the right to make or change any designation of Executory Contracts or Real Property Leases without the prior written consent of Champion, which shall not be unreasonably withheld.

ix. Without limiting any of Purchaser's rights pursuant to this Section 1.7, in the event that the Bankruptcy Court does not approve the assignment or transfer of one or more of the Assigned Agreements to the Purchaser as Purchased Assets, Purchaser may, in its sole discretion and at any time prior to the Closing Date, exclude any such Contracts from the Contract List and Schedule 1.1(a). In addition, at any time prior to the Closing Date, Purchaser may exclude any Executory Contract or Real Property Lease in the event that the Bankruptcy Court demands additional assurance of adequate protection unacceptable to the Purchaser, and if the adequacy of such assurance is not determined with finality prior to the Closing Date, the assumption and assignment of such Executory Contract or Real Property Lease to the Purchaser shall be deferred until such final determination is made, and (i) at Purchaser's discretion, Sellers shall continue to honor the Contract and make benefits available to Purchaser, with all obligations to be paid by Purchaser, and (ii) within 10 calendar days after the Bankruptcy Court's final determination, Purchaser may exclude such Executory Contract or Real Property Lease from the Contract List and Schedule 1.1(a) if the Bankruptcy Court requires additional adequate assurance unacceptable to the Purchaser; provided, however,

Purchaser shall bear and be responsible for all costs and obligations associated with such Executory Contract until the date which is the first to occur of (ww) the assumption and assignment thereof by Sellers to Purchaser, (xx) Sellers' successfully rejecting the applicable Contract in accordance with Section 365 of the Bankruptcy Code and (yy) 15 days following Purchaser's written election to exclude such Contract and treat it as a Non-Assumed Contract. Any Executory Contracts and Real Property Leases excluded from Schedule 1.1(a) pursuant to this sub-clause (ix) shall be Non-Assumed Contracts, and all Liabilities thereunder shall be Excluded Liabilities.

x. For the avoidance of doubt, no additions or subtractions to the list of Assigned Contracts on Schedule 1.1(a) shall result in an adjustment to the Purchase Price.

1.8. Updates to Purchased and Excluded Assets and Assumed and Excluded Liabilities. Notwithstanding anything in this Agreement to the contrary, the Purchaser may (i) include in the definition of Purchased Assets and exclude from the definition of Excluded Assets, any Contract and any asset of a type described in Sections 1.1(o) or 1.1(p) (so long as the Asset Purchaser also assumes, as applicable, the Liabilities underlying the applicable insurance policies acquired pursuant to Section 1.1(o) or the Liabilities underlying the applicable assets acquired pursuant to Section 1.1(p)) of any Seller and (ii) exclude from the definition of Purchased Assets and include in the definition of Excluded Assets, any Contract or asset of a type described in Section 1.1(o) or 1.1(p), in the case of Contracts in the manner set forth in Section 1.7 above and in the case of assets of a type described in Sections 1.1(o) or 1.1(p) on or prior to the Interim Deadline. Subject to Section 1.9 below, the Purchaser may also (i) with the prior consent of Champion, include in the definition of Purchased Assets and exclude from the definition of Excluded Assets, any other asset, right or property of any Seller previously included as an Excluded Asset and (ii) exclude from the definition of Purchased Assets and include in the definition of Excluded Assets, any other asset, right or property of any Seller, in each case until the Interim Deadline, by revising the applicable Schedules to this Agreement; provided that no such change to the Schedules, the definition of the Purchased Assets or the definition of the Excluded Assets shall result in an adjustment to the Purchase Price but any augmentation of the Excluded Assets shall be accompanied by a corresponding reasonable increase in the Wind-Down Budget to the extent appropriate to take into account the need for Sellers to administer and dispose of such additional Excluded Assets. The Purchaser may also assume any other Liability of any Seller previously included in the Excluded Liabilities at any time on or prior to the Interim Deadline, by revising the applicable Schedules to this Agreement; provided that no such change to the Schedules, the definition of the Excluded Liabilities or the definition of the Assumed Liabilities shall result in an adjustment to the Purchase Price. Notwithstanding anything in this Agreement to the contrary, the Purchaser may exclude any Liability covered by any insurance policies listed in Schedule 1.1(p) or 1.1(o) so long as the Purchaser also excludes from the definition of Purchased Assets (in the manner set forth above) the insurance policy assets covering such Liabilities and updates Schedule 1.1(p) or 1.1(o) accordingly.

1.9. Designation of Seller Securities as Acquired Assets. From and after the Execution Date until the Interim Deadline, the Purchaser may designate Seller Securities as Purchased Assets with the consent of Champion, such consent not to be unreasonably withheld. Such Seller Securities to be purchased shall thereafter be included as part of Schedule 1.1(y) and will be deemed Purchased Assets for all purposes of this Agreement.

1.10. Potential 338(g) Elections. For avoidance of doubt, to the extent that the Purchaser or any of its Affiliates is acquiring the stock of any direct or indirect subsidiary of Champion under this Agreement, it may make any election under Section 338(g) of the Code (or any analogous provision of state, local or non-United States Tax Law) with respect to the purchase of such stock that Purchaser is permitted to make under applicable Law, and, to the extent, if any, that Champion's consent to such election is required by applicable Law, Champion shall grant such consent; provided, however, (i) the Closing shall not be delayed by reason of any election made by the Purchaser pursuant to this Section 1.10, and (ii) in no event shall anything in this Section 1.10 be deemed to give rise to a condition to Closing based upon the success of any such election or achievement of any particular treatment of this transaction for tax purposes, and (iii) nothing in this Section 1.10 shall require the Sellers to incur any cost or expense that the Sellers are not otherwise required to bear pursuant to the other provisions of this Agreement, unless the same is reimbursed by the Purchaser or otherwise contemplated and covered by the Wind-Down Budget.

1.11. Intercompany Loans. Notwithstanding anything to the contrary set forth herein, all intercompany loans and other intercompany accounts shall be administered as follows:

(a) Intercompany Loans Owed by Acquired Entities to Sellers. With respect to any loans or other intercompany accounts owed by any International Subsidiary or by any other entity the equity interests of which Purchaser acquires, directly or indirectly, as a Purchased Asset (collectively, the "Transferred Subsidiaries"), to any of the Sellers or any of their other subsidiaries that Purchaser is not directly or indirectly acquiring, on the Closing Date the Sellers will cause such loans or intercompany accounts to be cancelled or contributed to the capital of CHB International BV or transferred to or contributed to the New Holdco, the Asset Purchaser or such other Transferred Subsidiary as Purchaser may reasonably designate (and Purchaser shall have the right reasonably to determine whether any such loan or other intercompany account is so cancelled, transferred or contributed).

(b) Intercompany Loans Owed by Sellers to Acquired Entities. With respect to any loans or other intercompany accounts owed by Champion Home Builders Company ("CHBC") or any other Seller (or any other subsidiary of any Seller to the extent that Purchaser is not acquiring, directly or indirectly, the equity of such obligor) to any Transferred Subsidiary, on the Closing Date the Sellers will cause such loans to be cancelled or transferred (by dividend or otherwise, in each case as reasonably requested by Purchaser) with the effect that after the Closing the Sellers and its continuing subsidiaries will have no further obligation to any of the Transferred Subsidiaries with respect to such intercompany loans and intercompany accounts (and Purchaser shall have the right reasonably to determine whether any such loan or other intercompany account is so cancelled or so transferred, as well as the structure of any such transfer), except that notwithstanding the foregoing, unless otherwise reasonably determined by

the Purchaser and elected prior to Closing, the intercompany loan in the amount of approximately $646,000 from SRI Homes ULC (Canada) to CHBC will be left in place and the Purchaser will agree that from and after the Closing such loan will be subordinated to other unsecured claims against CHBC.

(c)    Intercompany Loans Owed Among one or more Acquired Entities. With respect to any intercompany loans or other intercompany accounts owed by any Transferred Subsidiary to any other Transferred Subsidiary, Purchaser may reasonably elect to have such loans and account remain in effect, or to have them cancelled or contributed on the Closing Date. To the extent that Purchaser reasonably elects to have them cancelled, transferred or contributed prior to the Closing, the Sellers will cause such cancellation, transfer or contribution to occur in accordance with Purchaser's reasonable request.

(d)    Current Plan with Respect to Certain Intercompany Loans. In furtherance of the foregoing, unless otherwise determined or elected by the Purchaser as contemplated by clauses (a), (b) and (c) above: (i) the approximately $117.1 million of loans receivable that CHBC holds from CHB International will be transferred to the New Holdco at Closing as contemplated by Section 1.2(b); the approximately $4.3 million loan owed by Moduline Industries ULC (Canada) to CHBC as well as the $4.0 million loan owed by Caledonian Building Systems Ltd (UK) to CHBC would be contributed by CHBC to the capital of CHB International prior to the sale of the stock of CHB International to the New Holdco

1.12. "As Is" Transaction. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE IV OF THIS AGREEMENT (ALL OF WHICH SHALL LAPSE AND CEASE TO BE OF ANY FURTHER FORCE OR EFFECT UPON THE CLOSING AS PROVIDED BELOW IN THIS AGREEMENT), THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. ACCORDINGLY, EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, PURCHASER WILL ACCEPT THE PROPERTY AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE II.

## CONSIDERATION

2.1. Consideration to the Sellers.

(a)    The aggregate consideration (collectively, the "Purchase Price") to be paid to the Sellers for the purchase of the Purchased Assets shall be:

(i)    the release of Sellers and any guarantors (and their respective successors and assigns) from the obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in

equity, arising under, or otherwise relating to, the DIP Credit Facility and the First Lien Credit Agreement (singly, the "<u>DIP Credit Bid and Release</u>" and the "<u>First Lien Credit Bid and Release</u>" and, collectively, the "<u>Credit Bid and Release</u>");

       (ii)     the assumption of, and the undertaking to discharge, the Assumed Liabilities by the Asset Purchaser; and

       (iii)    the agreement by the Purchaser to fund from and after the Closing and from time to time through December 31, 2010, (the "<u>Wind-Down Facility</u>") an amount of up to $2,516,000, to be used solely to pay post-closing Liabilities of the Sellers consistent with the Wind-Down Budget (the "<u>Wind-Down Liabilities</u>"); provided, for the avoidance of doubt, that (1) limitations on use of the Carve-Out Account pursuant to the Final DIP Order shall continue unchanged and (2) no portion of the Wind-Down Faciity may be utilized to pay professional fees and expenses incurred to investigate, challenge, disallow or subordinate the liens securing, or the claims with respect to, the indebtedness of the Sellers under the DIP Credit Agreement or the First Lien Credit Agreement, or the claims of the DIP Lenders or Prepetition Lenders against the Sellers pursuant to the DIP Credit Agreement or the First Lien Credit Agreement, Loans or the Prepetition, to challenge or to seek avoidance of any of the transactions contemplated hereunder or to assert claims against the DIP Lenders, the Prepetition Lenders or the Purchaser, or any of their respective affiliates, employees, officers, agents, attorneys or other agents, representatives or advisors. Fundings under the Wind-Down Facility shall be made within three (3) Business Days of the Sellers' request, but not more frequently than on a weekly basis, and subject to receipt of Sellers' certification that the amount of such funding is consistent with the Sellers' projected expenditures for Wind-Down Liabilities for the succeeding week (net of any cash from previous extensions under the Wind-Down Facility not previously utilized to pay Wind-Down Liabilities), including a list of invoices to be paid; provided, that through the effective date of any plan of reorganization for the Sellers, professional fees of bankruptcy professionals payable as part of the Wind-Down Budget shall be subject to the procedures specified under the Bankruptcy Court's interim compensation procedure orders applicable to such professionals (and the Purchaser shall be deemed to be a party in interest with standing to object to any fee applications of such professionals contemplating payment with funds advanced under the Wind-Down Facility) and following the effective date of such a plan of reorganization, shall be required to be reasonable and supported by detailed invoices. Upon the first to occur of (i) substantial completion of the Wind-Down, as reasonably determined jointly by the Sellers and the Purchaser, (ii) consummation of a Chapter 11 plan for one or more of the Sellers; (iii) conversion or dismissal of the Sellers' Chapter 11 cases; and (iv) December 31, 2010, Sellers shall be obligated to repay any amounts funded under the Wind-Down Facility which have not, as of that date, been utilized to pay Wind-Down Liabilities and such obligation to repay amounts extended under the Wind-Down Facility and not utilized to pay Wind-Down Liabilities shall constitute allowed claims against Sellers with priority over any and all administrative expenses, diminution claims and all other claims against the Sellers, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331,

503(b), 506(a), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, that such priority shall not extend to, and Purchaser's shall not have a right to be paid out of the proceeds of, the Carve-Out Account or Excluded Assets described in Section 1.3(c).

(b)     The DIP Credit Bid and Release and the Wind-Down Facility shall in the first instance be deemed consideration for the Purchased Assets over which the DIP Lenders or First Lien Lenders do not hold perfected Encumbrances.  To the extent the consideration provided by the DIP Credit Bid and Release and the Wind-Down Facility exceeds the purchase price attributable to the Purchased Assets over which the DIP Lenders or First Lien Lenders do not hold perfected Encumbrances, the DIP Credit Bid and Release and the Wind-Down Facility shall in the second instance be deemed consideration for the Purchased Assets over which the DIP Lenders or First Lien Lenders hold perfected Encumbrances.

(c)     The First Lien Credit Bid and Release and assumption by the Purchaser of the Assumed Liabilities shall in all instances be deemed consideration for the Purchased Assets over which the DIP Lenders or First Lien Lenders hold perfected Encumbrances.

2.2. Consideration to the DIP Lenders and First Lien Lenders.

(a)     The aggregate consideration to be paid to the DIP Lenders and the First Lien Lenders for the assignment by the DIP Agent and the First Lien Agent to the Purchaser of the right to make the Credit Bid and Release and the making of the Credit Bid and Release pursuant to Section 2.1(a)(i) shall be:

(i)     The issuance to the DIP Lenders, in accordance with the terms and conditions set forth in the Equityholder Arrangements Term Sheet, of 40% of the initial equity interests in New Holdco (as defined in the Equityholder Arrangements Term Sheet) as consideration for the right to make the Credit Bid and Release in respect of the claims under the DIP Credit Agreement with respect to NM Loans; and

(ii)     The issuance to the DIP Lenders, in accordance with the terms and conditions set forth in the New Debt Facility Term Sheet, of $40 million in term loans by the Borrower (as defined in the New Debt Facility Term Sheet) as consideration for the right to make the Credit Bid and Release in respect of the claims under the DIP Credit Agreement with respect to Roll-Up Loans and in respect of claims under the First Lien Credit Agreement.

## ARTICLE III.

## CLOSING AND TERMINATION

3.1. Closing.  Subject to the satisfaction of the conditions set forth in Sections 9.1, 9.2 and 9.3 hereof or the waiver thereof by the party entitled to waive the applicable condition, the closing of the purchase and sale of the Purchased Assets, the delivery of the Purchase Price, the assumption of the Assumed Liabilities and the consummation of the other transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Ropes &

Gray LLP (or at such other place as the parties may designate in writing) on the date that is no later than the fifteenth (15th) calendar day following the entry of the Sale Order; provided, that, and subject to Section 3.4, to the extent the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 are not so satisfied or so waived on or prior to such date, the period of time within which the Closing shall occur shall be automatically extended until, and the Closing shall occur promptly (but no later than five (5) Business Days) following, such date as all of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 have been satisfied or waived by the party entitled to waive the applicable condition, unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of each of Sellers in the Purchased Assets to be acquired by the Purchaser hereunder shall be considered to have passed to the Purchaser and the assumption of all of the Assumed Liabilities shall be considered to have occurred as of 12:01 a.m. Eastern Time on the Closing Date; provided that the transfer of the Foreign Subsidiary Stock shall be deemed to have occurred as of immediately prior to the transfer of the other Purchased Assets.

3.2. Closing Deliveries by Sellers. At the Closing, Sellers shall deliver to the Purchaser:

(a)     one or more duly executed bills of sale with respect to the Purchased Assets, substantially in the form attached hereto as Exhibit A and the share certificate or other instrument evidencing the Foreign Subsidiary Stock together with duly executed stock powers and such other instruments as may be required to validly transfer ownership of the Foreign Subsidiary Stock to the New Holdco;

(b)     one or more duly executed assignment and assumption agreements with respect to the Assumed Liabilities, substantially in the form attached hereto as Exhibit B;

(c)     a true and correct copy of the Sale Order, which shall be a Final Order, pursuant to which, among other things, the Assigned Contracts are assumed and assigned to the Asset Purchaser;

(d)     a duly executed non foreign person affidavit of each of Sellers dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

(e)     a duly executed title affidavit with certifications regarding (i) parties in possession of the Real Property, and (ii) bankruptcy notices to creditors, such that the title company issuing Purchaser's (and if applicable, the Purchaser's lender's) title insurance policies for the Real Property will issue such title insurance policies with extended coverage regarding parties in possession and mechanics' liens (and the like) solely in reliance on the Sale Order and such title affidavit;

(f)     the officer's certificates required to be delivered pursuant to Sections 9.3(b) and 9.3(c) and the certificate of the Chief Financial Officer to be delivered pursuant to

Section 9.3(k); provided that nothing in any such certificate or certification shall be deemed to continue or extend beyond the Closing any representation or warranty of any Seller which, pursuant to the other provisions of this Agreement, lapse as of or prior to the Closing; provided further that no signatory to any such certificate shall take on personal liability with respect thereto;

(g) a duly executed quitclaim deed (or equivalent form of deed under applicable law) in any jurisdiction in which the applicable Assumed Owned Real Property is located, with respect to each Assumed Owned Real Property, in proper form for recordation in accordance with applicable law and sufficient to vest in the Purchaser (or, if applicable, its designee) all of Sellers' right, title and interest in each such Assumed Owned Real Property, together with such other transfer, recordation and deed intake forms and other statements, disclosures, documents and certifications reasonably and customarily required to convey real property in the jurisdiction in which the Assumed Owned Real Property is located (including any applicable transfer Tax or sales disclosures forms relating to the transfer of such Assumed Owned Real Property pursuant to the terms hereof);

(h) duly executed assignment and assumption agreements in substantially the form attached hereto as Exhibit E, assigning each of the Assumed Real Property Leases and Assigned Contracts to the Asset Purchaser (or, if applicable, its designee), together with such other transfer and recordation forms reasonably and customarily required to convey real property in each jurisdiction in which any Assumed Real Property Lease is located (including any applicable transfer Tax or sales disclosures forms relating to the transfer of such Assumed Real Property Lease pursuant to the terms hereof);

(i) a list of the Accounts Receivable as of the most recent practicable date prior to Closing;

(j) the certificate required under Section 9.3(o);

(k) all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement; and

(l) such other documents, instruments and certificates as the Purchaser may reasonably request.

3.3. Closing Deliveries by the Purchaser. At the Closing, the Purchaser shall deliver to (or at the direction of) Sellers:

(a) Documentation in form and substance reasonably satisfactory to the Sellers evidencing the Credit Bid and Release;

(b) a duly executed assignment and assumption agreement substantially in the form attached hereto as Exhibit B with respect to the Assumed Liabilities and duly executed assignment and assumption agreements in substantially the form attached hereto as Exhibit E with respect to the Assumed Real Property Leases;

(c)     the officer's certificates required to be delivered pursuant to Sections 9.2(a) and 9.2(b); provided that nothing in any such certificate or certification shall be deemed to continue or extend beyond the Closing any representation or warranty of any Seller which, pursuant to the other provisions of this Agreement, lapse as of or prior to the Closing; provided further that no signatory to any such certificate shall take on personal liability with respect thereto;

(d)     an agreement in form and substance reasonably satisfactory to Champion pursuant to which the Asset Purchaser shall indemnify the Sellers against any and Liabilities arising out of the UK Guarantees; and

(e)     all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by the Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

3.4.  Termination of Agreement.  This Agreement may be terminated as follows:

(a)     by the mutual written consent of Sellers, the Purchaser, the Required DIP Lenders and two of the three New Equity Investors at any time prior to the Closing;

(b)     automatically upon consummation of an Alternative Transaction;

(c)     by the Sellers, the Purchaser, two of the three New Equity Investors, or DIP Lenders (other than New Equity Investors and their respective affiliates) holding a majority in principal amount of the obligations under the DIP Credit Agreement held by DIP Lenders other than the New Equity Investors and their respective affiliates, if

(i)     (A) the Bidding Procedures Order shall not have been entered by the Bankruptcy Court by the close of business on February 8, 2010 or (B) following its entry, the Bidding Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any material respect without the prior written consent of the Purchaser and Sellers; provided, however, that the right to terminate this Agreement under this Section 3.4(c)(i) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Bidding Procedures Order to meet these requirements on or before such date;

(ii)     the Closing shall not have been consummated prior to March 31, 2010 (such date, or such later date as may be approved in writing by the parties listed in the lead-in to this sub-clause (c) above, the "Outside Date"); provided, however, that the right to terminate this Agreement under this Section 3.4(c)(ii) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(d)     by the Sellers, the Purchaser or two of the three New Equity Investors if (A) the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on March 3, 2010 or (B) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any material respect without the

prior written consent of the Purchaser, two of the three New Equity Investors and the Sellers; provided, however, that the right to terminate this Agreement under this Section 3.4(d) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Sale Order to meet these requirements on or before such date; and provided further that the Sellers' right to terminate this Agreement pursuant to subsection (A) of this Section 3.4(d) shall not be available to the Sellers unless the Sellers have used their commercially reasonable efforts to have the Sale Order entered as required by subsection (A) of this Section 3.4(d);

(e)     by the Sellers or the Purchaser, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; it being agreed that, without limiting in any way any party's right to terminate pursuant to any other provision hereof, the parties hereto shall, subject to Purchaser agreeing, on terms reasonably acceptable to Sellers, to reimburse Seller for Seller's professional fees relating to such efforts in amounts mutually agreed between Seller and Purchaser, promptly appeal any adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(f)     by the Purchaser or two of the three New Equity Investors, if

(i)     any condition precedent to the obligations of the Purchaser set forth in Sections 9.1 and 9.3 shall have become incapable of fulfillment other than as a result of a breach by the Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by the Purchaser;

(ii)     there shall be a material breach by any of the Sellers of any representation or warranty of or on behalf of the Sellers, or any covenant or agreement of or on behalf of the Sellers contained in this Agreement which would result in a failure of a condition set forth in Sections 9.1 or 9.3 and which breach cannot be cured or has not been cured by the earlier of (i) twenty (20) days after the giving of written notice by the Purchaser to the Sellers of such breach and (ii) the Outside Date; provided, that Purchaser is not then in material breach of the terms of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured;

(iii)     any Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of Sellers is appointed in any Chapter 11 Case;

(iv)     The Sellers shall have failed to assume, or shall have failed to assign, the Assigned Contracts listed or described in Schedule 3.4(f)(iv), except that this condition shall not apply as to any Assigned Contract to the extent that Purchaser and Sellers have entered into an arrangement pursuant to Section 8.3 reasonably acceptable to the Purchaser and two of the three New Equity Investors with respect to such Assigned Contract;

(v)    in the event that the DIP Modification Order has not been entered into and executed by February 8, 2010;

(vi)    Sellers have entered into an Alternative Transaction; provided, however, that the Outside Date has passed; or

(vii)    there has been a Material Adverse Change since December 5, 2009 (the "Reference Date");

(g)    by Sellers, if:

(i)    there shall be a material breach by the Purchaser of any representation or warranty of or on behalf of the Purchaser, or any covenant or agreement of or on behalf of the Purchaser contained in this Agreement which would result in a failure of a condition set forth in Sections 9.1 or 9.2 which breach cannot be cured or has not been cured by the earlier of (i) twenty (20) days after the giving of written notice by the Purchaser to the Sellers of such breach and (ii) the Outside Date; provided, that Sellers are not then in material breach of the terms of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured; or

(ii)    all of the conditions set forth in Sections 9.1 and 9.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and Purchaser fails to deliver the Purchase Price at the Closing; or

(h)    on the date of the Interim Deadline, by any of the Purchaser, Champion, any DIP Lender or two out of the three New Equity Investors if on or before such date, the forms of Definitive Debt Documents and the Definitive Equityholder Documents shall not have been approved as (i) being in form and substance satisfactory to, in the case of the New Equity Investors, the New Equity Investors and, in the case of the DIP Lenders, the Required DIP Lenders and (ii) having a level of conditionality satisfactory to the Sellers; provided that the right to terminate pursuant to this Section 3.4(h) shall expire on the day after the Interim Deadline if such right to terminate is not exercised on the Interim Deadline;

3.5.    Procedure Upon Termination.    In the event of a termination of this Agreement by the Purchaser or Sellers, or both, pursuant to Section 3.4, (a) written notice thereof shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, and (b) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto.

3.6.    Effect of Termination.    In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Purchaser or Sellers; provided, however, that Section 3.4, Section 3.5, this Section 3.6, Article XII, the Bidding Procedures Order (if entered) and, if applicable pursuant to Section 7.1, the Sellers' obligation to pay the Termination Fee and/or Expense Reimbursement, as applicable, shall survive any such termination and shall be enforceable

hereunder. In no event shall any termination of this Agreement relieve any party hereto of any Liability for any willful breach of this Agreement by such party.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby, jointly and severally, make the representations and warranties in this Article IV to the Purchaser as of the Execution Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), except as qualified or supplemented by Sections in the Seller Disclosure Schedule attached hereto. Each such Section of the Seller Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this Article IV. The information disclosed in any numbered part of the Seller Disclosure Schedule shall be deemed to relate to and to qualify only the particular representation or warranty set forth in the corresponding numbered Section in this Agreement and shall not be deemed to relate to or qualify any other representation or warranty unless so stated otherwise, specifying each other representation and warranty to which it relates.

4.1. Corporate Organization and Qualification. Champion is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Michigan. Champion is qualified and in good standing as a foreign corporation in each jurisdiction where the properties owned, leased or operated or the conduct of its Business require such qualification. Each of the other Sellers, CHB International and each direct or indirect subsidiary of CHB International is duly organized, validly existing and in good standing under the Laws of its respective jurisdiction of organization listed on Section 4.1 of the Seller Disclosure Schedule. Each of the other Sellers, CHB International and each direct or indirect subsidiary of CHB International is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated or the conduct of its respective business require such qualification. Each Seller has all requisite power and authority to own, lease and operate its properties and to carry on the Business as it is now being conducted, subject to the provisions of the Bankruptcy Code and the orders of the Bankruptcy Court. CHB International and each direct or indirect subsidiary of CHB International has all requisite power and authority to own, lease and operate its properties and to carry on the Business as it is now being conducted. Champion has previously made available to the Purchaser complete and correct copies of Champion's Certificate of Incorporation, as amended and in effect on the Execution Date (the "Champion Certificate"), and Champion's Bylaws, as amended and in effect on the Execution Date (the "Champion Bylaws") and the certificate of incorporation and bylaws (or other comparable organizational documents) of each of the other Sellers, CHB International and each direct or indirect subsidiary of CHB International, as amended and in effect on the Execution Date (the "Subsidiary Organizational Documents").

4.2. Champion and Subsidiaries.

(a)     Section 4.2(a) of the Seller Disclosure Schedule sets forth a true and complete list of the names, jurisdictions of organization, and jurisdictions of qualification as a foreign entity of each Seller, CHB International and each direct or indirect subsidiary of CHB

International.  Except as set forth in Section 4.2(a) of the Seller Disclosure Schedule, all outstanding shares of capital stock of or other equity ownership interests in each direct or indirect subsidiary of Champion are owned, directly or indirectly, by Champion free and clear of all Encumbrances, other than Permitted Encumbrances.  All outstanding shares of capital stock of or other equity ownership interests in each direct or indirect subsidiary of CHB International are owned, directly or indirectly, by CHB International free and clear of all Encumbrances, other than Permitted Encumbrances.  Other than Encumbrances under the DIP Credit Agreement and First Lien Credit Agreement (each of which shall be extinguished as of the Closing), all outstanding shares of capital stock of or other equity interests in CHB International are owned directly by CHBC free and clear of all Encumbrances.

(b)     Section 4.2(b) of the Seller Disclosure Schedule sets forth each corporation, association or other entity in which each Seller owns, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

4.3.  Authority Relative to This Agreement.  Except for such authorization as is required by the Bankruptcy Court and receipt of any Regulatory Approvals, each Seller has all requisite power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Sellers in connection with the consummation of the transactions contemplated by this Agreement (the "Sellers' Documents"), and (c) perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Sellers' Documents, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Sellers.  This Agreement has been, and at or prior to the Closing, each of the Sellers' Documents will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the Purchaser of this Agreement and the entry of the Sale Order) this Agreement constitutes, and each of the Sellers' Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) (the "Bankruptcy Exceptions").

4.4.  Conflicts; Consents of Third Parties.

(a)     Except as set forth on Section 4.4(a) of the Seller Disclosure Schedule or as permitted by the Sale Order, none of the execution and delivery by Sellers of this Agreement or any Sellers' Document, the consummation of the transactions contemplated hereby or thereby, or compliance by Sellers with any of the provisions hereof or thereof will (A) result in the loss or material impairment of the rights of Sellers in any Seller Intellectual Property or (B) to Sellers' Knowledge, conflict with, or result in any violation of or constitute a breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (i) the Champion Certificate, the

Champion Bylaws or the Subsidiary Organizational Documents; (ii) subject to and assuming entry of the Sale Order, any Contract or Permit to which any Seller or International Subsidiary is a party or by which any of the properties or assets of Sellers or any International Subsidiary is bound, including any Assigned Contract; (iii) subject to and assuming entry of the Sale Order, any order of any Governmental Body applicable to any Sellers or any International Subsidiary or any of the properties or assets of Sellers or any International Subsidiary, including the Purchased Assets, or the Business; or (iv) subject to and assuming entry of the Sale Order, any applicable Law.

(b)     Except as set forth on Section 4.4(b) of the Seller Disclosure Schedule, no order of, Permit or declaration or filing with, or notification to, any Governmental Body or other Person is required on the part of Sellers or any International Subsidiary in connection with the execution and delivery of this Agreement or Sellers' Documents, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Sellers of any other action contemplated hereby or thereby, except for the entry of the Sale Order.

4.5. Absence of Certain Developments.  Except for actions taken in connection with the Chapter 11 Case, as contemplated or expressly required or permitted by this Agreement or the DIP Facility, or as set forth in Section 4.5 of the Seller Disclosure Schedule, since the Most Recent Balance Sheet Date (as defined herein), the Business has been conducted in the Ordinary Course of Business and in accordance, in all material respects, with the requirements of the DIP Facility.

4.6. Litigation.  Except as set forth in Section 4.6 of the Seller Disclosure Schedule, there is no litigation, action, claim, series of related claims, suit, proceeding, investigation, examination, hearing, arbitration, settlement, inquiry or subpoena, pending or, to the Knowledge of Sellers, threatened against Sellers, CHB International or any direct or indirect subsidiary of CHB International or any property or asset of Sellers, CHB International or any direct or indirect subsidiary of CHB International where the amount in controversy exceeds or could reasonably be expected to exceed $1,000,000 or which otherwise is or could reasonably be expected to become material to any Seller or any International Subsidiary.  Except as set forth in Section 4.6 of the Seller Disclosure Schedule, no Seller or International Subsidiary is subject to any judgment, decree, injunction, settlement, or order of any court, arbitration panel or other Governmental Body that relates to the Business, the Purchased Assets or the International Subsidiaries and for which Sellers or any of the International Subsidiaries have continuing obligations or Liabilities.

4.7. Intellectual Property.

(a)     Section 4.7 of the Seller Disclosure Schedule sets forth true, complete and correct lists of (i) all of the patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Owned Intellectual Property, (ii) all other material Owned Intellectual Property and (iii) all Licensed Intellectual Property and the Contract pursuant to which such Licensed Intellectual Property is licensed to the Seller (except for Off the Shelf Software and the associated license agreement).

(b)   To the Sellers' Knowledge, none of the Sellers, the International Subsidiaries or any of their respective products or services is infringing upon, misappropriating, diluting or otherwise violating, the Intellectual Property of any third party and no Person is infringing upon, misappropriating, diluting or otherwise violating, any Seller Intellectual Property.

(c)   To the Sellers' Knowledge, there have been no security breaches relating to, or violations of any security or privacy policy regarding, or any unauthorized access of, any such data and information held by the Sellers or the International Subsidiaries.

**4.8. Agreements, Contracts and Commitments; Certain Other Agreements.** Except as set forth on Section 4.8 of the Seller Disclosure Schedule, the Sellers have heretofore delivered or made available to the Purchaser in the virtual data room or in the CD-Roms delivered to Ropes & Gray LLP true and complete copies of all Material Contracts that are in writing, including all amendments, modifications, schedules and supplements thereto and all waivers (including descriptions of oral waivers) with respect thereto. Assuming (x) the entry of the Sale Order and (y) due execution by the other party or parties thereto, as of the Closing Date, each Material Contract is in full force and effect and, subject to the Bankruptcy Exceptions, enforceable in accordance with its terms

**4.9. Regulatory Matters; Permits.**

(a)   To the Sellers' Knowledge, all of the Permits that are necessary or desirable for the operation of the Business (including the business of the International Subsidiaries) as currently conducted and the ownership of the Purchased Assets (collectively, the "Material Permits") are held by the Sellers and the International Subsidiaries and are in full force and effect. Section 4.9(a) of the Seller Disclosure Schedule sets forth a true, complete and correct list of all Material Permits held by the Sellers as of the Execution Date.

(b)   To the Sellers' Knowledge, each Seller and each International Subsidiary is in compliance with its obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that without notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit except for such failures to be in compliance or defaults that would not have, individually or in the aggregate, a material adverse effect on the Sellers', the International Subsidiaries' or the Purchaser's ability to operate the Business in the Ordinary Course of Business.

(c)   To the Sellers' Knowledge, each Material Permit is valid and in full force and effect and there is no proceeding, notice of violation, order of forfeiture or complaint or investigation against any Seller or International Subsidiary relating to any of the Material Permits pending or, to the Knowledge of the Sellers, threatened, before any Governmental Body.

(d)   Star Fleet, Inc. ("Star Fleet"), both presently and during the three (3) years immediately preceding the Execution Date has maintained a "Satisfactory" safety rating as promulgated by the United States Department of Transportation ("DOT"), and to the Knowledge of Sellers there are no issues, deficiencies or violations which would change such safety rating,

or of any notice of any intended, pending or proposed audit of operations by the DOT or any other Governmental Body having jurisdiction over Star Fleet's business.

4.10.    Brokers and Finders.  Except as set forth in Section 4.10 of the Seller Disclosure Schedule, Sellers have not employed, and to the Knowledge of Sellers, no other Person has made any arrangement by or on behalf of Sellers or any International Subsidiary with any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

4.11.    Title to Assets; Sufficiency and Condition of Assets.  At Closing and to Sellers' Knowledge, Sellers will have (and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser) good and marketable title in and to each of the material Purchased Assets (other than the Assumed Real Property Leases and Assumed Personal Property Leases) free and clear of all Encumbrances except Permitted Encumbrances and except as set forth in Section 4.11 of the Seller Disclosure Schedule. At Closing and to Sellers' Knowledge, each International Subsidiary will have good and marketable title in and to each of its material assets (other than leases) free and clear of all material Encumbrances except Permitted Encumbrances. At Closing and to Sellers' Knowledge, Sellers will have (and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser) valid leasehold interests in the material Assumed Personal Property Leases and the Assumed Real Property Leases, free and clear of all Encumbrances except Permitted Encumbrances and except as set forth in Section 4.11 of the Seller Disclosure Schedule.  At Closing and to Sellers' Knowledge, each International Subsidiary will have valid leasehold interests in its material leased personal and real property, free and clear of all material Encumbrances except Permitted Encumbrances. The Purchased Assets (together with the assets of the International Subsidiaries that will continue to be owned by them after giving effect to the Closing) constitute substantially all of the properties, assets and rights used by Sellers or necessary for the Purchaser to conduct and operate the Business as currently conducted and operated by Sellers.

4.12.    Tangible Personal Property.  Except as set forth in Section 4.12 of the Seller Disclosure Schedule, none of the Sellers or International Subsidiaries has received any written notice, or, to the Knowledge of Sellers, oral notice, of any default or event that with notice or lapse of time or both would constitute such a default by such Seller under any of the Personal Property Leases.

4.13.    Real Property.

(a)     Section 4.13(a) of the Seller Disclosure Schedule contains a complete and correct list of all Owned Real Property of the Sellers and International Subsidiaries setting forth the address or other information sufficient to identify specifically such Owned Real Property. Except as would not reasonably be expected to have a material adverse effect on the operation of the Business, Seller has not leased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of any Owned Real Property or the Sellers' interest in any portion of the Leased Real Property, that is not otherwise