| | |
|---|---|
| **Voting Agreements:** | If requested to do so by the Requisite Majority Holders, all other Equityholders will vote with respect to the following actions as requested by the Requisite Majority Holders, to the extent that such actions require a vote of the Equityholders: |

- any merger or consolidation; *provided* that in the case of any merger or consolidation that would constitute a sale or transfer of control to any Lead Investors or other holder of more than 10% of outstanding Shares (or any of their respective Affiliates) that such merger or consolidation also be approved by holders of a majority of the Shares held by Equityholders other than the Lead Investor or other 10% holder to which New Holdco or control of New Holdco would be sold or transferred;

- any sale or other transfer of all or substantially all the assets of New Holdco or any of its subsidiaries; *provided* that in the case of any sale of all or substantially all of the assets of New Holdco or any of its subsidiaries to any Lead Investors or other holder of more than 10% of outstanding Shares (or any of their respective Affiliates) that such sale also be approved by holders of a majority of the Shares held by Equityholders other than the Lead Investor or other 10% holder to which such assets would be sold or transferred;

- any other transaction that is the subject of a drag-along notice provided as described herein; provided that in the case of a drag-along sale to any Affiliate of any Drag-Along Proponent the requisite consent of other holders be obtained as described in the section captioned "Drag-Along Rights" below; and

- amendment, adoption or approval of any employee plan or benefit.

### *Limitations on Transfer; Tag/Drag Co-Sale Provisions; and ROFO*

| | |
|---|---|
| **Limitations on Transfer:** | Prior to an IPO, Shares cannot be transferred, except for the following permitted transfers: |

     (i)  transfers of shares to a Permitted Transferee that agrees to join the equityholder agreement(s) and be bound to the same extent as the transferor,

     (ii)  transfers pursuant to tag-along and drag-along provisions, described herein,

     (iii)  transfers in compliance with ROFO provisions, described herein (including both transfers to other Equityholders who exercised ROFO rights and transfers to third parties who agreed to join the equityholder agreement(s) and be bound to the same extent

as the transferor in the case of a transfer to third party on the terms and subject to the conditions described in the section captioned "Right of First Offer (ROFO)" below to the extent that existing Equityholders do not exercise ROFO rights); and

(iv)  such other transfers as may be approved by the board of directors of New Holdco (excluding in such vote any directors interested in the transfer) and which, in the case of any transfer or series of related transfers of Shares representing more than 5% of outstanding Shares by one or more Lead Investors or other holders of more than 10% of outstanding Shares (or any of their respective Affiliated Funds or Affiliates), also are made in compliance with the tag-along provisions described herein (an "Additional Subsequently Approved Transfer"); and which *further*, in the case of a transfer by any Lead Investor is subject to compliance with the ROFO rights described herein unless otherwise agreed by all Lead Investors (including transferees to whom director designation rights of any Lead Investor have been transferred in accordance with "Transfer of Board Seats" above for so long as such transferees have such director designation rights) who then have director designation rights;

*provided* that irrespective of the foregoing permitted transfer provisions Equityholders may not transfer Shares to an entity that competes with New Holdco in any material respect without the consent of the Requisite Majority Holders.

| | |
|---|---|
| **Right of First Offer ("ROFO")** | Prior to the earlier of an IPO or a Change of Control, no Equityholder may transfer Shares (other than transfers to Permitted Transferees and other than Additional Subsequently Approved Transfers in accordance with clause (iv) under the section captioned "Limitations on Transfer" to the extent provided therein) without first complying with the following first offer rights ("ROFO") procedures.  Prior to transferring or offering to transfer the Shares to a third party, the Equityholder that desires to transfer its Shares (the "ROFO Offeror") will first deliver to all other Equityholders (the "ROFO Offerees") a written offer to sell such Shares (the "ROFO Offer Notice"), which ROFO Offer Notice includes a specified price (the "Specified Price") at which the ROFO Offeror is willing to sell and describes in reasonable detail any and all other material terms of such offer.  Each ROFO Offeree will have a period of 20 days (the "ROFO Period") to accept such offer (and, if it so elects, to also accept for purchase (the "Over-Allotment Election") its respective pro rata portion of Shares as to which other ROFO Offerees decline to accept the offer) whereupon:  (i) if one or more ROFO Offerees accept such terms within the ROFO Period, they will acquire such Shares (in relative proportions proportionate to the respective |

relative ownership of Shares by each of the ROFO Offerees that agrees to acquire Shares, and subject to increase pursuant to any Over-Allotment Elections with respect to Shares declined by other ROFO Offerees) within 45 days of the end of the ROFO Period (subject to extension of up to 60 days to the extent reasonably required to comply with any applicable HSR or other regulatory requirements) or (ii) if the ROFO is not exercised with respect to all of the Shares proposed to be transferred, the ROFO Offeror will be entitled to transfer the remaining Shares that were the subject of that ROFO Offer Notice at a price not less than the Specified Price and on other terms and conditions no more favorable to the transferee in any material respect than the terms set forth in the ROFO Offer Notice; *provided* that such transfer is completed within 90 days of the termination of the ROFO Period or any earlier rejection of the ROFO offer by all ROFO Offerees; and (for the avoidance of doubt) *provided further* that the transferee joins the equityholder agreement(s) and agrees to be bound to the same extent as the transferor.

The foregoing ROFO procedures will not apply to any transaction that is the subject of any drag-along notice provided as described in the section captioned "Drag-Along Rights" below.

For purposes of the foregoing ROFO provisions, each ROFO Offeree may elect to purchase Shares either directly or through one or more Affiliated Funds or Affiliates and pro ration and other calculations for each ROFO Offeree and its respective Affiliated Funds and Affiliates will be made on a basis that aggregates holdings of each ROFO Offeree with those of its respective Affiliated Funds and Affiliates.

| | |
|---|---|
| **Tag-Along Rights:** | Prior to an IPO, subject to first complying with the ROFO procedures (if applicable), any Lead Investor may transfer Shares to any other person provided that if such transfer is to a person who is not a Permitted Transferee of such Lead Investor such Lead Investor provides all Equityholders an opportunity to participate on a pro rata basis, on equivalent terms and conditions, in such transfer. Prior to initiating any transfer that would trigger the foregoing tag-along rights, the Lead Investor proposing such transfer (the "Tag-Along Sale Proponent") will comply with the ROFO provisions described above; but in the event that the Lead Investors do not purchase Shares under the ROFO provisions, any other Equityholders who subsequently tag-along in such transfer will not be obligated to separately comply with the ROFO procedures with respect to such tag-along transfer. Except to the extent otherwise provided in clause (iv) under the section captioned "Limitations on Transfer," these tag-along rights will not apply to any Additional Subsequently Approved Transfer. |

| | |
|---|---|
| **Drag-Along Rights:** | Subject to the board and other approval requirements described in the section captioned "*Certain Actions*" above, if at any time holders of a majority of outstanding Shares (the "<u>Drag-Along Proponents</u>") propose to transfer, in a single transfer or series of related transfers (whether structured as a sale of securities, merger or equivalent transaction), Shares that represent more than eighty percent (80%) of the Shares held by such Drag-Along Proponents, the Drag-Along Proponents may deliver a drag-along notice to all other Equityholders, in which case all Equityholders will be required to transfer the same percentage of the Shares held by them at the same per Share price received by the Drag-Along Proponents, *provided* that in the case of a transfer to an Affiliate or Affiliated Fund of any Drag-Along Proponent the exercise of such drag-along rights will be subject to approval of the transaction by holders of a majority of shares held by Equityholders who are not, and are not Affiliates or Affiliated Funds of, the transferee / purchaser in such transaction. |

### *Miscellaneous*

| | |
|---|---|
| **Preemptive Rights:** | Prior to an IPO or a Change of Control, each Equityholder (either itself or through an Affiliated Fund or Affiliate) that is an "accredited investor" (as defined in Reg. D), and provides (and causes its Affiliated Fund or Affiliate, if applicable, to provide) customary investor representations in connection with its participation, shall be entitled to participate pro rata (based on owned and vested Shares) in offerings of equity of New Holdco or any subsidiary to any Lead Investors or other holder of more than fifteen percent (15%) of outstanding Shares (or to any Affiliate or Affiliated Fund of any such Lead Investor or other holder of more than fifteen percent (15%) of outstanding Shares). |
| **VCOC Rights:** | New Holdco will enter into standard VCOC rights letter agreements with each Lead Investor that requests them. |
| **Conversion to Corporate Form** | If New Holdco is established as a limited liability company or partnership that does not elect to be taxed as a corporation, it can be converted to corporation in connection with IPO or Change of Control transaction that is approved as described in the section captioned "Certain Actions"; but otherwise New Holdco will not be converted into corporate form (and will not take action to be taxed as a corporation) absent approval by the board and by all Lead Investors. All Equityholders will take such actions as may be reasonably requested in connection with any such approved conversions or elections.<br><br>If any of the Lead Investors or Other Initial Holders hold Shares through a blocker entity treated as a corporation for tax purposes, in the event of an IPO or Change of Control (and related conversion to corporate form), |

New Holdco and the Equityholders will use reasonable efforts to facilitate an exchange of the stock of any such blocker corporation for stock of the IPO company or reorganized or reconstituted corporate New Holdco in as tax efficient a manner as reasonably possible.

**Information Rights**

All Equityholders will be entitled to receive annual and quarterly financial reports when made available to lenders and, upon request, an opportunity to inspect, at such Equityholder's expense, a current list of Equityholders and current copies of New Holdco's Organizational Documents to the extent that such request is made in good faith.

Each Equityholder that, together with its Affiliates and Affiliated Funds, holds more than one percent (1%) of outstanding Shares will be provided an opportunity to communicate with management at least once each year during normal business hours and upon reasonable advance notice concerning New Holdco and its subsidiaries, their financial affairs and other topics (which may include compliance with environmental, health and safety regulations) reasonably requested by such Equityholder to be addressed by management; *provided* that, so long as 30 days prior written notice is provided, New Holdco and its subsidiaries may elect to structure a single annual meeting or conference call for all such communications.

All of the foregoing rights of any Equityholder to receive financial reports and other information and communicate with management will be subject to such Equityholder executing and delivering a customary and mutually satisfactory confidentiality agreement.

**Environmental Covenants**

New Holdco will:

    (a)  Provide prompt written notice to the board of directors of New Holdco (the "Board") of any environmental, health or safety ("EHS") event or matter reasonably likely to materially adversely impact New Holdco's operations, including, but not limited to any of the following that would be reasonably likely to have a material adverse effect on the condition (financial or otherwise), results of operations, business, or properties of New Holdco and its subsidiaries, taken as a whole:  notices of violations; fines or assessments; citations, suits, written complaints or administrative actions alleging material violations of EHS laws; serious personal injury or property damage arising or allegedly arising out of or relating to violation of EHS laws; unauthorized releases, spills or discharges of any significant quantities of hazardous substances into the environment or conditions which may cause New Holdco or any of its material subsidiaries to operate in non-compliance with its EHS policies or applicable EHS laws;

(b)  At regular intervals, but no less frequently than every year, provide to the Board (and, if requested by any Equityholder that holds in excess of two percent (2%) of outstanding Shares, to such Equityholder) a written report describing (i) the compliance of New Holdco and its material subsidiaries with New Holdco's EHS policies and applicable EHS laws, and (ii) steps the New Holdco and its subsidiaries have taken to implement such improvements and corrections as may be determined by the Board to be necessary or appropriate, after consultation with outside counsel and the Board, to maintain conformance with such policies and laws; and

(c)  Comply and cause its subsidiaries to comply in all material respects with all applicable statutes, laws, ordinances, rules, orders and regulations concerning labor, industrial hygiene and EHS laws.

No failure to comply with any of the foregoing covenants described in this section captioned "Environmental Covenants" will:  (i) give rise to any direct rights under or as a consequence of the foregoing covenants against any director, officer, employee or Equityholder of New Holdco or any of its subsidiaries or any of their respective directors, officers, partners, equityholders, affiliates, agents or representatives, (ii) entitle any party to seek money damages for any breach or alleged breach hereof.  No action may be taken to enforce any of the covenants described in clause (c) of this section captioned "Environmental Covenants" without the prior written consent of the Board and of holders of a majority of the Shares then outstanding.  In addition, no action may be taken to enforce any of the covenants described in clause (c) of this section captioned "Environmental Covenants" except where the New Holdco's failure to so comply would reasonably be expected to have a material adverse effect on the condition (financial or otherwise), results of operations, business, or properties of New Holdco and its subsidiaries, taken as a whole .  Each equityholder will expressly (A) agree to the foregoing limitations, (B) agree not to seek such money damages in any event with respect to any breach or alleged breach of these covenants and (C) agree not to seek injunctive or other relief with respect to any breach or alleged breach of these covenants without the prior written consent of the Board and of holders of a majority of the Shares then outstanding.

| | |
|---|---|
| **Prohibition on Certain Transactions** | From and after Closing and prior to an IPO or Change of Control, New Holdco will not enter into any transaction with any Equityholder that holds, either individually or together with its Affiliates or Affiliated Funds, in excess of ten percent (10%) of outstanding Shares (or with |

any group of such holders) unless (i) such transaction is on arm's-length terms that are fair to New Holdco in all material respects, (ii) all Equityholders are given an opportunity to participate in such transaction on equivalent terms or (iii) such transaction is otherwise approved (after disclosure of the interested nature of such transaction and all material terms thereof) by either (x) a majority of disinterested directors (*i.e.*, directors who are not employees, partners, owners, members or affiliates of the Equityholders with interests in such transaction – or of any of such Equityholders' affiliates) or (y) holders of a majority of Shares held by Equityholders other than Equityholders with an interest in such interested transaction. For the avoidance of doubt, the foregoing restriction will not apply to (i) the transactions among New Holdco and certain of its subsidiaries and designees of the Lead Investors described in the Letter of Intent and summarized in the Summary of Sponsor Management Advisory Arrangements provided herewith; or (ii) any drag-along transaction that has been approved as described in the section captioned "Drag-Along Rights" above.

### *Registration Rights*

**Registration Rights:**
The Lead Investors may exercise demand rights to cause an IPO, and such IPO will include primary shares to the extent the lead underwriter selected by the Lead Investors advises that such primary component is reasonably necessary for a successful offering. After an IPO, each Lead Investor will have two S-1 demand rights and three S-3 demand rights; *provided* that New Holdco will not be obliged to satisfy more than one demand in any 180 day period unless otherwise required by the Lead Investor Majority. Each demand must be for at least $25 million (or, if less, all Shares held by the party exercising demand registration rights) unless otherwise consented to by New Holdco and the Lead Investor Majority. Upon the request of the Lead Investors Majority, New Holdco will file a shelf registration, and underwritten takedowns off of such shelf will count as an S-3 demand. Each holder of Registrable Securities shall be entitled to customary piggyback registration rights on public offerings of New Holdco's stock (subject to pro rata cutback), without limit on the number of times such piggyback registration rights may be exercised. All underwriter's cutbacks will be on a pro rata basis for all selling Equityholders, subject to underwriter's determinations regarding marketability/pricing.

New Holdco will pay reasonable expenses (other than underwriters' discount and commissions) incurred by the Lead Investors in connection with registrations and sales of Shares. Upon request by any Equityholders other than the Lead Investors, New Holdco will also engage and be responsible to pay the reasonable fees of one law firm to

represent Equityholders other than the Lead Investors in each public offering in which such other Equityholders are exercising piggyback registration rights.

**Lock-up / Market Stand off:**   In connection with the IPO, each Equityholder will join and be bound by any customary lock-up agreement that is entered into by New Holdco or any selling Equityholder in connection with the IPO, provided that directors and officers are also required to enter into such lock-up agreements. After the IPO, each Equityholder that holds in excess of one-half of one percent (0.5%) of outstanding Shares will join and be bound by any customary lock-up agreement that is entered into by New Holdco or any selling Equityholder in connection with any underwritten public offering of Shares or other equity-linked securities of New Holdco, provided that directors and officers are also required to enter into such lock-up agreements. Such lock-up agreements shall cover a period of no more than 90 days (180 days in the case of an IPO). New Holdco will also agree to a customary lockup in connection with any underwritten offering by the selling Equityholders pursuant to the registration rights agreement.

*February 5, 2010*

*February 5, 2010*
## SUMMARY OF SPONSOR MANAGEMENT ADVISORY ARRANGEMENTS

The following is a description of proposed terms of a management advisory services agreement to be entered into among (x) a new holding company ("New Holdco") and one or more of it principal U.S. subsidiaries established for the acquisition of substantially all of the assets of Champion Enterprises, Inc. and its subsidiaries and (y) the respective designees of each of the three sponsor groups (Centerbridge, MAK Capital and Sankaty).

### *Sponsor Management Advisory Services Agreement*

**General:**  New Holdco and its principal U.S. subsidiaries will enter into a management advisory services agreement with the respective management or advisory affiliates or other designees of the three Lead Investors (Centerbridge, MAK Capital and Sankaty), with terms and conditions customary for transactions of this type. Term is evergreen five years (*i.e.*, initial term of five years, automatically extending one year at the end of each anniversary).

**Fee:**  $1.5 million per year payable in quarterly installments (to be allocated $125,000 per quarter to the respective designee of each of Sankaty, MAK Capital and Centerbridge or in such other matter as they may hereafter agree); *provided, however,* that if the issuer of the New Notes at any time elects to pay the additional 200 bps of interest on the New Notes in kind through the PIK election described in the [Letter of Intent] [New Note Term Sheet] then (i) only that portion of such management fees as would be required for the recipient to pay its taxes (the "Tax Liability Payment") will be paid in cash, (ii) all relevant parties, including New Holdco or its relevant subsidiaries and all management fee recipients, will report the full amount of such management fees as current income/expense (not deferred), and (iii) the amount of such fees in excess of the Tax Liability Payments will be paid in cash upon the earliest to occur of (x) such time as the New Notes are paid in full, (y) such time as the New Notes issuer no longer elects to pay any portion of the interest on New Notes in-kind (*provided* that the New Notes issuer has paid in cash a portion of any accrued paid-in-kind interest to the extent, if any, required to assure that the total amount of outstanding accrued paid-in-kind interest obligations does not then exceed the maximum total amount of accrued paid-in-kind interest that would accrue over a period equal to the sum of six months plus the length of the covenant holiday period under the New Notes) and (z) such earlier time (if any) as may be approved by the Required Noteholders.

**Other:**        The management advisory services agreement will contain exculpation, indemnification, expense reimbursement, termination, and other provisions customary for agreements of this type, including a right for New Holdco to terminate the management advisory services agreement in connection with an IPO or Changes of Control, subject to paying in full (i) all accrued and unpaid fees plus (ii) the net present value (calculated at discount rate equal to the then applicable five-year treasury note rate) of management fee assuming for purposes of calculation of the termination fee continuation of such arrangements for the longer of (x) three years following termination of the agreement or, (y) in the case of a termination occurring prior to [March __], 2012 continuation of such arrangement for the remaining portion of the initial five-year term (*i.e.*, through [March __], 2015. Exculpation and indemnification provisions will survive termination unless otherwise agreed by all parties.

# EXHIBIT G

## TERM LOAN FACILITY TERM SHEET

24217419_17.DOC

## EXHIBIT G TO ASSET PURCHASE AGREEMENT

## TERM LOAN FACILITY TERM SHEET

THIS TERM SHEET (the "*Term Sheet*") IS AN EXHIBIT TO THAT CERTAIN ASSET PURCHASE AGREEMENT DATED AS OF FEBRUARY 5, 2010 (the "*Purchase Agreement*"). THIS TERM SHEET SUMMARIZES THE PRINCIPAL TERMS OF THE TERM LOANS (AS DEFINED BELOW).

### $40,000,000 Term Loan Facility
### Summary of Principal Terms and Conditions[1]

| | |
|---|---|
| Borrower: | [_____], a wholly owned subsidiary of the Purchaser (such parent entity, the "*Parent*"), which shall be the entity that, either directly or through subsidiaries, is the acquiror of substantially all of the domestic assets in the Acquisition (except for certain specified assets (the "*Specified Assets*")) (the "*Borrower*"). |
| Administrative Agent: | [_____] shall act as sole and exclusive administrative agent (in such capacity, the "*Administrative Agent*") for a syndicate of banks, financial institutions, institutional investors and other persons (the "*Lenders*"), and shall perform the duties customarily associated with such role. |
| Collateral Trustee | [_____] shall act as collateral trustee (the "*Collateral Trustee*") for the Lenders, and will perform the duties customarily associated with such role. |
| Term Loan Facility: | A senior secured term loan facility (the "*Term Loans*"), in an aggregate original principal amount of $40,000,000 (the "*Term Loan Facility*"). |
| Offset: | In the event the Purchaser makes any payment of liabilities, obligations, losses, damages, claims, costs or expenses of any kind or nature (the "*CS Expenses*") to Credit Suisse AG, Cayman Island Branch or its affiliates as administrative agent under the First Lien Credit Agreement or the DIP Credit Agreement on account of |

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Asset Purchase Agreement to which this Term Sheet is an exhibit. In the event any such capitalized term is subject to multiple and differing definitions, the appropriate meaning thereof in this Term Sheet shall be determined by reference to the context in which it is used.

**CONFIDENTIAL**

any Lender as a lender under the First Lien Credit Agreement or the DIP Credit Agreement, as the case may be, failing to fund its pro rata share of such CS Expenses, the Purchaser shall be entitled to offset its obligations to any such Lender by reducing the principal amount of any Term Loans originally issued to such Lender or its designee by an amount equal to 118% of its pro rata share of such CS Expenses, effective as of the date of such payment by the Purchaser.

Purpose:

The Term Loans are being issued to the DIP Lenders, in partial consideration for their credit bid of the Obligations under the DIP Credit Agreement pursuant to the Acquisition.

Interest Rates and Fees:

The Term Loans shall bear interest at a rate of:

(a) the LIBO Rate plus 2.50%, which shall be payable in cash, plus

(b) 2.00%, which shall be payable in cash or in kind, at the Borrower's option.

The "LIBO Rate" shall at no time be less than 2.00%.

The Borrower may elect interest periods of 1, 2, 3 or 6 months or, if available to all Lenders, 9 or 12 months.

Interest shall be calculated on the basis of the actual days elapsed in a year of 360 days and shall be payable at the end of each interest period and, in any event, at least every 3 months.

In the event of a principal payment default, or in the event of a default in any other payment upon the election of the Administrative Agent or the Required Lenders, such overdue amount shall bear interest at a rate of 2.00% per annum above the foregoing.

The Borrower shall pay to the Administrative Agent fees with respect to its performance of duties in such capacity, as described in a fee letter between the Administrative Agent and the Borrower.

Final Maturity and
Amortization:

The Term Loan Facility will mature on the date that is the fifth anniversary of the Closing Date and will amortize in equal quarterly installments in aggregate annual amounts equal to 1.00% of the original principal amount of the

**CONFIDENTIAL**

Term Loans, with the balance payable on the final maturity date.

Guarantees:

All obligations of the Borrower under the Term Loan Facility (the "*Obligations*") shall be unconditionally guaranteed jointly and severally on a senior basis (the "*Guarantees*") by the Parent and, except to the extent prohibited or restricted by applicable law (including any requirement to obtain the consent of any governmental authority or third party), each existing and subsequently acquired or organized direct or indirect wholly-owned U.S. subsidiary of the Parent (other than (a) any immaterial subsidiary and (b) if applicable, any special purpose entity formed to issue the Instruments (as defined under the Side Agreement)) (the "*Subsidiary Guarantors*" and, together with the Parent, the "*Guarantors*" and together with the Borrower, the "*Obligors*").

Security:

The Obligations and the Guarantees (except for the Parent's guaranty, which will be unsecured) will be secured by substantially all of the present and after-acquired material personal property of the Borrower and each Subsidiary Guarantor and owned real property of the Borrower and the Subsidiary Guarantors (collectively, the "*Collateral*"), including but not limited to: (a) a perfected security interest in the domestic owned real property of the Borrower and the Subsidiary Guarantors, (b) a perfected security interest in all personal property of the Borrower and each Subsidiary Guarantor consisting of accounts, chattel paper, commercial tort claims (subject to materiality thresholds), documents, general intangibles, goods, instruments, investment property, deposit accounts and security accounts (each as defined in Section 9 of the Uniform Commercial Code as in effect from time to time in the State of New York), letter of credit rights and letters of credit, supporting obligations, inventory, certain assets related to such Collateral, and all proceeds of the foregoing.

Notwithstanding the foregoing, the Collateral shall not include: (a) any leasehold interests in real property, (b) pledges and security interests of contractual rights, license or other rights to the extent validly prohibited by any applicable legal or contractual provisions, or where a grant of a lien would cause or permit the loss of any material right with respect thereto, (c) investment

**CONFIDENTIAL**

property consisting of capital securities of a foreign subsidiary of any Guarantor, in excess of 65% of the total combined voting power of all capital securities of such foreign subsidiary; (d) any asset, as to which the granting of a security interest would be void or illegal under any applicable law; or (e) rights to receive any residual cash from any beneficiary of an Existing Letter of Credit (as defined in the Purchase Agreement) payable with respect to any Instruments (as defined in the Side Agreement, dated as of January 15, 2010, by and among the New Equity Investors, the Supporting Lenders party thereto and Champion Enterprises, Inc.) or pledged with respect to any Letter of Credit Facility (as defined in the Letter of Intent, dated as of January 15, 2010, and executed by the New Equity Investors party thereto, the Supporting Lenders party thereto and Champion Enterprises, Inc., as amended, restated, supplemented or otherwise modified, and which will be superseded by the Purchase Agreement, the "*Letter of Credit Facility*") .

The Guarantors shall not be required to take any actions to perfect the Lenders' security interests in the Collateral other than (a) the filing of UCC financing statements, (b) the filing of agreements evidencing such security interests with the United States Copyright Office and the United States Patent and Trademark Office, (c) the delivery of any certificated securities, (d) the recordation, by not later than 90 days after the Closing Date, of a mortgage on owned real property, *provided* that neither a local counsel opinion nor a title insurance policy shall be required with respect to any mortgage, and (e) making commercially reasonable efforts to obtain, by 120 days following the Closing Date, control agreements with respect to the deposit accounts and security accounts, *provided* that accounts with aggregate deposits of not more than $5,000,000 shall be excluded from the control agreement requirement.

Mandatory Prepayments:    Mandatory prepayments of (a) 100% of the net proceeds of debt issuances to any of the New Equity Investors (or their affiliated funds) unless each other Lender is granted a right to participate ratably in such issuance and (b) 100% of the net proceeds of any Disposition provided for under clause (i)(vi) in the heading "Negative Covenants" or of any casualty event; *provided, however,* that the foregoing shall not apply to net proceeds with respect to (i) any Disposition of the Specified Assets that occurs on

**CONFIDENTIAL**

or before the twelve-month anniversary of the Closing Date (the "<u>Specified Assets Disposition</u>"), (ii) any Disposition or casualty event that occurs on or before the twelve-month anniversary of the Closing Date, to the extent that the aggregate net proceeds with respect to all such Dispositions and casualty events does not exceed $20,000,000 <u>less</u> the net proceeds from any Specified Assets Disposition during such twelve-month period, and (iii) (x) any excess over the amount provided in clause (ii) hereof or (y) any Disposition or casualty event that occurs after the twelve-month anniversary of the Closing Date, in each case, to the extent that the Parent informs the Administrative Agent of its good faith intention to apply (or cause the Borrower or one or more of the Subsidiary Guarantors to apply) such proceeds to the restoration or replacement of assets or properties subject to casualty events, the acquisition of other fixed assets or properties consistent with the businesses permitted to be conducted under the loan documents (including by way of merger or investment), capital expenditures or Permitted Acquisitions, and within 365 days following the receipt of such proceeds, such proceeds are applied as described in this clause (iii).  The amount of such proceeds provided under clause (iii) that are unused or uncommitted after such 365-day period shall be applied to prepay the Term Loan Facility.

<u>Voluntary Prepayments</u>:

Prepayments with respect to the Term Loan Facility shall be permitted at any time, without premium or penalty, in the minimum amount of $1,000,000, and increments of $500,000 subject to reimbursement of any breakage costs.

<u>Facility Documentation</u>:

The documentation for the Term Loan Facility shall be negotiated in good faith and shall contain the terms and conditions set forth in this Term Sheet.  Such documentation shall contain only those payments, covenants and events of default, including the applicable standards, qualifications, thresholds, exceptions, "baskets" and grace and cure periods, expressly set forth in this Term Sheet, in each case substantially in the form as set forth in this Term Sheet.

<u>Representations and Warranties</u>:

The definitive Term Loan documentation shall contain the following representations and warranties of the Obligors: corporate power and authority to enter into the loan documentation, due authorization, execution, delivery and enforceability of such documentation, such

**CONFIDENTIAL**

documentation not conflicting with or creating a breach or default under charter documents, law or material contracts, and the perfection and priority of the security interests granted in the collateral.

<u>Conditions Precedent to Borrowing</u>:

(a) Bankruptcy court confirmation of Sale Order;

(b) the Definitive Transaction Documents (x) are in form and substance satisfactory to, in the case of the New Equity Investors, the New Equity Investors and, in the case of the DIP Lenders, the Required DIP Lenders and (y) have a level of conditionality reasonably satisfactory to the Debtors; provided that such determination shall be made by all such parties by no later than the Interim Deadline (each defined term in this clause (b), as defined in the Purchase Agreement); and

(c) At least $[_____] shall have been contributed by the Parent to the Borrower.

<u>Affirmative Covenants</u>:

The following shall be affirmative covenants of the Borrower and the Parent:

(a) <u>Financial Information, Reports, Notices, etc.</u> [2]: The Parent shall furnish to the Administrative Agent:

(i) commencing with the fiscal quarter ending June 30, 2010, as soon as available and in any event within 45 days after the end of the first three fiscal quarters of each fiscal year, an unaudited consolidated balance sheet of the Parent as of the end of the fiscal quarter for such quarter and consolidated statements of income and cash flow of the Parent and its subsidiaries and for the period commencing with the end of the last fiscal year and the year-to-date portion of the fiscal year, including (in each case) in comparative form the figures for the corresponding quarter and period from the preceding fiscal year and from the budget for such quarter and period, certified as complete and correct in all material respects, by the chief financial officer or chief accounting officer of the Parent (subject to normal year end adjustments);

---

[2] NTD: Reporting to be reviewed the based upon the ultimate structure (e.g., Parent's various subsidiaries may not be consolidated under GAAP).

**CONFIDENTIAL**

(ii) commencing with the fiscal year ended December 31, 2010, as soon as available and in any event within 120 days after the end of such fiscal year and within 90 days after the end of each subsequent fiscal year, the consolidated balance sheets of the Parent and its subsidiaries and the related consolidated statements of income and cash flow of the Obligors for such fiscal year, setting forth in comparative form the figures for the immediately preceding fiscal year and the figures in the budget for such fiscal year, audited (without certain qualifications to be agreed, including going concern and scope) by independent public accountants acceptable to the Administrative Agent or the Required Lenders;

(iii) concurrently with the delivery of financial information pursuant to clauses (i) and (ii) above, a compliance certificate executed by the chief financial officer or chief accounting officer of the Parent, (i) showing compliance with the financial covenants described in the heading "Financial Covenants" and stating that no default has occurred and is continuing (or, if a default has occurred, specifying the details of such default and the action that the applicable Obligor has taken or proposes to take with respect thereto) and (ii) stating that no subsidiary has been formed or acquired, and no subsidiary has ceased to be an immaterial subsidiary, since the delivery of the last compliance certificate (or, a statement that such subsidiary has complied in all material respects with the covenant described in clause (g) below);

(iv) commencing with the fiscal year ended December 31, 2010, as soon as available and in no event later than the earlier to occur of (x) 30 days after approval by the Parent's board of directors or board of managers and (b) 90 days after the first day of each fiscal year of Parent, an annual budget, prepared on a monthly basis for such fiscal year and containing consolidated projected financial statements (including balance sheets and statements of operations and cash flows) of the Obligors;

(v) as soon as available and in any event within 30 days after the Parent or any subsidiary obtains

7

**CONFIDENTIAL**

knowledge of the occurrence of an event of default, a statement of an Authorized Officer of the Parent setting forth details of such event of default and the action which the applicable entity has taken and proposes to take with respect thereto;

(vi) as soon as available and in any event within 30 business days after the Parent or any subsidiary obtains knowledge of a (x) the commencement of any litigation, action, proceeding or labor controversy that could reasonably be expected to have a Material Adverse Effect (as defined below) or affect the legality, validity or enforceability of the Term Loan Facility or (y) the occurrence of a Material Adverse Effect, notice thereof and, to the extent reasonably requested by the Administrative Agent, copies of all documentation relating thereto;

*"Material Adverse Effect"* shall mean a material adverse effect on (i) the business, assets, liabilities, operations, condition (financial or otherwise), operating results or prospects of the Parent and its subsidiaries taken as a whole, (ii) the rights and remedies of any secured party under the documentation or (iii) the validity or enforceability of the Term Loan Facility documentation.

(vii) promptly upon becoming aware of (x) the institution of any steps by any Person to terminate any Pension Plan (as defined in ERISA), (y) the failure to make a required contribution to any Pension Plan if such failure is sufficient to give rise to a Lien under Section 302(f) of ERISA, (z) the taking of any action with respect to a Pension Plan which could result in the requirement that any Obligor furnish a bond or other security to the PBGC or such Pension Plan, or (aa) the occurrence of any event with respect to any Pension Plan which could result in the incurrence by any Obligor of any material liability, fine or penalty, notice thereof and copies of all documentation relating thereto;

(viii) promptly upon receipt thereof, copies of all "management letters" submitted to any Obligor by the independent public accountants referred to in clause (ii) in connection with each audit made by

**CONFIDENTIAL**

such accountants;

(ix) promptly (i) if the Parent or the Borrower obtains knowledge that one or more of the Parent, the Borrower or any Person which owns, directly or indirectly, any interest of the Parent or the Borrower or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Terrorism Laws (as defined in the documentation), the Parent or the Borrower, as applicable, shall notify the Administrative Agent and (ii) upon the request of any Lender, the Parent and the Borrower will provide any information such Lender believes is reasonably necessary to be delivered to comply with the PATRIOT Act; and

(x) such other financial and other information as the Administrative Agent may from time to time reasonably request (including information and reports in such detail as the Administrative Agent may reasonably request with respect to the terms of and information provided pursuant to the compliance certificate).

(b) <u>Maintenance of Existence; Compliance with Contracts, Laws, etc.</u>: Each of the Parent and its subsidiaries shall:

(i) preserve and maintain its legal existence and qualification as a foreign corporation in each jurisdiction where the nature of its business or the location of its assets requires it to be so qualified (except in the case of any immaterial subsidiary and as otherwise permitted by clause (h) in the heading "Negative Covenants");

(ii) perform its obligations under agreements to which such entity is a party except where the failure to comply with such covenant could not reasonably be expected to result in a Material Adverse Effect;

(iii) comply with all applicable laws, rules, regulations and orders, including the payment (before the same become delinquent) of all Taxes, imposed upon such entity or upon its property except to the extent being diligently contested in good faith

**CONFIDENTIAL**

by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of such entity, except where such non-compliance could not reasonably be expected to result in a Material Adverse Effect; and

(iv) ensure that no portion of the Term Loan will be used, disbursed or distributed for any Person directly or indirectly in violation of Terrorism Laws (as defined below) and take all necessary action to comply with all Terrorism Laws with respect thereto.

"*Terrorism Laws*" shall mean any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the PATRIOT Act, (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts and acts of war.

(c) <u>Maintenance of Properties</u>: Each of the Parent and its subsidiaries shall maintain, preserve, protect and keep its properties in good repair, working order and condition (ordinary wear and tear excepted), and make necessary repairs, renewals and replacements so that the business carried on by the Parent and its subsidiaries may be properly conducted at all times, unless the Parent or such subsidiary determines in good faith that the continued maintenance of such property is no longer economically desirable, necessary or useful to the business of the Parent and its subsidiaries or the disposition of such property is otherwise permitted by clauses (h) and (i) in the heading "Negative Covenants", except where the failure to comply with this covenant could not reasonably be expected to result in a Materially Adverse Effect.

(d) <u>Insurance</u>: Each of the Parent and its subsidiaries

**CONFIDENTIAL**

(except immaterial subsidiaries) shall maintain:

(i) insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area, by Persons of comparable size engaged in the same or similar business as the Parent, the Borrower and their respective subsidiaries; and

(ii) all worker's compensation, employer's liability insurance or similar insurance as may be required under the laws of any state or jurisdiction in which it may be engaged in business;

*provided* that, in any event, the Parent and the Borrower will maintain at a minimum (with respect to itself and each of their respective subsidiaries) insurance (including loss of use of operating facilities and business interruption insurance) against loss (including loss of profits) and damage covering substantially all of the tangible real and personal property and improvements of the Parent and each of its subsidiaries by reason of any Insured Peril (as defined below), to the extent that such loss and damage is typically insured against in the same general area by Persons of comparable size engaged in the same or similar business as the Parent, the Borrower and their respective subsidiaries.

"*Insured Peril*" shall mean collectively, all risks (as such term is customarily used in the market for insurance) of physical loss including flood, earthquake and windstorm in the jurisdictions where the properties owned or operated by the Parent, the Borrower or any of their respective subsidiaries are located.

The Parent shall undertake commercially reasonable efforts to obtain the applicable insurer's agreement to provide, by 120 days after the Closing Date, that all insurance policies required pursuant to this covenant shall (i) to the extent applicable to an Obligor or its property, name the Collateral Trustee on behalf of the secured parties as mortgagee (in the case of property insurance) or additional insured (in

**CONFIDENTIAL**

the case of liability insurance), as applicable, and provide that the insurer shall endeavor to provide thirty days' prior written notice of cancellation or non-renewal to the Collateral Trustee and Administrative Agent, and (ii) be in addition to any requirements to maintain specific types of insurance contained in the other Term Loan Facility documentation.

(e) <u>Books and Records</u>: Each of the Parent and its subsidiaries shall keep books and records in accordance with GAAP which accurately reflect in all material respects all of its business affairs and transactions.

Each of the Parent and its subsidiaries shall, at the request of the Administrative Agent (such request to be made no more than once per year while no event of default has occurred or is continuing, and while an event of default has occurred and is continuing, at the request of the Administrative Agent) and upon reasonable notice to the Parent and the Borrower, provide each secured party or any of its representatives an opportunity to discuss such entity's financial affairs with its designated officers and employees and its independent public accountants (and each of the Parent and the Borrower will authorize such independent public accountant to discuss at such time each entity's financial matters with any secured party or any of its representatives), *provided* that the Parent may elect to structure an annual meeting or conference call for all such communications.

The Borrower shall be responsible for the expenses incurred (including any fees of such independent public accountants) (i) in the Administrative Agent's exercise of its rights pursuant to this section not more than one (1) time per year unless an event of default has occurred or is continuing and (ii) in any other secured party's exercise of its rights pursuant to this section, but only if an event of default has occurred and is continuing.

(f) <u>Environmental Laws</u>: Each of the Parent and its subsidiaries shall:

(i) use and operate all of its facilities and properties in material compliance with all Environmental Laws (as defined below), keep all necessary permits, approvals, certificates, licenses and other

CONFIDENTIAL

authorizations relating to environmental matters in effect and remain in material compliance therewith, and handle all Hazardous Materials (as defined below) in material compliance with all applicable Environmental Laws; and

(ii) promptly notify the Administrative Agent and provide copies upon receipt of all written claims, complaints, notices or inquiries relating to the condition of its facilities and properties in respect of, or as to compliance with, Environmental Laws that, if adversely determined, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, and shall promptly resolve any such non-compliance with Environmental Laws and keep its property free of any lien imposed by any Environmental Law.

"*Environmental Laws*" shall mean all applicable and legally binding federal, state, local or foreign statutes, laws, ordinances, codes, rules, regulations and guidelines (including consent decrees and administrative orders) relating to public health and safety and protection of the environment.

"*Hazardous Material*" shall mean (i) any "hazardous substance", as defined by CERCLA; (ii) any "hazardous waste", as defined by the Resource Conservation and Recovery Act, as amended; (iii) any petroleum product; or (iv) any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product) within the meaning of any other Environmental Laws.

(g) <u>Subsidiary Guarantors; Security, etc.</u>: Each of the Parent and its subsidiaries (other than any immaterial subsidiary) shall file such UCC financing statements, file such agreements with the United States Copyright Office and the United States Patent and Trademark Office, deliver such certificated securities, and deliver such mortgages on owned real property and control agreements (as described in clauses (d) and (e) of the last paragraph in the heading "Security") required in order to grant, preserve, protect and perfect the validity and first priority (subject to Permitted Liens (as defined below)) of the liens created or intended to be created by the Term

**CONFIDENTIAL**

Loan Facility documentation, except to the extent otherwise contemplated herein. The Parent shall cause any subsequently acquired or organized domestic subsidiary (other than any immaterial subsidiary), and any domestic subsidiary that ceases to be an immaterial subsidiary, to execute a guaranty (in form and substance reasonably satisfactory to the Administrative Agent or the Required Lenders) in favor of the secured parties; *provided* that no subsidiary formed solely for the purpose of consummating a Disposition permitted under clause (v) of clause (i) in the heading "Negative Covenants" shall be required to execute such guaranty and take the actions with respect to liens as described in this clause (g).

(h) <u>UK Pension Matters</u>: The Parent and the Borrower shall ensure that all pension schemes operated by or maintained for the benefit of the UK Subsidiary and its Subsidiaries and any of their employees are funded in accordance with the minimum funding requirement under Section 56 of the Pensions Act 1995 or the statutory funding objective under Section 222 of the UK Pensions Act and that no action or omission is taken by the UK Subsidiary or any of its Subsidiaries in relation to such a pension scheme which has or is reasonably likely to have a Material Adverse Effect (including the termination or commencement of winding-up proceedings of any such pension scheme or the UK Subsidiary ceasing to employ any member of such a pension scheme).

(i) Except for the Caledonian Mining Company Limited No. 1 Retirement Benefits Scheme and the Caledonian Mining Company Limited No. 2 Retirement Benefits Scheme, the Parent and the Borrower shall ensure that neither the UK Subsidiary nor any of its Subsidiaries is or will become an employer (for the purposes of Sections 38 to 51 of the UK Pensions Act) of an occupational pension scheme which is not a money purchase scheme (both terms as defined in the Pension Schemes Act 1993) or "connected" with or an "associate" of (as those terms are under in Sections 39 or 43 of the UK Pensions Act) such an employer.

(ii) The Parent, Borrower or UK Subsidiary shall deliver to the Agent at such times as those reports are prepared in order to comply with the then current

**CONFIDENTIAL**

statutory or auditing requirements (as applicable either to the trustees of any relevant schemes or to the UK Subsidiary), actuarial reports in relation to all pension schemes mentioned in clause (i) above.

(iii) The Parent, Borrower or UK Subsidiary shall promptly notify the Agent of any material change in the rate of contributions to any pension schemes mentioned in clause (i) above paid or recommended to be paid (whether by the scheme actuary or otherwise) or required (by law or otherwise).

(iv) The Parent, Borrower or UK Subsidiary shall immediately notify the Agent of any investigation or proposed investigation by the Pensions Regulator (that any of them become aware of) which may lead to the issue of a Financial Support Direction or a Contribution Notice to the UK Subsidiary.

(v) The Parent, Borrower or UK Subsidiary shall immediately notify the Agent if the UK Subsidiary receives a Financial Support Direction or a Contribution Notice from the Pensions Regulator.

(i) <u>Cash Management</u>: the Borrower and the Subsidiary Guarantors shall deposit, or cause to be deposited, promptly, and in any event no later than the end of the Business Day immediately following receipt thereof, all of such Person's Collections (as defined below) into deposit accounts and/or securities accounts that are subject to a Control Agreement (as defined below); *provided* that (i) this covenant shall not be applicable for 120 days after the Closing Date (or such additional time period as permitted by the Administrative Agent, such permission not to be unreasonably withheld), during which period the Borrower and Subsidiary Guarantors shall use commercially reasonable efforts to obtain such Control Agreements (*provided* that the failure to obtain such Control Agreement despite such commercially reasonable efforts shall not constitute a default or event of default) and (ii) at no time after such period shall an aggregate amount of more than $5,000,000 of the cash and Cash Equivalent Investments (as defined below) of the Borrower and the Subsidiary Guarantors be held other than in deposit accounts and/or securities accounts that are subject to a Control Agreement.

CONFIDENTIAL

"*Collections*" means all cash, checks, notes, instruments and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Parent and its Subsidiaries.

"*Control Agreement*" means an agreement in form and substance reasonably satisfactory to the Administrative Agent which provides for the Administrative Agent to have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts).

"*Cash Equivalent Investment*" means, at any time:

(a) any direct obligation of (or unconditionally guaranteed by) the United States (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States) maturing not more than one year from the date of acquisition thereof;

(b) commercial paper maturing not more than 365 days from the date of acquisition and rated A-1 or higher by S&P or P-1 or higher by Moody's;

(c) any certificate of deposit, time deposit, or bankers acceptance, maturing not more than one year after its date of acquisition, or any demand deposit accounts which, in any case, is issued by or established at any bank organized under the laws of the United States (or any State thereof) and which (i) has (A) a credit rating of A2 or higher from Moody's or A or higher from S&P and (B) a combined capital and surplus greater than $250,000,000 or (ii) is a Lender;

(d) any repurchase agreement having a term of 7 days or less entered into with any Lender or any commercial banking institution satisfying the criteria set forth in clause (c) which (i) is secured by a fully perfected security interest in any obligation of the type described in clause (a), and (ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder;

**CONFIDENTIAL**

(e) taxable and tax exempt auction rate securities rated AAA by S&P and Aaa by Moody's and with a reset of less than 90 days;

(f) shares of investment companies that are registered under the Investment Company Act of 1940, as amended, and that invest solely in one or more of the types of securities described in clauses (a) through (e) above;

(g) other investments similar to the foregoing as may from time to time be approved in writing by the Administrative Agent in its reasonable discretion.

(j) <u>Mortgages</u>: with respect to the real properties owned by the Borrower or a Subsidiary Guarantor, the Borrower or the Subsidiary Guarantor, as applicable, shall use commercially reasonable efforts to deliver a mortgage duly executed by the Borrower or the Subsidiary Guarantor, as applicable, in form and substance reasonably acceptable to the Administrative Agent (each a "***Mortgage***"), within 90 days following the Closing Date (or such additional time period as permitted by the Administrative Agent, such permission not to be unreasonably withheld). By such date, the Borrower or the applicable Subsidiary Guarantor shall deliver:

(i) an executed counterpart of a Mortgage;

(ii) evidence of the completion (or satisfactory arrangements for the completion) of the recording and filing of such Mortgage;

(iii) evidence of the payment of (or satisfactory arrangements for the payment of) all mortgage recording taxes, fees, costs and expenses of filing of each such Mortgage; and

(iv) with respect to each such Mortgage, such UCC financing statements as may be necessary to perfect the lien of the Collateral Trustee, for the benefit of the secured parties, on the fixtures granted in such Mortgage.

<u>Negative Covenants</u>:    The following shall be the negative covenants of the Borrower and the Parent:

(a) <u>Business Activities</u>: None of the Parent or any of its subsidiaries shall engage in any business activity except those business activities engaged in by the Parent and its

**CONFIDENTIAL**

subsidiaries after giving effect to the Acquisition and activities reasonably, ancillary, complimentary or incidental thereto;

(b) <u>Indebtedness</u>: None of the Parent or any of its subsidiaries shall create, incur, assume or permit to exist any indebtedness except:

(i) in respect to (x) the Obligations under the Term Loan Facility and (y) indebtedness under the Letter of Credit Facility;

(ii) assumed pursuant to the Acquisition, including existing indebtedness of non-Obligors;

(iii) indebtedness in an aggregate amount not to exceed $75,000,000 at any time that is subordinated in right of payment and unsecured or secured by a lien junior to the Obligations, in each case pursuant to an intercreditor agreement in customary form reasonably acceptable to the Administrative Agent or the Required Lenders so long as on a <u>pro forma</u> basis (after giving effect to such incurrence of debt) as of the last day of the most recently completed fiscal quarter with respect to which, pursuant to clause (a) in the heading "Affirmative Covenants", financial statements have been, or are required to have been, delivered by the Parent, the Leverage Ratio and the Interest Coverage Ratio would be 4.50:1 or less and greater than 2.00:1, respectively, in each case as of the last day of such fiscal quarter;

(iv) (x) incurred in the ordinary course of business of the Parent or any of its subsidiaries (including open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services which are not overdue for a period of more than 120 days or, if overdue for more than 120 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of the Parent or such subsidiary), (y) in respect of performance bonds, workers' compensation claims, surety, statutory, bid or appeal bonds, completion guarantees or reimbursement obligations with respect to self-insurance or similar obligations, in each case provided in the ordinary course of business and (z) in respect of

**CONFIDENTIAL**

reimbursement or indemnification obligations owed to (including in respect of letters of credit obtained for the benefit of) any Person with respect to (1) workers' compensation, health, disability or other employee benefits or (2) property, casualty or liability insurance, provided by such Person to the Parent or any of its subsidiaries, in the case of each of clauses (1) and (2), in the ordinary course of business; but excluding (in the case of each of clauses (x), (y) and (z)) indebtedness incurred through the borrowing of money or Contingent Liabilities (as defined below) in respect of indebtedness so incurred;

"*Contingent Liability*" shall mean any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness of any other Person (other than by endorsements of instruments in the course of collection or deposit), or guarantees the payment of dividends or other distributions upon the capital securities of any other Person. The amount of any Person's obligation under any Contingent Liability shall be deemed, without duplication, to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby (reduced to the extent that such Person's obligation thereunder is reduced by applicable law or valid contractual agreement).

(v) of the Parent or any of its subsidiaries (x) in respect of industrial revenue bonds or other similar governmental or municipal bonds, (y) evidencing the deferred purchase price of newly acquired property or incurred to finance repairs, improvements or additions to property, or the acquisition of property of the Borrower and its subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrower or its subsidiaries; *provided*, that, such indebtedness is incurred within 120 days following the acquisition of such property, and (z) in respect of capitalized lease

**CONFIDENTIAL**

liabilities; *provided* that the aggregate amount of all indebtedness outstanding pursuant to this clause shall not at any time exceed $15,000,000;

(vi) of any subsidiary of the Parent owing to the Parent or any of its other subsidiaries, or Contingent Liabilities of the Parent or any of its subsidiaries incurred with respect to the indebtedness of any other such subsidiary, which indebtedness (x) shall, if payable to the Borrower or a Subsidiary Guarantor, be evidenced by one or more promissory notes in form and substance reasonably satisfactory to the Administrative Agent or the Required Lenders, duly executed and delivered in pledge to the Collateral Trustee Agent pursuant to the Term Loan Facility documentation, and shall not be forgiven or otherwise discharged for any consideration other than payment in full or in part in cash or pursuant to a Permitted Refinancing (as defined below) (*provided* that only the amount repaid in part shall be discharged); and (y) if (1) incurred by a subsidiary of the Parent that is not an Obligor owing to an Obligor, or (2) a Contingent Liability incurred by an Obligor with respect to the indebtedness of a non-Obligor, shall not, in the case of both clauses (1) and (2) (when aggregated with the amount of investments made by way of contributions to capital or purchases of capital securities by the Obligors in subsidiaries which are not Subsidiary Guarantors under clause (y) of the proviso to clause (e)(vi) hereof), less Investment Returns, exceed at any time $40,000,000 in the aggregate with respect to such indebtedness incurred after the Closing Date;

"*Permitted Refinancing*" shall mean the incurrence of other indebtedness (whether with the same or different lenders) to refinance such existing indebtedness or the amendment, renewal or other modification of such existing indebtedness; *provided* that, in the case of such other indebtedness or modified indebtedness, the following conditions are satisfied:

(i) the weighted average life to maturity of such refinancing or modified indebtedness shall be greater than or equal to the weighted average life

**CONFIDENTIAL**

to maturity of the indebtedness being refinanced or modified, and the first scheduled principal payment in respect of such refinancing or modified indebtedness shall not be earlier than the first scheduled principal payment in respect of the indebtedness being refinanced or modified;

(ii) the principal amount of such refinancing or modified indebtedness shall be less than or equal to the principal amount then outstanding of the indebtedness being refinanced or modified;

(iii) each obligor on the refinancing or modified indebtedness shall have been an obligor on the indebtedness being refinanced or modified;

(iv) the security, if any, for the refinancing or modified indebtedness shall be the same as that for the indebtedness being refinanced or modified (except to the extent that less security is granted to holders of the refinancing indebtedness or modified indebtedness); and

(v) the refinancing or modified indebtedness is subordinated to the Obligations to the same degree, if any, or to a greater degree as the indebtedness being refinanced or modified.

(vii) incurred by the Advantage Home Subsidiary with respect to Floor Plan Financing Lines (as defined below) in an aggregate amount not exceeding $30,000,000 at any time;

(viii) incurred in respect of Permitted Receivables Transactions (as defined below);

"***Permitted Receivables Transaction***" shall mean any transaction providing for the assignment of accounts directly or indirectly owing by governmental entities (e.g., any account the debtor of which is the United States or any department or instrumentality thereof) with customary limited recourse obligations for breach of seller representations and warranties that are standard in accounts-sales transactions.

(ix) of a Person existing at the time such Person became a subsidiary of the Parent, but only if such

CONFIDENTIAL

indebtedness was not created or incurred in contemplation of such Person becoming such a subsidiary and the aggregate outstanding amount of all indebtedness existing pursuant to this clause does not exceed $25,000,000 at any time;

(x) with respect to hedging obligations entered into by the Parent or such subsidiary to hedge against interest rate or currency exchange rate fluctuations, in each case arising in the ordinary course of business of the Parent and its subsidiaries and not for speculative purposes;

(xi) in respect of netting services, overdraft protections and otherwise in connection with deposit accounts;

(xii) subordinated (on terms reasonably satisfactory to the Administrative Agent or the Required Lenders), if indebtedness of an Obligor, to the Obligations in respect of the deferred portion of the purchase price of a Permitted Acquisition that does not require the payment of any cash interest or principal prior to six months after the maturity of the Term Loan Facility ("*Permitted Seller Debt*") and indebtedness consisting of deferred acquisition obligations; *provided* that any deferred acquisition obligations are unsecured and subordinated, if indebtedness of an Obligor, in right of payment to the Obligations and on terms reasonably satisfactory to the Administrative Agent or the Required Lenders;

(xiii) other indebtedness of the Parent and its subsidiaries (other than indebtedness of foreign subsidiaries owing to any Obligor) in an aggregate amount at any time outstanding not to exceed $25,000,000;

(xiv) Permitted Refinancings of the indebtedness listed above; and

(xv) of the UK Subsidiary in respect of the UK Intercompany Loan.

"*Floor Plan Financing Lines*" shall mean indebtedness in the form of inventory financings or

**CONFIDENTIAL**

purchase money obligations used solely to fund working capital or the acquisition of the same or similar property; provided that such indebtedness (i) is secured only by otherwise unencumbered retail inventory of the Parent or any of its subsidiaries, and fixtures, furniture and other household items attached to or inside such inventory, and the proceeds thereof, and (ii) constitutes non-recourse debt.

(c) Liens: None of the Obligors shall create, incur, assume or permit to exist any lien upon any of its property (including capital securities of any Person), revenues or assets, whether now owned or hereafter acquired, except (solely, other than with respect to clause (i)(x) below, in the case of the Borrower and its subsidiaries) the following (each, a "*Permitted Lien*"):

(i) (x) liens securing payment of the Obligations and (y) liens on cash or rights to receive excess cash held by any beneficiary of an Existing Letter of Credit granted to the Issuing Bank and/or Lenders with respect to the reimbursement obligations under the Letter of Credit Facility (or refinancing indebtedness with respect thereto);

(ii) liens existing as of the consummation of the Acquisition securing indebtedness described in clause (b)(ii) hereof, and refinancings of such indebtedness; *provided* that no such lien shall encumber any additional property and the amount of indebtedness secured by such lien is not increased from that existing on consummation of the Acquisition (as such indebtedness may have been permanently reduced subsequent to such date);

(iii) liens securing indebtedness of the type permitted under clause (b)(iii) hereof;

(iv) liens securing indebtedness of the type permitted under clause (b)(v) hereof; *provided* that (x) such lien is granted within 120 days after such indebtedness is incurred, (y) the indebtedness secured thereby does not exceed 100% of the lesser of the cost or the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (z) such lien

CONFIDENTIAL

secures only the assets that are the subject of the indebtedness referred to in such clause;

(v) liens securing indebtedness permitted by clause (b)(ix) hereof; *provided* that such liens existed prior to such Person becoming a subsidiary, were not created in anticipation thereof and attach only to specific tangible assets of such Person (and not assets of such Person generally);

(vi) liens in favor of carriers, warehousemen, mechanics, materialmen and landlords granted in the ordinary course of business for amounts not overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(vii) liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits (other than Liens under ERISA), or to secure performance of or in connection with tenders, statutory obligations, bids, self-insurance arrangements, surety bonds, statutory or appeal bonds, performance bonds, contested taxes or import duties, leases or similar obligations (other than for borrowed money) entered into in the ordinary course of business;

(viii) judgment liens which are being contested in good faith and which do not otherwise result in an event of default under clause (e) in the heading "Events of Default";

(ix) easements, rights-of-way, zoning restrictions, minor defects or irregularities in title, encroachments, encumbrances disclosed by surveys, and other similar encumbrances not interfering in any material respect with the value or use of the property to which such lien is attached; and

(x) liens for taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with

**CONFIDENTIAL**

GAAP shall have been set aside on its books.

(xi) leases, subleases, licenses and sublicenses granted to third parties in the ordinary course of business, in each case not interfering in any material respect with the operations or business of the Borrower and its subsidiaries;

(xii) landlord liens arising under any lease contracts entered into by the Borrower or any of its subsidiaries in the ordinary course of business for amounts not overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(xiii) statutory liens of depository or collecting banks on items in collection and any accompanying documents or the proceeds thereof;

(xiv) liens securing indebtedness of the type permitted by clauses (b)(vii), (viii) and (x) hereof;

(xv) liens arising from precautionary UCC financing statement filings regarding operating leases;

(xvi) extensions, renewals and replacements of any of the foregoing liens to the extent and for so long as the Indebtedness secured thereby remains outstanding;

(xvii) other liens on assets of the Borrower and its subsidiaries *provided* that the indebtedness and other obligations secured thereby, does not exceed $15,000,000;

(xviii) customary rights of setoff upon deposits of cash in favor of banks or other depository institutions in which such cash is maintained in the ordinary course of business;

(ix) liens in favor of customs and revenue authorities arising as a matter of law or pursuant to a bond to secure payment of customs duties in connection with the importation of goods; and

(x) liens securing indebtedness permitted by clause

**CONFIDENTIAL**

(b)(xv) hereof.

(d) <u>Financial Condition and Operations</u>: see heading "Financial Covenants".

(e) <u>Investments</u>: None of the Parent or any of its subsidiaries shall purchase, make, incur, assume or permit to exist any investment in any other Person, except:

(i) investments existing as of consummation of the Acquisition;

(ii) Cash Equivalent Investments;

(iii) investments received in connection with the bankruptcy or reorganization of, or a composition or readjustment of debts, or settlement of delinquent accounts and disputes with customers and suppliers, in each case in the ordinary course of business;

(iv) [Reserved.];

(v) investments by the Parent in any of its subsidiaries or by any subsidiary of the Parent in any other subsidiary of the Parent; *provided* that the sum of (x) the aggregate amount of intercompany loans made, and Contingent Liabilities incurred, pursuant to clause (b)(vi)(y) hereof <u>plus</u> (y) the aggregate amount of investments under this clause by way of contributions to capital or purchases of capital securities made by Obligors in subsidiaries that are neither Subsidiary Guarantors nor wholly owned subsidiaries, <u>minus</u> (z) Investment Returns (as defined below), shall not exceed the amount set forth in clause (b)(vi)(y) hereof;

(vi) investments made by the Parent and its subsidiaries that constitute (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

(vii) investments made by the Parent and its subsidiaries constituting Permitted Acquisitions permitted pursuant to clause (h) hereof;

**CONFIDENTIAL**

(viii) investments consisting of the deferred portion of the sales price received, in cash or otherwise, by the Borrower or any subsidiary in connection with any Disposition permitted under clause (i) hereof;

(ix) investments made with net casualty proceeds or net Disposition proceeds in accordance with the provisions of the Term Loan Facility;

(x) investments in respect of loans and advances made by the Parent and its subsidiaries in the ordinary course of business and consistent with past practices to their respective employees, including for moving, travel and emergency expenses and other similar expenses or for income tax liabilities, so long as the aggregate principal amount thereof at any one time outstanding (determined without regard to any write-downs or write-offs of such loans and advances), less Investment Returns, does not exceed $2,000,000 in the aggregate for all employees;

(xi) investments in Persons engaged in the retail sale of the Borrower's and its subsidiaries' inventory, net of Investment Returns, not to exceed $20,000,000 outstanding at any time;

(xii) investments made in connection with the purchase of assets pursuant to Repurchase Obligations (as defined below); and

(xiii)[3] other investments made by the Borrower and its subsidiaries (net of Investment Returns) 365 days or more after the Closing Date (x) in an amount not to exceed $10,000,000 over the term of the Term Loan Facility and (y) so long as the Leverage Ratio (as defined in the heading "Financial Covenants") as at the end of the fiscal quarter most recently completed prior to the making of such investment with respect to which, pursuant to clause (a) in the heading "Affirmative Covenants", financial statements have been, or are required to have been, delivered by the Parent, was 2.50:1 or less, in an amount not to exceed the CNI Basket (as defined below) at the time of making such investment

---

[3] The baskets and ratios in this section are still subject to Company review.

CONFIDENTIAL

(*provided* that, after giving effect to any such investment pursuant to this clause (xiii)(y), before making any such investment (or series of related investments) in an amount exceeding $2,500,000, the Administrative Agent shall have received a compliance certificate executed by the chief financial officer of the Borrower certifying and, if reasonably requested by the Administrative Agent, showing (in reasonable detail and with appropriate calculations and computations in all respects reasonably satisfactory to the Administrative Agent or the Required Lenders) that on a historical pro forma basis (after giving effect to such Investment and related transactions and all investments and related transactions made pursuant to this subclause prior thereto during the applicable periods thereunder) as of the last day of the most recently completed fiscal quarter with respect to which, pursuant to clause (a) in the heading "Affirmative Covenants", financial statements have been, or are required to have been, delivered by the Parent, the Parent would be in compliance with the Interest Coverage Ratio and would have a Leverage Ratio of 2.50:1 or less (both ratios as described in the heading "Financial Covenants", in each case as of the last day of such fiscal quarter);

*provided, however,* that (a) any investment which when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements and (b) no investment otherwise permitted by clause (v) (to the extent constituting an investment by an Obligor in a Subsidiary that is not a Subsidiary Guarantor and solely following the written election of the Administrative Agent or the Required Lenders to terminate the ability to make further such investments), (vii) or (xiii) (in the case of each of clauses (vii) and (xiii), to the extent the Parent or its subsidiary is not already subject to an agreement to make such investment) shall be permitted to be made if any Default has occurred and is continuing or would result therefrom.

"*CNI Basket*" shall mean, 50% of Consolidated Net Income of the Parent and its subsidiaries (reduced by

**CONFIDENTIAL**

100% of net losses) plus other typical adjustments.

"*Investment Returns*" shall mean, with respect to any Investment by the Parent or any of its Subsidiaries in any Person after the Closing Date pursuant to subclauses (v), (x), (xi) or (xiii) of this clause (e) or subclause (vi)(y) of clause (b) hereof, cash received by the Parent or any of its Subsidiaries from such Person after the making of such Investment.

"*Repurchase Obligations*" shall mean obligations incurred pursuant to inventory repurchase agreements entered into in the ordinary course of the business of the Borrower and its subsidiaries consistent with reasonable and customary industry practices in such business in connection with floor-plan financing arrangements provided by financial institutions to retailers; *provided* that in no event shall the terms of such obligations require the obligor thereof to make any cash payment in respect thereof until title to such inventory has been transferred to the Borrower or any such subsidiary, as applicable.

(f) Restricted Payments: None of the Parent or any of its subsidiaries shall declare or make a Restricted Payment (as defined below), or make any deposit for any Restricted Payment, except:

(i) payable by any non-wholly owned subsidiary to its shareholders or members generally, so long as the Borrower or a Subsidiary Guarantor receives, directly or indirectly, a pro rata share of such dividends (based upon the aggregate equity interests of such non-wholly owned Subsidiary held by the Borrower and its subsidiaries);

(ii) payable (i) by any subsidiary of the Borrower to the Borrower or any other Subsidiary Guarantor (that is a wholly owned subsidiary of the Borrower), (ii) by any subsidiary that is not a Subsidiary Guarantor to any other subsidiary that is not a Subsidiary Guarantor, or (iii) by any subsidiary of the Parent that is not the Borrower or a subsidiary of the Borrower to the Parent;

**CONFIDENTIAL**

(iii) so long as a default has not occurred and is not continuing, the Parent or the Borrower may redeem or repurchase capital securities of the Parent or the Borrower, respectively, held by officers, directors or employees of the Parent or any of its subsidiaries following the termination of employment or service of such Person in an aggregate amount not to exceed with respect to all redemptions or purchases pursuant to this clause (iii) in the aggregate during any fiscal year, $2,500,000 and;

(iv)(x) other Restricted Payments made by the Parent after the twelve-month anniversary of the Closing Date (1) in an aggregate amount not to exceed $5,000,000 over the term of the Term Loan Facility or (2) so long as the Leverage Ratio (as defined in the heading "Financial Covenants") as at the end of the fiscal quarter most recently completed prior to the making of such Restricted Payment with respect to which, pursuant to clause (a) in the heading "Affirmative Covenants", financial statements have been, or are required to have been, delivered by the Parent, was 2.50:1 or less, in an amount not to exceed the CNI Basket at the time of making such Restricted Payment, and (y) other Restricted Payments by the Borrower to the Parent solely to enable the Parent to make the foregoing Restricted Payments; *provided* that (x) at the time of making any such Restricted Payment, no default shall have occurred and be continuing, (y) after giving effect to any such Restricted Payment, the Borrower and the Subsidiary Guarantors shall have Liquidity of at least $5,000,000 and (z) with respect to any Restricted Payment made pursuant to clause (iv)(y), (1) while the Term Loans remain outstanding, an amount equal to such Restricted Payment has been applied to the prepayment of the Term Loans and (2) before making any such Restricted Payment (or series of related Restricted Payments) in an amount exceeding $2,500,000, the Administrative Agent shall have received a compliance certificate executed by the chief financial officer of the Borrower certifying and, if reasonably requested by the Administrative Agent, showing (in reasonable detail and with appropriate calculations and computations in all respects reasonably satisfactory to the Administrative Agent or the Required Lenders) that

**CONFIDENTIAL**

on a historical pro forma basis (after giving effect to such Restricted Payment and related transactions and all Restricted Payments and related transactions made pursuant to this clause prior thereto during the applicable periods thereunder) as of the last day of the most recently completed fiscal quarter with respect to which, pursuant to clause (a) in the heading "Affirmative Covenants", financial statements have been, or are required to have been, delivered by the Parent, the Parent would be in compliance with the financial covenants in the heading "Financial Covenants" as of the last day of such fiscal quarter and, in the case of a Restricted Payment to be made pursuant to subclause (x)(2) of this clause (iv), would have a Leverage Ratio (as defined in the heading "Financial Covenants") of 2.50:1 or less as of the last day of such fiscal quarter;

(v) tax distributions to the holders of equity in the Parent to the extent that such holders are subject to tax on income attributable to the Parent or its subsidiaries; and

(vi) (x) Restricted Payments made with the proceeds from the contemporaneous issuance of new equity of the Parent and (y) Restricted Payments constituting the refinancing of subordinated debt with proceeds of additional subordinated debt.

"*Liquidity*" shall mean at any time, the sum of (a) unrestricted cash on hand of the Borrower and the Subsidiary Guarantors at such time, that is free of all liens (other than liens contemplated by clauses (c)(i), (x), (xi) and (solely with respect to liens contemplated by such foregoing clauses) (xvi) hereof).

"*Restricted Payment*" shall mean (a) the declaration or payment of any dividend (other than dividends to be paid or in fact paid in capital securities of the Parent (other than Redeemable Capital Securities (as defined in clause (g))) on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of any class of capital securities of the Parent or any of its subsidiaries or any warrants

**CONFIDENTIAL**

or options to purchase any such capital securities, whether now or hereafter outstanding, or the making of any other payment or distribution (other than in capital securities (other than Redeemable Capital Securities) of the Parent) in respect thereof, either directly or indirectly, whether in cash or property, obligations of the Parent or any of its subsidiaries or otherwise and (b) the payment of any principal with respect to indebtedness that is subordinated to the indebtedness under the Term Loan Facility.

(g) Issuance of Capital Securities: None of the Parent or any of its subsidiaries shall issue any capital securities (whether for value or otherwise) to any Person other than:

(i) (x) in the case of any subsidiary of the Parent that is not the Borrower or a subsidiary of the Borrower, to the Parent or any wholly owned subsidiary of the Parent or (y) in the case of any subsidiary of the Borrower, (1) if such subsidiary is a wholly owned subsidiary, to the Borrower or another wholly owned subsidiary and (2) if such subsidiary is not a wholly owned subsidiary, to its shareholders or members so long as the Borrower or subsidiary of the Borrower which owns the equity interest in such non-wholly owned subsidiary does not have its percentage ownership of the capital securities of such non-wholly owned subsidiary reduced after giving effect to such issuance,

(ii) for transfers or replacements of then outstanding shares of capital securities,

(iii) for stock splits, stock dividends and issuances which do not reduce the percentage ownership of the Parent or any of its subsidiaries in any class of the capital securities of such subsidiary (and for which the secured parties continue to have a first priority pledge of such capital securities), (d) to qualified directors to the extent required by applicable law, (e) for issuances by newly created or acquired subsidiaries in accordance with the terms of the Term Loan Facility, and (f) in the case of the Parent, to any Person, so long as such capital securities are not Redeemable Capital Securities (as defined below).

CONFIDENTIAL

"*Redeemable Capital Securities*" shall mean capital securities of the Parent that, either by its terms, by the terms of any security into which it is convertible or exchangeable or otherwise, (i) are or upon the happening of an event or passage of time would be required to be redeemed in whole or in part (except for consideration comprised of capital securities of the Parent which are not Redeemable Capital Securities) on or prior to the five and one-half (5-1/2) year anniversary of the consummation of the Acquisition, (ii) are redeemable in whole or in part at the option of the holder thereof (except for consideration comprised of capital securities of the Parent which are not Redeemable Capital Securities) at any time prior to such date or (iii) are convertible into or exchangeable (in whole or in part) for indebtedness of the Parent or any of its subsidiaries at any time prior to such date.

(h) Consolidation, Merger; Permitted Acquisitions, etc.: None of the Parent or any of its subsidiaries shall liquidate or dissolve, consolidate with, or merge into or with, any other Person, or purchase or otherwise acquire any substantial part of the assets of any Person (or any division thereof), except

(i) any subsidiary may liquidate or dissolve voluntarily into, and may merge with and into, the Parent or the Borrower (so long as the Parent or the Borrower, as applicable, is the surviving corporation) or any other subsidiary (*provided* that a Subsidiary Guarantor may only liquidate or dissolve into, or merge with and into, the Parent, the Borrower or another Subsidiary Guarantor), and the assets or capital securities of any subsidiary may be purchased or otherwise acquired by the Parent, the Borrower or any other subsidiary (*provided* that the assets or capital securities of any Subsidiary Guarantor may only be purchased or otherwise acquired by the Parent, the Borrower or another Subsidiary Guarantor); *provided* that in no event shall any Subsidiary Guarantor consolidate with or merge with and into any subsidiary other than another Subsidiary Guarantor unless after giving effect thereto, the Administrative Agent shall have a perfected pledge of, and security interest in and to, at least the same percentage of the issued and

**CONFIDENTIAL**

outstanding interests of capital securities (on a fully diluted basis) of the surviving Person as the Administrative Agent had immediately prior to such merger or consolidation in form and substance reasonably satisfactory to the Administrative Agent and its counsel, pursuant to such documentation and opinions as shall be necessary in the reasonable opinion of the Administrative Agent or the Required Lenders to create, perfect or maintain the collateral position of the secured parties therein;

(ii) the Parent or any of its subsidiaries may effect an acquisition of capital securities (by merger, consolidation, purchase or otherwise) or of any division or all or substantially all of the assets of any Person, if: (x) no default has occurred and is continuing or would occur after giving effect thereto; (y) (1) such acquisition (1) is a Permitted Foreign Acquisition (as defined below) or (2) if an acquisition of capital securities, shall result in the issuer of such capital securities becoming a wholly owned subsidiary that is incorporated or organized under the laws of the United States (whether by merger, stock purchase or otherwise); and (2) upon the consummation of such acquisition, the provisions of clause (g) in the heading "Affirmative Covenants" are complied with;

(iii) such acquisition was not preceded by an unsolicited tender offer for the capital securities of the Person subject to such acquisition by, or by a proxy contest initiated by, the Parent or any of its subsidiaries;

(iv) if such acquisition is consummated prior to the date on which financial statements are required to be delivered for the fiscal quarter ended September 30, 2011, either (x) so long as, after giving effect to such acquisition (other than any Permitted Foreign Acquisition by any Person that is not an Obligor), the Borrower and the Subsidiary Guarantors shall have Liquidity of at least $5,000,000 and on a pro forma basis (after giving effect to such acquisition) as of the last day of the most recently completed fiscal quarter with respect to which, pursuant to clause (a) in the heading "Affirmative Covenants", financial statements have been, or are required to

**CONFIDENTIAL**

have been, delivered by the Parent, the Leverage Ratio and the Interest Coverage Ratio would be 4.50:1 or less and greater than 2.00:1, respectively, in each case as of the last day of such fiscal quarter or (y) such acquisition is effected with the proceeds of the issuance of new equity of the Parent;

(v) for any acquisition in excess of $25,000,000, except to the extent effected with the proceeds of new equity of the Parent, the Borrower has obtained the consent of the Required Lenders; and

 (v) the Administrative Agent shall have received a compliance certificate executed by the chief financial officer or chief accounting officer of the Parent certifying and, if reasonably requested by the Administrative Agent, showing (in reasonable detail and with appropriate calculations and computations in all respects reasonably satisfactory to the Administration Agent) that (A) each of the conditions set forth in the preceding clauses (i), (ii), (iii), (iv) (as necessary) and (v) have been satisfied and (B) on a historical pro forma basis (after giving effect to such acquisition and all transactions related thereto (including all indebtedness that would be assumed or incurred as a result of such acquisition) and all acquisitions consummated prior thereto during the applicable periods thereunder) as of the last day of the most recently completed fiscal quarter with respect to which, pursuant to clause (a) in the heading "Affirmative Covenants", financial statements have been, or are required to have been, delivered by the Borrower, the Borrower would be in compliance with clauses (a) and (b) in the heading "Financial Covenants" as of the last day of such fiscal quarter.

"*Permitted Foreign Acquisition*" shall mean an acquisition by the Parent or any of its subsidiaries of all of the capital securities (by merger, consolidation, purchase or otherwise), or any division or all or substantially all of the assets, of any foreign Person; *provided* that, in the case of any such acquisition made by any Obligor, the consideration paid for all such acquisitions shall not exceed $30,000,000 in the aggregate during the Term Loan Facility.

**CONFIDENTIAL**

(i) <u>Permitted Dispositions</u>: None of the Parent or any of its subsidiaries shall dispose of any of such entity's assets (including accounts receivable and capital securities of subsidiaries) to any Person in one transaction or a series of transactions unless such Disposition (as defined below) is

(i) of inventory, or obsolete, damaged, worn out or surplus property disposed of in the ordinary course of business, intellectual property Collateral, or a Disposition permitted under clause (c)(xi) hereof;

(ii) permitted by clause (h) herein;

(iii) a Permitted Receivables Transaction;

(iv) [Reserved.];

(v) of other assets, the net Disposition proceeds of which, together with the net Disposition proceeds of all other assets disposed of pursuant to this clause (vi) during the same fiscal year, does not exceed $7,500,000; *provided* that, in the case of any Disposition pursuant to this clause (v), such Disposition shall be for fair market value and consideration shall consist of no less than 75% cash; and

(vi) in addition to Dispositions made pursuant to clause (v) hereof, to the extent the proceeds thereof are reinvested or applied to the prepayment of the Term Loans, to the extent required pursuant to clause (iii) in the heading "Mandatory Payments".

"*Disposition*" shall mean any sale, transfer, lease, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's or its subsidiaries' assets (including accounts receivable and capital securities of subsidiaries) to any other Person (other than to another Obligor) in a single transaction or series of related transactions, other than with respect to any such sale, transfer, lease, contribution or other conveyance for aggregate consideration of less than $500,000 with respect to any asset or group of related assets.

(j) <u>Transactions with Affiliates</u>: None of the Parent or its

CONFIDENTIAL

subsidiaries shall enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates (as defined below), unless such arrangement, transaction or contract is (i) on fair and reasonable terms no less favorable to such entity than it could obtain in an arm's-length transaction with a Person that is not an Affiliate and (ii) of the kind which would be entered into by a prudent Person in the position of such entity  with a Person that is not one of its Affiliates; *provided*, that the following shall in any event be permitted:  (1) the Term Loan Facility documentation, (2) transactions among the Obligors and/or between an Obligor and a wholly owned subsidiary, (3) loans and advances permitted under clause (e)(x), (4) transactions under the Letter of Credit Facility, (5) management fees as contemplated in the LOI, and (6) Restricted Payments or investments permitted hereunder pursuant to clauses (e) and (f), as applicable.

"*Affiliate*" of any Person shall mean any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.  "Control" of a Person means the power, directly or indirectly, (a) to vote (under ordinary circumstances) 10% or more of the capital securities (on a fully diluted basis) of such Person for the election of directors, managing members or general partners (as applicable) or (b) to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

(k) Accounting Changes: The Parent and its subsidiaries shall have a fiscal year ending on the Saturday nearest to December 31, and in the event of any change, the applicable Obligor will work in good faith with the Lenders to agree on any adjustment thereto and modify the Financial Covenants in the heading "Financial Covenants" as warranted by such adjustment.

(l) Activities of Parent: The Parent shall not engage in any business or other activity other than (i) owning the capital securities of the Borrower and its other subsidiaries, (ii) performing its Obligations under the Term Loan Facility documentation (including in the heading "Affirmative Covenants") and the Letter of Credit Facility, and (iii) executing and delivering, and performing its obligations under, guarantees that it is

**CONFIDENTIAL**

permitted to incur or maintain under the Term Loan Facility documentation and the Letter of Credit Facility, and, in the case of each of clauses (i), (ii) and (iii) activities reasonably related thereto.

(m) Restrictive Agreements, etc.: The Parent and its subsidiaries shall not enter into any agreement prohibiting:

(i) the creation or assumption of any lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(ii) the ability of any Obligor to amend or otherwise modify any Term Loan Facility documentation; or

(iii) the ability of any subsidiary to make any payments, directly or indirectly, to the Parent or the Borrower, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to (x) restrictions in the Term Loan Facility documentation or (y) in the case of clause (i) or (iii), (1) restrictions arising under applicable law, (2) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any of its subsidiaries, (3) customary restrictions on dispositions of real property interests found in reciprocal easement agreements of the Borrower or any of its subsidiaries, (4) restrictions arising under contractual obligations in existence on the Closing Date, (5) restrictions arising under any agreement governing any Indebtedness permitted by clause (e)(v) in the heading "Negative Covenants" as to the assets financed with the proceeds of such indebtedness, (6) restrictions in any agreement governing any Indebtedness permitted by clause (e)(vii) in the heading "Negative Covenants" as to the inventory financed with the proceeds of such indebtedness, (7) restrictions in any agreement governing any Indebtedness permitted by clause (e)(ix) in the heading "Negative Covenants, (8) customary provisions in any agreement for the sale or other disposition of a subsidiary that restricts distributions by such

**CONFIDENTIAL**

subsidiary pending such sale or other disposition, (9) provisions in agreements or instruments which prohibit the payment of dividends or the making of other distributions with respect to any class of capital securities of a Person other than on a pro rata basis, (10) customary provisions restricting assignments or other transfers of the direct interests in a joint venture contained in the related joint venture agreement and (12) customary provisions restricting assignments or other transfers contained in licenses.

<u>Financial Covenants</u>:

Limited to (a) a maximum ratio of consolidated debt (excluding indebtedness under the Letter of Credit Facility or related refinancing indebtedness) to consolidated adjusted LTM EBITDA (the "*Leverage Ratio*") and (b) a minimum ratio of consolidated adjusted LTM EBITDA to consolidated cash interest expense (the "*Interest Coverage Ratio*") that shall be tested quarterly and be set at levels consistent with the levels set forth on Annex I attached hereto.    The foregoing financial covenants shall be tested with respect to the Parent and its subsidiaries (excluding any issuer of the Instruments) on a consolidated basis[4], with the first covenant test to commence with the fiscal quarter ending September 30, 2011, *provided* that LTM EBITDA for (i) the four fiscal quarter period ending September 30, 2011 shall be calculated by multiplying the EBITDA with respect to the fiscal quarter ending September 30, 2011 by 4, (ii) the four fiscal quarter period ending December 31, 2011 shall be calculated by multiplying the EBITDA with respect to the two fiscal quarter period ending December 31, 2011 by 2, and (iii) the four fiscal quarter period ending March 31, 2012 shall be calculated by multiplying the EBITDA with respect to the three fiscal quarter period ending March 31, 2012 by 4/3.

<u>Events of Default</u>:

The following shall constitute an event of default under the Term Loan Facility:

(a) non-payment of (i) principal when due, (ii) interest or fees within three business days after becoming due, (iii) other monetary Obligations within 30 days after demand

---

[4] Financial covenants may need to be reformulated to take into account potential non consolidation of Borrower and other subsidiaries of Parent.

**CONFIDENTIAL**

by the Agent therefor;

(b) non-performance or non-observance by any Obligor with respect to any of the covenants described in the heading "Negative Covenants" and in clauses (a), (b)(i) (other than as a result of the failure to qualify as a foreign corporation in a jurisdiction where failure to so qualify could not reasonable be expected to have a Material Adverse Effect) and (g) in the heading "Affirmative Covenants";

(c) non-performance or non-observance by any Obligor with respect to any other agreement contained in the Term Loan Facility documentation, with a grace period of 30 days after the earlier of (i) notice thereof given to the Borrower by the Administrative Agent or any Lender and (ii) the date such Obligor first has actual knowledge of such default;

(d) cross-default (subject to any applicable grace period), whether by acceleration or otherwise, of any principal or stated amount of, or interest or fees on, of any indebtedness (other than indebtedness described in clause (a)) of the Parent or any material subsidiary having a principal or stated amount, individually, in excess of $10,000,000, or, in the aggregate, in excess of $20,000,000, or a default shall occur in the performance or observance of any obligation or condition with respect to such indebtedness if the effect of such default is to accelerate the maturity of any such indebtedness or such default shall continue unremedied for any applicable period of time sufficient to permit the holder or holders of such indebtedness, or any trustee or agent for such holders, to cause or declare such indebtedness or to become due and payable or to require such indebtedness to be prepaid, redeemed, purchased or defeased, or require an offer to purchase or defease such Indebtedness to be made, prior to its expressed maturity;

(e) any judgment or order for the payment of money, individually, in excess of $5,000,000, or, in the aggregate, in excess of $10,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has acknowledged its responsibility to cover such judgment or order) shall be rendered against the Parent or any material subsidiary and such judgment shall not have been vacated or

**CONFIDENTIAL**

discharged or stayed or bonded pending appeal within 30 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order;

(f) any of the following events shall occur with respect to any Pension Plan (as defined in ERISA):

(i) the institution of any steps by the Parent or the Borrower, any member of their respective Controlled Group (as defined in ERISA) or any other Person to terminate a Pension Plan if, as a result of such termination, the Parent, the Borrower or any such member could be required to make a contribution to such Pension Plan, or could reasonably expect to incur a liability or obligation to such Pension Plan, in excess of $10,000,000; or

(ii) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a lien under section 302(f) of ERISA; or

(iii) with respect to UK Pension Plans (and with terms as defined under the UK Pensions Act), the Pensions Regulator shall issue a Financial Support Direction or Contribution Notice to the UK Subsidiary or any of its Subsidiaries, unless the aggregate liability under all such Financial Support Directions and Contribution Notices is less than £5,000,000;

(g) the Term Loan Facility documentation, or any required lien thereunder with respect to an asset or assets of the Obligors whose fair market value in the aggregate is greater than $250,000, shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor party thereto, in each case for any reason other than the failure of the Collateral Trustee or any secured party to take any action within its control; any Obligor or any other party shall, directly or indirectly, contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under the Term Loan Facility documentation, any lien securing any Obligation shall, in whole or in part, cease to be a perfected first priority

CONFIDENTIAL

lien;

(h) the Parent or any material subsidiary shall

(i) become insolvent or generally fail to pay, or admit in writing its inability or unwillingness generally to pay, debts as they become due;

(ii) apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the property of any thereof, or make a general assignment for the benefit of creditors;

(iii) in the absence of such application, consent or acquiescence in or permit or suffer to exist the appointment of a trustee, receiver, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, sequestrator or other custodian shall not be discharged within 60 days; *provided* that each Obligor hereby expressly authorizes each secured party to appear in any court conducting any relevant proceeding during such 60-day period to preserve, protect and defend their rights under the Term Loan Facility documentation;

(iv) permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by any Obligor, such case or proceeding shall be consented to or acquiesced in by such Person or shall result in the entry of an order for relief or shall remain for 60 days undismissed; *provided*, that the each Obligor hereby expressly authorizes each secured party to appear in any court conducting any such case or proceeding during such 60-day period to preserve, protect and defend their rights under the Term Loan Facility documentation; or

(v) take any action authorizing, or in furtherance of, any of the foregoing;

in the case of clauses (i) through (iv) with respect to

**CONFIDENTIAL**

the Parent or Borrower, the outstanding principal amount of all outstanding Term Loans and all other Obligations shall automatically be and become immediately due and payable, without notice or demand to any Person.

(i) a Change in Control shall occur, which shall be defined as

(i) any person or group (within the meaning of Sections 13(d) and 14(d) under the Exchange Act), other than either (x) any Permitted Holder (as defined below) or (y) the Permitted Holders as a group, becoming the ultimate "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act) directly or indirectly, of voting securities representing more than 50% of the voting securities of the Parent on a fully diluted basis; or

(ii) the failure of the Parent at any time to directly own beneficially and of record on a fully diluted basis 100% of the outstanding voting securities of the Borrower, such voting securities to be held free and clear of all liens (other than liens granted under the Term Loan Facility documentation); or

(iii) during any period of 24 consecutive months, individuals who at the beginning of such period constituted the Board of Directors (or similar governing body) of the Parent (together with any new directors whose election to such Board or whose nomination for election by the stockholders of the Parent was approved by a vote of a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors (or similar governing body) of the Parent then in office.

"*Permitted Holder*" shall mean (i) any holder of the equity interests of the Parent as of the Closing Date, (ii) such holders' Affiliates, and (iii) the management of the Parent or its subsidiaries (collectively, the "*Permitted Holders*").

(j) any representation or warranty of any Obligor made or

**CONFIDENTIAL**

deemed to be made in the Term Loan Facility documentation (including any certificates delivered pursuant to Article [V]) is or shall be incorrect when made or deemed to have been made in any material respect.

If any event of default (other than any event of default described in clauses (h)(i) through (iv) with respect to the Parent or the Borrower) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent, upon the direction of the Required Lenders, shall by notice to the Parent and the Borrower declare all or any portion of the outstanding principal amount of the Term Loans to be due and payable, whereupon the full unpaid amount of such Term Loans and other Obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand or presentment.

Each Lender shall be entitled to exercise rights and remedies with respect to a payment default under its respective portion of the Term Loans (subject to mutually agreed notice and cure provisions).

Voting:                     Amendments, waivers, or forbearance shall require the approval of: (a) generally, the Required Lenders (as defined below); (b) each affected Lender to extend the maturity, extend the scheduled amortization, change the interest rate or payment terms, or take action that results in the release of all or substantially all Collateral or the release of all or substantially all guarantees or subordination of liens with respect to all or substantially all Collateral; and (c) each Lender affected disproportionately adversely in its capacity as Lender, when compared to other Lenders in such capacity, by such amendment; *provided, however,* that if the Borrower and/or the New Equity Investors desire to pursue an amendment, waiver or forbearance and have obtained the consent of at least fifty-five percent (55%) of the Lenders with respect to the outstanding Term Loans but cannot obtain the requisite Lender consent, as described in clauses (a) or (b), the Borrower and/or the New Equity Investors may elect to:

(i) cause the Borrower to prepay the outstanding Term Loans held by one or more non-consenting Lenders (without regard to any pro rata prepayment provisions) at

**CONFIDENTIAL**

a redemption price equal to 85% of the outstanding principal amount of the Term Loans to be redeemed <u>plus</u> 100% of accrued and unpaid interest with respect to such Term Loans; *provided* that, if such prepayment shall occur in connection with an amendment, waiver or forbearance as described in clause (b) and shall occur after the fourth anniversary of the Closing Date or clause (c) at any time, then the redemption price shall be 100% of the outstanding principal amount of the Term Loans to be prepaid <u>plus</u> 100% of accrued and unpaid interest with respect to such Term Loans; or

(ii) cause one or more of the non-consenting Lenders to sell all of its participation in the outstanding Term Loans to one or more existing or new Lenders that are willing to purchase such participations for an aggregate purchase price equal to 85% of the outstanding principal amount of such Term Loans <u>plus</u> 100% of accrued and unpaid interest with respect to such Term Loans; *provided* that, if such sale shall occur in connection with an amendment, waiver or forbearance as described in clause (b) and shall occur after the fourth anniversary of the Closing Date or clause (c) at any time, then the sale price shall be 100% of the outstanding principal amount of the Term Loans to be prepaid <u>plus</u> 100% of accrued and unpaid interest with respect to such Term Loans.

"*Required Lenders*" shall mean any of the following: (a) Lenders that hold not less than sixty percent (60%) of the aggregate principal amount of the Term Loans then outstanding, *provided* that such Lenders include at least two Lenders that are not affiliates of each other or of any of the New Equity Investors; (b) Lenders that hold not less than sixty-seven percent (67%) of the aggregate principal amount of the Term Loans then outstanding, *provided* that such Lenders include at least one Lender that is not an affiliate of any of the New Equity Investors; or (c) Lenders that hold not less than seventy-two and one-half percent (72.5%) of the aggregate principal amount of Term Loans then outstanding, without regard to whether or not any such Lender is an affiliate of the New Equity Investors.

Any fees or other amounts paid to holders of Term Loans in connection with any amendment, waiver, forbearance or other modification shall be offered on the same terms to all Term Lenders which timely consent to such

**CONFIDENTIAL**

amendment, waiver, forbearance or other modification.

Cost and Yield Protection:

The Borrower shall pay the Lenders and Administrative Agent customary LIBO breakage costs, increased capital costs and taxes on terms consistent with Section 4 of the Pre-Petition Credit Agreement.

Expenses and Indemnification:

Upon closing of the Acquisition, the Borrower shall pay (a) all reasonable out-of-pocket expenses of Administrative Agent associated with the negotiation, preparation execution and delivery of documents in connection with the New Loan Facility (including the reasonable fees, disbursements and other charges of counsel named in the Facilities Documentation), including any filings or, recordings, fees and (b) all reasonable out-of-pocket expenses (including the reasonable fees, disbursements and other charges of a single outside counsel of the Lenders) of any secured party incurred in connection with (i) the negotiation of any restructuring or "work-out" with the Borrower, whether or not consummated, of any Obligations and (ii) the enforcement of any Obligations.

Indemnification provisions shall be consistent with Section 12.4 under the Pre-Petition Credit Agreement.

Governing Law and Forum:

New York.

Counsel to the [Lenders and Administrative Agent]:

[＿＿＿]

**CONFIDENTIAL**                                                                    <u>ANNEX I</u>

<u>Financial Covenants</u>

(a) <u>Leverage Ratio</u>.  The Parent shall not permit the Leverage Ratio as of the last day of any fiscal quarter set forth below to be greater than the ratio set forth opposite such period:

| <u>Fiscal Quarter</u> | <u>Leverage Ratio</u> |
|---|---|
| Third fiscal quarter of 2011 through the second fiscal quarter of 2012 | 4.50:1 |
| Third fiscal quarter of 2012 through the second fiscal quarter of 2013 | 4.25:1 |
| Third fiscal quarter of 2013 through the second fiscal quarter of 2014 | 4.00:1 |
| Each fiscal quarter thereafter | 3.50:1 |

(b) <u>Interest Coverage Ratio</u>.  The Parent shall not permit the Interest Coverage Ratio as of the last day of any fiscal quarter set forth below to be less than the ratio set forth opposite such period:

| <u>Fiscal Quarter</u> | <u>Interest Coverage Ratio</u> |
|---|---|
| Third fiscal quarter of 2011 through the second fiscal quarter of 2012 | 2.00:1 |
| Third fiscal quarter of 2012 through the second fiscal quarter of 2013 | 2.25:1 |
| Third fiscal quarter of 2013 through the second fiscal quarter of 2014 | 2.50:1 |
| Each fiscal quarter thereafter | 2.75:1 |

**<u>EXHIBIT F</u>**

## Assumption and Assignment Procedures

1.      On or before five (5) calendar days following the entry of the order granting the Motion (the "Procedures Order"), the Debtors shall file and serve the Cure Notice, in substantially the form attached as Exhibit C to the Bidding Procedures Order (the "Cure Notice") upon the counterparties to the Assumed Executory Contracts, provided, however that the Debtors and the Stalking Horse Purchaser may mutually agree to designate an executory contract as an Assumed Executory more than five (5) calendar days after the entry of the Procedures Order; provided further, however, that, unless otherwise agreed to by the Debtors and the Stalking Horse Purchaser, an executory contract may not be designated an Assumed Executory Contract later than fifteen (15) calendar days prior to the Sale Hearing.  If the Debtors and the Stalking Horse Purchaser agree to designate an executory contract an Assumed Executory Contract after more than five (5) calendar days after the entry of the Procedures Order, the Debtors shall file and serve by overnight mail the Cure Notice on the Counterparty (defined below) within one (1) business day of such contract being designated an Assumed Executory Contract.  Counterparties to the Assumed Executory Contracts[1] (each a "Counterparty", and together, the "Counterparties") must file and serve any objection to the assumption and assignment of any Assumed Executory Contract, including objections to any cure cost (the "Cure Costs" or "Cure Amounts"), by the date that is fifteen (15) calendar days after service of the Cure Notice.

2.      The Stalking Purchaser shall be responsible for paying all Cure Amounts.  Any Counterparty failing to timely file an objection to the Cure Amount set forth in the Cure Notice

---

[1] The inclusion of any agreement as an Assumed Executory Contract does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included as an Assumed Executory Contract up until the time of the Sale Hearing

shall be forever barred from objecting to its Cure Amount and from asserting any additional cure or other amounts against the Debtors, their estates, and the Stalking Horse Purchaser with respect to the Assumed Executory Contract to which it is a Counterparty, and will be deemed to consent to its Cure Amount as set forth in the Cure Notice by the Debtors. Notwithstanding anything to the contrary, no executory contract or unexpired lease will be assumed unless and until the occurrence of the Closing Date and in accordance with the terms of the Agreement. Pursuant to the terms of the Agreement and this Order, the Stalking Horse Purchaser may remove any executory contract or lease from the list of Assumed Executory Contracts at any time prior to Closing.

3.      If any Counterparty objects for any reason to the assumption and assignment of an Assumed Executory Contract (other than with respect to the amount of its Cure Amount, as set forth above), the Counterparty must file any such objection with the Court on or before February 23, 2010, at 4:00 p.m. (prevailing Eastern Time), and serve such objection in accordance with the Sale Notice and/or Creditor Notice so as to be received by such date and time by (a) counsel for the Debtors; (b) counsel for the Committee; (c) counsel for the DIP Agent; (d) the U.S. Trustee; and (e) counsel for the Stalking Horse Purchaser, with a courtesy copy to Chambers, failing which the Counterparty will deemed to consent to the proposed assumption and assignment to the Purchaser or other Successful Bidder of such Assumed Executory Contract to which it is a Counterparty.

4.      Compliance with the foregoing notice provisions shall constitute sufficient notice of the Debtors' proposed sale of the Assets, the contemplated assumption and assignment of each Assumed Executory Contract and the proposed Cure Amounts with respect to each such

2

Assumed Executory Contract, and no additional notice of such contemplated transactions need be given.

13814-001\DOCS_DE:157280.3