# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CEI LIQUIDATION ESTATE, et al,[1] | ) | Case No. 09-14019 (KG) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

---

## DISCLOSURE STATEMENT DESCRIBING DEBTORS' SECOND AMENDED JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

---

### IMPORTANT DATES
Voting Deadline: December 20, 2010 at 4:00 p.m.
Objection Deadline: December 20, 2010, at 4:00 p.m.
Confirmation Hearing: December 29, 2010, at 1:30 p.m.

**Dated: November 16, 2010**

Counsel for Debtors and Debtors in Possession:
PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
Henry C. Kevane (CA Bar No. 125757)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705
Telephone: 302-652-4100
Facsimile: 302-652-4400
Email: ljones@pszjlaw.com
hkevane@pszjlaw.com
dbertenthal@pszjlaw.com
tcairns@pszjlaw.com

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: RH Liquidation Estate (f/k/a Redman Homes, Inc. (4957)); CEI Liquidation Estate (f/k/a Champion Enterprises, Inc. (3168)); CHBC Liquidation Estate (f/k/a Champion Home Builders Co. (4984)); NEBSI Liquidation Estate (f/k/a New Era Building Systems, Inc. (0928)); NAHC Liquidation Estate (f/k/a/ North American Housing Corp. (1097)); Homes of Merit, Inc. (8488); WHC Liquidation Estate (f/k/a Western Homes Corporation (6910)); SFI Liquidation Estate (f/k/a Star Fleet, Inc. (0506)); CEMC Liquidation Estate (f/k/a Champion Enterprises Management Co. (6726)); CRI Liquidation Estate (f/k/a Champion Retail, Inc. (2154)); SJAHI Liquidation Estate (f/k/a San Jose Advantage Homes, Inc. (1951)); HAC Liquidation Estate (f/k/a Highland Acquisition Corp. (8962)); HMCLLC Liquidation Estate (f/k/a Highland Manufacturing Company LLC (6762)); SSH Liquidating Corp. (6678); CHBI (f/k/a Champion Homes of Boaz, Inc. (3165)); Iseman Corp. (5899); MHCDC, LLC (3417); HomePride Finance Corp. (4767); and CDC Liquidation Estate (f/k/a Champion Development Corp. (4642)). The address for all Debtors is 3520 Lakeview Drive, Algonquin, IL 60102.

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. PREFATORY STATEMENT AND DEFINITIONS | | 1 |
| II. INTRODUCTION AND OVERVIEW | | 1 |
| A. Introduction | | 1 |
| B. Disclaimers | | 2 |
| C. An Overview of the Chapter 11 Process | | 3 |
| D. Plan Overview | | 3 |
| | 1. Summary of Classification and Treatment of Claims and Interests Under the Plan. | 4 |
| E. Voting on the Plan | | 8 |
| | 1. Who May Vote. | 8 |
| | 2. How to Vote. | 8 |
| F. Confirmation of the Plan | | 10 |
| | 1. Generally. | 10 |
| | 2. Objections to Confirmation. | 10 |
| | 3. Hearing on Confirmation. | 11 |
| III. HISTORY, ORGANIZATION AND ACTIVITIES OF THE DEBTORS | | 11 |
| A. Overview of the Debtors and Their Operations | | 11 |
| | 1. Summary of the Debtors' History and Business | 11 |
| B. Pre-Petition Capital Structure | | 12 |
| | 1. Prepetition Secured Debt | 12 |
| | 2. Convertible Unsecured Notes | 13 |
| | 3. Common Stock Holdings | 13 |
| | 4. Additional Liabilities | 13 |
| C. Events Leading to Bankruptcy | | 13 |
| D. The Commencement of the Chapter 11 Cases | | 14 |
| E. First Day Motions and Other Material Relief | | 14 |
| | 1. Joint Administration. | 15 |
| | 2. Employees. | 15 |
| | 3. Cash Management. | 15 |
| | 4. Taxes. | 15 |
| | 5. Utilities. | 16 |

*Signature Page to Disclosure Statement*

|  |  |  |  |
|---|---|---|---|
|  | 6. | Retention of Customer Programs. | 16 |
|  | 7. | Prepetition Shipper, Freight Forwarder, and Related Obligations. | 16 |
|  | 8. | Retention of Key Professionals. | 16 |
|  | 9. | Insurance Premiums. | 17 |
|  | 10. | Critical Vendors. | 17 |
|  | 11. | DIP Credit Agreement and Cash Collateral Use. | 17 |
|  | 12. | 503(b)(9) Claims. | 18 |
| F. | Official Committee of Unsecured Creditors. | | 18 |
| G. | The Sale of Substantially All of the Debtors' Assets. | | 19 |
| H. | The Committee Lawsuit | | 20 |
| I. | Other Asset Sales. | | 21 |
| J. | Unexpired Leases and Executory Contracts. | | 21 |
| K. | Bar Dates for Filing Proofs of Claim | | 21 |
| L. | Deadline Extensions | | 22 |
| M. | Name Change | | 22 |
| N. | Appointment of Estate Administrator | | 22 |
| O. | Other Postpetition Activities | | 23 |
| IV. | DESCRIPTION OF THE PLAN | | 23 |
| V. | SUMMARY OF DISTRIBUTABLE ASSETS | | 23 |
| A. | Introduction | | 23 |
| B. | Litigation | | 25 |
| VI. | TREATMENT OF UNCLASSIFIED CLAIMS | | 25 |
| A. | Summary | | 25 |
| B. | Administrative Claims (Other Than Professional Fee Claims) | | 25 |
| C. | Professional Fee Claims | | 26 |
| D. | Priority Tax Claims | | 28 |
| VII. | TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS | | 28 |
| A. | Summary | | 28 |
| B. | Classification and Treatment of Claims and Equity Interests | | 29 |
|  | 1. | Class 1 – Priority Claims Against Consolidated Debtors | 29 |
|  | 2. | Class 2 – Priority Claims Against CEI | 29 |
|  | 3. | Class 3 – Secured Claims Against Consolidated Debtors. | 30 |
|  | 4. | Class 4 – Secured Claims Against CEI. | 30 |

|     | 5.  | Class 5 –Unsecured Claims Against Consolidated Debtors. | 31 |
|     | 6.  | Class 7 – Equity Interests in the Consolidated Debtors. | 31 |

VIII. ACCEPTANCE OR REJECTION OF THE PLAN ... 32

A. Voting Classes ... 32

B. Acceptance by Impaired Classes ... 32

C. Presumed Acceptance of Plan ... 32

D. Presumed Rejection of Plan ... 32

E. Nonconsensual Confirmation ... 32

F. How to Vote ... 33

IX. MEANS FOR IMPLEMENTATION OF THE PLAN ... 33

A. Sources of Plan Distributions ... 33

B. Substantive Consolidation of Consolidated Debtors ... 33

C. Treatment of Estate Assets ... 34

D. Payment of Plan Expenses ... 35

E. Dissolution of Liquidating Debtors ... 35

F. Power and Authority of Estate Administrator ... 35

G. Preservation and Settlement of Litigation ... 36

H. The Creditor Trust ... 37

|     | 1.  | Creditor Trust Fund | 38 |
|     | 2.  | Payment of Creditor Trust Expenses | 38 |
|     | 3.  | Indenture Trustee Expenses | 38 |
|     | 4.  | Distribution of Creditor Trust Assets | 39 |
|     | 5.  | Power and Authority of Creditor Trustee | 40 |
|     | 6.  | Creditor Trust Distribution Procedures | 40 |
|     | 7.  | Liability and Indemnification of Creditor Trustee | 41 |
|     | 8.  | Federal Income Taxation of Creditor Trust | 41 |

I. The Committee Lawsuit ... 42

J. Post Effective Date Professional Fees ... 43

K. Release of Liens ... 44

L. Exemption from Certain Transfer Taxes ... 44

M. Dissolution of the Committee ... 45

N. Full and Final Satisfaction ... 45

O. Allocation of Distributions ... 45

| | | |
|---|---|---|
| P. | Rounding | 45 |
| Q. | No Interim Cash Payments of Less Than $50 on Account of Allowed Claims | 45 |
| R. | Unclaimed Property | 45 |
| S. | No Distributions on Late-Filed Claims | 46 |
| T. | Withholding Taxes | 46 |
| U. | De Minimis Distributions; Charitable Donation | 46 |
| V. | United States Trustee Fees | 47 |
| W. | Books and Records | 47 |
| X. | Corporate Action | 47 |

X. PROCEDURES FOR RESOLVING DISPUTED CLAIMS — 47

XI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES — 48

| | | |
|---|---|---|
| A. | Rejection of Executory Contracts and Unexpired Leases | 48 |
| B. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 48 |

XII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN — 49

| | | |
|---|---|---|
| A. | Conditions Precedent to Confirmation | 49 |
| B. | Conditions Precedent to Consummation | 49 |
| C. | Effect of Non-Occurrence of Conditions to Consummation | 50 |
| D. | Notice of Effective Date | 50 |

XIII. EFFECT OF CONSUMMATION — 50

| | | |
|---|---|---|
| A. | Binding Effect of Plan | 50 |
| B. | Vesting and Transfer of Assets | 50 |
| C. | Property Free and Clear | 51 |
| D. | Limitation of Liability | 51 |
| E. | Injunction | 51 |
| F. | Terms of Existing Injunctions or Stays | 52 |
| G. | Limitation of Liability of the Estate Administrator and the Creditor Trustee | 52 |
| H. | Releases by Debtors of the Debtor Released Parties | 53 |
| I. | [Reserved] | 53 |
| J. | Release By Holders of Claims and Equity Interests | 53 |
| K. | Good Faith | 54 |

XIV. RETENTION OF JURISDICTION — 54

XV. MISCELLANEOUS PROVISIONS — 56

A.  Modification of Plan ........................................... 56

B.  Withdrawal of Plan ........................................... 56

C.  Successors and Assigns ........................................ 56

D.  Reservation of Rights ......................................... 56

E.  Further Assurances ........................................... 57

F.  Entire Agreement ............................................ 57

G.  Retiree Benefits ............................................. 57

H.  Failure of Bankruptcy Court to Exercise Jurisdiction ............. 57

I.  Notices .................................................... 57

J.  Filing of Additional Documents ............................... 58

K.  Enforceability .............................................. 58

L.  Severability ................................................ 58

M.  Notice of Default under the Plan ............................. 58

N.  Investments ................................................ 59

O.  Reliance ................................................... 59

P.  Asset Purchase Agreement .................................... 59

Q.  Insurance .................................................. 59

XVI. RISK FACTORS .................................................. 60

XVII. FEASIBILITY .................................................... 60

XVIII. BEST INTERESTS OF CREDITORS TEST ............................ 61

A.  Chapter 7 .................................................. 61

B.  Liquidation Analysis ......................................... 61

XIX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...... 62

A.  Consequences to Holders of Claims ............................ 63

B.  Withholding ................................................ 64

1.      Importance of Obtaining Professional Tax Assistance. ..... 65

XX. CONCLUSION .................................................... 66

# I.

## PREFATORY STATEMENT AND DEFINITIONS

Pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), CEI Liquidation Estate (f/k/a Champion Enterprises, Inc.); CHBC Liquidation Estate (f/k/a Champion Home Builders Co.); RH Liquidation Estate (f/k/a Redman Homes, Inc.); NEBSI Liquidation Estate (f/k/a New Era Building Systems, Inc.); NAHC Liquidation Estate (f/k/a/ North American Housing Corp.); Homes of Merit, Inc; WHC Liquidation Estate (f/k/a Western Homes Corporation); SFI Liquidation Estate (f/k/a Star Fleet, Inc.); CEMC Liquidation Estate (f/k/a Champion Enterprises Management Co.); CRI Liquidation Estate (f/k/a Champion Retail, Inc); SJAHI Liquidation Estate (f/k/a San Jose Advantage Homes, Inc.); HAC Liquidation Estate (f/k/a Highland Acquisition Corp.); HMCLLC Liquidation Estate (f/k/a Highland Manufacturing Company LLC); SSH Liquidating Corp; CHBI (f/k/a Champion Homes of Boaz, Inc.); Iseman Corp.; MHCDC, LLC; HomePride Finance Corp; and CDC Liquidation Estate  (f/k/a Champion Development Corp), the debtors and debtors in possession in the above-captioned cases (the "Debtors"), submit this disclosure statement (the "Disclosure Statement") in support of the *Debtors' Second Amended Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code*, dated November 16, 2010 (the "Plan"). Unless otherwise noted, capitalized terms used herein have the meanings set forth in Article I of the Plan.

# II.

## INTRODUCTION AND OVERVIEW

### A.    Introduction

On November 15, 2009 (the "Petition Date"), the Debtors commenced these bankruptcy cases (the "Chapter 11 Cases") by filing voluntary petitions under Chapter 11 of the Bankruptcy Code.

This Disclosure Statement, submitted in accordance with section 1125 of the Bankruptcy Code, contains information regarding the Plan proposed by the Debtors. A copy of the Plan accompanies this Disclosure Statement. The Disclosure Statement is being distributed to you to help you make an informed judgment about the Plan.

In addition to summarizing the Plan, the Disclosure Statement describes: (1) the Debtors' history, businesses, assets and liabilities; (2) litigation pending by the Debtors; (3) assets available for distribution under the Plan; (3) the Plan's feasibility; and (5) alternatives to confirmation of the Plan. The Debtors strongly urge you to carefully review the contents of this Disclosure Statement and the Plan (including the exhibits to each) before making a decision to accept or reject the Plan. Particular attention should be paid to the provisions affecting or impairing your rights as a Creditor.

The Bankruptcy Court approved this Disclosure Statement as containing sufficient information to enable a hypothetical reasonable investor to make an informed judgment about the Plan. Under section 1125 of the Bankruptcy Code, this approval enabled the Debtors to send you this Disclosure Statement and solicit your acceptance of the Plan. The Bankruptcy Court has

not passed on the Plan itself or conducted a detailed investigation into the contents of this Disclosure Statement.

Your vote on the Plan is important. Absent acceptance of the Plan, there may be protracted delays or a liquidation under Chapter 7 of the Bankruptcy Code. These alternatives may not provide for distribution of as much value to Creditors holding Allowed Claims as does the Plan. Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot(s) no later than December 20, 2010, at 4:00 p.m. Eastern Time (the "Voting Deadline").

## B. <u>Disclaimers</u>

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. PLEASE READ THIS DOCUMENT WITH CARE. THE PURPOSE OF THE DISCLOSURE STATEMENT IS TO PROVIDE "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN. <u>SEE</u> 11 U.S.C. § 1125(a).

FOR THE CONVENIENCE OF CREDITORS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ANY SUMMARY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

NO REPRESENTATIONS CONCERNING THE DEBTORS' FINANCIAL CONDITION OR ANY ASPECT OF THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN OR INCLUDED WITH THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE INDICATED, IS UNAUDITED. MOREOVER, BECAUSE OF THE DEBTORS' FINANCIAL DIFFICULTIES, AS WELL AS THE COMPLEXITY OF THE DEBTORS' FINANCIAL MATTERS, THE BOOKS AND RECORDS OF THE DEBTORS, UPON WHICH THIS DISCLOSURE STATEMENT IN PART IS BASED, MAY BE INCOMPLETE OR INACCURATE. REASONABLE EFFORT HAS BEEN MADE, HOWEVER, TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

PACHULSKI STANG ZIEHL & JONES LLP ("PSZ&J") IS GENERAL INSOLVENCY COUNSEL TO THE DEBTORS. JACK B. FISHMAN IS THE ESTATE ADMINISTRATOR. PSZ&J AND THE ESTATE ADMINISTRATOR HAVE EACH RELIED UPON INFORMATION PROVIDED BY THE DEBTORS IN CONNECTION WITH

PREPARATION OF THIS DISCLOSURE STATEMENT. NEITHER PSZJ NOR THE ESTATE ADMINISTRATOR HAS INDEPENDENTLY VERIFIED ALL OF THE INFORMATION CONTAINED HEREIN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS LEGAL, BUSINESS, OR TAX ADVICE. EACH CREDITOR OR INTEREST HOLDER SHOULD CONSULT HIS, HER OR ITS OWN LEGAL COUNSEL AND ACCOUNTANT AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING HIS, HER OR ITS CLAIM.

**C.**     **An Overview of the Chapter 11 Process**

Chapter 11 of the Bankruptcy Code contains numerous provisions, the general effect of which is to provide the debtor with "breathing space" within which to propose a restructuring of its obligations to third parties. The filing of a Chapter 11 bankruptcy petition creates a bankruptcy estate comprising all of the property interests of the debtors. Unless a trustee is appointed by the Bankruptcy Court for cause (no trustee has been appointed in these Chapter 11 Cases), a debtor remains in possession and control of all its assets as a "debtor in possession." The debtor may continue to operate its business in the ordinary course on a day-to-day basis without Bankruptcy Court approval. Bankruptcy Court approval is only required for various enumerated kinds of transactions (such as certain financing transactions) and transactions out of the ordinary course of a debtor's business. The filing of the bankruptcy petition gives rise to what is known as the "automatic stay" which, generally, enjoins creditors from taking any action to collect or recover obligations owed by a debtor prior to the commencement of a Chapter 11 case. The Bankruptcy Court can grant relief from the automatic stay under certain specified conditions or for cause.

The Bankruptcy Code authorizes the creation of one or more official committees to protect the interests of some or all creditors or interest holders. The fees and expenses of counsel and other professionals employed by such official committees and approved by the Bankruptcy Court are generally borne by a bankruptcy estate. One official committee has been appointed in these Chapter 11 Cases, which represents the collective interests of general unsecured creditors (the "Committee").

A Chapter 11 debtor may emerge from bankruptcy by successfully confirming a plan of reorganization. Alternatively, as is the case here, the assets of a debtor may be sold and the proceeds distributed to creditors through a plan of liquidation. A plan may be either consensual or non-consensual and may provide, among other things, for the treatment of the claims of creditors and the interests of equity holders and the holders of options or warrants. The provisions of the Debtors' Plan are summarized below.

**D.**     **Plan Overview**

The Plan is a plan of liquidation. Pursuant to prior orders of the Bankruptcy Court, the Debtors sold substantially all of their Assets to Champion Enterprises Holdings, LLC and New Champion Homes, Inc. (the "Buyer"), satisfied the obligations owing to their Prepetition Lenders for money borrowed before the Petition Date and their obligations for money borrowed post-petition pursuant to the *Debtor-in-Possession Credit Agreement* dated as of November 15, 2009 (the "DIP Credit Agreement"), between CHBC and a syndicate of banks, financial institutions, and other institutional lenders, with Credit Suisse AG, Cayman Islands Branch, as administrative

agent (the "Agent") (together, the "DIP Lenders"), and obtained a commitment from the Buyer to fund an amount of up to $2.516 million for certain post-closing, wind-down liabilities of the Debtors subject to an d in accordance with the wind down budget provided in Schedule 10.1(ffff) to the Asset Purchase Agreement (the "Wind Down Budget") and the Asset Purchase Agreement. The Buyer also assumed certain additional liabilities of the Debtors. Under the Plan, the Debtors will transfer certain causes of action, collectively, the "Assigned Litigation," to a Creditor Trust that will administer and liquidate them for the benefit of general unsecured Creditors. The Plan provides for the full payment of Administrative Claims and Priority Claims. It is important to note, however, that any recovery to general unsecured Creditors (Classes 5 and 6 under the Plan), will be entirely dependant on the results of any prosecution of the Assigned Litigation. A full discussion of the Assigned Litigation is set forth at Article III(H) of this Disclosure Statement. The Plan further provides for the substantive consolidation of all of the Debtors except CEI Liquidation Estate ("CEI") (formerly known as Champion Enterprises, Inc.), for voting and distribution purposes, the termination of all Equity Interests in the Debtors, and the dissolution and winding up of the Debtors' affairs.

1.  **Summary of Classification and Treatment of Claims and Interests Under the Plan.**

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtors, and it separates those Claims and Equity Interests into Classes. The classification of Claims and Equity Interests and their treatment under the Plan take into account the differing nature and priority of the various Claims and Equity Interests under the Bankruptcy Code. The following chart briefly summarizes the treatment of Creditors and Equity Interest Holders under the Plan.[2] Amounts listed below are estimated. Actual Claims and Distributions will vary depending upon, among other things, the outcome of objections to Claims and recoveries on any Causes of Action.

a.  Unclassified Claims Against All Debtors

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| N/A | Administrative Claims | uncertain<br><br>Estimated Recovery: 100% | As is further described in Article II(B) of the Plan, each Creditor holding an Allowed Administrative Claim shall receive, without interest, Cash equal to the Allowed amount of such Claim, unless such Creditor shall have agreed to different treatment of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Allowed Administrative Claim; (b) in accordance with the terms and conditions of |

---

[2] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan and the claim amounts and recoveries are only estimates of the claims asserted against the Debtors. The total amount of Allowed Claims and recoveries may differ from the estimated amounts set forth in this Disclosure Statement. References should be made to the entire Disclosure Statement and the Plan for a complete description of the classification and treatment of Claims and Interests.

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| | | | agreements between Creditors holding such Claims and the Debtors; (c) with respect to any Allowed Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), until the entry of a Final Decree or an order converting or dismissing the case. |
| N/A | Priority Tax Claims | Less than $10,000<br><br>Estimated Recovery: 100% | As is further described in Article II(D) of the Plan, on the later to occur of (i) the Effective Date (or as soon as practicable thereafter), or (ii) the date on which such Claim shall become an Allowed Claim, the Liquidating Debtors (who are defined as the Debtors as of the Effective Date) shall pay to each Creditor holding an Allowed Priority Tax Claim the Allowed amount of such Claim without interest from the Petition Date. |
| N/A | Professional Fee Claims | Uncertain[3]<br><br>Estimated Recovery: 100%% | As is further described in Article II(C) of the Plan, the Debtors and/or the Liquidating Debtors shall pay Professionals all of their Allowed Professional Fee Claims, provided that, Contingency Fees and all Assigned Litigation Fee Claims shall be payable solely by, and from, the Creditor Trust (including Litigation Proceeds from the Committee Lawsuit). |

b.    Classified Claims

| CLASS NO. | DESCRIPTION | ESTIMATE OF CLAIM AMOUNTS ULTIMATELY ALLOWABLE | TREATMENT |
|---|---|---|---|
| 1 | Priority Claims, if any, against the Consolidated Debtors<br><br>**IMPAIRED**<br>**ENTITLED TO VOTE** | Less than $10,000<br><br>Estimated Recovery: 100% | Class 1 consists of the Priority Claims against the Consolidated Debtors. The Debtors believe that total Allowed Class 1 Claims are de minimis. As is further described in Article III(B)(1) of the Plan, to the extent any Class 1 Priority Claims exist, the Liquidating Debtors shall pay, in Cash, the Allowed amount of each Class 1 Priority Claim (without interest from the Petition Date) to each Creditor holding such a Claim as soon as practicable following the later of: (a) the Effective Date or (b) the date such Class 1 Priority |

---

[3] As set forth in the Plan, there are two sources of payment of Allowed Professional Fees: Professional Fees incurred from the Petition Date through the date on which the sale of substantially all of the Debtors' assets (the "Sale") to the Buyer closed (i.e., March 19, 2010) are paid from the Carve Out Account (i.e. the account established pursuant to the DIP Credit Agreement and DIP Financing Order for the Payment of these Professional Fee Claims), and Professional Fees incurred from and after the Closing through December 31, 2010 are paid from the Wind Down Facility (i.e., cash provided by the Buyer to fund from time to time the Wind Down Budget subject to and in accordance with the Asset Purchase Agreement and the Wind Down Budget). Total unpaid Professional Fee Claims through the Effective Date are not currently known. However, it does not appear that there are or will be any Professional Fee Claims for the period between the Petition Date and the Closing.

| | | | Claim becomes an Allowed Claim. |
|---|---|---|---|
| 2 | Priority Claims against CEI<br><br>**IMPAIRED<br>ENTITLED TO VOTE** | Less than $10,000<br><br>Estimated Recovery:<br>100% | Class 2 consists of the Priority Claims against CEI. The Debtors believe total Allowed Class 2 Claims are de minimis. As is further described in Article III(B)(2) of the Plan, to the extent any Class 2 Priority Claims exist, the Liquidating Debtors shall pay, in Cash, the Allowed amount of each Class 2 Priority Claim (without interest from the Petition Date) to each Creditor holding such a Claim as soon as practicable following the later of: (a) the Effective Date, or (b) the date such Class 2 Priority Claim becomes an Allowed Claim. |
| 3 | Secured Claims, if any, against Consolidated Debtors<br><br>**UNIMPAIRED<br>NOT ENTITLED TO VOTE** | $0.00<br><br>Estimated Recovery:<br>100% | Class 3 consists of any Secured Claims against the Consolidated Debtors. The Debtors believe that there are no Class 3 Secured Claims. Each Creditor holding a Class 3 Claim, if any, constitutes a separate subclass under the Plan. As is further described in Article III(B)(3) of the Plan, to the extent any Class 3 Secured Claims exist, at the option of the Liquidating Debtors, one of the following treatments shall be provided in full satisfaction, release, and discharge of such Claim: (i) the Creditor will retain its Lien on its collateral until the collateral is sold, and the proceeds of the sale, less costs and expenses of disposing of the collateral, will be paid to the Creditor; (ii) the Creditor will receive a Cash payment equal to the amount of its Allowed Secured Claim; or (iii) the collateral securing the Creditor's Secured Claim will be abandoned to the Creditor. |
| 4 | Secured Claims, if any, against CEI<br><br>**UNIMPAIRED<br>NOT ENTITLED TO VOTE** | $0.00<br><br>Estimated Recovery:<br>100% | Class 4 consists of any Secured Claims against CEI. Each Creditor holding a Class 4 Claim, if any, constitutes a separate subclass under the Plan. The Debtors believe there are no Class 4 Claims. As is further described in Article III(B)(4) of the Plan, to the extent any Class 4 Secured Claims exist, at the option of the Liquidating Debtors, one of the following treatments shall be provided in full satisfaction, release, and discharge of such Claim: (i) the Creditor will retain its Lien on its collateral until the collateral is sold, and the proceeds of the sale, less costs and expenses of disposing of the collateral, will be paid to the Creditor; (ii) the Creditor will receive a Cash payment equal to the amount of its Allowed Secured Claim; or (iii) the collateral securing the Creditor's Secured Claim will be abandoned to the Creditor.<br><br>**Exception for Certain Alleged Note Holder Claims:** As stated above, the Debtors believe that there are no Class 4 Secured Claims. However, one of the causes of action in the Committee Lawsuit[4] alleges that the Holders of those certain 2.75% convertible senior notes issued by CEI in the face amount of $180 million are |

---

[4] A description of the Committee Lawsuit is set forth in Section 3(H) of this Disclosure Statement.

| | | | subrogated to the rights of the Holders of those certain 7 5/8% Senior Notes issued by CEI in the face amount of $200 million. If the Committee Lawsuit is successful in that regard, the Holders of the 7 5/8% Senior Notes may allege that they hold Class 4 Claims. To the extent that any such Holder successfully establishes that it is a secured Class 4 Creditor, its Class 4 Claim will be paid solely from the proceeds of the Committee Lawsuit (or otherwise by, and from, the Creditor Trust Assets). |
|---|---|---|---|
| 5 | General Unsecured Claims against the Consolidated Debtors<br><br>**IMPAIRED ENTITLED TO VOTE** | $2,136,781,786 in Filed General Unsecured Claims. The amount of Allowed General Unsecured Claims against the Consolidated Debtors is currently unknown.<br><br>Estimated Recovery: unknown | Class 5 consists of the Claims of Creditors holding General Unsecured Claims against the Consolidated Debtors, (which are all of the Debtors except for Debtor CEI Liquidation Estate (f/k/a Champion Enterprises Inc.)) and includes the Intercompany Claims of CEI against any Consolidated Debtor. As is further described in Article III(B)(5) of the Plan, Distributions to Class 5 Creditors will be made from the net proceeds, after deduction of certain expenses and obligations as provided in the Plan, of those assets transferred to a trust for the benefit of Unsecured Creditors (the "Creditor Trust"). The specific assets to be transferred to the Creditor Trust are set forth in Article I(B)(42) of the Plan, and include, among other things, the Assigned Litigation, which consists of (i) avoidance actions belonging to the Debtors to recover certain prepetition transfers made to third parties, (ii) any claims recovered by the Committee against certain of the Debtors' prepetition lenders with respect to the Committee Lawsuit, (iii) other litigation belonging to the Debtors as of the Effective Date. Because Distributions to Class 5 Creditors depend largely on the outcome of the Assigned Litigation, it is impossible, at present, to determine the amount or timing of Distributions. To the extent that net proceeds become available, however, each Creditor holding a Class 5 Allowed General Unsecured Claim shall receive a Pro Rata share of the Consolidated Debtors' Distributable Trust Assets. |
| 6 | General Unsecured Claims against CEI<br><br>**IMPAIRED ENTITLED TO VOTE** | $1,515,016,232 in Filed General Unsecured Claims against CEI. Total Allowed General Unsecured Claims are currently unknown.<br><br>Estimated Recovery: unknown | Class 6 consists of the Claims of Creditors holding General Unsecured Claims against CEI, and includes the Intercompany Claims of any Consolidated Debtor against CEI. As is further described in Article III(B)(6) of the Plan, Distributions to Class 6 Creditors will be made from the net proceeds, after deduction of certain expenses and obligations as provided in the Plan, of those assets transferred to the Creditor Trust. The specific assets to be transferred to the Creditor Trust are set forth in Article I(B)(42) of the Plan, and include, among other things, the Assigned Litigation, which consists of (i) avoidance actions belonging to the Debtors to recover certain prepetition transfers made to third parties, (ii) any claims recovered by the Committee against certain of the Debtors' prepetition |

| | | | lenders, (iii) other litigation belonging to the Debtors as of the Effective Date. Because Distributions to Class 6 Creditors depend largely on the outcome of the Assigned Litigation, it is impossible, at present, to determine the amount or timing of Distributions. To the extent that net proceeds become available, however, each Creditor holding a Class 6 Allowed General Unsecured Claim shall receive a Pro Rata share of the CEI Distributable Trust Assets. |
|---|---|---|---|
| 7 | Equity Interests in the Consolidated Debtors **DEEMED TO REJECT- NOT ENTITLED TO VOTE** | Estimated Recovery: 0% | Class 7 consists of the Equity Interests in the Consolidated Debtors. Each Holder of an Equity Interest in the Consolidated Debtors shall neither receive a distribution nor retain any property under the Plan on account of such Equity Interest. Upon the Effective Date, Class 7 Equity Interests will be deemed cancelled and will cease to exist. |
| 8 | Equity Interests in CEI **DEEMED TO REJECT- NOT ENTITLED TO VOTE** | Estimated Recovery: 0% | Class 8 consists of the Equity Interests in CEI. Each Holder of an Equity Interest in CEI shall neither receive a distribution nor retain any property under the Plan on account of such Equity Interest. Upon the Effective Date, Class 8 Equity Interests will be deemed cancelled and will cease to exist. |

### E.   Voting on the Plan

####   1.   Who May Vote.

Each Creditor holding an Allowed Claim in Classes 1, 2, 5 and 6 is entitled to vote either to accept or to reject the Plan. Only those votes cast by Creditors holding Allowed Claims shall be counted in determining whether acceptances have been received sufficient in number and amount to obtain Confirmation. An Impaired Class of Claims shall have accepted the Plan if (excluding any Creditor designated under section 1126(e) of the Bankruptcy Code): (a) the Creditors holding at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan, and (b) the Creditors holding more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. Creditors holding Class 3 and 4 Claims are unimpaired, are deemed to accept the Plan and are not entitled to vote. Creditors holding Class 7 and Class 8 Equity Interests shall not receive any distributions under the Plan and are therefore deemed to reject the Plan and are not entitled to vote. Because Classes 7 and 8 are deemed to reject the Plan by operation of law, the Debtors will ask the Bankruptcy Court to confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code. Without limiting the foregoing, in the event that any Class of Claims entitled to vote on the Plan fails to accept the Plan as required by section 1129(a) of the Bankruptcy Code, the Plan may be amended and, in any event, the Debtors reserve the right to seek confirmation of the Plan over such rejection pursuant to section 1129(b) of the Bankruptcy Code.

####   2.   How to Vote.

All votes to accept or to reject the Plan must be cast by using the appropriate form of

Ballot. No votes other than ones using such Ballots will be counted except to the extent ordered otherwise by the Bankruptcy Court. A form of Ballot is being provided to Creditors in Classes 1, 2, 5 and 6 by which Creditors in such Classes may vote their acceptance or rejection of the Plan. The Ballot for voting on the Plan gives Creditors holding Claims in Classes 1, 2, 5 and 6 one important choice to make with respect to the Plan – you can vote for or against the Plan. To vote on the Plan, after carefully reviewing the Plan and this Disclosure Statement, please complete the Ballot, as indicated thereon, (1) by indicating on the enclosed Ballot that (a) you accept the Plan or (b) you reject the Plan and (2) by signing your name and mailing the Ballot in the envelope provided for this purpose. Epiq Bankruptcy Solutions, LLC, as the Voting Tabulator and Balloting Agent, will count the Ballots.

In addition, Article IX of the Plan allows Creditors to grant certain releases in favor of certain third parties, such as the Debtors' Professionals, members of the Committee, and the Debtors' present or former officer, directors, employees, representatives or agents, by checking the "opt in" box on the Ballot. Creditors who check the "opt in" on the Ballot and who vote to accept the Plan will be deemed to grant the releases set forth in Article IX(J) of the Plan. If Creditors do not check the 'opt in" box on the Ballot, then they will not be deemed to consent to the releases set forth in Article IX(J) of the Plan regardless of whether they vote to accept or reject the Plan. The Committee takes no position whether Creditors should "opt-in" to the releases set forth in Section IX(J) of the Plan.

IN ORDER TO BE COUNTED, BALLOTS MUST BE COMPLETED, SIGNED AND RECEIVED BY THE DEBTORS' BALLOTING AGENT, EPIQ BANKRUPTCY SOLUTIONS, LLC, NO LATER THAN 4:00 P.M. EASTERN TIME ON DECEMBER 20, 2010, AT THE FOLLOWING ADDRESS:

If by first class mail:

Champion Enterprises, Inc., et al, Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
P.O. Box 5014
New York, NY 10150-5014

If by overnight mail or hand delivery:
Champion Enterprises, Inc., et al., Ballot Processing Center
c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017

**DO NOT SEND YOUR BALLOT VIA FACSIMILE OR E-MAIL.**

IF YOUR BALLOT IS NOT PROPERLY COMPLETED, SIGNED AND RECEIVED AS DESCRIBED, IT WILL NOT BE COUNTED. IF YOUR BALLOT IS DAMAGED OR LOST, YOU MAY REQUEST A REPLACEMENT BY MAKING A WRITTEN REQUEST TO THE ADDRESS SHOWN ABOVE. FACSIMILE OR ELECTRONICALLY TRANSMITTED BALLOTS WILL NOT BE COUNTED.

## F.    Confirmation of the Plan

### 1.    Generally.

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation.  The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed in detail below.

### 2.    Objections to Confirmation.

Any objections to Confirmation of the Plan must be in writing, conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Delaware, and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtors, counsel to the Committee and the United States Trustee on or before the date set forth in the notice of the hearing on Plan Confirmation sent to you with this Disclosure Statement and the Plan.

Counsel on whom objections must be served are:

> Counsel for the Debtors
> Laura Davis Jones, Esq.
> Pachulski Stang Ziehl & Jones LLP
> 919 North Market St., 17th Floor
> Wilmington, DE  19899-8705
>
> Henry C. Kevane, Esq.
> David M. Bertenthal, Esq.
> Pachulski Stang Ziehl & Jones LLP
> 150 California St., 15th Floor
> San Francisco, CA 94111
>
> Counsel for the Committee
> Mark D. Olivere, Esq.
> Landis Rath & Cobb LLP
> 919 N. Market Street, Suite 1800
> Wilmington, DE 19801
>
> Michael E. Hastings, Esq.
> LeClairRyan
> 1800 Wachovia Tower, Drawer 1200
> Roanoke, VA 24006
>
> United States Trustee
> 844 King Street, Room 2207
> Lockbox #35
> Wilmington, DE  19801

### 3. Hearing on Confirmation.

The Court has set December 29, 2010, at 1:30 p.m. for a hearing (the "Confirmation Hearing") to determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing will be held in Courtroom 3 of the United States Bankruptcy Court, 824 Market Street, Wilmington, DE 19801, before the Honorable Kevin Gross, United States Bankruptcy Judge. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Court confirms the Plan, it will enter the Confirmation Order.

## III.

## HISTORY, ORGANIZATION
## AND ACTIVITIES OF THE DEBTORS

### A. Overview of the Debtors and Their Operations

#### 1. Summary of the Debtors' History and Business

Before the sale of substantially all of their Assets during these Chapter 11 Cases on March 19, 2010, CEI and its debtor and non-debtor subsidiaries were international manufacturers of factory-built homes and modular buildings, with operations in the United States, Canada and the United Kingdom.[5] Buildings constructed by the Debtors consisted of both single and multi-module units designed for either commercial or residential purposes. The Debtors' products ranged from single-module homes to sophisticated commercial structures such as hotels. The Debtors' North American manufacturing operations consisted of 22 homebuilding facilities in 13 states and three provinces in western Canada. The Debtors' homes were sold through more than 1,400 independent sales centers, builders and developers across the U.S. and western Canada and also through a retail segment that operated 14 sales offices in California. Since their founding in 1953, the Debtors have built and sold more than 1.7 million homes.

The Debtors offered their products and services through five distinct operating segments. These five segments are summarized below.

**U.S. Manufacturing**. Pre-petition, The Debtors operated 17 homebuilding facilities throughout the U.S. Factory-built homes were sold through independent sales centers, builders and developers, as well as through Champion's retail segment. During 2008, The Debtors had a 7.8 percent and 11.7 percent market share of the U.S. HUD-code and modular housing markets, respectively.

**Canada Manufacturing**. Prepetition, The Debtors were the leading producer of factory-built housing in western Canada. The Canadian operations were an autonomous segment of the Debtors that manufactured factory-built homes for a diverse set of customers, including homebuyers in rural areas not traditionally served by site-built construction and regions driven by energy-related growth.

---

[5] For ease of reference the term, "the Debtors" is used in this section III(A)(1) to refer to the entire family of CEI and its subsidiaries, even though some of CEI's subsidiaries are not parties to these cases. There were, for example, no bankruptcy proceedings filed for the Debtors' Canadian manufacturing or international segments.

**Star Fleet**. Debtor SFI Liquidation Estate (f/n/a Star Fleet, Inc.) ("Star Fleet") specialized in the transportation of manufactured housing, recreational vehicles, semi trailers, flat beds, tankers, boats, conversion vans, cargo trailers, and horse trailers from manufacturing facilities to retailers. Star Fleet worked with independent owner-operators who provide and drive the equipment used to transport products for Star Fleet. At the inception of these cases, Star Fleet had over 500 customers, including several of the Debtors' plants, which accounted for 12.6 percent of Star Fleet's total net sales of $67 million during 2008.

**Retail**. The Debtors' retail segment was comprised of 14 sales offices that sold manufactured houses to consumers throughout California. These sales offices specialized in replacing older homes within manufactured housing communities with new Manufactured Homes. The Debtors' sales agents located vacant spaces and available spaces to be renovated in local communities and order a home from a manufacturer. Homes can be placed in communities without a current customer, as a customer trade-in, or as a customer order for an approved buyer. The homes were placed on the leased sites and independent contractors were engaged to prepare the home and arrange site and home improvements such as decks, porches, landscaping and air conditioning. Of the total new homes sold by the Debtors' retail segment in 2008, 88.5% were produced by the Debtors.

**International**. The Debtors' international segment ("International") was comprised of Caledonian, which was acquired in April 2006, and Caledonian's subsidiary ModularUK, which was acquired in February 2008, and constructs steel-framed modular buildings for use as prisons, military accommodations, hotels, large-scale residential units, and various other commercial and institutional applications.

## B.   Pre-Petition Capital Structure

Pre-petition, Champion financed its operations with secured debt, unsecured notes, and equity as described in detail below.

### 1.   Prepetition Secured Debt

In April of 2006, Champion Home Builders Co (now known as CHBC Liquidation Estate, "CHBC"), as borrower and CEI and certain other direct and indirect subsidiaries of CHBC, as guarantors, entered into the Prepetition Credit Agreement with various financial institutions including Credit Suisse A.G.Cayman Islands Branch as agent, (collectively the "Prepetition Lenders"). The Prepetition Credit Agreement was comprised of the following: (a) a secured U.S. term loan of approximately $45.4 million as of the Petition Date; (b) a secured Sterling denominated term loan of approximately $59.9 million as of the Petition Date; (c) a revolving line of credit in the amount of $40.0 million, of which approximately $26.6 million was drawn as of the Petition Date, and (d) a synthetic letter of credit facility in the amount of $43.1 million (inclusive of interest and fees) which supported certain letters of credit (the "Prepetition Senior Secured Debt"). The Prepetition Credit Agreement was secured by a first security interest in substantially all of the assets of the domestic operating subsidiaries of the Debtors. Each of the Debtors was a guarantor under the Prepetition Credit Agreement. As will be discussed in additional detail in Article III(G) of this Disclosure Statement, the Prepetition Secured Debt was satisfied through the sale of substantially all of the Debtors' Assets during the Chapter 11 cases.

### 2. Convertible Unsecured Notes

In the fourth quarter of 2007, CEI issued $180 million of 2.75% convertible notes due 2037 (the "Convertible Unsecured Notes") that generated $174.1 million of net proceeds. Interest on the Convertible Unsecured Notes is payable semi-annually on May 1 and November 1 of each year. The Convertible Unsecured Notes were convertible into approximately 47.7 shares of CEI common stock per $1,000 of principal. The Debtors used the proceeds from the Convertible Unsecured Notes to facilitate a tender offer for CEI's 7.625% notes due 2009 (the "2009 Secured Notes"), to reduce the amount owing under the Prepetition Credit Agreement and for general corporate purposes. As will be discussed in Article III(G), alleged irregularities in the issuance of the Convertible Unsecured Notes and the payoff of the 2009 Secured Notes is the subject of the Committee Lawsuit.

### 3. Common Stock Holdings

Pre-petition, CEI's common stock was listed on the New York Stock Exchange and the Chicago Stock Exchange. As of the Petition Date, CEI had issued approximately 77.8 million shares of common stock to approximately 3,590 shareholders of record and approximately 11,517 beneficial holders. On November 16, 2009, the NYSE suspended trading in CEI's stock.

### 4. Additional Liabilities

As of the Petition Date, the Debtors were contingently obligated for approximately $55.1 million under letters of credit, primarily comprised of $34.4 million to support insurance reserves and $12.6 million to support long-term debt. The Debtors were also contingently obligated for approximately $6.1 million under surety bonds, generally to support license and service bonding and other performance requirements, and an additional $2.0 million to support repurchase obligations.

In addition, as of October 3, 2009, CEI and its affiliated Debtors owed approximately $60.5 million in accrued expenses (excluding accrued interest of approximately $2.1 million) and approximately $12.7 million in accounts payable. Further, as of November 13, 2009, CEI and its affiliated Debtors owed approximately $40.0 million in repurchase obligations, approximately $9.3 million in dealer volume discount obligations and approximately $610,000 in warranty obligations for warranty services that have been provided as of the Petition Date in addition to approximately $2.3 million in general warranty obligations.

## C. Events Leading to Bankruptcy

The severity and breadth of the global economic downturn significantly impacted the Debtors businesses profoundly. During 2007 and 2008, the broader U.S. housing market declined considerably, with 2008 registering a 41% decline in new single-family housing starts and a 38% decline in new home sales versus 2007 levels. In addition, average selling prices in many U.S. markets saw significant declines, and inventories of unsold homes continued to increase. Industry shipments of modular homes, which are more directly impacted by conditions in the traditional housing market, totaled an estimated 21,500 homes in 2008, a decrease of 33% versus 2007. The Debtors' sales of modular homes in 2008 were 32% lower than its sales of modular homes in 2007 and 23% lower than its modular sales in 2004. Declining home prices, an

oversupply of existing homes, and financial struggles for key demographics served by the U.S. manufacturing segment continued to result in a steep decline in U.S. factory-built housing shipments during 2009.

Changes in the credit market also had a substantial negative impact on the Debtors businesses. Independent retailers of factory-built homes generally finance their inventory purchases from manufacturers using floor plan financing provided by third party lending institutions and secured by a lien on the homes. The availability and cost of floor plan financing can affect the amount of retailer new home inventory, the number of retail sales centers and related wholesale demand. During the past five years, there has been consolidation among the major national floor plan lenders resulting in a reduction of the number of national lenders available to finance inventory purchases.

During 2008, approximately 42% of the Debtors' sales to independent retailers were financed by retailers under floor plan agreements with national lenders, while the remaining 58% were financed under various arrangements with local or regional banks or paid in cash. In accordance with trade practice, the Debtors entered into repurchase agreements with each of the national lenders and with a small number of local and regional banks providing floor plan financing. As a result of the credit crisis, during the fourth quarter of 2008 each of the national floor plan lenders substantially curtailed their lending activities, and one announced its intention to exit the business in 2009. The limitation of lending has had a negative impact on the manufactured home industry.

Finally, the number of factory-built homes that are sold to consumers and related wholesale demand are significantly affected by the availability, credit underwriting standards, loan terms and cost of consumer financing. During 2008, as the credit crisis deepened, credit terms and pricing for traditional mortgages were tightened substantially resulting in a more challenging lending environment for most home buyers.

As a result of these conditions and to help ensure that day-to-day operations could continue and that an orderly sale process could be in place to preserve the value of the Debtors' Assets, the Debtors determined that it was in the best interest of the Debtors, their estates and their creditors to commence the Chapter 11 cases.

## D.     The Commencement of the Chapter 11 Cases

The Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware on November 15, 2009. No trustee or examiner has been appointed in the Chapter 11 Cases. The Committee was appointed on December 1, 2009, to represent the interests of Debtors' general unsecured creditors. The Debtors continue to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code.

## E.     First Day Motions and Other Material Relief

On the Petition Date, the Debtors sought approval from the Bankruptcy Court of certain motions and applications (collectively, the "First Day Motions"), which the Debtors filed simultaneously with, or around the same time as, their voluntary petitions. The Debtors sought

this relief to minimize disruption of the Debtors' business operations as a result of the Chapter 11 filings, to establish procedures in the Chapter 11 Cases regarding the administration of the cases, interim compensation for professionals and to facilitate reorganization efforts. Specifically, the First Day Motions addressed the following issues, among others:

1. **Joint Administration.**

On the Petition Date, the Debtors filed their *Motion for an Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* [Docket No. 2], pursuant to which the Debtors sought an order directing the joint administration of their Chapter 11 Cases and the consolidation thereof for procedural purposes only. On November 17, 2009, the Bankruptcy Court entered an order granting the relief requested [Docket No. 38].

2. **Employees.**

On the Petition Date, the Debtors filed their *Motion for Entry of an Order: (I) Authorizing the Debtor to (A) Pay Wages, Salaries and Other Compensation, (B) Maintain Employee Medical and Similar Benefits, and (C) Pay Reimbursable Employee Expenses, and (II) Authorizing and Directing Banks and Other Financial Institutions to Pay All Checks and Electronic Payment Requests Made by the Debtors Relating to the Foregoing* [Docket No. 16], pursuant to which the Debtors sought an order authorizing them to pay and/or honor certain prepetition claims for wages, salaries and other compensation, as well as to honor paid time off, fixed holidays, medical benefits, contributions to employee benefit plans, and other employee benefits that the Debtors historically paid in the ordinary course of business, to reimburse certain reimbursable unpaid employee obligations, and to pay all costs incident to the foregoing. The Bankruptcy Court entered an order approving the motion in an interim basis on November 17, 2009 [Docket No. 41] and approved the motion on a final basis by order entered December 17, 2009 [Docket No. 182].

3. **Cash Management.**

On the Petition Date, the Debtors filed their *Motion for Entry of an Order Under 11 U.S.C. Sections 105, 345, 363, 503, 1107 and 1108 Authorizing (I) Maintenance of Certain Existing Bank Accounts, (II) Continued Use of Existing Business Forms, (III) Continued Use of Existing Cash Management System; (IV) Continued Performance of Intercompany Transactions and Exercise of Intercompany Setoff Rights, (V) Grant of Postpetition Administrative Priority to Intercompany Claims, and (VI) Limited Waiver of Section 345(b) Deposit and Investment Requirements* [Docket No. 7] pursuant to which the Debtors sought an order authorizing them to maintain their existing cash management system, bank accounts and business forms. The Debtors further requested that they be excused from compliance with certain aspects of section 345(b) of the Bankruptcy Code which requires compliance with certain deposit or investment procedures. The Bankruptcy Court entered its order granting the relief requested by the motion on November 17, 2009 [Docket No. 40].

4. **Taxes.**

On the Petition Date, the Debtors filed their *Motion for Entry of an Order (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Prepetition Fees and (B) Authorizing and*

*Directing Financial Institutions to Honor Related Checks and Electronic Payment Requests* [Docket No. 13] pursuant to which the Debtors sought authority to pay, in the Debtors' sole discretion, prepetition taxes and regulatory fees, in an aggregate amount of approximately $562,000.00. The Bankruptcy Court granted the motion by order entered on November 17, 2009 [Docket No. 42].

### 5. Utilities.

On the Petition Date, the Debtors filed their *Motion for Entry of Interim and Final Orders Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures for Determining Adequate Assurance of Payment* [Docket No. 6], pursuant to which the Debtors sought an order establishing "adequate assurance" procedures for efficient administration of the Debtors' responsibilities under section 366 of the Bankruptcy Code. On November 17, 2009, the Bankruptcy Court entered its interim order implementing the procedures proposed by the Debtors [Docket No. 45]. A final order was entered on December 17, 2009 [Docket No. 186].

### 6. Retention of Customer Programs.

On the Petition Date, the Debtors filed their *Motion for Entry of an Order Authorizing the Debtors to (I) Honor Prepetition Obligations Pursuant to Their Customer Programs and (II) to Continue the Same in the Ordinary Course of Business* [Docket No. 12], pursuant to which the Debtors sought authorization to continue to honor certain programs and warranty obligations to maximize sales, engender customer loyalty, and develop and sustain brand loyalty and a positive reputation in the marketplace. The Court entered an order granting the relief requested on November 17, 2009 [Docket No. 44].

### 7. Prepetition Shipper, Freight Forwarder, and Related Obligations.

On the Petition Date, the Debtors filed their *Motion for an Order Authorizing, But Not Directing, Debtors to Pay Prepetition Claims of Shippers and Granting Related Relief* [Docket No. 21], pursuant to which Debtors sought authority to pay certain essential prepetition shipper, freight forwarder and related obligations in the ordinary course of business in the estimated amount of $700,000.00. The Bankruptcy Court entered an order granting the relief requested on November 17, 2009 [Docket No. 43].

### 8. Retention of Key Professionals.

On the Petition Date, the Debtors filed a number of applications to employ Professionals, including:

- *Application Pursuant to Section 327(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure and Local Rule 2014-1 For Authorization to Employ and Retain Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* [Docket No. 18], pursuant to which the debtors sought to retain PSZ&J as general bankruptcy counsel. An order was entered authorizing PSZ&J's retention on December 17, 2009 [Docket No. 173].

- *Application for Entry of An Order Authorizing Retention and Employment of Alvarez & Marsal North America, LLC as Financial Advisors to Debtors and Debtors in Possession Pursuant to Section 327 and 328 of the Bankruptcy Code* [Docket No. 8], pursuant to which the Debtors sought to employ Alvarez & Marsal North America, LLC ("A&M") as their financial and reorganization consultants. The Bankruptcy Court authorized A&M's retention by order entered on December 17, 2009 [Docket No. 185].

- *Application for Entry of An Order Authorizing Retention and Employment of Epiq Bankruptcy Solutions, LLC as Notice, Claims and Balloting Agent* [Docket No. 14], pursuant to which the Debtors also sought to employ Epiq Bankruptcy Solutions, LLC as noticing, claims and balloting agent. The Bankruptcy Court authorized this retention on November 17, 2009 [Docket No. 39].

## 9. Insurance Premiums.

On the Petition Date, the Debtors filed their *Motion for Entry of an Order Under 11 U.S.C. Sections 105(a), 361, 362, 363 and 364 and Federal Rule of Bankruptcy Procedure 6004(a) for an Order Authorizing: (I) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Workers' Compensation, Liability, Property and Other Insurance Programs, Including Payment of Policy Premiums and Brokers' Fees; and (II) Continuation of Insurance Premium Financing Programs* [Docket No. 26], pursuant to which the Debtors sought authority to continue to pay the premiums and fees related to existing insurance coverage, to finance certain of their insurance premiums and to enter into new insurance agreements in the ordinary course of business. The Bankruptcy Court granted the motion by order entered November 17, 2009 [Docket No. 47].

## 10. Critical Vendors.

On the Petition Date, the Debtors filed their *Motion Authorizing But Not Directing Debtors To Pay Certain Prepetition Claims of Critical Vendors* [Docket No. 9], pursuant to which the Debtors sought authority to pay, in their sole discretion, an estimated $5.4 million in prepetition claims of certain vendors whose continued assistance was critical to the Debtors' reorganization efforts. The Bankruptcy Court granted the motion by order entered November 17, 2009 [Docket No. 49].

## 11. DIP Credit Agreement and Cash Collateral Use.

At the inception of these Cases, the Debtors owed approximately $187 million under the Prepetition Credit Agreement, as well as $42.1 million under their synthetic letter of credit facility, plus, in each case, certain interest and fees, and all of the Debtors' Assets, including all of their cash, were encumbered by perfected, first priority security interests in favor of the Prepetition Lenders. The Debtors required the use of the Prepetition Lenders' cash collateral and additional borrowings to operate efficiently as they liquidated their assets. Unable to find debtor-in-possession financing from a third party source, the Debtors and Prepetition Lenders negotiated and agreed on terms pursuant to which the Debtors could use their cash collateral and borrow addition post-petition funds, and on the Petition Date, the Debtors filed their *Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 365: (1) Authorizing Debtors to (A) Obtain Post-Petition Financing, and (B) Grant Senior Liens, Junior*

*Liens and Superpriority Administrative Expense Status; (II) Approving Use of Cash Collateral; (III) Granting Adequate Protection to Certain Prepetition Secured Parties; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 24] (the "DIP Financing Motion").

Pursuant to the DIP Financing Motion, the Debtors sought authority to borrow from the DIP Lenders: (i) up to $2 million in a synthetic letter of credit facility ("DIP LCs") upon entry of an interim order, (ii) up to $38 million in principal amount of new money loans (the "New Money Loan"), of which up to $30,335,052 in principal amount was to be advanced upon entry of an interim order, and the closing date with the remaining balance made available upon entry of a final order, and (iii) a dollar-for-dollar roll-up of up to $40 million in principal amount of outstanding prepetition loans and other credit extensions under the Prepetition Credit Agreement of the Prepetition Lenders (and/or their affiliates) who agreed to find the New Money Loans and the DIP LCs (the "Roll-Up Loan"), plus an additional principal amount equal to any amount of interest on the Roll-Up Loans that was paid in kind (the Roll-Up Loan, the New Money Loan and the DIP LCs, are collectively, the "DIP Loan"). In addition, as discussed above, the DIP established a Carve Out Account for the payment of certain Professional Fee Claims.

On November 17, 2009, the Bankruptcy Court entered its First Interim Order [Docket No. 50], which authorized the Debtors' use of cash collateral and additional borrowings under the DIP Loan pursuant to the terms of the budget, and granted certain adequate protection to the Prepetition Lenders on an interim basis. The Bankruptcy Court entered its Second Interim Order on December 18, 2009 [Docket No. 204], and its Final Order approving the DIP Motion on January 6, 2010 [Docket No. 244] (collectively, the DIP Orders")]. On January 21, 2010, the Debtors filed their *Emergency Motion to Approve Consensual Third Amendment to DIP Credit Agreement* [Docket No. 300]. The Bankruptcy Court granted the requested relief by order entered on February 4, 2010 [Docket No. 364].

### 12.    503(b)(9) Claims.

On the Petition Date, the Debtors filed their *Motion of the Debtors and Debtors in Possession for an Order Authorizing Payment in the Ordinary Course of (I) Section 503(b)(9) Claims and (II) Certain Obligations for the Postpetition Delivery of Goods and Services* [Docket No. 25], pursuant to which the Debtors sought authority to pay, in the Debtors' discretion, vendors who delivered goods to the Debtors in the ordinary course of business during the twenty-day period prior to the Petition Date but had not received payment for such goods by the Petition Date. The 503(b)(9) Claims were estimated by the Debtors to be approximately $6.6 million. The Bankruptcy Court granted the motion by order entered November 17, 2009 [Docket No. 48].

### F.    Official Committee of Unsecured Creditors.

On December 1, 2009, the U.S. Trustee appointed the Committee as the representative of the Debtors' general unsecured creditor constituency in the Chapter 11 Cases [Docket No. 90, amended by Docket Nos. 243, 646 and 797]. The Committee is composed of Wells Fargo Bank, N.A., Citadel Equity Fund Ltd., Citadel Convertible Opportunities Ltd. and Palace Sports & Entertainment. The Committee retained LeClair Ryan, PC [Docket No. 286] and Landis, Roth & Cobb LLP. [Docket No. 287] as co-counsel, Chanin Capital Partners as financial advisors [Docket No. 359] and Milberg LLP as special litigation counsel [Docket No. 588], and Pinckney,

Harris, Weidinger, LLP as conflicts counsel [Docket No. 837] to assist in its involvement in these Chapter 11 Cases.

## G.     The Sale of Substantially All of the Debtors' Assets.

On the Petition Date, the Debtors also filed two motions related to the disposition of substantially all their assets:

(1)     *Debtors' Motion to Approve: (A) Bidding Procedures for the Sale of the Debtors' Assets; (B) Scheduling an Auction and Hearing to Consider the Sale and Approve the Form and Manner of Notice Related Thereto; (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (D) Approving Certain Expense Reimbursement Provisions and Breakup Fee; and (E) Granting Related Relief* [Docket No. 272] (the "Sale Procedures Motion") and

(2)     *Debtors' Motion for Order: (I) Approving Asset Purchase Agreement and Authorizing the Sale of Assets Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 273] (the "Sale Motion"). A supplement to the Sale Motion was filed on February 23, 2010 [Docket No. 448].

By these motions, the Debtors sought authority to sell substantially all their assets (the "Sale") pursuant to that certain Asset Purchase Agreement between Champion Enterprises Holdings, LLC ("Champion Holdings") and New Champion Homes, Inc. ("Champion Homes") as Buyers, and Champion Enterprises, Inc. and Certain Subsidiaries of Champion Enterprises, Inc. as Sellers dated as of February 5, 2010 (the "Asset Purchase Agreement") [Docket No. 380]. Champion Homes and Champion Holdings (collectively, the "Buyer") are comprised of an investor group that includes the Prepetition Lenders, the DIP Lenders and affiliates of Centerbridge Partners, L.P., MAK Capital Fund LP and Sankaty Advisors, LLC, who invested $50 million in new capital in the acquiring entity. Pursuant to the Asset Purchase Agreement, the Prepetition Lenders and the DIP Lenders authorized the Buyer to credit bid the amount of the debt owing to them under the Prepetition Credit Agreement ($148,305,112.89) and the DIP Loan ($80,796,107.16). The Buyer also assumed numerous of the Debtors' liabilities (defined under the Asset Purchase Agreement as the "Assumed Liabilities") including but not limited to certain employee obligations, certain trade payables, 503(b)(9) Claims, certain trust fund taxes, cure obligations pursuant to section 365 of the Bankruptcy Code, with respect to contracts assumed by the Buyer under the Asset Purchase Agreement, and certain repurchase and warranty obligations. In addition, under the Asset Purchase Agreement, the Buyer agreed to fund the wind down facility in an amount up to $2.516 million (the "Wind Down Facility") to be used solely to pay certain post-closing wind-down liabilities of the Debtors, subject to and in accordance with the Asset Purchase Agreement and the Wind Down Budget. Excluded from the Sale were, *inter alia*, certain non-assumed contracts, certain documents, the Carve-Out Account (other than certain excess carve out cash pursuant to the terms of the Asset Purchase Agreement) and monies

deposited therein for payment of finally allowed Professional Fee Claims (except for certain excess carve-out cash to be remitted to the Buyer pursuant to the terms of the Asset Purchase Agreement), certain avoidance claims arising under the Bankruptcy Code or applicable state law, certain stock holdings, and certain other causes of action, the Committee Lawsuit, the Debtors' rights under the Asset Purchase Agreement, certain insurance policies and the properties and assets listed on Schedule 1.3(i) of the Asset Purchase Agreement. In consideration for contributing their credit bid, the Prepetition Lenders and the DIP Lenders received 40% of the equity in Champion Holdings and were issued $40 million in term loans ("New Debt Facility").

The Bankruptcy Court granted the Debtors' Sale Procedures Motion by order entered on February 8, 2010 [Docket No. 386], which order approved, among other things, the stalking horse bid and the bidding and notice procedures, and established February 24, 2010 as the date by which competing bids must be submitted. No competing bids were submitted by the deadline, and on March 1, 2010, the Debtors conducted an auction at which the Buyer was the successful bidder. The Bankruptcy Court held a hearing on the Sale on March 2, 2010 (the "Sale Hearing") and entered its order approving the Sale that same day [Docket No. 517] (with a supplemental order entered on March 24, 2010 [Docket No. 589]). The Committee objected to the Sale and to resolve its objections, the Debtors, the Buyer and the Committee agreed on the record at the Sale Hearing that the Committee's rights under the Committee Lawsuit (as further described below) would not be released or otherwise compromised by the Sale and that the Committee's claims for equitable subordination in the Committee Lawsuit would be limited to the $40 million New Debt Facility. The Sale closed on March 19, 2010 (the "Closing").

## H.  **The Committee Lawsuit**

On February 18, 2010, the Committee filed a complaint, amended on March 22 (the Complaint"), against lenders to a certain pre-petition credit agreement, dated October 31, 2005, which was amended and restated on April 7, 2006 (the "Credit Agreement"), in the United States Bankruptcy Court in the District of Delaware. The adversary proceeding number is 10-50514. The following discussion of the complaint is based on a description supplied by the Committee and does not necessarily reflect the Debtors' position with respect to the Complaint.

In the Complaint, the Committee alleges that the lenders (the "Lending Group") to the Credit Agreement, including Credit Suisse, engaged in a pattern of inequitable conduct that forced Champion into amendments to the Credit Agreement and caused Champion to issue a materially false and misleading prospectus for a notes offering that effectively enabled the Lending Group to increase its collateral position, obtain a substantial recovery on its Credit Facility, and transfer its credit risk to the Debtors' other creditors. Furthermore, the Committee alleges that MAK purchased substantial amounts of Champion's obligations under the Credit Agreement at a distressed price in contravention of the Credit Agreement, and did so not as a creditor seeking to maximize its recovery on its secured claim but rather as a strategic move to purchase all or a controlling interest in Champion at a favorable price.

The Complaint seeks damages in an amount no less than $100,000,000, which the Committee alleges the Lending Group drained from the Debtors' Estates through a series of amendments to the Credit Agreement, the redemption of the 2009 Notes and a series of payments to and transactions that benefitted the Lending Group. Specifically, the Complaint asserts claims

to equitably subordinate the Lending Group's secured claims and MAK's secured and unsecured claims against the Debtors to the claims of the General Unsecured Creditors, to equitably subrogate the holders of the Subordinated Notes, who effectively funded the redemption of the 2009 Notes, to the holders of the 2009 Notes, for damages for Credit Suisse's breach of the Credit Agreement, for unjust enrichment by the Lending Group due to the redemption of the 2009 Notes, to recover fraudulent transfers made by the Debtors to the Lending Group, including prepayments, fees, and expenses in connection with the amendments to the Credit Agreement, and transfers of collateral to the Lending Group, to recover preferential transfers made by the Debtors to the Lending Group, to avoid the Lending Group's unperfected security interests and to disallow all claims of the Lending Group against the Debtors.

On May 14, 2010, Credit Suisse and other members of the Lending Group filed motions to dismiss (the "Motions to Dismiss") the Complaint, seeking the dismissal of all the causes of action asserted by the Committee. The Committee filed its opposition brief to the Motions to Dismiss on June 14, 2010 and Credit Suisse and other members of the Lending Group filed reply briefs on June 29, 2010. A hearing on the defendants' Motions to Dismiss was held on July 14, 2010. On September 1, 2010, the Bankruptcy Court issued its opinion and order dismissing all causes of action except Count VI (breach of contract) against Credit Suisse and Count XII (disallowance of claims) against Credit Suisse. The Committee continues to prosecute the Committee Lawsuit.

## I.    Other Asset Sales.

On January 28, 2010, the Debtors filed their *Motion for Entry of an Order Approving (1) the Debtor's Retention of Moody Realty Co., Inc. as the Debtors' Broker with respect to Real Property in Henry, Tennessee, (2) the sale of the Real Property, and (3) the First and Final Fee Application of Moody Realty Co.* [Docket No. 331], pursuant to which, the Debtors sought to sell real property located in Henry, Tennessee for a price of $142,500 and to pay the associated broker's commission. The Bankruptcy Court approved the motion by order entered on February 17, 2009 [Docket No. 415]. The sale closed on March 1, 2010.

## J.    Unexpired Leases and Executory Contracts.

The Debtors have filed numerous motions seeking to reject unexpired leases of real property and/or executory contracts, which motions were grated by the Court [Docket Nos 285, 288, 417, 418, 586, 587, 873].

## K.    Bar Dates for Filing Proofs of Claim

The Bankruptcy Court entered an order on March 10, 2010 [Docket No. 544] which established May 11, 2010 as the deadline for filing Proofs of Claim for any Claims against the Debtors that arose before the Petition Date (including WARN Act Claims and excluding the claims of governmental entities), May 14, 2010 as the deadline for filing Proofs of Claim for any Claims against the Debtors of governmental entities, and May 11, 2010 as the deadline to file requests for payment of administrative expense claims (other than claims for fees and expenses of Professionals retained in the Chapter 11 Cases and members of the Committee) arising between the Petition Date and March 31, 2010. It also set the later of (i) May 11, 2010, or (ii) thirty days after the entry of an order approving rejection for claims based on the rejection of an

executory contract or unexpired lease. A schedule of the filed Proofs of Claims is maintained by Epiq Bankruptcy Solutions, LLC, the Debtors' noticing and claims agent.

**L.    Deadline Extensions**

On February 17, 2010 the Debtors' request for an extension of the deadline to assume or reject unexpired leases and executory contracts was granted. Per the Court's *Order Extending Deadline to Assume or Reject Unexpired Leases of Nonresidential Real Property Pursuant to Section 365(d)(4) of the Bankruptcy Code*, the deadline was extended to June 13, 2010 [Docket No. 416].

The Debtor also sought and obtained extensions of the deadline to remove actions pursuant to 28 U.S.C. Section 1452. By order entered on August 16, 2010, the deadline was extended to December 31, 2010 [Docket No. 895].

Finally, on March 10, 2010, the Debtors filed their first *Motion for an Order Pursuant to 11 U.S.C. Section 1121(D) Extending the Time Periods During Which the Debtors Have the Exclusive Right to File a Plan and Solicit Acceptances Thereto*, pursuant to which they sought to extend by one hundred twenty days the period under section 1121(b) of the Bankruptcy Code during which the Debtors have the exclusive right to file a Chapter 11 plan (the "Exclusive Filing Period") and the period under section 1121(c)(3) of the Bankruptcy Code during which the Debtors have the exclusive right to solicit acceptances of a Chapter 11 plan (the "Exclusive Solicitation Period," together with the Exclusive Filing Period, the "Exclusive Periods"). Specifically, they sought to extend the Exclusive Filing Period from March 15, 2010, through and including July 13, 2010, and to extend the Exclusive Solicitation Period from May 14, 2010, through and including September 11, 2010. By numerous orders extending the Exclusive Periods, the Exclusive Filing Period has been extended to October 12, 2010 and the Exclusive Solicitation Period has been extended to December 10, 2010 [Docket No. 836].

**M.    Name Change**

On April 22, 2010, the Debtors filed their *Motion for the Entry of an Administrative Order Changing Corporate Names and Revising Case* Caption [Docket No. 671], pursuant to which certain of the Debtors sought to change their names, and to revise the caption of their bankruptcy cases to reflect the name change of Champion Enterprises, Inc. to the "CEI Liquidation Estate." The motion was approved by order entered on May 13, 2010 [Docket No. 731].

**N.    Appointment of Estate Administrator**

The Debtors also sought and received authority to employ Jack B. Fishman as Estate Administrator *nunc pro tunc* to March 19, 2010. The terms of the court-approved sale of substantially all of the Debtors' assets to the Buyer required the engagement of an estate administrator to undertake all necessary and appropriate actions to wind down the Debtors as such may be defined in the Asset Purchase Agreement, any plan of reorganization or liquidation or other relevant documents as such may be agreed to by the Estate Administrator and other appropriate parties. The Court approved the employment of Mr. Fishman as Estate Administrator by order entered on April 20, 2010 [Docket No. 656].

## O. Other Postpetition Activities

After the Petition Date, the Debtors directed substantially all of their efforts, and all of the efforts of their professionals, toward streamlining and reducing operations, reducing costs, and liquidating their hard assets and remaining operations. The Debtors' overarching goal was to maximize the value of such assets while minimizing the expenses associated with maintaining such assets. Specifically, the Debtors have rejected numerous executory contracts and/or unexpired leases and defended motions for relief from stay, and compromised and/or objected to claims.

## IV.

## DESCRIPTION OF THE PLAN

A DISCUSSION OF THE PRINCIPAL PROVISIONS OF THE PLAN AS THEY RELATE TO THE TREATMENT OF CLASSES OF ALLOWED CLAIMS AND EQUITY INTERESTS IS SET FORTH IN ARTICLES IV THROUGH XV BELOW. THE DISCUSSION OF THE PLAN THAT FOLLOWS CONSTITUTES A SUMMARY ONLY AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. YOU ARE URGED TO READ THE PLAN IN FULL TO EVALUATE WHETHER TO ACCEPT OR REJECT THE DEBTORS' PROPOSED PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THIS SUMMARY AND THE PLAN, THE TERMS OF THE PLAN CONTROL. ALL CAPITALIZED TERMS NOT OTHERWISE DEFINED HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

## V.

## SUMMARY OF DISTRIBUTABLE ASSETS

## A. Introduction

This is a liquidating Plan. Virtually all of the Debtors' Assets were sold to the Buyer pursuant to the Asset Purchase Agreement, and the Debtors' primary secured debts (the obligations under the Prepetition Credit Agreement and the DIP Credit Agreement) were extinguished and released as a part of the sale. Certain administrative and contractual liabilities of the Debtors were assumed by the Buyer under the Asset Purchase Agreement. Additionally, the Buyer, pursuant to the Asset Purchase Agreement, agreed to fund a Wind Down Facility of up to $2.516 million to satisfy certain post-closing obligations of the Debtors subject to and consistent with the Wind Down Budget. With the exception of certain Cash on hand and funds derived from the Carve Out Account and the Wind Down Facility (except for any funds which shall be reapid or remitted to the Buyer pursuant to an in accordance with the Asset Purchase Agreement), the Debtors' primary remaining assets are any Avoidance Actions and the Committee Lawsuit.

Under the Plan, the Committee Lawsuit will be transferred to the Creditor Trust for continued prosecution and liquidation. In addition, certain Avoidance Actions that may be commenced by the Debtors prior to the Effective Date (referred to under the Plan as the Estate Avoidance Actions) will be prosecuted by the Liquidating Debtors for the principal purpose of

satisfying any otherwise unpaid administrative, professional and priority claims (or portions thereof) as well as Plan Expenses (i.e., expenses of the Liquidating Debtors following the Effective Date). All other Avoidance Actions will be transferred to the Creditor Trust for continued prosecution and liquidation. At such time as the Estate Administrator determines that all administrative and priority claims will be fully satisfied from the Estate Assets, and that sufficient funding exists for accrued and anticipated Plan Expenses, any unresolved Estate Avoidance Actions may then be turned over to the Creditor Trust.

The Plan contemplates the substantive consolidation of all Debtors except CEI (the parent Debtor). Creditors with Unsecured Claims against the Consolidated Debtors are classified in Class 5 of the Plan and Creditors with Unsecured Claims against CEI are classified in Class 6 of the Plan. The Creditor Trustee will segregate the assets and liabilities of the Consolidated Debtors and the assets of CEI and will make distributions to the Creditors of each in accordance with the assets, if any, available to satisfy the Claims of Unsecured Creditors of CEI and the Consolidated Debtors, respectively. Distributions to Class 5 Creditors will be made from the Consolidated Debtors' Distributable Trust Assets. Likewise, Distributions to Class 6 Creditors will be made from the CEI Distributable Trust Assets.

The Creditor Trustee will seek Bankruptcy Court approval for its proposed allocation of Creditor Trust Assets between CEI and the Consolidated Debtors. The trustee, however, also has the authority to propose an "inter-estate" settlement (among, on the one hand, CEI, and, on the other hand, the Consolidated Debtors), that (a) compromises, withdraws, offsets or extinguishes any Intercompany Claims, (b) substantively consolidates, in whole or in part, CEI into the Consolidated Debtors, (c) transfers any potential surplus available after Claims against the Consolidated Debtors are paid in full to satisfy Claims against CEI, or (d) otherwise achieves a comprehensive allocation of Creditor Trust Assets for Distributions among the holders of Allowed Claims in Classes 5 and 6. The Creditor Trustee will seek the approval of the Bankruptcy Court for any such "inter-estate" settlement. Nothing in the Plan or the Creditor Trust Agreement will affect the rights of any party in interest, including the Creditor Trustee, to object to any such "inter-estate" settlement or otherwise seek or oppose the full substantive consolidation of CEI into the Consolidated Debtors.

*The value of the Creditor Trust Assets (the Committee Lawsuit and any Avoidance Actions that are not Estate Avoidance Actions) is speculative and there is no assurance that such assets will generate any Litigation Proceeds for Distribution to the Holders of Class 5 and Class 6 Claims.* Under the Plan, Creditor Trust Expenses (i.e., expenses related to the administration of the Creditor Trust and the fees and expenses of its Professionals) are payable from the Creditor Trust Assets before any Distributions to Unsecured Creditors. In addition, in the event the Estate Assets are insufficient to satisfy administrative, professional and priority Claims under the Plan (or the Plan Expenses of the Liquidating Debtors), such costs may also become Creditor Trust Expenses payable prior to Distributions to Unsecured Creditors. Last, the Contingency Fee is also payable from the Litigation Proceeds of the Committee Lawsuit and might further reduce the amount of Creditor Trust Assets available for Distribution to Unsecured Creditors.

The Debtors and the Committee believe, however, that the Plan provides a superior alternative to Creditors than conversion to Chapter 7 since parties that are intimately familiar with the nature of the Litigation assets transferred to the Creditor Trust will remain responsible